1 (Pages 1 to 4)

**DIANA L. FIELDS - July 6, 2006**

---

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
 2             URBANA DIVISION
 3   MARGARET J. STILWELL,      *
            Plaintiff,          *
 4                              *
        VS.                     *  NO. 05-CV-02160
 5                              *
     AMERICAN GENERAL LIFE       *
 6   INSURANCE CO.,              *
            Defendant.           *
 7
 8   *****************************************************
 9
           ORAL DEPOSITION OF
10
           DIANA L. FIELDS
11
           JULY 6, 2006
12
13   *****************************************************
14
15   ORAL DEPOSITION OF DIANA L. FIELDS, produced as a witness at
16   the instance of the Plaintiff, and duly sworn, was taken in
17   the above-styled and numbered cause on the 6th day of July,
18   2006, from 8:52 a.m. to 11:15 a.m., before LaRita J.
19   Cormier, Certified Shorthand Reporter in and for the State
20   of Texas, reported by stenographic means, at the law offices
21   of WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, 5847 San
22   Felipe, Suite 2300, Houston, Texas 77057, pursuant to the
23   Federal Rules of Civil Procedure and the provisions stated
24   on the record or attached hereto.
25
```

---

**Page 3**

I N D E X

```
                                         PAGE
APPEARANCES...................................   02
EXAMINATION
     By Mr. Crowder...........................   04
CHANGES.......................................   90
SIGNATURE.....................................   91
REPORTER'S CERTIFICATE........................   92
```

---

**Page 2**

```
               A P P E A R A N C E S


FOR THE PLAINTIFF:
   Mr. Jason M. Crowder
   HELLER, HOLMES & ASSOCIATES, P.C.
   1101 Broadway
   Mattoon, Illinois 61938
   Phone:  217.235.2700
   Fax:    217.235.0743


FOR THE DEFENDANT:
   Mr. Daniel J. McMahon
   WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
   120 North LaSalle Street
   Chicago, Illinois 60602
   Phone:  312.704.0550
   Fax:    312.704.1522
```

---

**Page 4**

```
 1                DIANA L. FIELDS,
 2   having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4   BY MR. CROWDER:
 5      Q.  Could you go ahead and state your name for the
 6   record?
 7      A.  Diana Fields.
 8      Q.  Okay.  And where do you work?
 9      A.  American General, AIG.
10      Q.  Where are you currently located for work purposes?
11      A.  Allen Parkway.
12      Q.  And where is that, what town?
13      A.  Oh, Houston.  I'm sorry.
14      Q.  Okay.  How long have you been at this office?
15      A.  Thirty years.
16      Q.  Can you go through your background for me, your
17   educational background?
18      A.  I graduated high school and have two years of
19   junior college.
20      Q.  Okay.  And where did you go to junior college?
21      A.  San Jac, San Jacinto Junior College.
22      Q.  Where is that located?
23      A.  In Houston.
24      Q.  What year did you complete junior college?
25      A.  I don't remember.
```

---

**RIVERSIDE REPORTING, INC.**
713.626.2629

DEFENDANT'S
EXHIBIT
"3"

## DIANA L. FIELDS - July 6, 2006

5

1  Q. All right. Do you know approximately when that
2  was?
3  A. No, sir.
4  Q. Okay. Do you recall -- what year did you graduate
5  from high school?
6  A. '76.
7  Q. And did you go directly to junior college?
8  A. Yes, sir.
9  Q. Okay. And did you complete two years
10 consecutively?
11 A. No, sir.
12 Q. How many years do you recall going to junior
13 college, or what period of time?
14 A. I don't remember.
15 Q. Okay. When did you -- you said you've been at
16 this office for 30 years. Is that how long you've been with
17 American General?
18 A. Yes, sir.
19 Q. Do you recall your start date, then?
20 A. June 1st.
21 Q. Of what year?
22 A. 1976.
23 Q. Can you tell me your progression through the
24 company, what different positions you've held and when you
25 held them?

6

1  A. Yes, sir. I was a -- started in the mailroom of
2  the claims department, up through what I'm currently doing
3  now.
4  Q. Okay. What's your current position?
5  A. Senior claims analyst.
6  Q. How many positions did you hold between being in
7  the mailroom to senior claims analyst?
8  A. Three.
9  Q. Okay. Tell me about those and when you had them,
10 when you held those positions.
11 A. I can't tell you the years. Over 30 years. The
12 mailroom, and then I was the death claim clerk, and then I
13 became an examiner.
14 Q. Approximately when did you become an examiner,
15 claims examiner?
16 A. Don't remember.
17 Q. Do you recall what your job responsibilities were
18 as a claims examiner?
19 A. Yes, sir.
20 Q. Okay. Can you go through those for me.
21 A. To review and pay claims that were payable.
22 Q. Okay. What, if any, training did you receive in
23 that regard?
24 A. On the job.
25 Q. Were these all life insurance policies?

7

1  A. Yes, sir.
2  Q. It appeared that Old Line somehow became merged
3  with American General. Do you recall when that took place?
4  A. Approximately 2003.
5  Q. Okay. Have you ever had your deposition taken
6  before?
7  A. Yes, sir.
8  Q. How many times?
9  A. Four or five.
10 Q. And what were they related to? Claims being made
11 against American General?
12 A. Yes, sir.
13 Q. Okay. And were they with respect to the way
14 American General handled the claims?
15 A. They were in regards to the decision that was made
16 on the claim.
17 Q. Were those depositions all down here in Houston?
18 A. With the exception of one.
19 Q. Okay. Where was it?
20 A. Little Rock, Arkansas.
21 Q. Do you know why you did it up in Little Rock?
22 A. No, sir.
23 Q. Somebody told you to go and you went?
24 A. (The witness nods head.)
25 Q. Have you ever testified in court?

8

1  A. Yes, sir.
2  Q. Okay. How many times?
3  A. Twice.
4  Q. And where were those located?
5  A. One was in Conroe, Texas. The other one was in a
6  small town outside of Nashville, Tennessee. I don't
7  remember the name of the town.
8  Q. Do you remember the names of the policies?
9  A. No, sir.
10 Q. When did you become or when did you start your or
11 when did you become the senior claims analyst?
12 A. Approximately three years ago. They renamed the
13 position.
14 Q. Okay. And what was the position before then?
15 A. Claim investigator.
16 Q. And do you recall when you started that position?
17 A. No, sir.
18 Q. Have you essentially held every position in the
19 claims department you can hold?
20 A. No, sir.
21 Q. Okay. But you're familiar with the claims process
22 inside and out, would you agree?
23 A. The life claims process, yes, sir.
24 Q. Okay. Can you tell me the difference between
25 being a claims examiner and a claims investigator? What are

DIANA L. FIELDS - July 6, 2006

9

1  the differences there?
2      A. The claims investigator handled the contestable
3  claims, the foreign deaths, homicides.
4      Q. And then a claim investigator handles what kind?
5      A. Oh, that's what the claims investigator handles.
6  I'm so sorry.
7      Q. You may have said claims investigator, but I
8  thought you said claims examiner, so let's clear that up.
9  What's the difference, again, between being a claims
10 examiner and a claims investigator?
11     A. Claims examiner just handles the regular, ordinary
12 death claims. The claims investigator handles the
13 contestable death claims, the homicides, and foreign deaths.
14     Q. Then when they changed the name of the position to
15 senior claims analyst, did that change your responsibilities
16 in any way from a claims investigator to a senior claims
17 analyst?
18     A. No, sir.
19     Q. Okay. Prior to today's deposition did you review
20 any documents to familiarize yourself with this particular
21 life insurance policy?
22     A. Yes, sir, briefly.
23     Q. Okay. You understand that it's the life insurance
24 policy for James E. Stilwell; correct?
25     A. I know it's Mr. Stilwell. I don't know what his

10

1  first name is.
2      Q. Okay. And it was a policy that was $4 million in
3  the aggregate; correct?
4      A. Yes, sir.
5      Q. Okay. And there were a number of claims made
6  against that policy; correct?
7      A. From what I recall, yes, sir.
8      Q. Okay. Do you recall what documents you reviewed
9  in preparation for your deposition?
10     A. I briefly went through the whole file. The ones I
11 actually looked at were the letters that I wrote.
12     Q. Do you recall how many letters you were talking
13 about?
14     A. Two.
15     Q. Do you recall who those were addressed to?
16     A. I believe, you.
17     Q. Now, when you looked through the entire -- you
18 said briefly looked through the entire file, was it a hard
19 copy file or was it basically on a computer screen, pulling
20 it up?
21     A. It was a hard copy.
22     Q. Okay. When you get involved, do you get a hard
23 copy or do you -- and this is during your normal activities
24 as a senior analyst, are you looking at hard copies or are
25 you looking at a computer screen when you get involved?

11

1      A. Hard copy, usually.
2      Q. Okay. Do you have the capability from your desk
3  to print anything from a claims file off the computer?
4      A. Yes, sir.
5      Q. Did you look back --
6          MR. McMAHON: I want to clarify something
7  here. Forgive me for interjecting, because I just don't
8  want to leave a misapprehension. When you're referring
9  to a hard copy it is off of an imaged file; right?
10         THE WITNESS: Yes, sir.
11         MR. McMAHON: I want to make sure I
12 understand it.
13     Q. (BY MR. CROWDER) Why don't we go through that a
14 little bit. When a document comes in to American General,
15 can you tell me what happens to that document?
16     A. It's scanned in and then assigned to the
17 appropriate examiner.
18     Q. Can you explain how it -- how when it's scanned in
19 it gets to the appropriate file like the Stilwell insurance
20 policy file?
21         MR. McMAHON: I'll object to lack of
22 foundation.
23         You can go ahead and answer.
24     A. I don't know how it does.
25     Q. (BY MR. CROWDER) What department scans it in?

12

1      A. The scan center.
2      Q. Is that located where? The scan center is located
3  here in Houston?
4      A. Oh, yes, sir. I'm sorry.
5      Q. I understand that American General has a few
6  satellite or other locations; correct?
7      A. Yes, sir.
8      Q. Seems like there was perhaps a location in Dallas
9  as well?
10     A. Yes, sir.
11     Q. Let me just hand you document number -- AIG
12 document No. 288. The only thing I'm really curious about
13 is the numbers here at the top, top right corner. Are those
14 the -- is that the information that gets placed on a
15 document once it's scanned in?
16         MR. McMAHON: Objection. Lack of
17 foundation.
18         You can answer it if you know.
19     A. I don't know when it's put on there.
20     Q. (BY MR. CROWDER) But by the time you see it's
21 on there?
22     A. Yes, sir.
23     Q. Okay. Can you explain the top line of those two
24 lines that are placed on there?
25     A. The first part of it is the date. The other I

DIANA L. FIELDS - July 6, 2006

13

1  don't know what it is.
2      Q.  "The first part of it," when you say that, you're
3  talking about the top line of the two lines that are placed
4  on there by AIG?
5      A.  The first part of the top line.
6      Q.  Okay.  Let me have that document back real quick.
7  So when you talk about the first part, you're talking about
8  9-12-03; is that correct?
9      A.  Yes, sir.
10     Q.  Okay.  And that would indicate the date that it
11 was scanned in; correct?
12             MR. McMAHON:  Objection.  Lack of
13 foundation.
14     A.  Yes, sir.
15     Q.  (BY MR. CROWDER)  And what you're saying is you
16 don't know what the 1121 number references?
17     A.  No, sir.
18     Q.  Is that correct?
19     A.  Yes, sir.
20     Q.  Okay.  And then what about the second line, do you
21 know what that references?
22     A.  No, sir.
23     Q.  I take it, then, that those have no — in terms of
24 your evaluation of a file, these lines don't have a lot of
25 importance to you?

14

1      A.  No, sir.
2      Q.  Is that correct?
3      A.  Yes, sir.
4      Q.  Do you have any idea what happens to the original
5  document once it's scanned in?
6      A.  Yes, sir.
7      Q.  What happens?
8      A.  It's shredded.
9      Q.  So anything that would have an original signature
10 on it would be shredded once it was scanned in?
