IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARGARET J. STILWELL, HALEY STILWELL,       )
HEIDI STILWELL, JAMIE STILWELL, MEGAN        )
STILWELL,                                    )
                                             )       No. 05 CV 02160
                Plaintiff,                   )
                                             )       Honorable Chief Judge
        v.                                   )       Michael P. McCaskey
                                             )
AMERICAN GENERAL LIFE INSURANCE              )       Magistrate Judge
COMPANY,                                     )       David G. Bertha
                                             )
                Defendant.                   )
_____     )
                                             )
AMERICAN GENERAL LIFE INSURANCE              )
COMPANY,                                     )
                                             )
                Third-Party Plaintiff,       )
                                             )
        v.                                   )
                                             )
FIRST MID ILLINOIS BANK & TRUST,             )
TUSCOLA FURNITURE GROUP, LLC,                )
and JANKO FINANCIAL GROUP, LLC,              )
                                             )
                Third-Party Defendants.      )

## AMERICAN GENERAL'S COMBINED MOTION AND MEMORANDUM FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM

### INTRODUCTION

This is an attempt by Plaintiff, Margaret Stilwell[1], to reap a windfall by recovering life

insurance proceeds from American General that it has already paid to her creditors and

assignees, Tuscola Furniture Group (TFG) and Janko Financial Group (Janko), to satisfy a valid

business debt that she would have otherwise personally owed.

---

[1] Plaintiffs Haley, Heidi, Jamie and Megan Stillwell were later added as Plaintiff parties based solely on their status
as partial beneficiaries in the Policy at issue. For ease of reference and practicality, American General refers to
Plaintiffs in the singular as Margaret Stilwell. It should be noted, however, that Margaret Stilwell knows virtually
nothing about the substance of her claim and it is the unnamed Trustee of her Bankruptcy Estate and the Trustee's
counsel who are actually responsible for pursuing this baseless claim. Ex. B at 61, 63.

The case at bar is based on the frivolous contention that by paying a joint claim submitted by her business creditor and assignees, TFG and its lender, First Mid Illinois Bank & Trust ("the Bank"), American General improperly overpaid TFG approximately $182,000.00 -- not because Plaintiff did not actually owe TFG these funds (she did), but because, despite clear and unequivocal evidence to the contrary, she believes that TFG held only a single assignment under the Policy in the amount of $250,000. This position has no basis in fact or law.

The face of the undisputed claim documentation clearly and unambiguously demonstrates that TFG held assignments totaling $2,250,000 under the Policy. Plaintiff has offered nothing to the contrary and concedes that she actually has no knowledge of the total value of assignments that were held by TFG at the time of her husband's death. There is no question that American General's payment was proper, there was no overpayment to TFG, and no damage to Plaintiff. For this reason alone, American General is entitled to summary judgment as a matter of law. However, even if the face of the disputed assignment form at issue is ambiguous, the uncontroverted evidence demonstrates that American General's payment of the joint claim properly gave effect to the express intent of the parties as reflected in the related contracts, the surrounding circumstances, and the parties' course of conduct. Thus, either way, there are no triable issues of fact and American General is entitled to summary judgment on Plaintiff's claim.

Even if this Court finds that American General's payment of the joint claim was somehow improper, Plaintiff's claim is barred under the terms of the Policy, which itself requires Plaintiff to submit a claimant's statement upon the death of the Insured and protect American General from payment of claims based on invalid assignments.

Plaintiff's claim is also barred on grounds of laches, estoppel, waiver, and unjust enrichment. Despite the fact that she had knowledge of TFG's position and the representations it

390284.1

made to American General in its claim submissions, Plaintiff failed to object and did nothing to otherwise alert American General or TFG that she secretly disputed the payment of the joint claim.  Despite the fact that she submitted her own claim under a separate Policy issued by American General, Plaintiff never submitted a claim under the Policy at bar and gave American General no reason to believe that the joint claim was contested.

Instead, she sat back and allowed American General to pay off her business creditors with policy proceeds which reduced the debt that she personally owed, she allowed her creditors to voluntarily dismiss a separate action that had been pending against her on another matter as a result of that payment, and she filed for bankruptcy and then waited until she received a discharge of all of her debts before bringing the present claim.  To allow recovery under the set of facts in the record before the Court affronts the principals of fairness, justice and good conscience.

For all of these reasons, this Court should enter judgment in favor of American General and against Plaintiff as a matter of law.

In the alternative and assuming first that American General's Motion for Summary Judgment is denied, American General is entitled to summary judgment on its claims against Third Party Defendants, TFG and the Bank, for the reasons set forth in American General's separate but contemporaneously filed motion against those third parties.

## **UNDISPUTED MATERIAL FACTS**

### A.    ACV

1.    Margaret and Jim Stilwell were shareholders, directors and officers of Amishland Country Village, Inc. ("ACV"), a company engaged in the retail tourism business.  *See,* American General's Appendix of Exhibits filed in Support of its Motion for Summary Judgment

390284.1

("App.")[2] at Ex. A, Plaintiffs' Response to Requests to Admit, Nos. 1 and 2 and Ex. B, Deposition of Margaret Stilwell, at p. 12-13. ACV held an ownership interest in Amishland Development LLC, a development company that was partially owned and managed by Janko Financial Group, LLC ("Janko"). Ex. C, Deposition of Lawrence Bianchi, at 8-11. ACV operated its business from a location owned and leased by ACV. *Id.*

**B.    The Policies**

2.    In 1998, James Stilwell sought life insurance for the purpose of protecting his family from business debt and to assist in financing ACV's various business ventures. Ex. B at 16, 42, Ex. C at 12-13. On or about October 27, 1998, the Old Line Life Insurance Company of America, a subsidiary of American General, issued Policy No. 2604663 to James Stillwell with a face amount of $4,000,000 ("the Policy" or the "$4 Million Policy"). Ex. A at No. 3, Ex B(1). It also issued a separate policy (Policy No. 2384339) on the life of Mr. Stilwell in the amount of $1,000,000. ("the $1 Million Policy"). Ex. A at No. 11.

3.    Margaret Stilwell was the owner and a 60% beneficiary under the $4 Million Policy. Ex. B(1). The purpose of the $4 Million Policy was to assist in funding the Stilwells' business expenses related to ACV and, thus, to protect the Stilwell family from the business debt. Ex. D, Deposition of John Lyons, at 12-13, 16, Ex. B at 16, 42.

4.    Plaintiff was also a 60% beneficiary of the $1 Million Policy. Ex. B at 58-9. The purpose of the $1 Million Policy was to take care of Margaret Stilwell and the Stilwell children. Ex. B at 16, 42, Ex. D at 12-13, 16.

---

[2] All Exhibits referenced herein are contained in a separate Appendix of Exhibits, which American General has filed in support of its motion herewith.

### C.   Margaret Stilwell Executes Various Assignments Relating to the Consignment Agreements

5.   The $4 Million Policy allowed the policyholder to make third-party assignments and contained the following provisions:

**Payment of Proceeds**

> The face amount will be paid to the beneficiary immediately upon receipt of Due Proof of the Death of the Insured …

Ex. B (1) at 3.

**Assignment**

> No assignment of this policy will be binding on us until filed with us in writing and recorded by us.  No assignment will affect any payment we made before we recorded the assignment.  We will not be responsible for the validity of an assignment.

> All rights of the owner and any revocable beneficiary are subject to the rights of any assignee on record with us.

*Id.* at 7.

