MARGARET STILWELL E-FILED
Monday, 02 April, 2007 03:40:20 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

```
MARGARET J. STILWELL,        )
HALEY STILWELL, HEIDI        )
STILWELL, JAMIE STILWELL,    )
MEGAN STILWELL,              )
     Plaintiffs,             )
        -vs-                 )
AMERICAN GENERAL LIFE        )
INSURANCE COMPANY,           )
     Defendant.              )
-------------------------)  No. 05-CV-02160
AMERICAN GENERAL LIFE        )
INSURANCE COMPANY,           )
     Third-Party Plaintiff   )
        -vs-                 )
FIRST MID ILLINOIS BANK &    )
TRUST, TUSCOLA FURNITURE     )
GROUP, LLC, JANKO            )
FINANCIAL GROUP, LLC,        )
     Third-Party Defendants.)
-------------------------
```

COPY

CSR License No. 084-003038


DEPOSITION

        The deposition of MARGARET STILWELL, a
citizen of the State of Illinois, a witness of
lawful age; produced, sworn and examined upon her
corporeal oath, on the 9th day of February, 2007, at
the offices of Area Wide Reporting Service, 301 West
White Street, Champaign, Illinois, before June
Haeme, CSR, RMR, CRR, Notary Public in and for the
County of Ford and State of Illinois, as a witness
in a certain suit and matter now pending and
undetermined in the United States District Court for
the Central District of Illinois.

EXHIBIT
B

Page 2

Appearances:

Michael S. Seneca
Attorney at Law
Howard & Howard
One Technology Plaza, Suite 600
211 Fulton Street
Peoria, IL 61602-1350
Appearing for Tuscola Furniture Group
    and Janko Financial Group

Rebecca M. Rothman
Attorney at Law
Wilson, Elser, Moskowitz, Edelman &
    Dicker, LLP
120 North LaSalle Street, Suite 2600
Chicago, IL 60602
Appearing for American General Life

Jason M. Crowder
Attorney at Law
Heller, Holmes & Associates, P.C.
1101 Broadway Avenue
Mattoon, IL 61938
Appearing for Plaintiffs

Julie Beyers
Attorney at Law
Heavner, Scott, Beyers & Mihlar
111 E. Main Street, Suite 200
Decatur, IL 62523
Appearing for First Mid Illinois

Also Present: Larry Bianchi

Page 3

## INDEX

| | Page |
|---|---|
| EXAMINATION BY MS. ROTHMAN | 4 |
| EXAMINATION BY MR. SENECA | 65 |
| EXAMINATION BY MS. BEYERS | 67 |

### E X H I B I T S

| | Page |
|---|---|
| Stilwell Exhibit No. 1 | 16 |
| Stilwell Exhibit No. 2 | 20 |
| Stilwell Exhibit No. 3 | 23 |
| Stilwell Exhibit No. 4 | 25 |
| Stilwell Exhibit No. 5 | 27 |
| Stilwell Exhibit No. 6 | 28 |
| Stilwell Exhibit No. 7 | 29 |
| Stilwell Exhibit No. 8 | 32 |
| Stilwell Exhibit No. 9 | 46 |
| Stilwell Exhibit No. 10 | 47 |
| Stilwell Exhibit No. 11 | 48 |
| Stilwell Exhibit No. 12 | 52 |
| Stilwell Exhibit No. 13 | 57 |
| Stilwell Exhibit No. 14 | 58 |
| Stilwell Exhibit No. 15 | 58 |
| Stilwell Exhibit No. 16 | 59 |
| Stilwell Exhibit No. 17 | 60 |
| Stilwell Exhibit No. 18 | 45 |
| Stilwell Exhibit No. 19 | 45 |
| Stilwell Exhibit No. 20 | 66 |

Page 4

1  (Commencing at 10:55 a.m.)
2      MARGARET STIWELL,
3  the deponent herein, called as a witness, after
4  having been first duly sworn, was examined and
5  testified as follows:
6      EXAMINATION BY
7      MS. ROTHMAN:
8  Q. Mrs. Stilwell, can you state your full
9  name for the court reporter please?
10  A. Margaret Jo Stilwell.
11  Q. Let the record reflect this is the
12  discovery deposition of Margaret Jo Stilwell taken
13  pursuant to notice and continued to today's date by
14  agreement of the parties.  This deposition will be
15  taken in accordance with the federal rules of civil
16  procedure and all local applicable rules.
17      Mrs. Stilwell, my name is Becky Rothman.
18  I'm going to introduce myself again.  I represent
19  American General Life Insurance Company, the
20  defendant in the claim that you have filed.
21      Have you ever given a deposition before?
22  A. No.
23  Q. Okay.  Have you ever testified before?
24  A. Not that I remember.

Page 5

1  Q. Okay.  Never testified in court before?
2  A. Not that I remember.
3  Q. Okay.  Is there anything that would --
4  strike that.  Are you taking anything that would
5  affect your memory today?
6  A. No.
7  Q. Okay.  Do you have any known conditions
8  that affect your memory?
9  A. No.
10  Q. Okay.  You just don't remember if you've
11  testified.  Is that a fair statement?
12  A. Well, you know, like -- seems like a long
13  time ago maybe there was a car accident and I might
14  have had to say something, but I don't remember for
15  sure.
16  Q. Okay, fair enough.  I'm going to run down
17  some rules for deposition.  Your counsel may have
18  gone over them with you already, but I'm going to do
19  it again so that we're all on the same page, okay?
20      All of your responses have to be audible
21  so that the court reporter can take it down.  I'm
22  going to be asking questions, you're going to be
23  answering my questions, and she's going to be
24  recording what we say here today.

Page 6

1      So it's important to remember that, number
2  one, all your responses have to be audible.  No
3  nodding of the head or shaking of the head because
4  that won't be reflected in the record.  You have to
5  remember to try to say yes when you mean yes instead
6  of uh-huh, and no when you mean no instead of uh-uh,
7  because that looks the same on the record, okay?
8      A. Yes.
9      Q. And if -- that was a test.  And if you
10 forget, one of us will jump in and try to remind
11 you, okay?
12     A. Yes.
13     Q. If you do not understand one of the
14 questions I ask you, please let me know and I will
15 rephrase it, okay?
16     A. Yes.
17     Q. If you've answered the question, we're
18 going to assume that you understood it; is that
19 fair?
20     A. Uh-huh, yes.
21     Q. Last thing is I think, and anybody can
22 jump in if it's not, if you need to take a break,
23 let me know and we'll take breaks, okay?
24     A. Okay.

Page 7

1      Q. Where do you reside?
2      A. 2701 Curtis Road, Champaign, Illinois.
3      Q. How long have you lived there?
4      A. Since March of last year.
5      Q. Okay.  Where did you live prior to that?
6      A. 401 North Main, Atwood, Illinois.
7      Q. Okay.  How long have you lived at the
8  Atwood address?
9      A. About one and a half years.
10     Q. Do you live with anybody currently at
11 Curtis Road in Champaign?
12     A. My two younger daughters live with me.
13     Q. Okay.  Are they the two younger daughters
14 that are -- are they parties to this action as well?
15     A. Their names were listed, but they have no
16 knowledge of the information or anything.
17     Q. Okay.  What's your highest level of
18 education?
19     A. Bachelor's --
20     Q. Where did you get your --
1      A. -- of Education at Concordia University.
22     Q. Thank you.  When did you get your
23 bachelor's?
24     A. In 1974.

Page 8

1      Q. Did you work -- well, strike that.  Are
2  you currently employed?
3      A. Pardon me, correct that.  It was 1973.
4      Q. Okay.  Are you currently employed?
5      A. Yes.
6      Q. Okay.  Where do you work?
7      A. Lex Lincoln Land.
8      Q. And where is that?
9      A. Champaign.
10     Q. What do you do at Lex Lincoln Land?
11     A. Reservationist.
12     Q. What kind of business is Lex Lincoln Land?
13     A. A shuttle service from Champaign to
14 Chicago and Champaign to Indianapolis and back.
15     Q. Okay.  How long have you worked at Lex
16 Lincoln Land?
17     A. Since the end of August.
18     Q. And did you work somewhere prior to that?
19     A. Yes.
20     Q. Where did you work?
21     A. ABC Learning Center.
22     Q. How long did you work at -- strike that.
23 What did you do at ABC Learning Center?
24     A. Head teacher for the infant classroom.

Page 9

1      Q. Okay.  When did you start that position?
2      A. September of '05.
3      Q. Okay.  And you worked there from September
4  of '05 until when?
5      A. Until May of '05.  Or I mean '06.
6          MR. CROWDER:  That makes more sense.
7      Q. Prior to ABC Learning Center, were you
8  employed?
9      A. Yes.
10     Q. Where did you work?
11     A. Securitas.
12     Q. And what were your dates of employment at
13 Securitas?
14     A. I don't remember.
15     Q. Okay.  About how long did you work there?
16     A. About four months maybe.
17     Q. Okay.  What did you do?
18     A. Security work.
19     Q. Can you expand on that for me?
20     A. Security guard.
21     Q. Oh, okay.  Prior to working as a security
22 guard, where did you work?
23     A. I did part-time substituting at the
24 Atwood-Hammond schools.

**Page 10**

1   Q. Okay.
2   A. And drove part-time for Department of
3 Human Services for the blind.
4   Q. Okay. And how long did you hold that
5 position?
6   A. Until I started at ABC from the time that
7 the Amishland Country Village closed.
8   Q. Okay. Prior to substitute teaching, you
9 were involved with a company, Amishland Country
10 Village, correct?
11   A. Correct.
12   Q. And that's where you were employed or you
13 were employed at --
14   A. Yes.
15   Q. -- countryland or Amishland Country
16 Village, correct?
17   A. Correct.
18   Q. Okay. I'm going to refer to it today
19 probably as ACV. Is that okay?
20   A. That's all right with me.
21   Q. Okay. Did you -- my understanding is you
22 held -- you and your husband held a financial
23 interest in ACV; is that correct?
24   A. Right.

**Page 11**

1   Q. Were you two the sole shareholders in ACV?
2   A. We had partners.
3   Q. Okay. Who were your partners?
4   A. I mean I -- I'm not sure how that -- what
5 -- I'm not sure whether the partners qualify for
6 Amish Country Village partners. I think they did.
7 I think it was one-third the docs and one-third
8 Janko and one-third us.
9   Q. Okay. You believe it was -- the ownership
10 interest of ACV was one-third the docs, one-third
11 Janko and one-third you, meaning you and Mr.
12 Stilwell; is that right?
13      MR. CROWDER: That's actually wrong, but I
14 mean I don't know how much you want to get into
15 this. I mean obviously she's testifying, so I don't
16 want to --
17      MS. ROTHMAN: Right, so you don't want to
18 testify for her.
19      MR. CROWDER: I don't want to testify for
20 her, but --
1      MS. ROTHMAN: I understand.
22      MR. CROWDER: -- I don't know how
23 important it is for you to actually know the
24 structure of everything, so --

**Page 12**

1   A. I'm not sure how the structure was for
2 sure. I mean there's -- there was something that we
3 were one-third owner of.
4   Q. Okay. And that's what I'm getting at.
5 I'm trying to figure --
6   A. And it had to do with that business.
7   Q. I'm trying to figure out what your
8 knowledge is of your business dealings.
9   A. Well, we were one-third owner of something
10 to do with the business.
11   Q. Okay. And what was that business?
12 Amishland Country Village?
13   A. Yes.
14   Q. Okay. And what did Amishland Country
15 Village do?
16   A. It was a tourism attraction.
17   Q. Okay.
18   A. Retail.
19   Q. Okay. Other than Amishland Country
20 Village, do you have any knowledge of whether you
21 were a shareholder, officer, director of any other
22 corporation?
23   A. Was vice-president of Atwood Meat Service.
24   Q. Okay. And what did Atwood Meat Service

**Page 13**

1 do?
2   A. Sold meat.
3   Q. Were you an owner in Atwood Meat Service
4 as well?
5   A. Yes.
6   Q. Okay. Who were the other owners?
7   A. My husband, James E. Stilwell.
8   Q. Okay. Other than ACV and Atwood Meat
9 Service, were you involved in any other business
10 dealings? Well, strike that.
11      Other than Atwood Meat Services and ACV,
12 did you hold an ownership in any other businesses
13 that you know of?
14   A. No.
15   Q. Okay. My understanding -- I have looked
16 at the documents, so I've got a little bit of an
17 understanding of the --
18   A. Yes.
19   Q. -- business dealings. I understand that
20 your husband was involved in a company called
21 Amishland Development, LLC. Does that ring any
22 bells to you?
23   A. The name is familiar, but it's been a long
24 time. I don't remember.

---

**Page 14**

1  Q. Okay. And --

2  A. Because he -- because he handled the

3  business and I did promotions, information center,

4  entertainment, special events and grants which was

5  enough on my plate.

6  Q. Okay. So is it fair to say that you're

7  not that familiar with the business relationship

8  between Amishland Country Village and Amishland

9  Development? Would that be a fair statement?

10  A. Some -- somewhat familiar, but not as far

11  as intricate business details.

12  Q. Okay. Do you know if Amishland Country

13  Village owned the property that it operated on?

14  A. It seems like that might be the one-third,

15  one-third, one-third.

16  Q. Okay. Let's switch gears. I'm going to

17  talk about life insurance and probably come back to

18  the business dealings, but I'm going to talk about

19  life insurance.

20  Do you recall sometime in or around 1998

21  that Old Line Life Insurance issued certain life

22  insurance policies insuring the life of your

23  husband?

24  A. He took care of those and I was not

---

**Page 15**

1  involved in the decision.

2  Q. Okay. You were not involved in the

3  decision for your -- for your husband to go out --

4  A. For his life insurance.

5  Q. -- to get life insurance? I'm going to

6  ask you to try to remember to let me finish my

7  sentence --

8  A. Sorry.

9  Q. -- or my question before you answer. Not

10  because I care, but because the court reporter can't

11  take down both of us talking at once, okay?

12  Okay. So is it -- it's a fair statement

13  to say that you don't have much knowledge of the

14  life insurance dealings that have to do with your

15  husband; is that right?

16  A. I knew that we took out a life insurance

17  with John Lyons as an independent agent when we got

18  married and that I knew that he had to increase his

19  life insurance at a later date. I can't say the

20  dates. And I found out after his death what the

1  designated appointments were for the life insurance

22  through the -- my life insurance agent, John Lyons.

23  Q. Okay. So you had no idea of the fact that

24  he was issued two separate policies, one for 4

---

**Page 16**

1  million and one for 1 million; is that right?

2  MR. CROWDER: At what point in time?

3  Q. I'm sorry, at -- before your husband's

4  death.

5  A. I knew that he had to have life insurance

6  for loans.

7  Q. Okay.

8  A. But I wasn't particularly involved in it,

9  so I can't give you dates --

10  Q. Okay.

11  A. -- or facts on it.

12  Q. Was it your understanding, then, that the

13  purpose of at least part of these life insurance

14  policies was to fund business-related expenses or

15  loans?

16  A. My understanding is that it was two-fold.

17  One was to protect and give financial security for

18  the girls and me, and the second purpose was to pay

19  specific debts to specific entities.

20  Q. Okay. Let me show you -- I'm going to

21  mark this, and we can go off the record.

22  (Discussion off the record.)

23  (Stilwell Exhibit No. 1 was marked by the

24  court reporter.)

---

**Page 17**

1  BY MS. ROTHMAN:

2  Q. Margaret, I'm showing you a copy of a

3  document that's been marked Stilwell Exhibit No. 1.

4  This is an Old Line Life Insurance policy that was

5  issued with you as the owner. It's document or

6  policy number 12604663, and I'm going to -- well,

7  let me ask you, do you have any knowledge of the

8  total amount of life insurance that your husband was

9  issued?

10  MR. CROWDER: This is after -- at any

11  point in time?

12  MS. ROTHMAN: Yeah.

13  A. As of now?

14  Q. Uh-huh.

15  A. I had met with John Lyons, our agent,

16  after his death and he informed me of coverage.

17  Q. Okay. And is it your understanding that

18  you were the owner of a $4 million life insurance

19  policy and also a $1 million life insurance policy?

20  A. As of that time, yes.

21  Q. Okay. All right. Let's go on. When you

22  -- well, let me talk about John Lyons for a second.

23  How long have you known Mr. Lyons?

24  A. Well, I worked at Atwood-Hammond schools

## Page 18

1 and he was a teacher and coach there, so I knew him
2 then.
3    Q. Okay. When was that?
4    A. Probably somewhere between 19 -- after '74
5 and '80, somewhere in there.
6    Q. Okay. So you -- you have a -- well,
7 strike that. Had Mr. Lyons been your insurance
8 agent for a while?
9    A. We took out a policy with him for our --
10 to protect each other when we got married. After we
11 got married I guess.
12    Q. Right. And did you have any dealings
13 directly with Mr. Lyons after you got married after
14 you took out that insurance policy?
15    A. He's the only agent we used.
16    Q. Okay. And was he --
17    A. As far as I know.
18    Q. -- the agent that you used in general for
19 your business for liability insurance and that sort
20 of thing?
21    A. As far as I -- I think so.
22    Q. Okay. Get your car insurance --
23    A. Oh, no.
24    Q. No? Another agent for your car insurance?

## Page 19

1    A. Yes. We used Diamond Brothers for our car
2 insurance and our house insurance. I'm not sure if
3 we originally had some with him because Jim usually
4 took care of that.
5    Q. Okay.
6    A. I know later on Diamond Brothers in Arcola
7 was the one that we used for car and house
8 insurance.
9    Q. All right. If I told you that there's
10 documentation that I've reviewed that exists to
11 suggest that the purpose of the $4 million policy
12 that was issued was issued to assist in funding
13 business expenses relating to ACV, would you have
14 any reason to disagree with that statement?
15    A. I -- all I would know as far as that is
16 what -- the specific designation that John Lyons
17 explained to me in certain sections.
18    Q. Can you explain what you mean by that?
19    A. There was so much -- so much issued to
20 each -- to separate entities.
21    Q. And this is a conversation that you had
22 after your husband passed away; is that right?
23    A. Right.
24    Q. Okay. I'll come back to that. Let me

## Page 20

1 show you --
2    (Stilwell Exhibits No. 2 through 7 were
3 marked by the court reporter.)
4 BY MS. ROTHMAN:
5    Q. Margaret, you've got a stack of exhibits
6 in front of you that we just marked and we have now
7 gone through. The first document, Exhibit 2 for
8 your deposition, is a document titled Consignment
9 Agreement dated April 16th, 1999. Do you recognize
10 that document?
11    A. No.
12    Q. Okay. Do you have any idea what this
13 document is about?
14    A. No. I mean it says consignment.
15    Q. Okay. Do you have any understanding or
16 any knowledge of the financing agreement between ACV
17 and Janko to fund furniture inventory for ACV?
18    A. I know there was some agreement, but Jim
19 took care of it and worked it out with them. I was
20 -- wasn't involved in the decision.
21    Q. Okay. Turning to Exhibit 2 which is Bates
22 stamped -- you see the Bates stamps at the bottom?
23 It's 308. See the first page?
24    A. Yes.

## Page 21

1    Q. If you turn to 319 -- you're jumping ahead
2 of me there. I'll ask you about that one in a
3 second.
4    Turn to page 319. Do you recognize your
5 husband's signature on that document? On page 319.
6    A. It's not very clear, but it looks like it.
7    Q. Okay. You've got no reason to believe
8 that's not his signature?
9    A. No, I don't.
10    Q. Okay. And the same thing on 320?
11    A. Correct.
12    Q. Okay. Attached to this document is a
13 document called -- that's guaranty.
14    A. Yes.
15    Q. Bates stamp 321 and 322. Do you see that?
16    A. Yes.
17    Q. If you turn to 322, do you recognize your
18 signature on that document?
19    A. Yes, I do.
20    Q. Okay. Do you have any independent
21 recollection of signing this document?
22    A. My recollection is of signing documents
23 that Jim informed me I needed to sign. I don't
24 remember dates or -- and I really didn't take time

## Page 22

1 to read them, so --

2 Q. Okay. There was nothing that precluded

3 you from reading this document that you signed; is

4 that right?

5 A. Probably not, except shortage of time.

6 Q. Okay. Shortage of time meaning --

7 A. We were always busy.

8 Q. Okay. Busy at your job, in other words?

9 A. Correct.

10 Q. Okay.

11 A. And because when he told me to sign

12 something, I did.

13 Q. All right. Do you have any understanding

14 of what -- what this document is, this guaranty?

15 MR. CROWDER: And she's speaking

16 specifically of --

17 Q. Of the document you signed, 321 and 322.

18 A. I mean if I read it, I'm -- could probably

19 understand it, but at the time I signed it because

20 Jim said I needed to.

21 Q. Okay. Do you recall -- strike that. From

22 time to time in the business of ACV, would Jim come

23 to you and tell you you needed to sign documents and

24 you would sign them; is that right?

## Page 23

1 A. Yes.

2 Q. And he ran the business aspect of that?

3 A. Yes.

4 Q. You just basically did what you were told;

5 is that right?

6 A. Yes. Well, I did my job. My part was

7 basically to do other things other than business

8 agreements.

9 Q. Okay. You left that to him.

10 A. I mean there were certain businesses like

11 grants and sales and travel shows and other things

12 other than this.

13 Q. I understand. With respect to the

14 financing of the business, that was Jim's area --

15 A. Correct.

16 Q. -- correct? Okay. Looking at the next

17 exhibit in front of you, Exhibit No. 3, do you

18 recognize your signature on that document?

19 A. Yes, I do.

20 Q. Okay. Do you recall from time to time

21 being asked to sign documents which assigned your

22 rights under the life insurance policies that were

23 issued on the life of your husband to various

24 creditors of ACV?

## Page 24

1 MR. CROWDER: Do you understand the

2 question?

3 A. Say that again.

4 Q. Sure.

5 MS. ROTHMAN: Would you read back the

6 question?

7 (Requested portion of the deposition was

8 read by the court reporter.)

9 A. I was aware that we had designations for

10 certain monies from the life insurances that I had

11 signed. I don't remember when they were, but I was

12 aware they did -- Jim came through and he'd tell me

13 and I signed them.

14 Q. Your husband would present you with a

15 document, say would you sign this, and you would

16 sign it?

17 A. Or he would say -- he would either present

18 me with a document that said it needed to be signed

19 or tell me I needed to go somewhere and sign

20 something.

21 Q. Okay. And where would you go and sign it?

22 Did you go to Mr. Lyons's office?

23 A. That's very -- that's a possibility.

24 Q. You just -- you have no independent

## Page 25

1 recollection as you sit here today?

2 A. Not of individual things. It's been too

3 long.

4 Q. Okay. Looking at document Exhibit 3 in

5 front of you, do you recognize your signature on

6 that document?

7 A. Yes.

8 Q. Okay. Exhibit 4, do you have any

9 independent recollection of executing this document?

10 And if you turn the page --

11 A. It was the same story. It was something

12 that that is my signature and it would have been

13 something that Jim told me I needed to sign.

14 Q. Okay. And that was basically all you

15 knew.

16 A. Correct.

17 Q. Okay. The next document is a group

18 exhibit labeled Amishland Country Village

19 Consignment Documents, and is it a fair statement to

20 say that you were not directly involved in this

21 business transaction?

22 A. Correct.

23 Q. Okay. And you don't have much of any

24 knowledge of the -- this consignment agreement?

**Page 26**

1  A. I knew we had a consignment agreement. I
2  didn't know information that would be all of this,
3  all of the -- all of the documents that are in this
4  exhibit.
5  Q. Okay. What was your understanding of the
6  consignment agreement?
7  A. That we had one and that's all.
8  Q. Okay. And did you have an understanding
9  of what a consignment agreement was?
10  A. Well, I know what consignment means.
11  Q. Okay. And what -- what does it mean?
12  A. That somebody furnishes merchandise or
13  product and then they're reimbursed with
14  compensation for furnishing it financially.
15  Q. Okay. So was it your understanding that
16  the company named Tuscola Furniture Group was going
17  to be assisting you in furnishing you with furniture
18  inventory and then you would go ahead and sell that
19  through ACV?
20  A. That's what I said. That's the basic
21  knowledge I had and no details.
22  Q. Okay. Turning to the second page, which
23  is a document titled Consignment Agreement dated
24  November 17th, 2000, and it is Bates stamped 655

**Page 27**

1  through 666, do you recognize your husband's
2  signature on page 666?
3      MR. CROWDER: That's the same as Exhibit
4  2, isn't it?
5      MS. ROTHMAN: Exhibit 2 was the first
6  consignment agreement.
7  A. Yes, I recognize my husband's signature.
8  Q. Okay. The next page is another guaranty
9  document, 667 and 668. Do you see that?
10  A. Yes.
11  Q. And do you recognize your signature on
12  page 668?
13  A. Yes.
14  Q. And do you recognize your husband's
15  signature on that document?
16  A. Yes.
17  Q. Okay. Did you -- do you have any
18  independent recollection of executing this guaranty?
19  A. No.
20  Q. Okay. Do you have any understanding of
1  what this document means?
22      MR. CROWDER: The guaranty?
23      MS. ROTHMAN: Yeah.
24  A. Not really. I mean not the particulars.

**Page 28**

1  Q. Do you have an understanding that it means
2  that you're personally guarantying the debt of the
3  company, ACV?
4      MR. CROWDER: At this time or when she
5  signed it?
6  Q. At any time.
7  A. I know that a guaranty means that you are
8  guarantying the payment of something, but I don't
9  remember -- like I said before, I don't remember
10  particular dates or had not read the documents. I
11  just did what Jim told me to do.
12  Q. Okay. And there was nothing that
13  precluded you from reading this document?
14  A. No.
15  Q. Okay. Turning to Exhibit 6. You can put
16  that one away. Do you recognize this document?
17  A. I don't remember it, but I recognize my
18  signature.
19  Q. Okay. Can I ask you what you did today to
20  prepare for your deposition?
21  A. What I did today?
22  Q. Uh-huh. Or what you did -- strike that,
23  what you did to prepare for your deposition. Did
24  you look at any documents?

