E-FILED
Monday, 02 April, 2007 03:45:37 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

MARGARET J. STILWELL, HALEY STILWELL, HEIDI STILWELL, JAMIE STILWELL, MEGAN STILWELL,
Plaintiffs,
-vs-
AMERICAN GENERAL LIFE INSURANCE COMPANY,
Defendant.

No. 05-CV-02160

AMERICAN GENERAL LIFE INSURANCE COMPANY,
Third-Party Plaintiff
-vs-
FIRST MID ILLINOIS BANK & TRUST, TUSCOLA FURNITURE GROUP, LLC, JANKO FINANCIAL GROUP, LLC,
Third-Party Defendants.

COPY

CSR License No. 084-003038

DEPOSITION

The deposition of LAWRENCE BIANCHI, a citizen of the State of Illinois, a witness of lawful age; produced, sworn and examined upon his corporeal oath, on the 9th day of February, 2007, at the offices of Area Wide Reporting Service, 301 West White Street, Champaign, Illinois, before June Haeme, CSR, RMR, CRR, Notary Public in and for the County of Ford and State of Illinois, as a witness in a certain suit and matter now pending and undetermined in the United States District Court for the Central District of Illinois.

EXHIBIT C

Page 2

Appearances:

Michael S. Seneca
Attorney at Law
Howard & Howard
One Technology Plaza, Suite 600
211 Fulton Street
Peoria, IL 61602-1350
Appearing for Tuscola Furniture Group and Janko Financial Group

Rebecca M. Rothman
Attorney at Law
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
120 North LaSalle Street, Suite 2600
Chicago, IL 60602
Appearing for American General Life

Jason M. Crowder
Attorney at Law
Heller, Holmes & Associates, P.C.
1101 Broadway Avenue
Mattoon, IL 61938
Appearing for Plaintiffs

Julie Beyers
Attorney at Law
Heavner, Scott, Beyers & Mihlar
111 E. Main Street, Suite 200
Decatur, IL 62523
Appearing for First Mid Illinois

Page 3

INDEX

| | Page |
|---|---|
| EXAMINATION BY MS. ROTHMAN | 3 |
| EXAMINATION BY MR. CROWDER | 74 |
| EXAMINATION BY MS. BEYERS | 112 |
| REEXAMINATION BY MS. ROTHMAN | 121 |
| EXAMINATION BY MR. SENECA | 123 |
| REEXAMINATION BY MR. CROWDER | 126 |
| REEXAMINATION BY MR. SENECA | 128 |
| REEXAMINATION BY MR. CROWDER | 129 |

EXHIBITS

| | Page |
|---|---|
| Bianchi Exhibit No. 1 | 18 |
| Bianchi Exhibit No. 2 | 48 |
| Bianchi Exhibit No. 3 | 48 |
| Bianchi Exhibit No. 4 | 55 |
| Bianchi Exhibit No. 5 | 56 |
| Bianchi Exhibit No. 6 | 58 |
| Bianchi Exhibit No. 7 | 59 |
| Bianchi Exhibit No. 8 | 64 |
| Bianchi Exhibit No. 9 | 67 |
| Bianchi Exhibit No. 10 | 67 |
| Bianchi Exhibit No. 11 | 88 |
| Bianchi Exhibit No. 12 | 90 |
| Bianchi Exhibit No. 13 | 125 |

Page 4

(Commencing at 12:52 p.m.)

LAWRENCE BIANCHI,

the deponent herein, called as a witness, after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY
MS. ROTHMAN:

Q. Mr. Bianchi, is that --
**A. That's fine, that's fine.**
Q. Or what is it? Is it Bianchi?
**A. It should be. I say Bianchi, but Bianchi is the correct pronunciation, how's that?**
Q. I'm going to call you Mr. Bianchi.
**A. Great.**
Q. Would you state your full name for the court reporter please?
**A. Lawrence William Bianchi.**
Q. Let the record reflect this is the discovery deposition of Lawrence William Bianchi taken pursuant to notice and continued to today's date by agreement of the parties.
MS. ROTHMAN: Mr. Bianchi is here as an individual fact witness. He is also here as the corporate representative for Janko and TFG --

Page 5

MR. SENECA: That's correct.
MS. ROTHMAN: -- correct?
MR. SENECA: That's correct.
Q. Okay. Mr. Bianchi, I'm going to get some background information from you just briefly. What's your highest level of education?
**A. I have a master's degree in criminal justice.**
Q. Where did you get that?
**A. It's now the University of Illinois Springfield. It was Sangamon State University when I went there.**
Q. Okay. What -- I understand that you're involved in several companies, several real estate development companies from my review --
**A. Was.**
Q. -- of these materials. Are you -- well, let me ask you what companies you're involved in as an owner?
**A. Boy, it's changed so much recently, I'm going to have -- I am no longer a member of Janko Financial Group.**
Q. Okay.
**A. I have my own LLC. LW Bianchi and**

Page 6

Associates, LLC. I'm involved in various real estate partnerships. Do you want me to try to recall those?
Q. As you sit here today, you're involved in various real estate?
A. Uh-huh.
Q. Approximately how many?
A. Five.
Q. Are you involved in any business dealings with any of the parties to this action?
A. I hold a note from Janko Financial Group that represents a buyout that was done as of January 1, 2006, of my membership interest in the LLC. I have done work and do work for JFG as a -- through my LLC.
Q. And by JFG, are you referring to --
A. Janko.
Q. -- what I'm calling Janko?
A. Yes.
Q. Okay. What do you do for JFG/Janko?
A. If there's a matter that I was the most familiar person with, they will direct me to do certain things for them. It might -- it was more intensive last year. I've done nothing this year so

Page 7

far. I was on a retainer for the first part of last year and basically handling projects, something to do with our assisted living centers -- their assisted living centers or the hotels or other developments.
Q. Okay. Your buyout from JFG --
A. Yes.
Q. -- did that have anything to do with any of the issues raised --
A. No.
Q. -- in the complaint here?
A. No.
Q. Okay. I'm going to lay down some ground rules. I'm sorry I didn't go over them with you before, but you had a nice save there. All of your responses have to be audible because the court reporter can't take it down, so try to remember to say yes or no, okay? And we'll try to remind you. Nobody saved you there.
Okay. Can you tell me -- at some point you were a member of Janko though, correct?
A. Yes.
Q. And can you just explain for me what -- well, the other members of Janko were Dick Janko and

Page 8

Mike Janko; is that right?
A. Correct.
Q. And they're related somehow?
A. Dick is the father, Mike is the son.
Q. Okay. Do you have any relation to them?
A. No.
Q. Okay. That LLC, that's a limited liability company, correct?
A. Correct.
Q. And its purpose is what?
A. Real estate development.
Q. All right. And is Janko a member of any other companies?
A. Janko Financial Group owns stakes in various different companies, yes.
Q. Okay. At some point, did they have a stake in a development or an LLC called Amishland Development?
A. Yes.
Q. All right. And they also are an owner of an LLC called Tuscola Furniture Group that we've talked about; is that right?
A. Well, I don't know if Tuscola Furniture Group is a live company.

Page 9

Q. Okay.
A. If it is, then they would still be a 60 percent owner.
Q. Okay. Was Janko an original member of -- by original, I mean a founding member of Amishland Development, do you know?
A. No. Clarification. There was a new, newly formed Amishland Development when Janko became involved. There was a previous Amishland Development. And the only distinction that I can remember that a document might show is one had L.L.C., the other one had LLC. Janko Financial Group was a founding member of the newly constituted Amishland Development.
Q. Okay. When was that newly constituted approximately?
A. I don't have a recollection of when.
Q. Okay. The members of Amishland Development, LLC, were James Stilwell, Janko and a company called BLT-3 --
A. Correct.
Q. -- is that right? Okay. And what was the purpose of Amishland Development?
A. The purpose was to own a retail center in

Page 10

Tuscola, Illinois.

Q. At some point, Janko became the managing member of Amishland Development; is that right?

A. We always were the managing member of the LLC.

Q. Okay.

A. It was constituted with us as a member.

Q. Okay. How -- can you tell me how Janko became involved with Amishland Development or how this development came about?

MR. CROWDER: Rebecca, in the event that answers are going to invade the Dead Man's Act, should we go ahead and do the Dead Man's Act?

MS. ROTHMAN: You can have a standing objection, we can fight about it later, how's that?

MR. CROWDER: Yeah, because I think a lot of his answers might have -- you know, might involve conversations with Jim Stilwell, and I will be making a Dead Man's Act objection, so --

MS. ROTHMAN: I have no problem with a standing objection.

MR. CROWDER: Is everybody all right with that?

MR. SENECA: I'm fine with a standing

Page 11

objection. It makes more sense in terms of speed.

MS. BEYERS: That's fine, yeah.

A. Dick Janko and I were in Tuscola having to do with the development of a Holiday Inn Express hotel that we -- our company was involved in the development of, and we met Jim Stilwell one day at the Chamber of Commerce office. And that was our first encounter with Jim. I don't have a recollection of a date. And from there we became involved with him in various of his entities and various relationships.

Q. Okay. Can you list the entities, explain them -- or list them first?

A. I can't give you the order that we did them, but there was the -- what did Jim call it? Amishland Country Smokehouse was the name of the business owned by Jim and Margaret Stilwell that leased a restaurant building from Tuscola Restaurant Group, LLC, which the principal owner was Janko Financial Group. Amishland Country Village was the tenant to the building owned by Amishland Development, LLC. And originally Janko Financial Group entered into a consignment agreement with Amishland Country Village that had to do with the

Page 12

retailing of Amish furniture.

Q. Okay. Anything else?

A. Not that I recall.

Q. Okay. Then can you describe your business relationship with the Stilwells? I mean you seem to be quite friendly with Mrs. Stilwell.

A. We were always on what I thought were very good terms with both Jim and Margaret.

Q. Okay. Was there any personal relationship between any of the members of Janko and the Stilwells that predated these business dealings?

A. No.

Q. Okay. Do you have any contact or business dealings with Mrs. Stilwell or the Stilwell children --

A. No.

Q. -- now? Okay. Do you know if Janko does or any of the members of Janko?

A. Not to my knowledge.

Q. All right. You referenced a consignment agreement. If you'd look at what was previously marked for Mrs. Stilwell's deposition as Exhibit No. 2, is that -- is that the consignment agreement you were speaking of?

Page 13

A. Well, there were two consignment agreements. This is the first of those two.

Q. Okay. And why was it that the Stilwells -- well, strike that. Was it your understanding that the Stilwells were in need of assistance to finance the furniture? Is that what this agreement is about?

A. Jim had approached us for assistance in financing in his furniture operation.

Q. Okay. And was it your understanding that he approached you because he did not have the capital or the financial ability to get direct financing from the bank?

A. No, Jim had financing from the bank.

Q. Okay.

A. Jim came to us with two objectives. One, to get a higher credit amount. Number two, to get a better borrowing rate.

Q. Okay. And my understanding of this agreement is then by agreement Janko would then purchase the existing inventory that was owned by ACV, Jim Stilwell's company, and then purchase furniture for ACV to sell in a retail business? Is that a fair statement?

A. Not in its entirety. We were not involved with the ordering of furniture.

Q. Okay.

A. We never talked to vendors directly at the time of purchase. That was all done by Jim. And we simply were sent invoices that we made payment on. And then as I understand, we became the owners of the furniture at that point and were consigning that furniture to Jim, but we were not involved in the procurement.

Q. Okay. Thanks. Turning your attention -- you see the Bates stamp on the bottom? -- to document Bates stamp 311.

A. I'm sorry, I don't know what you're referring to. Oh, down here.

Q. The numbers on the bottom. See them right there on the bottom?

A. Uh-huh.

Q. Section 3.9, you see that provision?

A. Yes.

Q. And my reading of that provision is that under the agreement ACV had the obligation to maintain life insurance on James Stilwell in the amount of $2 million with Janko and the bank as a

named beneficiary. Is that your understanding of that provision?

A. That's what it says.

Q. Okay. What purpose did that provision serve?

A. That provision was included as additional security to us under the agreement.

Q. Okay. If you turn to page 314 in the agreement, Section 3. -- or 6.3 references a personal guarantee that was a condition to the agreement. Do you see that?

A. Now, which section?

Q. I'm at section -- down under Section 6, page 314.

A. Okay, I'm sorry, I was at 3.14 on the agreement.

Q. Sorry.

A. 6.3, yes, it shows that there would be a personal guarantee.

Q. Okay. So it was your understanding that a condition of the agreement was that Jim and Margaret Stilwell would personally guarantee the debt that was owed by ACV to Janko.

A. Yes.

Q. All right. And they fulfilled that condition; is that right?

A. They signed a guaranty.

Q. Okay. And is that guaranty that they signed the document that's 321 and 322 to this exhibit?

A. Yes, it is.

Q. All right. The provision to procure life insurance is also listed as a condition to the agreement. Do you see that under 6.4?

A. 6.4.

Q. I'm at -- I'm on page 314.

A. Yes.

Q. Right under the provision --

A. Yes.

Q. -- we just discussed.

A. Yes, it is.

Q. Do you see that?

A. Yes.

Q. Okay. Did the Stilwells fulfill this condition of the contract?

A. Not -- let me read it please.

Q. Sure.

A. Not originally.

Q. Okay. Was there any sort of understanding or agreement between you and the Stilwells or ACV as to how -- as to how they were going to go about fulfilling this condition?

A. When we originally signed the agreement and did the original transaction, at some point thereafter, and I don't recall the date, we were provided with a $500,000 beneficial interest in a life policy. At that time, we instructed Jim that that was not sufficient, that's not what the agreement called for. We kept up that contact with him and did not receive the additional beneficial interest until I believe September of 2000.

Q. Okay. And that beneficial interest was basically an assignment of rights under an existing insurance policy.

MR. CROWDER: I'll object to form.

Q. Is that right?

MR. CROWDER: Let me object to the form of the question, but you can answer.

A. Say again please.

Q. Sure. The -- well, let me ask you this. Did the Stilwells to your knowledge go out and obtain insurance with Janko and the bank named as an

Page 18

additional beneficiary?

A. **No. My understanding is that we were assigned a beneficial interest in an existing policy.**

Q. Okay.

MS. ROTHMAN: Would you mark --

MS. BEYERS: Are we still on the 1999 consignment agreement?

MS. ROTHMAN: Yeah.

(Bianchi Exhibit No. 1 was marked by the court reporter.)

BY MS. ROTHMAN:

Q. Mr. Bianchi, showing you what's been marked Exhibit 1 for your deposition, do you have any independent recollection of receiving this document?

A. **Not offhand, no.**

Q. Okay. Taking -- have you seen this document before?

A. **Offhand I don't recall, but I have no reason to believe that I didn't at some point.**

Q. Okay. Mr. Lyons, who did you -- do you know who he is?

A. **Yes.**

Page 19

Q. Okay. Who do you understand Mr. Lyons to be?

A. **I believe him to be an insurance agent who sold Jim various coverages.**

Q. Okay. And did you have dealings and communications with Mr. Lyons as the agent for Mr. Stilwell?

A. **Yes.**

Q. All right. You don't have any prior dealings with Mr. Lyons or any other dealings?

A. **No, no.**

Q. Okay. This correspondence seems to reference a copy of a $500,000 assignment on a $4 million policy and says I will get you another assignment sheet for an additional 1.5 and have Margaret sign it. Do you see that?

A. **Yes, I do.**

Q. Okay. So turn to Exhibit 3 that was previously marked for Stilwell's deposition. This is a copy of the $500,000 assignment that Janko received that was executed by Margaret Stilwell?

A. **That's correct.**

Q. Okay. And Exhibit 4, if you look at Exhibit 4, is this the additional $1.5 million

Page 20

assignment that Mr. Lyons references as the forthcoming assignment?

A. **It appears to be, yes.**

Q. Okay. And Exhibit 4, the $1.5 million assignment, is dated September 25th, 2000?

A. **That's correct.**

Q. Do you see that? And it was -- it's your recollection that it took a while to get this second assignment; is that right?

A. **Over a year. Almost a year and a half.**

Q. Okay. Do you know what the holdup was?

A. **No, I don't.**

Q. Okay. In any event, you never or Janko, and when I say you, I mean you as Janko in this --

A. **Uh-huh, yes.**

Q. -- instance, you never waived the condition that a $2 million protection or life insurance protection be obtained?

A. **No, we did not.**

MR. CROWDER: Show an objection as it calls for a legal conclusion.

Q. And you followed up with Mr. Stilwell and/or somebody on his behalf to obtain the additional assignment?

Page 21

A. **Yes, I did.**

Q. Okay. But approximately how many times did you attempt to follow-up?

A. **I have no recollection of a number, but I would say numerous.**

Q. Okay. Did he give you any explanation, he meaning Mr. Stilwell, as to what was taking so long and what the holdup was?

A. **No.**

Q. Showing you what was previously marked Stilwell Exhibit 5 is a packet of documents that all relate to the closing of a consignment transaction on November 17th, 2000. Do you see that?

A. **Yes.**

Q. Are you familiar with these documents?

A. **Yes.**

Q. All right. Again, I think your counsel told me I don't have to go through all of these documents to have you review them for me and verify that they contain true and correct copies of all the documents that are listed.

MS. ROTHMAN: Is that right?

MR. SENECA: We will stipulate to the authenticity of them, yes.

MS. ROTHMAN: Okay.
Q. At some point Janko assigned the interest in it -- the consignment agreement we just discussed to a newly created company, TFG; is that right?
**A. Yes.**
Q. All right. Turn to page -- of document Exhibit 5, Group Exhibit 5, turn to page 707. Do you recognize that document?
**A. Yes, I do.**
Q. Okay. Is this the assignment and assumption agreement between Janko and TFG?
**A. Yes, it is.**
Q. All right. And what is your understanding of the purpose of this document?
**A. Purpose of this document was to assign the rights that Janko Financial Group currently had in its transactions with Amishland Country Village concerning the furniture consignment agreement, that all those rights be transferred to Tuscola Furniture Group.**
Q. So not only were the obligations under the consignment agreement transferred, but also the rights -- the rights under the consignment agreement, correct?

**A. That's correct.**
Q. And that would have included the right to any assignment of life insurance that was given to Janko by the Stilwells in connection with the original consignment agreement?
**A. That is --**
MR. CROWDER: Show an objection as to calling for a legal conclusions for Mr. Bianchi. Subject to that --
**A. Section 2 states any and all contracts and other documents including insurance policies.**
Q. Okay. And your understanding of that section is that it would -- it was meant to include any right to any of the assignment of life insurance proceeds that had been given to Janko in connection with the original assignment, correct?
**A. Yes.**
MR. CROWDER: Same objection.
Q. Now, flipping to the consignment agreement at issue, the November 17th consignment agreement that's on page 655.
**A. Yes.**
Q. Setting aside -- I've looked at this consignment agreement. I've looked at the prior

consignment agreement. Setting aside the consigners' names, what, if any, material differences are there between the original consignment agreement and this consignment agreement?
**A. I'm not sure that I'm aware of all the differences, but the differences that I am aware of, on page 656, Section 2.1 calls for a change in the amount of available credit.**
Q. What was the reason for that decrease in the cap?
**A. Simply because the previous amount had not been utilized and was not contemplated.**
Q. All right. If you flip to --
**A. Now, I didn't go over the other -- do you want to?**
Q. Sure, I'm sorry.
**A. Okay.**
Q. That's the only one I saw, but --
**A. Okay. Specifically also the change in the requirement for beneficial interest in the insurance policy, in the life policy.**
Q. And are you on page 659?
**A. No, I'm on page --**

Q. I'm sorry, Bates stamp 659, Section 3.9.
**A. 659, yes.**
Q. Okay.
**A. Under life policy, the change in the amount and that had to be a beneficial interest showing TFG and bank named as beneficiary. So the change of the amount was -- affected the life insurance as well as the amount of credit.**
Q. Understood.
**A. Another difference was on 0657, Section 3.3, the specific locations at which furniture could be held, that was a difference. On page 0658, Section 3.6 was an addition, was an "Exclusive: ACV will not accept for consignment, sell or lease furniture of any kind except in accordance with this consignment agreement," so on and so forth. That was an addition.**
**And seems to me there would have been one other that I'm aware of. I would have to go through this.**
MR. SENECA: For clarification, you're asking as he sits here today what differences he's aware of.
Q. Correct. So you don't have to go through

Page 26

the document.
A. Okay.
Q. You've covered it for my purposes. You covered it a couple of times ago.
A. Okay.
Q. The Section 6.3, and this is obviously not a difference because it's the same, but Bates stamp 662, again Section 6.3, requires a personal guarantee by James and Margaret Stilwell of the debt that's owed by ACV to TFG; is that right?
**A. That's correct. And I think the other change that I was looking for that I'd like to mention was the requirement of the UCC filing.**
Q. Okay. And what provision are you referencing?
**A. Well, it's referenced in 3.6, but I know it's in the -- on another section.**
Q. Okay. And what was the change there with the UCC filing?
**A. I don't know that it was required in the past.**
Q. Okay. Understand. With respect to the condition of obtaining life insurance, do you know what the Stilwells did to fulfill that obligation

Page 27

under this consignment agreement?
**A. At closing, the Stilwells did not present an assignment of beneficial interest in the amount of $1,250,000, beneficial interest to JFG -- or excuse me, to Tuscola Furniture Group and the bank.**
Q. Okay. That was at closing?
**A. Right.**
Q. But did you go ahead and close anyway?
**A. Yes, we did.**
Q. Okay. And at closing, did you -- was there any discussion as to whether that provision was going to be waived?
**A. There was never any discussion or intent to waive that provision.**
Q. Okay. At some point, did -- after the closing, did you obtain an assignment of life insurance in the amount noted in the consignment, in the amount required under the consignment?
**A. At closing, we instructed Jim and Margaret Stilwell that we had to be covered under this agreement. We stated that we felt that we were covered under the agreement because of the assignment and assumption agreement that was dated the day before this agreement that assigned the life**

Page 28

**insurance's previous assignments. And we requested, pending receipt of the proper beneficial interest in the amount of $1,250,000 for Tuscola Furniture Group and First Mid Illinois Bank, that we wanted to substantiate to the insurance company the assignment of the rights to the beneficial interest that already existed, and therefore I requested -- we requested from Jim Stilwell that he provide us with a form so that we could notify the insurance company.**
Q. All right. And this was all discussed at the closing?
**A. Yes.**
Q. And Margaret Stilwell was present at the closing?
**A. Yes, she was.**
Q. And so would your discussions with Jim also have been directed to Margaret?
**A. They were directed to them both.**
Q. All right. So at the closing you advised them that you felt that the fact that they didn't show up with the proper documentation of the assignment of beneficial interest in life insurance was not a deal breaker because you were protected

Page 29

under the assignment and assumption agreement between TFG and Janko that had been executed the day before?
**A. That's correct.**
Q. Okay. Did they say anything to you concerning whether they thought that was fine too or whether they were disputing that?
MR. CROWDER: Object to the form.
**A. They didn't dispute it. I was told by Jim that he would get me the form so that we could notify the insurance company of the new name, Tuscola Furniture Group versus Janko Financial Group, on the existing assignments.**
Q. Okay. So in the discussions at closing, Mr. Stilwell indicated to you that he would get you something from the insurance company or get you something from -- get you something that you could give to the insurance company to protect your interest under the consignment.
MR. CROWDER: Same objection. Object to the form.
**A. To notify them of the assignment and assumption. A form to notify them of the assignment and assumption.**

Page 30

Q. All right. So Mr. Stilwell advised you that he would get you a form to notify the insurance company of the assignment and assumption agreement?
**A. Yes.**
Q. Okay. And did he ever do that?
**A. I received from Mr. Stilwell's insurance agent, John Lyons, a form that had been completed and was ready for my signature in order to show the assignment of the beneficial interest.**
Q. Showing you what was previously marked Stilwell's Deposition Exhibit 20, is that the document that you're referring to?
**A. That's correct.**
Q. Okay. Do you recall when you received this document from Mr. Lyons?
**A. I believe I received it on the 21st of November, though I don't have any document that states that, but noticing that apparently Mr. Lyons received it, it was received to Mr. Lyons's fax number on the 20th, and Mr. Lyons then forwarded that to me with a note stating that he was providing me the form.**
Q. Okay. Did you have any discussions with Mr. Lyons concerning this document?

