Multi-Page™

WILLIAM JOHN LYONS **E-FILED**
Monday, 02 April, 2007 03:46:33 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MARGARET J. STILWELL, HALEY
STILWELL, HEIDI STILWELL,
JAMIE STILWELL, MEGAN
STILWELL,                        No. 05-CV-02160

        Plaintiffs,

    vs.

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

        Defendant.

AMERICAN GENERAL LIFE
INSURANCE COMPANY,
  Third-Party Plaintiff,

    VS.

FIRST MID-ILLINOIS BANK &
TRUST, TUSCOLA FURNITURE
GROUP, LLC, and JANKO
FINANCIAL GROUP, LLC,
  Third-Party Defendants.



DEPOSITION

     The deposition of WILLIAM JOHN LYONS,
taken on behalf of the Third-Party Defendant
First Mid-Illinois at the office of Area Wide
Reporting, 301 W. White, Champaign, Illinois on
February 26, 2007, before Barbara A. Glover, CRR,
RPR, and Certified Shorthand Reporter of the
State of Illinois.

**EXHIBIT**

tabbies

**Page 2**

```
 1   APPEARANCES:
 2
 3        Heller, Holmes & Associates
          Jason M. Crowder
 4        1101 Broadway
          Mattoon, Illinois  61938
 5        (217) 235-2700
          Appearing for Plaintiffs
 6
 7
          Heavner, Scott, Beyers & Mihlar
 8        Julie Beyers
          111 E. Main Street, Suite 200
 9        Decatur, Illinois   62523
          (217) 422-1719
10        Appearing for Third-Party Defendant First
          Mid-Illinois
11
12
          Howard & Howard
13        Michael S. Seneca
          211 Fulton Street, Suite 600
14        Peoria, Illinois   61602-1350
          (309) 672-1483
15        Appearing for Tuscola Furniture and Janko
          Financial
16
17
          Wilson, Elser, Moskowitz, Edelman &
18        Dicker LLP
          Rebecca M. Rothmann
19        120 N. LaSalle Street, Suite 2600
          Chicago, Illinois   60602
20        (312) 704-0550
          Appearing for Defendant American General
21
22
23
24
```

**Page 3**

```
 1              I N D E X
 2
      EXAMINATION CONDUCTED BY:        PAGE
 3
      By: Ms. Beyers          4
 4    By: Mr. Seneca         72
      By: Ms. Rothmann       73
 5    By: Mr. Crowder        84
      By: Ms. Beyers         89
 6    By: Ms. Rothmann       90
      By: Mr. Seneca         93
 7    By: Ms. Beyers         94
      By: Mr. Crowder        97
 8    Q.
 9
10            E X H I B I T S
11    EXHIBIT                PAGE

12    Exhibit No. 1          13
      Exhibit No. 2          17
      Exhibit No. 3          19
13    Exhibit No. 4          20
      Exhibit No. 5          24
14    Exhibit No. 6          28
      Exhibit No. 7          29
15    Exhibit No. 8          31
      Exhibit No. 9          32
16    Exhibit No. 10         33
      Exhibit No. 11         40
17    Exhibit No. 12         44
      Exhibit No. 13         46
18    Exhibit No. 14         51
      Exhibit No. 15         55
19    Exhibit No. 16         58
      Exhibit No. 17         62
20    Exhibit No. 18         81
      Exhibit No. 19         84
21    Exhibit No. 20         88
      Exhibit No. 21         90
      Exhibit No. 22         97
23
24
```

**Page 4**

```
 1              WILLIAM JOHN LYONS
 2   the deponent herein, called as a witness, after
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5
 6        EXAMINATION CONDUCTED
 7        BY:  MS. BEYERS
 8
 9        Q.  Can you please state your name for the
10   record?
11        A.  I am William John Lyons.
12        Q.  Mr. Lyons, I'm going to have the
13   record reflect that you are here today pursuant
14   to a notice of deposition and a subpoena --
15        A.  Okay.
16        Q.  -- that you were served with to secure
17   your presence here today at the deposition and
18   that this deposition is going to be for discovery
19   purposes, and it's done pursuant to the Federal
20   Rules of Civil Procedure.
21        Mr. Lyons, have you ever given your
22   deposition before?
23        A.  No, ma'am, I don't believe so.
24        Q.  Okay.  I'm going to give you a few
```

**Page 5**

```
 1   quick rules here.
 2        A.  Okay.
 3        Q.  The court reporter is typing down your
 4   responses, so she can't -- you have to say your
 5   answer out loud.
 6        A.  Okay.
 7        Q.  She can't take down nods of the head.
 8        A.  Okay.  Okay.
 9        Q.  Of shakes of the head.  The other
10   thing that we have to remember is that one person
11   needs to talk at a time, so I'll ask the
12   question, and then you can provide the response.
13   It's hard to do, but we have to not talk over
14   each other so that she's real clear about what my
15   question is and what your response is.  Okay?
16        A.  Okay.
17        Q.  I introduced myself to you when you
18   first came in.  My name is Julie Beyers, and I
19   represent First Mid-Illinois Bank & Trust in the
20   case regarding Margaret Stilwell versus American
21   General Life Insurance company, and, Mr. Lyons,
22   have you brought with you today your entire file
23   concerning Margaret Stilwell and any life
24   insurance policies that she and her husband may
```

Page 6

1 have had with American General?
2     A. I have -- I have -- it's the Stilwell
3 file, yes, ma'am.
4     Q. And you're pointing to the document in
5 front of you?
6     A. Yes, ma'am, this is the document in
7 front of me is the Jim Stilwell file, yes, ma'am.
8     Q. And when you refer to it as the Jim
9 Stilwell file, does that contain all the
10 documents in your possession concerning any
11 claims made on a four million dollar policy and a
12 one million dollar policy?
13     A. Yes, ma'am.
14     Q. Okay. Would it also include any
15 applications or any other correspondence or
16 documents regarding his application for those
17 policies?
18     A. Yes, ma'am.
19     Q. Okay. Do you have any other documents
20 in your possession regarding James or Margaret
21 Stilwell other than these documents that you have
22 brought with you here today?
23     A. No, I do not believe so.
24     Q. Okay. Mr. Lyons, what is your current

Page 7

1 address?
2     A. I live at 231 North Main in Atwood,
3 Illinois.
4     Q. And where are you currently employed?
5     A. I am a self-employed life insurance
6 and -- life insurance salesman for -- I represent
7 several different companies.
8     Q. Okay. And who do you currently
9 represent?
10     A. American General, United Life, Old
11 Line Life who now is owned by American General.
12     Q. Okay.
13     A. Pekin Insurance Company, Standard Life
14 Insurance Company, and Midland National Life.
15     Q. Okay. So you still do -- sell
16 policies for American General. Is that correct?
17     A. Yes, ma'am.
18     Q. And Old Line Life?
19     A. Yes.
20     Q. At some point when the Stilwells came
21 to see you about life insurance you were a
22 district manager or regional manager?
23     A. Regional manager with Franklin Life
24 Insurance Company, yes, ma'am. Franklin Life

Page 8

1 Insurance was bought out by American General
2 Corporation.
3     Q. Okay. And when was that?
4     A. Ma'am, I can't remember. I'm sorry.
5     Q. Okay. That's all right. And what
6 were your job duties as district manager?
7     A. Mainly I was to sell life insurance
8 and recruit other agents to build an agency.
9     Q. Okay. So basically you sold policies
10 and tried to get other people interested in
11 selling the policies?
12     A. Yes, ma'am. I sold policies and tried
13 to get other agents -- other people in becoming
14 life insurance agents.
15     Q. Okay. When Franklin was bought out by
16 American General, did you remain a district
17 manager, or did you keep your position?
18     A. No, ma'am. American General didn't
19 have any such things as district managers. I was
20 just -- I just became a sales representative
21 for -- just as I am today.
22     Q. Oh, okay. So when the -- when the --
23 when Franklin bought American General, you
24 reverted back to being a salesperson, because

Page 9

1 there weren't any regional manager positions?
2     A. No, ma'am.
3         MR. CROWDER: Object.
4 BY MS. BEYERS:
5     Q. And that is currently what you're
6 doing today?
7     A. Yes, ma'am. I am a sales -- just a
8 sales rep, I guess you would call me.
9     Q. Well, don't say just, but...
10     A. Yeah.
11     Q. In your career with either Franklin or
12 American General have you ever been involved in
13 the claims process as far as evaluating claims or
14 analyzing claims for payment?
15     A. No, ma'am. If you mean I decide who
16 gets paid or what, no, ma'am, I do not do that.
17     Q. Okay. And never have done that?
18     A. No, ma'am. Couldn't want -- I
19 wouldn't want that responsibility either.
20     Q. So basically if one of the people that
21 you had sold insurance to had a claim to make,
22 your responsibility with respect to that would be
23 gathering the information and forwarding that on
24 to the company?

Page 10

1    A. Generally what my duties would be
2 would be to get a death certificate.
3    Q. Okay.
4    A. And then -- well, the first thing I
5 inform the company of the death.
6    Q. Okay.
7    A. And they would send me a form to be
8 signed by -- would be signed by and gather a
9 death certificate and a claimant statement, and I
10 would fill that -- I would have that signed by
11 the claimant and the death certificate and send
12 that back to the home office.
13    Q. Okay. And then the claim would be
14 evaluated and determined there. Is that correct?
15    A. Yes, ma'am.
16    Q. All right. Now, the policies -- the
17 four million dollar policy and the one million
18 dollar policy that are at issue or that we've
19 been talking about in this case it looks like
20 they were issued in approximately 1998. Is that
21 your recollection?
22    A. I really can't -- I would have to look
23 at my stuff, but I gather that you have seen
24 that, so I would agree that it was in 1998.

Page 11

1    Q. Okay. That would seem right to you?
2    A. Yes.
3    Q. Okay. Did you have a relationship
4 with the Stilwells prior to them coming in to
5 apply for the four million dollar policy and the
6 one million dollar policy?
7    A. Yes, ma'am.
8    Q. Okay. And can you tell me about that?
9    A. Yes, ma'am. I have known Margaret and
10 Jim -- I had known Margaret and Jim for a long
11 time, and actually in about '92 sold a life
12 insurance policy to Margaret, Margaret Stilwell.
13    Q. Okay.
14    A. And always tried to do business with
15 people in Atwood, and when Jim took over the meat
16 market, I was one of his best customers, and I
17 enjoyed -- I mean he had a very -- Jim Stilwell
18 was an excellent business person and very, very
19 good meat market, was excellent, and so we kind
20 of formed a friendship.
21    Jim was very -- very much into city
22 business and was very good for the town of
23 Atwood, excellent, and I like Atwood, and I spent
24 a lot of time there, so, you know, it was a -- it

Page 12

1 was a -- he actually let me form a salary
2 allotment and sell some health insurance -- or,
3 excuse me, some life insurance and disability
4 insurance to his employees through payroll
5 deduction.
6    Q. Ah. I see.
7    A. And that's how we formed -- on these
8 two particular cases what happened was --
9    Q. On those two policies, you mean?
10    A. These two policies.
11    Q. And just so that the record is clear,
12 we're talking about the four million dollar
13 policy with the number of 2604663?
14    A. Right.
15    Q. And then a one million dollar policy
16 with the number 2384389. Is that correct?
17    A. Yes. He came to me about those
18 policies.
19    Q. Okay.
20    A. Jim came to me about those policies.
21    Q. Okay.
22    A. And he said I need this insurance.
23 We're moving out of Atwood, and we're expanding,
24 and we need these policies, and the four million

Page 13

1 he told me was for debt that he was going to
2 acquire, and he wanted to protect his family from
3 the debt.
4    Q. Okay.
5    A. And the one million dollar policy he
6 was very explicit about that that would be to
7 take care of Maggie, which is Mrs. Stilwell, I'm
8 sorry, a lot of people call her Maggie and her
9 four daughters, their four children.
10    Q. Okay. All right. I'd like to have
11 you to look at this time what I'm going to
12 mark as Exhibit No. 1.
13       (At this point the court reporter
14       marked Lyons Exhibit No. 1 for purposes
15       of identification.)
16 BY MS. BEYERS:
17    Q. Can you just state for the record what
18 this document is?
19       MR. CROWDER: Just one page?
20 BY MS. BEYERS:
21    Q. Yeah, it's just that first page there.
22    A. This was a financial personal
23 insurance -- large amount supplement that was --
24 was -- you had to fill this out -- I had to fill

## Page 14

1 this out to get insurance for -- I believe this
2 was for the million dollar policy, because it
3 says insurance applied for in this company, eight
4 hundred thousand, and when I -- later on he
5 decided that he wanted to go to a million, but --
6 but this was -- I really can't remember filling
7 this out, but this is my handwriting, and I
8 filled it out. I'm sorry about that.
9     Q. That's okay. But that is your
10 signature there at the bottom of the page?
11     A. Yes, ma'am. Yes, it is. It's a
12 supplement for -- when you -- the insurance
13 companies -- American General, they like to know
14 why they need so much insurance.
15     Q. Okay. And this would have been
16 basically you filling out and telling them why
17 they were applying?
18     A. I would have asked Jim these
19 questions, and he would have answered them -- and
20 then he would have answered them, and then I
21 would have sent it in.
22     Q. Okay. Let me just back up for a few
23 minutes. We were talking about the fact that you
24 had known Mr. Stilwell for a long time and really

## Page 15

1 you were friends with Mr. Stilwell?
2     A. Yes.
3     Q. Is that fair?
4     A. Yes, ma'am.
5     Q. Okay. And then you said that he came
6 to you, and he wanted to purchase these two
7 policies that are involved in this case?
8     A. Right.
9     Q. And we've described those policies.
10     A. Right.
11     Q. Do you remember how many conversations
12 you had with him during the application process
13 before the policies were actually issued?
14     A. Not very much, because Jim was a
15 business person, and he was on the run all the
16 time.
17     Q. Okay.
18     A. And Jim was kind of working all the
19 time at his business, and he would drop in. He
20 would say I think I'm going to need this, and I
21 would say, okay.
22         He would say find me a price, and I
23 would look it up in the computer, and then he may
24 not show up for another month or two, because he

## Page 16

1 was busy. I mean, you know, he was busy, so I
2 mean nothing against that. That's just the way a
3 lot of business people are, and then he came in,
4 and he said, well, I think I'm going to go with
5 the four million dollar policy for the business.
6     Q. For the debt. Right?
7     A. For the debt, yes.
8     Q. Uh-huh.
9     A. For the business and then the one
10 million dollar for Maggie and the girls.
11     Q. Okay.
12     A. Which was fine with me.
13     Q. Okay.
14     A. I mean, honestly, people, I don't have
15 many people coming in wanting four million
16 dollars and one million dollars' worth of
17 coverage. I'll be honest with you. Those are
18 the biggest policies I ever sold.
19     Q. Okay. Okay. And so other than what
20 you've told me just now, do you remember any
21 other conversations with Mr. Stilwell prior to
22 you sending in documentation to American General
23 to have the policies issued?
24     A. No. I don't remember.

## Page 17

1     Q. And I guess -- it would have been, I'm
2 sorry, was Old Line Life?
3     A. Which Old Line Life people was being
4 -- in the process of being bought by American
5 General.
6     Q. Okay. So at the time you would
7 have -- this was in --
8     A. March of '98.
9     Q. Okay. And at that time would it still
10 have been Old Line Life?
11     A. Yes, ma'am, it would have been.
12     Q. And then at some point American
13 General took -- basically took over those
14 policies. Is that right?
15     A. Yes, ma'am. Yes, ma'am.
16         (At this point the court reporter
17         marked Lyons Exhibit No. 2 for purposes
18         of identification.)
19 BY MS. BEYERS:
20     Q. Okay. All right. Let's move on to
21 Exhibit No. 2 then. It's just this letter. I'm
22 going to have you look at this, Mr. Lyons, if you
23 don't mind.
24     A. This is a -- this is a letter that I

Page 18

1 wrote to the company to further show that there
2 was a need for this insurance, ma'am.
3    Q. Okay. And does that letter basically
4 summarize what you've told me as far as his need
5 or the purpose of these two policies?
6    A. Yes, ma'am. This is Mr. Stilwell
7 telling me -- you know, he was a very optimistic
8 person. He told me that they would have this
9 paid off in ten years, you know. He thought he
10 would have that debt paid off in ten years. He's
11 my customer, so I have to, you know, agree with
12 him, but, yes, ma'am.
13    Q. Sure. And that's your signature there
14 on the bottom of that letter?
15    A. Yes, ma'am, it is. Yes, it is.
16    Q. All righty. Was Margaret Stilwell
17 present during any of these discussions that you
18 remember between yourself and Mr. Stilwell?
19    A. I'm sorry, ma'am, no, she wasn't. She
20 was not.
21    Q. He just kind of came in and told you
22 want he wanted and went on back to work?
23    A. That's right.
24    Q. And you --

Page 19

1    A. I would figure it out.
2    Q. Figure it out?
3    A. Yeah, I would figure it out for him
4 and do what he wanted. He was my customer. I
5 would do anything for him.
6    Q. Okay. All right. Let me just show
7 you since I went to the trouble of copying
8 all these -- let me just show you Lyons
9 Exhibit 3.
10    (At this point the court reporter
11    marked Lyons Exhibit No. 3 for purposes
12    of identification.)
13    MS. BEYERS: I've just got the
14 declarations page and the second.
15    MR. CROWDER: Two pages?
16 BY MS. BEYERS:
17    Q. It's two pages, yeah.
18    Mr. Lyons, I'm going to show you
19 what's marked as Lyons Exhibit No. 3. Is that
20 the declarations page?
21    A. For the four million dollar policy,
22 yes, ma'am.
23    Q. Okay. What's the second page of that?
24 It was on the discovery. I just thought I would

Page 20

1 ask you.
2    A. It is a -- it just says payment of
3 proceeds, how it will be paid, and in the event
4 of suicide, there was no -- there would be no
5 payment paid for two years, and it also tells
6 that after two years there's no incontestability,
7 so the company can't come back and say, well, we
8 didn't know your health was this bad, and we
9 can't pay.
10    It's standard boilerplate, pretty
11 much.
12    Q. Sure. And that would have been
13 delivered to the Stilwells?
14    A. Yes, ma'am.
15    (At this point the court reporter
16    marked Lyons Exhibit No. 4 for purposes
17    of identification.)
18 BY MS. BEYERS:
19    Q. Okay. Let me show you Exhibit No. 4.
20 It's the letter to Cindy Priegel. Mr. Lyons, I'm
21 going to show you what we've marked as Exhibit
22 No. 4. Is this a letter that you drafted?
23    A. Yes, ma'am. It's my writing.
24    Q. Okay. And is that a letter that you

Page 21

1 wrote to Old Line Life basically saying that he
2 wanted the policy No. 2384389 to be for one
3 million?
4    A. Right.
5    Q. And then also specifying that the --
6 that the other policy for four million was going
7 to be assigned to the bank to cover debt. Is
8 that basically correct?
9    A. Yes. Yes.
10    MR. CROWDER: I'll just object to the
11 form. The document speaks for itself.
12    THE WITNESS: Is that something --
13 BY MS. BEYERS:
14    Q. No, that's okay. At various times
15 some of the people here may not like the way I
16 ask you a question, so they may object.
17    A. Okay.
18    Q. But unless somebody tells you not to
19 answer, or whatever, you can go ahead.
20    A. I didn't want to --
21    MR. CROWDER: No. Yeah, we just need
22 to -- for purposes of the record, we need to make
23 certain objections if we have them. No problem.
24    If we start talking, you can wait

Page 22

1 until we're done talking, and then you can answer
2 the question.
3        THE WITNESS: Thank you. I'm sorry.
4 Sorry to interrupt.
5 BY MS. BEYERS:
6        Q. No, you're fine. That's perfectly
7 fine.
8        Now, just back to where I was at.
9 Okay. Now, after the policies were issued were
10 there various assignments of the four million
11 dollar policy to cover the debt as Mr. Stilwell
12 indicated that he would be doing?
13        A. Julie, he would come in, and he
14 would -- Jim would come in, and he would say I
15 need an assignment for two million dollars for X,
16 Y, Z, just like Tuscola National Bank.
17        Q. Right.
18        A. And I'd fill out the assignment form
19 just like he wanted, and he would say, Maggie
20 will be in to sign it this afternoon, and I would
21 fill it out, and I would have Maggie sign it, and
22 then I would -- as soon as she signed it, I would
23 get it -- because it makes me nervous, so I would
24 sign it -- I would send it to the company

Page 23

1 immediately.
2        Q. Okay. Now, you say he would come in
3 and say he wanted an assignment, and then he
4 would tell you what he wanted.
5        Did he stay while you filled out the
6 form, or was it a situation where he came in and
7 said this is what I want, and he'd be out the
8 door, and you would fill out the paperwork?
9        A. Most of the time he would stay until I
10 filled out the paperwork but not always.
11        Sometimes he would -- he got so -- he
12 got very relaxed with the process of filling out
13 assignments and sending it, and he would say -- I
14 would say, well, you know, I would make sure that
15 I had all the details down, and Maggie would come
16 in and sign it, and I would send it away.
17        Q. Okay. So there were occasions when he
18 would come in, and he would tell you, and you'd
19 fill it out --
20        A. Yeah.
21        Q. -- on your own -- on your own,
22 basically?
23        A. Yeah, just so I could get it done so
24 he could -- so I could get it out of my hands.