11     A.  Yes, sir.
12     Q.  Based on your review of the Stilwell file in
13 preparation for the deposition, do you recall when you first
14 had involvement in that file?
15     A.  I don't remember the date.
16     Q.  Do you recall if it was during the processing of
17 the claims that were being made after Mr. Stilwell's death?
18     A.  No, sir.
19     Q.  It was after — it was after the claims had been
20 paid, then, to your recollection?
21     A.  Yes, sir.
22     Q.  There was a point in time after claims had been
23 paid when I had submitted a subpoena to get the claims file.
24 Were you involved in any way once that subpoena was sent to
25 American General?

15

1      A.  No, sir.
2      Q.  Would your involvement, then, with this particular
3  claim file have been shortly before you drafted one of the
4  two letters that you — the first of the two letters that
5  you drafted in this case?
6             MR. McMAHON:  Object to the form.
7             You can go ahead and answer.
8      A.  Yes, sir.
9      Q.  (BY MR. CROWDER)  Do you recall receiving any
10 letters from me in this case?
11     A.  No, sir.
12     Q.  If I would have drafted you a letter, would that
13 have been made part of the claims file, to your knowledge?
14     A.  To my knowledge, yes, sir.
15     Q.  Do you recall why you got involved in the case,
16 then?
17     A.  No, sir.
18     Q.  Was it prompted by a call from me, or do you have
19 any recollection of why you took a role in this case?
20     A.  I do not recall.
21     Q.  Do you know what documents you reviewed and what
22 you analyzed and who you talked to in preparing your
23 letters?
24     A.  No, sir.
25     Q.  Okay.  Do you recall talking to anybody?

16

1      A.  I don't recall.
2      Q.  Let me hand you a document from the claims file
3  that I received, documents — it's one document, pages 288
4  through 290, and ask you to take a look at that briefly.
5      A.  Okay.
6      Q.  Have you reviewed that document before?
7      A.  No, sir.
8      Q.  You've never seen that letter before?
9      A.  No, sir.
10     Q.  And you've never had any -- in terms of your
11 review of the file, you've never had occasion to read that
12 record or read that document?
13     A.  Not that I recall, no, sir.
14     Q.  Hand you AIG document 291 and 292, ask you if you
15 have ever read that document.
16             MR. McMAHON:  If you recall.
17     A.  No, sir, not that I recall.
18     Q.  (BY MR. CROWDER)  Hand you AIG document No. 330.
19 Have you ever seen that document before?
20     A.  No, sir.
21     Q.  And do you know whose handwriting is on that
22 document?
23     A.  No, sir.
24     Q.  It's not your handwriting; is that correct?
25     A.  No, sir.

DIANA L. FIELDS - July 6, 2006

17

1    Q. That is correct?
2    A. I mean, that is correct.
3    Q. Do you understand that this case, this claim file
4  involved collateral assignments that are issued by the
5  owner of the policy?
6    A. Yes, sir.
7    Q. Okay. I take it you've dealt with collateral
8  assignments in other files before?
9    A. Yes, sir.
10    Q. Okay. Would a collateral assignment that is made
11  against a policy have to be made via a document, an American
12  General document?
13        MR. McMAHON: Object to the lack of
14  foundation. Calls for speculation.
15    A. I wouldn't know. That's not my area.
16    Q. (BY MR. CROWDER) Okay. Whose area is that?
17    A. Policy owner service.
18    Q. Say that again?
19    A. Policy owner service.
20        MR. McMAHON: Policy owner service.
21    A. Sorry, my southern kicks in.
22    Q. (BY MR. CROWDER) During your years at American
23  General, have you ever seen a collateral assignment against
24  a policy that was not on an American General collateral
25  assignment form?

18

1    A. Yes, sir.
2    Q. Okay. On what occasion?
3    A. Can't give you a particular time or date.
4    Q. Do you know how many times?
5    A. No, sir.
6    Q. I mean, do you know approximately how many times?
7    A. No, sir.
8    Q. Over ten?
9    A. Yes, sir.
10    Q. And what were the documents, what were they? Were
11  they privately drafted documents, or what did they look
12  like, the collateral assignment?
13    A. They were documents drafted by the assignee.
14    Q. Hand you what's been marked AIG document No. 16
15  and ask you if you recognize that form.
16    A. Yes, sir.
17    Q. Okay. Is that the assignment form, American
18  General assignment form being used back in 2000 and 2001?
19        MR. McMAHON: Objection. Lack of
20  foundation.
21    A. Would not know.
22    Q. (BY MR. CROWDER) Is that an AIG assignment form?
23    A. Yes, sir.
24    Q. Is it continuing to be used?
25    A. I would not know.

19

1    Q. Document No. 16, again, can you tell me when that
2  document was scanned into the system, if you know?
3        MR. McMAHON: Objection. Lack of
4  foundation. Calls for speculation.
5    A. According to the date at the top, 12-28-2000, I'm
6  sorry, 11-28-2000.
7    Q. (BY MR. CROWDER) Okay. And this is one of those
8  documents you said that as far as you know, once it's
9  scanned in, the original is then shredded; correct?
10        MR. McMAHON: Objection. Lack of
11  foundation.
12    A. Yes, sir.
13    Q. (BY MR. CROWDER) Okay. How do you know that that
14  is the process?
15    A. Because that's what we've been told in trying to
16  pull a document back out of the box if we want the original.
17    Q. Okay. So if you make a request for the original,
18  you've been instructed by AIG that the original is no longer
19  in existence?
20    A. Yes, sir.
21    Q. Okay. Under what circumstances have you wanted
22  original documents in the past?
23    A. If the beneficiary wants the death certificate
24  back, we try to pull it to get it back to them, or original
25  documents that they've had a hard time recreating for their

20

1  own personal files.
2    Q. Going to hand you what's been marked as AIG
3  documents 1 and 2 and ask you if you are familiar with the
4  form itself, not necessarily the handwriting on the form but
5  the form itself. Are you familiar with that form?
6    A. No, sir.
7    Q. Okay. You've never seen an assignment that looks
8  like this before?
9        MR. McMAHON: Do you recall?
10    A. No, sir.
11    Q. (BY MR. CROWDER) Okay. Are the assignments that
12  you tend to have traditionally worked with like the
13  assignment that's drafted on AIG No. 16, document 16?
14    A. No, sir.
15    Q. Okay. What do they typically look like? Can you
16  describe them?
17    A. They're usually a longer form, similar to that one
18  but not -- I can't tell you that the wording is exactly the
19  same, but it's more of a wordier document than No. 16.
20        MR. McMAHON: You're referencing document
21  AIG 1 and 2?
22        THE WITNESS: Yes, sir. Sorry.
23    Q. (BY MR. CROWDER) Would it have at the top
24  something that identified it as an American General
25  document, to your recollection?

6 (Pages 21 to 24)

## DIANA L. FIELDS - July 6, 2006

21

1  A. Not that I recall. I don't remember what they
2  look like.
3  Q. Okay. Just so I'm clear, though, you have worked
4  with assignments that look like AIG document 16 before;
5  correct?
6  A. Yes, sir.
7  Q. Now, I want to make sure I understand. If
8  somebody, if somebody wanted to place an assignment against
9  their life insurance policy, a collateral assignment against
10 their life insurance policy, do you know what the process
11 would be for getting that documentation done?
12      MR. McMAHON: Objection. Lack of
13 foundation.
14 A. No, sir.
15 Q. (BY MR. CROWDER) You do not know the process?
16 A. No, sir, do not.
17 Q. Okay. If somebody wanted to -- let me back up.
18 Who would tell you that process at American General?
19 A. Policy owner service.
20 Q. Okay. If somebody said that they had an existing
21 collateral assignment but wanted to have it released, would
22 you know the process for doing that?
23      MR. McMAHON: Same objection.
24 A. No, sir.
25 Q. (BY MR. CROWDER) And who would tell you the

22

1  process for doing that?
2  A. Policy owner service.
3  Q. Do they have written policies that explain this,
4  or do you know?
5      MR. McMAHON: Same objection.
6  A. I do not know.
7  Q. (BY MR. CROWDER) Okay. In your job
8  responsibilities at American General, are there any written
9  policies that you follow?
10 A. No, sir.
11 Q. Okay. If somebody wanted to transfer a collateral
12 assignment, would you be able to explain that process?
13      MR. McMAHON: Same objection.
14 A. No, sir.
15 Q. (BY MR. CROWDER) And who would be familiar with
16 that process?
17 A. Policy owner service.
18 Q. When you do work on a particular file such as the
19 Stilwell file, do you make a computer entry as well
20 indicating that you've done something in the file?
21 A. I don't understand the question. I'm sorry.
22 Q. Well, there are certain documents that I've been
23 provided that show certain computer entries that were made
24 with notes. I'm asking whether or not you've done -- do you
25 do that as part of your practice when you're dealing with a

23

1  file.
2  A. Yes, sir.
3  Q. Okay. What's that called?
4  A. It's the comments section of our AWD system.
5  Q. What's the AWD system?
6  A. Automatic work distribution.
7  Q. How does that system work? What's the purpose?
8      MR. McMAHON: Objection. Lack of
9  foundation.
10 A. That's where our mail is scanned into.
11 Q. (BY MR. CROWDER) When you say mail, you're
12 talking about mail specifically directed to you or just
13 general documents?
14 A. Any and all documents.
15 Q. So these are part of the -- so document No. 16
16 would be part of the AWD system?
17      MR. McMAHON: Objection. Lack of
18 foundation.
19 A. Yes, sir.
20 Q. (BY MR. CROWDER) And the system itself has a --
21 provides you the ability to make specific notes or to make
22 an entry into a specific file; correct?
23      MR. McMAHON: Same objection.
24 A. Yes, sir.
25 Q. (BY MR. CROWDER) And how do you access that

24

1  system? Do you have to use a password or --
2  A. Yes, sir.
3  Q. And then once you're into the system, how do you
4  get into specific files? Do you have to know the file
5  number, name?
6  A. Either.
7  Q. Okay. If you want to make an entry, are there a
8  number of options that you have to go through in order to
9  make an entry?
10 A. No, sir.
11 Q. Okay. What do you do once you get in the system
12 and you want to make an entry on a specific claim file?
13 A. You go to that policy number and then click to
14 "Comments" and it will give you a box to enter.
15 Q. Okay. And then you just type in your comments?
16 A. Uh-huh.
17 Q. Is that correct?
18 A. Yes, sir.
19 Q. Hand you what's labeled AIG documents 5 and 6 and
20 ask you if those are examples of the comments you can enter
21 into the AWD system.
22 A. Yes, sir.
23 Q. It looks like each time you make an entry it shows
24 a begin date; is that correct?
25      MR. McMAHON: Objection. Lack of

DIANA L. FIELDS - July 6, 2006

25

1  foundation.
2      A. I don't know what all these entries are.
3      Q. (BY MR. CROWDER) Well, do you see the begin date
4  at the top?
5      A. Yes, sir.
6      Q. Okay. And does it put a date there for when you
7  get into the system?
8          MR. McMAHON: Same objection.
9      A. It's automatically there.
10     Q. (BY MR. CROWDER) When you print it out, when it
11 gets printed out, or is it in front of you as well when
12 you're on the screen?
13     A. It's in front of me.
14     Q. And is the time as well in front of you when
15 you're on the screen?
16     A. Yes, sir.
17     Q. So when you want to access back to something that
18 you have previously put in there or something that somebody
19 else has put in there, you can scroll back to it and see
20 what other people's notes are and what your previous notes
21 were; is that accurate?
22     A. Yes, sir.
23     Q. And you can also see who made the notes and those
24 type of things; correct?
25     A. Yes, sir.

26

1      Q. Do you know anything about — let me take a look
2  at that one real quick. Do you know anything about when it
3  says user name, batch station, and user? Do you know what
4  that means? I'll show you specifically the one I'm talking
5  about.
6          MR. McMAHON: Objection. Lack of
7  foundation.
8      A. I don't know what batch station and user batch is.
9      Q. (BY MR. CROWDER) Okay. That seems to be in the
10 line where it normally — or in the two lines before it
11 shows the name of the person who used the system. Do you
12 notice that?