6.   After the issuance of the Policy, Margaret Stilwell executed a number of assignments under the Policy to a number of business creditors in connection with ACV's various business transactions.  Ex. D at 22.  One of these business ventures involved an unusual private lending arrangement with Janko to assist in ACV obtaining financing at a rate that it was unable to obtain directly from a commercial lender.  Ex. E, Deposition of Thomas Chamberlain at 16-17, 22.  Ex. C at 11-12.

7.   On April 16, 1999, Janko and ACV entered into a Consignment Agreement to assist ACV financing its retail furniture operation. ("1999 Consignment Agreement").  Ex. B(2); Ex. C at 11-13.  The 1999 Consignment Agreement contained several provisions to protect Janko's investment with ACV, including the requirement that James and Margaret Stilwell personally guarantee ACV's debt (Ex. B at 21 and B(2) at Bates stamp 321-22) and a provision

5

which required ACV to maintain life insurance protection for the benefit of Janko and its lender.

Ex. B(2) at Bates stamp 311.

       8.      Specifically, Section 3.9 of the Consignment Agreement provided, in relevant

part:

> 3.9  <u>Life Insurance</u>:  ACV will maintain life insurance and pay the premiums thereon on JIM STILWELL in the amount of at least $2,000,000.00 or an amount equal to the Inventory Cap, if higher, with JANKO and Bank named as beneficiary …The life insurance proceeds shall be used first to pay Bank for the amount JANKO owes Bank in order to release its lien on the Amish furniture, then to JANKO for all Amish furniture owned by JANKO at average wholesale cost, less a credit for the amount paid Bank, and any other amounts owed to JANKO under this agreement and any excess life insurance proceeds shall be paid to the Estate of James Stilwell or ACV.  Upon payment, JANKO will convey title to as much of the Amish furniture free and clear of all liens, as was paid for by the insurance proceeds, to ACV.

*Id.*

       9.      Rather than complying with the express terms of Section 3.9, ACV provided

Janko with two separate assignments under the $4 Million Policy for a total assignment of

$2,000,000, the amount of the financing cap.  Ex. C at 17-18.  Initially, Margaret Stilwell

executed a form assignment on April 19, 1999 in the amount of $500,000 to Janko.  Ex. B at 23

and B(3).  Upon receipt of the $500,000 assignment, Janko followed up with Jim Stilwell to

obtain an additional assignment to cover the balance of the debt reflected in the Consignment

Agreement.  Ex. C at 17-21.  Thereafter, on September 25, 2000, Margaret Stilwell executed

another assignment in favor of Janko in the amount of $1,500,000.00.  Ex. A at No. 18; Ex. B at

25 and Ex. B(4).

      10.     Both of these assignments to Janko provide, in part:

> F.    The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the

390284.1

reason for any action taken by the Assignee, or the validity of the amount of the Liabilities or the existence of any default therein, or the filing of any notice under Paragraph E(2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received shall be a full discharge and release therefore to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned therein, shall be drawn to the exclusive order of the Assignee if, when, and in such amounts as may be requested by the Assignee.

Ex. B(3)and (4). American General verified receipt of each of these assignments. Ex. F at Nos. 15-16 and 19-20 and Ex. F(2), (4) and (5).

11.    Thereafter, the principals of Janko created an entity called Tuscola Furniture Group, LLC ("TFG") to assist in financing ACV's Amish furniture business and assume Janko's responsibilities to ACV under its consignment agreement. Ex. C at 22. Janko was the majority shareholder in TFG. Ex. C at 9. To this end, on November 16, 2000, Janko and its company TFG entered into an Assignment and Assumption Agreement which transferred and assigned all of Janko's rights and obligations under the 1999 Consignment Agreement to TFG. Ex B(5) at Bates stamp 707; Ex. C at 22. The Assignment and Assumption Agreement specifically included Janko's assignment to TFG of *"any and all Contracts and other documents including insurance policies, relating to and incurred in connection with the acquisition and consignment of Amish Furniture pursuant to the [1999] Consignment Agreement..."* Ex. B(5) at 707.

12.    After the Janko/TFG Assumption and Assignment Agreement was executed, ACV and TFG entered into a new Consignment Agreement. ("2000 Consignment"). Ex. B at 26-27 and Ex. B(5) at Bates stamp 655-666. With the exception of lowering the amount of financing available and a few other miscellaneous changes, the terms and conditions of the 2000

7

Consignment were identical to the 1999 agreement. Ex. C at 24-26; compare Ex. B(2) and B(5) at 655-666. For example, both James and Margaret Stilwell were required to guarantee ACV's debt to TFG under the 2000 Consignment and, like the first agreement, the 2000 Consignment required ACV to maintain life insurance in the amount of $1,250,000 with TFG and Bank[3] named as beneficiary. *Id*.

13.    However, at the closing of the 2000 financing transaction, the Stilwells did not present evidence of a new joint policy or an assignment of interest under the existing $4 Million Policy in an amended amount required under Section 3.9 of the new agreement. Ex. C at 26-29. TFG agreed to close the transaction anyway because it felt that it was adequately protected -- or over protected -- by virtue of the existing $2 Million assignment that it already held as a result of its Assignment and Assumption Agreement with Janko. *Id*.

14.    Pending receipt of new assignments from Margaret Stilwell in the proper amount required under the 2000 Consignment, TFG requested that the Stilwells provide it with documentation so that it could notify American General that Janko had assigned its Policy rights to TFG as a result of the Assignment and Assumption Agreement. *Id*. On or about November 21, 2000 Larry Bianchi of TFG received from the Stilwell's insurance agent, Mr. John Lyons, an American General assignment form that had already been partially completed. Ex. C at 30-32; Ex. B(20). Mr. Bianchi understood that Mr. Lyons had forwarded this form to him pursuant to his request that the Stilwells provide documentation that could be used to notify the insurer, American General, that TFG was the holder of the policy assignments originally held by Janko while the parties worked to satisfy the terms of the 2000 Consignment Agreement by effecting new policy assignments. Ex. C at 30-32, 37-38.

---

[3] This agreement too defines "BANK" as FIRST MID ILLINOIS BANK and TRUST OF TUSCOLA, ILLINOIS. ExB(5) at ___.

390284.1

15.    Section I, titled Contract Identification, and Section III, titled "Release of Assignment," had already been completed by Mr. Lyons when Mr. Bianchi received the form. Ex. C at 30-32; and Ex B(20); Ex. D at 97-98. Because he was concerned over the use of the term "release" in section III, instead of simply executing the form document, Mr. Bianchi specifically inserted the words *"in favor of [TFG]"* to make clear the parties' transfer of Janko's rights under the Policy to TFG. Ex. C at 30-32 and Ex. B(20). American General verified receipt of this document as an "Assignment Release." Ex. F at Nos. 39 and 40 and F(2) at Ex. 12.

16.    On or about November 21, 2000, Margaret Stilwell executed a Policy Assignment in the amount of $250,000 in favor of TFG. Ex. A at No 41, Ex. B at 28 and B(6). TFG received the November 21, 2000 assignment after Mr. Bianchi executed the Release of Assignment in favor of TFG. Ex. C at 33. Upon receipt, Mr. Bianchi notified Mr. Stilwell that the assignment was insufficient because 1) it did not include the Bank, and 2) the amount of the assignment was wrong and an additional $1 Million was required under the terms of the Consignment Agreement. *Id.*

17.    Thereafter, in January 2001, Margaret Stilwell executed another policy assignment in the amount of $1,000,000 in favor of the Bank. Ex. C at 34-35; Ex. B at 29-30 and Ex B(7). This time, Mr. Bianchi notified Mr. Stilwell that the January 2001 assignment was insufficient because it only named the Bank and he advised him that TFG would not release the $2 Million in policy  assignments that it received from Janko until the matter was corrected. Ex. C at 35. American General verified receipt of each of the November 2000 and the January 2001 assignments. Ex. F at Nos. 44 and 48 and at Ex. F(2) and Ex. 14 and 16.