**Page 29**

1  A. No.
2  Q. Did you --
3  A. I didn't have access -- I don't -- I
4  didn't have these at home.
5  Q. Okay. Did you look at them at any time to
6  prepare for your deposition?
7  A. Well, back when I signed it.
8  Q. Okay. After you signed it?
9  A. No.
10  Q. Have you seen the document since you
11  signed it?
12  A. No.
13  Q. Okay. All right. But that is your
14  signature --
15  A. Yes, it is.
16  Q. -- on this document? All right. Do you
17  have any understanding or any knowledge as to why
18  you signed this document?
19  A. It looks like an assignment for life
20  insurance since it's from American General. No, you
21  know, I really -- I don't know. I don't see any
22  figures or anything, so I really don't know.
23  Q. Okay. Turning to Exhibit 7 -- can you put
24  Exhibit 6 away? Exhibit 7, you recognize your

Page 30

1 signature on that document?
2   A. Yes, I do.
3   Q. Okay. Do you have any independent
4 recollection of signing this document?
5   A. No.
6   Q. Okay. And would this be another one of
7 the documents that your husband would tell you you
8 had to sign --
9   A. Correct.
10   Q. -- and you signed? Okay. My
11 understanding from reviewing the documents that have
12 been produced in discovery is that at some point
13 Amishland Development -- well, strike that.
14      At some point, ACV started to have some
15 financial difficulties. Is that a true statement?
16   A. In reflection, it is. My husband did
17 dealings with business connections and business
18 people and did not really keep me advised of that.
19   Q. Okay. So at -- do you recall at some
20 point that you learned that there were some
21 financial difficulties?
22   A. Yes.
23   Q. Okay. When was that that you learned
24 that, you first learned that?

Page 31

1   A. I don't remember the exact date, but it
2 was after we had been in operation for quite
3 sometime.
4   Q. Okay. When did you start operating?
5   A. I think it was September. I mean I -- I
6 can't be quoted on this, but I think it was
7 September of 1999. I don't want to be --
8   Q. Okay.
9   A. -- pinpointed on it.
10   Q. Fair enough.
11      THE WITNESS: Was it?
12      MR. CROWDER: Margaret, you got to do the
13 best of your recollection and just tell Rebecca --
14   A. I think it was September 1999.
15   Q. That's fine. And I fully understand that
16 you -- your recollection is a little cloudy, and,
17 you know, this is just to the best of your
18 recollection.
19   A. Correct.
20   Q. Okay. That's fine. Do you recall being
1 sued by anybody in relation to your business?
22   A. I don't recall at this time.
23   Q. Pardon me?
24   A. I really can't recall at this time.

Page 32

1   Q. Okay.
2      (Stilwell Exhibit No. 8 was marked by the
3 court reporter.)
4      (Recess.)
5 BY MS. ROTHMAN:
6   Q. Looking at Exhibit 8 for your deposition,
7 does this actually -- this is a group exhibit
8 document Bates stamped 32 through 36 and then 47
9 through 74, I believe. Look at -- turning your
10 attention to document 47, Bates stamp 47, this is a
11 complaint for forcible entry and detainer filed by
12 Amishland Development against Amishland Country
13 Village, James Stilwell and Margaret Stilwell.
14      Does this refresh your recollection as to
15 whether at some point you were -- you and your
16 husband and company were sued over financial
17 difficulties?
18   A. I don't recall. I remember that we owed
19 money and they were -- had conversations, but I
20 don't recall this.
21   Q. Okay. You don't have any independent
22 recollection of being served with a lawsuit or being
23 personally named in a lawsuit?
24   A. No.

Page 33

1   Q. Okay. Flip to 34. 34 through 36 is an
2 answer that was filed on your behalf by a Richard
3 Broch. Do you have a recollection that Mr. Richard
4 Broch represented you?
5   A. Yes, he was our attorney for the business.
6   Q. Okay. And if you flipped to page 36, do
7 you see your signature on that page?
8   A. Yes.
9   Q. Okay. And did you have an opportunity to
10 review the complaint and your answer to the
11 complaint --
12   A. No.
13   Q. -- before you signed it?
14   A. No.
15   Q. You didn't have the opportunity to do
16 that?
17   A. Oh. I just didn't --
18   Q. Okay.
19   A. -- because of being busy.
20   Q. All right. Mr. Broch was your attorney
21 for the business, is that what you said?
22   A. He handled business affairs.
23   Q. Okay. So he -- how long had he been your
24 counsel?

## Page 34

1  A. I think it kind of started approximately
2  the time that we started getting involved in
3  Amishland Country Village.
4  Q. But to your knowledge, was he involved on
5  your behalf with respect to the consignment
6  agreements that we had just looked at?
7  A. I don't know.
8  Q. Would there be some other attorney that
9  would have been involved on your behalf with those
10 transactions?
11 A. I don't recall.
12 Q. Okay. The only one you know of is Mr.
13 Broch; is that right?
14 A. He's the one that was on site.
15 Q. You had an in-house counsel?
16 A. He --
17  MR. CROWDER: I think she meant there's an
18 office, there's some offices there that --
19 A. He had an office in the building.
20 Q. Okay. And he was --
21 A. So on site like physically on site.
22 Q. Got it. Were there any other attorneys
23 that you have knowledge of that represented you or
24 your husband or your companies?

## Page 35

1  A. I don't recall.
2  Q. Okay. Other than the fellow that's
3  sitting next to you.
4  MR. CROWDER: That was more after -- I
5  think -- I think she was trying to get an impression
6  of at the time of this -- of this agreement, of the
7  consignment agreement.
8  A. Later and I'm not -- I can't give you a
9  date --
10 Q. Would it be --
11 A. -- but later Rod Smith represented us for
12 some stuff.
13 Q. Okay. All right. Do you know what he
14 represented you on? What stuff?
15 A. No.
16 Q. Okay. The front page of this document is
17 a voluntary dismissal. Do you have any idea why
18 this lawsuit was dismissed?
19 A. No.
20 Q. Flip to the front page. Okay. Do you
1  have any knowledge of how it was resolved?
22 A. No.
23 Q. Okay. You just know that it was filed and
24 somehow it was taken care of?

## Page 36

1  MR. CROWDER: Well, I'm --
2  Q. Is that right or no?
3  MR. CROWDER: I'll object because I don't
4  think that's what she said, but do you understand
5  her question?
6  A. I can see that it was filed and I
7  recognize my signature. I don't recall when it was
8  done. I signed it because Jim told me to.
9  Q. Okay. And you've got no other knowledge
10 of the allegations in the complaint or how or why it
11 was resolved; is that correct?
12 A. I said I remember at one time there was
13 financial conversations between the furniture group
14 and Jim, but I wasn't involved in the resolution.
15 Q. Okay. Let's talk about the furniture
16 group. You, I think, initially said it was your
17 understanding that Janko had one-third ownership,
18 the doctors or the docs had one-third ownership, and
19 you and your husband had a third ownership; is that
20 right?
21 A. I think that was for the development.
22 Q. Okay. Can you tell me what was your
23 relationship with Janko? Did you have a
24 relationship with Janko?

## Page 37

1  A. Jim's the one that did business
2  relationships with them. My relationship was having
3  lunch at the buffet with them.
4  Q. Okay. Did you do that often or was that a
5  one-time occurrence?
6  A. Whenever they showed up to talk about
7  things with Jim, I usually got invited for lunch.
8  Q. Okay. And who is they? Who are the
9  members of Janko?
10 A. Larry Bianchi and Dick Janko.
11 Q. Did you know Larry Bianchi and Dick Janko
12 prior to having business dealings with them?
13 A. No.
14 Q. Okay. Your first contact with Mr. Bianchi
15 -- Bianchi and Mr. Janko came in the form of a
16 business relationship; is that right?
17 A. Correct.
18 Q. Okay. Did your husband know Mr. Bianchi
19 or the Jankos before?
20 A. Not that I was aware of.
21 Q. Okay. Your husband passed away on March
22 2nd, 2003; is that right?
23 A. Correct.
24  MR. CROWDER: Well, actually you said --

Page 34 - Page 37

Page 38

1 you said March 2nd.
2    Q. I'm sorry, May 2nd.
3    A. May 2nd.
4    Q. Okay.
5       MR. CROWDER: Sorry about that.
6    Q. And that was incidentally prior to the
7 voluntary dismissal that was filed in this action;
8 is that right? And in the action that's Exhibit 8.
9    A. It was prior to that date.
10    Q. Okay. Do you -- would Mr. Broch have
11 communicated with you then instead of Jim as to what
12 was going on in that lawsuit?
13    A. I don't recall that. Does it say who was
14 involved with this?
15    Q. Well, it says that -- what do you mean
16 does it say who was involved in this?
17    A. For my attorney.
18    Q. Mr. --
19    A. Broch.
20    Q. -- Broch.
21    A. I don't recall.
22    Q. You don't recall having any discussions
23 with Mr. Broch about this lawsuit?
24    A. Well, I had discussions at different

Page 39

1 times, but I --
2    Q. You don't recall?
3    A. I don't recall specific ones.
4    Q. Okay. Do you recall general discussions
5 with Mr. Broch concerning this lawsuit?
6    A. No.
7    Q. Okay. Other than the two policies that
8 were issued by Old Line Life Insurance of $1 million
9 and the $4 million policy, did your husband have any
10 other life insurance policies on his life?
11    A. Yes.
12    Q. Okay. What other policies? I think you
13 mentioned one that you took out when you first got
14 married.
15    A. It was with Franklin. I mean that was
16 with John Lyons. I'm not going to say the company
17 for sure, but I think it was Franklin. We -- it was
18 expanded to turn into these, I think.
19    Q. Okay. So that at the time of his death,
20 did you submit claim -- did you take any steps to
21 submit claims for insurance proceeds, life insurance
22 proceeds?
23    A. John Lyons, who was the agent, called me
24 and --

Page 40

1    Q. He called you into his office?
2    A. Uh-huh.
3    Q. Okay. Do you recall when that was?
4    A. Shortly, within a month after -- shortly
5 after Jim died.
6    Q. All right. And you went to his office to
7 discuss with him making claims under the insurance
8 policies; is that right?
9    A. He more or less -- it was more him
10 explaining what was covered.
11    Q. Okay. That was a face-to-face meeting you
12 had with him at his office?
13    A. Uh-huh.
14    Q. Is that right?
15    A. Uh-huh.
16       MR. CROWDER: You have to say yes or no.
17    A. Yes.
18    Q. Was that one -- one conversation you had
19 or a number of conversations? One meeting or a
20 number of meetings?
21    A. Number of meetings.
22    Q. Okay. How many meetings?
23    A. I don't recall exactly how many, what the
24 number of meetings were.

Page 41

1    Q. Did you ever --
2    A. When something came up, he would let me
3 know --
4    Q. Did you have one --
5    A. -- and we would run out.
6    Q. Did you have more than one face-to-face
7 discussion with him about submitting claims to the
8 insurance companies?
9    A. I'm not sure if that was done in one
10 meeting. I think it was just done in one meeting.
11    Q. Okay. The first meeting that you had with
12 him, do you recall what was discussed?
13    A. I think he explained what the coverage
14 was.
15    Q. And what was that? What did he explain to
16 you? What did he tell you?
17    A. He just brought out the policies and
18 showed them to me and said that's what it was.
19    Q. And what -- what was it?
20    A. I don't remember the amounts. It was what
21 you have showed us in documentation.
22    Q. That $1 million and the $4 million; is
23 that right?
24    A. Correct.

Page 42

1   Q. Okay. What else did he say?
2   A. I don't --
3   Q. He said here's two policies you have.
4 One's for 1 million, one's for 4 million. What else
5 did he say?
6   A. How it was to be distributed. Kind of he
7 tried to explain how it was to be distributed.
8   Q. And what was your --
9   A. And information on it.
10   Q. -- understanding as to how -- well, strike
11 that. What did he say to you as to how it was going
12 to be distributed?
13   A. I don't recall details on that. I just
14 relied on him to take care of it.
15   Q. Can you tell me in general without getting
16 into the details what the gist of his explanation to
17 you was?
18   A. I think the 1 million, as I recall, was
19 for myself and the girls specifically. The 4
20 million was, as I recall, to be designated for
21 specific debts to specific people, and if it was not
22 -- if there was interest or money remaining, then it
23 would go to the girls and I as beneficiaries to be
24 divided up as it was in the $1 million policy.

Page 43

1   Q. Did he tell you who the specific debts
2 were under the policy?
3   A. Yes.
4   Q. And what did he say to you about that?
5   A. Well, he read it off the paper, so it
6 would have been what was on the paper.
7   Q. Do you have any recollection -- because I
8 don't have that paper in front of me probably. Do
9 you have any recollection of what --
10   A. The policies are right here.
11   Q. -- it was?
12   A. I can't quote it exactly.
13   Q. Well, can you quote it kind of?
14   MR. CROWDER: If you have any --
15   A. There was some -- a certain amount to
16 Tuscola National. There was a certain amount to
17 Paris I think.
18   THE WITNESS: Was that --
19   MR. CROWDER: You're going to have to --
20   A. You know, I can't -- I don't recall for
1 sure.
22   Q. Okay.
23   A. I don't want to say something that I don't
24 know for sure. I can't recall the exact

Page 44

1 assignments.
2   Q. Okay. Was it your understanding that
3 there was an assignment to First National or First
4 Mid Bank?
5   A. Yes.
6   Q. Do you have any knowledge of how much the
7 assignment was to First Mid Bank?
8   A. I can't remember.
9   Q. Okay. Do you have any knowledge that
10 there was an assignment to Janko?
11   A. Yes.
12   Q. Do you recall what the assignment was to
13 Janko?
14   A. No.
15   Q. Do you have any knowledge as to whether
16 there was an assignment to TFG?
17   A. Tuscola Furniture Group?
18   Q. Correct.
19   A. I think there was.
20   Q. Do you have any knowledge of what that
21 assignment was?
22   A. If I looked at the paper I would recall,
23 but I don't --
24   Q. As you sit here today?

Page 45

1   A. I do not want to have recorded that I said
2 something and be wrong.
3   Q. Okay. Did he tell you that you would be
4 getting money back underneath the -- or pursuant to
5 the $4 million policy? -
6   A. He said he would let me know.
7   Q. Okay. And was that pretty much the extent
8 of the first face-to-face meeting you had with him?
9   A. I don't remember exactly what
10 conversation, that was a long time ago, and I've
11 just been worried about finding a place to live and
12 having a job to pay my bills since then.
13   Q. I can appreciate that. Is there anything
14 that I could refresh your recollection with?
15   A. Show me the paper.
16   Q. Was there a specific paper that he had?
17   A. All he did was go through the policy and
18 show me what the policy said, so whatever the policy
19 said is what he would have told me.
20   Q. Okay.
21   (Stilwell Exhibits No. 9 through 19 were
22 marked by the court reporter.)
23 BY MS. ROTHMAN:
24   Q. Margaret, I've marked another batch of

Page 46

1 exhibits that are sitting in front of you and we're
2 just going to go through them.
3        The top document, Exhibit No. 9 for your
4 deposition, is a May 2nd, 2003, correspondence from
5 American General to you at a P.O. Box in Atwood,
6 Illinois. Do you recall receiving this letter?
7    A. No.
8    Q. Okay. Is that a correct address for you?
9    A. Yes.
10   Q. Okay. Do you have any reason to believe
11 you didn't receive this letter?
12   A. No.
13   Q. Okay. Would -- well, strike that. When
14 you contacted Mr. Lyons, did you do that -- you said
15 you did it within one month of your husband's death?
16   A. I don't recall time frames, it's been too
17 long ago, and my whole world was turned upside down,
18 so I can't give you times and dates.
19   Q. Okay. Would it be fair to assume that
20 perhaps you got this letter and contacted him after
21 receiving this letter?
22      MR. CROWDER: Well --
23   Q. If you know.
24      MR. CROWDER: Yeah, if you know the answer

Page 47

1 to that.
2    A. No, I don't.
3    Q. Okay. Flip to the next one, which is
4 document 10, No. 10. Do you recall executing this
5 document?
6    A. No.
7    Q. Okay. Do you recall ever filling
8 something out at Mr. Lyons's office or otherwise to
9 submit a claim under the $1 million policy?
10   A. I know I had to have done it.
11   Q. Okay. That's your signature on this form?
12   A. Yes.
13   Q. Okay. You have no independent
14 recollection of executing this document.
15   A. No.
16   Q. Okay. Now, up in the first portion of the
17 document, there's a column that says policy number
18 and amount of insurance. Do you see that?
19   A. Yes.
20   Q. Okay. And that policy number is 2384389
21 and the amount of insurance was $1 million, correct?
22   A. Correct.
23   Q. Okay. Do you have any knowledge of
24 executing a similar claim form for the $4 million

Page 48

1 policy?
2    A. No.
3    Q. Okay. If I told you that American General
4 did not have any executed claim form from you under
5 the $4 million policy, would you have any reason to
6 dispute that?
7    A. I don't know.
8    Q. You have no recollection of executing a
9 claim form under the $4 million policy; is that
10 right?
11   A. I don't know.
12   Q. Okay. Turning to Exhibit 11, and I
13 understand this is not a -- well, strike that. Have
14 you ever seen Exhibit 11 before?
15   A. No.
16   Q. All right. Exhibit 11 is a letter to Mr.
17 Broch, your attorney, from Timothy Howard who I
18 believe is opposing counsel or counsel for Amishland
19 Development in the replevin action that was filed.
20 And at the bottom of the paragraph, do you see it
21 says "finally we do not see the need to proceed with
22 the replevin action that has been scheduled for
23 trial this Friday because our client and the bank
24 will be paid from the insurance proceeds." Do you

Page 49

1 see that?
2    A. I can read that, yes.
3    Q. Okay. Do you -- does that refresh your
4 recollection at all as to why the replevin action
5 was resolved?
6    A. There was too much -- I'm sorry.
7    Q. That's okay. Go ahead.
8    A. I don't recall. I had -- I do not recall.
9 At this same time, I was -- what date is this? I
10 was making funeral arrangements, taking care of
11 family, trying to figure out what to do with the
12 company. This letter is not something that I
13 recall.
14   Q. I understand. Would you have expected Mr.
15 Broch to discuss with you the Amishland
16 Development's decision to dismiss their replevin
17 action because they were being --
18   A. He may have.
19   Q. -- paid by the proceeds?
20      MR. CROWDER: Object to the form of the
21 question. And don't forget that Rick Broch is your
22 attorney, so you have attorney/client privilege.
23 It's applicable to any conversations that you may or
24 may not remember. I guess --

Page 50

1    MS. ROTHMAN: Right, I'm not going to ask
2  her about any specific conversations she had with
3  him.
4        MR. CROWDER: And her expectation of what
5  he would do I think is -- there's no foundation for
6  that and I think it calls for speculation.
7        Q. As your attorney, would you have expected
8  him to keep you abreast on the status and what was
9  going on in that case?
10        MR. CROWDER: No foundation. You can
11  answer if you know.
12        A. I don't know.
13        Q. You don't know if he would have kept you
14  up to -- up to speed on the case?
15        A. I would think he would have had a
16  conversation, but I do not recall.
17        Q. You don't have any reason to believe that
18  he would not have conveyed that information to you.
19        MR. CROWDER: Object to the form. You can
20  answer if you...
21        A. Say that again.
22        Q. Do you have any reason to believe that Mr.
23  Broch would not have shared the information with you
24  that that lawsuit was going to be dismissed because

Page 51

1  the plaintiffs in that lawsuit were going to be paid
2  through insurance proceeds?
3        MR. CROWDER: Same objection.
4        A. There's an objection. I'm just going to
5  pass on that one.
6        Q. I think you've got to answer it though.
7        MS. ROTHMAN: What was my question?
8        MR. CROWDER: I don't think she has to
9  answer it. It really does invade attorney/client
10  when you start asking questions about what Mr. Broch
11  would or would not have told her about the replevin
12  action, so -- and you haven't really --
13        MS. ROTHMAN: Wait a second. What I'm
14  asking her is whether she believed she was kept
15  up-to-date on the facts and what was going on in
16  that case. So, you know, I'll ask it that way if
17  you want me to.
18        MR. CROWDER: I think -- I think you asked
19  her if she knew anything about the replevin action.
20  I think you got an answer that she did not, so I
1  think we're going over the same territory.
22        MS. ROTHMAN: Right, and I think she --
23  and then after her husband passed away, she was the
24  only one that would have been -- would have been the

Page 52

1  point person on it, so I -- well, let me ask this
2  and then I'll move on.
3  BY MS. ROTHMAN:
4        Q. Do you have any reason to believe that you
5  would not have been in contact with your attorney
6  during this time?
7        MR. CROWDER: Same objection. Go ahead.
8        A. Pass.
9        Q. You've got to answer it. Do you have any
10  reason -- he objected. You -- you don't know? You
11  can answer I don't know.
12        A. I talked to him.
13        Q. You spoke with your attorney?
14        A. I don't recall conversations.
15        MR. CROWDER: And you're not supposed to.
16        Q. Okay. Well, I'm not asking about the
17  conversations you had with him.
18        Showing you what's been marked Exhibit 12,
19  this is a letter from your attorney to a Tim Howard
20  that states, first paragraph, "as Margaret Stilwell
21  had forgotten about the specifics of the life
22  insurance assignments, I have indicated that I would
23  go over those with her to explain exactly where the
24  proceeds would go and -- or would go, for what

Page 53

1  purposes and what amounts. In that regard, I want
2  to clear up a couple questions I have since speaking
3  with her insurance agent, John Lyons of Atwood."
4        Do you see that?
5        MR. CROWDER: What paragraph were you
6  reading from?
7        MS. ROTHMAN: From the first paragraph.
8        A. Uh-huh.
9        Q. Okay.
10        A. Yes.
11        Q. Do you have any reason to dispute or to
12  deny that you were informed of the specifics of the
13  life insurance assignments?
14        A. Not according to this letter.
15        Q. Okay. You have no reason to deny that Mr.
16  -- well, strike that. You've got no reason to deny
17  that you did not know that TFG was submitting a
18  claim to American General in the amount --
19        MR. CROWDER: Object. No foundation. Are
20  you -- I think -- do you understand the question?
21        A. Well, it was a double negative, so --
22        Q. I'll rephrase the question. At some point
23  did you obtain knowledge that TFG was submitting a
24  claim to American General under the $4 million

Page 50 - Page 53

## Page 54

1 policy?

2    A. At one time -- at some time I would have
3 known that, yes.

4    Q. Okay. Do you know when that time was?

5    A. No.

6    Q. Okay. Do you have any reason to believe
7 that it was not during the time that these letters
8 are dated, this May 6, 2003, letter and the May
9 19th, 2003, letter?

10    A. I don't remember dates.

11    Q. Okay. That's not what I asked you though.
12 Do you have any reason to deny that you would have
13 known that TFG was making this claim during the --
14 during May 2003 when these letters were written and
15 this was being discussed among counsel?

16    A. The only reason I would not have known was
17 if I was relying on Richard Broch and John Lyons to
18 take care of it and -- and depended on them.

19    Q. And they did not tell you? That's the
20 only reason you would not know, is that what you're
21 saying?

22    A. To ask about the claims? I don't
23 understand.

24    Q. You said at some point you had knowledge

## Page 55

1 that TFG was submitting a claim to American General,
2 correct?

3    A. Yes.

4    Q. Okay. I asked you when you became aware
5 of that fact.

6    A. And I said I don't remember dates.

7    Q. You said you don't remember dates. I'm
8 now pointing you to these May 2003 correspondence
9 that discuss between your counsel and TFG's counsel
10 the fact that they're making a claim. And I'm
11 asking you do you have any reason to believe that
12 you did not know that a claim was being made at this
13 time?

14    A. I don't recall. It was probably directed
15 to -- who was it written to? Mr. Richard Broch. It
16 was probably written to Richard Broch. I relied on
17 him to take care of it.

18    Q. How did you come about the knowledge that
19 TFG was making a claim?

20    A. If I would think -- I would guess that it
1 was when John Lyons -- not guess, all right. John
22 Lyons reviewed who the claims were from, so it would
23 have been then.

24    Q. Did he advise -- do you recall having any

## Page 56

1 specific conversations with him where he advised you
2 that TFG was making a claim for life insurance of
3 approximately $500,000 or $481,000?

4    A. No. I don't recall because I said before
5 I don't recall specific conversations.

6    Q. Okay. So you don't -- you've got no
7 reason to believe that you would not have known in
8 May of 2003 that TFG was making a claim for life
9 insurance policies?

10    A. I was relying on --

11    MR. CROWDER: Let me object to the form of
12 the question, but you can answer to the extent you
13 know how.

14    A. I was relying on my agent to handle the
15 life insurance for me.

16    Q. I got that. That's pretty clear. What
17 I'm asking you is do you have any reason to believe
18 that you would not have known in May 2003 that TFG
19 was submitting this claim?

20    MR. CROWDER: Same objection. No
21 foundation.

22    Q. Do you have any reason to believe --

23    A. Pass.

24    Q. -- that you wouldn't have known this?

## Page 57

1    A. I don't know.

2    Q. Okay. Fair enough. Looking at Exhibit
3 13, it's a May 12th, 2003, letter to John Lyons from
4 Larry Bianchi and also signed by Tom Chamberlain.
5 Have you ever seen this document before?

6    A. Not to my recollection.

7    Q. Did you ever discuss this document with
8 John Lyons?

9    A. Not to my recollection. I don't remember
10 discussing it.

11    Q. Okay. Let's go back to your discussions
12 with Mr. Lyons. You had the one face-to-face
13 discussion where he said these are what the
14 assignments are and the assignments will be paid and
15 then you might get money underneath the $4 million
16 policy, correct? You had that discussion that we
17 discussed, right?