Page 31

**A. No, other than he was sending the --**
Q. Other than he would send it to you?
**A. Correct.**
Q. So you did initially have a discussion with him and asked him to send you something?
**A. No.**
Q. Oh, okay.
**A. I talked to Mr. Stilwell.**
Q. Okay.
**A. Mr. Stilwell contacted Mr. Lyons and provided the form, and I had asked Mr. Stilwell to provide us with a form that we could show an assignment of our $2 million beneficial interest from Janko Financial Group to Tuscola Furniture Group.**
Q. Okay. All right. And this is what you got, Exhibit 20?
**A. I got this form and it was Sections 1 and 3 were filled out.**
Q. All right. And so what you did to effectuate that intent was sign it and fill out the words released in favor of Tuscola Furniture Group, LLC?
**A. Correct.**

Page 32

MR. CROWDER: Object to the form of the question.
Q. All right. Why don't you tell me what you did after you received this document?
**A. When I received this document, after having read it, I knew that to make the document effective I had to sign it, and the reason that I put in favor of Tuscola Furniture Group is because I wanted to make sure that everyone understood that this was a transfer of the assignment from Janko Financial Group in favor of Tuscola Furniture Group. I was concerned about the statement that I saw release of assignment, but I made an assumption that that meant the release from Janko Financial Group to Tuscola Furniture Group.**
Q. Okay. And you didn't have any discussions with Mr. Lyons about -- about that?
**A. No.**
Q. Okay. Did you have any discussions with anybody at American General about that at this time?
**A. No.**
Q. Okay. Showing you what was marked for Mrs. Stilwell's deposition as No. 6, this is an assignment to Tuscola Furniture Group in the amount

Page 33

of $250,000. Can you tell me what this was, how this came about?
**A. This is what we received from Jim Stilwell after closing and after I had signed this other document. And having received this from Jim, I notified him of two discrepancies between this document and what was required in the consignment agreement. Number one, the amount was wrong, it was 250,000 instead of 1,250,000. And number two, this was an assignment to Tuscola Furniture Group only whereas our agreement stated that it was to be Tuscola Furniture Group, LLC, and the bank.**
Q. And was this a conversation you had with him face-to-face or over the phone --
**A. I don't recollect that.**
Q. -- do you recall? Okay. Do you recall what he said to you in return?
**A. Jim stated that he would get for me the proper assignment.**
Q. Okay. And did he ever do that?
**A. No.**
Q. Showing you what is marked Stilwell No. 7, it says an assignment from Margaret Stilwell to First Mid Illinois Bank and Trust for $1 million.

Page 34

Do you see this?
A. Yes.
Q. But do you know how this document came about?
**A. Well, this is -- is a further response that we received from Jim Stilwell concerning our request for $1,250,000 of assignment of beneficial interest in a life policy showing beneficial interest to Tuscola Furniture Group and First Mid Illinois Bank.**
Q. Okay.
MR. CROWDER: Move to strike the answer. Lacks foundation.
MS. ROTHMAN: Can you read back my --
Q. Well, I'll ask you something else. When did you -- have you ever received -- strike that. Do you recall receiving a copy of this document?
**A. Yes, I do.**
Q. Okay. When did you first receive a copy of this document?
**A. Sometime in January of 2001.**
Q. And when did -- who did you receive a copy of it from?
**A. To my best recollection, from Jim**

Page 35

**Stilwell.**
Q. Okay. Did you have any discussions with Jim Stilwell about this document?
**A. Yes, I did.**
Q. Okay. And what were those discussions?
**A. I informed Jim that this document did not satisfy the requirements of our consignment agreement and that he still needed to get to us an assignment of beneficial interest in the amount of $1,250,000 and that the assignment should be to Tuscola Furniture Group and First Mid Illinois Bank, and further, that we would not release any of the prior assignments that we held, those being the $2 million that we got originally at various times and the $250,000 that came after that, now the $1 million. We told him that it needed to be correct according to the documents.**
Q. Okay. And what did he say to you?
**A. Jim stated that he would get that release -- that assignment for me.**
Q. Did he ever -- and he never did that; is that right?
**A. That's correct.**
Q. Okay. After you had the discussion that

Page 36

you just described with Mr. Stilwell concerning the assignment he had given to the bank in the amount of $1 million, did you have further follow-up discussions with him concerning meeting this requirement?
**A. At various times I would ask him what the status was of fulfilling that requirement and he would respond that he was working on it.**
Q. Okay. Did he give you any explanation as to why he did it the way he did? Why he had one for $250,000 to TFG and why there was one for $1 million to the bank?
**A. The only thing I recollect him ever stating is that he must have misunderstood the proper form.**
Q. Okay. And so when you didn't get the additional or the corrected forms, you kept after him to provide you with the proper forms, correct?
**A. Correct.**
MR. CROWDER: Object to the form.
Q. But it was your position that you had sufficient protection -- or strike that. Was it your position that you had sufficient protection?
**A. It was my position, our position rather,**

Page 37

**that we were overprotected from the standpoint of amounts, and specifically the bank was protected in that our borrowing authority with them on this consignment agreement was $1 million. And therefore, if there was an assignment that existed for $1 million, even though the consignment agreement called for them as well as us to be listed for 1,250,000, that we know that that assignment that we had received would, in fact, cover the bank's position. So we felt that the bank was fully protected and that we were more than fully protected.**
Q. Okay. Let me turn you back to Exhibit 20, the document you executed -- well, let me ask you. This was -- let me just clarify. This was a document that you executed in an effort to confirm the assignment between Janko and TFG with American General?
MR. CROWDER: Object to the form.
**A. It was my understanding that we needed to notify the insurance company that the -- there was a transfer of the beneficial interest or at least our rights to the beneficial interest from JFG to Tuscola Furniture Group, and since we had a new**

consignment agreement under a new name and we did -- were not provided with the proper assignment at closing, that we wanted all parties effected to be notified.
Q. Okay. So you executed this document to notify American General of the assignment between Janko and Tuscola Furniture Group.
**A. Correct.**
Q. Okay.
**A. Or to -- actually to effectuate with them that assignment.**
Q. Them being American General?
**A. Yes, American General.**
Q. All right. To notify them of that agreement, that business --
**A. Well, I stop short of that because I don't know that we ever notified them that there was a separate agreement document.**
Q. Uh-huh.
**A. But in support of the document that we had signed, we felt that we needed to let the insurance company know that Janko Financial Group no longer possessed this beneficial interest and now Tuscola Furniture Group did.**

Q. The name had changed in other words.
**A. Right.**
MR. CROWDER: Object to the form.
Q. Okay. At some point, Amishland Country Village and the Stilwells started having financial difficulties; is that right?
**A. That's my understanding, yes.**
Q. When did you first become aware that they were starting to have financial problems?
**A. I don't know a date. I know a circumstance and that being that they started to become delinquent on their rental and they -- we started to see shortages in furniture inventory.**
MR. CROWDER: Object to the answer without foundation.
Q. Were you the point person so to speak? You were involved in the Stilwell -- the business dealings between Janko or TFG and Amishland Country Village; is that right?
**A. In the furniture business, I was involved, but I would not necessarily call myself the point person. I don't know that such a person existed because we had -- we hired a firm to do inventory.**
Q. Okay.

**A. And our office in Downers Grove handled the transactions for that business, and I wasn't aware of those individual transactions, didn't have anything to do with them, so I was the contact person with Jim Stilwell.**
Q. Okay. You just described that you became aware that they were having financial problems because they were unable to pay their rent; is that right?
**A. Well, I don't know which came first, the rent or the furniture.**
Q. Okay. All right. At some point, do you recall that Janko sued ACV and the Stilwells individually? Filed an action?
**A. I don't know that Janko did. I know that Amishland Development did.**
Q. I'm sorry, okay. And Janko was a member of the Amishland --
**A. Was the managing member.**
Q. Managing member?
**A. Yes.**
Q. Okay. Looking at Exhibit 8 that is in front of you that was marked at Mrs. Stilwell's deposition, this is a group of documents that was

produced in discovery to me, and directing your attention to Bates stamps 47 through 51 -- I'm sorry, 47 through looks like 74 is the complaint and at least two of the exhibits to the complaint.
Does this refresh your recollection on the fact that a lawsuit was filed?
MR. CROWDER: I'll object to the form.
**A. I am aware that a lawsuit was filed and this -- in reviewing this document, it appears to me that this is the document that I'm familiar with.**
Q. Okay. And so on or about -- on February 13th, 2003, Amishland Development filed suit against ACV and the Stilwells for delinquency in their rent.
**A. That's correct.**
Q. Okay. And you verified the allegations in this complaint, correct? Is that your signature on page 50?
**A. Yes, it is.**
Q. And 51?
**A. Yes, it is.**
Q. Okay. Now, the suit was brought against the Stilwells personally, and I see that in the caption. Do you know why that was? Was it -- did they have a guarantee, did they personally guarantee

the rent debt as well?
A. **Jim and Margaret were personally guaranteeing the lease.**
Q. Okay. All right. The body of the complaint sets out that the Stilwells owed approximately $380,000 in back rent, something like that. And so the claim was close to -- close to $400,000, is that right, do you recall?
A. **I -- I see in the document that it's stated as such.**
Q. All right. And you would have verified that amount; is that right?
A. **At the time, yes.**
Q. Okay. Do you know whether the Stilwells were represented by counsel in that action?
A. **Yes, they were.**
Q. Okay. And do you know who that was?
A. **I believe it was Mr. Crowder, Jason Crowder.**
Q. Do you have any knowledge of them being represented by a man named Mr. Broch?
A. **Well, let me -- let me restate. Mr. Broch represented them in some things, Rodney Smith represented them on other things, and Mr. Crowder**

**represented them on certain things, and it's very hard to distinguish which action was which attorney.**
Q. Okay. I hear you. You're looking at a page here of the exhibit in front of you. Does that refresh your recollection on which attorney --
A. **Yes.**
Q. -- represented them in the --
A. **It appears that it was Mr. Broch.**
Q. -- action? All right. You don't have any -- well, strike that. Had you dealt with Mr. Broch before on matters involving the Stilwells?
A. **Yes, I have.**
Q. Okay. When? Or what matters?
A. **Mr. Broch represented the Stilwells in our formation of Amishland Development, LLC; in the lease between Amishland Country Village and Amishland Development; in the lease between Amishland Country Smokehouse, which actually I think Atwood Meats was the tenant, to Tuscola Restaurant Group; and in the matter of the two various consignment agreements.**
Q. All right. The top document of the group exhibit that you're looking at tells me that this case was voluntarily dismissed. Do you see that?

Well, let me ask you this. Do you know why -- do you know -- this case was resolved eventually, correct?
A. **Yes.**
Q. Okay. And can you tell me how that resolution came about?
A. **I don't recall the details of the resolution.**
Q. You don't know whether it was resolved as a result of receiving payment from American General?
A. **I --**
MR. SENECA: Are you asking as he sits here today whether or not the documents reflect what happened?
MS. ROTHMAN: I'm asking what he --
A. **I don't remember.**
Q. Okay.
MR. CROWDER: Can we take a quick break?
MS. ROTHMAN: Yes.
(Recess at 1:42 p.m. to 1:49 p.m.)
BY MS. ROTHMAN:
Q. I'm not sure where I left off. I think I was asking you if you were aware of why it was that -- or strike that. I think I was asking you

why -- if you're aware of how this case was resolved.
A. **Because of the multiplicity of our relationship with Jim Stilwell, I don't specifically remember how this case was resolved.**
Q. Take a look at what was previously marked at Margaret Stilwell's deposition as 11. This is a letter from Howard and Howard to -- or from Timothy Howard to Richard Broch with a cc to Tuscola Furniture Group and First Mid Illinois Bank.
A. **Uh-huh.**
Q. Do you recall receiving this document? Do you have any independent recollection of that?
A. **I remember receiving it.**
Q. Why don't you go ahead and read it if you like.
A. **Yeah. No, I remember seeing it.**
Q. Okay. Look at the last paragraph. It says "finally we do not see the need to proceed with the replevin action that has been scheduled for trial this Friday because our client and the bank will be paid from insurance proceeds." Do you see that?
A. **Yes, I do.**

Page 46

Q. Does that refresh your recollection as to why the replevin action was voluntarily dismissed?

**A. Yes, it does.**

Q. Okay. And so is it your understanding that you voluntarily dismissed that action because you were being paid -- you anticipated payment of insurance proceeds?

**A. Correct.**

Q. Okay. And you understood Mr. Broch to be -- to be the Stilwell's counsel, correct?

**A. In this action, yes.**

Q. In this action. Mr. Stilwell passed away on or about May 2nd, 2003. Do you recall how you heard that he had passed?

**A. I think my partner, Dick Janko, notified me and he had received a call and I don't know if it was from Margaret or someone down in Amishland.**

Q. Okay. What -- did you take any steps to recover under the insurance policy after you learned that he had passed?

**A. On which of our business dealings?**

Q. On -- well, on any of your business dealings --

**A. Yes.**

Page 47

Q. -- how's that? Which business dealing are we talking about?

**A. We're talking about both the consignment agreement and the rental agreement between Amishland Development and Amishland Country Village.**

Q. Okay. And what steps did you take?

**A. I think I contacted John Lyons first and John said that he would provide us forms for filing a claim.**

Q. Okay. That was a telephone conversation you had?

**A. I believe so, yes.**

Q. All right. And was the -- what you said to him and what he said to you basically what you just told us, that you know you asked him to provide you claims, he said he would, that was the end of it or --

**A. Yes.**

Q. Okay. What happened next?

**A. I think we proceeded to gather documentation as to the amount of our claim and proceeded at some point to file the claim.**

Q. Okay.

(Bianchi Exhibits No. 2 through 8 were

Page 48

marked by the court reporter.)

MS. ROTHMAN: 3 was the cover sheet. I'm skipping 2 because 2 is actually the second page of 3. If you guys want to look at it, it's document 43, 44 and 45.

MR. CROWDER: From our production probably.

MS. ROTHMAN: Either production.

MR. SENECA: No, actually that was --

MS. BEYERS: Is that yours?

MR. SENECA: -- the response to subpoena I think to Jason previously, but anyway, we produced that document at some point.

MR. CROWDER: It's got a number on it.

MS. ROTHMAN: You'll probably find it in about three different spots.

BY MS. ROTHMAN:

Q. Mr. Bianchi, showing you what was marked Exhibit 3 for your deposition, and we're skipping Exhibit 2 because it's contained in Exhibit 3, is this -- you had described a conversation with John Lyons whereby you advised him that you needed a claim form and he had -- he sent you a claim form; is that right?

Page 49

**A. It -- I'm stating that I received a claim form from John Lyons.**

Q. Oh, I'm sorry. This is a fax transmittal to Tim Howard.

**A. Correct.**

Q. And Tim Howard was your attorney; is that right?

**A. Yes.**

Q. Okay. So you received a claim form from John Lyons and you -- and that's document 44, the second document of Exhibit 3, correct?

**A. That's not the form. That's the -- the letter that accompanied the form.**

Q. Okay. And then the next document is the form, correct?

**A. That's correct.**

Q. Okay. And then you -- when you received that document, did you discuss it with anybody?

**A. I don't recall offhand other than faxing it to Tim and probably also with my partners.**

Q. Okay. What did you do after receiving this document and faxing it to Tim and your partners?

**A. We gathered information and, based on Tim**

Page 50

**Howard's review of the statement, went ahead and filed the claim.**

Q. Okay. Looking at Exhibit -- let me see what exhibit -- 13.

MS. ROTHMAN: Is it over here? I'm looking for Stilwell 13.

MR. CROWDER: Yeah.

MR. SENECA: Yeah, 13 and 14 are right there.

MS. BEYERS: I mean this is a --

MS. ROTHMAN: I got it.

BY MS. ROTHMAN:

Q. Okay. Showing you what's been marked previously Stilwell Exhibit 13, do you recognize this document?

**A. Yes, I do.**

Q. Okay. Did you draft this document?

**A. Yes, I did.**

Q. Okay. Is this a document that you submitted in connection -- submitted to American General in connection with your claim under the policy?

**A. Yes, it is.**

Q. Okay. And if you flip -- you've got First

Page 51

Mid. Thomas Chamberlain signed the document as well?

**A. Yes.**

Q. Can you tell me how it came about that you were making a joint claim with the bank?

**A. It was our understanding that our consignment agreement required that.**

Q. Okay. Flipping to Exhibit A -- I think it's Exhibit A, it's Exhibit A that's referenced in the letter -- which is a document, a spreadsheet type document titled Tuscola Furniture Group, LLC.

**A. Correct.**

Q. Did you create this document?

**A. No, I did not.**

Q. Okay. Do you know who did create this document?

**A. The staff of Janko Financial Group.**

Q. Okay. Anybody verify the numbers on this document?

**A. I'm not sure I understand the question. What do you mean by verify?**

Q. Let me strike that. Do you have any reason to believe that the figures that are reflected here as due and owing are not accurate?

Page 52

MR. CROWDER: Object to the form.

**A. I -- I believe these to be accurate numbers --**

Q. Okay.

**A. -- except for one situation. If you would look under the area that says $101,780.32 unlocated inventory at cost, unknown sales price certainly higher, TFG entitled to a minimum of 10 percent fee, and you'll see a 10 percent figure there, that 101.780.32 was the wholesale amount. Under our agreement, we were due 10 percent of retail sales value, so that number may, in effect, be less than what it should have been.**

Q. Got it. Other than that exception, is -- do you have any reason to believe that the figures conveyed on this sheet are not accurate?

**A. No, I do not.**

Q. Okay. The second document, Tuscola Furniture Group, LLC, Stilwell Inventory Reconciliation, do you see that?

**A. Yes, I do.**

Q. Did you prepare that document?

**A. No, I did not.**

Q. Okay. Do you know who did?

Page 53

**A. Staff of Janko Financial Group.**

Q. All right. Do you have any reason to believe that the figures on that document are not accurate?

**A. No, I do not.**

MR. CROWDER: Show an objection to foundation.

Q. Okay. The last pages are the claim form and you executed that claim form on behalf of TFG, correct?

**A. That's correct.**

Q. And your intent in executing that claim form on behalf of TFG was to -- was to submit a claim to American General for American General to pay, correct?

**A. That's correct.**

Q. All right. And in connection with the claim that you submitted, you submitted the May 12th, 2003, correspondence, correct?

**A. Correct.**

Q. All right.

**A. That was the cover letter.**

Q. That was the cover letter to your claim form.

Page 54

A. **Correct.**
Q. Are the statements contained in your May 12th, 2003, correspondence true and correct?
A. **Yes.**
Q. Okay. Looking at --
A. **With one -- with one -- I think I corrected or made an addition to the information there with my May 28th, 2003, letter.**
Q. Okay. And that May 28th, 2003, letter is --
MS. BEYERS: Stilwell 14.
A. **Stilwell 14.**
Q. Stilwell 14, okay. How did you -- how did you come about knowing that you needed to amend the original letter?
A. **In reviewing my information, I saw that there was one assignment that I had not listed as one that we would release in exchange for the receipt of the proceeds, and I thought that rather than wait for somebody on the other side to point it out, that I wanted to -- you know, it came to my attention, so I wanted to point it out to the insurance company.**
Q. Okay. Looking at I think it was Stilwell

Page 55

Exhibit 4, Stilwell Exhibit 4 is a copy of a letter dated May 12th, 2003, to William Lyons from Thomas Chamberlain that was also executed by you, correct?
A. **Yes, it was.**
Q. Okay. And this is basically an identical letter to your May 12th letter, correct?
A. **I don't know if it's identical, but I believe it's extremely similar.**
Q. Okay. Did you discuss with anybody at the bank the drafting of this letter? I mean how did these two letters come -- come to be?
A. **I don't remember discussing the drafting of the letter. However, I may have shared my letter in draft form with the bank. But I don't have a recollection of discussing it.**
Q. Okay.
MS. BEYERS: And I think -- is that Stilwell Exhibit 4 or is that -- this one here, the one we're on, is that Bianchi 4?
MS. ROTHMAN: I'm sorry, Bianchi 4.
MS. BEYERS: Okay, I just wanted to make sure.
MS. ROTHMAN: Stilwell's 13, Bianchi's 4.
MS. BEYERS: 4, yeah. Okay, I'm sorry.

Page 56

MS. ROTHMAN: Two letters.
BY MS. ROTHMAN:
Q. All right. You signed off on the May 12th, 2003, correspondence, correct? I think you said you did.
A. **Yes.**
Q. And you don't have any reason to believe that the content of the bank's May 12th letter is not true and accurate, do you?
A. **Other than the same correction to the last paragraph on the page, it did not include the $250,000 assignment --**
Q. Okay.
A. **-- for release.**
Q. And after you submitted the May 12th letter, on or about May 28th, 2003, you amended your original letter with --
A. **I amended my letter. I didn't cite the bank's letter or amend it.**
Q. Right. And that -- that is Exhibit 5 that's in front of you? Do you have Exhibit 5?
A. **Yeah.**
Q. Bianchi 5?
A. **Yes, it is.**

Page 57

Q. Okay. Top page is a fax transmittal that you sent to John Lyons that basically says "attached is a letter as an amendment to my original letter dated May 12th, 2003. If there's any problem with this letter, please call me immediately. If I do not hear from you, I will overnight the letter to your office."
A. **Correct.**
Q. Do you see that? Did you have any discussions with John Lyons at this time or any time before sending this 5/28 fax concerning the need to amend here?
A. **I don't recall whether or not I would have called John to let him know, but I do know that upon becoming aware of the fact that there was one more assignment, that we needed to document that and specifically to state that we would release that in exchange for payment. So it would cover all assignments currently existing.**
Q. Did you have -- I might have asked you this and I apologize if I did. Did you have any conversations with John Lyons at any time concerning the number of outstanding assignments held by TFG?
A. **I don't know if my conversation was with**

**John. I know I talked with someone at the insurance company about the fact that we had multiple assignments that exceeded the amount of our consignment agreement.**

Q. Okay. Turn to page -- or turn to Exhibit Bianchi 6. This is a letter from American General dated June 10th, 2003, to you at Tuscola Furniture Group, and it basically says our records reflect that you've got an assignment in the amount of $250,000. Do you see that?

**A. Uh-huh.**

Q. And then if you flip the page, there's an almost identical form letter to you on behalf of Janko Financial Group and it basically says our records show that the assignment to financial -- to Janko Financial Group was released. Do you see that?

**A. Yes, I do.**

Q. Okay. Do you have a recollection of receiving these letters?

**A. Yes, I do.**

Q. Okay. What did you do after you received these letters?

**A. I believe I called and talked with someone**

**at American General to state that they should have a copy of the form in which we assigned JFG's rights to Tuscola Furniture Group.**

Q. Do you remember who you spoke to at American General?

**A. I believe it was Ray Sawicki.**

Q. Okay. In looking at Exhibit -- Bianchi Exhibit 7 is a letter dated June 11th, 2003, from you on behalf of Janko Financial Group to Mr. Sawicki?

**A. That's correct.**

Q. Do you see that? Was this a letter that you wrote in follow-up to the conversation that you had with him?

**A. Yes, it was.**

Q. Okay. Did you have just one conversation with him or did you have multiple conversations with him?

**A. I talked to several people at the insurance company. This is the only conversation I remember having with Mr. Sawicki.**

Q. Okay. Do you remember -- well, strike that. How many different people did you speak to at the insurance company?

**A. Perhaps as many as three.**

Q. Okay. Do you remember the sub -- substance of your conversation with each one of these people?

**A. No, I don't.**

Q. Okay. Would it have been all around the same time when you were trying to get this claim paid?

**A. Oh, that's the only time that I would have talked to someone at the insurance company is after Jim's death.**

Q. Okay. And it would have been in connection with the claim materials you submitted; is that right?

**A. It would have been in regard to the claim. I don't know if it was conversation before the claim was submitted or after.**

Q. Okay.

**A. But around that time.**

Q. All right. Well, is it fair to say that in -- I'm looking at the letters that we previously referenced, June 10th. That after receiving the claim, American General had some additional questions that they were posing and they had some

additional information they needed from you before they processed your claim.

MR. CROWDER: Object to the form.