Page 24

1 We insurance agents when you're talking about
2 this much money, we want to get it to the people
3 that it belongs to as fast as possible.
4        Q. Yeah. Sure thing. Okay. I'm going
5 to go through some of the assignments with you,
6 and I understand that you may not remember them.
7        A. Yes, ma'am.
8        Q. So -- but I just want to show them to
9 you.
10        A. Okay.
11        Q. And you tell me if -- I'll ask you
12 some questions.
13        A. Okay.
14        Q. Let's do Exhibit No. 5 first which is
15 the $500,000 assignment.
16        (At this point the court reporter
17        marked Lyons Exhibit No. 5 for purposes
18        of identification.)
19 BY MS. BEYERS:
20        Q. I'm going to show you Exhibit No. 5,
21 Mr. Lyons.
22        A. Okay.
23        Q. Does your signature appear on that
24 document?

Page 25

1        A. Yes, ma'am.
2        Q. Okay. And you were familiar, were you
3 not, with Mrs. Stilwell's signature?
4        A. Yes, ma'am.
5        Q. Okay. And her signature also is on
6 that document?
7        A. That looks like Margaret Stilwell's
8 signature.
9        Q. Okay. And do you remember anything
10 about -- and, just for the record, this is a
11 $500,000 assignment in favor of Janko Financial.
12        A. I remember -- I remember Janko
13 Financial being one -- at one time being an
14 assignee.
15        Q. Okay.
16        A. Other than that, I don't even remember
17 much about this.
18        Q. Okay. So as you sit here today, you
19 don't remember any conversations that you had
20 with Mr. Stilwell, Mrs. Stilwell, or anybody
21 else, for that matter, regarding this particular
22 assignment?
23        A. Julie, there would never be a
24 conversation with -- Jim would say this is what I

Page 26

1 want done, and that would be the end of it.
2    Q. Okay. Okay. Okay.
3    A. If Jim said I want Jason Crowder --
4 I'm using your name, Jason -- to have an
5 assignment for $500,000, I would -- I mean I
6 don't know why. I would just do what he told me,
7 I mean immediately.
8    Q. And as far as this assignment goes, do
9 you remember that much of that -- him coming in
10 and saying he wanted this?
11   A. He would have told me -- he would have
12 told me.
13   Q. Okay. And you're saying that based on
14 your practice?
15   A. Yes.
16   Q. With Mr. Stilwell?
17   A. Yes.
18   Q. Is that correct?
19   A. He definitely would tell me.
20       MR. CROWDER: I think one of the
21 things that Julie wants to get a clear handle on
22 is whether you have an independent recollection
23 of him coming in and saying I need a $500,000
24 policy or if you just are saying he would have

Page 27

1 told me -- based on the fact that you did it, he
2 would have had to tell you?
3       THE WITNESS: I couldn't tell you for
4 sure about the amount.
5 BY MS. BEYERS:
6    Q. Sure.
7    A. Because he came in quite so often.
8 All I'm trying to say, Julie, is if he told me to
9 do something, I did it right that day.
10   Q. Okay. Okay. And so let's -- and
11 let's just go back to Lyons Exhibit No. 5.
12   A. Okay.
13   Q. Do you remember a specific
14 conversation with Mr. Stilwell regarding this
15 particular assignment?
16   A. Not specific.
17   Q. Okay.
18   A. I mean, you know -- no, I don't.
19   Q. Okay.
20   A. I'm sorry. I just --
21   Q. That's okay. We're just trying to --
22 off the record for a second.
23       (At this point there was an off the
24       record discussion.)

Page 28

1 BY MS. BEYERS:
2    Q. All right. Exhibit No. 6 which is the
3 $1,500,000 assignment --
4       (At this point the court reporter
5       marked Lyons Exhibit No. 6 for purposes
6       of identification.)
7 BY MS. BEYERS:
8    Q. All right. Mr. Lyons, I'm going to
9 show you what's marked as Lyons Exhibit No. 6.
10   A. Okay.
11   Q. And let's look at the second page of
12 that document here. Does your signature appear
13 on that document?
14   A. Yes, ma'am. That's my signature, and
15 that's Margaret's signature.
16   Q. Okay. And --
17   A. To the best of my -- I mean -- and I
18 frankly don't know when we did this either. It
19 does say that 25th of September 2000, but I don't
20 recall any special details about this at all.
21   Q. Okay. So just so the record is clear,
22 this is an assignment for $1,500,000 to the Janko
23 Financial Group, and what you're telling me is,
24 again, if Mr. Stilwell told you he wanted this,

Page 29

1 you prepared it, but you can't remember sitting
2 here today any particular specific conversations
3 regarding this?
4    A. No, ma'am.
5    Q. But your signature and Mrs. Stilwell's
6 signature do appear on the document?
7    A. Yes, ma'am.
8    Q. Okay. Let's go to Exhibit No. 7.
9       (At this point the court reporter
10       marked Lyons Exhibit No. 7 for purposes
11       of identification.)
12 BY MS. BEYERS:
13   Q. I'd like to show you Exhibit No. 7
14 which is an assignment for $250,000 in favor of
15 Tuscola Furniture Group, and I want to ask you
16 does that to the best of your knowledge look like
17 Margaret Stilwell's signature there at the bottom
18 of the document?
19   A. Yes, ma'am.
20   Q. And does any portion of this bear your
21 handwriting, any portion of this document?
22   A. This is my printing here.
23   Q. And we're talking about in Section No.
24 1?

Page 30

1    A. Yes. That contract information and
2 the -- I printed the assignment to Tuscola
3 Furniture Group.
4    Q. Okay. And is the second page of that
5 just a verification?
6    A. Yes, ma'am.
7    Q. Of the assignment?
8    A. Yes, ma'am.
9    Q. Okay. And is that something that
10 would be issued by the home office once you sent
11 in the assignment itself?
12    A. The document 2 was the assignment
13 verification, and it appears to me that it came
14 from Old Line Life.
15    Q. Okay. Okay. And, again, do you have
16 any specific recollection concerning any
17 conversation with Mr. Stilwell or Mrs. Stilwell
18 regarding this assignment?
19    A. No, ma'am. No, ma'am, I don't.
20    Q. And, again, it was a situation where
21 he would have come in and told you to prepare it,
22 and you did?
23    A. Yes, ma'am.
24    Q. Is that correct?

Page 31

1    A. Yes, ma'am.
2    Q. All right. Exhibit No. 8.
3       (At this point the court reporter
4       marked Lyons Exhibit No. 8 for purposes
5       of identification.)
6 BY MS. BEYERS:
7    Q. I want to show you Exhibit No. 8, and
8 this is a one million dollar assignment in favor
9 of First Mid-Illinois Bank & Trust. Again, Mr.
10 Lyons, is that Margaret Stilwell's signature
11 there at the bottom?
12    A. Yes, ma'am.
13    Q. Okay. And does this assignment bear
14 your handwriting in Sections 1 and 2?
15    A. It does. It's my printing, ma'am.
16    Q. Okay. And is the second page an
17 assignment verification?
18    A. Yes, ma'am. It is.
19    Q. Okay. And, again, do you remember any
20 specific conversations with Mr. or Mrs. Stilwell
21 about this assignment?
22    A. No, ma'am.
23    Q. Again, it would have been a situation
24 where he came in and told you to prepare it, and

Page 32

1 you did?
2    A. Yes, ma'am.
3    Q. Okay. Now, Exhibit No. 9.
4       (At this point the court reporter
5       marked Lyons Exhibit No. 9 for purposes
6       of identification.)
7 BY MS. BEYERS:
8    Q. All right. I want to show you Exhibit
9 No. 9. Do any -- does Section No. 1 of this
10 document and No. 3, do those two bear your -- are
11 those in your handwriting?
12    A. Yes, ma'am.
13    Q. Okay.
14    A. Those are mine.
15    Q. Okay. And then there's a signature
16 down at the bottom with some handwriting next to
17 it to the left. That's -- that's not your
18 handwriting. Is that right?
19    A. No, ma'am, it is not.
20    Q. Okay. And do you recollect any
21 conversations with Mr. and Mrs. Stilwell
22 regarding this particular document?
23    A. No, ma'am. No, ma'am, I do not.
24    Q. Do you remember any conversations with

Page 33

1 Larry Bianchi, the gentleman that signed this
2 assignment -- or signed this document regarding
3 the document itself?
4    A. No, ma'am, I don't. I do not remember
5 this.
6    Q. Okay. All right. We'll just set that
7 aside.
8       Now, I want to show you what I've
9 marked as Lyons Exhibit No. 10.
10       (At this point the court reporter
11       marked Lyons Exhibit No. 10 for
12       purposes of identification.)
13 BY MS. BEYERS:
14    Q. And I think I've got the right pages
15 attached to this. It's a letter that shows an 11
16 page fax. Take a look at that, if you could look
17 at the attachments for me. Make sure I've put
18 that all together correctly.
19    A. This application was taken out on Jim
20 Stilwell after we had the five million dollars in
21 place. He came into my office. He wanted
22 another million dollars of insurance.
23    Q. Okay.
24    A. And I filled out the application, and

## Page 34

1  we submitted it into American General, and I
2  believe that was in March of 2003.
3       Q.  Okay.  And he was declined for that
4  policy?
5       A.  Yes, ma'am, he was, sadly.
6       Q.  Was he declined because of his health?
7       A.  Yes, ma'am.
8       Q.  Did Mr. Stilwell indicate to you at
9  that time why he needed or wanted another million
10 dollar policy?
11      A.  I believe he was going to build a
12 motel with a couple of partners.  He would like
13 to build a motel on his property, and I have no
14 idea other than he told me that he needed a
15 million dollars to cover the debt on his part of
16 the motel.
17      Q.  Okay.  Now, Mr. Stilwell passed away
18 shortly after that.  Correct?
19      A.  Yes, ma'am.
20      Q.  All right.  And do you remember the
21 exact date?  I was trying to find that here.
22      A.  No, ma'am, I don't.
23      Q.  If I said it was May 2nd of 2003,
24 would that sound just about right?

## Page 35

1       A.  That would -- I was going to say it
2  was -- I was sitting at home.  Yes, May 2nd
3  would.
4       Q.  And prior to May 2nd of 2003 had
5  anybody indicated to you that the Stilwells were
6  having some financial difficulties?
7       A.  No, ma'am.  No, ma'am.
8       Q.  Did that in any way ever come to your
9  attention?
10      A.  Not until after he died.
11      Q.  And what happened then after he died
12 that made you realize --
13      A.  I went to -- Margaret had called me
14 over after the funeral to the buffet, and she was
15 having a meeting with two or three people, and,
16 frankly, I can't remember who was there.
17          Anyway, when I went over there to the
18 meeting, they asked me about Jim's life
19 insurance, and I said that he had four million
20 dollars of life insurance that was assigned and
21 that he had a million dollars that was for Maggie
22 and the girls.
23      Q.  Okay.
24      A.  And they were very relieved, because

## Page 36

1  they didn't know he had it.  I mean Margaret knew
2  he had some.  She just didn't know what he had.
3       Q.  Okay.  So basically at this meeting
4  people were trying to get a feel for how much
5  money there was going to be to pay debts and then
6  how much --
7       A.  Yes.
8       Q.  -- money might be available to
9  Mrs. Stilwell on the million dollar policy?
10      A.  Yes, ma'am.
11          MR. CROWDER:  Object to the form.
12 BY MS. BEYERS:
13      Q.  Okay.  All right.  Now, prior to
14 Mr. Stilwell's death, do you remember having any
15 conversations with anybody from First
16 Mid-Illinois Bank & Trust?
17      A.  No, ma'am.
18      Q.  Okay.  Prior to Mr. Stilwell's death,
19 do you remember ever having any conversations
20 with Larry Bianchi or any other member of TFG or
21 Janko Financial Group?
22      A.  Larry Bianchi called me one time, but
23 I don't remember anything about the conversation.
24      Q.  Okay.  Do you know approximately when

## Page 37

1  it was in relationship to Mr. Stilwell's death?
2       A.  Well, he called me once before Jim
3  died and then once afterwards.
4       Q.  Okay.  And the conversation in which
5  he called you before Jim died, do you remember
6  how long that was --
7       A.  No, ma'am.
8       Q.  -- prior to?
9       A.  I do not remember.
10      Q.  Okay.  And let's talk about that
11 conversation.  Do you remember what he said to
12 you and what you said to him?
13      A.  No, ma'am, I do not.  I just remember
14 the name.  It's kind of an unusual name.
15      Q.  Okay.  And as far as then after
16 Mr. Stilwell passed away, you indicated you had
17 another conversation with him.  Do you know
18 approximately how long after Mr. Stilwell's
19 passing the second conversation took place?
20      A.  It was the day he died.
21      Q.  Okay.  And do you remember what he
22 said to you and what you said to him?
23      A.  He wanted to know if the life
24 insurance was still in force.

## Page 38

1  Q. And what did you indicate to him?
2  A. Yes, it was still in force.
3  Q. After that conversation to today do
4 you remember ever having any other conversations
5 with Mr. Bianchi?
6  A. No, ma'am.
7  Q. Now, do you remember having any
8 conversations with Margaret Stilwell prior to
9 Mr. Stilwell's death about any specifics
10 concerning either one of these policies or the
11 assignments on the four million dollar?
12  A. No, ma'am. No, ma'am.
13  Q. And other than what you've told me
14 here today, do you remember any specific
15 conversations with Jim Stilwell other than what
16 you've related to me today?
17  A. No, ma'am. The only thing that I want
18 to stress, Julie, is when Jim came in, he wanted
19 to make sure that we never assigned that million
20 dollar policy.
21  Q. Okay.
22  A. Never. He said don't let me do it. I
23 do not want -- I want that million dollars to go
24 to Maggie and the girls.