13     A. Yes, sir.
14     Q. Okay. But you don't know why it doesn't show a
15 name and why it just says "batch station"?
16     A. No, I don't know.
17     Q. Okay. And then the one below that doesn't have a
18 user name, if you can see that entry below that, doesn't
19 have a user name, does it?
20         MR. McMAHON: What page are you on?
21     A. I'm sorry. Five rolls to six.
22     Q. (BY MR. CROWDER) Okay. And then it says "user
23 name" and then "user name not found"?
24     A. Yes, sir.
25     Q. Do you know why that is?

27

1      A. No, sir.
2      Q. Anytime that you log onto the system and make a
3  comment, it automatically is going to put your name on
4  there; would that be accurate?
5          MR. McMAHON: Objection. Lack of
6  foundation.
7      A. It will put my name on there if I'm logging in,
8  yes, sir.
9      Q. (BY MR. CROWDER) Right. Show you what's marked
10 as AIG document 20, ask you if you've seen a document — not
11 this specific document but a document that gets produced
12 like this.
13     A. No, sir.
14     Q. Is that something that you're familiar with, a
15 letter that goes out indicating your release of assignment
16 verification?
17     A. No, sir.
18     Q. Okay. You're not part of that process at AIG
19 where a release comes in and then a letter gets drafted to
20 somebody indicating that the release has been recorded?
21     A. Correct.
22     Q. You're not part of that process; is that correct?
23     A. Correct.
24     Q. Now, in terms of your claims examination or claims
25 investigation, do you often go back to documents like that

28

1  to see if a document's — if an assignment has been released
2  in other type of documents?
3      A. Yes, sir.
4      Q. Okay. Hand you document AIG 21 and just direct
5  you to the wording "poor original." Do you know anything
6  about why that's on that document?
7      A. No, sir.
8      Q. Okay. I also want to direct you to the fact that
9  there seems to be two stampings, scan stamps on this
10 particular document. Do you have any idea why that would
11 occur?
12         MR. McMAHON: Objection. Calls for
13 speculation.
14     A. It was scanned twice.
15     Q. (BY MR. CROWDER) Can you tell me the
16 circumstances when a document gets scanned twice?
17         MR. McMAHON: Same objection.
18     A. It's scanned in originally; and when we send
19 information down to be back-scanned to be added to, like if
20 I've written a letter or the documents that I want added to
21 the file that I've created, documents that aren't pulled out
22 that have already been scanned will be scanned again, and
23 that's how they'll get two numbers.
24     Q. (BY MR. CROWDER) Okay.
25     A. That I'm aware of.

## DIANA L. FIELDS - July 6, 2006

29

1  Q.  Right.  And have you seen a document with two
2  numbers on it before?
3     A.  Yes, sir.
4     Q.  And what you're indicating is essentially when
5  you're working on a particular file and you have a hard copy
6  of a document such as this assignment, you write a letter
7  that's going to have this as part of the letter; when that
8  letter gets scanned in, this assignment is going to get
9  scanned in again?  Would that be accurate?
10       MR. McMAHON:  Objection.  Calls for
11  speculation and lack of foundation.
12       Go ahead and answer if you can.
13    A.  Not in the circumstances I was just describing.
14  It wouldn't necessarily be part of my letter that's going
15  out.  It may have been something that was used to review the
16  file for any reason.  Instead of throwing it away because it
17  was already scanned in the system, it just got still
18  attached to whatever I'm back-scanning and was just scanned
19  in again.
20    Q.  (BY MR. CROWDER)  So you used the term
21  "back-scanning."  Tell me what that -- is that what you just
22  described?  Is that what back scanning is?
23    A.  Yes, sir.
24    Q.  Okay.  And is there a particular policy for
25  back-scanning documents, or do you just have a custom and

30

1  practice of any document you're working on you're going to
2  end up having them back-scanned?
3       MR. McMAHON:  Object to the form.
4       You can answer if you can.
5    A.  Repeat that.  I'm sorry.
6    Q.  (BY MR. CROWDER)  Sure.  I'm just asking whether
7  there's a policy at American General for back scanning
8  documents that you've worked on.
9    A.  I know it's a practice --
10    Q.  Okay.
11    A.  -- for the claims department.
12    Q.  All right.  So it's a practice that's utilized by
13  not only you but everybody else in the claims department?
14       MR. McMAHON:  Objection.  Calls for
15  speculation.
16    Q.  (BY MR. CROWDER)  To your knowledge?
17       MR. McMAHON:  Objection.  Lack of
18  foundation.
19    A.  To my knowledge, yes, sir.
20    Q.  (BY MR. CROWDER)  Okay.  Now, is that part of any
21  written policy, to your knowledge, to back-scan those
22  documents?
23       MR. McMAHON:  Same objection.
24    A.  No, sir.
25    Q.  (BY MR. CROWDER)  Okay.  With respect to what

31

1  documents get attached to a release of assignment
2  verification like the one I showed you, AIG No. 20, who
3  would tell you at American General what documents are
4  provided to this letter that goes out?
5       MR. McMAHON:  Objection.  Lack of
6  foundation.
7    A.  Policy owner service.
8    Q.  (BY MR. CROWDER)  Do you know anybody at policy
9  owner service?  Do you know the head of policy owner
10  service?
11    A.  Drawing a blank.  I don't know his name.  Chris
12  Ayres.
13    Q.  Can you spell his last name?
14    A.  A-y-r-e-s.
15    Q.  And is he at the Houston location?
16    A.  Yes, sir.
17    Q.  Okay.  As part of your job, do you have to inquire
18  from policy owner services on different issues?
19    A.  Yes, sir.
20    Q.  Okay.  What kind of issues would typically come up
21  where you would discuss them with policy owner services?
22    A.  If I had a beneficiary change that wasn't done and
23  I wanted to know why and the file wasn't documented, I would
24  check with them to find out why.
25    Q.  If there was an assignment that was released and

32

1  you wanted to know if that was properly recorded, is that
2  something you would talk to policy owner service about?
3       MR. McMAHON:  Objection.  Calls for
4  speculation.
5    A.  If the file wasn't clear, sure.
6    Q.  (BY MR. CROWDER)  In your review of the Stilwell
7  matter, did you talk to policy owner service?
8    A.  No, sir.
9    Q.  Okay.  There was no reason for you -- from your
10  recollection, there was no reason for you to contact policy
11  owner service regarding the Stilwell file?
12       MR. McMAHON:  If you recall.
13    A.  Correct.
14    Q.  (BY MR. CROWDER)  Okay.  Hand you Document number
15  AIG 21 and ask you if any point in your examination of this
16  file or your review of this file you've reviewed that
17  document.
18       MR. McMAHON:  If you recall.
19    A.  Yes, sir.
20    Q.  (BY MR. CROWDER)  Okay.  And when would you have
21  reviewed that?
22    A.  While looking through the file prior to the
23  deposition.
24    Q.  Okay.  What about in preparation for drafting your
25  letters that you wrote, if you recall?

DIANA L. FIELDS - July 6, 2006



33
1    A.  I don't recall.
2    Q.  Okay.  What about document No. 23, AIG 23?
3        MR. McMAHON:  Is there a question pending?
4    Q.  (BY MR. CROWDER)  Have you reviewed that document,
5    to your recollection?  Have you seen it before?
6    A.  Yes, sir.
7    Q.  And was that reviewed in preparation for your
8    deposition?
9    A.  Yes, sir.
10   Q.  And do you recall whether you've reviewed it in
11   preparation for drafting your letters?
12   A.  I don't recall.
13   Q.  What about AIG 32, have you seen that?  Did you
14   read that in preparation for your deposition?
15   A.  Yes, sir.
16   Q.  And had you seen that document in preparation for
17   drafting your letters?
18   A.  Don't recall.
19   Q.  AIG document 117, have you seen that document
20   before today?
21   A.  No, sir.
22   Q.  Same question with respect to documents 222
23   through 226, have you ever reviewed any of those documents?
24       MR. McMAHON:  If you recall.
25   A.  No, sir.

35
1    are documents that were in the claim file, they are what
2    they are.
3        MR. CROWDER:  Right.  No.  I'm more
4    concerned with what documents she felt were important.
5        MR. McMAHON:  That she has an independent
6    recollection of.
7        MR. CROWDER:  Right.
8        MR. McMAHON:  Okay.  That's the way I
9    understood the questions.  Is that the way you understood
10   the questions?
11       THE WITNESS:  Yes.
12   Q.  (BY MR. CROWDER)  Are there any other documents?
13   And again, I took you through some documents that I have
14   specifically pulled out.  Were there any other documents
15   that were important for you to review or that you recall
16   reviewing that essentially you had to review to prepare your
17   letters?
18   A.  I don't recall.
19   Q.  So there's not one specific document you're saying
20   that you can point to to say this was very important to my
21   examination and preparation of the letter, of the letters I
22   drafted to you?
23   A.  No, sir.
24   Q.  Okay.  I want to make sure of one other thing.  In
25   a letter that was directed to Mr. Sawicki of American

34
1        MR. McMAHON:  Jason, can I just get clarity
2    on a line of questioning, because it dawns on me that the
3    witness has testified that she paged through the file.  And
4    the way I've taken your questions are does she have an
5    independent recollection of reviewing certain documents
6    you've pointed out from the file at the time she drafted the
7    letters.  That's what you're meaning by asking the question
8    does she have a recollection?
9        MR. CROWDER:  Well, I mean, the questions
10   are as they stand; but I was trying to get a feel for if she
11   reviewed the documents and essentially whether those
12   documents were -- I'm trying to figure out which ones were
13   important to her in terms of her review of the file.  So I'm
14   going to go through the letters now; and if that changes any
15   of her answers, we can go back to the documents.  But I'm
16   going to hand her her letters that she drafted and see if
17   that changes anything.
18       MR. McMAHON:  Okay.  I guess my question is
19   to the extent that these are documents that are in the claim
20   file, she's provided whatever testimony she's had as to
21   whether or not she reviewed the claim file.  To the extent
22   you're asking her separate and apart from the documents does
23   she have an independent recollection on particular
24   documents, obviously, I think that -- that's an area of
25   inquiry.  If what you're asking her is whether or not these

36
1    General, there were a number of documents referenced by a
2    Lawrence Bianchi, and you indicated earlier that you had not
3    examined this letter.  Is that still your recollection?
4    A.  Yes, sir.
5    Q.  Okay.  I just want to make sure whether you have
6    ever examined any of the documents that are made reference
7    in this letter, for example, a -- and you can take a look at
8    this as I point this out, but this made reference to an
9    April 16, 1999, consignment agreement between Janko
10   Financial Group and Amishland Country Village, Inc.  Have
11   you ever seen that document, to your recollection?
12   A.  Not to my recollection.
13   Q.  And do you know if that document is part of the
14   AIG file?
15   A.  Not that I saw.
16   Q.  And you were able to look at the entire file; is
17   that accurate?
18   A.  Yes, sir.
19   Q.  Okay.  There is made reference to an April 19,
20   1999, assignment in the amount of 500,000 from Margaret
21   Stilwell.  I've seen that document in the file.  Do you
22   recall ever having had to review that document?
23   A.  I don't recall.
24   Q.  Okay.  There's made reference in this letter to a
25   September 25, 2000, second assignment from Margaret Stilwell

## DIANA L. FIELDS - July 6, 2006

---

**37**

1  to Janko Financial Group for 1.5 million. Do you recall
2  seeing that assignment?
3      **A. Yes, sir.**
4      Q. There's made reference to, in this letter of
5  November 16, 2000, Assignment and Assumption Agreement
6  between Janko Financial Group and Tuscola Furniture Group.
7  Do you recall ever seeing that document?
8      **A. No, sir.**
9      Q. Okay. And is that document part of the AIG claims
10  file?
11          MR. McMAHON: If you know.
12      **A. I don't know.**
13      Q. (BY MR. CROWDER) There's made reference to a
14  November 17, 2000, consignment agreement between Tuscola
15  Furniture and Amishland Country Village. Have you ever
16  reviewed that document?