**D.    TFG and the Bank Submit a Joint Claim for Proceeds**

18.    James Stilwell died on May 2, 2003. Ex. A at No. 49.

19.    On or about May 12, 2006, TFG submitted to American General a completed "Proof of Death Claimant's Statement" ("claim form"), document submissions, including an Exhibit A, which purported to reflect the to be amount owed by the Stilwells and ACV to TFG as $512,974.50, and a cover letter which stated, in relevant part:

> ... *Tuscola Furniture Group, LLC ("TFG") and First Mid-Illinois Bank and Trust ("Bank"), are jointly making application on the collateral assignments they received to secure an obligation under a certain consignment agreement dated November 17, 2000 between TFG and Amish Land Country Village, Inc. As itemized on the attached Exhibit A, the total amount owed by Amish Land Country Village, Inc. and guaranteed by James and Margaret Stilwell is $512,974.50. This amount includes the amounts that TFG owes the Bank. Please issue your draft made payable to Tuscola Furniture Group, LLC and First Mid-Illinois Bank and Trust, and have it delivered to First-Mid Illinois and Trust – 229 South Neil – Champaign Illinois 61820 – attention: Thomas J. Chamberlain. The signature of the bank officer below acknowledges and confirms this direction.*
>
> *Upon receipt of this amount TFG and the Bank will relinquish all assignments against the proceeds on the life insurance policy no. 2604663. Specifically, these are the assignments to Janko Financial Group, LLC, TFG and the Bank dated April 19, 1999 for $500,000, September 25, 2000 for $1,500,000, and January 11, 2001 for $1,000,000.*
>
> *Finally we have enclosed and completed claimants statement on the form you provided for both TFG and Janko Financial Group, LLC.*

Ex. C at 50, Ex. B(13); Ex. F at No. 56 and Ex. F(2)(18).

20.    TFG's May 12, 2003 cover letter was also executed on behalf of the Bank by Thomas J. Chamberlain. *Id.*

21.    In addition to signing TFG's claim submission letter, the Bank submitted an identical claim letter and submissions to American General. The Bank's cover letter, signed by both Mr. Chamberlain and Lawrence W. Bianchi on behalf of TFG and Janko, was identical in

10

content to TFG's cover letter submission and also contained the same Exhibit A document, which purported to evidence the outstanding debt of $512,974.50. Ex. E at 46 and EX. E(5); Ex. C at 54-55 at C(4).

22.    Thereafter, Mr. Bianchi discovered that he had failed to list all of the assignments held by TFG and, on May 28, 2003, he forwarded additional correspondence to American General for the purpose of amending his initial claim submission to identify yet another assignment. Ex. C at 54 and B(14). This letter states, in part:

> **Please accept this letter as an amendment to my letter dated 12 May 2003. When listing "all Assignments" against the proceeds on the life insurance policy number 2604663, I inadvertently left out an assignment to Tuscola Furniture Group, LLC dated November 21, 2000 for $250,000.**

Ex. C at 56-57 and Ex C(5).

23.    On or about June 10, 2003, American General sent separate correspondence to TFG, Janko, and the Bank, which requested verification of the assignments referenced in their claims and confirmation of the debt they claimed they were owed. Ex. F at 68 and F(2) at Ex. 21; Ex. C at 58 and D(6). Significantly, American General advised Janko that, according to its records, Janko had released its assignment in December 2000 and it advised TFG that it only had records of one assignment to TFG in the amount of $250,000. *Id.*

24.    Mr. Bianchi responded to these letters on behalf of TFG and Janko by contacting American General and speaking with Director of Claims, Ray Sawicki. Ex. C at 58-64. Mr. Bianchi explained to Mr. Sawicki that TFG held multiple assignments which exceeded the amount of the parties' Consignment Agreement and he advised Mr. Sawicki that the reason and intent behind Janko's execution of the form release document was to notify American General that Janko had already released and transferred its policy rights to a new company called TFG

11

and that TFG was the holder of the assignments.  *Id.*    To confirm and follow up with this conversation, TFG forwarded correspondence to American General in further support of its claim which stated, in relevant part:

> *Thank you for the opportunity to provide a further explanation for a rather complex situation. ...*
> ***
> *On 16 April 1999, Janko Financial Group (JFG), LLC entered into a Consignment Agreement for the retailing of Amish Furniture with Amishland Country Village, Inc. and guaranteed personally by James and Margaret Stilwell.  Section 3.9 of this original consignment agreement required that JFG and their lender, First Mid-Illinois Bank and Trust (FMIB), receive an assignment of beneficial interest for life insurance on James Stilwell in the amount of $2,000,000.*
>
> *On 19 April 1999, JFG received an assignment of life insurance in the amount of $500,000 from Margaret Stilwell, owner of Policy No. 2604663 with James Stilwell as the insured.  However, it was not until 25 September 2000, that JFG received a second assignment of life insurance for the same policy in the amount of $1,500,000 from Margaret Stilwell.*
>
> *On 16 November 2000, JFG signed an assignment and assumption agreement with the newly formed LLC, Tuscola Furniture Group (TFG), LLC.  This new entity is owned 70% by JFG with JFG acting as managing member.  This agreement was specifically included and lists any rights to insurance assignments relating to the original consignment agreement.*
>
> *On 17 November 2000, TFG entered into a new consignment agreement with Amish Land Country Village, Inc. and guaranteed personally by James and Margaret Stilwell.  This new agreement modified and replaced the previous agreement.  Once again, Section 3.9 of the new consignment agreement required that TFG and their lender FMIB receive an assignment of beneficial interest for life insurance on James Stilwell in the amount of $1,250,000.*
>
> *On 20 November 2000, in support of the assignment and assumption agreement between JFG and TFG, JFG signed a release of assignment on Policy No. 2604663 'in favor of Tuscola Furniture Group, LLC.'  This release was a transfer of all rights of insurance assignment for JFG to TFG.*

*On 21 November 2000, TFG received an assignment of life insurance in the amount of $250,000 from Margaret Stilwell, owner of Policy No. 2604663 with James Stilwell as the insured. Then, on 11 January 2001, FMIB received an assignment of life insurance for the same policy in the amount of $1,000,000 from Margaret Stilwell.*

*The preceding chronology of events resulted in the following assignments from Margaret Stilwell on Policy No. 2604663:*

> *Tuscola Furniture Group, LLC - $2,000,000 (assignment transfer to Tuscola Furniture Group, LLC via agreement dated 16 November 2000 and release dated 20 November 2000);*

> *Tuscola Furniture Group, LLC - $250,000 (21 November 2000);*

> *First Mid-Illinois Bank and Trust - $1,000,000 (11 January 2001).*

*Therefore the life insurance assignments received from Margaret Stilwell on Policy No. 2604663 in satisfaction of the requirements of the consignment agreements (dated 16 April 1999 and 17 November 2000) totaled $3,250,000.*

*These events lead us to the claim being made jointly by TFG and FMIB to American General Life as documented in the information submitted by TFG, TFG and FMIB, a joint claim is being made for $512,974.50 in conjunction with the obligations of Amish Land County Village, Inc. and James and Margaret Stilwell per the consignment agreement date [sic] 17 November 2000. The payment of this claim in the amount of $512,974.50 would release all assignments to JFG, TFG and FMIB, which total $3,250,000. Mr. Sawicki, as we discussed I believe that a review of the enclosed letters dated 12 May 2003 and 28 May 2003, provide American General Life with releases for all assignments totaling $3,250,000 upon receipt of the claim amount of $512,974.50.*

Ex. C at 58-59 and C(7).