18    A. Yes.

19    Q. Okay. What other discussions did you have
20 with him concerning the claim under --

21    A. Basically that what my daughters -- how it
22 was divided up in the $1 million one.

23    Q. Okay.

24    A. And to go collect on that.

Page 58

1    Q. Okay. What about with respect to the $4
2  million one?
3    A. I don't remember -- I'm sure there was a
4  discussion, but I don't recall what it was or how
5  much was discussed.
6    Q. Okay. Looking at Exhibit 14, simply
7  because we've marked it, have you ever seen this
8  document before?
9    A. Not to my recollection.
10   Q. Okay. In Exhibit 15, a letter of May 28,
11 2003, to John or to American General from John Lyons
12 stating that he was returning a check made payable
13 to you because you and your attorney decided you
14 wanted the money to be placed in an interest-bearing
15 checkbook. Do you recall that?
16   A. I remember the decision. I don't remember
17 the specific conversation.
18   Q. Okay. So at some point you received funds
19 under the $1 million policy, correct?
20   A. Correct.
21   Q. Okay. How much was that?
22   A. I don't remember the exact amount.
23   Q. How much was it generally?
24   A. Between 20 and 30 possibly.

Page 59

1    Q. Under the $1 million policy? You sure it
2  wasn't more like 600,000?
3    A. Oh, no, no. Oh, okay.
4    Q. It was approximately 600,000?
5    A. Yes.
6    Q. Okay. All right. Do you have any
7  recollection of any conversations you had with Mr.
8  Lyons at this point concerning the $4 million policy
9  and whether you were entitled to any money under the
10 $4 million policy?
11   A. No, I don't recall a specific
12 conversation. I do remember him telling me that any
13 balance was due to any -- any unused money would go
14 to myself and the girls.
15   Q. Okay. Flip to Exhibit 16. This is a
16 letter dated July 11 from American General to you.
17 Do you recall receiving this document?
18   A. No, I don't recall.
19   Q. Okay. Is that your -- your correct
20 address up there?
i    A. Yes.
22   Q. All right. You don't have any reason to
23 believe you didn't receive this document?
24   A. No.

Page 60

1    Q. All right. And it says enclosed is our
2  check for $25,354.98. Do you see that?
3    A. Uh-huh.
4    Q. All right. And at some point you received
5  a check under the $4 million for approximately
6  $25,000. Is that correct?
7    A. Correct.
8    Q. Okay. Flip to Exhibit 17. This is a memo
9  dated July 10th from American General to John Lyons.
10 Is that your signature on that page?
11   A. Yes.
12   Q. Okay. And this is basically just
13 confirmation of delivery of the check.
14        MR. CROWDER: I think that's a question
15 she wants you to answer.
16   Q. Actually I'll strike that.
17        MR. CROWDER: Okay. You're done with that
18 one?
19        MS. ROTHMAN: I'm done with that one.
20   Q. Do you recall what you did with the
21 proceeds, that $25,000 check you got? Do you recall
22 what it was that you did with that money?
23   A. No.
24   Q. Did you return it to American General?

Page 61

1    A. I don't recall.
2    Q. Okay. At some point you filed for
3  bankruptcy, correct?
4    A. Correct.
5    Q. Personal bankruptcy. Do you recall when
6  that was?
7    A. I don't remember the date.
8    Q. Okay. Did you receive a discharge? Is
9  that bankruptcy over?
10   A. No.
11   Q. Is it still pending?
12   A. Yes.
13   Q. Okay. Do you know if you received a
14 discharge?
15   A. I know I did not receive a discharge for
16 personal bankruptcy.
17   Q. All right. Do you have any agreement with
18 the trustee in bankruptcy, the trustee of your
19 bankruptcy estate, to pursue this case?
20   A. Yes.
21   Q. Okay. And can you tell me what that
22 agreement is?
23   A. I can't tell the particulars. You'd have
24 to talk to the attorney. I don't know.

Page 58 - Page 61

Page 62

1    Q. Can you tell me the generals?  Can you
2  tell me what you think it is?
3        MR. CROWDER: If you know.  If you know,
4  Margaret.  I don't want you guessing about stuff
5  like that.
6     A. I -- you'll need to get the information
7  from him.
8     Q. Well, let me ask you this.
9     A. Or from somebody.
10        MR. CROWDER: The trustee?
11        THE WITNESS: Yes.
12        MR. CROWDER: Okay.
13     Q. Have you spoken with the trustee in this
14  case?
15     A. I only get information through the
16  lawyers.
17     Q. All right.  You have not spoken directly
18  to the trustee?
19     A. No.
20     Q. Okay.  Is it your understanding that the
21  trustee is going to get a percentage of whatever you
22  recover in this case, if anything?
23     A. Not the trustee.
24     Q. Your estate.

Page 63

1     A. My estate?  I don't think it's the --
2  well, I don't remember.
3     Q. Okay.  All right.  Do you know whether
4  Janko or --
5     A. You can contact Rod Smith and find out.
6     Q. Okay.  Do you know whether Janko, TFG or
7  the bank appeared as creditors in your personal
8  bankruptcy?  Do you have any idea?
9     A. Personal bankruptcy?
10     Q. Uh-huh.
11     A. I think they did.
12     Q. Think they did?
13     A. I think they were in all the bankruptcies.
14     Q. Okay.
15     A. I'm guessing.  I think.
16     Q. Do you have any knowledge whether you
17  listed this claim in your bankruptcy schedules?
18     A. What claim?
19     Q. The claim that you're asserting now
20  against American General?
21     A. I don't know.
22     Q. Okay.  What's your understanding of the
23  claim that you're asserting against American
24  General?

Page 64

1        MR. CROWDER: Well, I'm not going to have
2  her -- that calls for a legal answer, so I'm not
3  going to have her answer that.  You've got the
4  complaint, so you know what the claim is.
5     A. It would be whatever is in the paperwork.
6     Q. You don't have any specific knowledge of
7  what's in the paperwork?
8     A. Not enough to say it under oath.
9     Q. Did you -- okay.  Strike that.  I'm done.
10  Well, actually I'm not.
11        Did you have any direct communications
12  with anybody at Janko or TFG about the submission of
13  the claim to American General?
14     A. I don't think I've had any communications
15  with them at all.
16     Q. Okay.
17        MS. ROTHMAN: I'm done.
18        MS. BEYERS: Go ahead.
19        MR. CROWDER: Are you guys going to ask
20  some questions?
21        MS. BEYERS: Yes, Mike has a few and I
22  have just a few, just a few.
23        MR. CROWDER: Do you want to take a break
24  or do you want --

Page 65

1        THE WITNESS: Yes.
2        MR. CROWDER: You want to take a break?
3        THE WITNESS: Uh-huh.
4        MR. CROWDER: Okay.  Take a break real
5  quick.
6        (Recess at 12:26 p.m. to 12:37 p.m.)
7        EXAMINATION BY
8        MR. SENECA:
9     Q. Margaret, I have a few questions for you.
10  I'm Mike Seneca again, counsel for TFG and JFG,
11  yeah.
12        Earlier you testified that you didn't know
13  how much -- how many in a dollar amount in
14  assignments were made to Janko Financial Group, JFG,
15  or First Mid.  I want to ask you about did you know
16  how much in assignments at the time of your
17  husband's passing were outstanding to Tuscola
18  Furniture Group or TFG?
19     A. No.
20     Q. Okay.  Do you -- can you look at Exhibit 5
21  for a second?  And specifically I think it's on the
22  agreement, paragraph 3.9.  I'm referring to the
23  November 17th, 2000, assignment agreement, paragraph
24  3.9.  You testified earlier that you don't have any

Page 66

1 personal knowledge about the content of this
2 agreement. Is that right?
3    A. I didn't read it.
4    Q. Okay. Do you know -- then do you know if
5 paragraph 3.9 was ever complied with?
6    A. I don't know.
7    Q. Okay. Do you know if a $1.25 million
8 assignment was ever made to the bank and TFG?
9    A. I don't really know. Jim took care of
10 that stuff.
11    Q. Okay, that's fair. Do you know how much
12 was owed either Tuscola Furniture Group, Janko
13 Financial Group or First Mid at the time of your
14 husband's passing?
15    A. I don't personally know off the top of my
16 head. Is that what you said?
17    Q. Yes. And did you --
18    A. No.
19    Q. Okay. I'm going to have this exhibit
20 marked.
21    (Stilwell Exhibit No. 20 was marked by the
22 court reporter.)
23 BY MR. SENECA:
24    Q. I'm going to ask you to take a look at

Page 67

1 what's been marked as Exhibit 20. Do you recognize
2 that document?
3    A. No.
4    Q. Okay. So you don't know who -- who filled
5 that out?
6    A. No.
7    Q. Why it was filled out?
8    A. I don't recall.
9    Q. Okay. Do you know --
10    MR. SENECA: Okay, that's all the
11 questions I have.
12    MR. CROWDER: Is that it, Mike?
13    MR. SENECA: Yes.
14    MS. BEYERS: I just have a few questions,
15 Mrs. Stilwell.
16    EXAMINATION BY
17    MS. BEYERS:
18    Q. My name is Julie Beyers. I represent
19 First Mid Illinois Bank and Trust in this case.
20    A. Okay.
21    Q. And I'd like for you to look at Exhibit 13
22 if you would. And specifically I'd like to direct
23 your attention to paragraph 2 of the letter, and
24 just stating that for the record it indicates that

Page 68

1 "as itemized on the attached Exhibit A, the total
2 amount owed by Amishland Country Village,
3 Incorporated, and guaranteed by James and Margaret
4 Stilwell is $512,974.50. This amount includes the
5 amounts that TFG owes the bank."
6    Do you see that statement in Exhibit No.
7 13?
8    A. Just I read it with you.
9    Q. Okay. As you sit here today, do you have
10 any reason to disagree with that statement in that
11 amount being shown as being owed to TFG would
12 also include amounts -- well, strike that.
13    As you sit here today, do you have any
14 reason to disagree with that statement as you've
15 just read it in that letter?
16    MR. CROWDER: I'll object, no foundation,
17 but you can answer.
18    A. I don't know because I don't know enough
19 of what Jim did to be able to answer that.
20    Q. Okay. So as you sit here today, it would
21 be fair to say that you don't have any facts that
22 you can tell us that you're relying upon in an
23 effort to dispute that figure; is that correct?
24    A. I personally don't, but that doesn't mean

Page 69

1 that legal representation doesn't.
2    Q. Okay. But you personally do not; is that
3 correct?
4    A. I personally was not involved with the
5 business decisions and signed things when my husband
6 told me to because I was more than busy with doing
7 my own jobs at the barn. I did -- doesn't matter
8 what I did, but I put in lots of hours every day of
9 the week.
10    Q. Sure. And what I'm trying to get at with
11 you, Mrs. Stilwell, is just what your knowledge is
12 here today, and my understanding of your testimony
13 is that, as you sit here today, you don't have any
14 facts to dispute the facts set forth in that
15 particular paragraph.
16    A. I have no recollection.
17    Q. But you don't have any facts; is that
18 correct?
19    A. Maybe in my representation, but personally
20 in my head?
21    Q. Right.
22    A. No.
23    Q. Okay.
24    MS. BEYERS: That's all I have for you,

Page 70

1  Mrs. Stilwell.  Thank you very much.

2      MR. CROWDER:  Anybody else have any

3  follow-up?

4      MS. ROTHMAN:  No.

5      MR. CROWDER:  All right.  We'll reserve

6  signature and I think we're all done.

7      (Adjourned at 12:43 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 71

1  STATE OF ILLINOIS    )
                        )SS
2  COUNTY OF FORD       )

3

4      I, June Haeme, a Notary Public in and for
   the County of Ford, State of Illinois, do hereby
   certify that MARGARET STILWELL, the deponent herein,
5  was by me first duly sworn to tell the truth, the
   whole truth and nothing but the truth, in the
6  aforementioned cause of action.
       That the following deposition was taken on
7  behalf of the Defendant at the offices of Area Wide
   Reporting Service, 301 West White Street, Champaign,
8  Illinois, on February 9, 2007.
       That the said deposition was taken down in
9  stenograph notes and afterwards reduced to
   typewriting under my instruction; that the
10 deposition is a true record of the testimony given
   by the deponent; and that it was agreed by and
11 between the witness and attorneys that said
   signature on said deposition would not be waived.
12     I do further certify that I am a
   disinterested person in this cause of action; that I
13 am not a relative, or otherwise interested in the
   event of this action, and am not in the employ of
14 the attorneys for either party.
       IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 14th day of
   February, 2007.

16

17

18

19     JUNE HAEME, CSR, RMR, CRR
       NOTARY PUBLIC

20

21

   *OFFICIAL SEAL*
22 June Haeme
   Notary Public, State of Illinois
23 My Commission Expires:
   September 27, 2008
24

---

Page 72

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2          STATE OF ILLINOIS

3  MARGARET J. STILWELL,        )
   HALEY STILWELL, HEIDI        )
4  STILWELL, JAMIE STILWELL,    )
   MEGAN STILWELL,              )
5      Plaintiffs,              )
          -vs-                  )
6  AMERICAN GENERAL LIFE        )
   INSURANCE COMPANY,           )
7      Defendant.               )
   --------------------------   )  No. 05-CV-02160
8  AMERICAN GENERAL LIFE        )
   INSURANCE COMPANY,           )
9      Third-Party Plaintiff    )
          -vs-                  )
10 First Mid ILLINOIS BANK &    )
   TRUST, TUSCOLA FURNITURE     )
11 GROUP, LLC, JANKO            )
   FINANCIAL GROUP, LLC,        )
12     Third-Party Defendants.  )
   --------------------------

13

14     This is to certify that I have read the
   transcript of my deposition taken by June Haeme,
15 CSR, RMR, CRR, in the above-entitled cause, and that
   the foregoing transcript taken on February 9, 2007,
16 accurately states the questions asked and the
   answers given by me, with the exception of the
17 corrections noted, if any, on the attached errata
   sheet(s).

18

19

20         MARGARET STILWELL

   Subscribed and Sworn before
21 me this    day of

22         , 2007,

23            , Notary Public

24

$1 - best
MARGARET STILWELL

**-$-**

**$1** [9] 17:19 39:8 41:22 42:24 47:9,21 57:22 58:19 59:1
**$1.25** [1] 66:7
**$25,000** [2] 60:6,21
**$25,354.98** [1] 60:2
**$4** [14] 17:18 19:11 39:9 41:22 45:5 47:24 48:5 48:9 53:24 57:15 58:1 59:8,10 60:5
**$481,000** [1] 56:3
**$500,000** [1] 56:3
**$512,974.50** [1] .68:4

**-'-**

**'05** [3] 9:2,4,5
**'06** [1] 9:5
**'74** [1] 18:4
**'80** [1] 18:5

**---**

**-vs** [4] 1:6,10 72:5,9

**-0-**

**05-CV-02160** [2] 1:8 72:7
**084-003038** [1] 1:14

**-1-**

**1** [6] 3:8 16:1,23 17:3 42:4,18
**10** [3] 3:13 47:4,4
**10:55** [1] 4:1
**10th** [1] 60:9
**11** [5] 3:13 48:12,14,16 59:16
**1101** [1] 2:12
**111** [1] 2:15
**12** [2] 3:14 52:18
**120** [1] 2:8
**12604663** [1] 17:6
**12:26** [1] 65:6
**12:37** [1] 65:6
**12:43** [1] 70:7
**12th** [1] 57:3
**13** [4] 3:14 57:3 67:21 68:7
**14** [2] 3:15 58:6
**14th** [1] 71:15
**15** [2] 3:15 58:10
**16** [3] 3:8,16 59:15
**16th** [1] 20:9
**17** [2] 3:16 60:8
**7th** [2] 26:24 65:23
**18** [1] 3:17
**19** [3] 3:17 18:4 45:21
**1973** [1] 8:3

**-2-**

**1974** [1] 7:24
**1998** [1] 14:20
**1999** [3] 20:9 31:7,14
**19th** [1] 54:9

**-2-**

**2** [7] 3:9 20:2,7,21 27:4 27:5 67:23
**20** [5] 3:9,18 58:24 66:21 67:1
**200** [1] 2:15
**2000** [2] 26:24 65:23
**2003** [6] 37:22 46:4 54:8,9,14 55:8 56:8,18 57:3 58:11
**2007** [5] 1:18 71:8,15 72:15,22
**2008** [1] 71:23
**211** [1] 2:4
**23** [1] 3:9
**2384389** [1] 47:20
**25** [1] 3:10
**2600** [1] 2:8
**27** [2] 3:10 71:23
**2701** [1] 7:2
**28** [2] 3:11 58:10
**29** [1] 3:11
**2nd** [5] 37:22 38:1,2,3 46:4

**-3-**

**3** [3] 3:9 23:17 25:4
**3.9** [3] 65:22,24 66:5
**30** [1] 58:24
**301** [2] 1:19 71:7
**308** [1] 20:23
**319** [3] 21:1,4,5
**32** [2] 3:12 32:8
**320** [1] 21:10
**321** [2] 21:15 22:17
**322** [3] 21:15,17 22:17
**34** [2] 33:1,1
**36** [3] 32:8 33:1,6

**-4-**

**4** [6] 3:2,10 15:24 25:8 42:4,19
**401** [1] 7:6
**45** [2] 3:17,17
**46** [1] 3:12
**47** [3] 3:13 32:8,10,10
**48** [1] 3:13

**-5-**

**5** [2] 3:10 65:20
**52** [1] 3:14
**57** [1] 3:14
**58** [2] 3:15,15
**59** [1] 3:16

**-6-**

**6** [3] 3:11 28:15 29:24 54:8
**60** [1] 3:16
**600** [1] 2:3
**600,000** [1] 59:2,4
**60602** [1] 2:9
**61602-1350** [1] 2:4
**61938** [1] 2:12
**62523** [1] 2:16
**65** [1] 3:3
**655** [1] 26:24
**66** [1] 3:18
**666** [2] 27:1,2
**667** [1] 27:9
**668** [2] 27:9,12
**67** [1] 3:3

**-7-**

**7** [4] 3:11 20:2 29:23,24
**74** [1] 32:9

**-8-**

**8** [4] 3:12 32:2,6 38:8

**-9-**

**9** [5] 3:12 45:21 46:3 71:8 72:15
**9th** [1] 1:18

**-A-**

**a.m** [1] 4:1
**ABC** [4] 8:21,23 9:7 10:6
**able** [1] 68:19
**above-entitled** [1] 72:15
**abreast** [1] 50:8
**access** [1] 29:3
**accident** [1] 5:13
**accordance** [1] 4:15
**according** [1] 53:14
**accurately** [1] 72:16
**action** [12] 7:14 38:7,8 48:19,22 49:4,17 51:12 51:19 71:6,12,13
**ACV** [14] 10:19,23 11:1 11:10 13:8,11 19:13 20:16,17 22:22 23:24 26:19 28:3 30:14
**address** [3] 7:8 46:8 59:20
**Adjourned** [1] 70:7
**advise** [1] 55:24
**advised** [2] 30:18 56:1
**affairs** [1] 33:22
**affect** [2] 5:5,8
**affixed** [1] 71:15

**aforementioned** [1] 71:6
**afterwards** [1] 71:9
**again** [5] 4:18 5:19 24:3 50:21 65:10
**against** [3] 32:12 63:20 63:23
**age** [1] 1:18
**agent** [10] 15:17,22 17:15 18:8,15,18,24 39:23 53:3 56:14
**ago** [5] 5:13 45:10 46:17
**agreed** [1] 71:10
**agreement** [17] 4:14 20:9,16,18 25:24 26:1 26:6,9,23 27:6 35:6,7 61:17,22 65:22,23 66:2
**agreements** [2] 23:8 34:6
**ahead** [5] 21:1 26:18 49:7 52:7 64:18
**allegations** [1] 36:10
**always** [1] 22:7
**American** [19] 1:6,8 2:9 4:19 29:20 46:5 48:3 53:18,24 55:1 58:11 59:16 60:9,24 63:20,23 64:13 72:6,8
**Amish** [1] 11:6
**Amishland** [18] 10:7 10:9,15 12:12,14,19 13:21 14:8,8,12 25:18 30:13 32:12,12 34:3 48:18 49:15 68:2
**among** [1] 54:15
**amount** [11] 17:8 43:15 43:16 47:18,21 53:18 58:22 65:13 68:2,4,11
**amounts** [4] 41:20 53:1 68:5,12
**answer** [17] 15:9 33:2 33:10 46:24 50:11,20 51:6,9,20 52:9,11 56:12 60:15 64:2,3 68:17,19
**answered** [1] 6:17
**answering** [1] 5:23
**answers** [1] 72:16
**Appearances** [1] 2:1
**appeared** [1] 63:7
**Appearing** [4] 2:5,9 2:13,16
**applicable** [2] 4:16 49:23
**appointments** [1] 15:21
**appreciate** [1] 45:13
**April** [1] 20:9
**Arcola** [1] 19:6
**area** [1] 1:19 23:14 71:7
**arrangements** [1] 49:10
**aspect** [1] 23:2

**asserting** [1] 63:19,23
**assigned** [1] 23:21
**assignment** [9] 29:19 44:3,7,10,12,16,21 65:23 66:8
**assignments** [7] 44:1 52:22 53:13 57:14,14 65:14,16
**assist** [1] 19:12
**assisting** [1] 26:17
**Associates** [1] 2:14
**assume** [2] 6:18 46:19
**attached** [3] 21:12 68:1 72:17
**attention** [2] 32:10 67:23
**attorney** [16] 2:2,7,11 2:14 33:5,20 34:8 38:17 48:17 49:22 50:7 52:5,13,19 58:13 61:24
**attorney/client** [2] 49:22 51:9
**attorneys** [3] 34:22 71:11,14
**attraction** [1] 12:16
**Atwood** [9] 7:6,8 12:23 12:24 13:3,8,11 46:5 53:3
**Atwood-Hammond** [2] 9:24 17:24
**audible** [2] 5:20 6:2
**August** [1] 8:17
**Avenue** [1] 2:12
**aware** [4] 24:9,12 37:20 55:4
**away** [5] 19:22 28:16 29:24 37:21 51:23

**-B-**

**B** [1] 3:7
**bachelor's** [2] 7:19,23
**balance** [1] 59:13
**bank** [9] 1:10 44:4,7 48:23 63:7 66:8 67:19 68:5 72:10
**bankruptcies** [1] 63:13
**bankruptcy** [9] 61:3 61:5,9,16,18,19 63:8,9 63:17
**barn** [1] 69:7
**basic** [1] 26:20
**batch** [1] 45:24
**Bates** [6] 20:21,22 21:15 26:24 32:8,10
**became** [1] 55:4
**Becky** [1] 4:17
**behalf** [4] 33:2 34:5,9 71:7
**bells** [1] 13:22
**beneficiaries** [1] 42:23
**best** [2] 31:13,17

**between** [7] 14:8 18:4 20:16 36:13 55:9 58:24 71:11

**Beyers** [9] 2:14,15 3:3 64:18,21 67:14,17,18 69:24

**Bianchi** [7] 2:18 37:10 37:11,14,15,18 57:4

**bills** [1] 45:12

**bit** [1] 13:16

**blind** [1] 10:3

**bottom** [2] 20:22 48:20

**Box** [1] 46:5

**break** [4] 6:22 64:23 65:2,4

**breaks** [1] 6:23

**Broadway** [1] 2:12

**Broch** [17] 33:3,4,20 34:13 38:10,19,20,23 39:5 48:17 49:15,21 50:23 51:10 54:17 55:15,16

**Brothers** [2] 19:1,6

**brought** [1] 41:17

**buffet** [1] 37:3

**building** [1] 34:19

**business** [28] 8:12 12:6 12:8,10,11 13:9,19 14:3,7,11,18 18:19 19:13 22:22 23:2,7,14 25:21 30:17,17 31:21 33:5,21,22 37:1,12,16 59:5

**business-related** [1] 16:14

**businesses** [3] 13:12 23:10

**busy** [4] 22:7,8 33:19 69:6

**-C-**

**calls** [2] 50:6 64:2

**car** [5] 5:13 18:22,24 19:1,7

**care** [10] 14:24 15:10 19:4 20:19 35:24 42:14 49:10 54:18 55:17 66:9

**case** [7] 50:9,14 51:16 61:19 62:14,22 67:19

**center** [4] 8:21,23 9:7 14:3

**Central** [3] 1:1,22 72:1

**certain** [7] 1:21 14:21 19:17 23:10 24:10 43:15,16

**certify** [3] 71:4,12 72:14

**Chamberlain** [1] 57:4

**Champaign** [7] 1:19 7:2,11 8:9,13,14 71:7

**.heck** [5] 58:12 60:2,5 60:13,21

**checkbook** [1] 58:15

**Chicago** [2] 2:9 8:14

**citizen** [1] 1:17

**civil** [1] 4:15

**claim** [23] 4:20 39:20 47:9,24 48:4,9 53:18 53:24 54:13 55:1,10 55:12,19 56:2,8,19 57:20 63:17,18,19,23 64:4,13

**claims** [5] 39:21 40:7 41:7 54:22 55:22

**classroom** [1] 8:24

**clear** [3] 21:6 53:2 56:16

**client** [1] 48:23

**closed** [1] 10:7

**cloudy** [1] 31:16

**coach** [1] 18:1

**collect** [1] 57:24

**column** [1] 47:17

**Commencing** [1] 4:1

**Commission** [1] 71:23

**communicated** [1] 38:11

**communications** [2] 64:11,14

**companies** [2] 34:24 41:8

**company** [12] 1:7,9 4:19 10:9 13:20 26:16 28:3 32:16 39:16 49:12 72:6,8

**compensation** [1] 26:14

**complaint** [5] 32:11 33:10,11 36:10 64:4

**complied** [1] 66:5

**concerning** [3] 39:5 57:20 59:8

**Concordia** [1] 72:6

**conditions** [1] 5:7

**confirmation** [1] 60:13

**connections** [1] 30:17

**consignment** [12] 20:8 20:14 25:19,24 26:1,6 26:9,10,23 27:6 34:5 35:7

**contact** [3] 37:14 52:5 63:5

**contacted** [2] 46:14 46:20

**content** [1] 66:1

**continued** [1] 4:13

**conversation** [6] 19:21 40:18 45:10 50:16 58:17 59:12

**conversations** [10] 32:19 36:13 40:19 49:23 50:2 52:14,17 56:1,5 59:7

**conveyed** [1] 50:18

**copy** [1] 17:2

**corporation** [1] 12:22

**corporeal** [1] 1:18

**correct** [34] 8:3 10:10 10:11,16,17,23 21:11 22:9 23:15,16 25:16 25:22 30:9 31:19 36:11 37:17,23 41:24 44:18 46:8 47:21,22 55:2 57:16 58:19,20 59:19 60:6,7 61:3,4 68:23 69:3,18