**A. I don't know that they had additional questions. All I knew is that in the document they stated that they were unaware of the existing -- let's see. Let me review this.**

**All I know is by their letter that they're stating that we had released collateral assignments, and to my knowledge, that was not true.**

Q. Okay.

**A. And so therefore my contact was to clarify that point.**

Q. Okay. How did you get ahold of Mr. Sawicki?

**A. I believe that I probably talked to someone else who gave me his name and number and that -- and as I understand, my recollection, I may have talked to someone in Houston who directed me to Mr. Sawicki in Dallas.**

Q. Okay. And you had a conversation with Mr. Sawicki in which you explained the information that's laid out in your letter. Is that --

**A. That's correct.**

Q. -- a fair assumption? And then your June 11th, 2003, correspondence was basically in follow-up to your conversation with Mr. Sawicki?
**A. Yes, it was.**
Q. Basically laying out the information you had already provided him over the phone with respect to, you know, documentation for -- to support your claim; is that right?
**A. I can't state that we covered every one of these points in the phone conversation.**
Q. Okay.
**A. But I felt the need to give a complete explanation in writing so that, you know, he understood what had happened.**
Q. Okay. And was it your information in submitting this letter that American General be relying on the statements that you made in processing your claim?
MR. SENECA: Objection, calls for speculation.
**A. That I couldn't say.**
Q. Did you have any understanding as to why you were drafting this letter?
**A. I drafted this letter to document what had**

**happened.**
Q. Okay. Did you draft this letter and submit it in connection with the claim that you had made for the proceeds under the policy?
**A. I drafted this letter in response to a letter received from the insurance agency.**
Q. Okay. And the letter received from the insurance agency or the insurance company --
**A. Company.**
Q. -- I think it was is the one that said we don't have any record of your assignment?
**A. Correct.**
MR. CROWDER: Object to the form.
Q. Okay. And so you were in drafting this letter advising the insurance company of the fact that you did indeed have these assignments; is that right?
**A. I was notifying them of the chronology of the -- of our relationship with Amishland Country Village and some of the actions that had transpired over the term of our relationship with them.**
Q. Okay. Did you submit any documentation, any other documents that went with this letter or your letter?

**A. As it's stated in the first paragraph, I enclosed copies of the three letters dated May 12th, two letters dated May 12th, one from ourselves, one from Thomas Chamberlain, and then mine to Mr. Lyons.**
Q. Okay. The information that's contained in this June 11th, 2003, correspondence, is true and correct; is that right?
**A. Yes, it is.**
Q. Okay. After submitting this letter, did you have any other conversations with anybody at American General? I know you said that you had conversations with about three people.
**A. Not to my knowledge. That was the last conversation I believe I had, unless I had a conversation with Mr. Lyons, but he's not from that company.**
Q. Looking at -- Bianchi 8 is a June 25th, 2003, correspondence that was submitted to American General. What -- can you tell me why this document was submitted to American General?
**A. It was requested at some point by them so that they knew that I was formally authorized as the signatory for Janko Financial Group.**
Q. Okay. And at some point did you become

aware that they were going to pay the claim?
**A. Prior to receiving the funds?**
Q. The check, yeah.
**A. I'm not sure that I was informed of the amount. I was informed that a payment would be made, and I think the nature of any calls I had with Mr. Lyons would have been when can we expect payment.**
Q. Okay. All right. And at some point American General paid the claim; is that right?
**A. Correct.**
Q. All right. At the time of Mr. Stilwell's death, can you tell me approximately how much the Stilwells owed Janko and/or TFG?
**A. In various entities or --**
Q. Yes.
**A. -- this particular one?**
Q. Total.
MR. CROWDER: I'll object to the form.
**A. I couldn't give you exact amounts. I know that there was money owed as rental on the Amishland Country Smokehouse, there was money owed to Amishland Development, and there was money owed to Tuscola Furniture Group.**

Page 66

Q. Okay.
**A. And actually the money was owed to Tuscola Restaurant Group by Amishland -- Amishland Country Smokehouse.**
Q. Okay. You don't have any idea of what the approximate total amount was that they were into Janko to?
**A. Total amount --**
MR. CROWDER: Object to the form.
**A. And when you say Janko, these are distinct entities. Amishland Development was one-third owned by Janko. Tuscola Restaurant Group was owned, a percentage, by Janko.**
Q. Okay. I understand.
**A. But I don't know what the total would be.**
Q. Okay. Did TFG or Janko or Amishland Development file a claim against the estate of James Stilwell?
**A. I believe so, yes.**
Q. Okay. Do you know how much the claim was?
**A. Offhand, I don't.**
Q. Okay. Do you know how that claim was resolved or if it was resolved?
**A. I do know that one claim was filed by Amishland Development against Amishland Country Village on rental and that there was a judgment received in that case.**

Page 67

Q. Okay. How much was the judgment?
**A. I don't know a specific amount. I'm thinking something in the neighborhood of $700,000.**
Q. All right.
(Bianchi Exhibits No. 9 and 10 were marked by the court reporter.)
BY MS. ROTHMAN:
Q. Mr. Bianchi, showing you what's been previously -- what's been marked Exhibits 9 and 10 for your deposition. Exhibit 9 is a letter to Mr. Crowder who's sitting at the end of this table from Timothy Howard, your attorney, enclosing a fully executed agreement for the assignment of LLC membership interest.
**A. Uh-huh.**
Q. Was this in satisfaction of a claim that was made against the estate of James Stilwell? And you can take a minute to look at this.
**A. That's my understanding, yes.**
Q. Okay. And my understanding, and you can follow along with me on the recitals, is that there was a claim that was made by Amishland Development close to $800,000, 799,000 and change.

Page 68

**A. Correct.**
Q. And that the estate and the plaintiff decided to resolve that claim by an assignment, by Margaret Stilwell or by the estate assigning its interest in -- what is it, Amishland Development?
**A. Correct.**
Q. For a payment of $300,000; is that right?
**A. Correct.**
Q. Okay. So Amishland Development paid the estate $300,000 for the assignment of interest and -- their assignment of interest in Amishland Development, right? I think I just asked that twice.
**A. There was no payment that was made.**
Q. There was no payment that was made to the estate?
**A. No. Under the last whereas, the estate desires by this assignment --**
Q. Okay.
**A. -- to assign to the company all of Jim's membership rights and accept the same in satisfaction of the claim.**

Page 69

Q. And the payment?
**A. And the payment. So I don't know if you consider that a payment, but there was not -- no cash that was exchanged, no dollars were exchanged.**
Q. Okay. So it was just -- the last whereas paragraph, I was reading that paragraph to mean that the estate assigned the interest for the payment of $300,000. That's not right?
**A. No, that --**
Q. I'm misreading that?
**A. I think there was an assignment of the ownership interest as a trade-off for the judgment that had been received, because what I'm stating is there was no dollars.**
MR. CROWDER: I'm not sure what the relevance of all this was, but there was a $300,000 payment made.
MS. ROTHMAN: Okay. That's how I -- I wasn't quite sure.
MR. CROWDER: Just show an objection as to the relevance of this transaction with respect to this life insurance claim, but just to clear it up.
BY MS. ROTHMAN:
Q. I'll try to clear it up for you. Would it

Page 70

be fair to say, Mr. Bianchi, that the insurance payment that you received from American General reduced the amount that was owed to you by the Stilwells and their company?
MR. CROWDER: Object to the form.
**A. I --**
MR. CROWDER: No foundation.
**A. I really don't know how to answer that because I don't -- I'm, you know, reading this again after a long time and I really don't understand the details of this transaction. So I could not verify what you just said was true or not.**
Q. You can't verify for me whether the payment that was made by American General reduced the amount that was owed to you by the Stilwells and their company, ACV?
MR. CROWDER: Object to the form.
**A. The only thing I know about the fact that we had a payment is that we had life insurance as collateral on the loan, on the lease.**
Q. Okay. But were you owed a debt from the Stilwells and their company?
MR. SENECA: Just a point of clarification. When you're talking about this, are

Page 71

you talking about the payment of the 512, whether that reduced --
MS. ROTHMAN: Correct.
MR. SENECA: -- Stilwell's debt to --
MS. ROTHMAN: Yes, that what I'm --
MR. SENECA: -- various entities?
MR. CROWDER: That's a separate --
MS. ROTHMAN: That's what I meant.
**A. The payment of 512,000 --**
Q. I'm not --
MS. BEYERS: She's not talking about --
Q. I'm off of that.
**A. Oh, because there was another insurance payment. I was thinking of the other insurance payment. The $512,000 to my recollection had nothing to do with this action.**
Q. Okay. Got you. The $512,000 that was -- and change that was paid to you by the insurance, by American General, that's at issue here --
**A. Correct.**
Q. -- is it fair to say that that payment reduced the overall amount of debt that ACV and the Stilwells owed to --
**A. No, that's an incorrect statement. It did**

Page 72

**not reduce the overall amount. It only satisfied the amount owed under the consignment agreement. Had no relationship to the rest of the money owed.**
Q. Okay. It was -- it was -- it was -- but it did reduce the amount that they owed you under the consignment agreement.
**A. It satisfied the amount they owed us under the consignment agreement.**
Q. Okay. All right. So it reduced it to zero.
**A. That, yes.**
Q. Okay.
**A. But when you say the amount they owed us, they owed us more money than just what --**
MR. SENECA: That's what I wanted to clarify.
MS. ROTHMAN: I understand that. That's --
MR. SENECA: There's a bunch of different entities here who owed money.
MS. ROTHMAN: I understand that.
BY MS. ROTHMAN:
Q. So you mentioned another insurance payment. What -- what can you tell me about that?

Page 73

**A. That was a $1.5 million insurance payment to Amishland Development by the insurance company under terms of the lease agreement that called for a life policy, assignment of the beneficial interest.**
Q. Okay. Was that a payment that was made to a lender, do you know?
**A. Offhand, I don't know exactly how that flowed.**
Q. Okay. Margaret Stilwell filed for bankruptcy, personally filed for bankruptcy, correct?
**A. That's my understanding.**
Q. Your understanding. You -- you were the Janko company's -- Janko and TFG, did they assert a claim against Margaret Stilwell in her bankruptcy?
**A. I do not believe so.**
Q. Okay. And do you know why a claim was not asserted against Margaret Stilwell in her bankruptcy?
**A. Because we had been satisfied -- our claims had been satisfied, number one, through the payment of life insurance proceeds under the consignment agreement and, number two, through this agreement that was reached in our other transaction**

Page 74

between Amishland Development and Amishland Country Village. And I think we had previously reached an agreement on the restaurant rental prior to her filing bankruptcy.

MS. ROTHMAN: Okay, that's all I have.

MR. CROWDER: Julie, do you have any questions?

MS. BEYERS: I do have some. Do you want me to go first?

MR. CROWDER: I don't care.

MS. BEYERS: You go ahead.

EXAMINATION BY
MR. CROWDER:

Q. Larry, with respect to the bankruptcy question, do you know what, if any, payment you would have received from Margaret's bankruptcy had you filed a claim?

MR. SENECA: Objection, calls for speculation.

A. I have no knowledge of that.

Q. You haven't researched in any way whether or not you would have been paid any -- as an unsecured creditor, you would have been paid anything in Margaret's bankruptcy?

Page 75

A. I have not researched that.

Q. With respect to the consignment agreements, there were two of them; is that accurate?

A. That's correct.

Q. Okay. The first one Amishland Country Village entered into with Janko Financial Group; is that correct?

A. That's correct.

Q. Okay. When that deal was negotiated, was it Tim Howard that was representing Janko Financial Group in that transaction?

A. No, it was not.

Q. Who handled that?

A. Lawrence Baxter of Ottawa, Illinois.

Q. Okay. Do you recall -- do you recall attending the closing for that consignment agreement, if there was one?

A. Not for the first consignment agreement. I don't recall.

Q. Okay. At the time of the consignment agreement being signed, this is the one with Janko Financial Group, you were not provided any type of life insurance benefits from Jim Stilwell's life

Page 76

insurance; is that accurate?

A. I don't have the date of when we received the first assignment received from Jim of 500,000, but there was a provision that it would be provided. Whether or not it was provided at closing, I -- I think it was very close to closing if it wasn't at closing, but I don't have the date in front of me.

Q. Okay. You ultimately got an assignment of $500,000; is that correct?

A. First assignment received was in the amount of 500,000.

Q. And that was an assignment signed by Margaret to Janko Financial Group, correct?

A. I assume it was signed by Margaret. I don't have the document in front of me.

Q. Okay.

MR. SENECA: Want to pull it out?

MR. CROWDER: Sure, if you want. I just want to -- the document speaks for itself, but --

Q. And then later on I think you mentioned -- go ahead and take a look at that.

A. Yes, Margaret signed it.

Q. And what was that exhibit number?

A. Stilwell 3.

Page 77

Q. Okay. And then later on you received a $1.5 million assignment to Janko Financial Group, correct?

A. That's correct.

Q. And that was again signed by Margaret.

A. Is this the continuation of that document?

Q. Supposed to be.

A. There's a signature by Margaret Stilwell, yes.

MR. SENECA: On page 2 of --

A. Stilwell 4.

Q. Stilwell 4, okay. Then -- and the purpose of those two assignments that you received for the benefit of Janko Financial Group was basically to collateralize Janko Financial Group with respect to the consignment agreement transaction, correct?

A. Well, not only that -- the answer to that question is yes, but at the time that I was finally provided, we were under negotiations for revising the assignment -- the consignment agreement, and we stipulated that we would not revise the consignment agreement or assignment of the consignment agreement unless the Stilwells lived up to the original insurance requirement.

Page 78

Q. The -- when you say you stipulated, are you saying that you made -- you had a conversation with Jim with respect to this?
**A. That's correct.**
Q. And who had that conversation?
**A. Jim and I.**
Q. Okay. What was the purpose of forming Tuscola Furniture Group?
**A. Tuscola Furniture Group was formed because there had been other individuals involved in the activities involved with the first consignment agreement and we wanted to reflect those people's contributions and therefore ownership in a new entity.**
Q. Through some process, you ultimately ended up at a closing on the second consignment agreement; is that correct?
**A. That's correct.**
Q. Okay. And do you recall where that closing took place?
**A. No, I don't.**
Q. Did -- who represented Janko or I guess it would be Tuscola Furniture Group at this point? Who represented Tuscola Furniture Group for the purpose

Page 79

of this consignment agreement?
**A. For the -- for the documents or at the closing?**
Q. I guess if you had multiple counsel, let me know about that.
**A. Well, no, I don't believe counsel would have attended the signatures. I don't remember that as a fact. We -- we have oftentimes closed without counsel present at closing after counsel has reviewed documents and given approval. So I wouldn't have any specific knowledge as to who attended that specific closing other than the signatories, which is evidenced by their signature on documents.**
Q. Did you have a separate closing with Tom Chamberlain with respect to the loan documents?
**A. I can't recall if it was separate or not.**
Q. Do you recall whether Tom Chamberlain was there for the closing at all?
**A. No, I don't.**
Q. Don't -- make sure I understand. You don't remember if your attorney was at the closing, but it's not uncommon for them not to be, is that what you told me?

Page 80

**A. That's correct.**
Q. Don't remember if Tom Chamberlain was there; is that correct?
**A. For the closing of the consignment agreement? I do not remember him being there, no.**
Q. Okay. And do you remember whether the consignment agreement and the loan documents with the bank which were related to the consignment agreement were on the same -- took place at the same time or the same day?
**A. Could you restate that please?**
Q. Do you remember whether they were separate closings or whether they took place at the same time?
**A. I don't remember that.**
Q. Okay. Other than yourself and Jim Stilwell and Margaret Stilwell, were there anybody else there to your recollection?
**A. Unless they were signatory to the documents, I don't recall who was at the closing.**
Q. Okay. Now, you mentioned that John Lyons -- strike that. You mentioned that at the closing on the consignment agreement with Tuscola Furniture Group that once again there was no life insurance

Page 81

being procured by Jim for your protection. Was that accurate?
**A. There was supposed to be an assignment of beneficial interest provided at the closing and it was not.**
Q. Okay. Do you draw a distinction between what -- the phrase assignment of beneficial interest and the collateral assignments that we've discussed here today?
**A. I don't know what you refer to as collateral assignments.**
Q. Okay. So the documents that, for example, in Stilwell Exhibit No. -- yeah, that's -- Exhibit No. 6, if I call that a collateral assignment, is that what you're --
**A. I'm calling this an assignment of beneficial interest.**
Q. Okay. Did -- you received obviously a letter from John Lyons wherein he was providing you documentation for the Janko Financial Group release. Do you recall that?
**A. No. It wasn't for the Janko Financial Group release.**
Q. Okay. It was a document that was -- at

Page 82

the top said Janko Financial Group, then it said release of assignment. Do you recall that?
**A. I don't recall what the document said. I recall what I asked Jim to get me.**
Q. Okay. And you got something from John Lyons, correct?
**A. Correct.**
Q. Okay. And that document was -- said Janko Financial Group at the top, correct?
**A. I'd have to see the document.**
MR. SENECA: This (indicating)?
Q. Let's put it in front of you. Stilwell Exhibit No. 20.
**A. This is the document that I received from John Lyons.**
Q. Okay. And as you indicated, that you think it was prompted not by something that you said to John Lyons but something that Mr. Stilwell would have said to John Lyons.
**A. My recollection is that I told Mr. Stilwell that he had to provide us a document that we could sign that would evidence to the insurance company that the existing beneficial interests have been transferred from Janko Financial Group to**

Page 83

**Tuscola Furniture Group.**
Q. So you didn't -- what I'm asking you is you didn't make that call to John Lyons. You had that conversation with Jim Stilwell.
**A. That's correct.**
Q. Okay. John Lyons would not have known what you were asking for, would that be accurate?
**A. I have no idea if he knew or not.**
Q. Okay. Because you didn't talk to him.
**A. I did not talk to him.**
Q. Okay. The conversation that you just related to us was a conversation that you had only with Jim Stilwell?
**A. I don't know if it was just us only, no. I don't know who was in the room.**
Q. Okay. I think you indicated earlier you didn't know if it was either by phone or in person. Do you recall now that it was in person?
**A. No, no. It was at the closing, okay, so it had to be in person, and what I'm stating is that I had several conversations with Jim Stilwell, number one, the date of the closing, probably several more in the intervening days, because I had not received the document.**

Page 84

**We closed on the agreement on the -- what date was the closing? Agreement was on the 17th, and I don't remember receiving this form from John Lyons until the 21st, so I'm quite sure that I had numerous conversations with Jim Stilwell regarding this because we wanted to make sure that we had documented to the insurance company what had transpired because of the fact that Jim did not bring a new beneficial interest to the closing.**
Q. Okay. Other than the one -- other than the conversation that would have taken place in person at the closing, were the other conversation -- when you say numerous conversations, would those have been over the phone?
**A. Those would have been phone conversations.**
Q. Okay. Ultimately you got this form. Did you -- the form that's Exhibit No. 20, Stilwell Exhibit No. 20.
**A. Uh-huh.**
Q. Did you seek any legal consultation with respect to filling out this form?
**A. No, I did not.**
Q. Okay. Had you -- after Mr. Stilwell had not brought the collateral assignment to the

Page 85

closing, had you contacted legal counsel to figure out, hey, what do we need to do to protect our interest?
**A. No, I didn't, because of the fact that we were still covered by $2 million worth of beneficial interest.**
Q. And did you seek advice to determine whether or not you were actually covered by $2 million?
**A. No, I had evidence that we were through our assignment and assumption agreement.**
Q. But you didn't seek any legal advice to determine whether or not those assignments --
**A. No, my attorney told me we did, in fact, have coverage because of our assignment and assumption agreement.**
Q. And that would be who?
**A. Larry Baxter.**
Q. Okay. As I understand the transaction between -- that converted the original consignment agreement to this new consignment agreement, Amishland Country Village ceased owing Janko Financial Group any monies and became responsible to Tuscola Furniture Group under the consignment

Page 86

agreement of November 17. Is that accurate?
**A. I'm not sure how to answer because I don't know what Janko Financial Group's majority ownership in Tuscola Furniture Group, if that means that they owed Tuscola Furniture Group and Janko Financial Group or if they just owed Tuscola Furniture Group. So I don't believe I can answer that.**
Q. Okay. So you consider that to be kind of a legal -- legal thing that you're not -- that you don't know?
**A. It's a legal question that I don't know the answer to.**
Q. Okay. But from your understanding, Janko Financial Group was no longer involved in any transactions with Amishland Country Village as of November 17, 2000?
**A. No, they were still involved, but my understanding is that the new consignment agreement was between Amishland Country Village and Tuscola Furniture Group.**
Q. Okay.
**A. But there were other interactions between the two groups outside of the furniture business.**
Q. Right. What were those between Janko

Page 87

Financial Group and Amishland Country Village?
**A. Janko Financial Group was the managing member of the Amishland Development. Janko Financial Group was the majority owner of Tuscola Restaurant Group. Well, that transaction didn't have anything to do with Amishland Country Village, but Amishland Development did.**
Q. But I think what I'm trying to make sure is clear on the record, that as of November 17 -- is it 2000?
MS. ROTHMAN: Yes.
Q. -- 2000, there were no agreements, signed written agreements between Janko Financial Group and Amishland Country Village to your knowledge?
**A. Other than the assignment of beneficial interest, no.**
Q. Okay. When you say the assignment of beneficial interest, you're referencing back to the 5 million and the $1.5 million assignment.
**A. The 500,000 and the 1.5.**
Q. Yeah, the 500 and the 1.5. Did you -- do you recall having any conversations with Tom Chamberlain with respect to the -- what you're referring to as assignment of beneficial interest to

Page 88

First Mid?
**A. I don't have any specific recollection of discussing it with Tom, no.**
Q. Okay. You were made aware that Tom had received an assignment of 1 million from --
**A. That's correct.**
Q. -- the life insurance policy, correct?
**A. That's correct.**
Q. Okay. And you, in fact, received an assignment of 250,000 from the -- from -- signed by Margaret Stilwell on the life insurance policy, correct?
**A. To Tuscola Furniture Group, yes.**
Q. Okay. And that -- and that's the -- those documents were being filtered through you, correct? You were the person that was getting --
**A. I don't know if I'm the one that received them, but I certainly saw them.**
Q. Okay.
(Bianchi Exhibits No. 11 and 12 were marked by the court reporter.)
BY MR. CROWDER:
Q. Larry, do you have in front of you a document that's been marked as your Exhibit No. 11?

Page 89

**A. Yes.**
Q. Okay. And that's a letter to Tuscola Furniture Group from the Old Line Life Insurance Company?
**A. That's correct.**
Q. Okay. Dated December 4, 2000?
**A. That's correct.**
Q. Would this have -- would this be a document that you recall receiving?
**A. I don't recall receiving it, no.**
Q. With respect to documents that would come in that were addressed to Tuscola Furniture Group, would there have been a custom and practice to try to get those documents to you?
**A. Yes. Yes.**
Q. The address that's on there, Tuscola Furniture Group, would that be for -- for this letter to Tuscola Furniture Group, would that be an address where you would typically receive letters?
**A. Uh-huh, yes.**
Q. Okay. So while you -- make sure I understand. Did you say you recall receiving this or not?
**A. I don't see how anybody could say they**

Page 90

**recall receiving a document. Have I seen the document? Yes.**

Q. Okay. And you don't doubt that you received it close to December 4 of 2000?

**A. The date I would have no recollection of.**

Q. Okay. And that you understand that document memorializes the assignment that has been executed by Margaret Stilwell to Tuscola Furniture Group?

**A. Correct.**

Q. Okay. Now, I'll hand you what's been marked Exhibit Bianchi No. 12. And that's a document that's been -- that was sent to Janko Financial Group by -- by The Old Line; is that correct?

**A. Yes, it is.**

Q. Okay. And the address that that was sent to, is that the address of Janko Financial Group?

**A. There's two offices. That is the address in Peru.**

Q. Okay. And would you have any recollection of receiving this document?

**A. No, I would not.**

Q. Okay. And did you ever -- had you ever

Page 91

reviewed this document before I just showed it to you today?

**A. Only because it was a part of documents that had been included in filings.**

Q. Okay. Since the case has been --

**A. Correct.**

Q. Since this case has been pending?

**A. That's correct.**

Q. Okay. Is it your testimony that you do not recall having received this document shortly or within --

**A. I do not recall having received this document.**

Q. Okay. Is it within the records of your company or what was your company, Janko Financial Group or Tuscola Furniture Group, to your recollection?

**A. It's possible, but I may not -- the one problem with this is that it was addressed to Janko Financial Group. I would not normally be the one to receive as a first person anything directed at Janko Financial Group.**

Q. Would that be Dick Janko or Mike Janko that would be the person that would get this type of

Page 92

information?

**A. At that address, it would have gone to Dick and the practice was to send it to Mike. So I -- I may not have been in the loop on this particular document.**

Q. Okay. Were Dick and Mike involved in the consignment agreement with Tuscola Furniture Group and ACV?

**A. Could you explain involved?**

Q. Well, did they -- did you keep them advised? Did you guys discuss how things were going?

**A. I don't think I gave them any type of update. I was the one who was in charge of trying to get Jim to comply with the agreement. I don't believe I would give them updates because it, you know, could have been an everyday occurrence.**

Q. Well, the other thing I was interested in was would they have been involved in any of the closings for the consignment agreement with -- between TFG and --

**A. If they were signatories.**

Q. Okay. But you just don't remember?

**A. No.**

Page 93

Q. Okay. So I take it, having not known if you saw this document, that you don't know if you took any action after having -- with respect to receiving this document.