## Page 39

1  Q. Okay. Which is what he had related to
2 you when he took out the policies?
3  A. Yes. Yes, ma'am.
4  Q. Now, let's talk about conversations
5 with Mrs. Stilwell. You've told me about a
6 conversation that you had with her after
7 Mr. Stilwell's death where you were called to the
8 restaurant?
9  A. Right.
10  Q. To come and talk about what was going
11 on with these policies. Correct?
12  A. Right.
13  Q. Prior to that conversation, had you
14 had any other conversations with her as it would
15 relate to the policies?
16  A. No, ma'am.
17  Q. Now, after that conversation with her
18 at the restaurant did you have any other
19 conversations with her between that time and the
20 time that any claims were paid under the four
21 million dollar policy?
22  A. No, ma'am.
23  Q. Did you have any phone calls from
24 anybody that indicated that they were

## Page 40

1 representing Mrs. Stilwell?
2  A. No, ma'am.
3  Q. Okay. Now, after Mr. Stilwell's
4 death, then did you distribute claim forms to
5 various people with respect to the four million
6 dollar policy?
7  A. No, ma'am. The company does that.
8  Q. Oh, okay.
9  A. I did get death certificates. Okay?
10  Q. Okay.
11  A. I sent them in.
12  Q. Okay.
13  A. I got two, one for the four million,
14 and one for the other one, for the million.
15  Q. So just to summarize, you would have
16 gotten death certificates and sent them on to
17 American General?
18  A. Yes, ma'am.
19  Q. Okay. I want to show you what I'm
20 going to mark Lyons Exhibit No. 11.
21  (At this point the court reporter
22  marked Lyons Exhibit No. 11 for
23  purposes of identification.)
24

## Page 41

1 BY MS. BEYERS:
2  Q. Can you tell me what this document is?
3  A. That would be a four million dollar
4 policy, but it's not signed, so it's probably a
5 blank thing that I thought -- I always thought I
6 was helping, and the company evidently -- I mean
7 I noticed there was no signature, so I was using
8 a blank copy that I would have filled out in
9 case, you know -- that I would have filled out.
10 I had not ever had any dealings with assignments
11 before, ma'am.
12  Q. Okay.
13  A. Okay? And I was not a hundred percent
14 sure of the procedure.
15  Q. Okay.
16  A. And I called the home office, and the
17 home office told me that I did not need to do
18 this, so I didn't do it. I didn't pursue this
19 any farther.
20  Q. Okay. Is the first page of this a
21 cover sheet that -- to Tom Chamberlain at First
22 Mid?
23  A. Yes, ma'am.
24  Q. Okay. And would you have faxed him a

Page 42

1 claimant statement to be filled out?
2    **A. If he hadn't gotten one from the**
3 **company, yes, I probably would have.**
4    Q. Okay.
5    **A. And I don't recall this form, but that**
6 **is my handwriting, and I would have -- I would**
7 **have sent it to him.**
8    Q. Okay. And that's -- and that's your
9 handwriting on the second page of this exhibit.
10 Is that right?
11    **A. Yes, ma'am.**
12    Q. On the top part?
13    **A. Yes, ma'am.**
14    Q. And so if somebody called you and
15 asked you for a statement, you probably would
16 have faxed it to them, but then you're telling me
17 the company at some point told you that they
18 would do that?
19    **A. Yes.**
20    Q. Okay. Who did you speak to at
21 American General during the process of these
22 claims being made on the four million dollar
23 policy?
24    **A. I would call -- I would have called**

Page 43

1 **the claimant -- or the client service center, and**
2 **it was in Texas.**
3    Q. Okay. And did you talk to the same
4 person every time, or was it somebody -- it was
5 whoever you got on the phone, basically?
6    **A. I'm sorry. I'm shaking my head. Yes,**
7 **ma'am, that's correct, whoever got on the phone.**
8    Q. During the process of these claims
9 being made on the four million dollar policy did
10 you ever become aware of one particular person in
11 Texas that was looking at this claim?
12    **A. No, ma'am. No, ma'am.**
13    Q. And I take it if your -- well, would
14 this have been one of the biggest claims that you
15 had ever dealt with before?
16    **A. Yes, ma'am.**
17    Q. And would your responsibility with
18 respect to this have basically been confined to
19 forwarding whatever you -- information you got on
20 to the company?
21    **A. I was taught that when you had a death**
22 **claim, you sent the death certificate in and**
23 **claimant statement, and the company would take**
24 **care of the rest.**

Page 44

1    Q. Okay. I want to show you what -- I'm
2 going to turn this over --
3    **A. That's fine.**
4       **(At this point the court reporter**
5       **marked Lyons Exhibit No. 12 for**
6       **purposes of identification.)**
7 BY MS. BEYERS:
8    Q. All right. I'm going to show you what
9 I've marked as Lyons Exhibit No. 12. It's JL 20,
10 22, 21, 23 and 24.
11    **A. Okay.**
12    Q. Mr. Lyons, can you tell me if you
13 recognize this particular document?
14    **A. Let me tell you, this was sent to**
15 **me -- a copy of this was sent to me.**
16    Q. Uh-huh.
17    **A. I believe whoever this -- the First**
18 **Mid people sent this to me, but they sent the**
19 **original to American General, and I got a copy of**
20 **it.**
21    Q. Oh, okay.
22    **A. Okay.**
23    Q. All right. So you had a copy -- and
24 let me just say for the record I put these

Page 45

1 documents together in the order I thought they
2 should be in. This wasn't the order that I found
3 them in your file.
4    **A. Okay. No, ma'am.**
5    Q. Does that look --
6    **A. I don't recall -- I don't recall this.**
7 **I just recall getting this.**
8    Q. Okay.
9    **A. And I don't remember from where.**
10    Q. Okay. All right. And would the back
11 page of that document be the claimant statement
12 that was filled out and signed by First Mid?
13    **A. Yes, that would be it. That would be**
14 **it, ma'am.**
15    Q. Okay. And that's -- that was
16 previously marked JL 24?
17    **A. I have no idea what that is, ma'am.**
18 **I'm sorry.**
19    Q. That's okay. That's all right. And
20 let me show you -- well, let's go back. Do you
21 remember ever talking to anybody about this
22 letter or this -- or this claimant statement?
23    **A. I do not recall that, ma'am.**
24    Q. Okay. And let's go to Exhibit No. 13.

Page 46

1    (At this point the court reporter
2    marked Lyons Exhibit No. 13 for
3    purposes of identification.)
4 BY MS. BEYERS:
5    Q. Does this document look familiar to
6 you?
7    A. Again, I believe this was sent to
8 me -- I didn't fill this out, ma'am.
9    Q. Okay.
10    A. I think I got a copy from the home
11 office or maybe Tuscola Furniture Group sent it
12 to me. I do not recall, ma'am. The handwriting
13 on Larry Bianchi looks familiar, but that's all,
14 and I don't remember -- I don't remember any of
15 this other.
16    Q. Okay.
17    A. I mean, you know, here's that one that
18 says in favor of -- I've seen that a couple of
19 times, but I do not remember -- I know I didn't
20 send this to Tuscola Furniture Group. It got to
21 me, and whenever I get something sent to me, we
22 file it in the form.
23    Q. Okay.
24    A. I'm sorry, in the file, and my

Page 47

1 secretary -- why it got all mixed up is actually
2 she dropped the file, and the papers went a
3 thousand different places. We just regrouped
4 them, but as far as seeing this thing when it was
5 in its original, I do not remember seeing it in
6 the original. It's just a copy that was made.
7    Q. Okay.
8    A. That was sent to me.
9    Q. Yeah, and I wanted to be clear. You
10 know, I put together for your file what I thought
11 went together, but do you recognize all of these
12 documents as being documents that you have seen
13 before in your file?
14    A. Can I look?
15    Q. Sure.
16    MR. CROWDER: And, John, your file,
17 you can look at your file too to confirm
18 anything.
19    THE WITNESS: Okay.
20    MS. ROTHMANN: While he does that, I'm
21 going to take a quick break.
22    (At this point a short recess was
23    taken.)
24

Page 48

1 BY MS. BEYERS:
2    Q. What we were just talking about, Mr.
3 Lyons, just for clarification I had shown you
4 another document too just previously, No. 12,
5 which was a letter with some attachments.
6    A. Uh-huh.
7    Q. And Exhibit No. 13 which is a letter
8 with some attachments, and I think what you've
9 indicated to me is that, well, with respect to
10 Exhibit No. 12, you've got these documents, but
11 you don't know if they came in this order or not,
12 because somebody dropped your file, and so it's
13 impossible really to tell what came together. Is
14 that right?
15    A. Yes, ma'am, that is true, and the same
16 with this one.
17    Q. Same with Exhibit No. 13. Right?
18    A. Yeah.
19    Q. It's a letter, and we found the letter
20 in your file here, but it's not in the same order
21 that I've attached everything together. Is that
22 right?
23    A. Yes, ma'am.
24    Q. But you did in your file have the

Page 49

1 claimant's statement for -- one for TFG?
2    A. Right.
3    Q. And then one for JFG. Correct?
4    A. That's right.
5    Q. Okay. And they were attached to the
6 letter sent -- or, well, you don't know, but
7 there was also a separate letter from TFG and
8 JFG. Is that correct? We also found a copy of
9 this top letter, just these two pages is all I'm
10 asking you about in your file.
11    A. Yes, ma'am, the top two pages were in
12 my file.
13    Q. As well as those claimant statements
14 that I just showed you?
15    A. I had a copy those, yes, ma'am.
16    Q. Okay. All right. Okay. Now, after
17 various claims had been submitted did you get a
18 copy of some letters that American General sent
19 out to the various claimants?
20    A. You know, I don't think I did. I
21 don't think those are in my file. I don't
22 believe I did of the -- what I have, Julie, is
23 the one million dollar --
24    Q. Okay.

Page 50

1    A. -- thing.  I didn't have anything with
2  the -- I have no idea, to tell you the truth, who
3  got paid what on the assignments.
4      Q. On the four million dollar policy?
5      A. No, ma'am.  I don't.
6      Q. Okay.
7      A. I trusted my company to take care of
8  that to the best of their ability, and, you
9  know...
10     Q. So you trusted that they were going to
11 look at that documentation and review it.  Is
12 that right?
13     A. That's right.  Yes, ma'am.
14     Q. And anything really that you might
15 have gotten a copy of during the claims periods
16 you might have looked at it, but you didn't
17 really form an opinion?
18     A. No, ma'am.
19     Q. Or make any sort of decision
20 concerning --
21     A. No, ma'am.
22     Q. Is that a fair statement?
23     A. Yes, ma'am.
24     Q. Sorry.

Page 51

1      A. Yes, ma'am.  That's fine.  That's
2  fine.
3      Q. All right.  There were some -- okay.
4  Let me just ask you this: Did Margaret Stilwell
5  and her girls ever make a claim under the four
6  million dollar policy?
7      A. Not to my recollection, no, ma'am.
8      Q. And did they -- did they receive some
9  funds under that policy after all the other
10 claims had been paid?
11     A. Not to my recollection.
12     Q. Let me just -- let me show you Lyons
13 Exhibit No. 14.
14        (At this point the court reporter
15        marked Lyons Exhibit No. 14 for
16        purposes of identification.)
17     MR. CROWDER:  Six pages?
18 BY MS. BEYERS:
19     Q. Yeah, and I want to just say for the
20 record that I do know those were together in the
1  discovery, those six pages.
22     MS. ROTHMANN:  This is the fax cover
23 sheet?
24     MS. BEYERS:  Yeah.

Page 52

1      MS. ROTHMANN:  June 10th?
2  BY MS. BEYERS:
3      Q. Yeah.  Mr. Lyons, I just wanted you to
4  look at that and see if that looked familiar to
5  you?
6      A. I have -- ma'am, I didn't see any --
7  let me -- let me --
8      Q. Take your time.
9      A. Yeah, I'm sorry.
10     Q. Take your time.  That's fine.  Take
11 your time.
12     A. I never saw this first one.
13     Q. Okay.  And when you say first one,
14 we're talking about the one to Janko?
15     A. That's right.
16     Q. The first letter after the fax cover
17 sheet.  Is that right?
18     A. And I did not see this one to Tuscola
19 Furniture Group.
20     Q. Okay.
21     A. Tuscola National Bank, I did not see
22 that.  Mr. Miller at the First National Bank and
23 Mr. Chamberlain, no, I never saw these.
24     Q. Okay.  Okay.  You don't remember ever

Page 53

1  seeing those --
2      A. No, ma'am.
3      Q. -- documents?
4      A. No.  No, I don't, and it's weird,
5  because the cover sheet -- the cover sheet has my
6  name on it, but they're not in my file, and I
7  never --
8      Q. I think.  Can we go off the record?
9        (At this point there was an off the
10        record discussion.)
11 BY MS. BEYERS:
12     Q. Mr. Lyons, we just went through your
13 file, and this Lyons Exhibit No. 14 there is a
14 fax with the corresponding letters in there that
15 was faxed to you it looks like from the Dallas
16 service center.  Is that correct?
17     A. Yes, ma'am.
18     Q. And I would take it from your previous
19 answer that you don't really remember receiving
20 these?
21     A. No, ma'am.
22     Q. But they are a part of your file.
23 Correct?
24     A. Yes, ma'am.  Yes, ma'am.

Page 54

1    Q. And you would have kept them in your
2 file and maintained them as part of your claims
3 file regarding Margaret Stilwell. Is that
4 correct?
5    A. Yes, ma'am, I would have. Yes, ma'am.
6    Q. Okay. We had just talked about
7 whether Margaret Stilwell and the girls ever made
8 a claim under the policy that you remembered
9 sitting here today, and you had already answered
10 that question for me --
11   A. Okay.
12   Q. -- that you couldn't remember if they
13 did or that they had. Is that right?
14   A. That's right.
15   Q. All right. Did you -- with respect to
16 the million dollar policy, Mr. Lyons, did you
17 gather the claim forms from Mrs. Stilwell and the
18 girls?
19   A. Yes, ma'am, I certainly did.
20   Q. Okay. And then did you -- after you
21 gathered all of those claim forms, did you send
22 those into the company?
23   A. Yes, ma'am, I did.
24   Q. Okay. All right. And then

Page 55

1 Mrs. Stilwell and her daughters did receive
2 payment under the one million dollar policy. Is
3 that right?
4    A. Yes, ma'am, they did.
5    Q. Did you, in fact, deliver some of
6 those checks to them?
7    A. Ma'am, there was no checks. They have
8 checking accounts that they set up. It's a NOW
9 account. They can write one check to themselves
10 for the amount, and I delivered those to the four
11 girls and Margaret.
12   Q. Oh, okay. So those came to you from
13 your home office in Dallas, and then you took
14 care of delivering those?
15   A. That's right.
16   Q. Is that right?
17   A. That's correct.
18   Q. Okay. There were just some other
19 documents then in your file that I had questions
20 about...
21      (At this point the court reporter
22      marked Lyons Exhibit No. 15 for
23      purposes of identification.)
24

Page 56

1 BY MS. BEYERS:
2    Q. Exhibit No. 15 is this -- I skipped
3 over a bunch of stuff. It's this.
4       Mr. Lyons, I want to ask you about
5 Exhibit No. 15.
6    A. Uh-huh.
7    Q. Is this in your handwriting?
8    A. Yes, ma'am, it is.
9    Q. And is that your signature at the
10 bottom of that document?
11   A. Yes, ma'am, it is.
12   Q. And do you know what -- what resulted
13 in you sending this fax -- well, let's just
14 describe it for the record first. It's a fax
15 from you to Larry Bianchi. Correct?
16   A. Yes, ma'am.
17   Q. And what does that fax letter
18 indicate?
19   A. It says here's a copy of the five
20 hundred thousand assigned to Janko by Margaret on
21 policy 2604663. Policy is -- 2604663 is for four
22 million dollars, and I've enclosed a copy of the
23 declarations page of that policy, and I will get
24 another assignment sheet for Old Line for an

Page 57

1 additional 1.5 and have Margaret sign it, you
2 know. That would be something that he called me
3 up on the phone and that I would confirm with
4 Jim.
5       I do not remember doing this. It's
6 been too long. In fact, I didn't date it. This
7 would probably be early in this process, but I
8 have no date to prove it, so I do not recall
9 this, but that is my handwriting.
10   Q. Okay. And I was going to ask you
11 about that, if you had any recollection as to
12 when that was, because there isn't a date on the
13 document.
14   A. I do not remember this at all, ma'am.
15 I'm sorry.
16   Q. And you don't -- from your testimony,
17 and please correct me if I am wrong, you don't
18 remember any discussion with Mr. Bianchi
19 specifically?
20   A. No, ma'am.
21   Q. That would have resulted in you
22 writing this letter?
23   A. No, ma'am, I do not remember that.
24   Q. All right. Exhibit No. 16.

Page 58

1      (At this point the court reporter
2      marked Lyons Exhibit No. 16 for
3      purposes of identification.)
4  BY MS. BEYERS:
5      Q. Again, I'm just going to show you the
6  first page of this document indicated that there
7  were 14 pages, but I can't really tell what went
8  with this.
9      A. Okay.
10     Q. Can you -- is this your handwriting,
11  Mr. Lyons?
12     A. Yes, it is.
13     Q. And is that your signature there at
14  the bottom of the letter?
15     A. Yes, ma'am, it is.
16     Q. And can you tell -- can you state for
17  the record what this letter -- who the letter is
18  to and what are the contents?
19     A. This is to Lloyd Murphy.
20     Q. Okay.
21     A. And Lloyd was very nervous about -- I
22  guess I could say that, he was very nervous about
23  this money. He wanted to make sure that Jim's
24  policy -- he would call me several times and ask

Page 59

1  me if the policy was still in force.
2      Q. Okay. Do you know why he was nervous?
3  Did he ever indicate to you?
4      A. He just wanted to make sure the policy
5  was -- I figured that they -- he was -- his bank
6  was owed money.
7      Q. And do you remember your specific
8  conversation with him --
9      A. This was --
10     Q. -- regarding the contents of this fax?
11     A. This was I think after Jim -- I'm not
12  positive, though. I better not say that, because
13  I do not remember a conversation that I had with
14  Lloyd, but he was -- I will say that Lloyd was
15  very on top of making sure Jim paid the premiums
16  on his life insurance policy.
17     Q. Okay. And in the letter you've
18  indicated the company will pay Citizens directly,
19  and you've indicated they have no choice, because
20  Citizens has made the claim, and they do have an
21  assignment in force.
22         How did you come to know that the
23  company was going to deal with Citizens or pay
24  them directly?

Page 60

1      A. I had called the company, and when Jim
2  died, I wanted to make sure the policy was in
3  force, and they had said that Citizens had had a
4  claim.
5      Q. Or had already made a claim or had an
6  assignment?
7      A. Assignment. I'm sorry. Had an
8  assignment.
9      Q. Do you remember who it was that you
10  talked to at that time?
11     A. No, ma'am. I'm sorry.
12     Q. That's okay. That's all right. Can
13  you tell me a little bit more about this -- was
14  there where you would have picked up the phone
15  and called the --
16     A. Client service center.
17     Q. Okay. And you would have gotten
18  basically whoever picked up the phone. Is that
19  right?
20     A. Yes, ma'am.
21     Q. And basically you asked them if his
22  policy was still in force. Correct?
23     A. Yes, ma'am.
24     Q. Okay. Can you remember what you were

Page 61

1  told at that time?
2      A. The policy was still in force, and
3  there are assignments on it.
4      Q. And did they give you a list of
5  assignments?
6      A. They may have told me that list.
7  Whether I wrote them down or anything like that,
8  I don't remember. I do not recall.
9      Q. Did the person at the company indicate
10  that they were going to pay Citizens directly, or
11  was that something you assumed?
12     A. They would have been the one that told
13  me they paid them. I don't think I assumed that.
14  I just listened to what they said.
15     Q. Okay. And then you've got here after
16  that sentence, The money will be paid first come,
17  first serve. Call me if you have questions.
18         So in making that statement here, the
19  money will be paid first come, first serve, are
20  you talking about the remainder of the claimants,
21  or what were you indicating there in that
22  sentence?
23     A. What I was trying to reassure Lloyd is
24  that he would get paid.

Page 62

1    Q. Okay.
2    A. That's it.
3    Q. Okay. All right.
4    A. He was very nervous about getting
5 paid.
6    Q. Sure. When you talked to the person
7 at the service center, did you remember her or
8 the person that you spoke to saying anything
9 about -- about this entity having a valid
10 assignment at the time?
11    A. No, ma'am, I do not remember that. I
12 don't remember anything about that phone
13 conversation, ma'am.
14    Q. Okay. Okay. I want to just turn that
15 over then.
16    A. Okay. All right.
17       (At this point the court reporter
18       marked Lyons Exhibit No. 17 for
19       purposes of identification.)
20 BY MS. BEYERS:
21    Q. Then Exhibit No. 17, it's just his
22 handwriting one.
23       Mr. Lyons, I'd like you to look at
24 Exhibit No. 17. Is this your handwriting?