17      **A. Not that I recall.**
18      Q. And is that document part of the claims file?
19      **A. I do not know.**
20      Q. There's made reference to the November 21, 2000,
21  assignment to TFG for 250,000; and you indicated, I think,
22  that you remember reviewing that assignment; correct?
23      **A. Yes, sir.**
24      Q. And then there's also made reference to a January
25  11, 2001, assignment, collateral assignment from this policy

---

**38**

1  to First Mid-Illinois Bank & Trust for 1 million, and I
2  believe you recall reviewing that assignment; correct?
3      **A. Yes, sir.**
4      Q. And then there was made reference to the
5  November 20, 2000, release of assignment assigned by Janko
6  Financial Group, and you recall reviewing that release of
7  assignment; correct?
8      **A. Yes, sir.**
9          MR. CROWDER: Can we make copies of these
10  letters?
11          (Discussion off the record.)
12          (Short recess.)
13      Q. (BY MR. CROWDER) Okay. I've got my copies and,
14  Ms. Fields, you can grab your copy of your letter of January
15  26, 2004. Do you have that in front of you?
16      **A. Yes, sir.**
17      Q. And can you read the page numbers on the bottom,
18  the AIG numbers?
19          MR. McMAHON: They're tough to come out on
20  the copies, unfortunately. It looks like it's AIG 379 to
21  380 is the January 26th, 2004, letter; and Bates stamp AIG
22  384 is the March 5, 2004, letter.
23          MR. CROWDER: Okay.
24          (Discussion off the record.)
25      Q. (BY MR. CROWDER) Have you had an opportunity to

---

**39**

1  review this, then, this document, in preparation for your
2  deposition today?
3      **A. Yes, sir.**
4      Q. Okay. And I'm making reference to the letter of
5  January 26, 2004; is that correct? Is that the one you
6  reviewed?
7      **A. Yes, sir.**
8      Q. That letter that you wrote in the first sentence
9  essentially says "your letter of January 7, 2004, has been
10  referred to me for research and response." Have you had an
11  opportunity to read my letter of January 7, 2004?
12      **A. No, sir.**
13      Q. Based on what you said in that earlier -- in the
14  first sentence there of this letter, did you review it in
15  advance of writing this letter of --
16      **A. I don't recall.**
17      Q. Okay. Based on what's said in this letter,
18  though, is there any doubt in your mind that you did receive
19  a letter from me dated January 7, 2004?
20      **A. Based on what it says here, yes, sir.**
21      Q. Okay. And what you're saying is you just don't
22  recall the contents of that letter?
23      **A. Correct.**
24      Q. Now, that letter should be in the claims file, as
25  I understand it?

---

**40**

1      **A. Should be.**
2      Q. Okay. And did you see it as you were in
3  preparation for your deposition today when you were
4  reviewing the file?
5      **A. No, sir.**
6      Q. Okay. Can you explain to me why this would have
7  come to you, based on the fact that you're a senior claims
8  analyst?
9      **A. No.**
10          MR. McMAHON: Object to the form of the
11  question. Lack of foundation.
12      **A. Not that I recall, no, sir.**
13      Q. (BY MR. CROWDER) Okay. Is this the type of
14  inquiry that your job responsibility would require you to
15  respond to?
16          MR. McMAHON: Object to the form.
17      You can answer it.
18      **A. Sometimes.**
19      Q. (BY MR. CROWDER) Okay. What I'm trying to get a
20  feel for, is this a pretty unique situation where you're
21  having to respond to something that you typically wouldn't
22  have to, this is typically somebody else's job but you ended
23  up with it for some reason or another?
24      **A. No, it's not unique.**
25      Q. Okay. Is there any particular reason they

---

DIANA L. FIELDS - July 6, 2006

```
                                              41
1   wouldn't have had somebody who handled the actual claim
2   process when the checks were being drafted, that type of
3   thing, respond to this particular letter?
4        MR. McMAHON:  Would you read the question
5   back?      .
6        (The reporter read the requested material.)
7        MR. McMAHON:  Object to the form.  Lack of
8   foundation.
9   A.  On this particular case she was no longer with the
10  company.
11  Q.  (BY MR. CROWDER)  Okay.  Who is that person?
12  A.  Margaret Singh.
13  Q.  Is that spelled S-i-n-g-h?
14  A.  Yes, sir.
15  Q.  Do you know where she is now?
16  A.  No, sir.
17  Q.  Okay.  To your knowledge, is that the reason you
18  ended up having to review it?
19       MR. McMAHON:  Objection.  Asked and
20  answered.  Also calls for speculation.
21  A.  I don't recall why it was given to me.
22  Q.  (BY MR. CROWDER)  Well, let me ask it this way.
23  Would Margaret Singh have traditionally been the person who
24  would respond to a letter like this —
25       MR. McMAHON:  Same objection.
```

```
                                              42
1   Q.  (BY MR. CROWDER)  — in light of the fact she had
2   handled the claims process?
3        MR. McMAHON:  Same objection.
4   A.  I wouldn't know because she worked for Old Line,
5   and I don't know what their procedures were.
6   Q.  (BY MR. CROWDER)  Do you recall where Margaret
7   Singh was located when she was working on this?
8   A.  Dallas.
9   Q.  There was a Ray Sawicki, S-a-w-i-c-k-i; do you
10  recall his name?
11  A.  Yes, sir.
12  Q.  Okay.  Do you know him?
13  A.  Yes, sir.
14  Q.  Is he within your department?
15  A.  Yes, sir.
16  Q.  And is he in Houston?
17  A.  Yes, sir.
18  Q.  Still located in Houston?
19  A.  Yes, sir.
20  Q.  You start out this letter of January 26, 2004,
21  after you indicated that you're making reference to my
22  January 7, 2004, letter, you say "As part of our routine
23  handling of a claim with an assignment, we requested a
24  letter from each of the assignees indicating their loan's
25  outstanding balance."  Do you see that?
```

```
                                              43
1   A.  Yes, sir.
2   Q.  And did I read that into the record accurately?
3   A.  Yes, sir.
4   Q.  When you made reference to assignment, did you
5   mean collateral assignment?
6        MR. McMAHON:  You're asking her if she
7   remembers what she was thinking at the time in 2004 or what
8   she interprets today or what?
9   Q.  (BY MR. CROWDER)  How you interpret this letter,
10  what you meant by "assignment."
11       MR. McMAHON:  I'll have to object.  It calls
12  for speculation.
13  A.  I don't remember what I was -- what I was thinking
14  back then.
15  Q.  (BY MR. CROWDER)  How many different assignments
16  would you have -- how many different types of assignments
17  would you be dealing with besides collateral assignment?
18       MR. McMAHON:  Object to the form of the
19  question.  Lack of foundation.  Calls for speculation.
20       You can answer it if you can.
21  A.  There's different types of collateral assignments,
22  I guess is what I'm going at, the funeral home versus a bank
23  or a corporation.
24  Q.  (BY MR. CROWDER)  So is there any doubt in your
25  mind that you were making reference to a collateral
```

```
                                              44
1   assignment, it's just a question of what type of collateral
2   assignment?
3        MR. McMAHON:  Objection.  Calls for
4   speculation.
5   Q.  (BY MR. CROWDER)  You can answer.
6   A.  Yes, sir, referring to a collateral assignment.
7   Q.  Okay.  Then your next sentence is "Listed below is
8   each assignee and their outstanding balances," and then you
9   go through and list each of the assignees.  When you said
10  outstanding balances, were you making reference to the
11  amount of the assignment?
12       MR. McMAHON:  Again, object to the form of
13  the question.  Are you asking her if she remembers what she
14  was thinking in 2004?
15       MR. CROWDER:  I'm asking her the question
16  today, what she meant by outstanding balances, based on her
17  review of this letter.
18       MR. McMAHON:  Calls for speculation.
19       You can answer it if you can.
20  A.  As far as reviewing this letter for my deposition,
21  all I did was read over the letter.  Where I got the
22  information from, I don't remember.
23  Q.  (BY MR. CROWDER)  Well, you would have had to have
24  gotten it from the claims file, I would assume?
25  A.  Yes, sir.
```

## DIANA L. FIELDS - July 6, 2006

45

1    Q. All right. So you had reviewed the claims file
2 and then drafted this letter; correct?
3    A. Yes, sir.
4    Q. Okay. And so you put on there Tuscola National
5 Bank, and then you put the original amount assigned was 2
6 million; correct?
7    A. That's what my letter says, yes, sir.
8    Q. Okay. So that would have required you to have
9 reviewed the assignment to Tuscola National Bank and find
10 out what the amount was; correct?
11    A. Yes, sir.
12    Q. Okay. Did you do that with each of the
13 assignments that you listed here?
14    A. Not that I recall. I don't recall doing that, no,
15 sir.
16    Q. How would you have drafted a letter with each of
17 the specific numbers, then, if you didn't review and find
18 out what these assignments were for?
19       MR. McMAHON: Objection. Asked and
20 answered. It also mischaracterizes her testimony. She
21 already testified that it would have been based upon the
22 documents she reviewed in the claim file. She's just saying
23 she doesn't have any recollection of it right now.
24    Q. (BY MR. CROWDER) You can answer my question.
25    A. I forgot what your question was. I'm so sorry.

46

1    Q. Okay. Let me ask it again. Do you see where you
2 write down Tuscola National Bank and then you say the
3 original amount assigned was 2 million? Correct?
4    A. Yes, sir.
5    Q. Okay. In order to write this letter and put down
6 the 2 million and the original amount assigned was 2 million
7 you would have had to have reviewed something that told you
8 that Tuscola National Bank had an assignment to them for $2
9 million; correct?
10    A. Yes, sir.
11    Q. Okay. Same with Citizens First National Bank of
12 Princeton; is that accurate?
13    A. Yes, sir.
14    Q. You would have had to have reviewed an assignment
15 to Citizens First National Bank of Princeton that would have
16 indicated on there there was an assignment for 1.5 million;
17 correct?
18    A. Yes.
19    Q. And the same for Tuscola Furniture Group, LLC;
20 correct?
21    A. Yes, sir.
22    Q. You would have had to have reviewed that
23 assignment and determined that they had an assignment for
24 250,000; correct?
25    A. That's the only way I would have known it, yes,

47

1 sir.
2    Q. Okay. And the same for First Mid-Illinois Bank &
3 Trust; correct?
4    A. Yes, sir.
5    Q. You would have reviewed the assignment that they
6 had on file and determined that it was an assignment for $1
7 million; correct?
8    A. Yes, sir.
9    Q. Okay. Then you would also, based on this letter,
10 have reviewed documents indicating how much each of these
11 banks or each of these entities were claimed to have been
12 owed; correct?
13    A. Yes, sir.
14    Q. Okay. For example, you indicate on June 16th,
15 2003, you received a letter stating that the payoff amount
16 exceeded this amount. Do you see where you write that?
17    A. Yes, sir.
18    Q. Okay. That's an indication that you received a
19 letter from Tuscola National Bank indicating that they were
20 owed more than 2 million; correct?
21    A. Yes, sir.
22    Q. Okay. The same is true for a letter from Citizens
23 First National Bank of Princeton; correct? You saw a letter
24 in there dated June 16, 2003, indicating that they were owed
25 more than 1.5 million; correct?

48

1    A. Yes, sir.
2    Q. Okay. And this is a typical process that a claims
3 examiner is going to go through; is that accurate?
4       MR. McMAHON: Objection. Lack of
5 foundation.
6    A. I'm sorry. One more time.
7    Q. (BY MR. CROWDER) I said what you're examining,
8 what you're reviewing here and putting in this letter is a
9 typical process that a claims examiner goes through when a
10 claim is made on a policy; correct?
11       MR. McMAHON: Same objection.
12       You can answer it if you can.
13    A. I can't say what every claims examiner would do.
14 I only know what I would do.
15    Q. (BY MR. CROWDER) Well, let me ask it this way,
16 then. If Tuscola National Bank made a claim against life
17 insurance proceeds, you would need to, number one, make sure
18 that they had an assignment that entitled them to a claim;
19 correct?