### E.    American General's Payment of the Joint Claim

25.    American General sought the advice of its counsel, Melinda Boyd, regarding the payment of the joint claim submitted by TFG and the Bank.  Ex. G(2) Affidavit of Diane Fields at ¶ 6.  On June 25, 2003, TFG and Janko sent American General a formal authorization for Lawrence Bianchi to act as signatory for Janko and TFG for the purpose of releasing all assignments pertaining to the Policy under the joint claim.  Ex. C at 64 and C(8).  Thereafter, American General approved payment of the joint claim submitted by TFG and the Bank.  Ex. E at 63-64 and E(8).  On or about June 26, 2003, American General forwarded a check for $512,974.50 to TFG and First Mid.  *Id*; Ex. C at 65.  The check was deposited in TFG's account and the Bank was then paid the amount TFG owed the Bank as a result of its financing arrangement with ACV.  Ex. E at 64-66.

### F.    Stilwells' Claim Under the $1 Million Policy and American General's Payment to the Stilwells Under the Policies

26.    On or about May 6, 2003, Margaret Stilwell executed a "Proof of Death Claimant's Statement" ("claim form") under the $1 Million Policy, which was then submitted to American General on her behalf for processing.  Ex. B(10).  No similar claim form was submitted to American General by or on behalf of Margaret Stilwell under the $4 Million Policy and Margaret Stilwell never made a claim under the $4 Million Policy until the present suit was filed.  Ex. B at 47-48, Ex. C at 51.

27.    On or before May 28, 2003, American General forwarded a $600,000 check to Margaret Stilwell for her 60% share under the $1 Million Policy.  Ex. B at 59 and B(15); Ex. D at 55.  After processing and paying the various claims submitted by creditors under the $4 Million Policy, American General forwarded correspondence to Margaret Stilwell, along with a

check in the amount of $25,354.98, representing her 60% share of the policy benefits that remained under the $4 Million Policy after all business creditors' claims had been paid. Ex. B at 60 at B(16)and (17).

28.    At the same time, American General forwarded four claimants' statements to be completed by the remaining Stilwell beneficiaries. Ex B(17). On or about August 4, 2004, after receiving executed claim statements from each of the remaining beneficiaries, American General forwarded four checks in the amount of $4,225.83 to Haley Stilwell, Megan Stilwell, Jamie Stilwell Bowles and Heidi Stilwell. Ex. A at Nos. 95, 96 and Ex. A(27).

### G.    Notice of TFG's Joint Claim to Stilwells and Resolution of Replevin Action

29.    ACV was experiencing financial difficulties prior to the death of Mr. Stilwell. Ex. B at 30; Ex. C at 39; Ex. D at 43. As a result of ACV's inability to meet its debts under its lease agreement with Amishland Development, the landlord filed a lawsuit against ACV, Jim Stilwell, and Margaret Stilwell in February 2003. The lawsuit was brought by Janko as the managing member of the LLC and it sought to recover approximately $380,000 in back rent from ACV and the Stilwell parties. Ex. B (8) at 47-74; Ex. C at 41-42, Ex. H., Affidavit of Richard Broch at ¶ 3 and Ex. H(A).

30.    ACV and the Stilwells were represented in that action by attorney Richard Broch. Ex. B at 33-35 and B(8) at 34-36. Ex. H. Mr. Broch had represented the Stilwells in relation to the Consignment Agreements and was ACV's corporate attorney. Ex. B at 33, Ex. D at 43; Ex. H at ¶ 2. On or about May 6, 2003, Tim Howard, counsel for Amishland Development and the Janko related entities, forwarded correspondence to Mr. Broch, concerning the debt owed to TFG, which stated in part:

> ***Pursuant to the Consignment Agreement, we will seek satisfaction of our claim against your client, [ACV] from the***

>*proceeds of the life insurance policy on the life of Mr. Stilwell. Pursuant to paragraph 3.9 of the Agreement, Mr. Stilwell maintained a life insurance policy on his life with Old Line Life Insurance Company (Policy No. 2604663). One million dollars of coverage was collaterally assigned to Tuscola Furniture Group, LLC (TFG) and its bank, First Mid-Illinois Bank & Trust by an Assignment dated January 11, 2001. The proceeds of this policy are sufficient to satisfy the TFG claim of approximately $481,000, with the excess proceeds payable to Mrs. Stilwell. Our client is preparing a payoff statement.*
>
>*¶Finally, we do not see the need to proceed with the replevin action that has been scheduled for trial this Friday, because our client and the bank will be paid from the insurance proceeds.*
>
>*Call me to discuss this matter at your convenience.*

Ex. H at ¶ 5 and Ex. H(C).

31.     Plaintiff met with her counsel and insurance agent shortly after the death of Mr. Stilwell to discuss the existence of the policies and assignments. Ex. B at 17-19, 45, 47; Ex. D at 73-75; Ex. H at ¶ 6.

32.     On May 19, 2003, Richard Broch, forwarded correspondence to Tim Howard, attorney for TFG and Janko related entities, stating, in part:

>*As Margaret Stilwell had forgotten about the specifics of the life insurance assignments, I have indicated that I would go over those with her to explain exactly where the proceeds would go, for what purposes and in what amounts. In that regard I want to clear up a couple of questions I have since speaking with her insurance agent, John Lyons of Atwood.*
>
>\*\*\*
>
>*The purpose of this fax is to inquire as to whether or not you have, and would be able to forward to me, the assignment documentation for Janko Furniture Group, Citizens Bank and FMIB, so that I can go over with Margaret the exact nature of the assignment. We need to determine the amounts still owed to FMIB by JFG as of May 2, 2003; why Princeton is now claiming the 1.5 million; and the specifics as to the JFG claimed amount of $500,000 plus. Margaret is interested in taking care of any valid assignment as soon as the insurance money arrives, however needs to have these questions cleared up for her peace of mind.*

16

*Id.* at 6 and Ex. H(D).

33.     In addition to having direct communications with Mr. Howard regarding TFG's intent to satisfy its debt under the Consignment Agreement, the claim documentation that TFG submitted to American General demonstrates that Mr. Broch was a carbon copy recipient of TFG's original and amended claim submissions.   Ex. F(2) at Ex. 19 and 20; Ex. B(13) and (14).

.

34.     Thereafter, on June 30, 2003, the pending action for back rent against Mrs. Stilwell and ACV was voluntarily dismissed as a result of American General's payment of the joint claim made by TFG and the Bank.  Ex. H at ¶ 8 and H(E).

**H.      Margaret Stilwell's Bankruptcy and Discharge**

35.     On or about November 25, 2003, Margaret Stilwell sought protection from her creditors under Bankruptcy law by filing a Petition for Bankruptcy under Chapter 7 of the Bankruptcy Code.  Ex. I, U.S. Bankruptcy Court Docket Report from Case No. 03-93877.

36.     The payment made by American General to TFG and the Bank satisfied the amount that the Stilwells and their company owed TFG under the 2000 Consignment Agreement. Ex. C at 72.  Janko and TFG had no reason to and did not assert a claim in Margaret Stilwell's bankruptcy estate because their debt had been satisfied though American General's payment of life insurance proceeds under the $4 Million Policy. *Id.* at 73.

37.     On April 27, 2004, Margaret Stilwell received a discharge of all of her debts in the Bankruptcy proceedings.  Ex. I.   Thereafter, she filed the present claim against American General based on the theory that the payment of the joint claim was improper because it only held assignment of interest under the Policy in the total amount of $250,000.