**corrections** [1] 72:17

**correspondence** [2] 46:4 55:8

**counsel** [9] 5:17 33:24 34:15 48:18,18 54:15 55:9,9 65:10

**Country** [13] 10:7,9 10:15 11:6 12:12,14 12:19 14:8,12 25:18 32:12 34:3 68:2

**countryland** [1] 10:15

**County** [3] 1:20 71:2 71:4

**couple** [1] 53:2

**court** [13] 1:1,21 4:9 5:1,21 15:10 16:24 20:3 24:8 32:3 45:22 66:22 72:1

**coverage** [2] 17:16 41:13

**covered** [1] 40:10

**creditors** [2] 23:24 63:7

**Crowder** [51] 2:10 9:6 11:13,19,22 16:2 17:10 22:15 24:1 27:3,22 28:4 31:12 34:17 35:4 36:1,3 37:24 38:5 40:16 43:14,19 46:22 46:24 49:20 50:4,10 50:19 51:3,8,18 52:7 52:15 53:5,19 56:11 56:20 60:14,17 62:3 62:10,12 64:1,19,23 65:2,4,8 67:12 68:16 70:2,5

**CRR** [3] 1:20 71:19 72:15

**CSR** [4] 1:14,20 71:19 72:15

**Curtis** [1] 7:2,11

**-D-**

**D** [1] 3:1

**date** [7] 4:13 15:19 31:1 35:9 38:9 49:9 61:7

**dated** [5] 20:9 26:23 54:8 59:16 60:9

**dates** [9] 9:12 15:20 16:9 21:24 28:10 46:18 54:10 55:6,7

**daughters** [3] 7:12,13 57:21

**dealings** [8] 12:8 13:10 13:19 14:18 15:14 18:12 30:17 37:12

**death** [5] 15:20 16:4 17:16 39:19 46:15

**debt** [1] 28:2

**debts** [3] 16:19 42:21 43:1

**Decatur** [1] 2:16

**decided** [1] 58:13

**decision** [5] 15:1,3 20:20 49:16 58:16

**decisions** [1] 69:5

**defendant** [4] 1:7 4:20 71:7 72:7

**Defendants** [1] 1:12 72:12

**delivery** [1] 60:13

**deny** [3] 53:12,15,16 54:12

**Department** [1] 10:2

**depended** [1] 54:18

**deponent** [3] 4:3 71:4 71:10

**deposition** [18] 1:16 1:17 4:12,14,21 5:17 20:8 24:7 28:20,23 29:6 32:6 46:4 71:6,8 71:10,11 72:14

**designated** [1] 15:21 42:20

**designation** [1] 19:16

**designations** [1] 24:9

**details** [4] 14:11 26:21 42:13,16

**detainer** [1] 32:11

**development** [6] 13:21 14:9 30:13 32:12 36:21 48:19

**Development's** [1] 49:16

**Diamond** [1] 19:1,6

**Dick** [2] 37:10,11

**Dicker** [1] 2:8

**died** [1] 40:5

**different** [1] 38:24

**difficulties** [3] 30:15 30:21 32:17

**direct** [2] 64:11 67:22

**directed** [1] 55:14

**directly** [3] 18:13 25:20 62:17

**director** [1] 12:21

**disagree** [3] 19:14 68:10,14

**discharge** [3] 61:8,14 61:15

**discovery** [2] 4:12 30:12

**discuss** [4] 40:7 49:15 55:9 57:7

**discussed** [4] 41:12 54:15 57:17 58:5

**discussing** [1] 57:10

**discussion** [5] 16:22 41:7 57:13,16 58:4

**discussions** [5] 38:22 38:24 39:4 57:11,19

**disinterested** [1] 71:12

**dismiss** [1] 49:16

**dismissal** [2] 35:17 38:7

**dismissed** [2] 35:18 50:24

**dispute** [4] 48:6 53:11 68:23 69:14

**distributed** [3] 42:6,7 42:12

**District** [6] 1:1,1,21 1:22 72:1,1

**divided** [2] 42:24 57:22

**docs** [3] 11:7,10 36:18

**doctors** [1] 36:18

**document** [46] 17:3,5 20:7,8,10,13 21:5,12 21:13,18,21 22:3,14 22:17 23:18 24:15,18 25:4,6,9,17 26:23 27:9 27:15,21 28:13,16 29:10,16,18 30:1,4 32:8,10 35:16 46:3 47:4,5,14,17 57:5,7 58:8 59:17,23 67:2

**documentation** [2] 19:10 41:21

**documents** [10] 13:16 21:22 22:23 23:21 25:19 26:3 28:10,24 30:7,11

**doesn't** [3] 68:24 69:1 69:7

**dollar** [1] 65:13

**done** [9] 36:8 41:9,10 47:10 60:17,19 64:9 64:17 70:6

**double** [1] 53:21

**down** [5] 5:16,21 15:11 46:17 71:8

**drove** [1] 10:2

**due** [1] 59:13

**duly** [2] 4:4 71:5

**during** [4] 52:6 54:7 54:13,14

**-E-**

**E** [4] 2:15 3:1,7 13:7

**Edelman** [1] 2:7

**education** [2] 7:18,21

**effort** [1] 68:23

**either** [3] 24:17 66:12 71:14

**Elser** [1] 2:7

**employ** [1] 71:13

**employed** [5] 8:2,4 9:8 10:12,13

**employment** [1] 9:12

**enclosed** [1] 60:1

**end** [1] 8:17

**entertainment** [1] 14:4

**entities** [1] 16:19 19:20

entitled [1] 59:9
entry [1] 32:11
errata [1] 72:17
  state [1] 61:19 62:24
  63:1
event [1] 71:13
events [1] 14:4
exact [3] 31:1 43:24
  58:22
exactly [4] 40:23 43:12
  45:9 52:23
EXAMINATION [6]
  3:2,3,3 4:6 65:7 67:16
examined [2] 1:18 4:4
except [1] 22:5
exception [1] 72:16
executed [1] 48:4
executing [6] 25:9
  27:18 47:4,14,24 48:8
exhibit [57] 3:8,9,9,10
  3:10,11,11,12,12,13
  3:13,14,14,15,15,16
  3:16,17,17,18 16:23
  17:3 20:7,21 23:17,17
  25:4,8,18 26:4 27:3,5
  28:15 29:23,24,24 32:2
  32:6,7 38:8 46:3 48:12
  48:14,16 52:18 57:2
  58:6,10 59:15 60:8
  65:20 66:19,21 67:1
  67:21 68:1,6
exhibits [4] 20:2,5
  45:21 46:1
exists [1] 19:10
expand [1] 9:19
expanded [1] 39:18
expectation [1] 50:4
expected [2] 49:14
  50:7
expenses [2] 16:14
  19:13
Expires [1] 71:23
explain [4] 19:18 41:15
  42:7 52:23
explained [1] 19:17
  41:13
explaining [1] 40:10
explanation [1] 42:16
extent [2] 45:7 56:12

-F-

face-to-face [4] 40:11
  41:6 45:8 57:12
fact [3] 15:23 55:5,10
facts [6] 16:11 51:15
  68:21 69:14,14,17
fair [12] 5:11,16 6:19
  14:6,9 15:12 25:19
  31:10 46:19 57:2 66:11
  58:21
familiar [3] 13:23 14:7
  14:10
family [1] 49:11
far [4] 14:10 18:17,21

19:15
February [4] 1:18 71:8
  71:15 72:15
federal [1] 4:15
fellow [1] 35:2
few [5] 64:21,22,22
  65:9 67:14
figure [4] 12:5,7 49:11
  68:23
figures [1] 29:22
filed [8] 4:20 32:11
  33:2 35:23 36:6 38:7
  48:19 61:2
filled [1] 67:4,7
filling [1] 47:7
finally [1] 48:21
financial [1] 1:12 2:5
  10:22 16:17 30:15,21
  32:16 36:13 65:14
  66:13 72:11
financially [1] 26:14
financing [1] 20:16
  23:14
finding [1] 45:11
fine [2] 31:15,20
finish [1] 15:6
first [22] 1:10 2:16 4:4
  20:7,23 27:5 30:24
  37:14 39:13 41:11 44:3
  44:3,7 45:8 47:16
  52:20 53:7 65:15 66:13
  67:19 71:5 72:10
Flip [5] 33:1 35:20 47:3
  59:15 60:8
flipped [1] 33:6
follow-up [1] 70:3
following [1] 71:6
follows [1] 4:5
forcible [1] 32:11
Ford [3] 1:20 71:2,4
foregoing [1] 72:15
forget [2] 6:10 49:21
forgotten [1] 52:21
form [8] 37:15 47:11
  47:24 48:4,9 49:20
  50:19 56:11
forth [1] 69:14
found [1] 15:20
foundation [5] 50:5
  50:10 53:19 56:21
  68:16
four [1] 9:16
frames [1] 46:16
Franklin [2] 39:15,17
Friday [1] 48:23
front [2] 20:6 23:17
  25:5 35:16,20 43:8
  46:1
full [1] 4:8
fully [1] 31:15
Fulton [1] 2:4
fund [2] 16:14 20:17
funding [1] 19:12

funds [1] 58:18
funeral [1] 49:10
furnishes [1] 26:12
furnishing [2] 26:14
  26:17
furniture [11] 1:11 2:5
  20:17 26:16,17 36:13
  36:15 44:17 65:18
  66:12 72:10

-G-

gears [1] 14:16
general [22] 1:6,8 2:9
  4:19 18:18 29:20 39:4
  42:15 46:5 48:3 53:18
  53:24 55:1 58:11 59:16
  60:9,24 63:20,24 64:13
  72:6,8
generally [1] 58:23
generals [1] 62:1
girls [1] 16:18 42:19
  42:23 59:14
gist [1] 42:16
given [4] 4:21 71:10
  72:16
gone [2] 5:18 20:7
grants [2] 14:4 23:11
group [16] 1:11,12 2:5
  2:5 25:17 26:16 32:7
  36:13,16 44:17 65:14
  65:18 66:12,13 72:11
  72:11
guaranteed [1] 68:3
guaranty [6] 21:13
  22:14 27:8,18,22 28:7
guarantying [2] 28:2
  28:8
guard [2] 9:20,22
guess [4] 18:11 49:24
  55:20,21
guessing [2] 62:4 63:15
guys [1] 64:19

-H-

H [1] 3:7
Haeme [5] 1:20 71:3
  71:19,22 72:14
HALEY [1] 4 72:3
half [1] 7:9
hand [1] 71:15
handle [1] 56:14
handled [2] 14:2 33:22
he'd [1] 24:12
head [5] 6:3,3 8:24
  66:16 69:20
Heavner [1] 2:15
HEIDI [1] 4 72:3
held [2] 10:22,22
Heller [1] 2:11
hereby [1] 71:4
herein [2] 4:3 71:4
hereunto [1] 71:14

highest [1] 7:17
hold [2] 10:4 13:12
Holmes [1] 2:11
home [1] 29:4
hours [1] 69:8
house [2] 19:2,7
Howard [4] 2:3,3
  48:17 52:19
Human [1] 10:3
husband [20] 10:22
  13:7,20 14:23 15:3,15
  17:8 19:22 23:23 24:14
  30:7,16 32:16 34:24
  36:19 37:18,21 39:9
  51:23 69:5
husband's [6] 16:3
  21:5 27:1,7,14 46:15
  65:17 66:14

-I-

idea [4] 15:23 20:12
  35:17 63:8
IL [4] 2:4,9,12,16
Illinois [19] 1:1,2,10
  1:17,19,20,22 2:16 7:2
  7:6 46:6 67:19 71:1,4
  71:8,22 72:1,2,10
important [2] 6:1
  11:23
impression [1] 35:5
in-house [1] 34:15
incidentally [1] 38:6
include [1] 68:12
includes [1] 68:4
Incorporated [1] 68:3
increase [1] 15:18
independent [8] 15:17
  21:20 24:24 25:9 27:18,
  30:3 32:21 47:13
Indianapolis [1] 8:14
indicated [1] 52:22
indicates [1] 67:24
individual [1] 25:2
infant [1] 8:24
information [8] 7:16
  14:3 26:2 42:9 50:18
  50:23 62:6,15
informed [2] 17:16
  21:23 53:12
instead [3] 6:5,6 38:11
instruction [1] 71:9
insurance [48] 1:7,9
  4:19 14:17,19,21,22
  15:4,5,14,16,19,21,22
  16:5,13 17:4,8,18,19
  18:7,14,19,22,24 19:2
  19:2,8 23:22 29:20
  39:8,10,21,21 40:7
  41:8 47:18,21 48:24
  51:2 52:22 53:3,13
  56:2,9,15 72:6,8
insurances [1] 24:10
insuring [1] 14:22
interest [3] 10:23 11:10

42:22
interest-bearing [1]
  58:14
interested [1] 71:13
intricate [1] 14:11
introduce [1] 4:18
invade [1] 51:9
inventory [2] 20:17
  26:18
invited [1] 37:7
involved [15] 10:9 13:9
  13:20 15:1,2 16:8
  20:20 25:20 34:2,4,9
  36:14 38:14,16 69:4
issued [9] 14:21 15:24
  17:5,9 19:12,12,19
  23:23 39:8
itemized [1] 68:1

-J-

J [2] 1:3 72:3
James [2] 13:7 32:13
  68:3
JAMIE [2] 1:4 72:4
Janko [20] 1:11 2:5
  11:8,11 20:17 36:17
  36:23,24 37:9,10,11
  37:15 44:10,13 63:4,6
  64:12 65:14 66:12
  72:11
Jankos [1] 37:19
Jason [1] 2:10
JFG [2] 65:10,14
Jim [15] 19:3 20:18
  21:23 22:20,22 24:12
  25:13 28:11 36:8,14
  37:7 38:11 40:5 66:9
  68:19
Jim's [2] 23:14 37:1
Jo [2] 4:10,12
job [3] 22:8 23:6 45:12
jobs [1] 69:7
John [16] 15:17,22
  17:15,22 19:16 39:16
  39:23 53:3 54:17 55:21
  55:21 57:3,8 58:11,11
  60:9
Julie [2] 2:14 67:18
July [1] 59:16 60:9
jump [2] 6:10,22
jumping [1] 21:1
June [5] 1:19 71:3,19
  71:22 72:14

-K-

keep [2] 30:18 50:8
kept [2] 50:13 51:14
kind [4] 8:12 34:1 42:6
  43:13
knew [7] 15:16,18 16:5
  18:1 25:15 26:1 51:19
knowledge [7] 7:16
  12:8,20 15:13 17:7

20:16 25:24 26:21
29:17 34:4,23 35:21
36:9 44:6,9,15,20
47:23 53:23 54:24
55:18 63:16 64:6 66:1
69:11
**known** [8] 5:7 17:23
54:3,13,16 56:7,18,24

**-L-**

labeled [1] 25:18
**Land** [4] 8:7,10,12,16
**Larry** [4] 2:18 37:10
37:11 57:4
LaSalle [1] 2:8
last [2] 6:21 7:4
**Law** [4] 2:2,7,11,14
lawful [1] 1:18
lawsuit [8] 32:22,23
35:18 38:12,23 39:5
50:24 51:1
lawyers [1] 62:16
learned [3] 30:20,23
30:24
**Learning** [3] 8:21,23
9:7
least [1] 16:13
left [1] 23:9
legal [2] 64:2 69:1
less [1] 40:9
letter [15] 46:6,11,20
46:21 48:16 49:12
52:19 53:14 54:8,9
57:3 58:10 59:16 67:23
68:15
letters [2] 54:7,14
level [1] 7:17
**Lex** [4] 8:7,10,12,15
liability [1] 18:19
License [1] 1:14
life [37] 1:6,8 2:9 4:19
14:17,19,21,21,22 15:4
15:5,14,16,19,21,22
16:5,13 17:4,8,18,19
23:22,23 24:10 29:19
39:8,10,10,21 52:21
53:13 56:2,8,15 72:6,8
**Lincoln** [4] 8:7,10,12
8:16
**Line** [3] 14:21 17:4
39:8
listed [2] 7:15 63:17
live [4] 7:5,10,12 45:11
lived [2] 7:3,7
LLC [5] 1:11,12 13:21
72:11,11
LLP [1] 2:8
loans [2] 16:6,15
local [1] 4:16
look [6] 28:24 29:5 32:9
65:20 66:24 67:21
looked [3] 13:15 34:6
44:22

**Looking** [5] 23:16 25:4
32:6 57:2 58:6
looks [3] 6:7 21:6 29:19
lots [1] 69:8
lunch [2] 37:3,7
**Lyons** [15] 15:17,22
17:15,22,23 18:7,13
19:16 39:16,23 46:14
53:3 54:17 55:21,22
57:3,8,12 58:11 59:8
60:9
**Lyons's** [2] 24:22 47:8

**-M-**

**M** [2] 2:6,10
**Main** [2] 2:15 7:6
makes [1] 9:6
**March** [3] 7:4 37:21
38:1
mark [1] 16:21
marked [12] 16:23
17:3 20:3,6 32:2 45:22
45:24 52:18 58:7 66:20
66:21 67:1
married [5] 15:18
18:10,11,13 39:14
matter [1] 1:21 69:7
**Mattoon** [2] 2:12
may [16] 5:17 9:5 38:2
38:3 46:4 49:18,23,24
54:8,8,14 55:8 56:8,18
57:3 58:10
mean [17] 6:5,6 9:5
11:4,14,15 12:2 19:18
20:14 22:18 23:10
26:11 27:24 31:5 38:15
39:15 68:24
meaning [2] 11:11
22:6
means [4] 26:10 27:21
28:1,7
meant [1] 34:17
meat [6] 12:23,24 13:2
13:3,8,11
meeting [6] 40:11,19
41:10,10,11 45:8
meetings [4] 40:20,21
40:22,24
**MEGAN** [1] 1:5 72:4
members [1] 37:9
memo [1] 60:8
memory [2] 5:5,8
mentioned [1] 39:13
merchandise [1]
26:12
met [1] 17:15
**Michael** [1] 2:2
**Mid** [1] 1:10 2:16 44:4
44:7 65:15 66:13 67:19

72:10
might [3] 5:13 14:14
57:15
**Mihlar** [1] 2:15
**Mike** [3] 64:21 65:10
67:12
million [30] 16:1,1
17:18,19 19:11 39:8,9
41:22,22 42:4,4,18,20
42:24 45:5 47:9,21,24
48:5,9 53:24 57:15,22
58:2,19 59:1,8,10 60:5
66:7
money [8] 32:19 42:22
45:4 57:15 58:14 59:9
59:13 60:22
monies [1] 24:10
month [2] 40:4 46:15
months [1] 9:16
**Moskowitz** [1] 2:7
move [1] 52:2
**Mrs** [5] 4:8,17 67:15
69:11 70:1
**MS** [7] 3:2,3 4:7 11:17
11:21 17:1,12 20:4
24:5 27:5,23 32:5
45:23 50:1 51:7,13,22
52:3 53:7 60:19 64:17
64:18,21 67:14,17
69:24 70:4

**-N-**

**N** [1] 3:1
name [4] 4:9,17 13:23
67:18
named [2] 26:16 32:23
names [1] 7:15
**National** [2] 43:16
44:3
need [3] 6:22 48:21
62:6
needed [6] 21:23 22:20
22:23 24:18,19 25:13
negative [1] 53:21
**Never** [1] 5:1
next [5] 23:16 25:17
27:8 35:3 47:3
**North** [2] 2:8 7:6
notarial [1] 71:15
**Notary** [5] 1:20 71:3
71:19,22 72:23
noted [1] 72:17
notes [1] 71:9
nothing [3] 22:2 28:12
71:5
notice [1] 4:13
**November** [2] 26:24
65:23
now [6] 1:21 17:13 20:6
47:16 55:8 63:19
number [8] 6:1 17:6
40:19,20,21,24 47:17
47:20

**-O-**

oath [2] 1:18 64:8
object [6] 36:3 49:20
50:19 53:19 56:11
68:16
objected [1] 52:10
objection [4] 51:3,4
52:7 56:20
obtain [1] 53:23
obviously [1] 11:15
occurrence [1] 37:5
off [4] 16:21,22 43:5
66:15
office [7] 24:22 34:18
34:19 40:1,6,12 47:8
officer [1] 12:21
offices [1] 1:19 34:18
71:7
**OFFICIAL** [1] 71:21
often [1] 37:4
**Old** [3] 14:21 17:4 39:8
once [1] 15:11
one [35] 2:3 6:2,10,13
7:9 15:24 16:1,17 19:7
21:2 26:7 28:16 30:6
34:12,14 36:12 37:1
39:13 40:18,18,19 41:4
41:6,9,10 46:15 47:3
51:5,24 54:7 57:12,22
58:2 60:18,19
one's [2] 42:4,4
one-third [13] 11:7,7
11:8,10,10,11 12:3,9
14:14,15,15 36:17,18
one-time [1] 37:5
ones [1] 39:3
operated [1] 14:13
operating [1] 31:4
operation [1] 31:2
opportunity [2] 33:9
33:15
opposing [1] 48:18
originally [1] 19:3
otherwise [1] 47:8
71:13
outstanding [1] 65:17
owed [4] 32:18 66:12
68:2,11
owes [1] 68:5
own [1] 69:7
owned [1] 14:13
owner [5] 12:3,9 13:3
17:5,18
owners [1] 13:6
ownership [5] 11:9
13:12 36:17,18,19

**-P-**

**P.C** [1] 2:11
**p.m** [3] 65:6,6 70:7
**P.O** [1] 46:5

page [16] 3:2,8 5:19
20:23 21:4,5 25:10
26:22 27:2,8,12 33:6,7
35:16,20 60:10
paid [4] 48:24 49:19
51:1 57:14
paper [6] 43:5,6,8
44:22 45:15,16
paperwork [2] 64:5,7
paragraph [9] 48:20
52:20 53:5,7 65:22,23
66:5 67:23 69:15
**Pardon** [2] 8:3 31:23
**Paris** [1] 43:17
part [2] 16:13 23:6
part-time [2] 9:23 10:2
particular [2] 28:10
69:15
particularly [1] 16:8
particulars [1] 27:24
61:23
parties [2] 4:14 7:14
partners [4] 11:2,3,5
11:6
party [1] 71:14
pass [3] 51:5 52:8 56:23
passed [2] 19:22 37:21
51:23
passing [2] 65:17 66:14
pay [2] 16:18 45:12
payable [1] 58:12
payment [1] 28:8
pending [2] 1:21 61:11
people [2] 30:18 42:21
**Peoria** [1] 2:4
percentage [1] 62:21
perhaps [1] 46:20
person [2] 52:1 71:12
personal [2] 61:5,16
63:7,9 66:1
personally [7] 28:2
22:23 66:15 68:24 69:2
69:4,19
physically [1] 34:21
pinpointed [1] 31:9
place [1] 45:11
placed [1] 58:14
**Plaintiff** [2] 1:9 72:9
plaintiffs [4] 1:5 2:13
51:1 72:5
plate [1] 14:5
**Plaza** [1] 2:3
point [13] 16:2 17:11
30:12,14,20 32:15 52:1
53:22 54:24 58:18 59:8
60:4 61:2
pointing [1] 55:8
policies [12] 14:22
15:24 16:14 23:22 39:7
39:10,12 40:8 41:17
42:3 43:10 56:9
policy [26] 17:4,6,19
17:19 18:19,14 19:11

39:9 42:24 43:2 45:5
45:17,18,18 47:9,17
47:20 48:1,5,9 54:1
57:16 58:19 59:1,8,10
**portion** [2] 24:7 47:16
**position** [2] 9:1 10:5
**possibility** [1] 24:23
**possibly** [1] 58:24
**precluded** [2] 22:2
28:13
**prepare** [3] 28:20,23
29:6
**present** [3] 2:18 24:14
24:17
**pretty** [2] 45:7 56:16
**privilege** [1] 49:22
**procedure** [1] 4:16
**proceed** [1] 48:21
**proceeds** [7] 39:21,22
48:24 49:19 51:2 52:24
60:21
**produced** [2] 1:18
30:12
**product** [1] 26:13
**promotions** [1] 14:3
**property** [1] 14:13
**protect** [2] 16:17 18:10
**Public** [5] 1:20 71:3
71:19,22 72:23
**purpose** [3] 16:13,18
19:11
urposes [1] 53:1
**pursuant** [2] 4:13 45:4
**pursue** [1] 61:19
**put** [3] 28:15 29:23 69:8

### -Q-

**qualify** [1] 11:5
**questions** [10] 5:22,23
6:14 51:10 53:2 64:20
65:9 67:11,14 72:16
**quick** [1] 65:5
**quite** [1] 31:2
**quote** [2] 43:12
**quoted** [1] 31:6

### -R-

**ran** [1] 23:2
**read** [11] 22:1,18 24:5
24:8 28:10 43:5 49:2
66:3 68:8,15 72:14
**reading** [3] 22:3 28:13
53:6
**real** [1] 65:4
**really** [9] 21:24 27:24
29:21,22 30:18 31:24
51:9,12 66:9
eason [22] 19:14 21:7
46:10 48:5 50:17,22
52:4,10 53:11,15,16
54:6,12,16,20 55:11
56:7,17,22 59:22 68:10
68:14