**A. I -- I don't remember receiving the document. I don't remember taking any action.**

Q. Okay. At any point in time, and this is jumping forward to the claim made by -- the joint claim made by Tuscola Furniture Group and First Mid, at any point in time did you advise American General of the amount that First Mid was owed?

**A. Unless it was part of our filing for the claim, I don't know that we would have. I assume that First Mid may have included that information, but -- and it may be on that sheet that -- which is attached to the claim. There certainly was a breakdown.**

Q. Well, take a look at Exhibit A to your letter to Mr. Lyons of May 12 of 2003.

**A. Okay. Do you have an exhibit number?**

Q. That would be --

MR. SENECA: You said May 28, '03?

MR. CROWDER: May 12 I think.

MR. SENECA: Okay.

Page 94

A. All right.
Q. Did you find it?
A. Yes.
Q. What was the exhibit number on that?
A. Stilwell 13.
Q. Okay. In that Exhibit A, is there a breakdown as to what First Mid is owed and what Tuscola Furniture Group is owed?
A. What's Exhibit A now? Is that -- is this Exhibit A (indicating)?
Q. I thought it was marked as something, I'm sorry.
MS. ROTHMAN: It references Exhibit A in the letter.
MR. CROWDER: In the letter?
MS. ROTHMAN: Uh-huh.
MR. CROWDER: Okay.
Q. I'm sorry, I think that that's considered Exhibit A based on the contents of the letter.
A. I don't see any mention of First Mid Illinois in that recap.
Q. Okay. With respect to -- how about the body of the letter of May 12? Do you break it down in the body of the letter?

Page 95

A. Is there a breakdown of what's owed?
Q. First Mid.
A. No, there is not.
Q. There was one correspondence where you passed on the claim form and the instructions from John Lyons to Tim Howard. Did you in any way rely on counsel when you were preparing this claim?
A. I didn't actually prepare the claim. I may have signed it, but I don't know that I'm the one that would have filled out the form. I'd have to see the form again. I could tell you if I filled it out. I know I signed it.
Q. Okay.
A. Do we have the form?
MS. ROTHMAN: The last page in the document you're looking at. 13.
A. I'm sorry. Well, parts of this I filled out and parts I didn't. For instance, I didn't put in the name. I did write James Stilwell, the date, the heart attack, date of death, policy number, amount of insurance. I did not fill out the -- the other information, but I did sign it.
Q. Do you know who filled out the information that you didn't?

Page 96

A. No.
Q. With respect to the letter and the -- this draft that's dated May 12, 2003, did you seek any advice of counsel in drafting that letter?
A. Not to my recollection.
Q. Okay. I'm trying to figure out why you faxed the claim form to Tim Howard, and I was wondering if they were involved in it at all or if it was simply --
A. I think it was more of a notification, but I don't have a recollection of what happened after I faxed it to them.
Q. Were you in any way involved in the other claim made against proceeds of the life insurance by Amishland Development?
A. Under the agreement with -- for the rental or as collateral to the lease?
Q. Well, let me strike it. You understand that there was life insurance monies paid out of this $4 million policy that somehow benefitted Amishland Development; is that accurate?
A. Correct.
Q. Okay. Were you involved in that claim at all to your recollection?

Page 97

A. I'd have to see the document. I don't know who else would have filled it out, but I can't say that I did. If I -- there should be a claim form available and a signature.
Q. Okay. But you -- what I'm saying, you don't have a recollection of doing it.
A. Not as we sit here, no.
Q. After receiving the correspondence of June 10, 2003, from American General, you took some action obviously in response to the letter, correct?
A. Correct.
Q. Okay. Obviously it was of concern for you to see a letter saying that Tuscola Furniture Group only had a $250,000 assignment, correct?
A. That's correct.
Q. And it was a concern for you to see a letter from American General that said that Janko Financial Group's assignments had been released, correct?
A. It was a great concern.
Q. Okay. And so you took some action by calling American General, correct?
A. That's correct.
Q. Okay. And you ultimately got into a phone

conversation with a Ray Sawicki, correct?
**A. That's correct.**
Q. Okay. During that phone conversation, can you -- can you tell me, you know, were you explaining why you thought you still -- you had more than $250,000 in assignments for Tuscola Furniture Group during that conversation?
**A. I went through the chronology of the events that showed that we had beneficial interest in the amount of $3,250,000 or not -- no, that's not the we. That we and First Mid Illinois together had.**
Q. Okay. Did Ray Sawicki at any point in time indicate to you that, okay, they made a mistake, you do have additional assignments that we're not giving you credit for?
**A. He indicated to me that if I could put into letter form the information that we had discussed, that they would review it in terms of the final approval of the claim.**
Q. And after putting your letter together, which was dated June 11 --
**A. 11.**
Q. -- 2003, sending that in, did you ever

hear any -- anything further from them with respect to whether they agreed with your position?
**A. Did I hear from them? The only thing that I can recollect is that they approved the fact that we had beneficial interest in the amount of $2,250,000 to Tuscola Furniture Group and $1 million to First Mid Illinois and that payment was to be made.**
Q. Okay. That's --
**A. But that may have come from John Lyons not from -- I didn't talk to Ray Sawicki again.**
Q. Okay. That's what I want to get at. You mentioned that they approved that Tuscola Furniture Group had $2.25 million worth of assignments. Are you saying that American General through somebody told you that?
**A. I can't say that they told me that. All I know is that that's what happened.**
Q. That's what your position was.
**A. No, that's what happened.**
Q. Well, tell me why you think that's what happened.
**A. Well, they wouldn't have paid the claim otherwise.**

Q. Okay. So it's based on the fact that they paid the claim that makes you believe that they --
**A. If they didn't agree with my position, they wouldn't have paid that amount of claim.**
Q. That's your position, is that correct, that if they didn't agree that you had 2.25 million in assignments, they wouldn't have paid your 512,000 claim?
MS. BEYERS: I think he's been asked and answered that question several times now.
**A. I stand by my answer.**
Q. Well, I need an answer to the question.
**A. Restate the question.**
Q. Okay.
MR. CROWDER: Just read that last question back.
(Requested portion of the deposition was read by the court reporter.)
MR. SENECA: Objection, calls for speculation. Go ahead and answer.
**A. I can't say what amount they recognized as us having a claim. For instance, they could have recognized the $1.5 million beneficial interest and not the 500,000 or vice versa. I don't know which**

**combination of beneficial interest that they took into account. All I know is that I talked to Mr. Sawicki, I explained what had transpired, he said could you put that in a chronology, I said yes, I submitted that and we were paid.**
Q. Okay. The -- make sure I understand the 512,000 number. That number included that amount that TFG owed First Mid; is that accurate?
**A. Correct.**
Q. Okay. So I think documents reflect that First Mid was owed by TFG approximately 81,000 and some change. Do you have any reason to dispute that number?
MS. BEYERS: I'm sorry, I didn't hear the whole question. I'm sorry, Jason. I apologize because I didn't --
MR. CROWDER: I said I think the documents reflect that TFG owed First Mid approximately 81,000.
**A. At the time of Jim Stilwell's death.**
Q. Right.
**A. I believe that to be true.**
Q. Okay. You mentioned that the joint claim -- it was done jointly with First Mid because

Page 102

I think you said you thought you had to do it that way.
**A. An assignment agreement showed that we were to have a joint beneficial interest, and in terms of filing our claim based on the consignment agreement, that it was our understanding that it had to be joint.**
Q. Who gave you that understanding?
**A. That's my reading of the document.**
Q. Okay. So you're the one that --
**A. I don't know.**
Q. -- had that?
**A. I said that's my interpretation. I don't know about anybody else's interpretation.**
Q. And that's what I'm asking. Is that your interpretation or did you get that information from somebody else? Did somebody else tell you, hey, we need to do it this way?
**A. I really can't answer that because I don't know if I talked to counsel about it or not, but I know that for my reading of the document, that's at least how I individually felt.**
Q. Okay. And you knew at that time after Jim Stilwell's death that there was no joint assignment

Page 103

to First Mid and Tuscola Furniture Group; is that accurate?
**A. I was aware of that, yes.**
Q. Okay. In any of the conversations that you had with American General, did they ask -- did they ever ask you why are you guys filing this jointly versus separate claims from First Mid and Tuscola Furniture Group?
**A. I -- not only don't I remember them asking why we did it that way, I'm not sure and can't recall whether they instructed us to or not.**
Q. You just don't know --
**A. I just don't know.**
Q. -- one way or the other? Okay. The letter that you got from John Lyons on May 6 of 2003 suggested you file it separately, correct?
**A. I'd have to see that.**
Q. Okay. Pull that letter.
MR. SENECA: Second page of Bianchi 3.
Q. You're looking at the second page of Bianchi 3; is that correct? Is that a --
MR. SENECA: Want to read back the question or do you want --
Q. I'll wait for him.

Page 104

**A. There's nothing in this letter that states that it should not be filed as a joint claim.**
Q. Let's --
**A. It doesn't reference it.**
Q. Let's identify what you're looking at. You're looking at Bianchi Exhibit No. 3, the second page, correct?
**A. Bianchi 3, second page, yes.**
Q. Okay. And that's a letter from John Lyons to Tuscola Furniture Group, correct?
**A. Correct.**
Q. And attached to that was the assignment form, correct?
**A. No, it's the proof of death claim.**
Q. Yeah, the claim form, the claim form, correct?
**A. Correct.**
Q. And it was -- it's listed as Tuscola Furniture Group, correct, on the letterhead and in the claim form?
**A. On the letterhead, yes. On the claim form, there is no name.**
Q. Okay. And then did John Lyons explain what you needed to do to submit the claim?

Page 105

**A. He states that he enclosed the claim statement, says that American General shows your bank as having an assignment on the policy, please fill in your information on the claim statement. I also need the amount you are owed on your company letterhead and signed by the loan officer at the bank. Okay? Once I've received the letter stating the amount owed and signed by the loan officer and the completed claimant's statement form, I will send it to my company.**
**It does not reference at all whether or not the claim should be filed jointly or separately. It doesn't reference that.**
Q. Okay. And -- but that is a letter that's directed to Tuscola Furniture Group and your attention?
**A. No, not to my attention. It says chief loan officer which there is no such title.**
Q. Okay. So it's just directed to Tuscola Furniture Group, chief loan officer?
**A. Chief loan officer, Tuscola Furniture Group, yes.**
Q. Okay. And do you know whether or not First Mid received a similar document to this?

Page 106

A. It does not show as a copy here, so I don't have knowledge that they did or they didn't.
Q. Okay. Just a second. I think I'm wrapping up. Just a couple points I had to follow-up on.
Your comment -- your May 12 letter you indicated was -- you forgot to mention an assignment, correct? Your May 12, 2003, letter.
A. Forgot to mention one of the assignments in terms of that we would release these assignments -- specifically upon receipt of this amount, Tuscola Furniture Group and the bank will relinquish all assignments against the proceeds on the life insurance policy number. Specifically these are, and I list three of them, but I forgot to list the additional one, and that's why I sent the May 28th letter. This was only in reference to the fact that upon payment that we would release these three and then, with my amendment, four assignments.
Q. Right. Do you recall if somebody brought it to your attention that they had not put in that 250,000 assignment?
A. Nobody brought it to my attention. I noticed it.

Page 107

Q. Let's see if I understand it. Let me see if I can get a feel for your understanding of how these collateral assignments work. If you have a $250,000 collateral assignment from Jim Stilwell's life insurance policy and you're only owed 125,000 by Jim Stilwell, what's your understanding of how much you're entitled to make a claim for?
MR. SENECA: Objection to the form. Calls for a legal conclusion. Go ahead and answer.
MR. CROWDER: I'm simply trying to get his understanding.
A. My understanding is we can file a claim for the monies owed to us.
Q. And so if I said -- in my scenario I said you're owed 125,000. Then are you indicating that you would be able to make a claim for 125,000?
A. Correct.
Q. Okay. Could we take a look at Exhibit No. 11?
MR. SENECA: Which one, Stilwell or Bianchi?
MR. CROWDER: I think Stilwell.
MR. SENECA: This one (indicating)?
MR. CROWDER: Yeah, that's it.

Page 108

BY MR. CROWDER:
Q. I'll show this to you after I -- I read the statement, but I'm reading from Exhibit Stilwell No. 11 and it's a part of a sentence from the letter from Tim Howard to Richard Broch and it says, "$1 million of coverage was collaterally assigned to Tuscola Furniture Group, LLC, and its bank, First Mid Illinois Bank and Trust, by an assignment dated January 11, 2001." Do you see that statement?
A. Yes, I do.
Q. Okay. And do you agree that that's an inaccurate statement?
A. I don't know that I'm able to make a judgment on whether it's accurate or not.
Q. Why is that? Want me to show you the January 11, 2001, assignment?
A. Yes, please. Right.
Q. Okay. You want -- I've got it, but I don't have it marked as an exhibit. You want to find it?
MR. SENECA: Let me grab it. That's the one you're talking about, right (indicating)?
Q. Show you Stilwell Exhibit No. 7 which is the January 11, 2001, assignment.

Page 109

A. It would seem that in reviewing Stilwell No. 7, that this statement covers both Tuscola Furniture Group and First Mid Illinois Bank and that this document only references First Mid Illinois Bank.
Q. Okay. So you would agree with me that that statement is inaccurate from the standpoint that it tries to include TFG on the -- on the $1 million assignment?
A. I don't know whether the statement is accurate or not. All I can tell you is that in Stilwell document 7 it says First Mid Illinois Bank $1 million.
Q. Why can't you tell me whether that statement's accurate? In that statement it says that TFG and First Mid have a -- have been collaterally assigned $1 million pursuant to an assignment dated January 11, 2001.
A. I'm not lawyer enough to know if this assignment means more than what this document says.
Q. Okay. If it means -- if your name's not on it and that means that you're not a beneficiary of the collateral assignment, then you would agree that that's an inaccurate statement.

Page 110

A. No.
MR. SENECA: I'll object. The document speaks for itself.
**A. No, I wouldn't, because in terms of referencing the reason why this document was generated, it was generated because of a consignment agreement that called for a joint collateral assignment. So what I'm stating is I don't know the law well enough to know that if you provided a collateral -- a beneficial interest to one or the other, if that excludes the other.**
Q. Okay.
**A. I don't know that it does that. I don't know yes or no.**
Q. Okay. You also don't know with respect to Exhibit No. 7 how that document or -- how that document got generated? In other words, you were copied on it, but you don't know how it --
**A. I know how it got generated because I would hound Jim almost on a daily basis to provide us with a further beneficial interest. This form was generated because of my pressure on Jim Stilwell to live up to the consignment agreement. Unfortunately, the form that this takes isn't the**

Page 111

**exact form that's called for in the consignment agreement.**
Q. Okay. When you -- when you communicated with American General after the -- after Jim Stilwell's death and provided them documentation, did you provide them a copy of the assignment and assumption agreement that you made reference to?
**A. I don't have knowledge of that.**
Q. Your letter of June 11, 2003, does not suggest you provided them an assignment/assumption agreement.
**A. I don't -- don't believe that I would have at that time, but I don't know whether or not I did at some previous time or at some time after that. I am sure they have it now.**
Q. When you say you're sure you have it now --
**A. Part of the filings in the case.**
Q. Okay. But at the time that they -- at the time that they processed the life insurance claim, do you know whether or not you had provided it to them?
**A. I -- I don't know.**
Q. And then the same thing with the actual

Page 112

consignment agreement between TFG and ACV. Do you know whether or not you had provided that to --
**A. I don't know.**
Q. -- American General?
**A. I don't know.**
Q. If their records reflect that they don't have it, would you believe that it's because you hadn't given it to them?
**A. No, I believe it's because they don't have it.**
Q. Okay. Do you know whether or not you had again provided that to them at any time?
**A. I don't. I don't know.**
Q. Okay. So you can't testify one way or the other as to whether or not you gave it to them?
**A. No.**
Q. Is that a correct statement?
**A. That's a correct statement.**
MR. CROWDER: I think that's all I've got.
MS. BEYERS: I've got just a very few questions.

EXAMINATION BY
MS. BEYERS:

Q. Mr. Bianchi, I'd like you to look at your

Page 113

May 12, 2000, letter -- 2003 letter, I apologize. I think it's your Exhibit No. 13.
**A. Correct. Well, Stilwell 13.**
Q. Stilwell 13. And Mr. Crowder was asking you about that previously. In paragraph two of that letter, you have here that the amount owed by Amishland Country Village and guaranteed by James and Margaret Stilwell is $512,974.50. That amount includes the amount that TFG owes the bank; is that correct?
**A. Correct.**
Q. And that's a true and correct statement?
**A. That's correct.**
Q. And he referenced exhibit or the amounts -- the exhibit attached to the letter that says Tuscola Furniture Group, LLC, amounts due from Stilwells/ACV as of April 30th of 2003. Do you see that attached to the letter?
**A. Yes, I do.**
Q. And he pointed out to you that the amounts due to First Mid aren't specifically set forth on that document.
**A. Are not specifically set forth?**
Q. Right. Are they on there? Well, strike

Page 114

that. At the time that this letter was submitted, First Mid was owed approximately $81,000; is that correct?
A. That's my understanding.
Q. And that amount was, in fact, included in this $512,974.50 figure; is that correct?
A. Let me caution you on one thing.
Q. Yeah, of course.
A. The amount of money that was owed to the bank had no bearing on the creation of this document. This document shows what's owed to Tuscola Furniture Group. The idea that we had a line of credit with the bank was a separate and distinct business transaction. So what we owed First Mid Illinois Bank at the time, which was tied to this business, okay, had we been -- you know, the amount of money here would act in satisfaction of the debts owed to Tuscola Furniture Group. Then it would be up to Tuscola Furniture Group to satisfy the debt with the bank.
Q. Okay. All right. But First Mid was owed pursuant to the consignment agreement at this time approximately $81,000?
A. Pursuant to our loan documents not

Page 115

necessary -- they were not a signatory to the consignment.
Q. Okay. But pursuant to your loan documents, they were owed approximately $81,000 at the time that this letter was signed by you?
A. $81,000 on transactions that had involved our financial relationship with Amishland Country Village, yes.
Q. Okay. And that's why it's represented here in paragraph two that that was part of the $512,974.50; is that correct?
A. State that again.
Q. I'm sorry, and that's why here in paragraph two you stated that the amounts TFG owes the bank are included in the 512.974.50?
A. It's there to state that that payment would satisfy all the debts owed to us and therefore we could satisfy the bank.
Q. Okay.
A. And the distinction I want to make is that there was no money owed by Amishland Country Village to the bank. It was owed to us.
Q. And then in turn, you were to pay that to the bank.

Page 116

A. Correct.
Q. And what was contemplated under the consignment agreement was that there would be these beneficial interests or these assignments of the beneficial interest in life insurance policies to secure that amount that was owed to the bank.
A. I'm going to amend your statement. We had looked for one assignment. There were not to be multiple assignments. The one assignment was to be to Tuscola Furniture Group and First Mid Illinois Bank or actually the consignment agreement says the bank --
Q. Sure.
A. -- which happened to be First Mid Illinois Bank.
Q. First Mid.
A. Had -- had that assignment been properly presented, we wouldn't be here today.
Q. But First Mid did have an assignment for $1 million; is that correct?
A. I've seen the document that states that.
Q. Okay. And they were paid what they were owed by TFG out of the proceeds from the life insurance policies; is that correct?

Page 117

A. I don't know exactly what the flow of funds were, but my understanding is that TFG was paid and then the bank was paid by TFG.
Q. Okay. And they were paid what they were owed, correct, by TFG?
A. As far as I know, yes.
Q. Okay.
A. You know what? In retrospect, I believe that the check -- I don't know if the check was a two-party check. Transactionally what I believe happened was that the bank received the check and either deposited it in our account and then made payment or took the money out and made payment and then put the balance in our checking account, but the net result was the same.
Q. Correct. I mean the bank --
A. The bank was paid.
Q. And you got the remainder --
A. Right.
Q. -- is that correct?
A. That's correct.
Q. Okay. Now, Mr. Bianchi, you were saying that you received some correspondence after you submitted your May 12th, 2003, letter from American

Page 118

General asking you about this release of assignment; is that correct?

A. **You're referring to the June 10th letter?**

Q. Correct. And why don't you go ahead and refer to it. It's Bianchi Exhibit No. 6.

A. **Okay.**

THE WITNESS: Do you have that one?

MR. SENECA: I'm sure I do somewhere here. It's Bianchi 6?

MS. BEYERS: Uh-huh.

MR. SENECA: Is that what we're looking for? 6.

A. **Yes.**

Q. And the letter wherein the assignment or the release of the assignment in favor of the TFG was questioned was directed solely to Janko Financial Group; is that correct?

A. **You're referring to the June 10th letter, Exhibit 6?**

Q. Yes.

A. **It's addressed to Tuscola Furniture Group and myself.**

Q. Okay. That was not directed to First Mid; is that correct?

Page 119

A. **The attention on the letter is to Janko Financial Group and myself.**

Q. Okay. To Janko Financial Group and yourself; is that correct?

A. **That's correct.**

Q. And on behalf of Janko Financial Group, then you responded to that particular letter; is that correct?

A. **That's what prompted me to call American General again and that's how I got in touch with Mr. Sawicki.**

Q. And then after you spoke with Mr. Sawicki, then you drafted Bianchi Exhibit No. 7 --

A. **That's correct.**

Q. -- is that correct?

A. **That's correct.**

Q. And you are the sole author of this exhibit which is Bianchi Exhibit No. 7 --

A. **That's correct.**

Q. -- is that correct?

A. **Yes.**

Q. First Mid Illinois Bank and Trust did not draft that letter with you; is that correct?

A. **That's correct.**

Page 120

Q. And you provided them with a copy of that for the first time at the same time that you would have sent it to Mr. Sawicki; is that correct?

A. **That's correct.**

Q. And let's then go to your May 28th, 2003, letter to Mr. Lyons which I think it's Stilwell Exhibit 14.

A. **14, yes.**

Q. And just so we're clear, it's not that -- you wrote this letter not because the information contained in your May 12th, 2003, letter was incorrect. It's just that you left out one assignment --

A. **Right.**

Q. -- is that correct?

A. **I wanted to amend that letter to include, and therefore that's why I wrote it as I did, which was to rewrite that paragraph -- actually to make an addition to that paragraph, took out an and, put in a comma, and then put in the additional assignment of beneficial interest that I had inadvertently left out of the May 12th letter.**

Q. So it was really sent to make an addition to your prior letter.

Page 121

A. **It was an addition to. Yeah, I amended it with an addition.**

Q. With an addition. I just wanted to clarify it and make sure that that was clear.

MS. BEYERS: I don't have any other questions.

MR. SENECA: I've got a couple. Do you want me to go first or do you?

MS. ROTHMAN: I've got two.

REEXAMINATION BY

MS. ROTHMAN:

Q. Mr. Bianchi, Mr. Crowder had asked you a series of questions about whether you recalled providing American General with the consignment agreement document. Do you recall that?

A. **Yes.**

Q. And regardless of whether you provided them with the consignment agreement document, you did in fact discuss with them the existence of the consignment agreement; is that right?

A. **I don't specifically recall discussing it with them.**

MR. SENECA: Can I get clarification? Are you talking about on the phone or in the letters he

Page 122

sent?
Q. Well, discussing on the phone first of all. You don't recall discussing --
**A. Specifically recall that, no.**
Q. Okay. If you look at Bianchi 7, which is the letter that you sent in follow-up to Ray Sawicki.
**A. Uh-huh.**
Q. Take a chance to look at that document.
**A. Right. Right.**
Q. You agree with me that you reference the consignment agreement and the way the consignment agreements relates to the assignment of life insurance --
**A. Yes, I do.**
Q. -- in that document on the first page and also on the second page of that document?
**A. Yes.**
Q. Okay. So is it fair to say that you advised American General of the existence of that consignment agreement and specifically of the existence of the Section 3.9 of that agreement which required the Stilwells to -- to provide assignment of life insurance to TFG and the bank?