Page 63

1    A. Yes, ma'am.
2    Q. And can you tell me what prompted you
3 to write this out or what this indicates?
4    A. Probably it was a note -- I do not
5 recall why I did this. I have no -- it looks
6 like my doodling, it is my writing, and I have no
7 idea why I did this. Probably -- I really don't
8 know why I did this, ma'am.
9    Q. Okay.
10    A. I'm sorry.
11    Q. I didn't know if that came from a
12 conversation you had with somebody?
13    A. No. It looks like doing something --
14 I don't remember anything about that.
15    Q. Okay. All righty.
16    A. Sounds like something -- I draw
17 pictures and things on pages, and I'm not sure.
18    Q. Not sure what they are?
19    A. Yeah. Yeah. I don't know how you got
20 some more of my wonderful artwork.
21       MR. CROWDER: Was that 17?
22 BY MS. BEYERS:
23    Q. Yeah, it was.
24       Have you ever had a conversation with

Page 64

1 Margaret Stilwell regarding the distribution of
2 the monies under the four million dollar policy?
3    A. She came in to the office one day, and
4 we talked generally about -- about -- I knew that
5 she was upset about something, but I didn't
6 understand why.
7    Q. Uh-huh. Uh-huh. This was after
8 Mr. Stilwell's death?
9    A. Yes, ma'am.
10    Q. And this was after the claims had been
11 paid?
12    A. Way after, yes.
13    Q. Do you have an estimate as to when
14 that was?
15    A. No, ma'am, I can't recall.
16    Q. Okay. And -- but what you do remember
17 is she was upset about the way the claims were
18 paid?
19    A. On the four million dollar.
20    Q. Did she indicate to you what her
21 concern was or why she was upset?
22    A. I will tell you she was not very happy
23 with Janko Financial. I do remember that.
24    Q. And what did she say that made you

Page 65

1 believe that she was --
2    A. She just said that she was not very
3 happy with Larry Bianchi or Janko Financial.
4    Q. Did she -- other than that, do you
5 remember anything that -- specific that she said?
6    A. No, ma'am. No, ma'am.
7    Q. And what did you indicate to her when
8 she said that to you?
9    A. I had -- Julie, I didn't know what she
10 was talking about, so I just, you know...
11       You know, I just talked to her about
12 the one million dollar policy and was glad that
13 she had that. I reinforced that she did have
14 that one million dollar.
15    Q. Is that the only conversation that you
16 remember having with Mrs. Stilwell about the
17 disbursement?
18    A. Mrs. Stilwell has been to my house
19 several times but not about the life insurance.
20 She comes -- I've tried to help her find
21 employment and a few things like that.
22    Q. Okay. So she's come to your home for
23 social visits since --
24    A. Yes.

Page 66

1  Q. -- these -- since the monies were paid
2 out under both of these policies.  Is that
3 correct?
4    A. Yes.
5    Q. And other than the -- where did the
6 conversation take place that you had with her
7 when she came and said that she had some
8 concerns?
9    A. She was in my office one day.
10   Q. Okay.
11   A. She was wanting to know if I would --
12 the day that she came she wanted -- she wanted to
13 know if I would write her a letter of
14 recommendation for a job.
15   Q. Okay.  And during that conversation
16 she brought up the way the claims were paid under
17 the four million dollar policy?
18   A. Yes.
19   Q. Have you had any conversations with
20 Jason Crowder here?
21   A. Yes.
22   Q. Okay.
23   A. I went to Jason's office, and he made
24 a copy of all this.

Page 67

1    Q. Okay.  And do you remember
2 approximately when that was, when you went to
3 meet with Mr. Crowder?
4    A. You think I would remember, but I
5 thought it was last summer.
6    Q. Okay.  And did he call you up and
7 arrange the meeting?
8    A. Uh-huh.  Yes, ma'am.
9    Q. And what did he indicate to you when
10 he called you?
11   A. He wanted a copy of all my files, and
12 he wanted to ask me some questions about -- about
13 my files.
14   Q. Okay.  Did you let anybody at American
15 General know that a lawyer had contacted you
16 about these files?
17   A. I believe I -- I believe I did call
18 and tell somebody at the legal department that I
19 was going to go talk to Jason.
20   Q. Okay.  So at that point you wouldn't
21 have called the customer service center, you
22 would have called the legal --
23   A. I don't recall calling anybody, come
24 to think about it.  I'm sorry.  I just don't -- I

Page 68

1 might have called somebody, but I don't remember.
2    Q. Okay.
3    A. Julie, I will be very honest.  When
4 you people call, you make me nervous, so I just
5 come.  I don't ask questions.  I just -- I just
6 come.
7        I mean my dad always told me you tell
8 the truth and get -- you know, if somebody calls
9 you and wants to know what you think, you go talk
10 to them, so that's what I did, Julie.
11   Q. Okay.  That's what you did?
12   A. Yeah.
13   Q. Can you tell me about the conversation
14 then that you had with Mr. Crowder when you went
15 to his office?
16   A. Jason asked me a lot of questions just
17 like you did, Julie.
18   Q. Uh-huh.  Uh-huh.
19   A. And told me that Margaret was upset
20 about the way a couple of the claims were added
21 together.  I really didn't understand -- I
22 understood that that's what the -- what -- he
23 feels like there's a problem there with the
24 combination of a couple of claims.

Page 69

1        I really didn't have any answers for
2 him about what had happened, because I really --
3 like I told you, when American General paid the
4 claims, I was just tickled to death, because I
5 was glad the policy was in force, and I was
6 relieved that they paid the money.
7        I had nightmares -- the day Jim died,
8 I didn't sleep the whole night, because I was
9 worried about poor Margaret and the girls not
10 getting anything, the million or the four
11 million, and I was -- I was so thankful that I
12 had a good company that paid that money, but
13 that's all I remember about -- Jason was very
14 polite to me, very nice to me, asked me
15 questions, and I would respond just like I am
16 doing with you, and that's all I can recall.
17   Q. Okay.  So he -- what he was focused on
18 was some sort of combined claim.  Is that what
19 you're -- can you remember exactly?
20   A. No, I don't remember exactly.  I
21 didn't figure it dealt with me personally.  I
22 just felt like he was doing -- looking for some
23 answers that I couldn't give him.
24   Q. And so you made no comment about any

**Page 70**

1  sort of claims or the way the claims were made.
2  Is that a fair statement?
3      A. I will tell you I did tell Jason and
4  I've told you that Margaret was very upset with
5  Larry Bianchi.
6      Q. And what did you tell Jason about
7  that?
8      A. That's all I said. She was very
9  upset.
10      Q. Basically what you've told me today?
11      A. Yes, it was the same.
12      Q. And that was --
13      A. You know, let me -- let me -- I'll
14  have to be honest. You don't call me the day a
15  guy dies and ask me. You know, you wait until
16  after the funeral, you know, and I didn't think
17  that was very good -- I'm not -- I guess I'm a
18  central Illinois boy.
19          You don't call a person up the day he
20  dies and want to know if the life insurance is
21  still in force. I'm sorry, but that's just my
22  opinion. I probably shouldn't have told you
23  that, but that's the way it is.
24      Q. That's okay. And you said that you

**Page 71**

1  knew that Margaret was very upset. Again, you've
2  told me all of your conversations with Margaret
3  concerning that particular issue. Is that
4  correct?
5      A. Yes. Yes, ma'am. And my memory is
6  not real good.
7      Q. Well, that's --
8      A. I'm sorry.
9      Q. And when Mr. Bianchi called you, did
10  you have any idea how much the Stilwells or ACV
11  or any related entities owed Janko Financial or
12  TFG or anything like that?
13      A. No. No. Lloyd called me too, but it
14  was like three days after the funeral.
15      Q. And Lloyd is the one that you sent the
16  fax to?
17      A. Yes.
18      Q. That we've already talked about.
19  Correct?
20      A. Yes.
21      Q. And he called you shortly after
22  Mr. Stilwell's death?
23      A. Yeah, it was three days after we
24  buried him.

**Page 72**

1          MS. BEYERS: Mark, do you want to ask
2  a few questions? I think I'm almost done.
3      EXAMINATION CONDUCTED
4      BY: MR. SENECA
5      Q. I'm Mike Seneca. I have a couple of
6  questions.
7          We've discussed and looked at various
8  documents today provided to you by Larry Bianchi
9  on behalf of Janko Financial Group and Tuscola
10  Furniture Group and then several other documents
11  that you have in your file.
12          Do you have any reason to dispute any
13  of the statements made by Larry to you in any of
14  those letters?
15      A. No, Mike.
16      Q. Do you have any reason to dispute any
17  of the amounts represented in those documents?
18      A. Mike, I wouldn't know anything about
19  the amounts. I'm sorry.
20      Q. Did you do anything to investigate
21  Margaret's complaints about the way claims were
22  made?
23      A. No, ma'am -- no, sir. I'm sorry. I'm
24  sorry.

**Page 73**

1      Q. That's all right. That's all right.
2  That's all the questions I have.
3      A. I felt and I still feel that is my
4  company's job, not mine.
5      Q. So documents provided to you, you
6  didn't look at, independently review yourself?
7      A. No, sir.
8      Q. You just passed them on to your
9  company?
10      A. Yes, sir.
11          MR. SENECA: Okay. That's all the
12  questions I have.
13          MS. ROTHMANN: I've got a couple.
14      EXAMINATION CONDUCTED
15      BY: MS. ROTHMANN
16      Q. Mr. Lyons, Becky Rothmann. Nice to
17  meet you. I just had one or two, and it was just
18  on points of clarification.
19          You had testified in response to some
20  of Julie's questions that -- I don't want to put
21  words in your mouth -- sometime after
22  Mr. Stilwell passed away Margaret called you into
23  or down to the store for a meeting?
24      A. Yes, ma'am.

Page 70 - Page 73

## Page 74

1  Q. Okay. Do you know approximately when
2  that occurred?
3     A. It was approximately -- I think it was
4  about a week after his funeral.
5     Q. Okay. So about a week after his
6  funeral you were called down to discuss with
7  Margaret the life insurance policies, and you
8  said that there were a couple other people that
9  were present?
10    A. Yes, ma'am.
11    Q. It was Margaret Stilwell?
12    A. Right.
13    Q. Obviously was there. Correct?
14    A. Right.
15    Q. Yourself?
16    A. Yes.
17    Q. Do you recall who else was there?
18    A. Not -- no, ma'am. I really don't
19  remember. There was an attorney present that was
20  a friend of Margaret's and Jim's, and I don't
21  remember his name, and if you said the name, I
22  might remember it.
23    Q. It wasn't Mr. Crowder?
24    A. No. No.

## Page 75

1     Q. Was it a man named Richard Broch?
2     A. That's right it, Richard Broch.
3     Q. Richard Broch was present?
4     A. Yes.
5     Q. So Margaret, Richard Broch, yourself.
6  Anybody else?
7     A. There was somebody else there, and I
8  didn't know him.
9     Q. Okay. So another gentleman?
10    A. Yeah, gentlemen.
11    Q. That was there. Can you describe him?
12    A. No. I don't remember.
13    Q. Okay. Can you -- to the best of your
14  ability can you recall what you told them and
15  what they said to you, what the conversation was?
16    A. What I told them was I had listed the
17  one policy and told them it was four million
18  dollars, and there was assignments on that
19  particular policy, and I also told them about the
20  million dollar policy, that six hundred thousand
21  was to go to Maggie and a hundred thousand to go
22  to Heidi, Jamie, those girls -- the girls. Okay?
23    Q. Okay.
24    A. And that the policies were in force,

## Page 76

1  and that the claims would be paid, because it was
2  past the two years of contestability, and they
3  asked me how long it would take, and I said I
4  have no idea, you know, and basically they
5  said -- and pretty much I was excused after that.
6  I did hear them say that this would be able to
7  have Margaret keep the business open, they
8  thought.
9     Q. Okay. Did you -- with respect to the
10 four million dollar policy that you advised them
11 of and you advised them that there were
12 assignments on the four million dollar policy, is
13 that right?
14    A. Yes. Yes.
15    Q. Did you give them any specifics as to
16 what the assignments were on that four million
17 dollar policy?
18    A. No, ma'am.
19    Q. Okay.
20    A. No, ma'am.
21    Q. Do you recall anything else about that
22 meeting?
23    A. No, ma'am.
24    Q. Did you ever speak with a Richard

## Page 77

1  Broch again?
2     A. No, ma'am.
3     Q. And your next conversation with
4  Margaret Stilwell concerning the claim was when,
5  if you had one at all? Do you recall?
6     A. When she came in to get her money.
7     Q. The letter?
8     A. Her money, okay. Her money. All we
9  discussed about is here is the money, you know,
10 and, you know, Jim wanted that money to take care
11 of Margaret for the rest of her life. He thought
12 that that would take care of her, and I wished
13 her well, and that was basically that
14 conversation.
15    Q. Okay. Let me show you, I don't have
16 copies for everybody, but put this in front of
17 him.
18       Let me show you what was previously
19 marked I think at Margaret Stilwell's deposition
20 as Exhibit 10.
21    A. Okay.
22    Q. It's a claimant statement, proof of
23 death claimant statement. Do you see that?
24    A. Uh-huh.

Page 78

1    Q. Is that your handwriting --
2    A. Yes, ma'am, it is.
3    Q. -- at the top? Do you see Margaret
4 Stilwell's signature?
5    A. Yes, and that's Margaret Stilwell's
6 signatures.
7    Q. Okay. And the -- it looks like it was
8 dated the 6th of May?
9    A. Right.
10   Q. Could that be when your meeting took
11 place?
12   A. Yes, that would be -- she was
13 definitely in my office that day, but I don't
14 think I -- all we did was fill out the papers,
15 and I assured Margaret that this million dollars
16 was in force.
17   Q. Okay. And you didn't -- there was no
18 claim, similar claim made under the four million
19 dollar policy on behalf of Margaret Stilwell. Is
20 that right?
21   A. No, ma'am.
22   Q. Okay. I'm going to show you another
23 document that was marked. I think it was marked
24 16 and 17 at somebody's deposition, but I'll

Page 79

1 describe it for the record.
2    A. Okay.
3    Q. John, I'm showing you a document that
4 was previously marked I believe it's Exhibit 17
5 at one of the other depositions we have taken.
6 In any event, it's a memo it looks like from
7 American General to William Lyons?
8    A. Uh-huh.
9    Q. Dated July 10th, 2003?
10   A. Right.
11   Q. Enclosing a letter and a check, it
12 says. Do you recall getting that? Looks like
13 it's a check for $25,000 plus?
14   A. Yes.
15   Q. Under the four million dollar policy?
16   A. I didn't know it was under the four
17 million dollar policy -- and, you're right, the
18 one I thought that was, to be honest with you, is
19 I thought that was the interest that had been
20 earned, you know, some interest that had been
21 earned, and I did not realize that that was under
22 the -- I just got it to Margaret as fast as I
23 could. I'm sorry.
24   Q. Okay. And do you have any

Page 80

1 recollection of -- I think you had testified
2 before you didn't recall filling out claim forms
3 under the four million dollar policy?
4    A. No, ma'am, I do not. I don't remember
5 filling it out.
6    Q. Let me show you some things that I've
7 pulled here. These are the claim forms. Let me
8 put in front of you some proof of death claimant
9 statements.
10   A. This is Heidi's.
11   Q. Okay.
12   A. And this is Jamie's, and this is
13 Megan's, and this is -- this all says four
14 million dollar. Huh? I don't remember this,
15 but --
16   Q. Is that your handwriting on it? Is
17 this your handwriting?
18   A. That's my printing. Yes, ma'am, it
19 is.
20   Q. And these are claims under the four
21 million dollar policy?
22   A. And I don't remember that, and I don't
23 have copies of that. Now, I don't know why, but
24 I don't think it's in my file. Maybe it is. I

Page 81

1 don't remember that, ma'am. I'm sorry.
2    Q. That's okay. That's all right. Just
3 for the record, just to clear up your own
4 confusion here, I'm going to show him this.
5       (At this point the court reporter
6       marked Lyons Exhibit No. 18 for
7       purposes of identification.)
8    A. I feel really stupid.
9 BY MS. ROTHMANN:
10   Q. John, showing you what's been marked
11 Exhibit 18 of your deposition, this is a letter
12 from American General or a memo from American
13 General dated August 4th, 2003, to William John
14 Lyons?
15   A. That's right.
16   Q. Do you recall receiving this document?
17 The top document looks like it encloses three
18 checks.
19   A. Yes.
20   Q. Okay.
21   A. It's definitely been sent to me.
22   Q. Is that your handwriting on there?
23   A. Yes, it is, ma'am.
24   Q. Okay. Does that refresh your

Page 78 - Page 81

Page 82

1  recollection at all?
2      A. Yeah. Yeah. I -- this was -- I
3  filled this out to help get -- so Margaret
4  could -- Haley could get -- because she was a
5  minor at the time. Yes.
6      Q. Okay. And what you're referring to is
7  your own letter of August 20th, 2003?
8      A. Yes.
9      Q. To dear sirs?
10     A. Yeah.
11     Q. So that refreshes your recollect as to
12 whether you assisted with the claims process for
13 at least the Stilwell siblings?
14     A. Yes.
15     Q. Under the four million dollar policy.
16 Correct?
17     A. Yes. Yes.
18     Q. Okay. You had testified that you
19 don't -- you had received a copy of the May 12th
20 letters from TFG, Tuscola Furniture Group and
21 First Mid. I think they were marked, but that you thought
22 I believe they were marked, but that you thought
23 that the home office, American General's home
24 office got the originals. Do you recall that?

Page 83

1      A. Yes.
2      Q. What is it that makes you think that?
3      A. Because I don't remember -- I don't --
4  of course I don't remember -- none of this is my
5  handwriting is the reason I -- I mean there's
6  nothing here on these documents that -- this is
7  the original assignment.
8      Q. And you're talking about the
9  assignment and the claim forms that are attached?
10     A. Yeah.
11     Q. I'm talking about the letter that's
12 actually written to you, and the 231 North Main
13 Street, that's your address in Atwood?
14     A. Yes, it is. Yes, it is, because I
15 thought this was a copy of everything that they
16 had sent to the -- I don't think I got the
17 original. I think I got a copy of everything.
18     Q. Okay. You don't think you got the
19 original letter?
20     A. No.
21     Q. Okay. And you think --
22     A. I don't recall.
23     Q. That's what's in your file material?
24     A. Yeah, I think that's a copy too, but I

Page 84

1  honestly do not remember.
2      MS. ROTHMANN: Okay. That's all I
3  have.
4      EXAMINATION CONDUCTED
5      BY: MR. CROWDER
6      Q. Just a couple questions for you.
7  Again, John, this is from your file, and we'll
8  mark it 19.
9      (At this point the court reporter
10     marked Lyons Exhibit No. 19 for
11     purposes of identification.)
12 BY MR. CROWDER:
13     Q. Lyons Deposition Exhibit 19, again,
14 this is from your file. Just ask first if that's
15 -- Exhibit No. 19 is a document with your
16 handwriting on it?
17     A. Yes, it is.
18     Q. Okay. Any -- do you have any
19 independent recollection of drafting that
20 document?
21     A. No, ma'am -- no, sir, I do not.
22     Q. Okay. It indicates that -- in your
23 handwriting you wrote the four assignments on
24 Jim's policy are as follows. Correct?