20       MR. McMAHON: Objection. Calls for
21 conclusion or speculation.
22       Answer if you can.
23    A. Yes, sir.
24    Q. (BY MR. CROWDER) Okay. You would also need
25 information from Tuscola National Bank that they were

DIANA L. FIELDS - July 6, 2006

49

1  actually owed money from Jim Stilwell; correct?
2              MR. McMAHON: Same objection.
3     A.  Yes, sir.
4     Q.  (BY MR. CROWDER) Because if they're not owed any
5  money and this is a collateral assignment, then there's no
6  reason for them to be entitled to $2 million; correct?
7              MR. McMAHON: Same objection.
8     A.  Correct.
9     Q.  (BY MR. CROWDER) Okay. So you want to, as part
10 of your responsibility as a claims examiner, you want to
11 make sure they're actually owed money and that they have a
12 valid collateral assignment; correct?
13             MR. McMAHON: Object to the form. It's a
14 compound question. Calls for conclusion and lack of
15 foundation.
16         You can answer it if you can.
17    A.  Could you repeat it? I'm sorry.
18    Q.  (BY MR. CROWDER) Two of the things you're going
19 to want to do if somebody is making a claim make sure
20 they have a valid right to the claim, right to the money by
21 way of an assignment, and that they're actually owed money;
22 correct?
23             MR. McMAHON: Same objection.
24    A.  Correct.
25    Q.  (BY MR. CROWDER) Okay. Can you tell me what you

50

1  do to confirm these two things, if you're in position of a
2  claims examiner?
3              MR. McMAHON: Are you talking in the
4  abstract or are you talking in the specific instance or
5  what?
6              MR. CROWDER: No. I'm talking about -- she
7  indicated earlier that she can't say what somebody else
8  would do. I'm just asking her what she would do to confirm
9  this.
10    A.  I would request a letter in writing from the
11 assignees.
12    Q.  (BY MR. CROWDER) As to the amount owed?
13    A.  Yes, sir.
14    Q.  Okay. And would you also then -- would you
15 request the assignment from them, or would you simply review
16 the claims -- review the file to make sure that there was an
17 assignment on record?
18             MR. McMAHON: Object to the form.
19    A.  I would not ask them for a copy of the assignment,
20 no, sir.
21    Q.  (BY MR. CROWDER) Right. And that's because
22 essentially if the assignment is not on record with you,
23 then they don't have a right to make a claim; correct?
24             MR. McMAHON: Objection. Calls for a
25 conclusion, calls for a legal conclusion, calls for

51

1  speculation, lack of foundation, and assumes facts not in
2  evidence.
3     A.  If I got someone claiming money as an assignee and
4  I didn't have copies of the assignment, I would ask for
5  copies of the assignment and then refer it to legal.
6     Q.  (BY MR. CROWDER) Okay. On the Tuscola Furniture
7  Group, LLC, you put the original amount assigned was
8  250,000. Do you see that part?
9     A.  Yes, sir.
10    Q.  Had Tuscola Furniture Group made a claim in excess
11 of 250,000, would they have been entitled to anything more
12 than the 250,000-dollar assignment, based on your
13 examination and review of the file?
14             MR. McMAHON: Objection. Calls for
15 speculation, calls for conclusion.
16         You can answer if you can.
17    A.  In my opinion, no, sir.
18    Q.  (BY MR. CROWDER) Explain that.
19    A.  If the assignment is $250,000 and they are
20 requesting more or the payoff is more, they would not get
21 more. However, if they came back for whatever reason, to
22 back up their claim, again, I would send it to legal.
23    Q.  Okay. On the First Mid-Illinois Bank & Trust, you
24 put the original amount assigned was 1 million. If First
25 Mid-Illinois Bank & Trust is only owed $81,000, how much do

52

1  they get of that 1-million-dollar assignment?
2              MR. McMAHON: Same objection. That calls
3  for a legal conclusion.
4          You can answer it if you can.
5     A.  Their assignment is only 81,000?
6     Q.  (BY MR. CROWDER) No. Their assignment is a
7  million and they're owed 81,000.
8     A.  Then their letter should indicate that, that
9  that's what they're owed is 81,000.
10    Q.  My question to you is --
11             MR. McMAHON: He's giving you a hypothetical
12 situation.
13    Q.  (BY MR. CROWDER) I'm giving you a hypothetical.
14 If First Mid-Illinois Bank is owed $81,000 and they have an
15 assignment for 1 million, how much, based on your review and
16 examination and understanding of the process, would they be
17 entitled to?
18             MR. McMAHON: Objection. Calls for
19 speculation and it's an incomplete hypothetical, but go
20 ahead and answer it if you can.
21    A.  81,000.
22    Q.  (BY MR. CROWDER) From your review of the Stilwell
23 claim file, did Tuscola Furniture Group and First
24 Mid-Illinois Bank & Trust make a joint claim for moneys?
25             MR. McMAHON: Are you asking if she has an

14 (Pages 53 to 56)

## DIANA L. FIELDS - July 6, 2006

53

1  independent recollection of that?
2          MR. CROWDER: Yeah. I'm asking from her
3  review of the claims file.
4      A.  I don't recall seeing anything in the file, no,
5  sir.
6      Q.  (BY MR. CROWDER) Okay. In your letter you say on
7  May 12th we received a letter from First Mid-Illinois Bank &
8  Trust indicating the amount due Tuscola Furniture and First
9  Mid-Illinois Bank & Trust was $512,974.50 jointly. Do you
10 see that?
11     A.  Yes, sir.
12     Q.  Okay. Then you say this letter was signed by a
13 representative of both entities. Do you see that?
14     A.  Yes, sir.
15     Q.  Okay. Do you interpret that as making a joint
16 claim for moneys?
17     A.  That's what the letter says, yes, sir.
18     Q.  Okay. Did you also interpret that they were both
19 owed 512,974.50 total? Do you see that?
20         MR. McMAHON: If you recall.
21     A.  Yeah. I don't recall reviewing those documents
22 for this letter.
23     Q.  (BY MR. CROWDER) What documents?
24     A.  The letter from the two assignees stating what
25 their amount is.

54

1      Q.  Okay. You indicate on May 12th, 2003, we received
2  a letter from First Mid-Illinois Bank & Trust. Now to me
3  that means that you reviewed that letter of May 12th, 2003.
4  Is that accurate?
5      A.  That's what the letter says.
6      Q.  Okay. What you're saying is you don't recall
7  reviewing it?
8      A.  Correct.
9          MR. McMAHON: As you sit here today.
10         THE WITNESS: Correct.
11     Q.  (BY MR. CROWDER) You don't have an independent
12 recollection of reviewing that document?
13     A.  Correct.
14     Q.  But your letter tells you, and don't let me put
15 words in your mouth, the letter clearly indicates that you
16 did in fact review it, though?
17     A.  That's what the letter says, yes, sir.
18     Q.  Okay. Do you understand that letter to be making
19 reference to AIG documents 295 and 296?
20     A.  Yes, sir.
21     Q.  With respect to documents 295 and 296, do you have
22 an independent recollection of reviewing that document?
23     A.  No, sir.
24     Q.  From your review, from your examination of the
25 file, did AIG recognize document No. 21 as a release of

55

1  assignment for the Janko Financial Group assignments?
2          MR. McMAHON: Are you asking if she has an
3  independent recollection?
4          MR. CROWDER: Right.
5      A.  No, sir.
6      Q.  (BY MR. CROWDER) You don't have an independent
7  recollection?
8      A.  No, sir.
9      Q.  What I'm saying is that in your review of the
10 file, did you consider or did AIG consider this particular
11 document to be a release of assignment for Janko Financial
12 Group's prior assignments?
13         MR. McMAHON: If you recall.
14     A.  I don't recall.
15     Q.  (BY MR. CROWDER) In order to say that Tuscola
16 Furniture Group, LLC, had an assignment in the original
17 amount of 250,000, did you have to make a decision as to
18 whether or not Janko Financial Group's assignments were
19 released?
20         MR. McMAHON: Objection. Calls for a
21 conclusion.
22     A.  Again, I don't recall what I looked at when I did
23 my letter.
24     Q.  (BY MR. CROWDER) Do you see on the bottom where
25 it says written in there "in favor of Tuscola Furniture"?

56

1          MR. McMAHON: We're back to document Bates
2  number AIG 21.
3      Q.  (BY MR. CROWDER) Do you see that document?
4      A.  Yes, sir.
5      Q.  And you see that, where it's written in there?
6      A.  Yes, sir.
7      Q.  Okay. And you're familiar with that, you've seen
8  that before, correct, that writing in the bottom?
9      A.  During my review and prep for the deposition, yes,
10 sir.
11     Q.  Okay. Had you seen it before that?
12     A.  Not that I recall.
13     Q.  You're saying that when you drafted these letters
14 of January 26, 2004, you don't recall seeing that?
15         MR. McMAHON: Objection. Lack of
16 foundation.
17     A.  Not that I recall.
18     Q.  (BY MR. CROWDER) Okay. Take a look at your
19 March 5, 2004, letter which is AIG document 384. You
20 indicated that -- you see down there the sentence where it
21 says "as evidenced by the June 10, 2003, letter"? You see
22 that?
23     A.  Yes, sir.
24     Q.  It says, "As evidenced by the June 10, 2003,
25 letter authored by a representative of AGL's individual

DIANA L. FIELDS - July 6, 2006

---

**57**

1  claims department and sent to Larry Bianchi of Janko
2  Financial Group, LLC, it was AGL's position that the
3  assignment to JFG dated April 2000 and October of 2000 had
4  been released by the release of assignment received by AGL
5  in December 2000." Did I read that accurately?
6      A.  Yes, sir.
7      Q.  The release of assignment, when you say the
8  release of assignment received by AGL in December of 2000,
9  do you recognize that as the document, AIG document No. 21,
10 that you were making reference to there?
11          MR. McMAHON:  Objection.  Calls for
12 conclusion.  You can answer it if you can.
13     A.  I don't know.
14     Q.  (BY MR. CROWDER)  What don't you know?
15     A.  If that's the document that was referred to in
16 this letter.
17     Q.  Why would you not know?
18     A.  Because I didn't write this letter.
19     Q.  Who wrote this letter?
20     A.  I do not recall.  Someone in our legal department,
21 I believe.
22     Q.  Well, why does it have your name on it?
23     A.  Because they generated the letter and asked me to
24 sign it.
25     Q.  Is that standard policy for you to put a name on a

**58**

1  letter you didn't draft?
2          MR. McMAHON:  Objection.  Lack of
3  foundation.
4      A.  Yes, sir.
5      Q.  (BY MR. CROWDER)  You've --
6      A.  I've done it before.
7      Q.  How often do you do that?
8      A.  Not very often.
9      Q.  Under what circumstances would you do that?
10     A.  If it's a claims case and I'm asked by our legal
11 department to draft a letter or to sign a letter that
12 they've drafted regarding one of our cases, that's when I'd
13 do it.
14     Q.  So you don't know -- you didn't draft this letter
15 at all?
16     A.  No, sir.
17     Q.  And the analysis that was discussed in here is not
18 your analysis?
19     A.  Right.
20          MR. McMAHON:  Object to the lack of
21 foundation.  Calls for conclusion.
22     Q.  (BY MR. CROWDER)  What was your answer to that
23 question?
24     A.  Correct.  I didn't -- I didn't do any of the
25 analysis.

**59**

1      Q.  Okay.  Well, let's go back to your letter of
2  January 26, 2004.
3      A.  Yes, sir.
4      Q.  Did you draft this letter?
5      A.  Yes, sir.
6      Q.  Was the legal department involved at this point in
7  time?
8      A.  I don't recall.
9      Q.  How did the legal department get involved and end
10 up drafting the March 5, 2004, letter?
11     A.  I don't recall.
12     Q.  Would you have gotten them involved?
13          MR. McMAHON:  Objection.  Calls for
14 speculation.  Asked and answered.
15     A.  I don't recall.
16     Q.  (BY MR. CROWDER)  Well, let's go through how legal
17 department would get involved in a case, then.  Give me the
18 scenarios in which the legal department would get involved.