17

**H.    TFG, Janko and the Bank's Verification of Claim Submissions And American General's Reliance on Those Submissions**

38.    The content of the May 12, 2003 submissions by TFG, Janko and the Bank were truthful and accurate.  Ex. C at 52-54, 64 Ex. E at 48-49.  TFG, Janko, and its lender First Mid Illinois Bank knew that American General would be relying on the representations that were made in the claim submissions.  Ex. C at 98, Ex. F at 67.  Their intent in drafting the claim submissions was to get American General to pay the claim under the Policy.  Ex. C at 53, Ex. E at 68.  TFG, Janko, and the Bank had no reason to believe that the submission of the joint claim was not proper or that ACV or Plaintiff had any objection to or issue with the claim that was submitted.  Ex. C at 102, Ex. E at 95.

39.    American General reviews the documentation that is submitted with a claim to determine whether the claim is payable under the policy based upon the documentation submitted in support of the claim.  Ex. G(3) at ¶ 2.  In reviewing claims that are made and determining whether those claims are payable, the claims examiner and claims analyst relies on the truth of the representations that are made in the documents and claim submissions that are received with the claim. *Id.* at ¶ 4.

40.    American General's Policy No. 2604663 ("the Policy") required Plaintiff to execute and submit a claimants' statement.  *Id.* at ¶ 3.  This purpose of requiring that a beneficiary submit a claimant's statement and provide other reasonably requested information in connection with a claim so that American General can make the necessary investigation to determine if and when payment is proper under the Policy and also to protect the Company from paying contested claims. *Id.*

41.    American General paid what was believed to be an uncontested claim after a detailed and thorough investigation.  *Id.* at ¶ 7.  Margaret Stilwell never submitted a claimants'

statement under the $4 Million Policy and she never notified American General that she objected to payment of the joint claim that TFG and the Bank had made prior to American General's payment of that claim. *Id*. at ¶ 5. Had American General known that Plaintiff objected to payment of the joint claim, it would not have paid the claim. *Id*. at ¶ 6-7. Instead, it would have determined whether the proceeds could have been paid pursuant to a settlement agreement between the adverse parties, or it would have filed a complaint for interpleader relief. *Id*.

## ARGUMENT

### I.    AMERICAN GENERAL PROPERLY PAID THE JOINT CLAIM BASED ON PLAIN LANGUAGE OF THE EXISTING ASSIGNMENTS AND THE EXPRESS INTENT OF THE PARTIES

Assignments are governed by contract law and are subject to the same requisites for validity as are other contracts. *Employers Modern Life Co. v Lindley*, 83 Ill.App.3d 394, 404 N.E.2d 1036 (5th Dist. 1980). A court's primary goal in construing a contract is to give effect to the intent of the parties. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34, 195 Ill. Dec. 701, 628 N.E.2d 1165 (1st Dist. 1993). Like any other contract, the creation and existence of an assignment is to be determined according to the intent of the parties, and that intent is derived not only from the instruments executed, but also from the surrounding circumstances. *Rivan Die Mold Corp. v. Stewart Warner Corp.,* 26 Ill. App. 3d 637, 642, 325 N.E.2d 357 (1st Dist. 1975).

In determining the intent of the parties, the court must consider the document as a whole, rather than focusing upon isolated portions. *Premier Title Company v. Donahue*, 328 Ill.App.3d 161, 765 N.E.2d 513 (2nd Dist 2002); *Spectramed, Inc. v. Gould, Inc.*, 304 Ill. App. 3d 762, 770, 237 Ill. Dec. 578, 710 N.E.2d 1 (1st Dist. 1998). When the language of a contract is clear, the court must determine the intent of the parties solely from the language of the contract based on its plain and ordinary meaning. *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 344, 249 Ill. Dec. 303, 736 N.E.2d 145 (1st Dist. 2000).

A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Central States Pension Fund v. Kroger Co.*, 73 F.3d 727, 732 (7th Cir. 1996). If, after considering the language of an agreement, a court determines that the document is ambiguous, it may then look beyond the agreement to ascertain the intent of the parties from extrinsic

evidence, including other instruments, the surrounding circumstances, and the course of the parties' conduct. *Donahue,* 328 Ill. App. 3d at 164, 765 N.E.2d 516; *see also, Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill. 2d 281, 288, 565 N.E.2d 990 (Ill. 1990); *Rivan Die Mold Corp., supra.. Northern Trust Co. v. Tarre,* 86 Ill. 2d 441, 450, 427 N.E.2d 1217 (Ill. 1981). If the intent of the parties can be ascertained from the extrinsic evidence, the issue is decided as a matter of law. *Marusiak v. Adjustable Clamp, Co.*, 2005 U.S. Dist. LEXIS 22016 (N.D. Ill. 2005).

### A.      <u>The Plain Language of the Disputed Assignment Form Compels the Conclusion that Janko Assigned its Rights to TFG</u>

No particular form or language is required to effect the valid assignment of an insurance policy. *Clarin Corp. v. Massachusetts Gen. Life Ins. Co.*, 44 F.3d 471 (7th Cir 1994) *citing, Stoller v. Exchange Nat'l Bank,* 199 Ill. App. 3d 674, 557 N.E.2d 438, 443, 145 Ill. Dec. 668 (1st Dist. 1990); *Gray v. Penn Mut. Life Ins. Co.*, 5 Ill. App. 2d 541, 126 N.E.2d 409 (1st Dist 1995). All that is required is a sufficiently specific expression of the intent to assign the insurance policy. *Clarin,* 44 F.3d 471; *Stoller, 557 N.E.2d at 443.* When a valid assignment occurs, "the assignee acquires all of the interest of the assignor in the property that is transferred." *Buck v. Illinois National Bank & Trust Co.,* 79 Ill. App. 2d 101, 106, 223 N.E.2d 167 (1st Dist. 1967).

Plaintiff's case is premised entirely on the contention that the November 21, 2000 Assignment form completed by Janko ("Disputed Assignment Form") operated as a general and blanket release of all Janko's rights under the Policy, rather than a transfer (or notice of a trust) of those rights to TFG. Ex. B(20). This document is a form document from American General titled "ASSIGNMENT," which consists of four (4) sections. Ex. B(20). Part I titled, "Contract Identification," is completed to identify the Policy at issue. Part II, titled "Assignment" is left

blank. Part III is titled "Release of Assignment." It identifies the Assignee/Creditor as "Janko Financial Group LLC."

The last section, Part IV is titled "Sign Here For Above Request" and provides, in relevant part: *"[T]o Release the assignment of this contract, this request must be signed by the Assignee"* The contract is signed as "assignee" by "Lawrence W. Bianchi, Authorized Member" and the words ***"in favor of Tuscola Furniture Group, L.L.C."*** are specifically inserted by hand next to his signature. *Id.* Ex. B(20).

Keeping in mind the cardinal rules of contract construction, the only reasonable interpretation of this form is the one offered to American General by TFG and Janko. By specifically and intentionally inserting the phrase ***"in favor of Tuscola Furniture Group, L.L.C.,"*** Janko's intent to transfer, assign, and/or release its rights under the identified contract to and "in favor of" TFG is clear and unambiguous.