**Rebecca** [2] 2:6 31:13
**receive** [4] 46:11 59:23
61:8,15
**received** [3] 58:18 60:4
61:13
**receiving** [3] 46:6,21
59:17
**Recess** [2] 32:4 65:6
**recognize** [14] 20:9
21:4,17 23:18 25:5
27:1,7,11,14 28:16,17
29:24 36:7 67:1
**recollection** [23] 21:21
21:22 25:1,9 27:18
30:4 31:13,16,18 32:14
32:22 33:3 43:7,9
45:14 47:14 48:8 49:4
57:6,9 58:9 59:7 69:6
**record** [7] 4:11 6:4,7
16:21,22 67:24 71:10
**recorded** [1] 45:1
**recording** [1] 5:24
**recover** [1] 62:22
**reduced** [1] 71:9
**refer** [1] 10:18
**referring** [1] 65:22
**reflect** [1] 4:11
**reflected** [1] 6:4
**reflection** [1] 30:16
**refresh** [3] 32:14 45:14
49:3
**regard** [1] 13:1
**reimbursed** [1] 26:13
**relating** [1] 19:13
**relation** [1] 31:21
**relationship** [5] 14:7
36:23,24 37:2,16
**relationships** [1] 37:2
**relative** [1] 71:13
**relied** [2] 42:14 55:16
**relying** [4] 54:17 56:10
56:14 68:22
**remaining** [1] 44:22
**remember** [32] 4:24
5:2,10,14 6:1,5,9,14
13:24 15:6 21:24 24:11
28:9,9,17 31:1 32:18
36:12 41:20 44:8 45:9
49:24 54:10 55:6,7
57:9 58:3,16,16,22
59:12 61:7 63:2
**remind** [1] 6:10
**rephrase** [1] 6:15
53:22
**replevin** [6] 48:19,22
49:4,16 51:11,19
**reporter** [8] 4:9 5:21
15:10 16:24 20:3 24:8
32:3 45:22 66:22
**Reporting** [1] 1:19
71:7
**represent** [1] 4:18
67:18
**representation** [2]

69:1,19
**represented** [4] 33:4
34:23 35:11,14
**Requested** [1] 24:7
**Reservationist** [1]
8:11
**reserve** [1] 70:5
**reside** [1] 7:1
**resolution** [1] 36:14
**resolved** [3] 35:21
36:11 49:5
**respect** [3] 23:13 34:5
58:1
**responses** [5] 5:20 6:2
**Retail** [1] 12:18
**return** [1] 60:24
**returning** [1] 58:12
**review** [1] 33:10
**reviewed** [2] 19:10
55:22
**reviewing** [1] 30:11
**Richard** [5] 33:2,3
54:17 55:15,16
**Rick** [1] 49:21
**right** [46] 10:20,24
11:12,17 15:15 16:1
17:21 18:12 19:9,22
19:23 22:4,13,24 23:5
29:13,16 33:20 34:13
35:13 36:2,20 37:16
37:22 38:8 40:6,8,14
41:23 43:10 48:10,16
50:1 51:22 55:21 57:17
59:6,22 60:1,4 61:17
62:17 63:3 66:2 69:21
70:5
**rights** [1] 23:22
**ring** [1] 13:21
**RMR** [3] 1:20 71:19
72:15
**Road** [2] 7:2,11
**Rod** [2] 31:6 63:5
**Rothman** [23] 2:6 3:2
4:7,17 11:17,21 17:1
17:12 20:4 24:5 27:5
27:23 32:5 45:23 50:1
51:7,13,22 52:3 53:7
60:19 64:17 70:4
**rules** [3] 4:15,16 5:17
**run** [2] 5:16 41:5

### -S-

**s** [3] 2:2 3:7 72:17
**sales** [1] 23:11
**says** [5] 20:14 38:15
47:17 48:21 60:1
**scheduled** [1] 48:22
**schedules** [1] 63:17
**schools** [2] 9:24 17:24
**Scott** [1] 2:15
**seal** [2] 71:15,21
**second** [6] 16:18 17:22
21:3 26:22 51:13 65:21

**sections** [1] 19:17
**Securitas** [2] 9:11,13
**security** [4] 9:18,20
9:21 16:17
**see** [14] 20:22,23 21:15
27:9 29:21 33:7 36:6
47:18 48:20,21 49:1
53:4 60:2 68:6
**sell** [1] 26:18
**Seneca** [7] 2:2 3:3 65:8
65:10 66:23 67:10,13
**sense** [1] 9:6
**sentence** [1] 15:7
**separate** [1] 15:24
19:20
**September** [6] 9:2,3
31:5,7,14 71:23
**served** [1] 32:22
**service** [7] 1:19 8:13
12:23,24 13:3,9 71:7
**Services** [2] 10:3 13:11
**set** [2] 69:14 71:14
**shaking** [1] 6:3
**shared** [1] 50:23
**shareholder** [1] 12:21
**shareholders** [1] 11:1
**sheet** [1] 72:17
**shortage** [2] 22:5,6
**shortly** [1] 40:4,4
**show** [4] 16:20 20:1
45:15,18
**showed** [2] 37:6 41:18
41:21
**showing** [1] 17:2 52:18
**shown** [1] 68:11
**shows** [1] 23:11
**shuttle** [1] 8:13
**sign** [11] 21:23 22:11
22:23,24 23:21 24:15
24:16,19,21 25:13 30:8
**signature** [19] 21:5,8
21:18 23:18 25:5,12
27:2,7,11,15 28:18
29:14 30:1 33:7 36:7
47:11 60:10 70:6 71:11
**signed** [16] 22:3,17,19
24:11,13,18 28:5 29:7
29:8,11,18 30:10 33:13
36:8 57:4 69:5
**signing** [3] 21:21,22
30:4
**similar** [1] 47:24
**simply** [1] 58:6
**sit** [6] 25:1 44:24 68:9
68:13,20 69:13
**site** [2] 34:14,21,21
**sitting** [2] 35:3 46:1
**Smith** [2] 35:11 63:5
**Sold** [1] 13:2
**sole** [1] 11:1
**sometime** [2] 14:20
31:3
**somewhat** [1] 14:10

**somewhere** [4] 8:18
18:4,5 24:19
**sorry** [5] 15:8 16:3 38:2
38:5 49:6
**sort** [1] 18:19
**speaking** [2] 22:15
53:2
**special** [1] 14:4
**specific** [14] 16:19,19
19:16 39:3 42:21,21
43:1 45:16 50:2 56:1,5
58:17 59:11 64:6
**specifically** [2] 22:16
42:19 65:21 67:22
**specifics** [2] 52:21
53:12
**speculation** [1] 50:6
**speed** [1] 50:14
**spoke** [1] 52:13
**spoken** [2] 62:13,17
**SS** [1] 71:1
**stack** [1] 20:5
**stamp** [2] 21:15 32:10
**stamped** [3] 20:22
26:24 32:8
**stamps** [1] 20:22
**start** [3] 9:1 31:4 51:10
**started** [4] 10:6 30:14
34:1,2
**state** [8] 1:2,17,20 4:8
71:1,4,22 72:2
**statement** [9] 5:11
14:9 15:12 19:14 25:19
30:15 68:6,10,14
**states** [5] 1:1,21 52:20
72:1,16
**stating** [2] 58:12 67:24
**status** [1] 50:8
**stenograph** [1] 71:9
**steps** [1] 39:20
**still** [1] 61:11
**Stilwell** [52] 1:3,4,4,4
1:5,17 3:8,9,9,10,10
3:11,11,12,12,13,13
3:14,14,15,15,16,16
3:17,17,18,4 8:10,12
4:17 11:12 13:7 16:23
17:3 20:2 32:2,13,13
45:21 52:20 66:21
67:15 68:4 69:11 70:1
71:4 72:3,3,4,4,4,19
**STIWELL** [1] 4:2
**story** [1] 25:11
**Street** [5] 1:19 2:4,8
2:15 71:7
**strike** [15] 5:4 8:1,22
13:10 18:7 22:21 28:22
30:13 42:10 46:13
48:13 53:16 60:16 64:9
68:12
**structure** [2] 11:24
12:1
**stuff** [4] 35:12,14 62:4
66:10

submission [1] 64:12
submit [3] 39:20,21
  47:9
ubmitting [5] 41:7
  53:17,23 55:1 56:19
Subscribed [1] 72:20
substitute [1] 10:8
substituting [1] 9:23
sued [2] 31:21 32:16
suggest [1] 19:11
suit [1] 1:21
Suite [3] 2:3,8,15
supposed [1] 52:15
switch [1] 14:16
sworn [4] 1:18 4:4 71:5
  72:20

-T-

T [1] 3:7
taking [2] 5:4 49:10
teacher [2] 8:24 18:1
teaching [1] 10:8
Technology [1] 2:3
telling [1] 59:12
territory [1] 51:21
test [1] 6:9
testified [6] 4:5,23 5:1
  5:11 65:12,24
testify [2] 11:18,19
estifying [1] 11:15
estimony [2] 69:12
  71:10
TFG [16] 44:16 53:17
  53:23 54:13 55:1,19
  56:2,8,18 63:6 64:12
  65:10,18 66:8 68:5,11
TFG's [1] 55:9
Thank [2] 7:22 70:1
third [1] 36:19
Third-Party [4] 1:9
  1:12 72:9,12
through [14] 15:22
  20:2,7 24:12 26:19
  27:1 32:8,9 33:1 45:17
  45:21 46:2 51:2 62:15
Tim [1] 52:19
times [2] 39:1 46:18
Timothy [1] 48:17
titled [2] 20:8 26:23
today [12] 5:5,24 10:18
  25:1 28:19,21 44:24
  68:9,13,20 69:12,13
today's [1] 4:13
Tom [1] 57:4
too [3] 25:2 46:16 49:6
took [8] 14:24 15:16
  18:9,14 19:4 20:19
  39:13 66:9
.op [2] 46:3 66:15
total [2] 17:8 68:1
tourism [1] 12:16

transaction [1] 25:21
transactions [1] 34:10
transcript [2] 72:14
  72:15
travel [1] 23:11
trial [1] 48:23
tried [1] 42:7
true [3] 30:15 71:10
Trust [3] 1:11 67:19
  72:10
trustee [7] 61:18,18
  62:10,13,18,21,23
truth [3] 71:5,5,5
try [3] 6:5,10 15:6
trying [5] 12:5,7 35:5
  49:11 69:10
turn [5] 21:1,4,17
  25:10 39:18
turned [1] 46:17
turning [6] 20:21 26:22
  28:15 29:23 32:9 48:12
Tuscola [8] 1:11 2:5
  26:16 43:16 44:17
  65:17 66:12 72:10
two [6] 7:12,13 11:1
  15:24 39:7 42:3
two-fold [1] 16:16
typewriting [1] 71:9

-U-

under [14] 23:22 40:7
  43:2 47:9 48:4,9 53:24
  57:20 58:19 59:1,9
  60:5 64:8 71:9
underneath [2] 45:4
  57:15
understand [12] 6:13
  11:21 13:19 22:19
  23:13 24:1 31:15 36:4
  48:13 49:14 53:20
  54:23
understood [1] 6:18
undetermined [1]
  1:21
United [3] 1:1,21 72:1
University [1] 7:21
unused [1] 59:13
up [9] 37:6 41:2 42:24
  47:16 50:14,14 53:2
  57:22 59:20
up-to-date [1] 51:15
upside [1] 46:17
used [4] 18:15,18 19:1
  19:7
usually [2] 19:3 37:7

-V-

various [1] 23:23
vice-president [1]
  12:23
Village [13] 10:7,10,16
  11:6 12:12,15,20 14:8
  14:13 25:18 32:13 34:3

68:2
voluntary [2] 35:17
  38:7

-W-

Wait [1] 51:13
waived [1] 71:11
wants [1] 60:15
week [1] 69:9
West [2] 1:19 71:7
WHEREOF [1] 71:14
White [2] 1:19 71:7
whole [2] 46:17 71:5
Wide [2] 1:19 71:7
Wilson [1] 2:7
within [2] 40:4 46:15
without [1] 42:15
witness [10] 1:17,20
  4:3 31:11 43:18 62:11
  65:1,3 71:11,14
words [2] 22:8
worked [4] 8:15 9:3
  17:24 20:19
world [1] 46:17
worried [1] 45:11
written [3] 54:14 55:15
  55:16
wrong [2] 11:13 45:2

-X-

X [2] 3:1,7

-Y-

year [1] 7:4
years [1] 7:9
younger [2] 7:12,13

PO Box 401
Milwaukee  WI  53201 0401
888 653 5463

THE OLD LINE LIFE Insurance Company of America

## POLICY DELIVERY RECEIPT

Contract/Certificate Number: _____ 2604663 _____

Owner: _____ MARGARET STILWELL _____

**My life or annuity contract/certificate has been delivered to me.**

Date: _____

Owner Signature: _____

**IMPORTANT NOTICE:**   **The laws of your state may require the completed Policy Delivery Receipt be returned to the Insurance Company.**

EXHIBIT
B1

# AMERICAN GENERAL LIFE INSURANCE COMPANY

MARGARET STILWELL
218 N IOWA STREET
ATWOOD IL    61913

Company: OLD LINE LIFE INSURANCE COMPANY
Policy Number: 2604663
Insured or Annuitant: MARGARET STILWELL

## MERGER CERTIFICATE

This certificate has been issued as a result of a merger on March 31, 2003 of:

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA, a Wisconsin insurance corporation
(Old Line Life);

Into

AMERICAN GENERAL LIFE INSURANCE COMPANY, a Texas insurance corporation (American General Life), the surviving company.

This is to certify that American General Life hereby assumes all liability for the insurance policy, certificate or annuity contract identified above issued by Old Line Life (or any predecessor company) the same as if it had been issued originally by American General Life. Benefits under the policy, certificate or annuity contract identified above will not change as a result of this merger.

This certificate is effective March 31, 2003.

Signed at the Home Office of American General Life Insurance Company,

_Elizabeth M. Mal_
Secretary

IMPORTANT

President

This certificate becomes a part of your policy, certificate or annuity contract, and should be attached thereto. All inquiries should be directed to American General Life Insurance Company, 2727-A Allen Parkway, Houston, Texas 77019 (Mailing Address: P.O.Box 4373, Houston, TX 77210-4373).

F(  INFORMATION OR TO MAKE A COMPLAINT, CALL US AT 1-800-937-2351.

AGLC 8204-IL

**AMERICAN**
**GENERAL**
**FINANCIAL GROUP**

THE OLD LINE LIFE   .URANCE COMPANY OF AMERICA
*Member American General Financial Group*
P.O. Box 401
Milwaukee, Wisconsin 53201-0401
888/653-5463

## CHECKBOOK REMINDER
(Please substitute for any previous slip referring to this policy)

| (Name of Insured)<br>JAMES E STILWELL | (Policy)<br>2604663 |
|---|---|

Please remember to deduct $ __1,780.63__ on the ___27___ of each billing period. Your premium will be automatically paid by the Pre-Authorized Check Plan premium.

Notice:  If you change your checking account to another bank, please complete the form below and mail immediately to the address shown.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UTHORIZATION TO HONOR PRE-AUTHORIZED PAYMENTS DRAWN AND PAYABLE TO:

le OLD LINE LIFE Insurance Company of America                ATTACH VOIDED CHECK TO COMPLETED FORM

i **a convenience** to me, I hereby request and authorize you, or your Agent Bank, to initiate debit entries on my checking account maintained at the bank med below hereof for the periodic payment to the company named above, hereinafter called COMPANY, of premiums due and/or loan repayment on the licy(ies) shown below, and, if a mutual fund program is indicated below, to the broker/dealer or its nominee or to the funds shown below for mutual fund bscription payments, and if a savings and loan savings account is indicated below, to the savings and loan association shown below for deposit to the licated savings account and if other amounts are designated, to the designated payee.

s agreed that:

1. Debit entries shall be drawn on or about the dates on which payments are due.
2. The COMPANY shall incur no liability by reason of the dishonor of any such debit entries.
3. Any requirement for giving notice of premium due on the insurance policies shall be waived as long as this plan is in effect.
4. This authorization shall not become effective unless and until the insurance policies are approved and shall relate only to insurance premiums, policy loan repayment, mutual fund subscription payments or deposits to savings accounts falling due on or after the issue date of said insurance policies.
5. This plan shall continue in effect unless and until terminated by COMPANY or me by thirty (30) days written notice to the other party. COMPANY may terminate the plan immediately if any debit entries are not paid upon presentation.
6. Amounts drawn shall be distributed by Agent Bank to COMPANY, or the funds or savings and loan associations named hereon within fifteen (15) days after presentation of debit entries to bank depositor named hereon.
7. This service shall apply to policies and fund accounts listed hereon.

s authorization is applicable (please check premium payment desired) to the following:

| POLICY NUMBERS | NAME OF INSURED | MONTHLY | QUARTERLY | SEMI-ANNUAL | ANNUAL |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

essly recognizing that the premiums on the above policy(ies) are due in accordance with the provision therein and that the COMPANY hereby in no way es or modifies the premium due date or any other terms of the policy(ies).

uest that debit entries be drawn under this authority on the _____ day of each month a premium is due. If no date is indicated, debit entries will be n on the due date, or earliest due date of the policy(ies).

E OF BANK

lESS                                CITY            STATE            ZIP CODE

UNT NO.                DATE            SIGNATURE OF DEPOSITOR AS IT APPEARS ON BANK RECORDS

# Finding a Low Cost Policy

After you have decided which kind of life insurance fits your needs, look for a good buy. Your chances of finding a good buy are better if you use two types of index numbers that have been developed to aid shopping for life insurance. One is called the "Surrender Cost Index" and the other is the "Net Payment Cost Index". It will be worth your time to try to understand how these indexes are used, but in any event, use them only for comparing the relative costs of similar policies. *LOOK FOR POLICIES WITH LOW COST INDEX NUMBERS.*

## What is Cost?

"Cost" is the difference between what you pay and what you get back. If you pay a premium for life insurance and get nothing back, your cost for the death protection is the premium. If you pay a premium and get something back later on, such as a cash value, your cost is smaller than the premium.

The cost of some policies can also be reduced by dividends; these are called "participating" policies. Companies may tell you what their current dividends are, but the size of future dividends is unknown today and cannot be guaranteed. Dividends actually paid are set each year by the company.

Some policies do not pay dividends. These are called "guaranteed cost" or "non-participating" policies. Every feature of a guaranteed cost policy is fixed so that you know in advance what your future cost will be.

The premiums and cash values of a participating policy are guaranteed, but the dividends are not. Premiums for participating policies are typically higher than for guaranteed cost policies, but the cost to you may be higher or lower, depending on the dividends actually paid.

## WHAT ARE COST INDEXES?

In order to compare the cost of policies, you need to look at:

1. Premiums
2. Cash values
3. Dividends

Cost indexes use one or more of these factors to give you a convenient way to compare relative costs of similar policies. When you compare costs, an adjustment must be made to take into account that money is paid and received at different times. It is not enough to just add up the premiums you will pay and to subtract the cash values and dividends you expect to get back. These indexes take care of the arithmetic for you. Instead of having to add, subtract, multiply and divide many numbers yourself, you just compare the index numbers which you can get from the life insurance agents and companies:

1. *Life Insurance Surrender Cost Index* - This index is useful if you consider the level of the cash values to be of primary importance to you. It helps you compare costs if at some future point in time, such as 10 or 20 years, you were to surrender the policy and take its cash value.

2. *Life Insurance Net Payment Cost Index* - This index is useful if your main concern is the benefits that are to be paid at your death and if the level of cash values is of secondary importance to you. It helps you compare costs at some future point in time, such as 10 or 20 years, if you continue paying premiums on your policy and do not take its cash value.

•••

There is another number called the Equivalent Level Annual Dividend. It shows the part dividends play in determining the cost index of a participating policy. Adding a policy's Equivalent Level Annual Dividend to its cost index allows you to compare total costs of similar policies before deducting dividends. However, if you

make any cost comparisons of a participating policy with a non-participating policy, remember that the total cost of the participating policy will be reduced by dividends, but the cost of the non-participating policy will not change.

## HOW DO I USE COST INDEXES?

The most important thing to remember when using cost indexes is that a policy with a smaller index number is generally a better buy than a comparable policy with a larger index number. The following rules are also important:

1. Cost comparisons should only be made between similar plans of life insurance. Similar plans are those which provide essentially the same basic benefits and require premium payments for approximately the same period of time. The closer policies are to being identical, the more reliable the cost comparison will be.

2. Compare index numbers only for the kind of policy for your age and for the amount you intend to buy. Since no one company offers the lowest cost for *all* types of insurance at *all* ages and for *all* amounts of insurance, it is important that you get the indexes for the actual policy, age and amount which you intend to buy. Just because a "shoppers guide" tells you that one company's policy is a good buy for a particular age and amount, you should not assume that all of the company's policies are equally good buys.

3. Small differences in index numbers could be offset by other policy features, or differences in the quality of service you may expect from the company or its agent. Therefore, when you find small differences in cost indexes, your choice should be based on something other than cost.

4. In any event, you will need other information on which to base your purchase decision. Be sure you can afford the premiums, and that you understand its cash values, dividends and death benefits. You should also make a judgement on how well the life insurance company or agent will provide service in the future to you as a policyholder.

5. These life insurance cost indexes apply to new policies and should not be used to determine whether you should drop a policy you have already owned for awhile in favor of a new one. If such a replacement is suggested, you should ask for information from the company which issued the old policy before you take action.

## Important Things to Remember—A Summary

The first decision you must make when buying a life insurance policy is choosing a policy whose benefits and premiums most closely meet your needs and ability to pay. Next, find a policy which is also a relatively good buy. If you compare Surrender Cost Indexes and Net Payment Cost Indexes of similar competing policies, your chances of finding a relatively good buy will be better than if you do not shop. *REMEMBER, LOOK FOR POLICIES WITH LOWER COST INDEX NUMBERS.* A good life insurance agent can help you choose the amount of life insurance and kind of policy you want and will give you cost indexes so that you can make cost comparisons of similar policies.

Don't buy life insurance unless you intend to stick with it. A policy which is a good buy when held for 20 years can be very costly if you quit during the early years of the policy. If you surrender a policy during the first few years, you may get little or nothing back and much of your premium may have been used for company expenses.

Read your new policy carefully, and ask the agent or company for an explanation of anything you do not understand. Whatever you decide now, it is important to review your life insurance program every few years to keep up with any changes in your income and responsibilities.

STATEMENT OF POLICY COST AND BENEFIT INFORMATION

LTG. SERIES 10 YR
RTG10

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA
P.O. BOX 401
MILWAUKEE,WI 53201-0401

POLICY NO   2604663

INSURED   JAMES E STILWELL                           AGE   44        DEBBIE
                                                                     NO CITY

| POLICY YEAR | ANNUAL PREMIUM (CURRENT RATES) | GUARANTEED CASH SURRENDER VALUE | GUARANTEED DEATH PAYMENT BEGIN. OF YR. |
|---|---|---|---|
| 1 | 20350.00 | | 4000000 |
| 2 | 20350.00 | | 4000000 |
| 3 | 20350.00 | | 4000000 |
| 4 | 20350.00 | | 4000000 |
| 5 | 20350.00 | | 4000000 |
| 6 | 20350.00 | | 4000000 |
| 7 | 20350.00 | | 4000000 |
| 8 | 20350.00 | | 4000000 |
| 9 | 20350.00 | | 4000000 |
| 10 | 20350.00 | | 4000000 |
| 11 | 127510.00 | | 4000000 |
| 12 | 142990.00 | | 4000000 |
| 13 | 161950.00 | | 4000000 |
| 14 | 183430.00 | | 4000000 |
| 15 | 207430.00 | | 4000000 |
| 16 | 235030.00 | | 4000000 |
| 17 | 266470.00 | | 4000000 |
| 18 | 302470.00 | | 4000000 |
| 19 | 342550.00 | | 4000000 |
| 20 | 388870.00 | | 4000000 |
| AT AGE 62 | 342550.00 | | 4000000 |
| AT AGE 65 | 479710.00 | | 4000000 |

LIFE INSUR. NET PAYMENT COST INDEX
10TH YR.**    20TH YR.**
5.09          24.48

LIFE INSUR. SURRENDER COST INDEX
10TH YR.**    20TH YR.**
5.09          24.48

THE COLUMNS OF THIS REPRESENTATION DO NOT REFLECT THE FACT THAT, BECAUSE OF INTEREST, A DOLLAR IN
THE FUTURE HAS LESS VALUE THAN A DOLLAR TODAY.

**AN EXPLANATION OF THE INTENDED USE OF THE LIFE INSURANCE COST INDEXES IS PROVIDED IN THE LIFE
INSURANCE BUYERS GUIDE.

IMPORTANT NOTE  -  DURING THE THIRTY DAY PERIOD FROM THE DATE OF DELIVERY OF THIS POLICY IT MAY BE
                   SURRENDERED TO THE COMPANY FOR CANCELLATION AND A FULL REFUND OF ANY MONEY PAID.

1L

11/12/2003

STATEMENT OF POLICY COST AND BENEFIT INFORMATION

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA

LTG SERIES 10 YR
RTG10

P.O. BOX 401
MILWAUKEE, WI 53201-0401

POLICY NO    2604663

INSURED    JAMES E STILWELL

AGE    44

DEBBIE

NO CITY

| POLICY YEAR | ANNUAL PREMIUM (MAXIMUM RATES) | GUARANTEED CASH SURRENDER VALUE | GUARANTEED DEATH PAYMENT BEGIN. OF YR. |
|---|---|---|---|
| 1 | 20350.00 | | |
| 2 | 20350.00 | | |
| 3 | 20350.00 | | |
| 4 | 20350.00 | | |
| 5 | 20350.00 | | 4000000 |
| 6 | 20350.00 | | 4000000 |
| 7 | 20350.00 | | 4000000 |
| 8 | 20350.00 | | 4000000 |
| 9 | 20350.00 | | 4000000 |
| 10 | 20350.00 | | 4000000 |
| 11 | 165910.00 | | 4000000 |
| 12 | 185950.00 | | 4000000 |
| 13 | 210550.00 | | 4000000 |
| 14 | 238510.00 | | 4000000 |
| 15 | 269710.00 | | 4000000 |
| 16 | 305470.00 | | 4000000 |
| 17 | 346390.00 | | 4000000 |
| 18 | 393190.00 | | 4000000 |
| 19 | 445270.00 | | 4000000 |
| 20 | 501790.00 | | 4000000 |
| AT AGE 62 | 445270.00 | | 4000000 |
| AT AGE 65 | 637710.00 | | 4000000 |

LIFE INSUR. NET PAYMENT COST INDEX
10TH YR.**    20TH YR.**
5.09    30.88

LIFE INSUR. SURRENDER COST INDEX
10TH YR.**    20TH YR.**
5.09    30.88

**AN EXPLANATION OF THE INTENDED USE OF THE LIFE INSURANCE COST INDEXES IS PROVIDED IN THE LIFE INSURANCE BUYERS GUIDE.

THE COLUMNS OF THIS REPRESENTATION DO NOT REFLECT THE FACT THAT, BECAUSE OF INTEREST, A DOLLAR IN THE FUTURE HAS LESS VALUE THAN A DOLLAR TODAY.