Page 123

**A. That's correct.**
Q. Okay.
MS. ROTHMAN: Thank you.
MR. SENECA: I have a couple of questions. You guys have any follow-up?
MS. BEYERS: No.
MR. SENECA: I'll give you an opportunity after I'm done too, so --
EXAMINATION BY
MR. SENECA:
Q. Mr. Bianchi, I'm going to show you what's been marked Stilwell Exhibit 20. Do you recognize that document?
**A. Yes, I do.**
Q. Did -- who came up or what prompted that document?
**A. I told Jim Stilwell that we required that he provide us with a form so that we could substantiate to the insurance company the action we had taken and our assignment and assumption agreement that was signed I believe on the 16th of -- the day before our closing which was the 17th of the month in question which I don't remember offhand. Was it November?**

Page 124

MS. ROTHMAN: Yes.
**A. Okay, November. Because of the fact that he came to closing without a new assignment of beneficial interest, I told him that we required that he provide us with a document so that we could evidence to the insurance company what we had done in the assumption/assignment agreement. Basically we wanted them to know that we were transferring our beneficial interest of $2 million from Janko Financial Group to Tuscola Furniture Group which the document provides for.**
Q. Did you have any input on the form, that transaction -- on this form prior to you receiving it?
**A. The only thing I had to do with this form was the signature and the notation after the signature.**
Q. Did you fill out any of the Sections 1, 2 or 3?
**A. No, I did not.**
Q. Earlier you mentioned that it came with a cover letter.
MR. SENECA: I'm going to have you mark this.

Page 125

(Bianchi Exhibit No. 13 was marked by the court reporter.)
BY MR. SENECA:
Q. I've handed you what's been marked as Bianchi No. 13. Can you take a look at that?
**A. Yes.**
Q. Do you recognize that?
**A. Yes, I do.**
Q. Is that what you were referring to when you talked about the cover letter to the assignment we just referenced as Stilwell No. 20?
**A. Yes, it is.**
Q. And who sent you that letter?
**A. John Lyons.**
Q. Okay. And what was your understanding -- strike that. I don't have any questions on this. Let me go through my list real quick.
Earlier you mentioned you weren't aware of exactly who was at closings, but if they signed the documents, they were at closing. Do you mean that if they signed the documents, they were present at closing or what do you mean by that?
**A. Can I see the second assignment document?**
Q. And you're referring to the November 17th,

Page 126

2000?

**A. Uh-huh. Well, as I see it, there's only three people that signed at that closing, those being Dick Janko, Jim Stilwell and Margaret Stilwell.**

Q. Other than that, you -- you know they were at the closing, but you're not sure who else was at the closing.

**A. Correct. The reason...**

MR. SENECA: I have nothing else.

MR. CROWDER: I've just got one follow-up.

REEXAMINATION BY

MR. CROWDER:

Q. On Stilwell Exhibit No. 20, what you indicated is that you signed your name, correct?

**A. Correct.**

Q. And then you wrote in authorized member.

**A. Correct.**

Q. And then you wrote in favor of Tuscola Furniture Group, LLC.

**A. That's correct.**

Q. Okay. And when you received that document, the only thing that had -- was filled in was items 1 and 3, correct?

Page 127

**A. That's correct.**

Q. Okay. And the cover letter that was -- that Mike just marked as Exhibit No. 13 is the form -- is the -- is the cover letter that that form came in, Exhibit No. 20?

**A. That's correct.**

Q. Okay. And I noticed John Lyons indicated, you know, please call if you have any questions. Did you make any contact with him or did you just sign the document and send it to American General?

**A. I didn't call him because I thought I understood the document to state that we were releasing the assignment from Janko Financial Group to Tuscola Furniture Group.**

Q. And did you -- okay. So it looks like from this correspondence, Exhibit No. 13, that he provided you an envelope to send it in; is that correct?

**A. That's what it says.**

Q. Okay.

**A. I don't -- I'll go by what it says.**

Q. And do you recall whether you provided any letter of explanation when you sent the form in?

**A. I have no idea.**

Page 128

Q. Okay.

MR. SENECA: One follow-up question.

REEXAMINATION BY

MR. SENECA:

Q. On Bianchi 13, referring you back to the letter, you indicated you received that from Lyons. The first sentence reads "I have enclosed the form to release the assignment of Policy No. 2604663 from Janko Financial Group." What did you take from Janko Financial Group to mean?

MR. CROWDER: I'll object to that.

**A. What do I think this letter means?**

Q. What -- what was your understanding of from Janko Financial Group to mean?

**A. Well, my understanding is that I was being provided this form in response to my request of Jim Stilwell which was to release/transfer/assign the beneficial interest from Janko Financial Group to Tuscola Furniture Group. So therefore, as I read this letter or read this letter, I was releasing that assignment from Janko Financial Group to Tuscola Furniture Group which is why I didn't simply sign my name and put authorized member. That's why I made the notation so there wouldn't be any doubt**

Page 129

**that this was in favor of Tuscola Furniture Group, LLC, which is not something that I've ever signed any other document that way for any other reason.**

MR. SENECA: Okay. I don't have any further questions.

REEXAMINATION BY

MR. CROWDER:

Q. I notice you didn't date it. Do you know what day you would have signed that?

**A. I would have assumed because of the urgency that I signed it on the date that I received it, and I would have assumed that, because of the pressure that I put on Jim Stilwell, that if Mr. Lyons received it on the 20th, that he probably sent it out that same day. So my assumption has always been that I signed this on the date of receipt which I would state was the 21st of November.**

Q. You think you received it by U.S. mail from John Lyons?

**A. I don't know if it was U.S. mail or pigeon mail, but it was received.**

Q. Okay. But you don't know when you received it; is that correct?

**A. I can't state exactly when I received it.**

**All I know is that I probably signed it and sent it out the day I received it.**

MR. SENECA: And we're referring to Stilwell 20?

THE WITNESS: Yes.

MR. CROWDER: Right. That's all I have for you.

MR. SENECA: Any further questions?

MS. BEYERS: No.

MS. ROTHMAN: No.

MR. SENECA: Okay, we'll reserve signature.

(Adjourned at 3:34 p.m.)

STATE OF ILLINOIS )
)SS
COUNTY OF FORD )

I, June Haeme, a Notary Public in and for the County of Ford, State of Illinois, do hereby certify that LAWRENCE BIANCHI, the deponent herein, was by me first duly sworn to tell the truth, the whole truth and nothing but the truth, in the aforementioned cause of action.

That the following deposition was taken on behalf of the Defendant at the offices of Area Wide Reporting Service, 301 West White Street, Champaign, Illinois, on February 9, 2007.

That the said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my instruction; that the deposition is a true record of the testimony given by the deponent; and that it was agreed by and between the witness and attorneys that said signature on said deposition would not be waived.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative, or otherwise interested in the event of this action, and am not in the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 14th day of February, 2007.

June Haeme

JUNE HAEME, CSR, RMR, CRR
NOTARY PUBLIC

"OFFICIAL SEAL"
June Haeme
Notary Public, State of Illinois
My Commission Expires:
September 27, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

MARGARET J. STILWELL, HALEY STILWELL, HEIDI STILWELL, JAMIE STILWELL, MEGAN STILWELL,
Plaintiffs,
-vs-
AMERICAN GENERAL LIFE INSURANCE COMPANY,
Defendant.
---------------------------
AMERICAN GENERAL LIFE INSURANCE COMPANY,
Third-Party Plaintiff
-vs-
FIRST MID ILLINOIS BANK & TRUST, TUSCOLA FURNITURE GROUP, LLC, JANKO FINANCIAL GROUP, LLC,
Third-Party Defendants.
---------------------------

No. 05-CV-02160

This is to certify that I have read the transcript of my deposition taken by June Haeme, CSR, RMR, CRR, in the above-entitled cause, and that the foregoing transcript taken on February 9, 2007, accurately states the questions asked and the answers given by me, with the exception of the corrections noted, if any, on the attached errata sheet(s).

LAWRENCE BIANCHI

Subscribed and Sworn before me this day of , 2007,

, Notary Public

-$-

$1 [12] 33:24 35:15 36:3 36:11 37:4,6 99:6 108:5 109:8,13,17 116:20
$1,250,000 [4] 27:4 28:3 34:7 35:10
$1.5 [6] 19:24 20:4 73:1 77:2 87:19 100:23
$101,780.32 [1] 52:6
$2 [7] 14:24 20:17 31:13 35:13 85:5,8 124:9
$2,250,000 [1] 99:6
$2.25 [1] 99:14
$250,000 [8] 33:1 35:15 36:11 56:12 58:10 97:14 98:6 107:4
$3,250,000 [1] 98:10
$300,000 [4] 68:9,12 69:8,16
$380,000 [1] 42:6
$4 [2] 19:13 96:20
$400,000 [1] 42:8
$500,000 [4] 17:8 19:13,20 76:9
$512,000 [2] 71:15,17
$512,974.50 [3] 113:8 114:6 115:11
$700,000 [1] 67:6
$800,000 [1] 68:2
$81,000 [4] 114:2,23 115:4,6

-'-

'03 [1] 93:22

---

-vs [4] 1:6,10 132:5,9

-0-

05-CV-02160 [2] 1:8 132:7
0657 [1] 25:10
0658 [1] 25:12
084-003038 [1] 1:14

-1-

1 [8] 3:10 6:13 18:10,14 31:18 88:5 124:18 126:24
1,250,000 [2] 33:9 37:8
1.5 [3] 19:15 87:20,21
10 [7] 3:15 52:8,9,11 67:8,12 97:9
101.780.32 [1] 52:10
10th [4] 58:7 60:22 118:3,18
11 [13] 3:15 45:7 88:20 88:24 98:22,23 107:19 108:4,9,16,24 109:18 111:9
1101 [1] 2:12
111 [1] 2:15
112 [1] 3:3
11th [3] 59:8 62:2 64:6
12 [10] 3:16 88:20 90:12 93:19,23 94:23 96:3 106:6,8 113:1
120 [1] 2:8
121 [1] 3:3
123 [1] 3:4
125 [1] 3:16
125,000 [3] 107:5,15 107:16
126 [1] 3:4
128 [1] 3:5
129 [1] 3:5
12:52 [1] 4:1
12th [13] 53:19 54:3 55:2,6 56:4,8,15 57:4 64:2,3 117:24 120:11 120:22
13 [16] 3:16 50:4,6,8,14 55:23 94:5 95:16 113:2 113:3,4 125:1,5 127:3 127:16 128:5
13th [1] 41:12
14 [6] 50:8 54:11,12,13 120:7,8
14th [1] 131:15
16th [1] 123:21
17 [3] 86:1,16 87:9
17th [5] 21:13 23:20 84:2 123:22 125:24
18 [1] 3:10
1999 [1] 18:7
1:42 [1] 44:20
1:49 [1] 44:20

-2-

2 [9] 3:11 12:23 23:10 47:24 48:3,3,20 77:10 124:18
2.1 [1] 24:8
2.25 [1] 100:6
20 [11] 30:11 31:17 37:13 82:13 84:17,18 123:12 125:11 126:14 127:5 130:4
200 [1] 2:15
2000 [10] 17:13 20:5 21:13 86:16 87:10,12 89:6 90:4 113:1 126:1
2001 [5] 34:21 108:9 108:16,24 109:18
2003 [27] 41:12 46:13 53:19 54:3,8,9 55:2 56:4,16 57:4 58:7 59:8 62:2 64:6,18 93:19 96:3 97:9 98:24 103:15 106:8 111:9 113:1,17 117:24 120:5,11
2006 [1] 6:13
2007 [5] 1:18 131:8,15 132:15,22
2008 [1] 131:23
20th [2] 30:20 129:14
211 [1] 2:4
21st [3] 30:16 84:4 129:17
250,000 [3] 33:9 88:10 106:22
25th [2] 20:5 64:17
2600 [1] 2:8
2604663 [1] 128:8
27 [1] 131:23
28 [1] 93:22
28th [5] 54:8,9 56:16 106:17 120:5
2nd [1] 46:13

-3-

3 [17] 3:2,11 15:9 19:18 31:19 48:2,4,19,20 49:11 76:24 103:19,21 104:6,8 124:19 126:24
3.14 [1] 15:15
3.3 [1] 25:11
3.6 [2] 25:13 26:16
3.9 [3] 14:19 25:1 122:22
301 [2] 1:19 131:7
30th [1] 113:17
311 [1] 14:13
314 [3] 15:8,14 16:12
321 [1] 16:5
322 [1] 16:5
3:34 [1] 130:13

-4-

4 [15] 3:12 19:23,24 20:4 55:1,1,18,19,20 55:23,24 77:11,12 89:6 90:4
43 [1] 48:5
44 [2] 48:5 49:10
45 [1] 48:5
47 [2] 41:2,3
48 [2] 3:11,11

-5-

5 [8] 3:12 21:11 22:7,7 56:20,21,23 87:19
5/28 [1] 57:11
50 [1] 41:17
500 [1] 87:21
500,000 [4] 76:3,11 87:20 100:24
51 [2] 41:2,19
512 [1] 71:1
512,000 [3] 71:9 100:7 101:7
512.974.50 [1] 115:15
55 [1] 3:12
56 [1] 3:12
58 [1] 3:13
59 [1] 3:13

-6-

6 [10] 3:13 15:13 32:23 58:6 81:14 103:15 118:5,9,12,19
6.3 [4] 15:9,18 26:6,8
6.4 [2] 16:10,11
60 [1] 9:2
600 [1] 2:3
60602 [1] 2:9
61602-1350 [1] 2:4
61938 [1] 2:12
62523 [1] 2:16
64 [1] 3:14
655 [1] 23:21
656 [1] 24:8
659 [3] 24:23 25:1,2
662 [1] 26:8
67 [2] 3:14,15

-7-

7 [10] 3:13 33:22 59:8 108:23 109:2,12 110:16 119:13,18 122:5
707 [1] 22:7
74 [2] 3:2 41:3
799,000 [1] 68:2

-8-

8 [4] 3:14 40:22 47:24 64:17
81,000 [2] 101:11,19
88 [1] 3:15

-9-

9 [6] 3:14 67:8,12,13 131:8 132:15
90 [1] 3:16
9th [1] 1:18

-A-

ability [1] 13:12
able [2] 107:16 108:13
above-entitled [1] 132:15
accept [2] 25:14 68:23
accompanied [1] 49:13
accordance [1] 25:15
according [1] 35:17
account [3] 101:2 117:12,14
accurate [16] 51:24 52:2,16 53:4 56:9 75:4 76:1 81:2 83:7 86:1 96:21 101:8 103:2 108:14 109:11,15
accurately [1] 132:16
act [4] 10:12,13,19 114:17
action [19] 6:10 40:14 42:15 43:2,9 45:20 46:2,5,11,12 71:16 93:3,6 97:10,21 123:19 131:6,12,13
actions [1] 63:20
activities [1] 78:11
actual [1] 111:24
ACV [13] 13:22,23 14:22 15:23 17:2 25:13 26:10 40:13 41:13 70:16 71:22 92:8 112:1
addition [8] 25:13,17 54:7 120:19,23 121:1 121:2,3
additional [13] 15:6 17:12 18:1 19:15,24 20:24 36:17 60:23 61:1 61:4 98:15 106:16 120:20
address [6] 89:16,19 90:17,18,19 92:2
addressed [3] 89:12 91:19 118:21
Adjourned [1] 130:13
advice [3] 85:7,12 96:4
advise [1] 93:10
advised [5] 28:20 30:1 48:22 92:11 122:20
advising [1] 63:15
affected [1] 25:7
affixed [1] 131:15
aforementioned [1] 131:6
afterwards [1] 131:9
again [11] 17:21 21:17 26:8 70:9 77:5 80:24 95:11 99:11 112:12 115:12 119:10
against [9] 41:12,21 66:17 67:1,20 73:15 73:18 96:14 106:13
age [1] 1:18
agency [2] 63:6,8
agent [3] 19:3,6 30:7
ago [1] 26:4
agree [6] 100:3,6 108:11 109:6,23 122:11
agreed [2] 99:2 131:10
agreement [104] 4:21 11:23 12:21,23 13:6 13:20,20 14:22 15:7,9 15:11,16,21 16:10 17:2 17:5,11 18:8 22:3,11 22:18,22,24 23:5,19 23:20,24 24:1,4,5 25:16 27:1,21,22,23 27:24 29:1 30:3 33:8 33:11 35:8 37:4,7 38:1 38:15,18 47:4,4 51:7 52:11 58:4 67:16 72:2 72:6,8 73:3,23,24 74:3

75:18,19,22 77:16,20 77:22,22 78:12,16 79:1 80:5,7,9,23 84:1,2 85:11,16,21,21 86:1 86:18 92:7,15,20 96:16 102:3,6 110:7,23 111:2 111:7,11 112:1 114:22 116:3,11 121:15,18,20 122:12,21,22 123:21 124:7
**agreements** [6] 13:2 43:21 75:3 87:12,13 122:13
**ahead** [9] 10:13 27:8 45:15 50:1 74:11 76:21 100:20 107:9 118:4
**ahold** [1] 61:14
**allegations** [1] 41:15
**almost** [3] 20:10 58:13 110:20
**along** [1] 67:24
**always** [3] 10:4 12:7 129:15
**amend** [5] 54:14 56:19 57:12 116:7 120:16
**amended** [3] 56:16,18 121:1
**amendment** [2] 57:3 106:19
**American** [40] 1:6,8 2:9 32:20 37:17 38:6 38:12,13 44:10 50:20 53:14,14 58:6 59:1,5 60:23 62:16 64:11,18 64:20 65:10 70:2,14 71:19 93:10 97:9,17 97:22 99:15 103:5 105:2 111:4 112:4 117:24 119:9 121:14 122:20 127:10 132:6,8
**Amish** [1] 12:1
**Amishland** [56] 8:17 9:5,8,9,14,18,23 10:3 10:9 11:16,20,21,24 22:17 39:4,18 40:16 40:18 41:12 43:15,16 43:17,18 46:17 47:4,5 63:19 65:21,23 66:3,3 66:11,16 67:1,1 68:1,7 68:11,13 73:2 74:1,1 75:6 85:22 86:15,19 87:1,3,6,7,14 96:15,21 113:7 115:7,21
**amount** [50] 13:17 14:24 24:9,12 25:5,7,8 27:3,17,18 28:3 32:24 33:8 35:9 36:2 42:12 47:21 52:10 58:3,9 65:5 66:6,8 67:5 70:3 70:15 71:22 72:1,2,5,7 72:13 76:11 93:11 95:21 98:10 99:5 100:4 100:21 101:7 105:5,8 106:12 113:6,8,9 114:5 114:9,17 116:6
**amounts** [6] 37:2 65:20 113:14,16,20 115:14
**answer** [13] 17:20 34:12 39:14 70:8 77:17 86:2,7,12 100:11,12 100:20 102:19 107:9
**answered** [1] 100:10
**answers** [3] 10:12,17 132:16
**anticipated** [1] 46:6
**anyway** [2] 27:8 48:12
**apologize** [3] 57:21 101:15 113:1
**Appearances** [1] 2:1
**Appearing** [4] 2:5,9 2:13,16
**approached** [2] 13:8 13:11
**approval** [2] 79:10 98:20
**approved** [2] 99:4,13
**approximate** [1] 66:6
**April** [1] 113:17
**area** [3] 1:19 52:6 131:7
**aside** [2] 23:23 24:1
**assert** [1] 73:14
**asserted** [1] 73:18
**assign** [2] 22:15 68:22
**assigned** [7] 18:3 22:2 27:24 59:2 69:7 108:6 109:17
**assigning** [1] 68:6
**assignment** [111] 17:15 19:13,15,20 20:1 20:2,5,9,24 22:10 23:3 23:14,16 27:3,16,23 28:5,23 29:1,22,23 30:3,9 31:13 32:10,13 32:24 33:10,19,23 34:7 35:9,10,20 36:2 37:5,8 37:17 38:2,6,11 54:17 56:12 57:16 58:9,15 63:11 67:16 68:5,12 68:13,20 69:11 73:4 76:3,8,10,12 77:2,20 77:22 81:3,7,14,16 82:2 84:24 85:11,15 87:15,17,19,24 88:5 88:10 90:7 97:14 102:3 102:24 104:12 105:3 106:8,22 107:4 108:8 108:16,24 109:9,18,20 109:23 110:8 111:6 116:8,9,17,19 118:1 118:14,15 120:13,20 122:13,23 123:20 124:3 125:10,23 127:13 128:8 128:21
**assignment/assumption** [1] 111:10
**assignments** [24] 28:1 29:13 35:13 57:19,23 58:3 61:9 63:16 77:13 81:8,11 85:13 97:18 98:6,15 99:14 100:7 106:9,11,13,19 107:3 116:4,9
**assistance** [2] 13:5,8
**assisted** [2] 7:3,4
**Associates** [2] 2:11 6:1
**assume** [2] 76:14 93:13
**assumed** [2] 129:10 129:12
**assumption** [13] 22:11 27:23 29:1,23,24 30:3 32:13 62:1 85:11,16 111:7 123:20 129:15
**assumption/assignment** [1] 124:7
**attached** [6] 57:2 93:16 104:12 113:15 113:18 132:17
**attack** [1] 95:20
**attempt** [1] 21:3
**attended** [2] 79:7,12
**attending** [1] 75:17
**attention** [8] 14:11 41:2 54:22 105:16,17 106:21,23 119:1
**attorney** [10] 2:2,7,11 2:14 43:2,5 49:6 67:15 79:22 85:14
**attorneys** [2] 131:11 131:14
**Atwood** [1] 43:19
**audible** [1] 7:16
**authenticity** [1] 21:24
**author** [1] 119:17
**authority** [1] 37:3
**authorized** [3] 64:22 126:17 128:23
**available** [2] 24:9 97:4
**Avenue** [1] 2:12
**aware** [15] 24:6,7 25:19 25:23 39:8 40:3,7 41:8 44:23 45:1 57:15 65:1 88:4 103:3 125:18
**away** [1] 46:12

## -B-

**B** [1] 3:9
**background** [1] 5:5
**balance** [1] 117:14
**bank** [50] 1:10 13:13 13:14 14:24 17:24 25:6 27:5 28:4 33:12,24 34:10 35:11 36:2,12 37:2,10 45:10,21 51:5 55:10,14 80:8 105:3,7 106:12 108:7,8 109:3 109:5,12 113:9 114:10 114:13,15,20 115:15 115:18,22,24 116:6,11 116:12,15 117:3,11,16 117:17 119:22 122:24 132:10
**bank's** [3] 37:10 56:8 56:19
**bankruptcy** [8] 73:10 73:10,15,19 74:4,14 74:16,24
**based** [4] 49:24 94:19 100:1 102:5
**basis** [1] 110:20
**Bates** [5] 14:12,13 25:1 26:7 41:2
**Baxter** [2] 75:15 85:18
**bearing** [1] 114:10
**became** [7] 9:8 10:2,9 11:9 14:7 40:6 85:23
**become** [3] 39:8,12 64:24
**becoming** [1] 57:15
**behalf** [7] 20:23 53:9 53:13 58:13 59:9 119:6 131:7
**beneficial** [42] 17:8,12 17:14 18:3 24:21 25:5 27:3,4 28:2,6,23 30:9 31:13 34:7,8 35:9 37:22,23 38:23 73:4 81:4,7,17 82:23 84:9 85:5 87:15,18,24 98:9 99:5 100:23 101:1 102:4 110:10,21 116:4 116:5 120:21 124:4,9 128:18
**beneficiary** [4] 15:1 18:1 25:6 109:22
**benefit** [1] 77:14
**benefits** [1] 75:24
**benefitted** [1] 96:20
**best** [1] 34:24
**better** [1] 13:18
**between** [22] 12:10 17:2 22:11 24:3 29:2 33:6 37:17 38:6 39:18 43:16,17 47:4 74:1 81:6 85:20 86:19,22 86:24 87:13 92:21 112:1 131:11
**Beyers** [22] 2:14,15 3:3 11:2 18:7 48:10 50:10 54:11 55:17,21,24 71:11 74:8,11 100:9 101:14 112:20,23 118:10 121:5 123:6 130:9
**Bianchi** [60] 1:17 3:10 3:11,11,12,12,13,13 3:14,14,15,15,16,16 4:2,8,10,11,11,13,17 4:19,22 5:4,24 18:10 18:13 23:8 47:24 48:18 55:19,20 56:23 58:6 59:7 64:17 67:8,11 70:1 88:20 90:12 103:19,21 104:6,8 107:21 112:24 117:22 118:5,9 119:13,18 121:12 122:5 123:11 125:1,5 128:5 131:4 132:19
**Bianchi's** [1] 55:23
**BLT-3** [1] 9:20
**body** [3] 42:4 94:23,24
**borrowing** [2] 13:18 37:3
**bottom** [3] 14:12,16 14:17
**Boy** [1] 5:20
**break** [2] 44:18 94:23
**breakdown** [3] 93:17 94:7 95:1
**breaker** [1] 28:24
**briefly** [1] 5:5
**bring** [1] 84:9
**Broadway** [1] 2:12
**Broch** [8] 42:21,22 43:8,10,14 45:9 46:9 108:5
**brought** [4] 41:21 84:24 106:20,23
**building** [2] 11:18,21
**bunch** [1] 72:19
**business** [16] 6:9 11:17 12:4,11,13 13:23 38:15 39:17,20 40:2 46:21 46:22 47:1 86:23 114:14,16
**buyout** [2] 6:12 7:6