Page 85

1      A. Yeah.
2      Q. And then you list the Tuscola National
3  Bank in the amount of two million?
4      A. Yes.
5      Q. Tuscola Furniture Group in the amount
6  of $250,000?
7      A. Right.
8      Q. Citizens Bank of Princeton in the
9  amount of 1.5 million?
10     A. Yes.
11     Q. And First Mid-Illinois Bank in the
12 amount of a million?
13     A. Yeah.
14     Q. Do you know -- do you have any
15 recollection where you received this information?
16     A. No, sir.
17     Q. Okay. But this is a document that is
18 in your handwriting?
19     A. Right, it is.
20     Q. Okay.
21     A. And, again, it's not dated, which I'm
22 trying very much better to do.
23     Q. Let me have you look at Exhibit
24 No. -- Exhibit No. 7 again. This is your

Page 86

1 deposition, Lyons Deposition Exhibit No. 7, and
2 that's the assignment to Tuscola Furniture Group.
3 Correct?
4     A. Right.
5     Q. Okay. And that bears to your
6 recollection Margaret Stilwell's signature on it?
7     A. Yes. Yes.
8     Q. And let me have you take a look at
9 Lyons Exhibit No. 9, Exhibit No. 9. This is a --
10 been marked release of assignment. Correct?
11    A. Right.
12    Q. Okay. This is a document that you in
13 part authored. Correct?
14    A. Right.
15    Q. Okay. You authored Section 1?
16    A. Right.
17    Q. And Section 3. Correct?
18    A. Yes.
19    Q. And you -- and you marked release of
20 assignment. Correct?
21    A. Yes.
22    Q. Okay. And you wrote in Janko
23 Financial Group, LLC. Correct?
24    A. Yes.

Page 87

1     Q. Okay. Now, the part at the bottom you
2 did not have anything to do with. Correct?
3     A. No, sir.
4     Q. So you did not have anything to do
5 with writing in favor of Tuscola Furniture Group,
6 LLC?
7     A. No, sir.
8     Q. So my statement is correct?
9     A. Yes, sir.
10    Q. You sent -- after you filled out
11 Sections 1 and 3, did you send this document on
12 to Janko Financial Group?
13    A. Yes, sir.
14    Q. And did you have anything to do with
15 them forwarding it on to American General for
16 entry?
17    A. No, sir.
18    Q. So when this document last left your
19 hands in the original form, it only had Sections
20 1 and 3 written in?
21    A. That's right.
22    Q. Okay. And did you fill this document
23 out the way you did based on conversations you
24 had with Mr. Stilwell? In other words, did he

Page 88

1 tell you what to do?
2     A. Yes, sir.
3     Q. Okay. And based on what he told you,
4 then you filled this document out and sent it on
5 to Janko Financial Group?
6     A. Yes. Yes.
7     Q. Okay. It probably will be best -- not
8 that I want you to have to go through this
9 laborious process, but there has been some
10 confusion as to what you remember being in your
11 file and what is part of your file and that type
12 of thing, so I have a complete copy of what I
13 believe is your file, and why don't we mark a
14 complete copy of your file, have you identify it
15 as what is in your file today and mark it as
16 Exhibit No. 20 to your deposition.
17        It may take you some time to thumb
18 through it and make sure it's there, but I think
19 it's probably important in light of the fact that
20 there was some uncertainty as to what was in your
21 file and what wasn't, so we'll mark it No. 20.
22        (At this point the court reporter
23        marked Lyons Exhibit No. 20 for
24        purposes of identification.)

Page 89

1     MS. BEYERS: Is this in the same form
2 you produced this, Jason?
3     MR. CROWDER: Yeah.
4     MS. BEYERS: This is in the form of
5 how you produced it?
6     MR. CROWDER: How we produced it, and
7 just for background, this is the copy of the file
8 that you brought to my office that day. I made
9 one copy of it. I just want you to identify that
10 Exhibit No. 20 is a copy of your file.
11    MS. BEYERS: Okay.
12    MS. ROTHMANN: Take your time, Mr.
13 Lyons, because you're going to look at it with
14 your --
15    MS. BEYERS: Well, that's your last
16 question, because I have one follow-up question,
17 and he could just do that at the end. Is that
18 all right? Do you have any more questions?
19    MR. CROWDER: Not unless something
20 changes.
21    RE-EXAMINATION CONDUCTED
22    BY: MS. BEYERS
23    Q. Now, Mr. Seneca down there asked you
24 if you had any knowledge that anything contained

Page 90

1 in the materials submitted to American General by
2 TFG and JFG were untrue, and, by the same token,
3 you have no knowledge that any of the information
4 given by First Mid to American General was not
5 correct?
6      A. No.  I thought -- I thought everything
7 was correct.
8      Q. Okay.  All right.  And you had no
9 reason to state --
10      MR. CROWDER: Just let me show an
11 objection to that as no foundation to that
12 question and answer.
13      MS. BEYERS: That's okay.  I think
14 he's answered.
15      RE-EXAMINATION CONDUCTED
16      BY: MS. ROTHMANN
17      Q. John, I'm showing you --
18      (At this point the court reporter
19       marked Lyons Exhibit No. 21 for
20       purposes of identification.)
21 BY MS. ROTHMANN:
22      Q. John, showing you what's been marked
23 Exhibit 21 for your deposition, is that a letter
24 that you wrote to Old Line Life Client Service

Page 91

1 Center?
2      A. Yes.
3      Q. And it's dated May 28th, 2001?
4      A. Yes.
5      Q. Do you see that?
6      A. Yes.
7      Q. And in it you list what you believe
8 the total of the assignment should be on the four
9 million dollar policy?
10      A. Yes.
11      Q. Do you see that?  And it says there
12 should be one to Tuscola Furniture Group, one to
13 the Citizens -- I'm paraphrasing here, one to
14 Citizens National Bank, and one to Tuscola
15 National Bank.  Do you see that?
16      A. Yes.  Yes.
17      Q. So according to your records, on May
18 28th, 2001, you had record of three total
19 assignments?
20      A. That's right.
21      Q. Okay.  And then it says, I'm enclosing
22 two assignment forms for policy, the four million
23 dollar policy?
24      A. This is probably included in these,

Page 92

1 but I don't recall that.
2      Q. Okay.  That would -- the two
3 assignments would include the ones that you're
4 listing there --
5      A. Yes.
6      Q. -- you believe?
7      A. Yes, I believe.
8      Q. Okay.  Looking at what was marked just
9 at your deposition the Lyons Exhibit 8 which is
10 in there, and I'm holding on to a copy of it too.
11 It's an assignment to First Mid National Bank &
12 Trust of one million dollars?
13      MS. BEYERS: I think it's First
14 Mid-Illinois.
15 BY MS. ROTHMANN:
16      Q. Sorry First Mid-Illinois Bank & Trust,
17 one million dollars signed by Margaret Stilwell?
18      A. Right.
19      Q. In January 2001?
20      A. Uh-huh.
21      Q. Do you see that?
22      A. Yes.
23      Q. Do you know whether this was part of
24 your file when you created your May 28th, 2001,

Page 93

1 correspondence, or if it's part of your file now?
2      A. I don't recall if it's part of my file
3 now or not.  I haven't looked at my file.
4      Q. Okay.
5      A. Jim would change these assignments so
6 often, you guys, I don't remember.  I was just
7 doing what he wanted me to do.  I just really
8 don't recall.
9      Q. Okay.  I just am wondering if maybe it
10 would refresh your recollection, because it was
11 not -- the assignment to First Mid is not listed
12 on your May 28th, 2001, correspondence.
13      A. I don't remember.  I don't remember.
14      MS. ROTHMANN: That's all I have.
15      RE-EXAMINATION CONDUCTED
16      BY: MR. SENECA
17      Q. I have a couple of follow-up
18 questions.
19      The American General assignment forms
20 after those are filled out do those go straight
21 to the American General, or do they go back to
22 you, or how does that work?
23      A. When the assignments forms are filled
24 out, they should go directly to American General,

Page 94

1 but sometimes they send them to me, and I forward
2 them on. I would either fax them or send them.
3 As soon as I got them, I would send them.
4    Q. Do you know in this case if you
5 received any of the assignments back and had to
6 forward them on to American General?
7    A. I do not recall.
8    Q. Does American General have a joint
9 assignment form?
10    A. I don't know, sir.
11    Q. Okay. Do you know if they have a
12 joint claim form?
13    A. I do not know that either, sir.
14       MR. SENECA: That's all the questions
15 I have.
16       MR. CROWDER: Okay. So we're all done
17 questioning?
18    RE-EXAMINATION CONDUCTED
19    BY: MS. BEYERS
20    Q. Well, I just have one more question.
21    A. Julie, you're going to ask me another
22 question, and they're going to ask me two or
23 three more.
24    Q. You're never going to get to go home.

Page 95

1    A. It's all right.
2    Q. On Lyons Exhibit No. 8 that
3 Ms. Rothmann was just asking you about, on the
4 second page, which is the assignment
5 verification, does that show that you would have
6 gotten a copy of it?
7    A. This would have been -- this would
8 have been my -- the -- this is what I would have
9 got a copy of.
10    Q. Okay. And that is dated January 30th,
11 2001. Correct?
12    A. Right. Right.
13    Q. And it's the assignment verification
14 for the assignment to First Mid-Illinois Bank &
15 Trust. Correct?
16    A. Right. Right. Right.
17    Q. And we're going to go through now
18 Exhibit 20, and if that was in your -- if that's
19 in your -- in Exhibit 20, then you did get a copy
20 of that. Correct?
21    A. Yes. Yes.
22    Q. And you may just have forgotten to
23 note it --
24    A. Right.

Page 96

1    Q. -- in that other letter. Is that
2 correct?
3    A. That's correct.
4    Q. And on Exhibit No. 19 we were
5 asking you about it previously. Let's get to
6 it. This is where you made a list of the
7 assignments?
8    A. Yes.
9    Q. And on there you do list the
10 assignment to First Mid. Correct?
11    A. Yes. It's on there, but I don't
12 recall when I did that.
13    Q. Okay. And, again, and by the same
14 token, you don't remember if you gave this to
15 anybody. Is that true?
16    A. No. No. I don't -- I don't remember
17 giving it to anybody. I do not -- and that's not
18 saying I didn't. I just don't recall.
19    Q. Okay.
20    A. So now I'm supposed to go through all
21 this stuff, guys?
22       MR. CROWDER: Assuming you're done?
23       MS. BEYERS: Yeah.
24       MR. CROWDER: Okay. What we need to

Page 97

1 do, all you're going to do is you're going to go
2 through Exhibit 20, and you're going to identify
3 once you're done whether that is a true and
4 complete copy of your file. Okay?
5       THE WITNESS: Okay. Well, you made it
6 Jason. Didn't you?
7       MR. CROWDER: I know. We don't want
8 to call me as a witness. Off the record.
9       (At this point there was an off the
10       record discussion.)
11       (At this point the court reporter
12       marked Lyons Exhibit No. 22 for
13       purposes of identification.)
14    RE-EXAMINATION CONDUCTED
15    BY: MR. CROWDER
16    Q. We've just gone through your entire
17 file. Does Exhibit No. 20 with the exception of
18 Exhibit No. 22 contain your entire file?
19    A. Yes, sir.
20    Q. Okay. And then with respect to Lyons
21 Exhibit No. 22, let me just ask you first is that
22 your handwriting?
23    A. Yes, sir.
24    Q. Okay. Do you have any recollection of

Page 98

1 this particular -- drafting this particular
2 document?
3    A. It's my handwriting, but I don't
4 remember doing it.
5    Q. Okay.  And --
6    A. Or when I did it either.
7    Q. All right.  And it's a document that
8 you sent to a gentleman named Larry?
9    A. Yeah.
10    Q. And you would have enclosed a --
11    A. Release of assignment.
12    Q. Release of assignment on the policy
13 2604663.  Correct?
14    A. That's correct.
15    Q. And it would have been related to
16 Janko Financial Group?
17    A. That's correct.
18    MR. CROWDER:  That's all I have.
19    MS. BEYERS:  We'll try to make --
20    MS. ROTHMANN:  Mr. Lyons, you can
21 either reserve your signature or waive your
22 signature, and what this means is if you reserve
23 your signature, you're going to have the
24 opportunity to review the transcript and make

Page 99

1 sure that the court reporter has copied down your
2 answers -- transcribed them correctly.
3    THE WITNESS:  Okay.
4    MS. ROTHMANN:  And you can make the
5 changes if she did not transcribe it correctly.
6 You can't make substantive changes.
7    THE WITNESS:  Okay.
8    MS. ROTHMANN:  But you would be able
9 to have an opportunity to read her transcript.
10    If you waive your signature, it
11 means you won't see your transcript, and you
12 won't have to deal with it, so it's up to you
13 whether you want to reserve your signature or
14 waive it.
15    THE WITNESS:  I'll waive it.  I trust
16 her.
17    (Deponent is excused.)
18
19
20
21
22
23
24

Page 100

1          CERTIFICATE
2
3       I, BARBARA A. GLOVER, Certified
Shorthand Reporter, do hereby certify that
4 WILLIAM JOHN LYONS, the deponent herein, was by
me first duly sworn to tell the truth, the whole
5 truth and nothing but the truth in the
aforementioned cause of action.
6       That the foregoing deposition was
7 taken on behalf of the Defendant First
Mid-Illinois Bank & Trust on February 26, 2007.
        That said deposition was taken down in
8 stenograph notes and afterwards reduced to
typewriting under my instruction and said
9 transcription is a true record of the testimony
given; and that it was agreed by and between the
10 witness and attorneys that said signature on said
deposition would be waived.
11       I do hereby certify that I am a
disinterested person in this cause of action;
12 that I am not a relative of any party or any
attorney of record in this cause, or an attorney
13 for any party herein, or otherwise interested in
the event of this action, and am not in the
14 employ of the attorneys for either party.
    Dated this 13th day of March, 2007.
15
16
17    Barbara A. Glover, CSR, RPR
    CRR, CCR
18
19
20
21
22
23
24

$1,500,000 - bought
**WILLIAM JOHN LYONS**

**-$-**

**$1,500,000** [2] 28:3 28:22
**,$25,000** [1] 79:13
**$250,000** [2] 29:14 85:6
**$500,000** [4] 24:15 25:11 26:5,23

**-'-**

**'92** [1] 11:11
**'98** [1] 17:8

**-0-**

**05-CV-02160** [1] 1:6

**-1-**

**1** [9] 3:11 13:12,14 29:24 31:14 32:9 86:15 87:11,20
**1.5** [2] 57:1 85:9
**10** [4] 3:16 33:9,11 77:20
**10th** [2] 52:1 79:9
**11** [4] 3:16 33:15 40:20 40:22
**1101** [2] 2:4
**111** [1] 2:8
**12** [6] 3:17 44:5,9 48:4 48:10 82:21
**120** [1] 2:19
**12th** [1] 82:19
**13** [7] 3:11,17 45:24 46:2 48:7,17 82:21
**13th** [1] 100:14
**14** [5] 3:18 51:13,15 53:13 58:7
**15** [4] 3:18 55:22 56:2 56:5
**16** [4] 3:19 57:24 58:2 78:24
**17** [8] 3:12,19 62:18,21 62:24 63:21 78:24 79:4
**18** [3] 3:20 81:6,11
**19** [3] 3:12,20 84:8,10 84:13,15 96:4
**1998** [2] 10:20,24

**-2-**

**2** [5] 3:12 17:17,21 30:12 31:14
**20** [11] 3:13,21 44:9 88:16,21,23 89:10 95:18,19 97:2,17
**200** [1] 2:13
**,2000** [1] 28:19
**,2001** [6] 91:3,18 92:19 92:24 93:12 95:11
**2003** [6] 34:2,23 35:4 79:9 81:13 82:7

**2007** [3] 1:22 100:7,14
**20th** [1] 82:7
**21** [4] 3:21 44:10 90:19 90:23
**211** [2] 2:13
**217** [2] 2:5,9
**22** [5] 3:22 44:10 97:12 97:18,21
**23** [1] 44:10
**231** [2] 7:2 83:12
**235-2700** [1] 2:5
**2384389** [2] 12:16 21:2
**24** [3] 3:13 44:10 45:16
**25th** [2] 28:19
**26** [2] 1:22 100:7
**2600** [2] 2:19
**2604663** [4] 12:13 56:21,21 98:13
**28** [1] 3:14
**28th** [4] 91:3,18 92:24 93:12
**29** [1] 3:14
**2nd** [4] 34:23 35:2,4

**-3-**

**3** [8] 3:12 12:19,11,19 32:10 86:17 87:11,20
**301** [1] 1:22
**309** [1] 2:14
**30th** [1] 95:10
**31** [1] 3:15
**312** [1] 2:20
**32** [1] 3:15
**33** [1] 3:16

**-4-**

**4** [5] 3:3,13 20:16,19,22
**40** [1] 3:16
**422-1719** [1] 2:9
**44** [1] 3:17
**46** [1] 3:17
**4th** [1] 81:13

**-5-**

**5** [5] 3:13 24:14,17,20 27:11
**51** [1] 3:18
**55** [1] 3:18
**58** [1] 3:19

**-6-**

**6** [4] 3:14 28:2,5,9
**600** [1] 2:13
**60602** [1] 2:19
**61602-1350** [1] 2:14
**61938** [1] 2:4
**62** [1] 3:19
**62523** [1] 2:9
**672-1483** [1] 2:14

**6th** [1] 78:8

**-7-**

**7** [6] 3:14 29:8,10,13 85:24 86:1
**704-0550** [1] 2:20
**72** [1] 3:4
**73** [1] 3:4

**-8-**

**8** [6] 3:15 31:2,4,7 92:9 95:2
**81** [1] 3:20
**84** [2] 3:5,20
**88** [1] 3:21
**89** [1] 3:5

**-9-**

**9** [6] 3:15 32:3,5,9 86:9 86:9
**90** [2] 3:6,21
**93** [1] 3:6
**94** [1] 3:7
**97** [3] 3:7,22

**-A-**

**ability** [2] 50:8 75:14
**able** [2] 76:6 99:8
**according** [1] 91:17
**account** [1] 55:9
**accounts** [1] 55:8
**acquire** [1] 13:2
**action** [3] 100:5,11,13
**ACV** [1] 71:10
**added** [1] 68:20
**additional** [1] 57:1
**address** [2] 7:1 83:13
**advised** [2] 76:10,11
**aforementioned** [1] 100:5
**afternoon** [1] 22:20
**afterwards** [2] 37:3 100:8
**again** [15] 28:24 30:15 30:20 31:9,19,23 46:7 58:5 71:1 77:1 84:7,13 85:21,24 96:13
**against** [1] 16:2
**agency** [1] 8:8
**agents** [4] 8:8,13,14 24:1
**agree** [2] 10:24 18:11
**agreed** [1] 100:9
**ahead** [1] 21:19
**allotment** [1] 12:2
**almost** [1] 72:2
**always** [4] 11:14 23:10 41:5 68:7
**American** [36] 1:9,11 2:20 5:20 6:1 7:10,11