19     A.  You want all of them?
20     Q.  I want to know essentially whether the claims
21 department has to contact the legal department or is there
22 some way other than that that the legal department somehow
23 jumps in and drafts a letter.
24          MR. McMAHON:  You want her to give examples
25 of situations with the legal department like when they're

**60**

1  served with a subpoena from counsel?
2      Q.  (BY MR. CROWDER)  How would the legal department
3  get involved in drafting a letter like this?
4      A.  A file was referred to legal from us through a
5  subpoena, through correspondence coming directly into their
6  office.  That's some of the ways.
7      Q.  If correspondence was going directly into the
8  office and they were responding to it, why would they put
9  your name on it?
10          MR. McMAHON:  Objection.  Calls for
11 speculation.  Also, you're getting into attorney-client
12 communication and I direct her not to answer the question.
13 You're asking her about why legal would take a course of
14 action.  The only way she could possibly answer that would
15 be to disclose attorney-client communication, so I'm going
16 to direct her not to answer the question.
17     Q.  (BY MR. CROWDER)  Diana, let me just ask you this.
18 Is there any other possibilities other than you pass
19 something on to the legal department that they would get
20 involved in drafting a letter with your name on it?
21          MR. McMAHON:  Calls for speculation.
22     A.  One more time.  I'm so sorry.
23     Q.  (BY MR. CROWDER)  That's okay.
24          MR. CROWDER:  Could you read that question
25 back.

16 (Pages 61 to 64)

## DIANA L. FIELDS - July 6, 2006

61

1      (The reporter read the requested material.)
2      A.  If the letter was sent directly to the law
3   department on a claims case.
4      Q.  (BY MR. CROWDER) And I guess what I'm trying to
5   say is why would they put your name on it, if it's directly
6   to the law department?
7           MR. McMAHON:  I'll direct her not to answer.
8   That's getting into privileged communications.  You're
9   asking her to delve into the mind of a lawyer.  The only
10   possible way she can answer that question is if the attorney
11   communicates to her what the thought process was.  That
12   necessarily gets into attorney-client communications.
13           MR. CROWDER:  And I question whether there's
14   attorney-client privilege conversation that took place
15   between Diana Fields and the legal department in drafting
16   this letter.
17           MR. McMAHON:  Well, I guess that's an issue
18   that someone else will have to resolve because by necessity
19   it is a communication between a lawyer for the company and a
20   representative of the company, and that's attorney-client
21   communication, and that's going to be subject to privilege.
22   You can disagree with it.  That's fine.  But we're not going
23   to get that resolved today because I'm directing her not to
24   answer the question.
25           MR. CROWDER:  That's fine.  I just question

62

1   whether or not you're in an attorney-client situation when
2   there's nothing to suggest that this letter is drafted by an
3   attorney.  It doesn't even say it's drafted by the legal
4   department and you're trying to suggest that there's some
5   type of privilege.
6           MR. McMAHON:  That's not the question you
7   asked.  The question was is why would the legal
8   department take certain action.  The only way she can answer
9   that is to divulge attorney-client communication because
10   you're asking her -- first of all, you're asking her to
11   delve into the mind of someone else and articulate a reason
12   why someone else would do something.  A, that's
13   inappropriate.  But secondarily, the only way she could
14   possibly answer the question is if that someone else
15   communicated to her what the thought process was.  And the
16   predicate to the question is why would the legal department
17   do something, and the legal department is the attorneys for
18   the company.  She's a representative of the company, and the
19   only way she would know that is it was communicated to her
20   by a lawyer, so it necessarily is an attorney-client
21   communication, and she can't answer that question.
22      Q.  (BY MR. CROWDER) Do you recall specifically being
23   asked to sign off on this letter?
24      A.  No, sir.
25      Q.  You do not?

63

1      A.  No, sir.
2      Q.  So you're saying that somebody drafts a letter,
3   asks you to put your name on it, and you don't recall that
4   happening?
5           MR. McMAHON:  If the question is does she
6   have an independent recollection?
7           MR. CROWDER:  That's what I'm asking.
8      A.  No, sir.
9      Q.  (BY MR. CROWDER) You don't recall that happening?
10      A.  No, sir.
11      Q.  Then how do you know you didn't draft the letter?
12      A.  By the language of the letter.  It's not my style
13   of letter.
14      Q.  So you think it's simply the language, the way
15   it's written, that tells you that this was drafted by
16   somebody else?
17      A.  Yes, sir.
18      Q.  And there's absolutely no way for you to know who
19   drafted it?
20      A.  It would be our attorneys.
21           MR. McMAHON:  I'm not sure I understand the
22   question.  Go ahead.  She answered it.
23      Q.  (BY MR. CROWDER) How do you know it would be your
24   attorneys, then?
25      A.  Because this is the style of letter from the law

64

1   department.
2      Q.  You've seen enough letters from the law department
3   to know that this is the style of letter they draft?  Is
4   that what you're trying to tell me?
5      A.  Yes, sir.
6      Q.  Whose style?
7      A.  Our attorneys.
8      Q.  Okay.  Well, who's in the legal department?
9      A.  Who's in the legal department?
10      Q.  Yeah.  Who's drafting letters in the legal
11   department?
12      A.  This could have been anybody from Catherine
13   Easterby to Melina Boyd Dressler to Christine Layton.
14      Q.  What was the second name?
15      A.  Melinda Boyd Dressler.
16           MR. McMAHON:  That's all one person.
17      Q.  (BY MR. CROWDER) Then there's a third person you
18   said?
19      A.  Christine Franze or Christine Layton.
20      Q.  Anybody else?
21      A.  At this time, no.  Just those three.
22      Q.  What about back in March of 2004?
23      A.  That's the three back in 2004 that we dealt with
24   in the law department.
25      Q.  So if the law department drafted this letter, to

DIANA L. FIELDS - July 6, 2006

**Page 65**

1  your knowledge, it would have been one of those three
2  people?
3      A.  To the best of my knowledge, yes, sir.
4      Q.  Okay.  Let's take a quick break.
5          (Short recess.)
6      Q.  (BY MR. CROWDER)  Hand you AIG document 378 and
7  ask you to take a look at that.
8      A.  Yes, sir.
9      Q.  Can you explain what that document is?
10     A.  It's part of our AWD system history file.
11     Q.  And what history is being documented there?
12     A.  That I touched the file.
13     Q.  Do you know what you did on that day?
14     A.  No, sir, not by this form.
15     Q.  What form would tell you what you did, or what
16  exists that would tell you what you did on that day?
17     A.  Nothing, that I'm aware of.
18     Q.  What's the date on there?
19     A.  January 26th, '04, is the end date.  It doesn't
20  have a begin date.
21     Q.  Your first letter was dated January 26, 2004.
22  Does that tell you anything about what that document is made
23  reference to?
24         MR. McMAHON:  Objection.  Calls for
25  speculation.

**Page 66**

1          You can answer if you can.
2      A.  It would mean that on January 26th I opened the
3  file to look at it.
4      Q.  (BY MR. CROWDER)  Take a look at documents 381
5  through 383 and ask if you can identify first what those
6  papers are.
7      A.  Again, it's the AWD history.
8      Q.  And does it show some entries that you were the
9  user on the AWD history?
10     A.  Yes, sir.
11     Q.  Okay.  What dates did you access the file?
12     A.  March the 5th.
13     Q.  What time?
14     A.  1539, 1534, 1529.  1529.
15         MR. McMAHON:  That's just documents 382 and
16  383?  Is that what you limited your question to?  This 381,
17  there's a different date.
18         THE WITNESS:  This is not me.
19         MR. McMAHON:  Okay.
20         MR. CROWDER:  No.  I was making reference
21  simply to her entries.
22     Q.  (BY MR. CROWDER)  Does it tell you what you
23  accessed the files for on those days?  Was it that day or
24  two days?
25     A.  One day.

**Page 67**

1      Q.  Does it tell you what you accessed the file for on
2  that day?
3      A.  No, sir.
4      Q.  Do you have any recollection of why you accessed
5  the file?
6      A.  I do not recall, no, sir.
7      Q.  Okay.  Would it have been in relation to the
8  letters you had drafted?
9      A.  Could have, yes, sir.
10     Q.  Okay.  Any other reasons you would have accessed
11  the file?
12     A.  I don't recall any other reason.
13     Q.  Will this document tell you if you printed
14  anything off the file, off the claims file?
15     A.  No, sir.
16     Q.  Do you recall having any conversations with any of
17  the claims department personnel who handled the processing
18  of the life insurance policy, James Stilwell life insurance
19  policy?
20     A.  I don't recall, no, sir.
21     Q.  Okay.  Did you talk to Ray Sawicki about his
22  involvement?
23     A.  Not that I recall.
24     Q.  How about Melinda Singh or --
25         MR. McMAHON:  Margaret Singh?

**Page 68**

1      Q.  (BY MR. CROWDER)  Margaret Singh.
2      A.  No, sir.
3      Q.  You did not talk to her?
4      A.  No, sir.
5      Q.  Do you recall having any conversations with me?
6      A.  Not that I recall, no, sir.
7      Q.  If you had conversations with me, would you have
8  logged those into the system?
9      A.  Not necessarily.
10     Q.  Can you tell me what your custom and practice is
11  with respect to logging things into the AWD system?
12     A.  Currently, in my position that I'm in now, I log
13  incoming calls and anything that I'm reviewing in a file.
14     Q.  What about back in January and March of '04?  Can
15  you tell me what you were doing?
16     A.  Most of my notes, if there were phone calls that I
17  wanted to document, I would document on a piece of paper and
18  put in the file.
19     Q.  But you didn't open the system up and document the
20  phone calls?
21     A.  Not often, no, sir.
22     Q.  Okay.  And did you, to your recollection, see any
23  handwritten notes in the file from you?
24     A.  Not that I recall, no, sir.
25     Q.  Okay.  Did you always have handwritten notes,

## DIANA L. FIELDS - July 6, 2006

---

69

1  then, from phone conversations, or did you have phone
2  conversations where you didn't document anything?
3      **A. I didn't always document phone conversations.**
4      Q. Are phone conversations in any way recorded by
5  AIG, to your knowledge?
6      **A. Not to my knowledge, no, sir.**
7      Q. When this letter went out on March 5 of 2004, did
8  you review it to make sure you thought it was accurate?
9      **A. Not that I recall, no, sir.**
10      Q. Okay. Now, that entry, that last entry that I
11  showed you, which was on pages 382 and 383, indicated that
12  you were in the system on March 5 of 2004; correct?
13      **A. Yes, sir.**
14      Q. And this letter went out on March 5 of 2004;
15  correct?
16      **A. Yes, sir.**
17      Q. Was there anybody else in the AWD system on
18  March 5 of 2004, to your recollection?
19          MR. McMAHON: Objection. Lack of
20  foundation. Calls for a conclusion.
21      **A. No, sir. It appears to just be me.**
22      Q. (BY MR. CROWDER) Now, does the legal department
23  have access to the AWD system?
24          MR. McMAHON: Objection. Lack of
25  foundation.

---

70

1      **A. I do not know.**
2      Q. (BY MR. CROWDER) Hand you document 385 and ask if
3  you know what that document is.
4      **A. It's an AWD transmittal form.**
5      Q. Okay. What's that? What's the purpose of it?
6      **A. To -- we put it on top of the files that we're
7  sending downstairs to the back-scanned so they'll know who
8  the piece of mail that's attached belongs to.**
9      Q. What's this indicate? Do documents 385 and 386 go
10  together?
11          MR. McMAHON: Objection. Calls for a
12  conclusion and for speculation.
13          You can answer if you can.
14      **A. I would not have any way of knowing.**
15      Q. (BY MR. CROWDER) Are you indicating that document
16  385 suggests there's another document that's going to be
17  scanned in?
18          MR. McMAHON: Objection. Calls for a
19  conclusion, calls for speculation.
20      **A. 385 doesn't say what was being scanned, so I have
21  no way of knowing what was attached to this.**
22      Q. (BY MR. CROWDER) But there was something scanned,
23  based on what you're reading in 385?