Plaintiff's interpretation, on the other hand, is unreasonable because it fixates on the term "release" and completely ignores the specific language that was purposely drafted into this form document. Accordingly, Plaintiff's position flies in the face of the most basic principals of contract construction -- that (1) contracts are construed as a whole (*Donahue, supra*); and (2) that meaning and effect are to be given to all terms and provisions. *See, State Farm Mut. Auto. Ins. Co. v. Schmitt*, 94 Ill. App. 3d 1062 (1st Dist. 1981)(it is presumed that the provisions are purposefully inserted and that the language was not employed idly); *Lulich v. Sherwin-Williams Co.*, 799 F. Supp. 64, 67 (N.D. Ill. 1992)(meaning should be ascribed to every term in a contract); *Atlantic Mutual Ins. Co. v. Metron Engineering and Construction Co.*, 83 F.3d 897, 900 (7th Cir. 1996)("It is presumed that every clause in the contract was inserted deliberately and

for a purpose…"); *Moore v. Lomas Mortgage USA,* 796 F. Supp. 300, 304 (N.D.Ill. 1992)(court must avoid construction that renders some terms superfluous.)

      Taken as a whole, the Disputed Assignment Form is clear and unambiguous. On its face, this form assignment compels the conclusion that the parties intended to transfer Janko's rights under the Policy to TFG -- not simply relinquish its rights back to Plaintiff. There is no reasonable alternative interpretation that can be reached based on a proper reading of this contract as a whole. Thus, American General properly paid the claim submitted based on the clear and unambiguous assignment form and it is entitled to summary judgment for this reason alone.

### B.    The Uncontroverted Extrinsic Evidence Compels The Finding That the Claim was Properly Paid To Give Effect to the Intent of the Parties

      Even if the Court finds that the face of the Disputed Assignment Form is ambiguous because it is susceptible to reasonable alternative interpretations, there can be no question in light of the admissible extrinsic evidence that the parties intended TFG to have an assignment of interest in the Policy that exceeded the amount of the joint claim. Accordingly, American General is still entitled to summary judgment because it properly paid the claim to give effect to the unambiguous intent of the parties.

### (i)    Janko and TFG intended to Transfer, Not Release, the Prior Policy Assignments

      Unlike the other assignment documents,[4] Plaintiff had no part in creating or executing the Disputed Assignment Form. Ex. B at 66-67 and (B)(20). In fact, Plaintiff has no idea who

---

[4] Aside from recognizing her signature on the other assignment documents that exist and recalling that she periodically executed these types of forms because her husband asked her to do so (Ex. B at 23-25, 28-30), Plaintiff has no recollection or knowledge of the assignments that were executed under the Policy (*Id.*), she has no knowledge of the total amount of valid assignments that existed under the Policy at the time of her husband's death (*Id.* at 65), and she has no knowledge of how much had been assigned to Janko under the Policy, how much assigned to TFG under the Policy, or how much had been assigned to First Bank. (*Id.* at 44).

390284.1

completed this document and she has no knowledge of why the document was generated. *Id.* Thus, one can reasonably conclude that the relevant parties to the Disputed Assignment Form are Janko and TFG and, thus, it is Janko and TFG's intent in executing this document that the Court should view as relevant and controlling.

The intent of Janko and TFG is clear from the undisputed related documents and testimony. The face of the parties' Assignment and Assumption Agreement undeniably "transferred and assigned" all of the rights and obligations that Janko held under the 1999 Consignment Agreement, including "all contracts and other documents including insurance policies, relating to and incurred in connection with the acquisition and consignment of Amish Furniture..." to TFG. Ex B(5) at 707. The $500,000 and $1.5 million Policy assignments that Janko had held as a result of the 1999 Consignment Agreement were included in the bundle of rights that were transferred from Janko to TFG on November 16, 2000.

Accordingly, when Janko executed the Disputed Assignment Form on or about November 21, 2000, it had already transferred and assigned all of its rights under the Policy to TFG five days earlier under the Assignment and Assumption Agreement. As a matter of law and logistics, Janko no longer held any rights under the Policy and there was nothing left for Janko to release on November 21, 2000. *See, Young v. Chicago Federal Sav. & Loan Ass'n,* 180 Ill.App.3d 280, 535 N.E.2d 977 (1st Dist 1989)

The documentary evidence is factually and legally consistent with the undisputed testimony from Janko and TFG regarding their intent in executing the Disputed Assignment Form. Mr. Bianchi, the corporate representative of TFG and Janko, testified that the Disputed Assignment Form was not meant to operate as a general blanket release of Janko's rights, but

instead was intended to give the insurer, American General, notice that Janko had transferred its original $2 million Policy assignment to TFG.  Ex. C at 30-32, 37-38, 82-83.

Furthermore, Mr. Bianchi's testimony is undisputed and consistent with the objective documentary evidence before the court.  Mr. Bianchi testified that the Stilwells showed up to the closing for the 2000 Consignment transaction without the proper life insurance protection required under Section 3.9, but TFG decided to close the transaction in any event because it felt that it was sufficiently protected by virtue of the assignments that had been transferred to TFG under its prior Assignment and Assumption Agreement with Janko.  Ex. C at 27-29.  There is no evidence to the contrary and no legal support for the finding that Janko released the $2,000,000 policy assignments that it received under the 1999 Consignment Agreement.

### (ii)    The Objective Evidence of Plaintiffs' Intent Demonstrates that TFG was the Intended Beneficiary of the Policy Assignments

Even assuming Plaintiff's intent is somehow relevant does not change the outcome.  As noted above, Plaintiff has no relevant knowledge of the Disputed Assignment Form.  Nor does she have any knowledge of the total amount of valid policy assignments that existed at the time of her husband's death (Ex. B at 65) or how much had been assigned to Janko, TFG, and/or the Bank (*Id.* at 44).  Accordingly, she has nothing to add.

The objective evidence and documentation of the underlying financial transaction between ACV and TFG as well as the parties' prior course of dealings under the Consignment Agreement leave no doubt that it was always the parties' intent to protect TFG's investment in ACV in an amount no less than the total agreed upon financing under the Consignment.

The fact that Plaintiff has absolutely no knowledge and hardly any recollection of the underlying financial transactions between ACV and TFG is irrelevant. She attended the closing, she personally guaranteed the transaction, and she is clearly bound by the content of the

390284.1

documents that were executed in relation to the parties' financing agreement. *Leon v. Max E. Miller and Sons*, 23 Ill.App.3d 694, 699-700, 320 N.E.2d 256, 260 (1974); *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill.App.3d 810, 616 N.E.2d 615 (2nd Dist. 1993).

This means that Plaintiff is bound by the knowledge of the Assignment and Assumption Agreement between TFG and Janko, which is specifically included in the closing documents for the parties' consignment transaction. Ex. B(5) at Bates stamp 707. The only reasonable conclusion based on the evidence is that ACV and the Stilwells had notice and knowledge of Janko's prior assignment of rights to TFG and that AVC shared the intent to protect TFG as evidenced in the parties' transaction.[5]

As noted above, Mr. Bianchi's testimony that the Stilwells showed up to the closing of the 2000 Consignment transaction without the $1.25 Million policy assignments necessary to comply with the requirements in Sections 3.9 and 6.4, but that the parties nonetheless agreed to close because TFG felt that it was overprotected by virtue of the prior policy assignments that had been transferred under the Assignment and Assumption Agreement, is logical and consistent with the objective documentary evidence before the Court. Furthermore, as noted above, although Plaintiff attended the closing and personally guaranteed the Consignment Agreement (Ex B(5) at Bates stamp 668), she recalls absolutely nothing about the transaction and, thus, Mr. Bianchi's testimony concerning the parties' intent is unrebutted. *Id.* at 25, 27, 28.