IMPORTANT NOTE - DURING THE THIRTY DAY PERIOD FROM THE DATE OF DELIVERY OF THIS POLICY, IT MAY BE SURRENDERED TO THE COMPANY FOR CANCELLATION AND A FULL REFUND OF ANY MONEY PAID.

IL

11/12/2003

AGENCY: 434
AGENT : X DEBBIE
MAILTO: NONE
POLICY: 2604663

DEBBIE

lll..ll..ll..ll..l..ll..l

NO AGENT ADDRESS FOUND

# THE OLD LINE LIFE Insurance Company of America

1200 North Mayfair Road, Suite 300 • PO Box 401 • Milwaukee WI  53201-0401 • 800-487-5433

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA, A STOCK COMPANY (REFERRED TO IN THIS POLICY AS WE/US/OUR) WILL PAY THE BENEFITS OF THIS POLICY SUBJECT TO ITS PROVISIONS. THIS PAGE AND THE PAGES THAT FOLLOW ARE PART OF THIS POLICY.

SIGNED AT OUR HOME OFFICE AT 1200 NORTH MAYFAIR ROAD, SUITE 300, P.O. BOX 401, MILWAUKEE, WISCONSIN  53201 0401.

_General Counsel_                    _President_

RIGHT TO RETURN POLICY

THE OWNER MAY RETURN THIS POLICY TO US AT THE ABOVE ADDRESS OR TO THE AGENT FROM WHOM IT WAS PURCHASED WITHIN 30 DAYS AFTER RECEIPT.  THIS POLICY WILL THEN BE CANCELLED AS OF ITS DATE OF ISSUE AND ANY PREMIUM PAID WILL BE REFUNDED.

NW                                                    B-7133
                                                      B1101000-1033-0501

**NOTICE PAGE**

## ILLINOIS
## LIFE AND HEALTH INSURANCE GUARANTY
## ASSOCIATION LAW

Note: The terms "policy" and "Policyholder" as used in this Notice shall be read to mean "certificate" and "Certificateholder", respectively, as applicable to persons insured under a group insurance plan.

Residents of Illinois who purchase health insurance, life insurance, and annuities should know that the insurance companies licensed in Illinois to write these types of insurance are members of the Illinois Life and Health Insurance Guaranty Association. The purpose of this Guaranty Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its policy obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the covered claims of policyholders that live in Illinois (and their payees, beneficiaries, and assignees) and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however, as noted on the other side of this page.

### DISCLAIMER

The Illinois Life and Health Insurance Guaranty Association provides coverage of claims under some types of policies if the insurer becomes impaired or insolvent. COVERAGE MAY NOT BE AVAILABLE FOR YOUR POLICY. Even if coverage is provided, there are substantial limitations and exclusions. Coverage is generally conditioned on continued residence in Illinois. Other conditions may also preclude coverage.

You should not rely on availability of coverage under the Life and Health Insurance Guaranty Association L( when selecting an insurer. Your insurer and agent are prohibited by law from using the existence of the Association or its coverage to sell you an insurance policy.

The Illinois Life and Health Insurance Guaranty Association or the Illinois Department of Insurance will respond to any questions you may have which are not answered by this document. Policyholders with additional questions may contact:

Illinois Life and Health Insurance Guaranty Association
8420 West Bryn Mawr Avenue
Chicago, Illinois 60631
(312) 714-8050

Illinois Department of Insurance
320 West Washington Street
4th Floor
Springfield, Illinois 62767
(217) 782-4515

### SUMMARY OF GENERAL PURPOSES AND
### CURRENT LIMITATIONS OF COVERAGE

The Illinois law that provides for this safety-net coverage is called the Illinois Life and Health Insurance Guaranty Association Law ("Law") [215 ILCS 5/531.01, et seq.]. The other side of this page contains a brief summary of the Law's coverages, exclusions and limits. This summary does not cover all provisions, nor does it in any way change anyone's rights or obligations under the Law or the rights or obligations of the Guaranty Association. If you have obtained this document from an agent in connection with the purchase of a policy, you should be aware that its delivery to you does not guarantee that your policy is covered by the Guaranty Association.

(continued on next page)

## NOTICE PAGE (Continued)

If any complaints arise regarding the insurance provided by this policy, you may contact us as follows:

A    ·ican General Insurance Service Center
Correspondence Unit
P.O. Box 35844
Dallas, Texas 75235-0844

Toll Free Telephone Number: 1-800-487-5433
Within Dallas Area Code 214: 654-6300

If you are unable to obtain the information you need from us, you may write to the Department of Insurance at the following address:

Illinois Department of Insurance
Consumer Division
Springfield, Illinois 62767

## TABLE OF CONTENTS

| PAGE | TITLE OF PROVISION |
|---|---|
| 7 | ASSIGNMENT |
| 7 | BENEFICIARY |
| 7 | CHANGE OF OWNER OR BENEFICIARY |
| 7 | CLAIMS OF CREDITORS |
| 7 | CONTRACT |
| 7 | CORRESPONDENCE |
| 5 | DEFINITIONS |
| 6 | EXCHANGE OPTIONS |
| 5 | GRACE PERIOD |
| 3 | INCONTESTABILITY |
| 7 | MISSTATEMENT OF AGE OR SEX |
| 5 | NONPARTICIPATING |
| 7 | OWNER |
| 3 | PAYMENT OF PROCEEDS |
| 7 | POLICY SETTLEMENT |
| 2 | POLICY SPECIFICATIONS |
| 5 | PREMIUM PAYMENT |
| 5 | REINSTATEMENT |
| 5 | RENEWAL OPTION |
| 5 | RIGHT TO CHANGE PREMIUM |
| COVER | RIGHT TO RETURN POLICY |
| 2 | SCHEDULE OF BENEFITS AND PREMIUMS |
| 3 | SUICIDE |
| LAST | TABLE OF PREMIUMS |

SEE SUPPLEMENTAL BENEFIT PAGES FOR RIDERS, IF ANY

RENEWABLE LEVEL TERM LIFE POLICY -- INDETERMINATE PREMIUM
INSURANCE PAYABLE IN EVENT OF DEATH PRIOR TO EXPIRY DATE
PREMIUMS PAYABLE DURING TERM                    NO DIVIDENDS

80-RCT 97D                    2604663                    PAGE  1

POLICY SPECIFICATIONS

INSURED          JAMES E STILWELL              2604663        POLICY NUMBER

FACE AMOUNT      $4,000,000                    10/27/1998     DATE OF ISSUE

PREMIUM CLASS    NON-TOBACCO                   44             AGE AT ISSUE
                 RATED CLASS H


SCHEDULE OF BENEFITS AND PREMIUMS

|  |  | ANNUAL | YEARS |
|---|---|---|---|
| BENEFITS | BENEFIT AMOUNTS | PREMIUMS | PAYABLE |
| LIFE INSURANCE | $4,000,000 | $6,830.00 | 10 YEARS* |
| INITIAL EXPIRY DATE   10/27/2008 | | | |

SUBSEQUENT EXPIRY DATES WILL OCCUR AT THE END OF EACH ONE YEAR RENEWABLE
TERM PERIOD.  THE FINAL EXPIRY DATE IS 10/27/2049.
PERMANENT EXTRA                              13,520.00        10 YEARS

TOTAL FIRST YEAR ANNUAL PREMIUM             $20,350.00

PREMIUMS OTHER THAN ANNUAL ARE A PERCENTAGE OF THE ANNUAL PREMIUM.
PREMIUMS ARE PAYABLE AT 01 MONTH INTERVALS FROM 10/27/1998.   THE FIRST
INTERVAL PREMIUM IS $1,780.63.

* RENEWAL PREMIUMS ARE SHOWN ON THE LAST PAGE.  ON THE  TENTH POLICY
ANNIVERSARY AND ANY LATER POLICY ANNIVERSARY WE HAVE A LIMITED RIGHT
TO CHANGE THE PREMIUM.  SEE THE RIGHT TO CHANGE PREMIUM PROVISION.

THIS POLICY MAY BE EXCHANGED FOR A NEW POLICY.  SEE THE EXCHANGE OPTIONS
PROVISION.  OPTION 1 IS AVAILABLE UNTIL THE EIGHTH POLICY ANNIVERSARY,
PROVIDED THE INSURED IS AGE 65 OR LESS ON THE DATE OF EXCHANGE.  THE
DATE OF EXCHANGE UNDER OPTION 2 IS THE TENTH POLICY ANNIVERSARY,
PROVIDED THE INSURED IS AGE 70 OR LESS.

80-PCT 70-2

PAYMENT OF PROCEEDS

THE FACE AMOUNT WILL BE PAID TO THE BENEFICIARY IMMEDIATELY UPON RECEIPT
OF DUE PROOF OF THE DEATH OF THE INSURED IF DEATH OCCURS PRIOR TO THE
EXPIRY DATE.  IF DEATH OCCURS IN THE GRACE PERIOD OF AN UNPAID PREMIUM
AN AMOUNT EQUAL TO THE PREMIUM FOR ONE MONTH WILL BE DEDUCTED FROM THE
PROCEEDS.

SUICIDE EXCLUSION

IN THE EVENT OF THE SUICIDE OF THE INSURED, WHILE SANE OR INSANE,
WITHIN 2 YEARS FROM THE DATE OF ISSUE, OUR LIABILITY WILL BE LIMITED
TO THE PREMIUMS PAID.

INCONTESTABILITY

WE WILL NOT CONTEST THIS POLICY AFTER IT HAS BEEN IN FORCE DURING THE
LIFETIME OF THE INSURED FOR TWO YEARS FROM THE DATE OF ISSUE.  WE WILL
NOT CONTEST ANY REINSTATEMENT AFTER THE REINSTATEMENT HAS BEEN IN FORCE
DURING THE LIFETIME OF THE INSURED FOR TWO YEARS.  IF WE DO CONTEST A
REINSTATEMENT, WE WILL CONTEST ONLY STATEMENTS MADE IN THE REINSTATEMENT
APPLICATION.

(THIS PAGE IS INTENTIONALLY LEFT BLANK.)

**DEFINITIONS**

**Age** or **attained age** means the insured's age nearest birthday at the beginning of a policy year.

**Policy months, years and anniversaries.** The first policy year begins on the date of issue. Policy months, years and anniversaries will be measured from that date.

## PREMIUM PAYMENT

The first premium is due on or before delivery of this policy. Later premiums are due and payable at the intervals and for the period shown on page 2, while the insured is alive. With our consent, premiums may be paid at other intervals.

Premiums after the first are payable at our home office or to an authorized agent in exchange for a receipt signed by one of our officers.

Any premium, after the first, not paid on or before its due date will be in default. Such due date will be the date of default.

## GRACE PERIOD

A 31 day grace period, without interest charge, is allowed for the payment of each premium after the first. This policy will stay in force during this period. If the premium is not paid by the end of this period, insurance will cease.

## REINSTATEMENT

This policy may be reinstated within five years of the date of default subject to receipt of evidence of insurability satisfactory to us.

Reinstatement will also be subject to (1) payment of the premium for the grace period with interest at the rate of 6% per year compounded annually plus the premium due for the current policy month, if this policy has a renewable term period of one year, or (2) payment of all overdue premiums with interest at the rate of 6% per year compounded annually, if this policy has a renewable term period other than one year.

## NONPARTICIPATING

This policy does not pay dividends.

## RENEWAL OPTION

This policy may be renewed without evidence of insurability on each expiry date for a further term period. Renewal premiums are shown on the last page.

The first premium for a new term will be due at the end of the previous term. This policy will renew if this premium is paid within the grace period. Premiums for the new term will be due and payable at the intervals show on page 2.

No term period will extend beyond the final expiry date shown on page 2.

## RIGHT TO CHANGE PREMIUM

We reserve the right to change the premium for this policy on the policy anniversary specified on page 2 and on any later policy anniversary, subject to the following terms:

1. The premium will not exceed the applicable maximum premium shown on the last page.

2. Any change in premium will be made on a uniform basis for all insureds with the same benefits and provisions who have the same age at issue, date of issue, sex and premium class. No change in premium will occur due to any change in the insured's health or occupation.

3. Any change in premium will take effect only after 30 days' prior notice to the owner of this policy.

4. Any change in premium will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the premium.

This provision does not apply to any rider attached to this policy.

**OWNER**

The owner is as shown in the application unless changed. The owner has all rights under this policy while the insured is alive. These rights are subject to the consent of any living irrevocable beneficiary.

**B     FICIARY**

The beneficiary or beneficiaries are as shown in the application unless changed. If no beneficiary survives the insured, the owner or the estate of the owner will be the beneficiary. However, if a trust is the owner and no beneficiary survives the insured, the estate of the insured will be the beneficiary.

**CHANGE OF OWNER OR BENEFICIARY**

While this policy is in force the owner may change the beneficiary or ownership by written notice to us. When we record the change, it will take effect as of the date the owner signed the notice, subject to any payment we make or other action we take before recording.

**CORRESPONDENCE**

Any request, notice or proof shall be filed with our home office.

**ASSIGNMENT**

No assignment of this policy will be binding on us until filed with us in writing and recorded by us. No assignment will affect any payment we made before we recorded the assignment. We will not be responsible for the validity of an assignment.

All rights of the owner and any revocable beneficiary are subject to the rights of any assignee on record with us.

**POLICY SETTLEMENT**

In any settlement we may require the return of this policy.

**THE CONTRACT**

This policy, including any riders and endorsements, the original application and any supplemental applications and declarations, is the     ire contract.

All statements in an application are representations and not warranties. No statement will be used to void this policy or to contest a claim unless it appears in an application or declaration which is attached to and made part of this policy.

This policy may not be changed, nor may any of our rights or requirements be waived, except in writing by one of our authorized officers.

**MISSTATEMENT OF AGE OR SEX**

If the insured's age or sex has been misstated, any death benefit payable by us will be what the premiums paid would have bought at the insured's correct age and sex.

**CLAIMS OF CREDITORS**

All payments under this policy are exempt from the claims of creditors to the extent permitted by law. Payments may not be assigned or withdrawn without our consent before becoming payable.

(

The Payment Options of the policy to which this endorsement is attached will be as follows:

## PAYMENT OPTIONS

The term "annuitant/insured" as used in the following paragraph means the person named in the Policy Specifications as annuitant or insured, as the case may be.

Proceeds of less than $5,000 will be paid in one lump sum. Proceeds of $5,000 or more may be paid under an option. When proceeds are placed under an option the payee will receive a settlement contract. The date of the contract will be the date the proceeds become payable. The owner may choose the option only while the annuitant/insured is living. After the death of the annuitant/insured, the beneficiary may choose the option if proceeds are payable in one sum. Payment options for death proceeds must be chosen within six months after the annuitant's/insured's death. Payment options for other proceeds must be chosen within two months of the date they are payable. All elections must be filed with us in writing. Payments may be requested at 1, 3, 6 or 12 month intervals. Each payment must be at least $50. Each payee must be a living person receiving payments in his own right.

The interest rate for options 1, 2 and 3 will be declared by us each year. This rate will never be less than 3% per year. For options 1 and 3 any interest in excess of 3% will be used to increase payment amounts; for option 2 any excess interest will be used to lengthen the payment period.

For options 4, 5, 6 and 7 the payments will be based on rates declared by us from time to time. These rates will be 3 1/2% less than the published rates in effect for immediate annuities on the date of the settlement contract. Payments under these rates will never be less than the amount according to the tables of minimum monthly income in this endorsement. The rates in the tables are derived from a projection of the 1983 Table "a", and an annual interest rate of 3.00%.

**Option 1. Interest.** We will hold the proceeds on deposit. Interest will be paid while the payee is living. Sums of $500 or more may be withdrawn up to four times a year.

**Option 2. Specified Income.** We will pay a stated income amount until the proceeds, with interest on the unpaid balance, are used up. The income each year may not be less than 10% of the proceeds.

**Option 3. Income for Specified Period.** We will pay an income for a stated period, up to 30 years.

**Option 4. Life Income with Guaranteed Period.** We will pay an income for a guaranteed period and for the rest of the payee's life. The guaranteed period may be 10, 15 or 20 years.

**Option 5. Life Income without Guaranteed Period.** We will pay an income for the payee's lifetime. Payments will end at the death of the payee. However, if the payee dies within one year of the date of the settlement contract, payments will be continued to a contingent payee until 10 years from the date of the settlement contract.

**Option 6. Life Income with Installment Refund.** We will pay an income for a guaranteed period and for the rest of the payee's life. The guaranteed period is the period required for the sum of income payments to equal the proceeds applied.

**Option 7. Joint Life Income with 2/3 to Survivor.** We will pay an income while both payees are living. When one payee dies we will pay 2/3 of the income for the rest of the survivor's life. However, if one payee dies within one year from the date of the settlement contract, income will be paid to the survivor thereafter as if the survivor had chosen option 5 on the date of the settlement contract.

**Additional Option to Buy Single Premium Immediate Life Annuity at Reduced Rate.** If proceeds of at least $5,000 are applied under option 4, 5, 6 or 7, additional money may be used to buy a single premium immediate life annuity. The cost of this annuity will be 3 1/2% less than the then published rate. The monthly income from this annuity together with the monthly income from option 4, 5, 6 or 7 may not exceed 3 times the monthly income which could be bought solely by applying the policy proceeds. Written request must be made within 31 days from the date proceeds are payable.

**(Continued on page 2)**

### TABLE OF MINIMUM MONTHLY INCOME FOR FEMALE PAYEES
### UNDER PAYMENT OPTIONS FOR EACH $1,000 OF PROCEEDS

| OPTION 3 INCOME FOR SPECIFIED PERIOD | | AGE AT FIRST PAYMENT | OPTION 4 LIFE INCOME WITH GUARANTEED PERIOD | | | OPTION 5 LIFE INCOME WITHOUT GUARANTEED PERIOD | OPTION 6 LIFE INCOME WITH INSTALLMENT REFUND |
|---|---|---|---|---|---|---|---|
| Year | Income | | 10 Years | 15 Years | 20 Years | | |
| 1 | $ 84.47 | 5 and under | $ 2.72 | $ 2.72 | $ 2.72 | $ 2.72 | $ 2.79 |
| 2 | 42.86 | 6 | 2.73 | 2.73 | 2.73 | 2.73 | 2.79 |
| 3 | 28.99 | 7 | 2.74 | 2.74 | 2.74 | 2.74 | 2.79 |
| 4 | 22.06 | 8 | 2.75 | 2.75 | 2.75 | 2.75 | 2.79 |
| 5 | 17.91 | 9 | 2.76 | 2.76 | 2.76 | 2.76 | 2.79 |
| 6 | 15.14 | 10 | 2.77 | 2.77 | 2.77 | 2.77 | 2.79 |
| 7 | 13.16 | 11 | 2.78 | 2.78 | 2.78 | 2.78 | 2.79 |
| 8 | 11.68 | 12 | 2.79 | 2.79 | 2.79 | 2.79 | 2.79 |
| 9 | 10.53 | 13 | 2.80 | 2.80 | 2.80 | 2.80 | 2.80 |
| 10 | 9.61 | 14 | 2.81 | 2.81 | 2.81 | 2.81 | 2.81 |
| 11 | 8.86 | 15 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 |
| 12 | 8.24 | 16 | 2.83 | 2.83 | 2.83 | 2.83 | 2.83 |
| 13 | 7.71 | 17 | 2.85 | 2.85 | 2.84 | 2.85 | 2.84 |
| 14 | 7.26 | 18 | 2.86 | 2.86 | 2.86 | 2.86 | 2.86 |
| 15 | 6.87 | 19 | 2.87 | 2.87 | 2.87 | 2.87 | 2.87 |
| 16 | 6.53 | 20 | 2.89 | 2.89 | 2.89 | 2.89 | 2.88 |
| 17 | 6.23 | 21 | 2.90 | 2.90 | 2.90 | 2.90 | 2.90 |
| 18 | 5.96 | 22 | 2.92 | 2.92 | 2.92 | 2.92 | 2.91 |
| 19 | 5.73 | 23 | 2.93 | 2.93 | 2.93 | 2.93 | 2.93 |
| 20 | 5.51 | 24 | 2.95 | 2.95 | 2.95 | 2.95 | 2.95 |
| 21 | 5.32 | 25 | 2.97 | 2.97 | 2.96 | 2.97 | 2.96 |
| 22 | 5.15 | 26 | 2.98 | 2.98 | 2.98 | 2.98 | 2.98 |
| 23 | 4.99 | 27 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| 24 | 4.84 | 28 | 3.02 | 3.02 | 3.02 | 3.02 | 3.02 |
| 25 | 4.71 | 29 | 3.04 | 3.04 | 3.04 | 3.04 | 3.04 |
| 26 | 4.59 | 30 | 3.06 | 3.06 | 3.06 | 3.06 | 3.06 |
| 27 | 4.48 | 31 | 3.09 | 3.08 | 3.08 | 3.09 | 3.08 |
| 28 | 4.37 | 32 | 3.11 | 3.11 | 3.11 | 3.11 | 3.10 |
| 29 | 4.27 | 33 | 3.13 | 3.13 | 3.13 | 3.13 | 3.13 |
| 30 | 4.18 | 34 | 3.16 | 3.16 | 3.15 | 3.16 | 3.15 |
| | | 35 | 3.18 | 3.18 | 3.18 | 3.18 | 3.18 |
| | | 36 | 3.21 | 3.21 | 3.21 | 3.21 | 3.20 |
| | | 37 | 3.24 | 3.24 | 3.24 | 3.24 | 3.23 |
| | | 38 | 3.27 | 3.27 | 3.27 | 3.27 | 3.26 |
| | | 39 | 3.30 | 3.30 | 3.30 | 3.30 | 3.29 |
| | | 40 | 3.34 | 3.33 | 3.33 | 3.34 | 3.32 |
| | | 41 | 3.37 | 3.37 | 3.36 | 3.37 | 3.35 |
| | | 42 | 3.41 | 3.40 | 3.40 | 3.41 | 3.39 |
| | | 43 | 3.44 | 3.44 | 3.43 | 3.45 | 3.42 |
| | | 44 | 3.49 | 3.48 | 3.47 | 3.49 | 3.46 |
| | | 45 | 3.53 | 3.52 | 3.51 | 3.53 | 3.50 |
| | | 46 | 3.57 | 3.57 | 3.55 | 3.58 | 3.54 |
| | | 47 | 3.62 | 3.61 | 3.60 | 3.62 | 3.58 |
| | | 48 | 3.67 | 3.66 | 3.64 | 3.67 | 3.63 |
| | | 49 | 3.72 | 3.71 | 3.69 | 3.73 | 3.68 |
| | | 50 | 3.78 | 3.76 | 3.74 | 3.78 | 3.73 |
| | | 51 | 3.83 | 3.82 | 3.79 | 3.84 | 3.78 |
| | | 52 | 3.90 | 3.88 | 3.85 | 3.90 | 3.83 |
| | | 53 | 3.96 | 3.94 | 3.90 | 3.97 | 3.89 |
| | | 54 | 4.03 | 4.00 | 3.96 | 4.04 | 3.95 |
| | | 55 | 4.10 | 4.07 | 4.02 | 4.12 | 4.02 |
| | | 56 | 4.17 | 4.14 | 4.09 | 4.19 | 4.08 |
| | | 57 | 4.25 | 4.22 | 4.15 | 4.28 | 4.15 |
| | | 58 | 4.34 | 4.29 | 4.22 | 4.36 | 4.23 |
| | | 59 | 4.42 | 4.37 | 4.29 | 4.46 | 4.30 |
| | | 60 | 4.52 | 4.46 | 4.36 | 4.56 | 4.39 |
| | | 61 | 4.62 | 4.55 | 4.44 | 4.66 | 4.47 |
| | | 62 | 4.72 | 4.64 | 4.51 | 4.78 | 4.56 |
| | | 63 | 4.84 | 4.74 | 4.59 | 4.90 | 4.66 |
| | | 64 | 4.95 | 4.84 | 4.66 | 5.03 | 4.76 |
| | | 65 | 5.08 | 4.95 | 4.74 | 5.17 | 4.87 |
| | | 66 | 5.21 | 5.06 | 4.81 | 5.31 | 4.98 |
| | | 67 | 5.35 | 5.17 | 4.89 | 5.47 | 5.10 |
| | | 68 | 5.50 | 5.28 | 4.96 | 5.65 | 5.23 |
| | | 69 | 5.66 | 5.40 | 5.03 | 5.83 | 5.36 |
| | | 70 | 5.82 | 5.52 | 5.09 | 6.03 | 5.51 |
| | | 71 | 6.00 | 5.64 | 5.15 | 6.25 | 5.66 |
| | | 72 | 6.18 | 5.75 | 5.21 | 6.49 | 5.82 |
| | | 73 | 6.37 | 5.87 | 5.26 | 6.74 | 5.99 |
| | | 74 | 6.56 | 5.98 | 5.30 | 7.02 | 6.17 |
| | | 75 | 6.76 | 6.09 | 5.34 | 7.33 | 6.37 |
| | | 76 | 6.97 | 6.19 | 5.38 | 7.65 | 6.57 |
| | | 77 | 7.17 | 6.29 | 5.41 | 8.01 | 6.78 |
| | | 78 | 7.39 | 6.38 | 5.43 | 8.40 | 7.02 |
| | | 79 | 7.59 | 6.46 | 5.46 | 8.82 | 7.26 |
| | | 80 | 7.79 | 6.53 | 5.47 | 9.28 | 7.52 |
| | | 81 and over | 7.99 | 6.59 | 5.49 | 9.78 | 7.79 |