## -C-

**calls** [7] 20:21 24:8 62:19 65:6 74:18 100:19 107:8
**cap** [1] 24:11
**capital** [1] 13:12
**caption** [1] 41:23
**care** [1] 74:10
**case** [8] 43:24 44:2 45:1 45:5 67:3 91:5,7 111:18
**cash** [1] 69:4
**caution** [1] 114:7
**CC** [1] 45:9
**ceased** [1] 85:22
**center** [1] 9:24
**centers** [2] 7:3,4
**Central** [3] 1:1,22 132:1
**certain** [3] 1:21 6:23 43:1
**certainly** [3] 52:7 88:18 93:16
**certify** [3] 131:4,12 132:14
**Chamber** [1] 11:7
**Chamberlain** [7] 51:1 55:3 64:4 79:16,18 80:2 87:23
**Champaign** [2] 1:19 131:7
**chance** [1] 122:9
**change** [9] 24:8,20 25:4,7 26:12,18 68:2 71:18 101:12
**changed** [2] 5:20 39:1
**charge** [1] 92:14
**check** [5] 65:3 117:9,9 117:10,11
**checking** [1] 117:14
**Chicago** [1] 2:9
**chief** [3] 105:17,20,21

**children** [1] 12:15
**chronology** [3] 63:18 98:8 101:4
**circumstance** [1] 39:11
**cite** [1] 56:18
**citizen** [1] 1:17
**claim** [73] 42:7 47:9,21 47:22 48:23,23 49:1,9 50:2,21 51:5 53:8,9,12 53:14,18,23 60:7,13 60:15,16,23 61:2 62:8 62:18 63:3 65:1,10 66:17,20,22,24 67:19 68:1,5,24 69:22 73:15 73:17 74:17 93:8,9,13 93:16 95:5,7,8 96:7,14 96:23 97:3 98:20 99:23 100:2,4,8,22 101:24 102:5 104:2,14,15,15 104:20,21,24 105:1,4 105:12 107:7,12,16 111:20
**claimant's** [1] 105:9
**claims** [3] 47:16 73:21 103:7
**clarification** [4] 9:7 25:21 70:24 121:23
**clarify** [4] 37:15 61:12 72:16 121:4
**clear** [5] 69:22,24 87:9 120:9 121:4
**client** [1] 45:21
**close** [6] 27:8 42:7,7 68:2 76:6 90:4
**closed** [2] 79:8 84:1
**closing** [41] 21:12 27:2 27:6,10,16,19 28:12 28:15,20 29:14 33:4 38:3 75:17 76:5,6,7 78:16,20 79:3,9,12,15 79:19,22 80:4,20,22 81:4 83:19,22 84:2,9 84:12 85:1 123:22 124:3 125:20,22 126:3 126:7,8
**closings** [3] 80:13 92:20 125:19
**collateral** [12] 61:9 70:20 81:8,11,14 84:24 96:17 107:3,4 109:23 110:7,10
**collateralize** [1] 77:15
**collaterally** [2] 108:6 109:17
**combination** [1] 101:1
**comma** [1] 120:20
**Commencing** [1] 4:1
**comment** [1] 106:6
**Commerce** [1] 11:7
**Commission** [1] 131:23
**communicated** [1] 111:3
**communications** [1] 19:6
**companies** [5] 5:14 5:15,18 8:13,15
**company** [41] 1:7,9 8:8,24 9:20 11:5 13:22 22:4 28:5,10 29:11,16 29:18 30:3 37:21 38:22 54:23 58:2 59:20,24 60:10 63:8,9,15 64:16 68:22 70:4,16,22 73:2 82:23 84:7 89:4 91:15 91:15 105:5,10 123:19 124:6 132:6,8
**company's** [1] 73:14
**complaint** [5] 7:11 41:3,4,16 42:5
**complete** [1] 62:12
**completed** [2] 30:7 105:9
**comply** [1] 92:15
**concern** [3] 97:12,16 97:20
**concerned** [1] 32:12
**concerning** [8] 22:18 29:6 30:24 34:6 36:1,4 57:11,22
**conclusion** [2] 20:21 107:9
**conclusions** [1] 23:8
**condition** [8] 15:10,21 16:2,9,21 17:4 20:17 26:23
**confirm** [1] 37:16
**connection** [7] 23:4 23:15 50:20,21 53:17 60:13 63:3
**consider** [2] 69:3 86:8
**considered** [1] 94:18
**consigners'** [1] 24:2
**consigning** [1] 14:8
**consignment** [72] 11:23 12:20,23 13:1 18:8 21:12 22:3,18,22 22:23 23:5,19,20,24 24:1,4,4 25:14,16 27:1 27:17,18 29:19 33:7 35:7 37:4,6 38:1 43:21 47:3 51:7 58:4 72:2,6 72:8 73:23 75:2,17,19 75:21 77:16,20,21,22 78:11,16 79:1 80:4,7,8 80:23 85:20,21,24 86:18 92:7,20 102:5 110:6,23 111:1 112:1 114:22 115:2 116:3,11 121:14,18,20 122:12 122:12,21
**constituted** [3] 9:13 9:15 10:7
**consultation** [1] 84:20
**contact** [5] 12:13 17:11 40:4 61:12 127:9
**contacted** [3] 31:10 47:7 85:1
**contain** [1] 21:20
**contained** [4] 48:20 54:2 64:5 120:11
**contemplated** [2] 24:13 116:2
**content** [1] 56:8
**contents** [1] 94:19
**continuation** [1] 77:6
**continued** [1] 4:20
**contract** [1] 16:21
**contracts** [1] 23:10
**contributions** [1] 78:13
**conversation** [24] 33:13 47:10 48:21 57:24 59:13,16,20 60:3 60:16 61:21 62:3,10 64:14,15 78:2,5 83:4 83:11,12 84:11,13 98:1 98:3,7
**conversations** [11] 10:18 57:22 59:17 64:10,12 83:21 84:5 84:13,15 87:22 103:4
**converted** [1] 85:20
**conveyed** [1] 52:16
**copied** [1] 110:18
**copies** [2] 21:20 64:2
**copy** [10] 19:13,20 34:17,19,22 55:1 59:2 106:1 111:6 120:1
**corporate** [1] 4:24
**corporeal** [1] 1:18
**correct** [155] 4:12 5:1 5:2,3 7:21 8:2,8,9 9:21 19:22 20:6 21:20 22:24 23:1,16 25:24 26:11 29:4 30:13 31:3,24 35:16,23 36:18,19 38:8 41:14,16 44:3 46:8,10 49:5,11,15,16 51:12 53:10,11,15,16,19,20 54:1,3 55:3,6 56:4 57:8 59:11 61:24 63:12 64:7 65:11 68:3,8,10 71:3 71:20 73:11 75:5,8,9 76:9,13 77:3,4,16 78:4 78:17,18 80:1,3 82:6,7 82:9 83:5 88:6,7,8,12 88:15 89:5,7 90:10,15 91:6,8 96:22 97:10,11 97:14,15,19,22,23 98:1 98:2 100:5 101:9 103:16,21 104:7,10,11 104:13,16,17,19 106:8 107:17 112:17,18 113:3 113:10,11,12,13 114:3 114:6 115:11 116:1,20 116:24 117:5,16,20,21 118:2,4,17,24 119:4,5 119:8,14,15,16,19,20 119:23,24 120:3,4,15 123:1 126:9,15,16,18 126:21,24 127:1,6,18 129:23
**corrected** [2] 36:17 54:7
**correction** [1] 56:10
**corrections** [1] 132:17
**correspondence** [11] 19:12 53:19 54:3 56:4 62:2 64:6,18 95:4 97:8 117:23 127:16
**cost** [1] 52:7
**counsel** [11] 21:17 42:15 46:10 79:4,6,9,9 85:1 95:7 96:4 102:20
**Country** [24] 11:16,20 11:24 22:17 39:4,18 43:16,18 47:5 63:19 65:22 66:3 67:1 74:1 75:6 85:22 86:15,19 87:1,6,14 113:7 115:7 115:21
**County** [3] 1:20 131:2 131:4
**couple** [4] 26:4 106:4 121:7 123:4
**course** [1] 114:8
**court** [11] 1:1,21 4:16 7:16 18:11 48:1 67:9 88:21 100:18 125:2 132:1
**cover** [9] 37:9 48:2 53:22,23 57:18 124:22 125:10 127:2,4
**coverage** [2] 85:15 108:6
**coverages** [1] 19:4
**covered** [7] 26:3,4 27:20,22 62:9 85:5,8
**covers** [1] 109:2
**create** [2] 51:13,15
**created** [1] 22:4
**creation** [1] 114:10
**credit** [5] 13:17 24:9 25:8 98:16 114:13
**creditor** [1] 74:23
**criminal** [1] 5:7
**Crowder** [63] 2:10 3:2 3:4,5 10:11,16,22 17:17,19 20:20 23:7 23:18 29:8,20 32:1 34:12 36:20 37:19 39:3 39:14 41:7 42:18,19 42:24 44:18 48:6,14 50:7 52:1 53:6 61:3 63:13 65:19 66:9 67:14 69:15,20 70:5,7,17 71:7 74:6,10,13 76:18 88:22 93:23 94:15,17 100:15 101:17 107:10 107:22,24 108:1 112:19 113:4 121:12 126:11 126:13 128:11 129:7 130:6
**CRR** [3] 1:20 131:19 132:15
**CSR** [4] 1:14,20 131:19 132:15
**custom** [1] 89:13

-D-

**D** [1] 3:1
**daily** [1] 110:20
**Dallas** [1] 61:20
**date** [14] 4:21 11:9 17:7 39:10 76:2,7 83:22 84:2 90:5 95:19,20 129:8,11,16
**dated** [13] 20:5 27:23 55:2 57:4 58:7 59:8 64:2,3 89:6 96:3 98:22 108:8 109:18
**days** [1] 83:23
**Dead** [3] 10:12,13,19
**deal** [2] 28:24 75:10
**dealing** [1] 47:1
**dealings** [9] 6:9 12:11 12:14 19:5,10,10 39:18 46:21,23
**dealt** [1] 43:10
**death** [7] 60:11 65:13 95:20 101:20 102:24 104:14 111:5
**debt** [7] 15:22 26:9 42:1 70:21 71:4,22 114:20
**debts** [2] 114:18 115:17
**Decatur** [1] 2:16
**December** [2] 89:6 90:4
**decided** [1] 68:5
**decrease** [1] 24:10
**Defendant** [3] 1:7 131:7 132:7
**Defendants** [2] 1:12 132:12
**degree** [1] 5:7
**delinquency** [1] 41:13
**delinquent** [1] 39:12
**deponent** [3] 4:3 131:4 131:10
**deposited** [1] 117:12
**deposition** [18] 1:16 1:17 4:19 12:22 18:14 19:19 30:11 32:23 40:24 45:7 48:19 67:13 100:17 131:6,8,10,11 132:14
**describe** [1] 12:4
**described** [3] 36:1 40:6 48:21
**desires** [1] 68:20
**details** [2] 44:7 70:11
**determine** [2] 85:7,13
**development** [35] 5:15 8:11,17,18 9:6,8,10,14 9:19,23 10:3,9,10 11:4 11:6,22 40:16 41:12 43:15,17 47:5 65:23 66:11,17 67:1 68:1,7 68:11,14 73:2 74:1 87:3,7 96:15,21
**developments** [1] 7:5
**Dick** [8] 7:24 8:4 11:3 46:15 91:23 92:3,6 126:4
**Dicker** [1] 2:8
**difference** [3] 25:10 25:12 26:7
**differences** [4] 24:3,7 24:7 25:22

**different** [4] 8:15 48:16 59:23 72:19
**difficulties** [1] 39:6
**direct** [2] 6:22 13:12
**directed** [8] 28:18,19 61:19 91:21 105:15,19 118:16,23
**directing** [1] 41:1
**directly** [1] 14:4
**discovery** [2] 4:19 41:1
**discrepancies** [1] 33:6
**discuss** [4] 49:18 55:9 92:11 121:19
**discussed** [5] 16:16 22:3 28:11 81:8 98:19
**discussing** [6] 55:12 55:15 88:3 121:21 122:2,3
**discussion** [4] 27:11 27:13 31:4 35:24
**discussions** [9] 28:17 29:14 30:23 32:16,19 35:2,5 36:4 57:10
**disinterested** [1] 131:12
**dismissed** [3] 43:24 46:2,5
**dispute** [2] 29:9 101:12
**disputing** [1] 29:7
**distinct** [2] 66:10 114:14
**distinction** [3] 9:10 81:6 115:20
**distinguish** [1] 43:2
**District** [6] 1:1,1,21 1:22 132:1,1
**document** [111] 9:11 14:13 16:5 18:16,19 22:6,8,14,15 26:1 30:12,15,17,24 32:4,5 32:6 33:5,7 34:3,17,20 35:3,6 37:14,16 38:5 38:18,20 41:9,10 42:9 43:22 45:12 48:4,13 49:10,11,14,18,22 50:15,17,19 51:1,10 51:11,13,16,19 52:18 52:22 53:3 57:16 61:5 62:24 64:19 76:15,19 77:6 81:24 82:3,8,10 82:14,21 83:24 88:24 89:9 90:1,2,7,13,22 91:1,10,13 92:5 93:2,4 93:6 95:16 97:1 102:9 102:21 105:24 109:4 109:12,20 110:2,5,16 110:17 113:22 114:11 114:11 116:21 121:15 121:18 122:9,16,17 123:13,16 124:5,11 125:23 126:23 127:10 127:12 129:3
**documentation** [6] 28:22 47:21 62:7 63:22 81:20 111:5
**documented** [1] 84:7
**documents** [26] 21:11 21:15,19,21 23:11 35:17 40:24 44:13 63:23 79:2,10,14,16 80:7,20 81:12 88:15 89:11,14 91:3 101:10 101:17 114:24 115:4 125:20,21
**doesn't** [2] 104:4 105:13
**dollars** [2] 69:4,14
**done** [7] 6:12,14,24 14:5 101:24 123:8 124:6
**doubt** [2] 90:3 128:24
**down** [7] 7:13,17 14:15 15:13 46:17 94:23 131:8
**Downers** [1] 40:1
**draft** [5] 50:17 55:14 63:2 96:3 119:23
**drafted** [3] 62:24 63:5 119:13
**drafting** [5] 55:10,12 62:23 63:14 96:4
**draw** [1] 81:6
**due** [4] 51:24 52:11 113:16,21
**duly** [2] 4:4 131:5
**during** [2] 98:3,7

-E-

**E** [3] 2:15 3:1,9
**Edelman** [1] 2:7
**education** [1] 5:6
**effect** [1] 52:12
**effected** [1] 38:3
**effective** [1] 32:7
**effectuate** [2] 31:21 38:10
**effort** [1] 37:16
**either** [4] 48:8 83:17 117:12 131:14
**Elser** [1] 2:7
**employ** [1] 131:13
**enclosed** [3] 64:2 105:1 128:7
**enclosing** [1] 67:15
**encounter** [1] 11:8
**end** [2] 47:16 67:14
**ended** [1] 78:15
**entered** [2] 11:23 75:7
**entirety** [1] 14:1
**entities** [6] 11:10,12 65:15 66:11 71:6 72:20
**entitled** [2] 52:8 107:7
**entity** [1] 78:14
**envelope** [1] 127:17
**errata** [1] 132:17
**estate** [12] 5:14 6:2,5 8:11 66:17 67:20 68:4 68:6,12,18,19 69:7
**event** [3] 10:11 20:13 131:13
**events** [1] 98:9
**eventually** [1] 44:2
**everybody** [1] 10:22
**everyday** [1] 92:17
**evidence** [3] 82:22 85:10 124:6
**evidenced** [1] 79:13
**exact** [2] 65:20 111:1
**exactly** [4] 73:7 117:1 125:19 129:24
**EXAMINATION** [8] 3:2,2,3,4 4:6 74:12 112:22 123:9
**examined** [2] 1:18 4:4
**example** [1] 81:12
**exceeded** [1] 58:3
**except** [2] 25:15 52:5
**exception** [2] 52:14 132:16
**exchange** [2] 54:18 57:18
**exchanged** [2] 69:4,4
**excludes** [1] 110:11
**Exclusive** [1] 25:13
**excuse** [1] 27:5
**executed** [9] 19:21 29:2 37:14,16 38:5 53:9 55:3 67:16 90:8
**executing** [1] 53:12
**exhibit** [86] 3:10,11,11 3:12,12,13,13,14,14 3:15,15,16,16 12:22 16:6 18:10,14 19:18 19:23,24 20:4 21:11 22:7,7 30:11 31:17 37:13 40:22 43:4,23 48:19,20,20 49:11 50:3 50:4,14 51:8,9,9 55:1 55:1,18 56:20,21 58:5 59:7,8 67:13 76:23 81:13,13 82:13 84:17 84:18 88:24 90:12 93:18,20 94:4,6,9,10 94:13,19 104:6 107:18 108:3,19,23 110:16 113:2,14,15 118:5,19 119:13,18,18 120:7 123:12 125:1 126:14 127:3,5,16
**exhibits** [5] 41:4 47:24 67:8,12 88:20
**existed** [3] 28:7 37:5 39:22
**existence** [3] 121:19 122:20,22
**existing** [7] 13:21 17:15 18:3 29:13 57:19 61:6 82:23
**expect** [1] 65:7
**Expires** [1] 131:23
**explain** [4] 7:23 11:12 92:9 104:23
**explained** [2] 61:22 101:3
**explaining** [1] 98:5
**explanation** [4] 21:6 36:9 62:13 127:23
**Express** [1] 11:4
**extremely** [1] 55:8

-F-

**face-to-face** [1] 33:14
**fact** [19] 4:23 28:21 37:9 41:6 57:15 58:2 63:15 70:18 79:8 84:8 85:4,14 88:9 99:4 100:1 106:18 114:5 121:19 124:2
**fair** [6] 13:24 60:20 62:1 70:1 71:21 122:19
**familiar** [3] 6:22 21:15 41:10
**far** [2] 7:1 117:6
**father** [1] 8:4
**favor** [6] 31:22 32:8 32:11 118:15 126:19 129:1
**fax** [4] 30:19 49:3 57:1 57:11
**faxed** [2] 96:7,12
**faxing** [2] 49:19,22
**February** [5] 1:18 41:11 131:8,15 132:15
**fee** [1] 52:8
**felt** [6] 27:21 28:21 37:10 38:21 62:12 102:22
**few** [1] 112:20
**fight** [1] 10:15
**figure** [4] 52:9 85:1 96:6 114:6
**figures** [3] 51:23 52:15 53:3
**file** [4] 47:22 66:17 103:16 107:12
**filed** [11] 40:14 41:6,8 41:12 50:2 66:24 73:9 73:10 74:17 104:2 105:12
**filing** [7] 26:13,19 47:8 74:4 93:12 102:5 103:6
**filings** [2] 91:4 111:18
**fill** [4] 31:21 95:21 105:4 124:18
**filled** [7] 31:19 95:10 95:11,17,23 97:2 126:23
**filling** [1] 84:21
**filtered** [1] 88:15
**final** [1] 98:20
**finally** [2] 45:19 77:18
**finance** [1] 13:6
**financial** [64] 1:12 2:5 5:22 6:11 8:14 9:12 11:20,22 13:12 22:16 29:12 31:14 32:11,14 38:22 39:5,9 40:7 51:17 53:1 58:14,15 58:16 59:9 64:23 75:7 75:11,23 76:13 77:2 77:14,15 81:20,22 82:1 82:9,24 85:23 86:3,5 86:14 87:1,2,4,13 90:14,18 91:15,20,22 97:18 115:7 118:17 119:2,3,6 124:10 127:13 128:9,10,14,18 128:21 132:11
**financing** [3] 13:9,13 13:14
**fine** [5] 4:9,9 10:24 11:2 29:6
**firm** [1] 39:23
**first** [63] 1:10 2:16 4:4 7:1 11:8,13 13:2 28:4 33:24 34:9,19 35:11 39:8 40:10 45:10 47:7 50:24 64:1 74:9 75:6 75:19 76:3,10 78:11 88:1 91:21 93:9,11,14 94:7,20 95:2 98:11 99:7 101:8,11,18,24 103:1,7 105:24 108:7 109:3,4,12,16 113:21 114:2,15,21 116:10,14 116:16,19 118:23 119:22 120:2 121:8 122:2,16 128:7 131:5 132:10
**Five** [1] 6:8
**flip** [3] 24:14 50:24 58:12
**flipping** [2] 23:19 51:8
**flow** [1] 117:1
**flowed** [1] 73:8
**follow** [1] 67:24
**follow-up** [9] 21:3 36:3 59:13 62:3 106:5 122:6 123:5 126:11 128:2
**followed** [1] 20:22
**following** [1] 131:6
**follows** [1] 4:5
**Ford** [3] 1:20 131:2,4
**foregoing** [1] 132:15
**forgot** [3] 106:7,9,15
**form** [70] 17:17,19 28:9 29:8,10,21,23 30:2,7 30:22 31:11,12,18 32:1 36:15,20 37:19 39:3 41:7 48:23,23 49:2,9 49:12,13,15 52:1 53:8 53:9,13,24 55:14 58:13 59:2 61:3 63:13 65:19 66:9 70:5,17 84:3,16 84:17,21 95:5,10,11 95:14 96:7 97:4 98:18 104:13,15,15,20,22 105:9 107:8 110:21,24 111:1 123:18 124:12 124:13,15 127:3,4,23 128:7,16
**formally** [1] 64:22
**formation** [1] 43:15
**formed** [2] 9:8 78:9

forming [1] 78:7
forms [3] 36:17,18 47:8
forth [3] 25:16 113:21 113:23
forthcoming [1] 20:2
forward [1] 93:8
forwarded [1] 30:20
foundation [4] 34:13 39:15 53:7 70:7
founding [2] 9:5,13
four [1] 106:19
Friday [1] 45:21
friendly [1] 12:6
front [7] 40:23 43:4 56:21 76:7,15 82:12 88:23
fulfill [2] 16:20 26:24
fulfilled [1] 16:1
fulfilling [2] 17:4 36:7
full [1] 4:15
fully [3] 37:10,11 67:15
Fulton [1] 2:4
funds [2] 65:2 117:2
furniture [89] 1:11 2:5 8:21,23 12:1 13:6,9,23 14:2,8,9 22:18,19 25:11,15 27:5 28:3 29:12 31:14,22 32:8 32:11,15,24 33:10,12 34:9 35:11 37:24 38:7 38:24 39:13,20 40:11 45:10 51:11 52:19 58:7 59:3 65:24 78:8,9,23 78:24 80:23 83:1 85:24 86:4,5,6,20,23 88:13 89:3,12,17,18 90:8 91:16 92:7 93:9 94:8 97:13 98:6 99:6,13 103:1,8 104:10,19 105:15,20,21 106:12 108:7 109:3 113:16 114:12,18,19 116:10 118:21 124:10 126:20 127:14 128:19,22 129:1 132:10

-G-

gather [1] 47:20
gathered [1] 49:24
General [40] 1:6,8 2:9 32:20 37:18 38:6,12 38:13 44:10 50:21 53:14,14 58:6 59:1,5 60:23 62:16 64:11,19 64:20 65:10 70:2,14 71:19 93:10 97:9,17 97:22 99:15 103:5 105:2 111:4 112:4 118:1 119:10 121:14 122:20 127:10 132:6,8
generated [5] 110:6,6 110:17,19,22
given [7] 23:3,15 36:2 79:10 112:8 131:10 132:16
giving [1] 98:16
gone [1] 92:2
good [1] 12:8
grab [1] 108:21
great [2] 4:14 97:20
ground [1] 7:13
group [139] 1:11,12 2:5 2:5 5:22 6:11 8:14,21 8:24 9:13 11:19,20,23 22:7,16,20 27:5 28:3 29:12,13 31:14,15,22 32:8,11,11,14,15,24 33:10,12 34:9 35:11 37:24 38:7,22,24 40:24 43:20,22 45:10 51:11 51:17 52:19 53:1 58:8 58:14,16 59:3,9 64:23 65:24 66:3,12 75:7,12 75:23 76:13 77:2,14 77:15 78:8,9,23,24 80:24 81:20,23 82:1,9 82:24 83:1 85:23,24 86:4,5,6,6,14,20 87:1 87:2,4,5,13 88:13 89:3 89:12,17,18 90:9,14 90:18 91:16,16,20,22 92:7 93:9 94:8 97:13 98:7 99:6,14 103:1,8 104:10,19 105:15,20 105:22 106:12 108:7 109:3 113:16 114:12 114:18,19 116:10 118:17,21 119:2,3,6 124:10,10 126:20 127:13,14 128:9,10,14 128:18,19,21,22 129:1 132:11,11
Group's [2] 86:3 97:18
groups [1] 86:23
Grove [1] 40:1
guarantee [6] 15:10 15:19,22 26:9 41:24 41:24
guaranteed [1] 113:7
guaranteeing [1] 42:3
guaranty [2] 16:3,4
guess [2] 78:22 79:4
guys [4] 48:4 92:11 103:6 123:5