**7:16** 8:1,16,18,23 9:12 14:13 16:22 17:4,12 34:1 40:17 42:21 44:19 49:18 67:14 69:3 79:7 81:12,12 82:23 87:15 90:1,4 93:19,21,24 94:6,8
**amount** [7] 13:23 27:4 55:10 85:3,5,9,12
**amounts** [2] 72:17,19
**analyzing** [1] 9:14
**answer** [5] 5:5 21:19 22:1 53:19 90:12
**answered** [4] 14:19,20 54:9 90:14
**answers** [3] 69:1,23 99:2
**Anyway** [1] 35:17
**appear** [3] 24:23 28:12 29:6
**APPEARANCES** [1] 2:1
**Appearing** [4] 2:5,10 2:15,20
**application** [4] 6:16 15:12 33:19,24
**applications** [1] 6:15
**applied** [1] 14:3
**apply** [1] 11:5
**applying** [1] 14:17
**Area** [1] 1:21
**arrange** [1] 67:7
**artwork** [1] 63:20
**aside** [1] 33:7
**assigned** [4] 21:7 35:20 38:19 56:20
**assignee** [1] 25:14
**assignment** [45] 22:15 22:18 23:3 24:15 25:11 25:22 26:5,8 27:15 28:3,22 29:14 30:2,7 30:11,12,18 31:8,13 31:17,21 33:2 56:24 59:21 60:6,7,8 62:10 83:7,9 86:2,10,20 91:8 91:22 92:11 93:11,19 94:9 95:4,13,14 96:10 98:11,12
**assignments** [18] 22:10 23:13 24:5 38:11 41:10 50:3 61:3,5 75:18 76:12,16 84:23 91:19 92:3 93:5,23 94:5 96:7
**assisted** [1] 82:12
**Associates** [1] 2:3
**assumed** [2] 61:11,13
**Assuming** [1] 96:22
**assured** [1] 78:15
**attached** [4] 33:15 48:21 49:5 83:9
**attachments** [3] 33:17 48:5,8
**attention** [1] 35:9
**attorney** [3] 74:19

**100:12,12
attorneys** [2] 100:10 100:14
**Atwood** [6] 7:2 11:15 11:23,23 12:23 83:13
**August** [2] 81:13 82:7
**authored** [2] 86:13,15
**available** [1] 36:8
**aware** [1] 43:10
**away** [3] 23:16 34:17 37:16 73:22

**-B-**

**B** [1] 3:9
**background** [1] 89:7
**bad** [1] 20:8
**bank** [18] 1:14 5:19 21:7 22:16 31:9 36:16 52:21,22 59:5 85:3,8 85:11 91:14,15 92:11 92:16 95:14 100:7
**Barbara** [3] 1:22 100:3 100:17
**based** [4] 26:13 27:1 87:23 88:3
**bear** [3] 29:20 31:13 32:10
**bears** [1] 86:5
**became** [1] 8:20
**Becky** [1] 73:16
**become** [1] 43:10
**becoming** [1] 8:13
**behalf** [4] 1:21 72:9 78:19 100:6
**belongs** [1] 24:3
**best** [6] 11:16 28:17 29:16 50:8 75:13 88:7
**better** [2] 59:12 85:22
**between** [3] 18:18 39:19 100:9
**Beyers** [48] 2:7,8 3:3,5 3:7 4:7 5:18 9:4 13:16 13:20 17:19 19:13,16 20:18 21:13 22:5 24:19 27:5 28:1,7 29:12 31:6 32:7 33:13 36:12 41:1 44:7 46:4 48:1 51:18 51:24 52:2 53:11 56:1 58:4 62:20 63:22 72:1 89:1,4,11,15,22 90:13 92:13 94:19 96:23 98:19
**Bianchi** [11] 33:1 36:20 36:22 38:5 46:13 56:15 57:18 65:3 70:5 71:9 72:8
**biggest** [2] 16:18 43:14
**bit** [1] 60:13
**blank** [2] 41:5,8
**boilerplate** [1] 20:10
**bottom** [4] 14:10 18:14 29:17 31:11 32:16 56:10 58:14 87:1
**bought** [4] 8:1,15,23

17:4
boy [1] 70:18
break [1] 47:21
Broadway [1] 2:4
Broch [5] 75:1,2,3,5 77:1
brought [4] 5:22 6:22 66:16 89:8
buffet [1] 35:14
build [3] 8:8 34:11,13
bunch [1] 56:3
buried [1] 71:24
business [9] 11:14,18 11:22 15:15,19 16:3,5 16:9 76:7
busy [2] 16:1,1

-C-

calls [2] 39:23 68:8
care [6] 13:7 43:24 50:7 55:14 77:10,12
career [1] 9:11
case [5] 5:20 10:19 15:7 41:9 94:4
cases [1] 12:8
CCR [1] 100:17
center [6] 43:1 53:16 60:16 62:7 67:21 91:1
central [1] 1:2 70:18
certain [1] 21:23
certainly [1] 54:19
certificate [5] 10:2,9 10:11 43:22 100:1
certificates [2] 40:9 40:16
Certified [1] 1:23 100:3
certify [1] 100:3,11
Chamberlain [2] 41:21 52:23
Champaign [1] 1:22
change [1] 93:5
changes [3] 89:20 99:5 99:6
check [3] 55:9 79:11 79:13
checking [1] 55:8
checks [3] 55:6,7 81:18
Chicago [1] 2:19
children [1] 13:9
choice [1] 59:19
Cindy [1] 20:20
Citizens [8] 59:18,20 59:23 60:3 61:10 85:8 91:13,14
city [1] 11:21
Civil [1] 4:20
claim [20] 9:21 10:13 40:4 43:11,22 51:5 54:8,17,21 59:20 60:4 60:5 69:18 77:4 78:18 78:18 80:2,7 83:9

94:12
claimant [11] 10:9,11 42:1 43:1,23 45:11,22 49:13 77:22,23 80:8
claimant's [1] 49:1
claimants [2] 49:19 61:20
claims [24] 6:11 9:13 9:13,14 39:20 42:22 43:8,14 49:17 50:15 51:10 54:2 64:10,17 66:16 68:20,24 69:4 70:1,1 72:21 76:1 80:20 82:12
clarification [2] 48:3 73:18
clear [6] 5:14 12:11 26:21 28:21 47:9 81:3
client [3] 43:1 60:16 90:24
combination [1] 68:24
combined [1] 69:18
coming [4] 11:4 16:15 26:9,23
comment [1] 69:24
companies [2] 7:7 14:13
company [26] 1:9,12 5:21 7:13,14,24 9:24 10:5 14:3 18:1 20:7 22:24 40:7 41:6 42:3 42:17 43:20,23 50:7 54:22 59:18,23 60:1 61:9 69:12 73:9
company's [1] 73:4
complaints [1] 72:21
complete [8] 88:12,14 97:4
computer [1] 15:23
concern [1] 64:21
concerning [7] 5:23 6:10 30:16 38:10 50:20 71:3 77:4
concerns [1] 66:8
CONDUCTED [10] 3:2 4:6 72:3 73:14 84:4 89:21 90:15 93:15 94:18 97:14
confined [1] 43:18
confirm [2] 47:17 57:3
confusion [1] 81:4 88:10
contacted [1] 67:15
contain [6] 6:9 97:18
contained [1] 89:24
contents [2] 58:18 59:10
contestability [1] 76:2
contract [1] 30:1
conversation [24] 25:24 27:14 31:7 36:23 37:4,11,17,19 38:3 39:6,13,17 59:8 59:13 62:13 63:12,24 65:15 66:6,15 68:13

75:15 77:3,14
conversations [18] 15:11 16:21 25:19 29:2 31:20 32:21,24 36:15 36:19 38:4,8,15 39:4 39:14,19 66:19 71:2 87:23
copied [1] 99:1
copies [2] 77:16 80:23
copy [28] 41:8 44:15 44:19,23 46:10 47:6 49:8,15,18 50:15 56:19 56:22 66:24 67:11 82:19 83:15,17,24 88:12,14 89:7,9,10 92:10 95:6,9,19 97:4
copying [1] 19:7
Corporation [1] 8:2
correct [43] 7:16 10:14 12:16 21:8 26:18 30:24 34:18 39:11 43:7 49:3 49:8 53:16,23 54:4 55:17 56:15 57:17 60:22 66:3 71:4,19 74:13 82:16 84:24 86:3 86:10,13,17,20,23 87:2 87:8 90:5,7 95:11,15 95:20 96:2,3,10 98:13 98:14,17
correctly [1] 33:18 99:2,5
correspondence [3] 6:15 93:1,12
corresponding [1] 53:14
couple [9] 34:12 46:18 68:20,24 72:5 73:13 74:8 84:6 93:17
course [1] 83:4
court [25] 1:1 5:3 13:13 17:16 19:10 20:15 24:16 28:4 29:9 31:3 32:4 33:10 40:21 44:4 46:1 51:14 55:21 58:1 62:17 81:5 84:9 88:22 90:18 97:11 99:1
cover [8] 21:7 22:11 34:15 41:21 51:22 52:16 53:5,5
coverage [1] 16:17
created [1] 92:24
Crowder [30] 2:3 3:5 3:7 9:13 13:19 19:15 21:10,21 26:3,20 36:11 47:16 51:17 63:21 66:20 67:3 68:14 74:23 84:5,12 89:3,6,19 90:10 94:16 96:22,24 97:7,15 98:18
CRR [1] 1:22 100:17
CSR [1] 100:17
current [1] 6:24
customer [3] 18:11 19:4 67:21
customers [1] 11:16

-D-

D [1] 3:1
dad [1] 68:7
Dallas [2] 53:15 55:13
date [4] 34:21 57:6,8 57:12
dated [7] 78:8 79:9 81:13 85:21 91:3 95:10 100:14
daughters [2] 13:9 55:1
days [2] 71:14,23
deal [2] 59:23 99:12
dealings [1] 41:10
dealt [2] 43:15 69:21
dear [1] 82:9
death [19] 10:2,5,9,11 36:14,18 37:1 38:9 39:7 40:4,9,16 43:21 43:22 64:8 69:4 71:22 77:23 80:8
debt [8] 13:1,3 16:6,7 18:10 21:7 22:11 34:15
debts [1] 36:5
Decatur [1] 2:9
decide [1] 9:15
decided [1] 14:5
decision [1] 50:19
declarations [3] 19:14 19:20 56:23
declined [2] 34:3,6
deduction [1] 12:5
Defendant [5] 1:10,21 2:10,20 100:6
Defendants [1] 1:16
definitely [3] 26:19 78:13 81:21
deliver [1] 55:5
delivered [2] 20:13 55:10
delivering [1] 55:14
department [1] 67:18
deponent [3] 4:2 99:17 100:4
deposition [18] 1:19 1:20 4:14,17,18,22 77:19 78:24 81:11 84:13 86:1,1 88:16 90:23 92:9 100:6,7,10
depositions [1] 79:5
describe [3] 56:14 75:11 79:1
described [1] 15:9
details [2] 23:15 28:20
determined [1] 10:14
Dicker [1] 2:18
died [7] 35:10,11 37:3 37:5,20 60:2 69:7
dies [2] 70:15,20
different [2] 7:7 47:3
difficulties [1] 35:6
directly [4] 59:18,24 61:10 93:24
disability [1] 12:3

disbursement [1] 65:17
discovery [3] 4:18 19:24 51:21
discuss [1] 74:6
discussed [2] 72:7 77:9
discussion [4] 27:24 53:10 57:18 97:10
discussions [1] 18:17
disinterested [1] 100:11
dispute [2] 72:12,16
distribute [1] 40:4
distribution [1] 64:1
district [6] 1:1,2 7:22 8:6,16,19
DIVISION [1] 1:3
document [38] 6:4,6 13:18 21:11 24:24 25:6 28:12,13 29:6,18,21 30:12 32:10,22 33:2,3 41:2 44:13 45:11 46:5 48:4 56:10 57:13 58:6 78:23 79:3 81:16,17 84:15,20 85:17 86:12 87:11,18,22 88:4 98:2 98:7
documentation [1] 16:22 50:11
documents [15] 6:10 6:16,19,21 45:1 47:12 47:12 48:10 53:3 55:19 72:8,10,17 73:5 83:6
dollar [47] 6:11,12 10:17,18 11:5,6 12:12 12:15 13:15 14:2 16:5 16:10 19:21 22:11 31:8 34:10 36:9 38:11,20 39:21 40:6 41:3 42:22 43:9 49:23 50:4 51:6 54:16 55:2 64:2,19 65:12,14 66:17 75:20 76:10,12,17 78:19 79:15,17 80:3,14,21 82:15 91:9,23
dollars [13] 16:16 22:15 33:20,22 34:15 35:20,21 38:23 56:22 75:18 78:15 92:12,17
dollars' [1] 16:16
done [9] 4:19 9:17 22:1 23:23 26:1 72:2 94:16 96:22 97:3
doodling [1] 63:6
door [1] 23:8
down [10] 5:3,7 23:15 32:16 61:7 73:23 74:6 89:23 99:1 100:7
drafted [1] 20:22
drafting [2] 84:19 98:1
draw [1] 63:16
drop [1] 15:19
dropped [1] 47:2 48:12
duly [2] 4:3 100:4
during [6] 15:12 18:17 42:21 43:8 50:15 66:15

**Multi-Page**™

**duties** [2] 8:6 10:1

**-E-**

ṽ [3] 2:8 3:1,9
**early** [1] 57:7
**earned** [2] 79:20,21
**Edelman** [1] 2:17
**eight** [1] 14:3
**either** [9] 9:11,19 28:18 38:10 94:2,13 98:6,21 100:14
**Elser** [1] 2:17
**employ** [1] 100:14
**employed** [1] 7:4
**employees** [1] 12:4
**employment** [1] 65:21
**enclosed** [2] 56:22 98:10
**encloses** [1] 81:17
**enclosing** [2] 79:11 91:21
**end** [2] 26:1 89:17
**enjoyed** [1] 11:17
**entire** [3] 5:22 97:16 97:18
**entities** [1] 71:11
**entity** [1] 62:9
**entry** [1] 87:16
**estimate** [1] 64:13
**evaluated** [1] 10:14
**evaluating** [1] 9:13
**event** [3] 20:3 79:6 100:13
**everybody** [1] 77:16
**evidently** [1] 41:6
**exact** [1] 34:21
**exactly** [2] 69:19,20
**EXAMINATION** [5] 3:2 4:6 72:3 73:14 84:4
**examined** [1] 4:3
**excellent** [3] 11:18,19 11:23
**exception** [1] 97:17
**excuse** [1] 12:3
**excused** [2] 76:5 99:17
**exhibit** [99] 3:10,11,12 3:12,13,13,14,14,15 3:15,16,16,17,17,18 3:18,19,19,20,20,21 3:21,22 13:12,14 17:17 17:21 19:9,11,19 20:16 20:19,21 24:14,22 27:10 27:11 28:2,5,9 29:8,10 29:13 31:2,4,7 32:3,5 32:8 33:9,11 40:20,22 42:9 44:5,9 45:24 46:2 48:7,10,17 51:13,15 53:13 55:22 56:2,5 57:24 58:2 62:18,21 62:24 77:20 79:4 81:6 81:11 84:10,13,15 85:23,24 86:1,9,9 88:16,23 89:10 90:19

**Exhibits** [1] 82:21
**expanding** [1] 12:23
**explicit** [1] 13:6

**-F-**

**fact** [5] 14:23 27:1 55:5 57:6 88:19
**fair** [3] 15:3 50:22 70:2
**familiar** [4] 25:2 46:5 46:13 52:4
**family** [1] 13:2
**far** [5] 9:13 18:4 26:8 37:15 47:4
**farther** [1] 41:19
**fast** [2] 24:3 79:22
**favor** [5] 25:11 29:14 31:8 46:18 87:5
**fax** [10] 33:16 51:22 52:16 53:14 56:13,14 56:17 59:10 71:16 94:2
**faxed** [1] 41:24 42:16 53:15
**February** [2] 1:22 100:7
**Federal** [1] 4:19
**feels** [1] 68:23
**felt** [2] 69:22 73:3
**few** [4] 4:24 14:22 65:21 72:2
**figure** [4] 19:1,2,3 69:21
**figured** [1] 59:5
**file** [44] 5:22 6:3,7,9 45:3 46:22,24 47:2,10 47:13,16,17 48:12,20 48:24 49:10,12,21 53:6 53:13,22 54:2,3 55:19 72:11 80:24 83:23 84:7 84:14 88:11,11,13,14 88:15,21 89:7,10 92:24 93:1,2,3 97:4,17,18
**files** [3] 67:11,13,16
**fill** [10] 10:10 13:24,24 22:18,21 23:8,19 46:8 78:14 87:22
**filled** [13] 14:8 23:5,10 33:24 41:8,9 42:1 45:12 82:3 87:10 88:4 93:20,23
**filling** [5] 14:6,16 23:12 80:2,5
**financial** [1] 1:16 2:15 13:22 25:11,13 28:23 35:6 36:21 64:23 65:3 71:11 72:9 86:23 87:12 88:5 98:16
**fine** [7] 16:12 22:6,7 44:3 51:1,2 52:10
**first** [8] 1:14,21 2:10 4:3 5:18,19 10:4 13:21 24:14 31:9 36:15 41:20 41:21 44:17 45:12 52:12,13,16,22 56:14

**58:6** 61:16,17,19,19 82:21 84:14 85:11 90:4 92:11,13,16 93:11 95:14 96:10 97:21 100:4,6
**five** [2] 33:20 56:19
**focused** [1] 69:17
**follow-up** [2] 89:16 93:17
**follows** [2] 4:4 84:24
**force** [11] 37:24 38:2 59:1,21 60:3,22 61:2 69:5 70:21 75:24 78:16
**foregoing** [1] 100:6
**forgotten** [1] 95:22
**form** [17] 7:10 12:1 21:11 22:18 23:6 36:11 42:5 46:22 50:17 87:19 89:1,4 94:9,12
**formed** [2] 11:20 12:7
**forms** [9] 40:4 54:17 54:21 80:2,7 83:9 91:22 93:19,23
**forward** [2] 94:1,6
**forwarding** [3] 9:23 43:19 87:15
**found** [3] 45:2 48:19 49:8
**foundation** [1] 90:11
**four** [42] 6:11 10:17 11:5 12:12,24 13:9,9 16:5,15 19:21 21:6 22:10 35:19 38:11 39:20 40:5,13 41:3 42:22 43:9 50:4 51:5 55:10 56:21 64:2,19 66:17 69:10 75:17 76:10,12,16 78:18 79:15,16 80:3,13,20 82:15 84:23 91:8,22
**Franklin** [5] 7:23,24 8:15,23 9:11
**frankly** [2] 28:18 35:16
**friend** [1] 74:20
**friends** [1] 15:1
**friendship** [1] 11:20
**front** [4] 6:5,7 77:16 80:8
**Fulton** [1] 2:13
**funds** [1] 51:9
**funeral** [5] 35:14 70:16 71:14 74:4,6
**Furniture** [13] 1:15 2:15 29:15 30:3 46:11 46:20 52:19 72:10 82:20 85:5 86:2 87:5 91:12