24      **A. Yes, sir.**
25      Q. Okay. And is that a document that you filled out?

---

71

1      **A. Yes, sir.**
2      Q. Okay. So you filled that document 385 out because
3  you wanted something scanned into the file?
4      **A. Yes, sir.**
5      Q. Okay. And what you're saying is you just can't
6  tell what that document was?
7      **A. Correct.**
8      Q. But you would be able to review it based on the
9  fact that when it was scanned in, it was scanned in 3-8-04
10  at 1:16 p.m.; correct?
11      **A. I'm sorry. Your question again?**
12      Q. Wouldn't you know what document was scanned in
13  based on the time and date of the scanning?
14          MR. McMAHON: Objection. Calls for a
15  conclusion, lack of foundation.
16      **A. Not necessarily. Some other stuff could have
17  gotten mixed in.**
18      Q. (BY MR. CROWDER) So if there was something else
19  scanned in on 3-8-04 at 1:16 p.m., you wouldn't know if that
20  was what your intent was? Was that what you're indicating?
21          MR. McMAHON: Same objection. Also you're
22  asking about her intent. You haven't established that she
23  authored that document.
24          MR. CROWDER: Yeah, I did.
25          MR. McMAHON: I don't think so.

---

72

1          MR. CROWDER: She just said she authored the
2  document.
3      Q. (BY MR. CROWDER) Is that correct?
4      **A. Yes.**
5          MR. McMAHON: I stand corrected.
6      Q. (BY MR. CROWDER) And what you're indicating, just
7  so we're clear, is that there was something that was
8  supposed to be scanned in as a result of you authoring this
9  document; correct?
10      **A. Correct.**
11      Q. Okay. And if this document was scanned on 3-8-04
12  at 1:16 p.m., then you would think that whatever you
13  intended to be scanned in would follow that; correct?
14          MR. McMAHON: Objection. Calls for
15  conclusion and for speculation.
16      **A. If we're assuming, yes.**
17      Q. (BY MR. CROWDER) Okay. In other words, they
18  wouldn't scan this in 3-8-04 and then scan what you intended
19  to be documented on 3-9-04; correct?
20          MR. McMAHON: Same objection. You're asking
21  what she thinks someone else would be doing in an area that
22  she doesn't work in.
23      Q. (BY MR. CROWDER) I think that, typically
24  speaking, these systems are set up so that you know when
25  certain things happen. Is that accurate?

---

## DIANA L. FIELDS - July 6, 2006

73

1    A. Correct.
2         MR. McMAHON: Objection. Lack of
3    foundation.
4    Q. (BY MR. CROWDER) Okay. You want to be able to
5    rely on the system so that you know when certain documents
6    were entered into the system; correct?
7         MR. McMAHON: Same objection.
8    Q. (BY MR. CROWDER) Is that accurate?
9    A. Yes, sir.
10    Q. Okay. So if this document was scanned in on
11    3-8-04 at 1:16 p.m., your intent was that the document that
12    you wanted scanned in would be done at that same time;
13    correct?
14         MR. McMAHON: Same objection.
15    A. Yes, sir.
16    Q. (BY MR. CROWDER) Okay.
17         (Brief interruption.)
18    Q. (BY MR. CROWDER) What's -- what was Ray Sawicki's
19    title back in January and March of 2004?
20    A. Director.
21    Q. Director of?
22    A. Claims.
23    Q. Okay. Would he be your boss?
24    A. Yes, sir.
25    Q. Okay. And was he -- does he still have that

74

1    title?
2    A. Yes, sir.
3    Q. Okay. And back in, I think, May of 2003 when
4    Mr. Stilwell passed away, would that have also been his
5    title, director of claims?
6         MR. McMAHON: If you know.
7    A. I don't know.
8    Q. (BY MR. CROWDER) I want to make sure I ask you,
9    did you have any conversations with Lawrence Bianchi, to
10    your recollection?
11    A. Not that I recall.
12    Q. Okay. What about a Tom Chamberlain?
13    A. Not that I recall.
14    Q. What about Tim Howard?
15    A. Not that I recall.
16    Q. A Rick Heavenar, H-e-a-v-e-n-a-r?
17    A. Not that I recall, no, sir.
18    Q. There was a couple names from -- do you know a
19    Roshawn Byrd, B-y-r-d?
20    A. Yes, sir.
21    Q. Okay. What does she do?
22    A. She's no longer with the company.
23    Q. She's no longer with the company?
24    A. Right.
25    Q. What was her position when she was with the

75

1    company?
2    A. I do not know.
3    Q. Was she at the Houston office?
4    A. For a short period of time.
5    Q. Can you give me -- can you tell me what you would
6    do in a situation where you were handling the claim itself
7    from the onset -- let me back up and make sure I set this up
8    accurately.
9         Will you only get involved after the insured has
10    passed away and people are starting to make claims? Would
11    that be your first involvement in a case, in a policy?
12    A. Yes, sir.
13    Q. Okay. So all the assignments and those type of
14    things that take place, if they're going to take place, take
15    place without your involvement; is that accurate?
16    A. Correct.
17    Q. Okay. When -- what, if anything, would you do if
18    you got a message or you got a phone call from somebody
19    involved that they were concerned about claims that were
20    being made and the accuracy of those claims being made? As
21    a claims examiner, what would you do?
22         MR. McMAHON: Objection. Calls for
23    speculation, incomplete hypothetical.
24         You can answer if you can. Lack of foundation
25    too. You can answer it if you can.

76

1    A. It would all depend on what the phone call or the
2    concerns were. Normally, I would ask them to document them
3    in writing and give me a letter of their concerns.
4    Q. (BY MR. CROWDER) Along that same inquiry from
5    somebody, what would result in you passing that on to the
6    legal department to make sure that -- passing that on to
7    somebody else to make sure that in fact their concerns were
8    handled appropriately?
9         MR. McMAHON: Hold on. Can you read the
10    question back, please?
11         (The reporter read the requested material.)
12         MR. McMAHON: Wait a second. I'm not sure I
13    understand the question. I'm concerned to the extent you're
14    asking her when she would involve the legal department? Is
15    that your question?
16    Q. (BY MR. CROWDER) Well, do you understand my
17    question, Diana?
18    A. Yes, sir, I believe I do.
19    Q. Okay.
20    A. And it again would depend on what the letter or
21    the circumstances were about this -- the phone call or their
22    letter that I asked them to send in. It may go to legal.
23    It may go to my director. I might document the file until I
24    was ready with all the other backup documentation to present
25    it to my director.

**DIANA L. FIELDS - July 6, 2006**

---

77

1    Q.  Okay.  The two sources that you would send that to
2    would be the legal department or your director, though?
3    That's where it would get passed on to if in fact you were
4    going to pass it on?
5        A.  Yes, sir.
6        Q.  Now, does the director get involved in every claim
7    file?
8        A.  No, sir.
9        Q.  Okay.  So, I mean, you can have a typical claim
10   file that the director would never have any involvement in;
11   would that be accurate?
12       A.  Correct.
13       Q.  Okay.  And when the checks get ready to be drafted
14   out, if you're handling the claim file, are you the one
15   that's basically ordering the checks to go to who they need
16   to go to?
17           MR. McMAHON:  Her personally?
18           MR. CROWDER:  Right.
19       Q.  (BY MR. CROWDER)  Are you the one getting those
20   drafted and telling people what the numbers are and those
21   type of things?
22       A.  Yes, sir.
23       Q.  Okay.
24           MR. McMAHON:  I want to be clear.  On a
25   claim that she has that somehow has been assigned to her?

---

78

1            MR. CROWDER:  Right, a claim that she has.
2        Q.  (BY MR. CROWDER)  The claims that you've had, have
3    you had people call up and say I think somebody's making a
4    false claim?
5        A.  Yes, sir.
6        Q.  And that's when — tell me what you do in response
7    to that.  I don't want to put words in your mouth.
8        A.  Again, I would ask them to put it in writing,
9    whatever their concern is, and would gather up all the
10   documentation and direct it to either my director or legal.
11       Q.  Okay.  Again, asking what you would do.  When an
12   entity has a collateral assignment, one that you've verified
13   and the system shows it's on record, when it goes to
14   verifying the debt or the amount of money that that entity
15   is owed, do you do anything to make sure that the insured is
16   the actual one owing that money?
17           MR. McMAHON:  Objection to the extent it
18   calls for speculation, incomplete hypothetical.
19           Go ahead and answer it if you can.
20       A.  I do not know, sir.
21       Q.  (BY MR. CROWDER)  You do not understand the
22   question or what?
23       A.  I do not ask the entity if the insured is the
24   debtor.
25       Q.  Okay.  Now why is that?

---

79

1        A.  Because it doesn't make any difference on a life
2    insurance policy if the insured is the debtor or not,
3    because the owner is the one that makes the assignment.
4        Q.  So, make sure I understand you correctly, then.  A
5    collateral assignment — this is just — I'm going to try to
6    understand what you're telling me.  If a collateral
7    assignment is issued to Tuscola Furniture Group by the owner
8    of the policy on the life of James Stilwell, does it matter
9    to you if James Stilwell owes the money to the assignee?
10           MR. McMAHON:  Objection.  Calls for
11   speculation.  Assumes facts not in evidence.
12           Go ahead and answer if you can.
13       A.  Does not matter to me, no, sir.
14       Q.  (BY MR. CROWDER)  Okay.  Does it matter to you if
15   the owner of a policy owes the money to the assignee?
16           MR. McMAHON:  Same objection.
17       A.  No, sir.
18       Q.  (BY MR. CROWDER)  Okay.  And why not?
19       A.  Again, the owner has the right to assign that
20   proceeds or has the right to assign that policy as
21   collateral.  To my knowledge, it doesn't matter who the
22   debtor is.
23       Q.  How do you verify what they're assigning the
24   collateral for, though?
25           MR. McMAHON:  Same objection.

---

80

1        Q.  (BY MR. CROWDER)  Do you understand what I'm
2    saying?
3        A.  No, sir.
4        Q.  Okay.  If the owner makes a collateral assignment,
5    how do you know if they're making a collateral assignment
6    for one particular debt or another?
7            MR. McMAHON:  Same objection.
8        A.  I do not know.
9        Q.  (BY MR. CROWDER)  And it doesn't matter?
10           MR. McMAHON:  Same objection.
11       A.  I don't understand what you mean it doesn't
12   matter.
13       Q.  (BY MR. CROWDER)  Well, if Margaret Stilwell is
14   the owner of this policy and she makes a collateral
15   assignment to Tuscola Furniture Group for 250,000, so long
16   as Tuscola Furniture Group is owed some money by somebody,
17   they're allowed to make a claim?
18           MR. McMAHON:  Objection.  Calls for
19   speculation.  Assumes facts not in evidence.
20           You can answer if you can.
21       Q.  (BY MR. CROWDER)  Or does Tuscola Furniture Group
22   have to be owed some money from the owner or the insured?
23           MR. McMAHON:  Same objection.
24       Q.  (BY MR. CROWDER)  That's what I'm trying to get a
25   clarification on.

---

## DIANA L. FIELDS - July 6, 2006

81

1      MR. McMAHON: Same objection.
2      A. I wouldn't know the answer to that.
3      Q. (BY MR. CROWDER) Okay. But you understand what
4    I'm asking?
5      A. Yes, sir.
6      Q. Okay. Let me ask it differently. If Margaret
7    Stilwell makes a collateral assignment to Tuscola Furniture
8    Group for this 250,000 but Tuscola Furniture Group is owed
9    money by a separate corporation, would you want to know
10   that?
11           MR. McMAHON: Objection. Calls for
12   speculation. Incomplete hypothetical.
13           You can answer it if you can.
14      A. I didn't understand the question.
15      Q. (BY MR. CROWDER) Okay. Let me ask it again a
16   different way, try to make it more understandable. And
17   maybe the easiest way is when a collateral -- when the
18   assignee of a collateral assignment makes a claim against a
19   life insurance policy, are they, to your knowledge and
20   understanding, are they saying when they make a claim that
21   so-and-so owes me this much money? And if so, who's the
22   so-and-so?