However, even if one completely ignores the existence of the Janko's prior assignment to TFG, the Consignment Agreements, and the parties' prior course of dealings under these

---

[5] There is no factual or legal basis to presume that the assignments executed under the prior Consignment were automatically released or otherwise terminated by virtue of this new agreement. *See, Central State Bank v. Edwards*, 21 Tenn. App. 418, 111 S.W.2d 873 (1937) (Life insurance policy assignment is not released from pledge by giving new notes in payment of old where return of assignment is never demanded). There is nothing on the face of the Consignment Agreement to support the finding that the prior assignments were null and void.

390284.1

agreements compel the finding that the parties intended to protect TFG's loan up to the total amount of its potential liability under the financing cap.

In addition to requiring that James and Margaret Stilwell personally guarantee ACV's debt to TGF under section 6.3, Section 3.9 and 6.4 required ACV to maintain a life insurance policy on the life of James Stilwell in an amount of at least $1.25 million for the benefit of **both** TFG and its lender, First Mid Illinois Bank. Ex. B(5) at 662.  The clear and plain language of the Consignment Agreement demonstrates that the parties disclosed intent was to protect both TFG and the Bank with available life insurance proceeds.  Thus, American General properly gave effect to the intent of the parties when it paid the claim that was submitted by TFG and the Bank.

The parties' prior course of dealing also supports this finding.  ACV's prior Consignment Agreement with Janko is virtually identical to the underlying transaction at issue.  The record demonstrates that in the past, Plaintiff had complied with the spirit of the life insurance provisions by making Policy assignments to Janko in the amount specified in the Agreement and that Janko had accepted these assignments in lieu of requiring strict performance with Section 3.9 and 6.4.  Ex. B(2), B(3), and B(4).  Accordingly, one may reasonably conclude that the assignments given to TFG and the Bank under the 2000 Consignment transaction were intended to protect both TFG and the Bank, and not just the Bank -- an entity to whom Plaintiff owed  no direct contractual liability.

No matter how the evidence is selected and viewed, the parties' intent to protect TFG under the Policy up to the amount of the Consignment Agreement is clear and unambiguous. The related documents, surrounding circumstances, undisputed testimony, and the parties' prior course of conduct all require the finding that American General properly paid the joint claim to

give effect to the intent of the parties. Accordingly, this Court should enter summary judgment in favor of American General and against Plaintiff as a matter of law.

## II.     PLAINTIFF'S CLAIM IS BARRED UNDER THE POLICY

The Policy required Plaintiff to submit a claim for proceeds as a condition precedent to the payment of benefits. Ex. A (1) at 3. Plaintiff never submitted a claim of her own under the $4 Million Policy and never notified American General of her objection to TFG's claim prior to payment of the claim. Ex. B at 47-48, Ex. D at 51; Ex. G(3) at ¶ 5. This requirement of giving notice of a claim is not a mere technicality, but is intended to protect the insurer from paying contested claims and serve the practical purpose of enabling it to make the necessary investigation and to avoid paying contested claims. *See, Vignali v. Farmers Equitable Ins. Co.,* 71 Ill. App. 2d 114, 121 216 N.E.2d 827 (3rd Dist. 1966). Plaintiff failed to comply with the terms of the Policy and failed to give American General notice of her claim and, thus, it should be barred.

Furthermore, the Policy explicitly provides that American General *"will not be responsible for the validity of an assignment."* Ex. A(1) at 7. Accordingly, assuming that TFG did not hold a valid assignment of Janko's Policy rights, American General is entitled to summary judgment under the terms of the Policy for this reason as well.

## III.     PLAINTIFF'S CLAIMS ARE OTHERWISE BARRED

### A.     Plaintiff's Claim is Barred Under A Theory of Unjust Enrichment

Plaintiff's end run around her creditors and her claim for repayment from American General smacks of unjust enrichment. Plaintiff undeniably reaped substantial personal benefits from American General's the payment of the claim that she is now attempting to challenge.

The payment that Plaintiff now seeks to recover had the undeniable effect of "reducing to zero" a valid debt that Plaintiff would have otherwise owed directly to TFG as a result of her

28

personal guarantee of ACV's loan. Ex. C at 72. American General's payment to TFG also had the effect of causing Janko to suddenly drop a separate claim that it had filed on behalf of ACV's landlord against ACV, Plaintiff, and her husband for outstanding rent of almost $400,000. Ex. H at ¶¶ 5-8.

After Mr. Stilwell's death, Janko's counsel advised Plaintiff, through her counsel, that its company, TFG, intended to submit a claim for life insurance proceeds for the total amount it was owned under the Consignment Agreement. *Id.* Janko further advised Plaintiff and her counsel that if the insurer paid TFG's claim, Janko would not pursue the pending claim for back rent. *Id.* While this separate legal proceeding does not appear to have had anything to do with the Consignment Agreement, there can be little question that Plaintiff received a direct benefit from American General's payment of the joint claim when it resulted in the voluntary dismissal of that lawsuit.

Regardless of whether American General's payment of the joint claim was technically proper, allowing her to now recover from American General the proceeds that were paid to TFG in satisfaction of a debt that she would have otherwise personally owed violates the basic principals of fairness, justice and good conscience. Accordingly, her claim should be barred under a theory of unjust enrichment.

### B.    Plaintiff's Claim is Also Barred by the Doctrines of Waiver, Estoppel and Laches

Even if American General's payment of TFG's claim was improper and the unjust enrichment defense is inapplicable, Plaintiff's claim is nonetheless barred by the doctrines of waiver, estoppel and laches.

Waiver is a voluntary relinquishment of a known right. *Crum & Forster Managers Corp. v. Resolution Trust Corp.,* 156 Ill. 2d 384, 620 N.E.2d 1073, 1080, 189 Ill. Dec. 756 (Ill. 1993);

*Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir. 1979). It may be express or implied, arising from acts, words, conduct, or knowledge of the one waiving the right. *Id.*  It may also be inferred from delay in asserting a right. *First Trust & Savings Bank v. Skokie Federal Savings & Loan Association*, 126 Ill. App. 3d 42, 45, 466 N.E.2d 1048 (1st Dist. 1984); *John Kubinski & Sons, Inc. v. Dockside Development Corp.*, 33 Ill. App. 3d 1015, 1020, 339 N.E.2d 529  (1st. Dist. 1975)(Waiver occurs when one acts inconsistent with an intention to insist upon a known right).

Plaintiff had knowledge of her rights under the Policy.  She met with her counsel and insurance agent to discuss the existing insurance policies and she knew that she was the primary beneficiary under the $ 1 Million Policy and that if there were funds available after the creditors had been paid from the $ 4 Million Policy, she was entitled to her pro rata share of funds as a beneficiary of that policy as well.  Ex B at 17-19, 45, 47; Ex. D at 73-75; Ex. H at 6.

There can be little doubt that Plaintiff knew that she was required to submit a claimant's statement under either Policy to recover proceeds.  This is a clear term in the Policy and within four (4) days of her husband's death, she submitted an executed claimant's statement form seeking payment under the $1 Million policy.  However, at no time did Plaintiff ever submit a claim to American General under the $4 million policy. Ex. B at 47-48; Ex. C at 51, Ex. G(3) at ¶ 5.  At no time prior to the filing of the present lawsuit, did Plaintiff object to the payment of TFG's joint claim or otherwise express an intention to lay claim to the policy proceeds that were assigned to various creditors.  Ex. G(3) at ¶ 5.

Not only was her counsel was specifically apprised of TFG's intention to submit a joint claim, he discussed this fact with Plaintiff (Ex. H at ¶¶ 6-7 and Ex. H(D)) and, thereafter, he was copied on TFG's May 12, 2006 claim submission to American General. Ex. B(13) and (14).