**MINIMUM INCOME AMOUNTS PAYABLE OTHER THAN MONTHLY WILL BE FURNISHED ON REQUEST.**

## TABLE OF MINIMUM MONTHLY INCOME UNDER PAYMENT OPTIONS FOR EACH $1,000 OF PROCEEDS

### OPTION 7 - JOINT LIFE INCOME WITH TWO THIRDS TO SURVIVOR

| Male \ Female | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
|---|---|---|---|---|---|---|---|---|---|
| 40 | $3.35 | $3.45 | $3.55 | $3.67 | $3.80 | $3.94 | $4.10 | $4.28 | $4.47 |
| 41 | 3.37 | 3.47 | 3.58 | 3.70 | 3.83 | 3.97 | 4.14 | 4.32 | 4.51 |
| 42 | 3.39 | 3.49 | 3.60 | 3.72 | 3.86 | 4.01 | 4.18 | 4.37 | 4.56 |
| 43 | 3.41 | 3.51 | 3.62 | 3.75 | 3.89 | 4.05 | 4.22 | 4.41 | 4.61 |
| 44 | 3.42 | 3.53 | 3.65 | 3.78 | 3.92 | 4.08 | 4.26 | 4.46 | 4.67 |
| 45 | 3.44 | 3.55 | 3.67 | 3.81 | 3.96 | 4.12 | 4.31 | 4.51 | 4.72 |
| 46 | 3.46 | 3.57 | 3.70 | 3.84 | 3.99 | 4.16 | 4.35 | 4.56 | 4.78 |
| 47 | 3.48 | 3.59 | 3.72 | 3.87 | 4.03 | 4.20 | 4.40 | 4.61 | 4.84 |
| 48 | 3.50 | 3.62 | 3.75 | 3.90 | 4.07 | 4.25 | 4.45 | 4.67 | 4.90 |
| 49 | 3.52 | 3.64 | 3.78 | 3.93 | 4.10 | 4.29 | 4.50 | 4.73 | 4.97 |
| 50 | 3.54 | 3.66 | 3.80 | 3.96 | 4.14 | 4.34 | 4.55 | 4.79 | 5.04 |
| 51 | 3.56 | 3.69 | 3.83 | 4.00 | 4.18 | 4.38 | 4.61 | 4.85 | 5.11 |
| 52 | 3.58 | 3.71 | 3.86 | 4.03 | 4.22 | 4.43 | 4.66 | 4.92 | 5.19 |
| 53 | 3.60 | 3.73 | 3.89 | 4.07 | 4.26 | 4.48 | 4.72 | 4.99 | 5.27 |
| 54 | 3.62 | 3.76 | 3.92 | 4.10 | 4.31 | 4.53 | 4.78 | 5.06 | 5.35 |
| 55 | 3.65 | 3.78 | 3.95 | 4.14 | 4.35 | 4.59 | 4.85 | 5.13 | 5.43 |
| 56 | 3.67 | 3.81 | 3.98 | 4.17 | 4.39 | 4.64 | 4.91 | 5.21 | 5.52 |
| 57 | 3.69 | 3.84 | 4.01 | 4.21 | 4.44 | 4.69 | 4.98 | 5.29 | 5.62 |
| 58 | 3.72 | 3.86 | 4.04 | 4.24 | 4.48 | 4.75 | 5.05 | 5.37 | 5.72 |
| 59 | 3.74 | 3.89 | 4.07 | 4.28 | 4.53 | 4.81 | 5.12 | 5.46 | 5.82 |
| 60 | 3.76 | 3.92 | 4.10 | 4.32 | 4.58 | 4.87 | 5.19 | 5.55 | 5.93 |
| 61 | 3.79 | 3.95 | 4.13 | 4.36 | 4.62 | 4.93 | 5.27 | 5.64 | 6.04 |
| 62 | 3.82 | 3.97 | 4.17 | 4.40 | 4.67 | 4.99 | 5.34 | 5.74 | 6.16 |
| 63 | 3.84 | 4.00 | 4.20 | 4.44 | 4.72 | 5.05 | 5.42 | 5.84 | 6.28 |
| 64 | 3.87 | 4.03 | 4.24 | 4.48 | 4.77 | 5.11 | 5.51 | 5.94 | 6.41 |
| 65 | 3.90 | 4.06 | 4.27 | 4.52 | 4.82 | 5.18 | 5.59 | 6.05 | 6.54 |
| 66 | 3.92 | 4.10 | 4.31 | 4.57 | 4.88 | 5.25 | 5.68 | 6.16 | 6.68 |
| 67 | 3.95 | 4.13 | 4.34 | 4.61 | 4.93 | 5.31 | 5.76 | 6.28 | 6.83 |
| 68 | 3.98 | 4.16 | 4.38 | 4.65 | 4.98 | 5.38 | 5.85 | 6.39 | 6.98 |
| 69 | 4.01 | 4.19 | 4.42 | 4.70 | 5.04 | 5.45 | 5.94 | 6.51 | 7.13 |
| 70 | 4.04 | 4.23 | 4.45 | 4.74 | 5.09 | 5.52 | 6.03 | 6.63 | 7.29 |
| 71 | 4.07 | 4.26 | 4.49 | 4.78 | 5.14 | 5.59 | 6.12 | 6.76 | 7.45 |
| 72 | 4.10 | 4.29 | 4.53 | 4.83 | 5.20 | 5.66 | 6.22 | 6.88 | 7.62 |
| 73 | 4.13 | 4.33 | 4.57 | 4.87 | 5.25 | 5.73 | 6.31 | 7.01 | 7.80 |
| 74 | 4.16 | 4.36 | 4.61 | 4.92 | 5.31 | 5.80 | 6.40 | 7.14 | 7.97 |
| 75 | 4.19 | 4.39 | 4.65 | 4.96 | 5.36 | 5.87 | 6.50 | 7.27 | 8.15 |
| 76 | 4.22 | 4.43 | 4.68 | 5.01 | 5.42 | 5.94 | 6.59 | 7.40 | 8.33 |
| 77 | 4.25 | 4.46 | 4.72 | 5.05 | 5.47 | 6.00 | 6.68 | 7.53 | 8.52 |
| 78 | 4.28 | 4.49 | 4.76 | 5.10 | 5.52 | 6.07 | 6.77 | 7.66 | 8.71 |
| 79 | 4.31 | 4.53 | 4.80 | 5.14 | 5.58 | 6.14 | 6.87 | 7.79 | 8.89 |
| 80 | 4.34 | 4.56 | 4.83 | 5.18 | 5.63 | 6.21 | 6.96 | 7.92 | 9.08 |

MINIMUM INCOME AMOUNTS FOR AGES NOT SHOWN AND MINIMUM INCOME AMOUNTS PAYABLE OTHER THAN MONTHLY WILL BE FURNISHED ON REQUEST.

PO3-J 79-5

**THE OLD LINE LIFE** Insurance Company — America

20040603

**PART A**

**COMPLETE FOR ALL POLICIES (Please Print)—Questions 1a through g apply to Proposed Insured**

| | |
|---|---|
| **1. a. NAME** James E Stilwell ☒ Male ☐ Female | **6. a. PLAN** ☒ Non Par ☐ Par LTG 10 **b. AMOUNT** 5,000,000 |
| **b.** ☐ Single ☐ Married ☐ Divorced ☐ Widowed ☐ Separated | **c. PREMIUMS PAYABLE** ☐ Annual ☒ Semi-annual ☐ Quarterly ☐ Pre-Auth. Chk. ☐ GAP ☐ List Bill |
| **c. DATE OF BIRTH** 10 07 54 **d. AGE** 43 **e. BIRTHPLACE** IL USA | **d. For Universal Life only:** ☐ Option 1 ☐ Option 2 Planned Premium $ _____ Additional Initial Premium $ _____ |
| **f. SOCIAL SECURITY OR TAX NO.** 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 | **e. AUTOMATIC PREMIUM LOAN, if available** ☐ Yes ☐ No |
| **g. HOME TELEPHONE NO.** 217 578-3132 | **f. ADDITIONAL COVERAGES (Check if desired)** |
| **2. SEND ALL MAIL TO OWNER AT ADDRESS IN** ☐ 3a ☐ 3b ☐ 9 | ☐ WP or WMD, _____ |
| **3. a. RESIDENCE ADDRESS OF PROPOSED INSURED** No. & Street 218 N. Iowa State IL Zip 61913 City Atwood How long at this address? 5 yrs. Previous Addresses (5 Yrs.) | ☐ ADB $ _____ ☐ GIO _____ Units ☐ Spouse Rider _____ Units ☐ Child Rider _____ Units ☐ Term Rider Plan _____ $ _____ (Amt. or M.I.) ☐ Term Rider on Other Insured – use separate application |
| **QUESTIONS 3b & c APPLY TO PROPOSED INSURED IF AGE 15 OR OVER. TO OWNER OR PAYOR IF PROPOSED INSURED UNDER AGE 15.** | **g. IF PARTICIPATING, USE OF DIVIDENDS** |
| **b. BUSINESS ADDRESS with present employer** _____ yrs. Employer Self Employed Entrepeneur No. & Street 102 N. Main City Atwood State IL Zip 61913 Nature of Business Antiques, Furniture, Cheese, meat | Purchase 1 Yr. Term, balance to: ☐ (1) Cash ☐ (5) Deposit at Interest ☐ (2) Reduce Premium ☐ (6) Reduce Premiums ☐ (3) Paid Up Additions ☐ (7) Purchase Paid Up Additions ☐ (4) Deposit at Interest ☐ (8) Use All to Purchase 1 Yr. Term |
| **c. OCCUPATION (All, if more than one)** Food Service, restaurant Owner Duties (Describe) | **7. LIFE INSURANCE IN FORCE ON PROPOSED INSURED** Name of Company Bankers Life Issue Year 84 Amount 800,000 ADB Personal/Business Business |

| **4. HAS ANY PERSON PROPOSED FOR INSURANCE:** | Yes | No |
|---|---|---|
| **a.** smoked cigarettes during the past 12 months? | ☐ | ☒ |
| **b.** smoked pipes or cigars during the past 12 months? | ☐ | ☒ |
| **c.** used any other tobacco products during the past 12 months? | ☐ | ☒ |

| **5. HAS ANY PERSON PROPOSED FOR INSURANCE:** | Yes | No |
|---|---|---|
| **a.** engaged, or intend to engage, in hang gliding, racing, scuba diving, sky diving? | ☐ | ☒ |
| **b.** had driver's license restricted, revoked or suspended? If yes, give driver's ID#. | ☐ | ☒ |
| **c.** other life insurance applications pending? | ☐ | ☒ |
| **d.** ever had life or health insurance declined, modified or rated? | ☐ | ☒ |
| **e.** any intention of traveling or residing outside the U.S.? | ☐ | ☒ |
| **f.** any intention of replacing or changing any life insurance or annuity policy in force in this or any other company? | ☐ | ☒ |
| If any of 5a through 5f are answered Yes, give names & full details in REMARKS. | | |
| **g.** taken within five years or intend to take flights other than as fare-paying passenger on scheduled airlines? If Yes, complete Aviation Questionnaire. | ☐ | ☒ |

**8. BENEFICIARY for benefits payable upon death of the proposed insured**

Primary: Full Name Margaret Stilwell Age 47 Relationship Wife 60%

Contingent: Jamie Stilwell (19 yr.), Heidi Stilwell (16) Megan Stilwell (13), Haley Stilwell (10%) 8 & Letha, GRANDAUGHTER

Except as otherwise directed: (a) The proceeds are to be divided equally among all persons who are named as Primary Beneficiary and who survive the insured, but if none survive, equally among all persons who are named as Contingent Beneficiary and who survive the insured. (b) This right to change the beneficiary is reserved.

**9. NAME OF OWNER if other than proposed insured** Relationship Margaret Stilwell Wife Address 218 N Iowa Atwood IL 61913 Social Security or Tax No. 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

**10. SPECIAL POLICY DATE, IF DESIRED**

**11. AMOUNT PAID WITH THIS APPLICATION: $** 0

**12. REMARKS**

**AMENDMENTS AND CORRECTIONS (for Home Office use only)** Plan Rtg 10

**THIS IS A REISSUED POLICY AND REPLACES ANY POLICY BEARING THIS NUMBER PRIOR TO** 10-30-98

This application consists of Part A and one or more Parts B. This application is not a contract of insurance. A contract of insurance shall take effect only if a policy is issued on this application and the first premium is paid in full (a) during the lifetime of all proposed insureds and (b) while there is no change in the insurability and health of all such persons from that stated in this application. However, if cash is paid when this application is signed, the terms of the Conditional Receipt shall apply. It is represented that all statements and answers in this application are true, full and complete, and bind all parties in interest under any policy applied for. Only an authorized officer of our Company can make, void, waive or change any of the conditions or provisions of any application, policy or receipt or accept risks or pass on insurability. Notice to or knowledge by an agent or medical examiner is not notice to or knowledge by us. Acceptance of any policy issued on this application shall mean acceptance of any change, correction, addition or amendment noted by us in the "Amendments and Corrections" Section. However, any such change shall require the written consent of the person or persons who sign this application. The Proposed Insured shall be the policy owner unless another owner is named above.

**DECLARATION**

I have carefully read the receipt. I understand and agree to its terms including the conditions under which a limited amount of insurance may take effect before policy delivery. I have received the MIB, Inc. and Fair Credit Reporting Act Notices.

Signed at City Atwood State IL

Signature of Proposed Insured X James E Stilwell

Date 3/2/98

Signature of Spouse (Spouse Rider Only)

Signature of Owner (if 9 answered) Margaret Stilwell

Witness William _____ (LICENSED RESIDENT AGENT WHERE REQUIRED BY STATUTE OR REGULATION)

SIGNATURE & TITLE OF OFFICER SIGNING FOR CORP OR TRUSTEE

Form 4485-Q (Rev. 88)

FF-04001000-1048-1196
Supply Ordering Number-0420!000-1019-1196

THE OLD LINE LIFE Insurance Company of America    238439

(refer... ...o in this application as we/us/our)

**PART B**

**1. PROPOSED INSURED** (Person Named on 1a Part A)
A. Height: 6 ft. 1 in.
B. Weight: 320 lbs.
C. Change in weight in past 12 months. *(Give reason)* lbs. Loss ____ Gain ____

| 2. FULL NAME(S) OF ADDITIONAL INDIVIDUAL(S) PROPOSED OR INSURANCE (PLEASE PRINT) first  middle  last | DATE OF BIRTH month day year | Age | Sex | Place of Birth | Height ft. in. | Weight lbs. | Total Insurance in Force |
|---|---|---|---|---|---|---|---|
| a. SPOUSE OR PAYOR (If proposed for insurance) | | | | | | | |
| b. CHILDREN (If proposed for insurance and residing with Proposed Insured) | | | | | | | |

**3. Name and address of your personal physician (if none, so state)** DR. MANO HAN - Main street. Atwood IL 6/9/

QUESTIONS 4-8 PERTAIN TO ALL PERSONS NAMED ABOVE AND ARE TO BE ANSWERED TO THE BEST OF THE APPLICANT'S KNOWLEDGE AND BELIEF

108 S. Main. Atwood IL 6/9/

GIVE FULL DETAILS IF ANSWER TO QUESTION 4 IS NO OR 5, 6, 7, 8 IS YES
Name of Person | Details, Dates, Doctors' Names & Addresses

| | Yes | No |
|---|---|---|
| **4. Are all persons proposed for insurance in good health?** | ☒ | ☐ |
| **5. Has any person proposed for insurance any physical defect?** | ☐ | ☒ |
| **6. HAS ANY PERSON PROPOSED FOR INSURANCE:** | | |
| a. received treatment or joined an organization for alcoholism or drug dependency or abuse; been advised to discontinue the use of alcohol or drugs? | ☐ | ☒ |
| b. used cocaine, barbiturates, amphetamines or any other drug which might cause a dependency, other than as prescribed by a licensed physician? | ☐ | ☒ |
| c. ever been diagnosed by or received medical treatment from a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☒ |
| d. ever applied for or received disability benefits from any source? | ☐ | ☒ |
| **7. HAS ANY PERSON PROPOSED FOR INSURANCE EVER HAD:** | | |
| a. convulsions, epilepsy, paralysis, neuritis, sciatica, nervous breakdown, headache, dizziness, fainting spells, speech defect, nervous or mental disorder? | ☐ | ☒ |
| b. high blood pressure, chest pain, palpitation, heart attack, stroke, heart murmur, hemorrhage, rheumatic fever, disorder of heart or blood vessels? | ☐ | ☒ |
| c. persistent hoarseness or cough, shortness of breath, asthma, emphysema, tuberculosis, bronchitis, disorder of respiratory system? | ☐ | ☒ |
| d. recurrent indigestion, ulcer, colitis, diverticulitis, hernia, intestinal bleeding, appendicitis, disorder of stomach, liver, digestive or abdominal organs? | ☐ | ☒ |
| e. sugar, albumin, blood or pus in urine, kidney stone, diabetes, or disorder of kidneys, bladder, prostate, or genito-urinary organs? | ☐ | ☒ |
| f. arthritis, gout, disorder of muscles, bones, joints or spine? | ☐ | ☒ |
| g. impairment of vision or hearing or disorder of eyes, ears, nose or throat? | ☐ | ☒ |
| h. tumor, cyst, cancer, hemorrhoids, venereal disease, anemia, disorder of blood, skin, thyroid or other glands? | ☐ | ☒ |
| i. treatment or observation in any hospital or institution? (past 5 years) | ☐ | ☒ |
| j. X-ray or electrocardiograms? (past 5 years) | ☐ | ☒ |
| k. treatment or consultations with any physicians or practitioners, other than as stated above? (past 5 years) | ☐ | ☒ |

**8. Is any person proposed for insurance now pregnant? (if so, how many months?)**

**COMPLETE IF PROPOSED INSURED UNDER AGE 15**

**9. List life insurance in force on family, (if none, so state)**

| | Age | Amount | | | Amount |
|---|---|---|---|---|---|
| Father | | | Mother | | |
| Brothers | | | Sisters | | |

Owner (if other than parent)

Signature of Proposed Insured X

Witness (LICENSED RESIDENT AGENT WHERE REQUIRED BY STATUTE OR REGULATION)  William John Lyns

Form 4485-Q (Rev. 88)

**COMPLETE IF PROPOSED INSURED AGE 15 OR OVER & NOT SELF-SUPPORTING**

**10. Parent's/Spouse's full name** ____

**11. Parent's/Spouse's occupation** ____

**12. How much insurance does Parent/Spouse carry?** ____

**13. Does Proposed Insured have an independent source of income?** (state source) ____

Signature of Spouse (If required) ____

Signature of Owner (If required) ____

FF-04001000-1046-1196
Supply Ordering Number- 04201000-1015-1196

**OFFICER'S REPORT**

Is policy intended to replace insurance or annuity in any company? ☐ Yes ☒ No  If Yes, give full details and attach any other papers required by state law.

Are you related to any person proposed for insurance? ☐ Yes ☒ No  If Yes, give details ____

Estimate of Proposed Insured's Income: Salary $ 150,000  Other Income $ ____  Net Worth $ 10,000,000

AGENCY OR BRANCH OFFICE   CODE NO.   William John Lyns   WCO90

PRODUCER'S NAME FOR RECORD PURPOSES (IF MORE THAN ONE INDICATE % SPLIT)   CODE NO.

I hereby certify that I personally solicited and completed this application; that I have no knowledge of anything which might affect the insurability of any person proposed for insurance which is not fully set forth herein.

William John Lyns   SIGNATURE OF PRODUCER

2604663

# E OLD LINE LIFE Insurance Compan, i America

**ANSWERS TO MEDICAL EXAMINER**

Agency # W0090

PART B

forming Part B of Application when used in connection with new Life Insurance

posed Insured _Earl_ First Name _Jamin_ Middle Tribal _Stilwell_ Last Name  Birth Date _10_ Month _7_ Day _54_ Year

**1. a.** Name and address of your personal physician (if none, so state)

Dr. NATHAN Atwood, Ill.

**b.** Date and reason last consulted?

Lung infection - 1 yr ago

**c.** What treatment was given or medication prescribed?

Cald - Rx

|  | Yes | No |
|---|---|---|
| **2.** Have you smoked cigarettes during the past 12 months? | ☐ | ☐ |
| Do you currently smoke pipes or cigars or use any other tobacco products? | ☐ | ☐ |
| **3. a.** Have you received treatment or joined an organization for alcoholism or drug dependency or abuse; been advised to discontinue the use of alcohol or drugs? | ☐ | ☑ |
| **b.** Have you used cocaine, barbiturates, amphetamines or any other drug which might cause a dependency, other than as prescribed by a licensed physician? | ☐ | ☑ |
| **4.** Have you ever had or been told you had or been treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☑ |
| **5. Are you in good health?** | ☑ | ☐ |
| **6.** Do you have any physical defect? | ☐ | ☑ |

**7.** Have you ever been treated for or ever had any known indication of:

|  | Yes | No |
|---|---|---|
| **a.** convulsions, epilepsy, paralysis, neuritis, sciatica, nervous breakdown, headache, dizziness, fainting spells, speech defect, nervous or mental disorder? | ☐ | ☑ |
| **b.** high blood pressure, chest pain, palpitation, heart attack, stroke, heart murmur, hemorrhage, rheumatic fever, disorder of heart or blood vessels? | ☐ | ☑ |
| **c.** persistent hoarseness or cough, shortness of breath, asthma, emphysema, tuberculosis, bronchitis, disorder of respiratory system? | ☐ | ☑ |
| **d.** recurrent indigestion, ulcer, colitis, diverticulitis, hernia, intestinal bleeding, appendicitis, disorder of stomach, liver, digestive or abdominal organs? | ☐ | ☑ |
| **e.** sugar, albumin, blood or pus in urine, kidney stone, diabetes, or disorder of kidneys, bladder, prostate, or genito-urinary organs? | ☐ | ☑ |
| **f.** arthritis, gout, disorder of muscles, bones, joints or spine? | ☐ | ☑ |
| **g.** impairment of vision or hearing or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| **h.** tumor, cyst, cancer, hemorrhoids, venereal disease, anemia, disorder of blood, skin, thyroid or other glands? | ☐ | ☑ |
| **8.** Are you now under observation or taking treatment? | ☐ | ☑ |
| **9.** Have you had any change in weight in the past year? | ☐ | ☑ |

**10.** Other than above, have you within the past 5 years:

|  | Yes | No |
|---|---|---|
| **a.** Had any mental or physical disorder not listed above? | ☐ | ☑ |
| **b.** Had a checkup, consultation, illness, injury, surgery? | ☐ | ☑ |
| **c.** Been a patient in a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| **d.** Had electrocardiogram, X-ray, or other diagnostic test? | ☐ | ☑ |
| **e.** Been advised to have any diagnostic test, hospitalization, or surgery which was not completed? | ☐ | ☑ |

|  | Yes | No |
|---|---|---|
| **11.** Have you ever been deferred, rejected or discharged from military service or discharged because of a physical or mental condition? | ☐ | ☑ |
| **12.** Have you ever requested or received a pension, benefits, or payment because of an injury, sickness or disability? | ☐ | ☑ |
| **13.** Family History: Tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide? | ☐ | ☑ |

|  | Age if Living? | Cause of Death | Age at Death? |
|---|---|---|---|
| Father | 67 - Living + well |  |  |
| Mother | 63 Living + well |  |  |
| Brothers and Sisters No. Living .... | 1 Brother - Stephen - Living |  |  |
| No. Dead .... | 1 Sister 41 - Living + well |  |  |

**14.** Females only:

|  | Yes | No |
|---|---|---|
| **a.** Have you ever had any disorder of menstruation, pregnancy or of the female organs or breasts? | ☐ | ☐ |
| **b.** Are you now pregnant? (If so, how many months?) | ☐ | ☐ |

Give full details in REMARKS if Answer to Question 5 is No, or if answer to Questions 2-4 or 6-14 is Yes. Identify question number and circle applicable items; include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.

REMARKS

I hereby declare that, to the best of my knowledge and belief, the information given above is correctly recorded, complete and true, and I agree that the Company, believing it to be true, shall rely and act upon it accordingly.

Date _3-23-98_

Signature of Person Examined. _Earl Stilwell_
(or adult applicant if person examined is under 15)

Signed at City _Urbana_ State _Ill._ Witnessed by _Robert W. Atkins M.D._ M.D.

Form 80P (Rev. 87)   The attached authorization should be dated and signed by the person examined.

0420-1000-1032-1194 (Front)

TABLE OF PREMIUMS AT THE CURRENT AND MAXIMUM RATES FOR THE FACE AMOUNT AND PREMIUM CLASS OF THIS POLICY.