-H-

H [1] 3:9
Haeme [5] 1:20 131:3 131:19,22 132:14
HALEY [2] 1:4 132:3
half [1] 20:10
hand [2] 90:11 131:15
handed [1] 125:4
handled [2] 40:1 75:14
handling [1] 7:2
hard [1] 43:2
hear [5] 43:3 57:6 99:1 99:3 101:14
heard [1] 46:14
heart [1] 95:20
Heavner [1] 2:15
HEIDI [2] 1:4 132:3
held [3] 25:12 35:13 57:23
Heller [1] 2:11
hereby [1] 131:4
herein [2] 4:3 131:4
hereunto [1] 131:14
hey [2] 85:2 102:17
higher [2] 13:17 52:8
highest [1] 5:6
hired [1] 39:23
hold [1] 6:11
holdup [2] 20:11 21:8
Holiday [1] 11:4
Holmes [1] 2:11
hotel [1] 11:5
hotels [1] 7:4
hound [1] 110:20
Houston [1] 61:19
Howard [12] 2:3,3 45:8,8,9 49:4,6 67:15 75:11 95:6 96:7 108:5
Howard's [1] 50:1

-I-

idea [4] 66:5 83:8 114:12 127:24
identical [3] 55:5,7 58:13
identify [1] 104:5
IL [4] 2:4,9,12,16
Illinois [34] 1:1,2,10 1:17,19,20,22 2:16 5:10 10:1 28:4 33:24 34:10 35:11 45:10 75:15 94:21 98:11 99:7 108:8 109:3,4,12 114:15 116:10,14 119:22 131:1,4,8,22 132:1,2,10
immediately [1] 57:5
inaccurate [3] 108:12 109:7,24
inadvertently [1] 120:21
include [4] 23:13 56:11 109:8 120:16
included [7] 15:6 23:2 91:4 93:14 101:7 114:5 115:15
includes [1] 113:9
including [1] 23:11
incorrect [2] 71:24 120:12
indeed [1] 63:16
independent [2] 18:15 45:13
indicate [1] 98:14
indicated [8] 29:15 82:16 83:16 98:17 106:7 126:15 127:7 128:6
indicating [5] 82:11 94:10 107:15,23 108:22
individual [2] 4:23 40:3
individually [2] 40:14 102:22
individuals [1] 78:10
information [17] 5:5 49:24 54:7,16 61:1,22 62:5,15 64:5 92:1 93:14 95:22,23 98:18 102:16 105:4 120:10
informed [3] 35:6 65:4 65:5
Inn [1] 11:4
input [1] 124:12
instance [3] 20:16 95:18 100:22
instead [1] 33:9
instructed [3] 17:9 27:19 103:11
instruction [1] 131:9
instructions [1] 95:5
insurance [70] 1:7,9 14:23 16:9 17:16,24 19:3 20:18 23:3,11,14 24:21 25:8 26:23 27:17 28:5,9,23 29:11,16,18 30:2,6 37:21 38:21 45:22 46:7,19 54:23 58:1 59:20,24 60:10 63:6,8,8,15 69:22 70:1 70:19 71:13,14,18 72:23 73:1,2,22 75:24 76:1 77:24 80:24 82:22 84:7 88:7,11 89:3 95:21 96:14,19 106:14 107:5 111:20 116:5,24 122:14,24 123:19 124:6 132:6,8
insurance's [1] 28:1
intensive [1] 6:24
intent [3] 27:13 31:21 53:12
interactions [1] 86:22
interest [50] 6:13 17:8 17:13,14 18:3 22:2 24:21 25:5 27:3,4 28:2 28:6,23 29:19 30:9 31:13 34:8,9 35:9 37:22,23 38:23 67:17 68:7,12,13 69:7,12 73:4 81:4,7,17 84:9 85:3,6 87:16,18,24 98:9 99:5 100:23 101:1 102:4 110:10,21 116:5 120:21 124:4,9 128:18
interested [2] 92:18 131:13
interests [2] 82:23 116:4
interpretation [3] 102:13,14,16
intervening [1] 83:23
invade [1] 10:12
inventory [5] 13:21 39:13,23 52:7,19
invoices [1] 14:6
involve [1] 10:17
involved [24] 5:14,18 6:1,4,9 9:9 10:9 11:5 11:10 14:1,9 39:17,20 78:10,11 86:14,17 92:6 92:9,19 96:8,13,23 115:6
involving [1] 43:11
issue [2] 23:20 71:19
issues [1] 7:9
items [1] 126:24
itself [2] 76:19 110:3

-J-

J [2] 1:3 132:3
James [7] 9:19 14:23 26:9 66:17 67:20 95:19 113:7
JAMIE [2] 1:4 132:4
Janko [106] 1:11 2:5 4:24 5:21 6:11,17,18 7:21,24,24 8:1,12,14 9:4,8,12,19 10:2,8 11:3 11:19,22 12:10,17,18 13:20 14:24 15:23 17:24 19:20 20:13,14 22:2,11,16 23:4,15 29:2,12 31:14 32:10 32:14 37:17 38:7,22 39:18 40:13,15,17 46:15 51:17 53:1 58:14 58:16 59:9 64:23 65:14 66:7,10,12,13,16 73:14 73:14 75:7,11,22 76:13 77:2,14,15 78:22 81:20 81:22 82:1,8,24 85:22 86:3,5,13,24 87:2,3,13 90:13,18 91:15,19,21 91:23,23 97:17 118:16 119:1,3,6 124:9 126:4 127:13 128:9,10,14,18 128:21 132:11
January [6] 6:12 34:21 108:9,16,24 109:18
Jason [4] 2:10 42:18 48:12 101:15
JFG [5] 6:14,16 7:6 27:4 37:23
JFG's [1] 59:2
JFG/Janko [1] 6:20
Jim [54] 10:18 11:6,8 11:15,17 12:8 13:8,14 13:16,22 14:5,9 15:21 17:9 19:4 27:19 28:8 28:17 29:9 33:3,5,18 34:6,24 35:3,6,19 40:5 42:2 45:4 75:24 76:3 78:3,6 80:16 81:1 82:4 83:4,13,21 84:5,8 92:15 101:20 102:23 107:4,6 110:20,22 111:4 123:17 126:4 128:16 129:13
Jim's [2] 60:11 68:22
John [28] 30:7 47:7,8 48:21 49:2,10 57:2,10 57:14,22 58:1 80:21 81:19 82:5,15,18,19

83:3,6 84:3 95:6 99:10 103:15 104:9,23 125:14 127:7 129:19
joint [8] 51:5 93:8 101:23 102:4,7,24 104:2 110:7
jointly [3] 101:24 103:7 105:12
judgment [4] 67:2,4 69:12 108:14
Julie [2] 2:14 74:6
jumping [1] 93:8
June [16] 1:19 58:7 59:8 60:22 62:1 64:6 64:17 97:8 98:22 111:9 118:3,18 131:3,19,22 132:14
justice [1] 5:8

-K-

keep [1] 92:10
kept [2] 17:11 36:17
kind [2] 25:15 86:8
knew [5] 32:6 61:5 64:22 83:8 102:23
knowing [1] 54:14
knowledge [10] 12:19 17:23 42:20 61:10 64:13 74:20 79:11 87:14 106:2 111:8
known [2] 83:6 93:1

-L-

L.L.C [1] 9:12
Lacks [1] 34:13
laid [1] 61:23
Larry [3] 74:14 85:18 88:23
LaSalle [1] 2:8
last [10] 6:24 7:1 45:18 53:8 56:10 64:13 68:19 69:5 95:15 100:15
law [5] 2:2,7,11,14 110:9
lawful [1] 1:18
Lawrence [7] 1:17 4:2 4:17,19 75:15 131:4 132:19
lawsuit [2] 41:6,8
lawyer [1] 109:19
lay [1] 7:13
laying [1] 62:5
learned [1] 46:19
lease [7] 25:14 42:3 43:16,17 70:20 73:3 96:17
leased [1] 11:18
least [3] 37:22 41:4 102:22
left [3] 44:22 120:12,21
legal [9] 20:21 23:8 84:20 85:1,12 86:9,9 86:11 107:9
lender [1] 73:6
less [1] 52:12
letter [99] 45:8 49:13 51:10 53:22,23 54:8,9 54:15 55:1,6,6,10,13 55:13 56:8,16,17,18 56:19 57:3,3,5,6 58:6 58:13 59:8,12 61:8,23 62:16,23,24 63:2,5,6,7 63:15,23,24 64:9 67:13 81:19 89:2,18 93:19 94:14,15,19,23,24 96:2 96:4 97:10,13,17 98:18 98:21 103:15,18 104:1 104:9 105:7,14 106:6 106:8,17 108:4 111:9 113:1,1,6,15,18 114:1 115:5 117:24 118:3,14 118:18 119:1,7,23 120:6,10,11,16,22,24 122:6 124:22 125:10 125:13 127:2,4,23 128:6,12,20,20
letterhead [3] 104:19 104:21 105:6
letters [9] 55:11 56:1 58:20,23 60:21 64:2,3 89:19 121:24
level [1] 5:6
liability [1] 8:8
License [1] 1:14
life [38] 1:6,8 2:9 14:23 16:8 17:9 20:17 23:3 23:14 24:22 25:4,7 26:23 27:16,24 28:23 34:8 69:22 70:19 73:4 73:22 75:24,24 80:24 88:7,11 89:3 96:14,19 106:14 107:5 111:20 116:5,23 122:13,24 132:6,8
limited [1] 8:7
line [3] 89:3 90:14 114:13
list [5] 11:12,13 106:15 106:16 125:17
listed [5] 16:9 21:21 37:7 54:17 104:18
live [2] 8:24 110:23
lived [1] 77:23
living [2] 7:3,4
LLC [26] 1:11,12 5:24 6:1,13,15 8:7,17,21 9:12,19 10:5 11:19,22 31:23 33:12 43:15 51:11 52:19 67:16 108:7 113:16 126:20 129:2 132:11,11
LLP [1] 2:8
loan [10] 70:20 79:16 80:7 105:6,8,18,20,21 114:24 115:3
locations [1] 25:11
longer [3] 5:21 38:22 86:14
look [14] 12:21 19:23 45:6,18 48:4 52:6 67:21 76:21 93:18 107:18 112:24 122:5,9 125:5
looked [3] 23:23,24 116:8
looking [16] 26:12 40:22 43:3,23 50:3,6 54:5,24 59:7 60:21 64:17 95:16 103:20 104:5,6 118:11
looks [2] 41:3 127:15
loop [1] 92:4
LW [1] 5:24
Lyons [44] 18:22 19:1 19:6,10 20:1 30:7,15 30:18,20,24 31:10 32:17 47:7 48:22 49:2 49:10 55:2 57:2,10,22 64:4,15 65:7 80:21 81:19 82:6,15,18,19 83:3,6 84:4 93:19 95:6 99:10 103:15 104:9,23 120:6 125:14 127:7 128:6 129:14,19
Lyons's [1] 30:19

-M-

M [2] 2:6,10
mail [3] 129:18,20,21
Main [1] 2:15
maintain [1] 14:23
majority [2] 86:3 87:4
makes [2] 11:1 100:2
man [1] 42:21
Man's [3] 10:12,13,19
managing [5] 10:2,4 40:19,20 87:2
Margaret [29] 1:3 11:17 12:8 15:21 19:16 19:21 26:9 27:19 28:14 28:18 33:23 42:2 45:7 46:17 68:6 73:9,15,18 76:13,14,22 77:5,8 80:17 88:11 90:8 113:8 126:4 132:3
Margaret's [2] 74:16 74:24
mark [2] 18:6 124:23
marked [24] 12:22 18:10,14 19:19 21:10 30:10 32:22 33:22 40:23 45:6 48:1,18 50:13 67:8,12 88:21 88:24 90:12 94:11 108:19 123:12 125:1,4 127:3
master's [1] 5:7
material [1] 24:2
materials [2] 5:17 60:13
matter [3] 1:21 6:21 43:20
matters [2] 43:11,13
Mattoon [1] 2:12
may [37] 46:13 52:12 53:18 54:2,8,9 55:2,6 55:13 56:3,8,15,16 57:4 61:18 64:2,3 91:18 92:4 93:14,15 93:19,22,23 94:23 95:9 96:3 99:10 103:15 106:6,8,17 113:1 117:24 120:5,11,22
mean [12] 9:5 12:5 20:14 50:10 51:21 55:10 69:6 117:16 125:20,22 128:10,14
meaning [1] 21:7
means [5] 86:4 109:20 109:21,22 128:12
meant [3] 23:13 32:14 71:8
Meats [1] 43:19
meeting [1] 36:4
MEGAN [2] 1:5 132:4
member [15] 5:21 7:21 8:12 9:4,5,13 10:3,4,7 40:17,19,20 87:3 126:17 128:23
members [4] 7:24 9:18 12:10,18
membership [3] 6:13 67:17 68:23
memorializes [1] 90:7
mention [4] 26:13 94:20 106:7,9
mentioned [8] 72:23 76:20 80:21,22 99:13 101:23 124:21 125:18
met [1] 11:6
Michael [1] 2:2
Mid [40] 1:10 2:16 28:4 33:24 34:9 35:11 45:10 51:1 88:1 93:9,11,14 94:7,20 95:2 98:11 99:7 101:8,11,18,24 103:1,7 105:24 108:8 109:3,4,12,16 113:21 114:2,15,21 116:10,14 116:16,19 118:23 119:22 132:10
might [5] 6:23 9:11 10:17,17 57:20
Mihlar [1] 2:15
Mike [6] 8:1,4 91:23 92:3,6 127:3
million [31] 14:24 19:14,24 20:4,17 31:13 33:24 35:14,16 36:3 36:11 37:4,6 73:1 77:2 85:5,9 87:19,19 88:5 96:20 99:6,14 100:6 100:23 108:6 109:9,13 109:17 116:20 124:9
mine [1] 64:4
minimum [1] 52:8
minute [1] 67:21
misreading [1] 69:10
mistake [1] 98:15
misunderstood [1] 36:14
money [11] 65:21,22 65:23 66:2 72:3,14,20 114:9,17 115:21 117:13
monies [3] 85:23 96:19 107:13
month [1] 123:23
Moskowitz [1] 2:7
most [1] 6:21
Move [1] 34:12
Mrs [5] 12:6,14,22 32:23 40:23
MS [66] 3:2,3,3 4:7,22 5:2 10:14,20 11:2 18:6 18:7,9,12 21:22 22:1 34:14 44:15,19,21 48:2 48:8,10,15,17 50:5,10 50:11,12 54:11 55:17 55:20,21,23,24 56:1,2 67:10 69:18,23 71:3,5 71:8,11 72:17,21,22 74:5,8,11 87:11 94:13 94:16 95:15 100:9 101:14 112:20,23 118:10 121:5,9,11 123:3,6 124:1 130:9 130:10
multiple [4] 58:2 59:17 79:4 116:9
multiplicity [1] 45:3
must [1] 36:14

-N-

N [1] 3:1
name [10] 4:15 11:16 29:11 38:1 39:1 61:17 95:19 104:22 126:15 128:23
name's [1] 109:21
named [4] 15:1 17:24 25:6 42:21
names [1] 24:2
nature [1] 65:6
necessarily [1] 39:21
necessary [1] 115:1
need [8] 13:5 45:19 57:11 62:12 85:2 100:12 102:18 105:5
needed [9] 35:8,16 37:20 38:21 48:22 54:14 57:16 61:1 104:24
negotiated [1] 75:10
negotiations [1] 77:19
neighborhood [1] 67:6
net [1] 117:15
never [5] 14:4 20:13 20:16 27:13 35:21
new [9] 9:7 29:11 37:24 38:1 78:13 84:9 85:21 86:18 124:3
newly [4] 9:8,13,15 22:4
next [2] 47:19 49:14
nice [1] 7:15
Nobody [2] 7:19

106:23
**normally** [1] 91:20
**North** [1] 2:8
**notarial** [1] 131:15
**Notary** [5] 1:20 131:3 131:19,22 132:23
**notation** [2] 124:16 128:24
**note** [2] 6:11 30:21
**noted** [2] 27:17 132:17
**notes** [1] 131:9
**nothing** [5] 6:24 71:16 104:1 126:10 131:5
**notice** [2] 4:20 129:8
**noticed** [2] 106:24 127:7
**noticing** [1] 30:18
**notification** [1] 96:10
**notified** [4] 33:6 38:4 38:17 46:15
**notify** [8] 28:9 29:11 29:22,23 30:2 37:21 38:6,14
**notifying** [1] 63:18
**November** [10] 21:13 23:20 30:17 86:1,16 87:9 123:24 124:2 125:24 129:17
**now** [17] 1:21 5:10 12:17 15:12 23:19 24:15 35:15 38:23 41:21 80:21 83:18 90:11 94:9 100:10 111:15,17 117:22
**number** [20] 13:17 21:4 30:20 33:8,9 48:14 52:12 57:23 61:17 73:21,23 76:23 83:22 93:20 94:4 95:20 101:7,7,13 106:14
**numbers** [3] 14:16 51:18 52:3
**numerous** [3] 21:5 84:5,13

-O-

**oath** [1] 1:18
**object** [19] 17:17,19 29:8,20 32:1 36:20 37:19 39:3,14 41:7 52:1 61:3 63:13 65:19 66:9 70:5,17 110:2 128:11
**objection** [14] 10:15 10:19,21 11:1 20:20 23:7,18 29:20 53:6 62:19 69:20 74:18 100:19 107:8
**objectives** [1] 13:16
**obligation** [2] 14:22 26:24
**obligations** [1] 22:21
**obtain** [3] 17:24 20:23 27:16
**obtained** [1] 20:18
**obtaining** [1] 26:23
**obviously** [4] 26:6 81:18 97:10,12
**occurrence** [1] 92:17
**off** [3] 44:22 56:3 71:12
**offhand** [6] 18:17,20 49:19 66:21 73:7 123:24
**office** [3] 11:7 40:1 57:7
**officer** [5] 105:6,8,18 105:20,21
**offices** [3] 1:19 90:19 131:7
**OFFICIAL** [1] 131:21
**oftentimes** [1] 79:8
**Old** [2] 89:3 90:14
**once** [2] 80:24 105:7
**one** [54] 2:3 9:11,12 11:6 13:16 24:19 25:18 33:8 36:10,11 52:5 54:6,6,17,18 55:18,19 57:15 59:16 60:3 62:9 63:10 64:3,3 65:17 66:24 73:21 75:6,18 75:22 83:22 84:10 88:17 91:18,20 92:14 95:4,10 102:10 103:14 106:9,16 107:20,23 108:22 110:10 112:14 114:7 116:8,9 118:7 120:12 126:11 128:2
**one-third** [1] 66:11
**operation** [1] 13:9
**opportunity** [1] 123:7
**order** [2] 11:14 30:8
**ordering** [1] 14:2
**original** [11] 9:4,5 17:6 23:5,16 24:3 54:15 56:17 57:3 77:23 85:20
**originally** [4] 11:22 16:24 17:5 35:14
**otherwise** [2] 99:24 131:13
**Ottawa** [1] 75:15
**ourselves** [1] 64:3
**outside** [1] 86:23
**outstanding** [1] 57:23
**overall** [2] 71:22 72:1
**overnight** [1] 57:6
**overprotected** [1] 37:1
**owed** [47] 15:23 26:10 42:5 65:14,21,22,23 66:2 70:3,15,21 71:23 72:2,3,5,7,13,14,20 86:5,6 93:11 94:7,8 95:1 101:8,11,18 105:5 105:8 107:5,13,15 113:6 114:2,9,11,14 114:18,21 115:4,17,21 115:22 116:6,23 117:5
**owes** [2] 113:9 115:14
**owing** [2] 51:24 85:22
**own** [2] 5:24 9:24
**owned** [5] 11:17,21 13:21 66:11,12
**owner** [5] 5:19 8:20 9:3 11:19 87:4
**owners** [1] 14:7
**ownership** [3] 69:12 78:13 86:3
**owns** [1] 8:14

-P-

**P.C** [1] 2:11
**p.m** [4] 4:1 44:20,20 130:13
**packet** [1] 21:11
**page** [27] 3:1,10 15:8 15:14 16:12 22:6,7 23:21 24:8,23,24 25:12 41:17 43:4 48:3 56:11 57:1 58:5,12 77:10 95:15 103:19,20 104:7 104:8 122:16,17
**pages** [1] 53:8
**paid** [19] 45:22 46:6 60:8 65:10 68:11 71:18 74:22,23 96:19 99:23 100:2,4,7 101:5 116:22 117:3,3,4,17
**paragraph** [10] 45:18 56:11 64:1 69:6,6 113:5 115:10,14 120:18 120:19
**part** [6] 7:1 91:3 93:12 108:4 111:18 115:10
**particular** [3] 65:17 92:5 119:7
**parties** [3] 4:21 6:10 38:3
**partner** [1] 46:15
**partners** [2] 49:20,23
**partnerships** [1] 6:2
**parts** [2] 95:17,18
**party** [1] 131:14
**passed** [4] 46:12,14,20 95:5
**past** [1] 26:21
**pay** [4] 40:8 53:15 65:1 115:23
**payment** [32] 14:6 44:10 46:6 57:18 65:5 65:8 68:9,16,17 69:1,2 69:3,7,17 70:2,14,19 71:1,9,14,15,21 72:24 73:1,5,22 74:15 99:7 106:18 115:16 117:13 117:13
**pending** [3] 1:21 28:2 91:7
**people** [5] 59:19,23 60:4 64:12 126:3
**people's** [1] 78:12
**Peoria** [1] 2:4
**percent** [4] 9:3 52:8,9 52:11
**percentage** [1] 66:13
**Perhaps** [1] 60:1
**person** [13] 6:22 39:16 39:22,22 40:5 83:17 83:18,20 84:12 88:16 91:21,24 131:12
**personal** [4] 12:9 15:10,19 26:8
**personally** [5] 15:22 41:22,24 42:2 73:10
**Peru** [1] 90:20
**phone** [10] 33:14 62:6 62:10 83:17 84:14,15 97:24 98:3 121:24 122:2
**phrase** [1] 81:7
**pigeon** [1] 129:20
**place** [4] 78:20 80:9,13 84:11
**plaintiff** [3] 1:9 68:4 132:9
**Plaintiffs** [3] 1:5 2:13 132:5
**Plaza** [1] 2:3
**point** [25] 7:20 8:16 10:2 14:8 17:6 18:21 22:2 27:15 39:4,16,21 40:12 47:22 48:13 54:20,22 61:13 64:21 64:24 65:9 70:23 78:23 93:7,10 98:13
**pointed** [1] 113:20
**points** [2] 62:10 106:4
**policies** [3] 23:11 116:5 116:24
**policy** [20] 17:9,16 18:4 19:14 24:22,22 25:4 34:8 46:19 50:22 63:4 73:4 88:7,11 95:20 96:20 105:3 106:14 107:5 128:8
**portion** [1] 100:17
**posing** [1] 60:24
**position** [9] 36:21,23 36:24,24 37:10 99:2 99:19 100:3,5
**possessed** [1] 38:23
**possible** [1] 91:18
**practice** [2] 89:13 92:3
**predated** [1] 12:11
**prepare** [2] 52:22 95:8
**preparing** [1] 95:7
**present** [4] 27:2 28:14 79:9 125:21
**presented** [1] 116:18
**pressure** [2] 110:22 129:13
**previous** [4] 9:9 24:12 28:1 111:14
**previously** [11] 12:21 19:19 21:10 30:10 45:6 48:12 50:14 60:21 67:12 74:2 113:5
**price** [1] 52:7
**principal** [1] 11:19
**problem** [3] 10:20 57:4 91:19
**problems** [2] 39:9 40:7
**proceed** [1] 45:19
**proceeded** [2] 47:20 47:22
**proceeds** [9] 23:15 45:22 46:7 54:19 63:4 73:22 96:14 106:13 116:23
**process** [1] 78:15
**processed** [2] 61:2 111:20
**processing** [1] 62:18
**procure** [1] 16:8
**procured** [1] 81:1
**procurement** [1] 14:10
**produced** [3] 1:18 41:1 48:12
**production** [2] 48:6,8
**projects** [1] 7:2
**prompted** [3] 82:17 119:9 123:15
**pronunciation** [1] 4:12
**proof** [1] 104:14
**proper** [6] 28:2,22 33:19 36:15,18 38:2
**properly** [1] 116:17
**protect** [2] 29:18 85:2
**protected** [4] 28:24 37:2,11,12
**protection** [5] 20:17 20:18 36:22,23 81:1
**provide** [11] 28:8 31:12 36:18 47:8,15 82:21 110:20 111:6 122:23 123:18 124:5
**provided** [20] 17:8 31:11 38:2 62:6 75:23 76:4,5 77:19 81:4 110:9 111:5,10,21 112:2,12 120:1 121:17 127:17,22 128:16
**provides** [1] 124:11
**providing** [3] 30:21 81:19 121:14
**provision** [11] 14:19 14:21 15:2,4,6 16:8,14 26:14 27:11,14 76:4
**Public** [5] 1:20 131:3 131:19,22 132:23
**pull** [2] 76:17 103:18
**purchase** [3] 13:21,22 14:5
**purpose** [9] 8:10 9:23 9:24 15:4 22:14,15 77:12 78:7,24
**purposes** [1] 26:3
**pursuant** [5] 4:20 109:17 114:22,24 115:3
**put** [11] 32:8 82:12 95:18 98:17 101:4 106:21 117:14 120:19 120:20 128:23 129:13
**putting** [1] 98:21