**-G-**

**gather** [3] 10:8,23 54:17
**gathered** [1] 54:21
**gathering** [1] 9:23
**General** [35] 1:9,11 2:20 5:21 6:1 7:10,11

**7:16** 8:1,16,18,23 9:12 14:13 16:22 17:5,13 34:1 40:17 42:21 44:19 49:18 67:15 69:3 79:7 81:12,13 87:15 90:1,4 93:19,21,24 94:6,8
**General's** [1] 82:23
**generally** [2] 10:1 64:4
**gentleman** [3] 33:1 75:9 98:8
**gentlemen** [1] 75:10
**girls** [10] 16:10 35:22 38:24 51:5 54:7,18 55:11 69:9 75:22,22
**given** [4] 4:21 90:4 100:9
**giving** [1] 96:17
**glad** [2] 65:12 69:5
**Glover** [3] 1:22 100:3 100:17
**goes** [1] 26:8
**gone** [1] 97:16
**good** [5] 11:19,22 69:12 70:17 71:6
**Group** [20] 1:15,16 28:23 29:15 30:3 36:21 46:11,20 52:19 72:9 72:10 82:20 85:5 86:2 86:23 87:5,12 88:5 91:12 98:16
**guess** [4] 9:8 17:1 58:22 70:17
**guy** [1] 70:15
**guys** [2] 93:6 96:21

**-H-**

**H** [1] 3:9
**Haley** [2] 1:4 82:4
**handle** [1] 26:21
**hands** [2] 23:24 87:19
**handwriting** [24] 14:7 29:21 31:14 32:11,16 32:18 42:6,9 46:12 56:7 57:9 58:10 62:22 62:24 78:1 80:16,17 81:22 83:5 84:16,23 85:18 97:22 98:3
**happy** [2] 64:22 65:3
**hard** [1] 5:13
**he'd** [1] 23:7
**head** [3] 5:7,9 43:6
**health** [3] 12:2 20:8 34:6
**hear** [1] 76:6
**Heavner** [1] 2:7
**Heidi** [2] 1:5 75:22
**Heidi's** [1] 80:10
**Heller** [1] 2:3
**help** [2] 65:20 82:3
**helping** [1] 41:6
**hereby** [2] 100:3,11
**herein** [3] 4:2 100:4,13
**holding** [1] 92:10

**Holmes** [1] 2:3
**home** [11] 10:12 30:10 35:2 41:16,17 46:10 55:13 65:22 82:23,23 94:24
**honest** [4] 16:17 68:3 70:14 79:18
**honestly** [2] 16:14 84:1
**house** [1] 65:18
**Howard** [2] 2:12,12
**Huh** [1] 80:14
**hundred** [5] 14:4 41:13 56:20 75:20,21
**husband** [1] 5:24

**-I-**

**idea** [6] 34:14 45:17 50:2 63:7 71:10 76:4
**identification** [22] 13:15 17:18 19:12 20:17 24:18 28:6 29:11 31:5 32:6 33:12 40:23 44:6 46:3 51:16 55:23 58:3 62:19 81:7 84:11 88:24 90:20 97:13
**identify** [3] 88:14 89:9 97:2
**Illinois** [9] 1:2,22,23 2:4,9,14,19 7:3 70:18
**immediately** [2] 23:1 26:7
**important** [1] 88:19
**impossible** [1] 48:13
**include** [2] 6:14 92:3
**included** [1] 91:24
**incontestability** [1] 20:6
**independent** [2] 26:22 84:19
**independently** [1] 73:6
**indicate** [8] 34:8 38:1 56:18 59:3 61:9 64:20 65:7 67:9
**indicated** [8] 22:12 35:5 37:16 39:24 48:9 58:6 59:18,19
**indicates** [2] 63:3 84:22
**indicating** [1] 61:21
**inform** [1] 10:5
**information** [5] 9:23 30:1 43:19 85:15 90:3
**instruction** [1] 100:8
**insurance** [34] 1:9,12 5:21,24 7:5,6,13,14,21 7:24 8:1,7,14 9:21 11:12 12:2,3,4,22 13:23 14:1,3,12,14 18:2 24:1 33:22 35:19 35:20 37:24 59:16 65:19 70:20 74:7
**interest** [2] 79:19,20
**interested** [2] 8:10 100:13

interrupt [1] 22:4
introduced [1] 5:17
investigate [1] 72:20
involved [2] 9:12 15:7
issue [2] 10:18 71:3
issued [5] 10:20 15:13
  16:23 22:9 30:10
itself [3] 21:11 30:11
  33:3

-J-

J [1] 1:4
James [1] 6:20
Jamie [2] 1:5 75:22
Jamie's [1] 80:12
Janko [16] 1:15 2:15
  25:11,12 28:22 36:21
  52:14 56:20 64:23 65:3
  71:11 72:9 86:22 87:12
  88:5 98:16
January [2] 92:19
  95:10
Jason [11] 2:3 26:3,4
  66:20 67:19 68:16
  69:13 70:3,6 89:2 97:6
Jason's [1] 66:23
JFG [3] 49:3,8 90:2
Jim [26] 6:7,8 11:10,10
  11:15,17,21 12:20
  14:18 15:14,18 22:14
  25:24 26:3 33:19 37:2
  37:5 38:15,18 57:4
  59:11,15 60:1 69:7
  77:10 93:5
Jim's [4] 35:18 58:23
  74:20 84:24
JL [2] 44:9 45:16
job [3] 8:6 66:14 73:4
John [11] 1:20 4:1,11
  47:16 79:3 81:10,13
  84:7 90:17,22 100:4
joint [2] 94:8,12
Julie [13] 2:8 5:18
  22:13 25:23 26:21 27:8
  38:18 49:22 65:9 68:3
  68:10,17 94:21
Julie's [1] 73:20
July [1] 79:9
June [1] 52:1

-K-

keep [2] 8:17 76:7
kept [1] 54:1
kind [4] 11:19 15:18
  18:21 37:14
knew [4] 36:1 64:4 71:1
knowledge [3] 29:16
  89:24 90:3
known [1] 11:9,10
  14:24

-L-

laborious [1] 88:9

large [1] 13:23
Larry [10] 33:1 36:20
  36:22 46:13 56:15 65:3
  70:5 72:8,13 98:8
LaSalle [1] 2:19
last [2] 67:5 87:18
  89:15
lawyer [1] 67:15
least [1] 82:13
left [2] 32:17 87:18
legal [2] 67:18,22
letter [32] 17:21,24
  18:3,14 20:20,22,24
  33:15 45:22 48:5,7,19
  48:19 49:6,7,9 52:16
  56:17 57:22 58:14,17
  58:17 59:17 66:13 77:7
  79:11 81:11 82:7 83:11
  83:19 90:23 96:1
letters [4] 49:18 53:14
  72:14 82:20
life [32] 1:9,11 5:21,23
  7:5,6,10,11,13,14,18
  7:21,23,24 8:7,14
  11:11 12:3 17:2,3,10
  21:1 30:14 35:18,20
  37:23 59:16 65:19
  70:20 74:7 77:11 90:24
light [1] 88:19
Line [9] 7:11,18 17:2,3
  17:10 21:1 30:14 56:24
  90:24
list [6] 61:4,6 85:2 91:7
  96:6,9
listed [2] 75:16 93:11
listened [1] 61:14
listing [1] 92:4
live [1] 7:2
LLC [4] 1:15,16 86:23
  87:6
Lloyd [7] 58:19,21
  59:14,14 61:23 71:13
  71:15
LLP [1] 2:18
look [19] 10:22 13:11
  15:23 17:22 28:11
  29:16 33:16,16 45:5
  46:5 47:14,17 50:11
  52:4 62:23 73:6 85:23
  86:8 89:13
looked [4] 50:16 52:4
  72:7 93:3
looking [3] 43:11 69:22
  92:8
looks [10] 10:19 25:7
  46:13 53:15 63:5,13
  78:7 79:6,12 81:17
loud [1] 5:5
Lyons [64] 1:20 4:1,11
  4:12,21 5:21 6:24
  13:14 17:17,22 19:8
  19:11,18,19 20:16,20
  24:17,21 27:11 28:5,8
  28:9 29:10 31:4,10
  32:5 33:9,11 40:20,22
  44:5,9,12 46:2 48:3

51:12,15 52:3 53:12
53:13 54:16 55:22 56:4
58:2,11 62:18,23 73:16
79:7 81:6,14 84:10,13
86:1,9 88:23 89:13
90:19 92:9 95:2 97:12
97:20 98:20 100:4

-M-

M [2] 2:3,18
ma'am [147] 4:23 6:3
  6:6,7,13,18 7:17,24 8:4
  8:12,18 9:2,7,15,16,18
  10:15 11:7,9 14:11
  15:4 17:11,15,15 18:2
  18:6,12,15,19 19:22
  20:14,23 24:7 25:1,4
  28:14 29:4,7,19 30:6,8
  30:19,19,23 31:1,12
  31:15,18,22 32:2,12
  32:19,23,23 33:4 34:5
  34:7,19,22 35:7,7
  36:10,17 37:7,13 38:6
  38:12,12,17 39:3,16
  39:22 40:2,7,18 41:11
  41:23 42:11,13 43:7
  43:12,12,16 45:4,14
  45:17,23 46:8,12 48:15
  48:23 49:11,15 50:5
  50:13,18,21,23 51:1,7
  52:6 53:2,17,21,24,24
  54:5,5,19,23 55:4,7
  56:8,11,16 57:14,20
  57:23 58:15 60:11,20
  60:23 62:11,13 63:1,8
  64:9,15 65:6,6 67:8
  71:5 72:23 73:24 74:10
  74:18 76:18,20,23 77:2
  78:2,21 80:4,18 81:1
  81:23 84:21
Maggie [9] 13:7,8
  16:10 22:19,21 23:15
  35:21 38:24 75:21
Main [3] 2:8 7:2 83:12
maintained [1] 54:2
makes [2] 22:23 83:2
man [1] 75:1
manager [6] 7:22,22
  7:23 8:6,17 9:1
managers [1] 8:19
March [3] 17:8 34:2
  100:14
Margaret [43] 1:4 5:20
  5:23 6:20 11:9,10,12
  11:12 18:16 25:7 29:17
  31:10 35:13 36:1 38:8
  51:4 54:3,7 55:11
  56:20 57:1 64:1 68:19
  69:9 70:4 71:1,2 73:22
  74:7,11 75:5 76:7 77:4
  77:11,19 78:3,5,15,19
  79:22 82:3 86:6 92:17
Margaret's [3] 28:15
  72:21 74:20
mark [7] 13:12 40:20
  72:1 84:8 88:13,15,21
marked [38] 13:14
  17:17 19:11,19 20:16
  20:21 24:17 28:5,9

29:10 31:4 32:5 33:9
33:11 40:22 44:5,9
45:16 46:2 51:5 55:22
58:2 62:18 77:19 78:23
78:23 79:4 81:6,10
82:22 84:10 86:10,19
88:23 90:19,22 92:8
97:12
market [2] 11:16,19
material [1] 83:23
materials [1] 90:1
matter [1] 25:21
Mattoon [1] 2:4
may [17] 5:24 15:23
  21:15,16,24 34:23
  35:2,4 61:6 78:8 82:19
  88:17 91:3,17 92:24
  93:12 95:22
mean [15] 9:15 11:17
  12:9 16:1,2,14 26:5,7
  27:18 28:17 36:1 41:6
  46:17 68:7 83:5
means [2] 98:22 99:11
meat [2] 11:15,19
meet [2] 67:3 73:17
meeting [7] 35:15,18
  36:3 67:7 73:23 76:22
  78:10
MEGAN [1] 1:5
Megan's [1] 80:13
member [1] 36:20
memo [2] 79:6 81:12
memory [1] 71:5
Michael [1] 2:13
Mid [8] 41:22 44:18
  45:12 82:21 90:4 92:11
  93:11 96:10
Mid-Illinois [1] 1:14
  1:21 2:10 5:19 31:9
  36:16 85:11 92:14,16
  95:14 100:7
Midland [1] 7:14
might [5] 36:8 50:14
  50:16 68:1 74:22
Mihlar [1] 2:7
Mike [3] 72:5,15,18
Miller [1] 52:22
million [72] 6:11,12
  10:17,17 11:5,6 12:12
  12:15,24 13:5 14:2,5
  16:5,10,15,16 21:9
  21:3,6 22:10,15 31:8
  33:20,22 34:9,15 35:19
  35:21 36:9 38:11,19
  38:23 39:21 40:5,13
  40:14 41:3 42:22 43:9
  49:23 50:4 51:6 54:16
  55:2 56:22 64:2,19
  65:12,14 66:17 69:10
  69:11 75:17,20 76:10
  76:12,16 78:15,18
  79:15,17 80:3,14,21
  82:15 85:3,9,12 91:9
  91:22 92:12,17
mind [1] 17:23
mine [2] 32:14 73:4

minor [1] 82:5
minutes [1] 14:23
mixed [1] 47:1
money [14] 24:2 36:5
  36:8 58:23 59:6 61:16
  61:19 69:6,12 77:6,8,8
  77:9,10
monies [2] 64:2 66:1
month [1] 14:23
Moskowitz [1] 2:17
Most [1] 23:9
motel [3] 34:12,13,16
mouth [1] 73:21
move [1] 17:20
moving [1] 12:23
Mrs [14] 13:7 25:3,20
  29:5 30:17 31:20 32:21
  36:9 39:5 40:1 54:17
  55:1 65:16,18
Ms [63] 3:3,4,5,6,7 4:7
  9:4 13:16,20 17:19
  19:13,16 20:18 21:13
  22:5 24:19 27:5 28:1,7
  29:12 31:6 32:7 33:13
  36:12 41:1 44:7 46:4
  47:20 48:1 51:18,22
  51:24 52:1,2 53:11
  56:1 58:4 62:20 63:22
  72:1 73:13,15 81:9
  84:2 89:1,4,11,12,15
  89:22 90:13,16,21
  92:13,15 93:14 94:19
  95:3 96:23 98:19,20
  99:4,8
Murphy [1] 58:19

-N-

N [2] 2:19 3:1
name [8] 4:9 5:18 26:4
  37:14,14 53:6 74:21
  74:21
named [2] 75:1 98:8
National [4] 7:14
  22:16 52:21,22 85:2
  91:14,15 92:11
need [12] 12:22,24
  14:14 15:20 18:2,4
  21:21,22 22:15 26:23
  41:17 96:24
needed [2] 34:9,14
needs [1] 5:11
nervous [6] 22:23
  58:21,22 59:2 62:4
  68:4
never [8] 9:17 25:23
  38:19,22 52:12,23 53:7
  94:24
next [2] 32:16 77:3
nice [2] 69:14 73:16
night [1] 69:8
nightmares [1] 69:7
nods [1] 5:7
none [1] 83:4
North [2] 7:2 83:12

**note** [2] 63:4 95:23
**notes** [1] 100:8
**nothing** [3] 16:2 83:6 100:5
**notice** [1] 4:14
**noticed** [1] 41:7
**now** [23] 7:11 10:16 16:20 22:8,9 23:2 32:3 33:8 34:17 36:13 38:7 39:4,17 40:3 49:16 55:8 80:23 87:1 89:23 93:1,3 95:17 96:20
**number** [2] 12:13,16

**-O-**

**object** [4] 9:3 21:10,16 36:11
**objection** [1] 90:11
**objections** [1] 21:23
**Obviously** [1] 74:13
**occasions** [1] 23:17
**occurred** [1] 74:2
**off** [8] 18:9,10 27:22 27:23 53:8,9 97:8,9
**office** [16] 1:21 10:12 30:10 33:21 41:16,17 46:11 55:13 64:3 66:9 66:23 68:15 78:13 82:23,24 89:8
**often** [2] 27:7 93:6
**Old** [9] 7:10,18 17:2,3 17:10 21:1 30:14 56:24 90:24
**once** [4] 30:10 37:2,3 97:3
**one** [56] 5:10 6:12 9:20 10:17 11:6,16 12:15 13:5,19 16:9,16 21:2 25:13,13 26:20 31:8 36:22 38:10 40:13,14 40:14 42:2 43:10,14 46:17 48:16 49:1,3,23 52:12,13,14,18 55:2,9 61:12 62:22 64:3 65:12 65:14 66:9 71:15 73:17 75:17 77:5 79:5,18 89:9,16 91:12,12,13 91:14 92:12,17 94:20
**ones** [1] 92:3
**open** [1] 76:7
**opinion** [2] 50:17 70:22
**opportunity** [2] 98:24 99:9
**optimistic** [1] 18:7
**order** [4] 45:1,2 48:11 48:20
**original** [7] 44:19 47:5 47:6 83:7,17,19 87:19
**originals** [1] 82:24
**otherwise** [1] 100:13
**owed** [2] 59:6 71:11
**own** [4] 23:21,21 81:3 82:7
**owned** [1] 7:11

**-P-**

**page** [18] 3:2,10 13:19 13:21 14:10 19:14,20 19:23 28:11 30:4 31:16 33:16 41:20 42:9 45:11 56:23 58:6 95:4
**pages** [9] 19:15,17 33:14 49:9,11 51:17 51:21 58:7 63:17
**paid** [22] 9:16 18:9,10 20:3,5 39:20 50:3 51:10 59:15 61:13,16 61:19,24 62:5 64:11 64:18 66:1,16 69:3,6 69:12 76:1
**papers** [2] 47:2 78:14
**paperwork** [2] 23:8 23:10
**paraphrasing** [1] 91:13
**part** [10] 34:15 42:12 53:22 54:2 86:13 87:1 88:11 92:23 93:1,2
**particular** [11] 12:8 25:21 27:15 29:2 32:22 43:10 44:13 71:3 75:19 98:1,1
**partners** [1] 34:12
**party** [3] 100:12,13,14
**passed** [4] 34:17 37:16 73:8,22
**passing** [1] 37:19
**past** [1] 76:2
**pay** [5] 20:9 36:5 59:18 59:23 61:10
**payment** [4] 9:14 20:2 20:5 55:2
**payroll** [1] 12:4
**Pekin** [1] 7:13
**people** [17] 8:10,13 9:20 11:15 13:8 16:3 16:14,15 17:3 21:15 24:2 35:15 36:4 40:5 44:18 68:4 74:8
**Peoria** [1] 2:14
**percent** [1] 41:13
**perfectly** [1] 22:6
**periods** [1] 50:15
**person** [5] 5:10 11:18 15:15 18:8 43:4,10 61:9 62:6,8 70:19 100:11
**personal** [1] 13:22
**personally** [1] 69:21
**phone** [7] 39:23 43:5,7 57:3 60:14,18 62:12
**picked** [2] 60:14,18
**pictures** [1] 63:17
**place** [4] 33:21 37:19 66:6 78:11
**places** [1] 47:3
**Plaintiff** [1] 1:12
**Plaintiffs** [1] 1:7 2:5