23           MR. McMAHON: Object to the form of the
24   question. Calls for speculation. It's a hypothetical.
25           Do you understand the question?

82

1           THE WITNESS: Yes.
2      A. I don't see the behind the scenes as far as who
3    owes to whom, but when I ask for a letter from the assignee
4    as far as what their indebtedness is for this assignment for
5    this policy, I would expect to get back what the debt is.
6    As far as to who owes it, I don't know that.
7      Q. (BY MR. CROWDER) And that's not -- in terms of
8    the way you handle claims, that's not something that you
9    research into to verify that this debt is a legitimate debt?
10           MR. McMAHON: Same objection.
11      Q. (BY MR. CROWDER) Is that accurate?
12      A. Right.
13      Q. Okay. You rely on the verification of the
14   assignee that they're owed money under this collateral
15   assignment?
16      A. Yes, sir.
17      Q. Okay. And you might not know in this particular
18   case -- let me ask it differently. Have you dealt with
19   claims where there's collateral assignment that exceed --
20   out there that exceed the actual amount of the life
21   insurance policy?
22      A. Yes, sir.
23      Q. Okay. If in fact there are collateral, two
24   collateral assignments, say, on a 4-million-dollar policy,
25   one of them for 3 million and one of them for 2 million, and

83

1    both of them are owed the amount to the assignment, how do
2    you determine who gets the money?
3           MR. McMAHON: Objection. Calls for
4    speculation, calls for a conclusion.
5           You can answer it.
6      A. The person that had the first assignment would
7    have first claim on the money.
8      Q. (BY MR. CROWDER) Okay. To your knowledge, in the
9    Stilwell claim, did that become an issue?
10           MR. McMAHON: If you know.
11      A. Oh, I don't know.
12      Q. (BY MR. CROWDER) I think I know the answer to
13   this question, but I want to make sure it's on the record.
14   In the situation where there are collateral assignments to a
15   bank, the bank will send you a letter saying here's the
16   balance, here's the interest on the date of death; correct?
17      A. No, sir.
18      Q. What do they do?
19      A. They will send me what the balance is and they'll
20   usually send me a per diem, that's what I ask for, a per
21   diem amount of interest.
22      Q. And through what date, though?
23      A. I don't give them an end date. It's when I get a
24   per diem so that I can figure out when I pay it how much the
25   interest will be.

84

1      Q. Okay. From your standpoint and review of a file,
2    is it the amount of money that's owed on the date of death
3    that's critical?
4           MR. McMAHON: Object to the form of the
5    question. Lack of foundation.
6           If you understand it, go ahead and answer it.
7      A. I don't understand it. Sorry.
8      Q. (BY MR. CROWDER) Okay. Well, if Jim Stilwell
9    owes a million dollars to Tuscola National Bank, is it --
10   and of course that money continues to -- what he owes has
11   interest involved, is it what he owes on his date of death,
12   May 2nd, '03, that allows him to make a claim, or does his
13   date of death not have anything to do with it?
14           MR. McMAHON: I'm going to object to the
15   lack of foundation and assumes facts not in evidence, mainly
16   to the form of the question.
17      Q. (BY MR. CROWDER) Do you understand the question?
18      A. Uh-huh, yes, sir. Date of death doesn't have
19   anything to do with it.
20      Q. Okay. From your review and what you do, you're
21   not concerned with date of death?
22      A. Correct.
23      Q. Okay. Is there any inquiry into the person who
24   made the assignment, the owner of the policy, as to whether
25   or not they owe this money that's being claimed?

## DIANA L. FIELDS - July 6, 2006

85

1    MR. McMAHON: Objection. Calls for
2  speculation, lack of foundation.
3        Answer if you can.
4    **A. I missed the question. I'm sorry.**
5    Q. (BY MR. CROWDER) All right. We've established
6  that in a policy like this the owner is the one that's
7  making the assignment; correct?
8    **A. Correct.**
9    Q. The owner is the person that is allowed to make an
10 assignment of life insurance policy; accurate?
11   **A. Correct.**
12   Q. Okay. Is there any verification with the owner,
13 after the insured has passed away, as to people who are
14 making the claims?
15       MR. McMAHON: You're asking her what her
16 personal procedure would be if she was faced with that
17 circumstance?
18       MR. CROWDER: Right.
19       MR. McMAHON: Objection. Calls for
20 speculation.
21       You can answer it if you can.
22   **A. No, sir, I don't run it by the beneficiary.**
23   Q. (BY MR. CROWDER) Can it be as simple — when a
24 person is making a claim on a collateral assignment, can it
25 be as simple as I'm owed X amount of dollars and then verify

86

1  it and sign the name?
2        MR. McMAHON: Objection. Calls for
3  speculation, assumes facts not in evidence.
4        If you can answer the question.
5    **A. It has to be on their letterhead and signed by an**
6  **officer of the company; but yes, it can be as simple as**
7  **that.**
8    Q. (BY MR. CROWDER) And in terms of how they got to
9  that number or the calculations that lead to that number,
10 that's not important to you?
11       MR. McMAHON: Same objection.
12   **A. No, sir.**
13   Q. (BY MR. CROWDER) On AIG document No. 21, did you
14 make any determination as to whether or not this assignment
15 or this release of assignment gave any rights to Tuscola
16 Furniture Group?
17       MR. McMAHON: If you recall.
18   **A. I don't recall.**
19   Q. (BY MR. CROWDER) You don't remember one way or
20 the other?
21   **A. No, sir.**
22   Q. Okay. If you were the claims examiner on this
23 file, I'm asking you hypothetically, if you were claims
24 examiner on this file and you were dealing with this release
25 of assignment and had somebody saying -- had a claimant

87

1  saying to you that Janko Financial Group released or
2  transferred their prior assignments to Tuscola Furniture
3  Group based on this document, what would you do?
4        MR. McMAHON: Objection. Calls for
5  speculation, incomplete hypothetical, and assumes facts not
6  in evidence.
7        You can answer it if you can.
8    **A. If someone came in and made a claim on behalf of**
9  **them for this assignment, I would have directed it to my**
10 **director.**
11   Q. (BY MR. CROWDER) Do you know if that's what
12 happened in this case?
13   **A. I do not know.**
14   Q. You would not have made any -- drawn any
15 conclusions or you would not have made any decisions as to
16 whether or not Tuscola Furniture Group was entitled to the
17 prior Janko Financial Group assignments?
18       MR. McMAHON: Well, I think she's already
19 testified she didn't get involved until the money was
20 already paid.
21       MR. CROWDER: I'm just asking from a
22 hypothetical situation.
23   Q. (BY MR. CROWDER) You would not have made —
24       MR. McMAHON: In a separate claim
25 hypothetical, if this document came in to her, you're asking

88

1  her what she would do?
2        MR. CROWDER: Right.
3        MR. McMAHON: Same objections.
4        Go ahead and answer.
5    **A. No, I wouldn't have.**
6    Q. (BY MR. CROWDER) Okay. You would not have made
7  any decisions about this document doesn't give Tuscola
8  Furniture Group any rights or this document does give
9  Tuscola Furniture Group any rights?
10   **A. I wouldn't have made a decision at all on it.**
11   Q. You would have simply passed the documentation on
12 to your director?
13   **A. Correct.**
14   Q. Okay.
15       MR. CROWDER: That's all I have for you.
16       MR. McMAHON: We'll reserve signature. I
17 have a question. Jason, are you going to be testifying in
18 this case and offering an affidavit yourself, or do you plan
19 to take the position that any communications that were not
20 reduced to writing that you had are somehow relevant to the
21 case?
22       MR. CROWDER: I am not going to be
23 testifying, obviously. We're basing this on, obviously,
24 documentation; so I don't see that that's something that I
25 plan on doing.

# DIANA L. FIELDS - July 6, 2006

89

1    MR. McMAHON: Okay. If you were, we'd want
2  to take your deposition, but I don't want to take a lawyer's
3  deposition lightly, particularly a lawyer representing a
4  client in a case, and I have no intention of doing that
5  unless you're planning to be a witness. Otherwise, I'd have
6  to change that position, obviously. So we can confirm this
7  one way or the other off the record, but I just was curious
8  at this point as to whether you had a position on that.
9  Right now you have no intention of being a witness in this
10  case?
11    MR. CROWDER: No. I mean, as I understood
12  and I asked her today, she has no recollection of any
13  conversations with me.
14    MR. McMAHON: Do you have recollections of
15  conversations with her?
16    MR. CROWDER: I do have recollections, but I
17  don't know that they are —
18    MR. McMAHON: Relevant.
19    MR. CROWDER: -- yeah, relevant to and
20  contradictory to anything that's said in the letters. And I
21  just don't know that they're going to be important to the
22  outcome of this case anyway.
23    MR. McMAHON: We can talk about that.
24    (Deposition concluded at 11:15 a.m.)
25

90

1    CHANGES AND SIGNATURE
2    WITNESS NAME: DIANA L. FIELDS
3    DATE OF DEPOSITION: 07-06-06
4  _____
5  PAGE    LINE    CHANGE    REASON____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

91

1    I, DIANA L. FIELDS, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5
6    _____
7    DIANA L. FIELDS
8  THE STATE OF TEXAS:
9  COUNTY OF HARRIS:
10
11    Before me, _____, on this day
12  personally appeared DIANA L. FIELDS, known to me (or proved
13  to me under oath or through _____) (description
14  of identity or other document) to be the person whose name
15  is subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18
19    Given under my hand and seal of office this
20  _____ day of _____, 2006.
21
22
23    _____
24    NOTARY PUBLIC IN AND FOR
25    THE STATE OF _____

92

1  STATE OF TEXAS   )
                     )
2  COUNTY OF HARRIS  )
3        DEPOSITION OFFICER'S CERTIFICATE
4  ORAL DEPOSITION OF DIANA L. FIELDS
   Taken on July 06, 2006
5
6  I, LaRita J. Cormier, Certified Shorthand Reporter in and
   for the State of Texas, hereby certify that this deposition
7  transcript is a true record of the testimony given by the
   witness named herein, after said witness was duly sworn or
8  affirmed by me.
9  I further certify that I am neither attorney nor counsel
   for, related to, nor employed by any of the parties to the
10  action in which this testimony was taken. Further, I am not
   a relative nor employee of any attorney of record in this
11  cause, nor do I have a financial interest in this action.
12  Further certification requirements pursuant to the Rules
   will be certified to after they have occurred, if
13  applicable.
14  Subscribed and sworn to on this the 12th day of July, 2006.
15
16
17    LaRita J. Cormier, Texas CSR 3412
   Expiration Date: 12-31-07
18    Firm Registration No. 62
   4545 Post Oak Place, Suite 350
19    Houston, Texas 77027
   PHONE: 713.626.2629
20    FAX:   713.626.1966
21
22
23
24
25

DIANA L. FIELDS - July 6, 2006

1   I, DIANA L. FIELDS, have read the foregoing deposition and

2   hereby affix my signature that same is true and correct,

3   except as noted above.

4

5                                    *Diana L. Fields*
                        _____

6                            DIANA L. FIELDS

7

8   THE STATE OF TEXAS:

9   COUNTY OF HARRIS:

10

11          Before me,  ANDREA L. TERRY  , on this day

12  personally appeared DIANA L. FIELDS, known to me (or proved

13  to me under oath or through _____) (description

14  of identity or other document) to be the person whose name

15  is subscribed to the foregoing instrument and acknowledged

16  to me that they executed the same for the purposes and

17  consideration therein expressed.

18

19          Given under my hand and seal of office this

20  10TH day of August ___, 2006.

21                                        ┌─────────────────────────┐
                                          │  (SEAL)  ANDREA L. TERRY │
22                                        │          Notary Public   │
                                          │          STATE OF TEXAS  │
23         *Andrea L. Terry*              │     My Comm. Exp. 06-28-2010 │
        _____          └─────────────────────────┘

24         NOTARY PUBLIC IN AND FOR

25         THE STATE OF  TEXAS

RIVERSIDE REPORTING, INC.
713.626.2629