390284.1

Plaintiff has no factual basis to dispute that her counsel discussed TFG's claim and intentions with her at the time (Ex. B at 50-54) -- but even if she did, her counsel's knowledge would still be imputed to her. *Hengel, Inc. v. Hot 'n Now, Inc.*, 1996 U.S.Dist LEXIS 12120 (N.D. Ill 1996), *citing Ekel v. Bynum*, 240 Ill.App.3d 867, 8  608 N.E.2d 167 (1st Dist 1992)(Illinois courts consistently hold that "notice to an attorney is knowledge of, or imputed to, the client...") Despite the knowledge that TFG had made a claim under the Policy in the total amount it was owed or otherwise expressed an intention to lay claim to these funds.  based on the purported misrepresentation that it held Policy assignments in excess of the amount claimed,  Plaintiff never objected to TFG's claim.  By failing to act to protect her interest, Plaintiff has waived the right to additional proceeds under the Policy.

Even assuming that Plaintiff has not waived her rights under the facts, she is nonetheless estopped from pursuing the present claim based her conduct (or lack thereof) during (and after) the claims process.  Unlike waiver, where the focus is on Plaintiff's implied or expressed intent, estoppel focuses on the effects that Plaintiff's conduct had on American General. *Saverslak*, 606 F.2d at 213. "[E]stoppel is appropriate against a person who adopts a position which reasonably misleads someone into detrimental reliance, regardless of the intent of his actions, if to hold otherwise would have an unjust effect." *M.J. Oldenstedt Plumbing Co. v. K Mart Corp.*, 257 Ill. App. 3d 759, 629 N.E.2d 214, 218, 195 Ill. Dec. 906 (3d Dist. 1994); *Buczak v. Central Savings & Loan Association*, 230 Ill. App. 3d 490, 594 N.E.2d 1291, 1296, 171 Ill. Dec. 771 (1st Dist. 1992). "It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert h[er] right. [s]he cannot by h[er] silence induce or encourage the commission of the act and then be heard to complain." *Buczak*, 594 N.E.2d at 1297.

31

The facts discussed above in the context of waiver and unjust enrichment also support a finding that Plaintiff is estopped from pursuing the present claim against American General. Plaintiff had knowledge of her rights under the Policy, knew that TFG had represented in its claim submission to American General that it was entitled to an amount that Plaintiff secretly contested it was technically owed, but nevertheless, she did nothing to protect her own interest or to notify American General to TFG's purported misrepresentations. Instead, she sat back and silently watched while American General considered TFG's claim submissions and then paid the claim. She also failed to object and quietly received the benefits of American General's payment of TFG's claim, which not only satisfied a valid company debt that she would have been personally liable to pay, but also prompted the sudden dismissal of an unrelated Janko claim against her for almost $400,000. Finally, she waited until she had obtained a discharge of her debts to TFG and Janko in bankruptcy before she decided to alert American General to her position and pursue the present claim. Ex. I.

On the other hand, American General paid what it believed was an uncontested claim after a detailed and thorough investigation. Ex. G(3) at ¶ 7. American General had no knowledge that the claim was contested. *Id.* at ¶ 5. Had Plaintiff's secret position been disclosed, the insurer would have followed its standard practice of either paying the proceeds pursuant to an agreement between the adverse claimants, or sought protection from the risk of possible double liability under the Policy by filing an action for interpleader relief. *Id.* at ¶ 6. While fraudulent intent is not a necessary element of equitable estoppel, it may certainly be reasonably inferred from the objective facts in the record at bar. At a minimum, however, there

should be no question that these facts satisfy the elements of estoppel and, thus, bar Plaintiff's claim.[6]

Finally, the equitable doctrine of laches also bars Plaintiff's claim. *Teamsters and Employers Welfare Trust of Ill. v. Gorman Brothers Ready Mix*, 283 F.3d 877, 881 (7th Cir. 2002), *citing Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 822 (7th Cir. 1999)(laches is applicable to suits at law or in equity). The "doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights." *Hollis v. Muller*, 284 BR 256 (N.D. Ill. 2002). Dismissal of a claim on the grounds of laches requires that there be (1) unreasonable and unexcused delay in bringing the claim, and (2) material prejudice to the defendant as a result of the delay. *Id.*

Plaintiff had knowledge of TFG's claim under the policy in May 2003 and failed to file suit or object to the payment of the claim until June 2005. Whether this two year delay was part of a calculated strategy to reap the full benefit of American General's pay off of her creditors and then avoid the rest of her debts in bankruptcy before challenging the payment of TFG's claim or whether it was simple laziness or inadvertence, the delay is still inexplicable, unreasonable, and inexcusable. As noted above, Plaintiff's intentional silence materially prejudiced American General because it caused the insurer to pay a claim that was secretly contested whereas had it

---

[6] The standard elements of equitable estoppel are (1) words or conduct of the party against whom estoppel is alleged, constituting either misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom estoppel is asserted that the representations were untrue; (3) the party claiming the benefit of estoppel must not have known the representations were false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting estoppel; (5) the party claiming the benefit of estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of estoppel must be in a position of prejudice if the party against whom estoppel is alleged is permitted to deny the truth of the representations made. *Vaughn v. Speaker*, 126 Ill.2d 150, 533 N.E.2d 885 (Ill. 1988).

known the claim was disputed, it would have simply sought to deposit the funds with the Court and forced Plaintiff to fight it out with TFG directly.

## CONCLUSION

For all of the foregoing reasons, American General is entitled to summary judgment on Plaintiff's claim. If, however, this Court denies American General's motion, it is entitled to summary judgment on its third party claims against TFG and First Mid for the reasons set forth in the separate motion and memorandum of law that have been filed in the third party action.

Respectfully submitted,

**AMERICAN GENERAL LIFE INSURANCE COMPANY**

By: ____ s/ Rebecca M. Rothmann _____
  Rebecca M/ Rothmann
  Attorney Bar Number: 6236791
  Attorney for Defendant/Third Party
   Plaintiff
  WILSON, ELSER, MOSKOWITZ,
   EDELMAN & DICKER LLP
  120 North La Salle Street, Suite 2600
  Chicago, Illinois 60602
  Phone: (312) 704-0550
  Fax: (312) 704-1522
  Rebecca.Rothmann@wilsonelser.com

## CERTIFICATE OF SERVICE

I hereby certify that on **April 2, 2007**, I electronically filed the above pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

### SERVICE LIST
*Margaret Stilwell v. American General Life Ins. Co.*

Jason M. Crowder
HELLER, HOLMES & ASSOC., P.C.
1101 Broadway, P.O. Box 889
Mattoon, IL 61938
(217) 235-2700
(217) 235-0743 (Fax#)
crowderjason@hotmail.com.

Richard L Heavner
HEAVNER SCOTT BEYERS & MIHLAR
111 E Main St., Suite 200
Decatur, IL 62523
217-422-1719
Fax: 217-422-1754
richardheavner@hsbattys.com

Timothy J Howard
HOWARD & HOWARD ATTORNEYS PC
211 Fulton St, Ste 600
Peoria, IL 61602-1350
309-672-1483
Fax: 309-672-1568
thoward@howardandhoward.com

    s/ Rebecca M. Rothmann
    Rebecca M. Rothmann
Attorney Bar Number: 6236791
Attorney for Defendant/Third Party
 Plaintiff
WILSON, ELSER, MOSKOWITZ,
 EDELMAN & DICKER LLP
120 North La Salle Street, Suite 2600
Chicago, Illinois 60602
Phone: (312) 704-0550
Fax: (312) 704-1522
Rebecca.Rothmann@wilsonelser.com

390284.1