WE MAY CHANGE THE CURRENT PREMIUM IN ACCORDANCE WITH THE RIGHT TO CHANGE PREMIUM PROVISION.

| POLICY YEAR | CURRENT ANNUAL LIFE INSURANCE PREMIUM | MAXIMUM ANNUAL LIFE INSURANCE PREMIUM |
|---|---|---|
| 1- 10 | 20,350.00 | 20,350.00 |
| 11 | 127,510.00 | 165,910.00 |
| 12 | 142,990.00 | 185,950.00 |
| 13 | 161,950.00 | 210,550.00 |
| 14 | 183,430.00 | 238,510.00 |
| 15 | 207,430.00 | 269,710.00 |
| 16 | 235,030.00 | 305,470.00 |
| 17 | 266,470.00 | 346,390.00 |
| 18 | 302,470.00 | 393,190.00 |
| 19 | 342,550.00 | 445,270.00 |
| 20 | 385,870.00 | 501,790.00 |
| 21 | 432,190.00 | 561,790.00 |
| 22 | 479,710.00 | 623,710.00 |
| 23 | 524,950.00 | 682,510.00 |
| 24 | 569,350.00 | 740,350.00 |
| 25 | 616,510.00 | 801,430.00 |
| 26 | 670,150.00 | 871,270.00 |
| 27 | 735,910.00 | 956,590.00 |
| 28 | 814,270.00 | 1,064,710.00 |
| 29 | 902,950.00 | 1,189,630.00 |
| 30 | 1,001,350.00 | 1,339,630.00 |
| 31 | 1,108,750.00 | 1,526,710.00 |
| 32 | 1,220,950.00 | 1,759,150.00 |
| 33 | 1,339,390.00 | 2,045,710.00 |
| 34 | 1,465,270.00 | 2,397,910.00 |
| 35 | 1,595,230.00 | 2,832,190.00 |
| 36 | 1,726,990.00 | 3,366,070.00 |
| 37 | 1,860,430.00 | 3,827,830.00 |
| 38 | 1,977,430.00 | 3,827,830.00 |
| 39 | 2,080,030.00 | 3,827,830.00 |
| 40 | 2,198,470.00 | 3,827,830.00 |
| 41 | 2,359,870.00 | 3,827,830.00 |
| 42 | 2,591,470.00 | 3,827,830.00 |
| 43 | 2,892,070.00 | 3,827,830.00 |
| 44 | 3,245,110.00 | 3,827,830.00 |
| 45 | 3,646,990.00 | 3,827,830.00 |

80-RCT 79-8                    2604663              NEXT TO LAST PAGE

TABLE OF PREMIUMS AT THE CURRENT AND MAXIMUM RATES FOR THE FACE AMOUNT
AND PREMIUM CLASS OF THIS POLICY.    (CONTINUED)

| POLICY YEAR | CURRENT ANNUAL LIFE INSURANCE PREMIUM | MAXIMUM ANNUAL LIFE INSURANCE PREMIUM |
|---|---|---|
| 46 | 3,827,830.00 | 3,827,830.00 |
| 47 | 3,827,830.00 | 3,827,830.00 |
| 48 | 3,827,830.00 | 3,827,830.00 |
| 49 | 3,827,830.00 | 3,827,830.00 |
| 50 | 3,827,830.00 | 3,827,830.00 |
| 51 | 3,827,830.00 | 3,827,830.00 |

RENEWABLE LEVEL TERM LIFE POLICY -- INDETERMINATE PREMIUM
INSURANCE PAYABLE IN EVENT OF DEATH PRIOR TO EXPIRY DATE
PREMIUMS PAYABLE DURING TERM                        NO DIVIDENDS

80-RCT 79-8                  2604663                    LAST PAGE

# CONSIGNMENT AGREEMENT

This Consignment Agreement made this _16th_ day of _April_ , 1999 by and between JANKO FINANCIAL GROUP L.L.C., an Illinois Limited Liability Company, hereafter "JANKO" and AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation, hereafter "ACV".

WHEREAS, ACV is in the business of retail sale of Amish made furniture and desires to establish a retail outlet in Tuscola, Illinois but lacks financial resources for acquiring an adequate inventory of Amish furniture, and

WHEREAS, JANKO has the financial resources and is willing to purchase an inventory of Amish crafted furniture and consign same with ACV upon the terms and conditions herein.

1. **DEFINITIONS**

   1.1 "ACV" means AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation the consignee under this Consignment Agreement.

   1.2 "AMISH FURNITURE" herein means originally made and crafted Amish furniture, fully finished, and AMISH style furniture made by others but does not include crafts, lamps, pictures and accessories other than wood products, whether Amish made or not.

   1.3 "AVERAGE WHOLESALE COST" means the inventory value of the AMISH FURNITURE as determined by QUICK BOOKS software program on a straight line average

   1.4 "BANK" means FIRST MID-ILLINOIS BANK and TRUST OF TUSCOLA, ILLINOIS.

   1.5 "INVENTORY CAP" means the maximum total aggregate amount of the average wholesale cost of Amish Furniture consigned by JANKO to ACV.

   1.6 "JANKO" means JANKO FINANCIAL GROUP, L.L.C., an Illinois Limited Liability Company herein the consignor under this Agreement.

   1.7 "JANKO'S INVESTMENT" means all amounts paid by JANKO for AMISH FURNITURE less credits for payments received from sales of AMISH FURNITURE

1

**EXHIBIT**

_B2_

1.8    "STILWELL" means JAMES and/or MARGARET STILWELL, the sole Shareholders of ACV.

2.    **AGREEMENTS OF JANKO**

2.1    JANKO agrees to purchase the existing inventory of Amish furniture now owned by ACV at current wholesale replacement cost and to purchase new Amish furniture selected by ACV, all at wholesale value or cost from time to time during the existence of this Agreement provided that the total amount of purchases shall never exceed $2,000,000.00 except as otherwise allowed herein.

2.2    JANKO will be the owner of such Amish furniture free and clear of all liens and encumbrances except a Security Agreement with BANK in an amount not to exceed 80% of the wholesale value.

2.3    JANKO will consign the Amish furniture with ACV and with no other party or entity unless with the consent of ACV or pursuant to termination of this Agreement by reason of the default of ACV.

2.4    JANKO will pay ACV, or at the direction of ACV, the seller of the Amish furniture all items delivered to an ACV store or warehouse within seven (7) days of demand and JANKO'S receipt of proper documentation, i.e. Purchase Order Receipts with corresponding copy of vendor invoices and no more frequently than once every two (2) weeks.

2.5    Wholesale value will be determined and supported by receipts or invoices from suppliers, copies to be provided by STILWELL.

2.6    JANKO may increase or waive the inventory cap of $2,000,000.00 limit on the purchase of Amish furniture upon the written request of ACV submitted not earlier than one (1) year from the date of this Agreement and conditioned upon evidence that ACV is current and not in default on any of its financial obligations including all current and long term lenders and tax obligations to State and Federal governmental bodies.

3.    **AGREEMENTS OF ACV:**

3.1    ACV will sell to JANKO its existing inventory of Amish furniture at current wholesale replacement cost and purchase on behalf of JANKO additional Amish furniture at wholesale cost from time to time during the term of this Agreement which total wholesale value should never exceed $2,000,000.00 unless increased pursuant to paragraph 2.6 above.

2

0309

3.2    ACV's purchase at wholesale of Amish furniture on behalf of JANKO shall be under the supervision and direction of STILWELL who shall exercise reasonable care and diligence in selecting marketable Amish furniture at fair and reasonable cost.

3.3    ACV will keep, preserve, repair and maintain all Amish furniture in good condition at it's store in Tuscola, IL and sell and market same in the ordinary course of its business at retail pricing in such amounts as determined by ACV. At all times ownership of the Amish furniture shall be in the name of JANKO and ACV will execute, obtain or provide such Bill of Sales, Inventory lists, or other documents as deemed necessary by JANKO to evidence its ownership.

3.4    **Principal Payments:** ACV will pay or remit to BANK in an account designated by JANKO by the 10th day of the month,  an amount equal to the average wholesale cost of the items sold during the previous month. Such reductions in the inventory level of Amish furniture may be replaced up to the inventory cap.

3.5    **Consignment Payments:** For its consignment services, ACV may retain all amounts in excess of average wholesale cost obtained from the sale at retail of the Amish furniture after deducting and paying Bank in an account designated by JANKO by the 10th day of the month an amount equal to the previous month's total of:

a)    10% of retail sale price, exclusive of sales tax;

b)    interest (at the rate charged by BANK to JANKO) on the amount of JANKO'S INVESTMENT; and

c)    all other costs, points, fees, charges by BANK to JANKO.

3.6    **Other Furniture:** ACV may purchase or maintain for resale any other furniture complimentary to, but not currently produced by Amish manufactures in an amount not to exceed 3% of the average wholesale replacement cost of total inventory.

3.7    **Product Liability Insurance:** ACV will obtain Product Liability Insurance in the minimum amount of One Million Dollars at its cost, naming JANKO as an additional insured with fee tail coverage, with an Insurance Company rated by AM Best of a rating of "A" or better.

3

3.8 <u>Casualty Insurance:</u> ACV will insure the Amish furniture against fire, loss, theft, vandalism, damage and other casualty with an insurance company rated by AM Best of a rating A or better at its full insurable value naming JANKO and BANK as additional party insured. Said policies will maintain a clause requiring notice to JANKO and BANK ten (10) days prior to any alteration in terms or cancellation. ACV will furnish evidence of such insurance being in force to JANKO and BANK. Any insurance proceeds paid to JANKO and BANK in excess of the balance of the obligations owed by ACV to JANKO and JANKO'S cost for the Amish Furniture shall be the property of ACV and shall be paid over to ACV after the obligations due under this Agreement and Amish furniture costs have been paid in their entirety.

3.9 <u>Life Insurance:</u> ACV will maintain life insurance and pay the premiums thereon on JIM STILWELL in an amount of at least $2,000,000.00 or an amount equal to the Inventory Cap, if higher, with JANKO and BANK named as beneficiary with an insurance company rated A or better by AM Best. The life insurance proceeds shall be used first to pay BANK for the amount JANKO owes BANK in order to release its lien on the Amish furniture, then to JANKO for all Amish furniture owned by JANKO at average wholesale cost, less a credit for the amount paid BANK, and any other amounts owed to JANKO under this Agreement and any excess life insurance proceeds shall be paid to the Estate of JIM STILWELL or ACV. Upon payment JANKO will convey title to as much of the Amish furniture free and clear of all liens, as was paid for by the insurance proceeds, to ACV.

3.10 If ACV shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required above, or fail to pay any premium in whole or in part relating to any such policies, then JANKO may, but need not, obtain and cause to be maintained any or all of such policies and pay any part or all of the premiums due thereunder without thereby waiving the said default or any other default by ACV. Any sums so disbursed by JANKO shall be additional indebtedness owed by ACV to JANKO and shall incur interest at the default rate of 12%.

3.11 ACV shall implement and maintain an inventory and accounting system acceptable to JANKO and BANK for the purpose and tracking the purchase and sale and payment of funds pursuant to this Agreement, which shall include, but not be limited to the following:

a) Physical inventory will be taken by ACV once/month and ACV will do such spot inventories as directed by JANKO. JANKO may also conduct its own spot, random or complete inventories.

4

    b)    ACV will maintain on a daily basis, a running book inventory.

    c)    Whenever inventory records over a quarterly period indicate "inventory shrinkage" has occurred, ACV will pay JANKO within  five (5) days the amount of SHRINKAGE at average wholesale cost,  plus 10% of the sale price of the missing inventory and inventory records will be adjusted in accordance therewith.

    d)    ACV will establish and implement a physical coding system of inventory items acceptable to JANKO, and every item will be backed by a Bill of Sale, purchase order or paid receipt in connection with its acquisition and a sales receipt in connection with its disposition.

3.12    ACV shall pay and be responsible for all expenses for the storage, transportation, handling, sales and distribution of said Amish furniture, as well as all costs incurred by JANKO in connection with BANK financing of JANKO'S purchase of Amish furniture, including, but not limited to interest, points, fees and other BANK charges incurred to maintain inventory financing by BANK.

3.13    ACV will keep account books and records giving complete information covering all transactions in connection with the purchase, sale, returns and distribution of Amish furniture and payment of the amounts due hereunder,  and such books and records shall be open during normal business hours to the inspection of any duly authorized representative of JANKO or BANK.

3.14    <u>Inspections</u>:  JANKO, BANK or their agents shall have the right, at any time and from time to time hereunder, to inspect and examine the Amish furniture and to copy any records relating thereto, provided that such inspection, examination or copying does not unreasonably interfere with ACV's Business.

3.15    ACV will use its best efforts to sell and merchandise Amish furniture promptly and in a profitable manner.

3.16    ACV shall not have any store wide sale of Amish furniture for less than average wholesale cost plus 10% without the consent of JANKO except in the case of Amish furniture deemed unmarketable, obsolete or damaged in the opinion of ACV.

0312

4.    **TERM**

4.1    This Agreement shall remain in effect for ten (10) years from the date of the first monies of JANKO used to purchase new or existing inventories of Amish furniture which date shall be inserted at the end of this Agreement.

4.2    After completion of the first five (5) years of this Agreement, ACV shall have the right to terminate this Agreement upon thirty (30) days advance written notice to JANKO and payment to JANKO for the Amish furniture at current wholesale replacement cost or average wholesale cost, whichever is higher and all accrued and delinquent obligations owed by ACV to JANKO. In addition, ACV will pay JANKO a "residual payment" equal to two times 2% of the average annual gross retail sales of Amish furniture by ACV during the first five years of this Agreement. 1/8 of said amount shall be paid for the next eight quarters thereafter or until the end of the original ten year term, which ever occurs first.

4.3    JANKO shall have the right to terminate this Agreement after the first twelve months of ACV's operations at its new building at ~South Progress Street,~ Tuscola, IL unless ACV does not open for business at its new building within twelve months of the date of this agreement in which case, JANKO shall have the right to terminate this Agreement any month after the first twelve months from the date of this Agreement. Written notice of termination shall be given to ACV 120 days in advance of the date of termination. In the event of termination by JANKO, JANKO will be paid the same amounts as in the event of termination by ACV except JANKO shall not be entitled to the residual payment.

5.    **WARRANTIES AND COVENANTS OF ACV:**

5.1    ACV expressly warrants, covenants and agrees, so long as any indebtedness as hereinbefore described remains unpaid to JANKO, as follows:

5.2    ACV is (or at time of conveyance will be) the sole owner of the Amish furniture in its existing inventory free from any lien, security interest or encumbrance in favor of any person or entity, has the right to convey its existing inventory of Amish furniture to JANKO and will defend the collateral against the claims and demands of all persons.

5.3    Except for sales in the ordinary course of business, ACV shall not sell, assign, transfer, encumber or hypothecate in any manner the Amish furniture.

6

0313

5.4    ACV is a Corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. ACV has the power and authority to carry on its business, to enter into this Consignment Agreement and to carry out the provisions hereof.

5.5    ACV is not in violation of, and the execution, delivery and performance of and compliance with this Consignment Agreement, will not result in ACV being in violation of, or in conflict with, or constitute a default under any term or provisions of any mortgage, indenture, contract, agreement, instrument, judgement, decree, order, statute, rule or regulation applicable thereto.

5.6    There are no actions, suits or proceedings pending or to the knowledge of ACV threatened against or affecting ACV at law or in equity or before or by any federal, state, municipal or other governmental department, commissions, board, bureau, agency or instrumentality, domestic or foreign, which involve the possibility of any judgement or liability not fully covered by insurance and which may result in any material adverse change in ACV's business or the operations, properties or assets or in the condition (financial or otherwise) of ACV.

6.    <u>CONTINGENCIES AND CONDITIONS:</u>

6.1    JANKO'S obligations under this Agreement are contingent upon:

6.2    JANKO obtaining a line of credit in the minimum of 2.0 million dollars from BANK for the purchase of Amish furniture on terms acceptable to JANKO and ACV.

6.3    Personal guarantee to JANKO by JAMES and MARGARET STILWELL of all funds owed by ACV to JANKO and for the obligations of ACV under this Agreement whether to JANKO or BANK.

6.4    Life Insurance on JAMES STILWELL in the amount of at least Two Million Dollars or an amount equal to the Inventory Cap, if higher, with JANKO and BANK as beneficiaries to the extent of the amounts owed to them, with an Insurance Company rated "A" or better by AM Best.

6.5    Casualty insurance coverage equal to average wholesale cost on all furniture inventory with JANKO and BANK named as an additional insured party with an Insurance Company rated "A" or better by AM Best.

7

0314

6.6    Product Liability Insurance in an amount of at least One Million Dollars with JANKO named as an additional insured party, with an Insurance Company rated "A" or better by AM Best.

6.7    ACV having received all necessary government approvals for site plans and building permits, financing approval, a signed contract for construction of all real estate and infrastructure improvements and a signed Contract for construction of a building at South Progress St., Tuscola, IL to be used for retail sale of the Amish furniture. Except JANKO will participate in an amount not to exceed $300,000 in average wholesale the cost of inventory for ACV operating at storefront(s) in the Tuscola Outlet Mall until ACV's building is completed and ready for occupancy, subject to the provisions of paragraph 4.3.

6.8    An inventory and accounting system acceptable to JANKO and BANK for the purpose of tracking the Amish furniture business and payments due under this Agreement.

6.9    A Letter of Intent between JANKO and JAMES STILWELL for JAMES STILWELL to lease a restaurant from JANKO on land currently owned by the TUSCOLA HOTEL GROUP, L.L.C. adjacent to the Holiday Inn Express in Tuscola, IL.

6.10   ACV's obligations under this Agreement are contingent upon 6.2, 6.5, 6.7, 6.8 and 6.9 above.

7.  **PERFORMANCE:**

7.1    If ACV (1) defaults by failing to pay when due any single installment or payment required to be made to JANKO or BANK under the terms of this Consignment Agreement and such default is not cured within ten (10) days of written notice to ACV; or (2) defaults in the performance of any other covenant or agreement hereof and such default is not cured by ACV within thirty (30) days after written notice to ACV (unless the default involves a dangerous condition which shall be cured forthwith); JANKO may treat such a default as a breach of this Agreement and JANKO shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity:  (i) maintain an action for any unpaid amounts; (ii) declare the entire balance due and maintain an action for such amount; (iii) forfeit the ACV's interest this Agreement, retain all sums paid; and with or without notice and without process of law, take possession of said

8

furniture, or any part thereof that remains unsold or in the custody of ACV, and for that purpose may enter any of the premises of ACV to search for or obtain said furniture, and consignee hereby waives any trespass or any rights of action for damages that it might or could have against consignor or its agents by reason of consignor, or its agents, procuring or attempt to procure possession of Amish furniture after forfeiture as aforesaid; or (iv) upon ACV's failure to surrender possession of the Amish furniture to JANKO, maintain an action for possession of the Amish furniture under the Illinois Replevin Act.

7.2     If default is based upon the failure to pay sales taxes, insurance, liens or other charges relating to the Amish furniture as provided in this Agreement, JANKO may elect to make such payments, which amounts shall become immediately due and payable by ACV to JANKO, and if not paid within ten (10) days of demand shall then be payable together with 12% interest per annum.

## 8.     DEFAULT, FEES:

8.1     ACV shall pay all reasonable attorney's fees and costs incurred by JANKO in enforcing the terms and provisions of this Consignment Agreement, or in defending any proceeding to which JANKO is made a party defendant as a result of the acts or omissions of ACV.

8.2     All rights and remedies given to JANKO, shall be distinct, separate, and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement; (2) No waiver of any breach or default of either party hereunder shall be implied from any omission by the other party to take any action on account of any similar or different breach or default. The payment or acceptance of money after it falls due after knowledge of any breach of this agreement by JANKO, or after the termination of ACV's right of possession of the Amish Furniture hereunder, or after the service of any notice, or after commencement of any suit, or after final judgment for replevin shall not reinstate, continue, or extend this Agreement nor affect any such notice, demand or suit or any right hereunder not herein expressly waived.

## 9.    DELINQUENT MONTHLY PAYMENTS:

9.1    ACV acknowledges that late payments by ACV to JANKO of the amounts or other charges due hereunder will cause JANKO to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed upon BANK by the terms of any note, and/or security agreement covering the Amish Furniture. Accordingly, if any installment or any sum due from ACV shall not be received by JANKO or JANKO's designee within ten (10) days after said amount is due, then ACV shall pay to JANKO a late charge equal to the greater of (i) five percent (5%) per month of such overdue amount, plus any attorney's fees incurred by JANKO by reason of ACV's failure to pay and/or other charges due hereunder; or (ii) One Hundred Dollars ($100.00). The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that JANKO will incur by reason of the late payment by ACV. Acceptance of such late charges by JANKO shall in no event constitute a waiver of ACV's default with respect to such overdue amount, nor prevent JANKO from exercising any of the other rights or remedies granted hereunder.

## 10.    SEVERABILITY:

10.1    Any provisions of this Consignment Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and such other provisions shall remain in full force and effect.

## 11.    WAIVER:

11.1    The waiver by JANKO of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition of any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of payment hereunder by JANKO shall not be deemed to be a waiver of any preceding breach by ACV of any term, covenant or condition of this Agreement, other than the failure of ACV to pay the particular delinquency so accepted, regardless of the JANKO's knowledge of such preceding breach at the time of acceptance of such delinquent payment.

0317

12. **NOTICES:**

12.1  All notices and demands which may, or are required to be given by either party to the other hereunder, shall be in writing. All notices and demands by the JANKO to the ACV shall be sent by United States Certified or Registered mail, postage prepaid, addressed to ACV at the business address, or to such other places as the ACV may from time to time designate in writing to the JANKO or may be personally served upon ACV. All notices and demands by ACV to JANKO shall be sent by United States Certified or Registered Mail, postage prepaid, addressed to JANKO, 2220 Marquette Road, Peru, IL or to such other person or place or persons or places as the JANKO may from time to time designate in writing to the ACV. All notices shall be effective as of the date of receipt or certification. Delivery may also be made by an established national overnight delivery service (such as Federal Express).

13. **MARGINAL HEADINGS:**

13.1  The marginal headings and titles to the Paragraphs of this Agreement are not a part of the Agreement and shall have no effect upon the construction or interpretation of any part hereof.

14. **TIME:**

14.1  Time is of the essence in this Consignment Agreement and each and all of its provisions.

15. **SUCCESSORS AND ASSIGNS; BINDING EFFECT:**

15.1  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

15.2  ACV may not assign its interest, rights or obligations herein without the consent of JANKO.

16. **SUBORDINATION:**

16.1  Upon the request of JANKO, ACV herewith subordinates or will subordinate its rights hereunder to any lien of any Security Agreement by JANKO to any bank, or other lending institution now or hereafter placed against the Amish furniture. ACV shall execute upon request a document indicating said subordination. The provisions of this paragraph shall be self-operative and no further instrument of subordination shall be required .

11

17. **SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS:**

   17.1   JANKO and ACV each hereby agree that their respective representations, warranties, covenants and agreements set forth herein shall survive the closing and shall thereafter be fully effective and enforceable.

18.   **AGENTS:**

   18.1   JANKO's agent for all matters under this agreement is DICK JANKO, until ACV is notified of a different agent pursuant to paragraph 12.1.

   18.2   ACV's agent for all matters under this Agreement is JAMES STILWELL, until JANKO is notified of a different agent pursuant to paragraph 12.1.

19.   **ENTIRE AGREEMENT:**

   19.1   This Consignment Agreement contains the entire agreement of the parties hereto with respect to the matters covered hereby, and no other agreement, statement or promise made by any party hereto, or to any employee, officer or agent of any party hereto, which is not contained herein, shall be binding or valid.

This Agreement is made the day and year first above written the effective is below.

ACV:                                           JANKO:

AMISHLAND COUNTRY                   JANKO FINANCIAL GROUP, L.L.C.,
VILLAGE, INC.,                          An Illinois Limited Liability Company,
an Illinois Corporation

BY: _____        BY: _____
Printed: _____        RICHARD JANKO, Authorized Member
Its: _____        2220 Marquette Road
                                       Peru, IL  61354

12

0319

20.   **EFFECTIVE DATE:**

20.1   The parties agree, pursuant to paragraph 4.1, that the beginning date (effective date) of this Agreement is _April 16_, 1999.

**ACV:**                                             **JANKO:**

**AMISHLAND COUNTRY**                                 **JANKO FINANCIAL GROUP, L.L.C.,**
**VILLAGE, INC.,**                                    **An Illinois Limited Liability Company,**
**an Illinois Corporation**

BY: _Jim Stilwell_                                   BY: _____
Printed: _Jim Stilwell_                              RICHARD JANKO, Authorized Member
Its: _President_                                     2220 Marquette Road
                                                     Peru, IL  61354

JANKO\AMISHLND.AGR3 ML

13

0320

## GUARANTY

WHEREAS, JANKO FINANCIAL GROUP, L.L.C., an Illinois Limited Liability Company, hereinafter referred to as "JANKO" and AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation, hereinafter referred to as "ACV" are about to execute a document entitled "CONSIGNMENT AGREEMENT" dated _April 16_, 1999, wherein JANKO will consign Amish furniture to ACV; and

WHEREAS, JAMES STILWELL and MARGARET STILWELL, hereinafter referred to as "Guarantor", have a financial interest in ACV; and

WHEREAS, JANKO would not execute the Consignment Agreement if Guarantor did not execute and deliver to JANKO this Guarantee.

NOW, THEREFORE, for and in consideration of the execution of the foregoing Consignment Agreement by JANKO and as a material inducement to JANKO to execute said Consignment Agreement, Guarantor hereby unconditionally and irrevocably guarantees the prompt payment by ACV of all sums payable by ACV under said Consignment Agreement and the faithful and prompt performance by ACV of each and every one of the terms, conditions and covenants of said Consignment Agreement to be kept and performed by ACV.

It is specifically agreed and understood that the terms of the foregoing Consignment Agreement may be altered, affected, modified or changed by agreement between JANKO and ACV, or by a course of conduct, and said Consignment Agreement may be assigned by JANKO, or any assignee of JANKO, without consent or notice to Guarantor and that this Guaranty shall thereupon and thereafter guarantee the performance of said Consignment Agreement as so changed, modified, altered or assigned.

This Guaranty shall not be released, modified or affected by failure or delay on the part of JANKO to enforce any of the rights or remedies of JANKO under said Consignment Agreement, whether pursuant to the terms thereof or at law or in equity.

Ten (10) days' notice of default shall be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee under which JANKO may proceed forthwith and immediately against ACV or against Guarantor following any breach or default by ACV or for the enforcement of any rights which JANKO may have as against ACV pursuant to or under the terms of the within Consignment Agreement at law or in equity.

1

JANKO shall have the right to proceed against the Guarantor hereunder following any breach or default by ACV without first proceeding against ACV and without previous notice to or demand upon ACV.

Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) demand of payment, presentation and protest; (c) all right to assert or plead any statute of limitations as to or relating to this Guaranty and the Consignment Agreement; (d) any right to require JANKO to proceed against the ACV or any other Guarantor or any other person or entity liable to JANKO; (e) any right to require JANKO to proceed under any other remedy JANKO may have before proceeding against Guarantor; and (f) any right of subrogation.

Guarantor does hereby subrogate all existing or future indebtedness of ACV to Guarantor to the obligations owed to JANKO under this Consignment Agreement and this Guaranty.

In the event any action be brought by said JANKO against Guarantor hereunder to enforce the obligation of Guarantor hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the Court.

IN WITNESS WHEREOF, the undersigned have set their hands and seals this _16_ day of _April_, 1999, at _Tuscola_, Illinois.

GUARANTOR:

_____
JAMES STILWELL

_____
MARGARET STILWELL

ADDRESS: _718 N Iowa_
_Atwood_

JANKO\GUARANTY.STL

2

0322