-Q-

questioned [1] 118:16
questions [12] 60:24 61:5 74:7 112:21 121:6 121:13 123:4 125:16 127:8 129:5 130:8 132:16
quick [2] 44:18 125:17
quite [3] 12:6 69:19 84:4

-R-

raised [1] 7:9
rate [1] 13:18
rather [2] 36:24 54:19
Ray [5] 59:6 98:1,13 99:11 122:6
reached [2] 73:24 74:2
read [11] 16:22 32:6 34:14 45:15 100:15,18 103:22 108:2 128:19 128:20 132:14
reading [6] 14:21 69:6 70:9 102:9,21 108:3
reads [1] 128:7
ready [1] 30:8
real [5] 5:14 6:1,5 8:11 125:17
really [4] 70:8,10 102:19 120:23
reason [11] 18:21 24:10 32:7 51:23 52:15 53:2 56:7 101:12 110:5 126:9 129:3
Rebecca [2] 2:6 10:11
recalled [1] 121:13
recap [1] 94:21
receipt [4] 28:2 54:19 106:11 129:16
receive [5] 17:12 34:19 34:22 89:19 91:21
received [51] 19:21 30:6,14,16,19,19 32:4 32:5 33:3,5 34:6,16 37:9 46:16 49:1,9,17 58:22 63:6,7 67:3 69:13 70:2 74:16 76:2 76:3,10 77:1,13 81:18 82:14 83:24 88:5,9,17 90:4 91:10,12 105:7 105:24 117:11,23 126:22 128:6 129:11 129:14,18,21,23,24 130:2
receiving [19] 18:15 34:17 44:10 45:12,14 49:21 58:20 60:22 65:2 84:3 89:9,10,22 90:1 90:22 93:4,5 97:8 124:13
recently [1] 5:20
Recess [1] 44:20
recitals [1] 67:24
recognize [4] 22:8 50:14 123:12 125:7
recognized [2] 100:21 100:23
recollect [3] 33:15 36:13 99:4
recollection [24] 9:17 11:9 18:15 20:8 21:4 34:24 41:5 43:5 45:13 46:1 55:15 58:19 61:18 71:15 80:18 82:20 88:2 90:5,21 91:17 96:5,11 96:24 97:6
Reconciliation [1] 52:20
record [4] 4:18 63:11 87:9 131:10
records [4] 58:8,15 91:14 112:6
recover [1] 46:19
reduce [2] 72:1,5
reduced [6] 70:3,14 71:2,22 72:9 131:9
REEXAMINATION [8] 3:3,4,5,5 121:10 126:12 128:3 129:6
refer [2] 81:10 118:5
reference [7] 19:13 104:4 105:11,13 106:17 111:7 122:11
referenced [6] 12:20 26:16 51:9 60:22 113:14 125:11
references [4] 15:9 20:1 94:13 109:4
referencing [3] 26:15 87:18 110:5
referring [10] 6:16 14:15 30:12 87:24 118:3,18 125:9,24 128:5 130:3
reflect [7] 4:18 44:13 58:8 78:12 101:10,18 112:6
reflected [1] 51:24
refresh [3] 41:5 43:5 46:1
regard [1] 60:15
regarding [1] 84:5
regardless [1] 121:17
relate [1] 21:12
related [3] 8:3 80:8 83:12
relates [1] 122:13
relation [1] 8:5
relationship [7] 12:5 12:9 45:4 63:19,21 72:3 115:7
relationships [1] 11:11
relative [1] 131:13
release [15] 32:13,14 35:12,19 54:18 56:14 57:17 81:20,23 82:2 106:10,18 118:1,15 128:8
release/transfer/assign [1] 128:17
released [4] 31:22 58:16 61:9 97:18
releasing [2] 127:13 128:20
relevance [2] 69:16,21
relinquish [1] 106:13
rely [1] 95:6
relying [1] 62:17
remainder [1] 117:18
remember [24] 7:17 9:11 44:16 45:5,14,17 55:12 59:4,21,22 60:2 79:7,22 80:2,5,6,12,15 84:3 92:23 93:5,6 103:9 123:23
remind [1] 7:18
rent [5] 40:8,11 41:13 42:1,6
rental [6] 39:12 47:4 65:21 67:2 74:3 96:16
replevin [2] 45:20 46:2
reporter [8] 4:16 7:17 18:11 48:1 67:9 88:21 100:18 125:2
Reporting [2] 1:19 131:7
representative [1] 4:24
represented [10] 42:15 42:21,23,24 43:1,7,14 78:22,24 115:9
representing [1] 75:11
represents [1] 6:12
request [2] 34:7 128:16
requested [5] 28:1,7,8 64:21 100:17
required [7] 26:20 27:18 33:7 51:7 122:23 123:17 124:4
requirement [5] 24:21 26:13 36:5,7 77:24
requirements [1] 35:7
requires [1] 26:8
researched [2] 74:21 75:1
reserve [1] 130:11
resolution [2] 44:6,8
resolve [1] 68:5
resolved [6] 44:2,9 45:2,5 66:23,23
respect [16] 26:22 62:6 69:21 74:14 75:2 77:15 78:3 79:16 84:21 87:23 89:11 93:3 94:22 96:2 99:1 110:15
respond [1] 36:8
responded [1] 119:7
response [5] 34:5 48:11 63:5 97:10 128:16
responses [1] 7:16
responsible [1] 85:23
rest [1] 72:3
restate [3] 42:22 80:11 100:13
restaurant [7] 11:18 11:18 43:19 66:3,12 74:3 87:5
result [2] 44:10 117:15
retail [3] 9:24 13:23 52:11
retailing [1] 12:1
retainer [1] 7:1
retrospect [1] 117:8
return [1] 33:17
review [5] 5:15 21:19 50:1 61:7 98:19
reviewed [2] 79:10 91:1
reviewing [3] 41:9 54:16 109:1
revise [1] 77:21
revising [1] 77:19
rewrite [1] 120:18
Richard [2] 45:9 108:5
right [81] 8:1,12,20,22 9:22 10:3,22 12:20 14:16 16:1,2,8,14 17:18 19:9 20:9 21:17 21:22 22:4,6,13 23:2 23:14 24:14 26:10 27:7 28:11,20 30:1 31:16 31:20 32:3 35:22 38:14 39:2,6,19 40:9,12 42:4 42:8,11,12 43:9,22 47:13 48:24 49:7 50:8 53:2,17,21 56:3,20 60:14,20 62:8 63:17 64:7 65:9,10,12 67:7 68:9,14 69:8 72:9 86:24 94:1 101:21 106:20 108:17,22 113:24 114:21 117:19 120:14 121:20 122:10 122:10 130:6
rights [9] 17:15 22:16 22:19,23,23 28:6 37:23 59:2 68:23
RMR [3] 1:20 131:19 132:15
Rodney [1] 42:23
room [1] 83:15
Rothman [47] 2:6 3:2 3:3 4:7,22 5:2 10:14 10:20 18:6,9,12 21:22 22:1 34:14 44:15,19 44:21 48:2,8,15,17 50:5,11,12 55:20,23 56:1,2 67:10 69:18,23 71:3,5,8 72:17,21,22 74:5 87:11 94:13,16 95:15 121:9,11 123:3 124:1 130:10
rules [1] 7:14

-S-

s [3] 2:2 3:9 132:17
sales [2] 52:7,11
Sangamon [1] 5:11
satisfaction [3] 67:19 68:24 114:17
satisfied [4] 72:1,7 73:20,21
satisfy [4] 35:7 114:19 115:17,18
save [1] 7:15
saved [1] 7:19
saw [5] 24:19 32:12 54:16 88:18 93:2
Sawicki [15] 59:6,10 59:21 61:15,20,22 62:3 98:1,13 99:11 101:3 119:11,12 120:3 122:7
says [18] 15:3 19:14 33:23 45:19 52:6 57:2 58:8,14 105:2,17 108:5 109:12,15,20 113:15 116:11 127:19,21
scenario [1] 107:14
scheduled [1] 45:20
Scott [1] 2:15
seal [2] 131:15,21
second [12] 20:8 48:3 49:11 52:18 78:16 103:19,20 104:6,8 106:3 122:17 125:23
section [15] 14:19 15:9 15:12,13,13 23:10,13 24:8 25:1,10,13 26:6,8 26:17 122:22
Sections [2] 31:18 124:18
secure [1] 116:6
security [1] 15:7
see [38] 14:12,16,19 15:11 16:10,18 19:16 20:7 21:13 34:1 39:13 41:22 42:9 43:24 45:19 45:22 50:3 52:9,20 57:9 58:10,16 59:12 61:7 82:10 89:24 94:20 95:11 97:1,13,16 103:17 107:1,1 108:9 113:17 125:23 126:2
seeing [1] 45:17
seek [4] 84:20 85:7,12 96:3
seem [2] 12:5 109:1
sell [2] 13:23 25:14
send [6] 31:2,5 92:3 105:9 127:10,17
sending [3] 31:1 57:11 98:24
Seneca [48] 2:2 3:4,5 5:1,3 10:24 21:23 25:21 44:12 48:9,11 50:8 62:19 70:23 71:4 71:6 72:15,19 74:18 76:17 77:10 82:11 93:22,24 100:19 103:19 103:22 107:8,20,23 108:21 110:2 118:8,11 121:7,23 123:4,7,10 124:23 125:3 126:10 128:2,4 129:4 130:3,8

130:11
sense [1] 11:1
sent [14] 14:6 48:23 57:2 90:13,17 106:16 120:3,23 122:1,6 125:13 127:23 129:14 130:1
sentence [2] 108:4 128:7
separate [7] 38:18 71:7 79:15,17 80:12 103:7 114:13
separately [2] 103:16 105:12
September [3] 17:13 20:5 131:23
series [1] 121:13
serve [1] 15:5
Service [2] 1:19 131:7
set [3] 113:21,23 131:14
sets [1] 42:5
Setting [2] 23:23 24:1
several [6] 5:14,14 59:19 83:21,23 100:10
shared [1] 55:13
sheet [5] 19:15 48:2 52:16 93:15 132:17
short [1] 38:16
shortages [1] 39:13
shortly [1] 91:10
show [14] 9:11 20:20 23:7 28:22 30:8 31:12 53:6 58:15 69:20 106:1 108:2,15,23 123:11
showed [3] 91:1 98:9 102:3
showing [10] 18:13 21:10 25:6 30:10 32:22 33:22 34:8 48:18 50:13 67:11
shows [3] 15:18 105:2 114:11
side [1] 54:20
sign [7] 19:16 31:21 32:7 82:22 95:22 127:10 128:23
signatories [2] 79:13 92:22
signatory [3] 64:23 80:19 115:1
signature [9] 30:8 41:16 77:8 79:13 97:4 124:16,17 130:12 131:11
signatures [1] 79:7
signed [29] 16:3,5 17:5 33:4 38:21 51:1 56:3 75:22 76:12,14,22 77:5 87:12 88:10 95:9,12 105:6,8 115:5 123:21 125:19,21 126:3,15 129:2,9,11,16 130:1
similar [2] 55:8 105:24
simply [5] 14:6 24:12 96:9 107:10 128:22
sit [2] 6:4 97:7
sits [2] 25:22 44:12
sitting [1] 67:14
situation [1] 52:5
skipping [2] 48:3,19
Smith [1] 42:23
Smokehouse [4] 11:16 43:18 65:22 66:4
sold [1] 19:4
sole [1] 119:17
solely [1] 118:16
someone [6] 46:17 58:1,24 60:10 61:17 61:19
Sometime [1] 34:21
somewhere [1] 118:8
son [1] 8:4
sorry [17] 7:14 14:14 15:15,17 24:17 25:1 40:17 41:3 49:3 55:20 55:24 94:12,18 95:17 101:14,15 115:13
sort [1] 17:1
speak [2] 39:16 59:23
speaking [1] 12:24
speaks [2] 76:19 110:3
specific [5] 25:11 67:5 79:11,12 88:2
specifically [11] 24:20 37:2 45:4 57:17 106:11 106:14 113:21,23 121:21 122:4,21
speculation [3] 62:20 74:19 100:20
speed [1] 11:1
spoke [2] 59:4 119:12
spots [1] 48:16
spreadsheet [1] 51:10
Springfield [1] 5:11
SS [1] 131:1
staff [2] 51:17 53:1
stake [1] 8:17
stakes [1] 8:14
stamp [4] 14:12,13 25:1 26:7
stamps [1] 41:2
stand [1] 100:11
standing [3] 10:14,21 10:24
standpoint [2] 37:1 109:7
started [3] 39:5,11,13
starting [1] 39:9
state [17] 1:2,17,20 4:15 5:11 57:17 59:1 62:9 115:12,16 127:12 129:17,24 131:1,4,22 132:2
statement [19] 13:24 32:12 50:1 71:24 105:2 105:4,9 108:3,9,12 109:2,7,10,15,24 112:17,18 113:12 116:7
statement's [1] 109:15
statements [2] 54:2 62:17
states [9] 1:1,21 23:10 30:18 104:1 105:1 116:21 132:1,16
stating [8] 30:21 36:14 49:1 61:9 69:13 83:20 105:7 110:8
status [1] 36:7
stenograph [1] 131:9
steps [2] 46:18 47:6
still [6] 9:2 18:7 35:8 85:5 86:17 98:5
Stilwell [100] 1:3,4,4,4 1:5 9:19 10:18 11:6,17 12:6,14,14 14:23 15:22 19:7,21 20:22 21:7,11 26:9 27:20 28:8,14 29:15 30:1 31:8,10,11 33:3,22,23 34:6 35:1,3 36:1 39:17 40:5 45:4 46:12 50:6,14 52:19 54:11,12,13,24 55:1 55:18 66:18 67:20 68:6 73:9,15,18 76:24 77:8 77:11,12 80:17,17 81:13 82:12,18,21 83:4 83:13,21 84:5,17,23 88:11 90:8 94:5 95:19 107:6,20,22 108:3,23 109:1,12 110:22 113:3 113:4,8 120:6 123:12 123:17 125:11 126:4,5 126:14 128:17 129:13 130:4 132:3,3,4,4,4
Stilwell's [17] 12:22 13:22 19:19 30:6,11 32:23 40:23 45:7 46:10 55:23 65:12 71:4 75:24 101:20 102:24 107:4 111:5
Stilwells [25] 12:5,11 13:3,5 16:20 17:2,23 23:4 26:24 27:2 39:5 40:13 41:13,22 42:5 42:14 43:11,14 65:14 70:4,15,22 71:23 77:23 122:23
Stilwells/ACV [1] 113:17
stipulate [1] 21:23
stipulated [2] 77:21 78:1
stop [1] 38:16
Street [5] 1:19 2:4,8 2:15 131:7
strike [12] 13:4 34:12 34:16 36:22 43:10 44:24 51:22 59:22 80:22 96:18 113:24 125:16
sub [1] 60:2
Subject [1] 23:9
submit [4] 53:13 63:3 63:22 104:24
submitted [12] 50:20 50:20 53:18,18 56:15 60:13,17 64:18,20 101:5 114:1 117:24
submitting [2] 62:16 64:9
subpoena [1] 48:11
Subscribed [1] 132:20
substance [1] 60:3
substantiate [2] 28:5 123:19
such [3] 39:22 42:10 105:18
sued [1] 40:13
sufficient [3] 17:10 36:22,23
suggest [1] 111:10
suggested [1] 103:16
suit [3] 1:21 41:12,21
Suite [3] 2:3,8,15
support [2] 38:20 62:7
supposed [2] 77:7 81:3
sworn [4] 1:18 4:4 131:5 132:20

-T-

T [1] 3:9
table [1] 67:14
takes [1] 110:24
taking [3] 18:18 21:7 93:6
Technology [1] 2:3
telephone [1] 47:10
tells [1] 43:23
tenant [2] 11:21 43:19
term [1] 63:21
terms [7] 11:1 12:8 73:3 98:19 102:5 106:10 110:4
testified [1] 4:5
testify [1] 112:14
testimony [2] 91:9 131:10
TFG [31] 4:24 22:4,11 25:6 26:10 29:2 36:11 37:17 39:18 52:8 53:9 53:13 57:23 65:14 66:16 73:14 92:21 101:8,11,18 109:8,16 112:1 113:9 115:14 116:23 117:2,3,5 118:15 122:24
Thank [1] 123:3
Thanks [1] 14:11
thereafter [1] 17:7
therefore [7] 28:7 37:5 61:12 78:13 115:17 120:17 128:19
thinking [2] 67:6 71:14
Third-Party [4] 1:9 1:12 132:9,12
Thomas [3] 51:1 55:2 64:4
thought [7] 12:7 29:6 54:19 94:11 98:5 102:1 127:11
three [7] 48:16 60:1 64:2,12 106:15,19 126:3
through [15] 6:14 21:18 25:19,24 41:2,3 47:24 73:21,23 78:15 85:10 88:15 98:8 99:15 125:17
tied [1] 114:15
Tim [9] 49:4,6,20,22 49:24 75:11 95:6 96:7 108:5
times [5] 21:2 26:4 35:14 36:6 100:10
Timothy [2] 45:8 67:15
title [1] 105:18
titled [1] 51:11
today [6] 6:4 25:22 44:13 81:9 91:2 116:18
today's [1] 4:20
together [2] 98:11,21
Tom [6] 79:15,18 80:2 87:22 88:3,4
too [2] 29:6 123:8
took [10] 20:8 78:20 80:9,13 93:3 97:9,21 101:1 117:13 120:19
top [4] 43:22 57:1 82:1 82:9
total [4] 65:18 66:6,8 66:15
touch [1] 119:10
trade-off [1] 69:12
transaction [11] 17:6 21:12 69:21 70:11 73:24 75:12 77:16 85:19 87:5 114:14 124:13
Transactionally [1] 117:10
transactions [5] 22:17 40:2,3 86:15 115:6
transcript [2] 132:14 132:15
transfer [2] 32:10 37:22
transferred [3] 22:19 22:22 82:24
transferring [1] 124:8
transmittal [2] 49:3 57:1
transpired [3] 63:20 84:8 101:3
trial [1] 45:21
tries [1] 109:8
true [9] 21:20 54:3 56:9 61:10 64:6 70:12 101:22 113:12 131:10
Trust [5] 1:11 33:24 108:8 119:22 132:10
truth [3] 131:5,5,5
try [5] 6:2 7:17,18 69:24 89:13

**trying** [5] 60:7 87:8 92:14 96:6 107:10
**turn** [8] 15:8 19:18 22:6 22:7 37:13 58:5,5 115:23
**Turning** [1] 14:11
**Tuscola** [82] 1:11 2:5 8:21,23 10:1 11:3,18 22:19 27:5 28:3 29:12 31:14,22 32:8,11,15 32:24 33:10,12 34:9 35:11 37:24 38:7,23 43:19 45:9 51:11 52:18 58:7 59:3 65:24 66:2 66:12 78:8,9,23,24 80:23 83:1 85:24 86:4 86:5,6,19 87:4 88:13 89:2,12,16,18 90:8 91:16 92:7 93:9 94:8 97:13 98:6 99:6,13 103:1,8 104:10,18 105:15,19,21 106:12 108:7 109:2 113:16 114:12,18,19 116:10 118:21 124:10 126:19 127:14 128:19,22 129:1 132:10
**twice** [1] 68:15
**two** [20] 13:1,2,16,17 33:6,9 41:4 43:20 55:11 56:1 64:3 73:23 75:3 77:13 86:23 90:19 113:5 115:10,14 121:9
**two-party** [1] 117:10
**type** [4] 51:11 75:23 91:24 92:13
**typewriting** [1] 131:9
**typically** [1] 89:19

**-U-**

**U.S** [2] 129:18,20
**UCC** [2] 26:13,19
**ultimately** [4] 76:8 78:15 84:16 97:24
**unable** [1] 40:8
**unaware** [1] 61:6
**uncommon** [1] 79:23
**under** [32] 14:22 15:7 15:13 16:10,14 17:15 22:21,23 25:4 27:1,18 27:20,22 29:1,19 38:1 46:19 50:21 52:6,10 63:4 68:19 72:2,5,7 73:3,22 77:19 85:24 96:16 116:2 131:9
**understand** [17] 5:13 14:7 19:1 26:22 51:20 61:18 66:14 70:10 72:17,21 79:21 85:19 89:22 90:6 96:18 101:6 107:1
**understood** [5] 25:9 32:9 46:9 62:14 127:12
**undetermined** [1] 1:21
**Unfortunately** [1] 110:24
**United** [3] 1:1,21 132:1
**University** [2] 5:10,11
**unknown** [1] 52:7
**unless** [4] 64:14 77:23 80:19 93:12
**unlocated** [1] 52:6
**unsecured** [1] 74:23
**up** [11] 17:11 20:22 28:22 69:22,24 77:23 78:16 106:4 110:23 114:19 123:15
**update** [1] 92:14
**updates** [1] 92:16
**urgency** [1] 129:11
**utilized** [1] 24:13

**-V-**

**value** [1] 52:12
**various** [11] 6:1,5 8:15 11:10,11 19:4 35:14 36:6 43:20 65:15 71:6
**vendors** [1] 14:4
**verified** [2] 41:15 42:11
**verify** [5] 21:19 51:18 51:21 70:11,13
**versa** [1] 100:24
**versus** [2] 29:12 103:7
**vice** [1] 100:24
**Village** [20] 11:20,24 22:17 39:5,19 43:16 47:5 63:20 67:2 74:2 75:7 85:22 86:15,19 87:1,6,14 113:7 115:8 115:21
**voluntarily** [3] 43:24 46:2,5

**-W-**

**wait** [2] 54:20 103:24
**waive** [1] 27:14
**waived** [3] 20:16 27:12 131:11
**West** [2] 1:19 131:7
**whereas** [3] 33:11 68:19 69:5
**whereby** [1] 48:22
**wherein** [2] 81:19 118:14
**WHEREOF** [1] 131:14
**White** [2] 1:19 131:7
**whole** [2] 101:15 131:5
**wholesale** [1] 52:10
**Wide** [2] 1:19 131:7
**William** [3] 4:17,19 55:2
**Wilson** [1] 2:7
**within** [2] 91:11,14
**without** [3] 39:14 79:8 124:3
**witness** [8] 1:17,20 4:3 4:23 118:7 130:5 131:11,14
**wondering** [1] 96:8
**words** [3] 31:22 39:1 110:17
**worth** [2] 85:5 99:14
**wrapping** [1] 106:4
**write** [1] 95:19
**writing** [1] 62:13
**written** [1] 87:13
**wrong** [1] 33:8
**wrote** [5] 59:13 120:10 120:17 126:17,19

**-X-**

**X** [2] 3:1,9

**-Y-**

**year** [5] 6:24,24 7:2 20:10,10
**yourself** [2] 80:16 119:4

**-Z-**

**zero** [1] 72:10