**plus** [1] 79:13
**point** [30] 7:20 13:13 17:12,16 19:10 20:15 24:16 27:23 28:4 29:9 31:3 32:4 33:10 40:21 42:17 44:4 46:1 47:22 51:14 53:9 55:21 58:1 62:17 67:20 81:5 84:9 88:22 90:18 97:9,11
**pointing** [1] 6:4
**points** [1] 73:18
**policies** [27] 5:24 6:17 7:16 8:9,11,12 10:16 12:9,10,18,20,24 15:7 15:9,13 16:18,23 17:14 18:5 22:9 38:10 39:2 39:11,15 66:2 74:7 75:24
**policy** [63] 6:11,12 10:17,18 11:5,6,12 12:13,15 13:5 14:2 16:5 19:21 21:2,6 22:11 26:24 34:4,10 36:9 38:20 39:21 40:6 41:4 42:23 43:9 50:4 51:6,9 54:8,16 55:2 56:21,21,23 58:24 59:1 59:4,16 60:2,22 61:2 64:2 65:12 66:17 69:5 75:17,19,20 76:10,12 76:17 78:19 79:15,17 80:3,21 82:15 84:24 91:9,22,23 98:12
**polite** [1] 69:14
**poor** [1] 69:9
**portion** [2] 29:20,21
**position** [1] 8:17
**positions** [1] 9:1
**positive** [1] 59:12
**possession** [2] 6:10,20
**possible** [1] 24:3
**practice** [1] 26:14
**premiums** [1] 59:15
**prepare** [2] 30:21 31:24
**prepared** [1] 29:1
**presence** [1] 4:17
**present** [4] 18:17 74:9 74:19 75:3
**pretty** [2] 20:10 76:5
**previous** [1] 53:18
**previously** [5] 45:16 48:4 77:18 79:4 96:5
**price** [1] 15:22
**Priegel** [1] 20:20
**Princeton** [1] 85:8
**printed** [1] 30:2
**printing** [3] 29:22 31:15 80:18
**problem** [2] 21:23 68:23
**procedure** [2] 4:20 41:14
**proceeds** [1] 20:3
**process** [9] 9:13 15:12

17:4 23:12 42:21 43:8 57:7 82:12 88:9
**produced** [3] 89:2,5,6
**prompted** [1] 63:2
**proof** [2] 77:22 80:8
**property** [1] 34:13
**protect** [1] 13:2
**prove** [1] 57:8
**provide** [1] 5:12
**provided** [2] 72:8 73:5
**pulled** [1] 80:7
**purchase** [1] 15:6
**purpose** [1] 18:5
**purposes** [24] 4:19 13:14 17:17 19:11 20:16 21:22 24:17 28:5 29:10 31:4 32:5 33:12 40:23 44:6 46:3 51:16 55:23 58:3 62:19 81:7 84:11 88:24 90:20 97:13
**pursuant** [2] 4:13,19
**pursue** [1] 41:18
**put** [6] 33:17 44:24 47:10 73:20 77:16 80:8

**-Q-**

**questioning** [1] 94:17
**questions** [17] 14:19 24:12 55:19 61:17 67:12 68:5,16 69:15 72:2,6 73:2,12,20 84:6 89:18 93:18 94:14
**quick** [2] 5:1 47:21
**quite** [1] 27:7

**-R-**

**RE-EXAMINATION** [5] 89:21 90:15 93:15 94:18 97:14
**read** [1] 99:9
**real** [2] 5:14 71:6
**realize** [2] 35:12 79:21
**really** [15] 10:22 14:6 14:24 48:13 50:14,17 53:19 58:7 63:7 68:21 69:1,2 74:18 81:8 93:7
**reason** [4] 72:12,16 83:5 90:9
**reassure** [1] 61:23
**Rebecca** [1] 2:18
**receive** [2] 51:8 55:1
**received** [3] 82:19 85:15 94:5
**receiving** [2] 53:19 81:16
**recess** [1] 47:22
**recognize** [2] 44:13 47:11
**recollect** [2] 32:20 82:11
**recollection** [13] 10:21 26:22 30:16 51:7,11

57:11 80:1 82:1 84:19 85:15 86:6 93:10 97:24
**recommendation** [1] 66:14
**record** [22] 4:10,13 12:11 13:17 21:22 25:10 27:22,24 28:21 44:24 51:20 53:8,10 56:14 58:17 79:1 81:3 91:18 97:8,10 100:9 100:12
**records** [1] 91:17
**recruit** [1] 8:8
**reduced** [1] 100:8
**refer** [1] 6:8
**referring** [1] 82:6
**reflect** [1] 4:13
**refresh** [1] 81:24 93:10
**refreshes** [1] 82:11
**regarding** [12] 5:20 6:16,20 25:21 27:14 29:3 30:18 32:22 33:2 54:3 59:10 64:1
**regional** [3] 7:22,23 9:1
**regrouped** [1] 47:3
**reinforced** [1] 65:13
**relate** [1] 39:15
**related** [4] 38:16 39:1 71:11 98:15
**relationship** [2] 11:3 37:1
**relative** [1] 100:12
**relaxed** [1] 23:12
**release** [4] 86:10,19 98:11,12
**relieved** [1] 35:24 69:6
**remain** [1] 8:16
**remainder** [1] 61:20
**remember** [82] 5:10 8:4 14:6 15:11 16:20 16:24 18:18 24:6 25:9 25:12,12,16,19 26:9 27:13 29:1 31:19 32:24 33:4 34:20 35:16 36:14 36:19,23 37:5,9,11,13 37:21 38:4,7,14 45:9 45:21 46:14,14,19 47:5 52:24 53:19 54:12 57:5 57:14,18,23 59:7,13 60:9,24 61:8 62:7,11 62:12 63:14 64:16,23 65:5,16 67:1,4 68:1 69:13,19,20 74:19,21 74:22 75:12 80:4,14 80:22 81:1 83:3,4 84:1 88:10 93:6,13,13 96:14 96:16 98:4
**remembered** [1] 54:8
**rep** [1] 9:8
**reporter** [26] 1:23 5:3 13:13 17:16 19:10 20:15 24:16 28:4 29:9 31:3 32:4 33:10 40:21 44:4 46:1 51:14 55:21 58:1 62:17 81:5 84:9

88:22 90:18 97:11 99:1
100:3
**Reporting** [1] 1:22
'epresent [3] 5:19 7:6
7:9
**representative** [1]
8:20
**represented** [1] 72:17
**representing** [1] 40:1
**reserve** [3] 98:21,22
99:13
**respect** [7] 9:22 40:5
43:18 48:9 54:15 76:9
97:20
**respond** [1] 69:15
**response** [3] 5:12,15
73:19
**responses** [1] 5:4
**responsibility** [3] 9:19
9:22 43:17
**rest** [2] 43:24 77:11
**restaurant** [2] 39:8
39:18
**resulted** [2] 56:12
57:21
**reverted** [1] 8:24
**review** [3] 50:11 73:6
98:24
**Richard** [5] 75:1,2,3,5
76:24
**right** [86] 8:5 10:16
11:1 12:14 13:10 15:8
15:10 16:6 17:14,20
18:23 19:6 21:4 22:17
27:9 28:2,8 31:2 32:8
32:18 33:6,14 34:20
34:24 36:13 39:9,12
42:10 44:8,23 45:10
45:19 48:14,17,22 49:2
49:4,16 50:12,13 51:3
52:15,17 54:13,14,15
54:24 55:3,15,16 57:24
60:12,19 62:3,16 73:1
73:1 74:12,14 75:2
76:13 78:9,20 79:10
79:17 81:2,15 85:7,19
86:4,11,14,16 87:21
89:18 90:8 91:20 92:18
95:1,12,12,16,16,16
95:24 98:7
**righty** [2] 18:16 63:15
**Rothmann** [20] 2:18
3:4,6 47:20 51:22 52:1
73:13,15,16 81:9 84:2
89:12 90:16,21 92:15
93:14 95:3 98:20 99:4
99:8
**RPR** [2] 1:23 100:17
**rules** [2] 4:20 5:1
**run** [1] 15:15

**-S-**

**S** [2] 2:13 3:9
**sadly** [1] 34:5
**salary** [1] 12:1

**sales** [3] 8:20 9:7,8
**salesman** [1] 7:6
**salesperson** [1] 8:24
**saw** [2] 52:12,23
**says** [8] 14:3 20:2 46:18
56:19 79:12 80:13
91:11,21
**Scott** [1] 2:7
**second** [9] 19:14,23
27:22 28:11 30:4 31:16
37:19 42:9 95:4
**secretary** [1] 47:1
**Section** [4] 29:23 32:9
86:15,17
**Sections** [3] 31:14
87:11,19
**secure** [1] 4:16
**see** [13] 7:21 12:6 52:4
52:6,18,21 77:23 78:3
91:5,11,15 92:21 99:11
**seeing** [3] 47:4,5 53:1
**seem** [1] 11:1
**self-employed** [1] 7:5
**sell** [3] 7:15 8:7 12:2
**selling** [1] 8:11
**send** [10] 10:7,11 22:24
23:16 46:20 54:21
87:11 94:1,2,3
**sending** [5] 16:22
23:13 56:13
**Seneca** [9] 2:13 3:4,6
72:4,5 73:11 89:23
93:16 94:14
**sent** [22] 14:21 30:10
40:11,16 42:7 43:22
44:14,15,18,18 46:7
46:11,21 47:8 49:6,18
71:15 81:21 83:16
87:10 88:4 98:8
**sentence** [2] 61:16,22
**separate** [1] 49:7
**September** [1] 28:19
**serve** [2] 61:17,19
**served** [1] 4:16
**service** [6] 43:1 53:16
60:16 62:7 67:21 90:24
**set** [2] 33:6 55:8
**several** [4] 7:7 58:24
65:19 72:10
**shakes** [1] 5:9
**shaking** [1] 43:6
**sheet** [5] 41:21 51:23
52:17 53:5,5 56:24
**short** [1] 47:22
**Shorthand** [2] 1:23
100:3
**shortly** [2] 34:18 71:21
**show** [27] 15:24 18:1
19:6,8,18 20:19,21
24:8,20 28:9 29:13
31:7 32:8 33:8 40:19
44:1,8 45:20 51:12
58:5 77:15,18 78:22
80:6 81:4 90:10 95:5

**showed** [1] 49:14
**showing** [4] 79:3 81:10
90:17,22
**shown** [1] 48:3
**shows** [1] 33:15
**siblings** [1] 82:13
**sign** [5] 22:20,21,24
23:16 57:1
**signature** [25] 14:10
18:13 24:23 25:3,5,8
28:12,14,15 29:5,6,17
31:10 32:15 41:7 56:9
58:13 78:4 86:6 98:21
98:22,23 99:10,13
100:10
**signatures** [1] 78:6
**signed** [9] 10:8,8,10
22:22 33:1,2 41:4
45:12 92:17
**similar** [1] 78:18
**sirs** [1] 82:9
**sit** [1] 25:18
**sitting** [3] 29:1 35:2
54:9
**situation** [3] 23:6
30:20 31:23
**six** [5] 51:17,21 75:20
**skipped** [1] 56:2
**sleep** [1] 69:8
**social** [1] 65:23
**sold** [5] 8:9,12 9:21
11:11 16:18
**sometime** [1] 73:21
**sometimes** [2] 23:11
94:1
**soon** [2] 22:22 94:3
**sorry** [26] 8:4 13:8 14:8
17:2 18:19 22:3,4
27:20 43:6 45:18 46:24
50:24 52:9 57:15 60:7
60:11 63:10 67:24
70:21 71:8 72:19,23
72:24 79:23 81:1 92:16
**sort** [1] 50:19 69:18
70:1
**sound** [1] 34:24
**Sounds** [1] 63:16
**speak** [2] 42:20 76:24
**speaks** [1] 21:11
**special** [1] 28:20
**specific** [8] 27:13,16
29:2 30:16 31:20 38:14
59:7 65:5
**specifically** [1] 57:19
**specifics** [2] 38:9 76:15
**specifying** [1] 21:5
**spent** [1] 11:23
**spoke** [1] 62:8
**standard** [2] 7:13
20:10
**start** [1] 21:24
**state** [5] 1:23 4:9 13:17
58:16 90:9

**statement** [13] 10:9
42:1,15 43:23 45:11
45:22 49:1 50:22 61:18
70:2 77:22,23 87:8
**statements** [3] 49:13
72:13 80:9
**STATES** [1] 1:1
**stay** [2] 23:5,9
**stenograph** [1] 100:8
**still** [9] 7:15 17:9 37:24
38:2 59:1 60:22 61:2
70:21 73:3
**Stilwell** [54] 1:4,5,5,5
1:6 5:20,23 6:2,7,9,21
11:12,17 13:7 14:24
15:1 16:21 18:6,16,18
22:11 25:20,20 26:16
27:14 28:24 30:17,17
31:20 32:21 33:20 34:8
34:17 36:9 37:16 38:8
38:15 39:5 40:1 51:4
54:3,7,17 55:1 64:1
65:16,18 73:22 74:11
77:4 78:19 82:13 87:24
92:17
**Stilwell's** [18] 25:3,7
29:5,17 31:10 36:14
36:18 37:1,18 38:9
39:7 40:3 64:8 71:22
77:19 78:4,5 86:6
**Stilwells** [5] 7:20 11:4
20:13 35:5 71:10
**store** [1] 73:23
**straight** [1] 93:20
**Street** [4] 2:8,13,19
83:13
**stress** [1] 38:18
**stuff** [3] 10:23 56:3
96:21
**stupid** [1] 81:8
**submitted** [3] 34:1
49:17 90:1
**subpoena** [1] 4:14
**substantive** [1] 99:6
**such** [1] 8:19
**suicide** [1] 20:4
**Suite** [3] 2:8,13,19
**summarize** [1] 18:4
40:15
**summer** [1] 67:5
**supplement** [2] 13:23
14:12
**supposed** [1] 96:20
**sworn** [2] 4:3 100:4

**-T-**

**T** [1] 3:9
**taught** [1] 43:21
**telling** [4] 14:16 18:7
28:23 42:16
**tells** [2] 20:5 21:18
**ten** [2] 18:9,10
**testified** [4] 4:4 73:19
80:1 82:18

**testimony** [2] 57:16
100:9
**Texas** [2] 43:2,11
**TFG** [6] 36:20 49:1,7
71:12 82:20 90:2
**Thank** [1] 22:3
**thankful** [1] 69:11
**themselves** [1] 55:9
**Third-Party** [4] 1:12
1:16,21 2:10
**thought** [15] 18:9
19:24 41:5,5 45:1
47:10 67:5 76:8 77:11
79:18,19 82:22 83:15
90:6,6
**thousand** [5] 14:4 47:3
56:20 75:20,21
**three** [6] 35:15 71:14
71:23 81:17 91:18
94:23
**through** [9] 12:4 24:5
53:12 88:8,18 95:17
96:20 97:2,16
**thumb** [1] 88:17
**tickled** [1] 69:4
**times** [4] 21:14 46:19
58:24 65:19
**today** [15] 4:13,17 5:22
6:22 8:21 9:6 25:18
29:2 38:3,14,16 54:9
70:10 72:8 88:15
**together** [8] 33:18 45:1
47:10,11 48:13,21
51:20 68:21
**token** [2] 90:2 96:14
**Tom** [1] 41:21
**too** [6] 47:17 48:4 57:6
71:13 83:24 92:10
**took** [7] 11:15 17:13
17:13 37:19 39:2 55:13
78:10
**top** [6] 42:12 49:9,11
59:15 78:3 81:17
**total** [2] 91:8,18
**town** [1] 11:22
**transcribe** [1] 99:5
**transcribed** [1] 99:2
**transcript** [2] 98:24
99:9,11
**transcription** [1]
100:9
**tried** [4] 8:10,12 11:14
65:20
**trouble** [1] 19:7
**true** [4] 48:15 96:15
97:3 100:9
**trust** [9] 1:15 5:19 31:9
36:16 92:12,16 95:15
99:15 100:7
**trusted** [2] 50:7,10
**truth** [5] 50:2 68:8
100:4,5,5
**try** [1] 98:19
**trying** [6] 27:8,21

34:21 36:4 61:23 85:22
**turn** [2] 44:2 62:14
**Tuscola** [17] 1:15 2:15
22:16 29:15 30:2 46:11
46:20 52:18,21 72:9
82:20 85:2,5 86:2 87:5
91:12,14
**two** [22] 12:8,9,10 15:6
15:24 18:5 19:15,17
20:5,6 22:15 32:10
35:15 40:13 49:9,11
73:17 76:2 85:3 91:22
92:2 94:22
**type** [1] 88:11
**typewriting** [1] 100:8
**typing** [1] 5:3

———————
-U-
**uncertainty** [1] 88:20
**under** [16] 39:20 51:5
51:9 54:8 55:2 64:2
66:2,16 78:18 79:15
79:16,21 80:3,20 82:15
100:8
**understand** [3] 24:6
64:6 68:21
**understood** [1] 68:22
**United** [2] 1:1 7:10
**unless** [2] 21:18 89:19
**untrue** [1] 90:2
**unusual** [1] 37:14
**up** [13] 14:22 15:23,24
47:1 55:8 57:3 60:14
60:18 66:16 67:6 70:19
81:3 99:12
**upset** [7] 64:5,17,21
68:19 70:4,9 71:1
**URBANA** [1] 1:3
**using** [2] 26:4 41:7

———————
-V-
**valid** [1] 62:9
**various** [6] 21:14 22:10
40:5 49:17,19 72:7
**verification** [5] 30:5
30:13 31:17 95:5,13
**versus** [1] 5:20
**visits** [1] 65:23
**vs** [2] 1:8,13

———————
-W-
**W** [1] 1:22
**wait** [2] 21:24 70:15
**waive** [4] 98:21 99:10
99:14,15
**waived** [1] 100:10
**wanting** [2] 16:15
66:11
**wants** [2] 26:21 68:9
**week** [2] 74:4,5
**weird** [1] 53:4
**White** [1] 1:22

**whole** [2] 69:8 100:4
**Wide** [1] 1:21
**William** [6] 1:20 4:1
4:11 79:7 81:13 100:4
**Wilson** [1] 2:17
**wished** [1] 77:12
**witness** [11] 4:2 21:12
22:3 27:3 47:19 97:5,8
99:3,7,15 100:10
**wonderful** [1] 63:20
**wondering** [1] 93:9
**words** [2] 73:21 87:24
**worried** [1] 69:9
**worth** [1] 16:16
**write** [3] 55:9 63:3
66:13
**writing** [4] 20:23 57:22
63:6 87:5
**written** [2] 83:12 87:20
**wrong** [1] 57:17
**wrote** [6] 18:1 21:1
61:7 84:23 86:22 90:24

———————
-X-
**X** [3] 3:1,9 22:15

———————
-Y-
**Y** [1] 22:16
**years** [5] 18:9,10 20:5
20:6 76:2
**yourself** [4] 18:18 73:6
74:15 75:5

———————
-Z-
**Z** [1] 22:16