IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARGARET J. STILWELL, HALEY STILWELL,
HEIDI STILWELL, JAMIE STILWELL,
MEGAN STILWELL,
        Plaintiffs,

    -vs-             No. 05 CV 02160

AMERICAN GENERAL LIFE INSURANCE
COMPANY,
        Defendant.
-----------------------------------
AMERICAN GENERAL LIFE INSURANCE
COMPANY,
        Third Party Plaintiff,

    -vs-

FIRST MID ILLINOIS BANK & TRUST,
TUSCOLA FURNITURE GROUP, LLC, and
JANKO FINANCIAL GROUP, LLC,
        Third Party Defendants.



DEPOSITION

The Deposition of THOMAS J. CHAMBERLAIN, a
citizen of the State of Illinois, a witness of
lawful age; produced, sworn, and examined upon his
corporeal oath, at the offices of Area Wide
Reporting Service, 301 West White Street,
Champaign, Illinois, at 3:00 P.M. on the 8th day
of February, 2007, before Shelley Marvin, CRR,
RPR, and CSR in and for the State of Illinois, CSR
License No. 84-003926, as a witness in a certain
suit and matter now pending and undetermined in
the United States District Court for the Central
District of Illinois.



**EXHIBIT**
E

**Page 2**

```
1              APPEARANCES
2  HELLER, HOLMES & ASSOCIATES, P.C.
     1101 Broadway Avenue
3    Mattoon, Illinois 61938
     By: Jason M. Crowder
4  Appearing on behalf of Plaintiffs

5  HEAVNER, SCOTT, BEYERS & MIHLAR
     111 East Main Street, Suite 200
6    Decatur, Illinois 62523
     By: Julie Beyers
7  Appearing on behalf of Defendant First Mid
     Illinois Bank & Trust
8
   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
9    120 North LaSalle Street
     Chicago, Illinois 60602-2412
10   By: Rebecca M. Rothmann
     Appearing on behalf of Defendant/Third Party
11 Plaintiff American General Life Insurance Company
12
13
14          CONTENTS        Page
```

```
15 Examination by Ms. Rothmann         4
16 Examination by Mr. Crowder          68
17 Further Examination by Ms. Rothmann 97
18 Examination by Mr. Beyers           101
19 Further Examination Mr. Crowder     105
20
21          EXHIBITS
22 Deposition Exhibit 1      15
23 Deposition Exhibit 2      20
24 Deposition Exhibit 3      32
```

**Page 3**

```
1  Deposition Exhibit 4        34
2  Deposition Exhibit 5        46
3  Deposition Exhibit 6        50
4  Deposition Exhibit 7        56
5  Deposition Exhibit 8        63
6  Plaintiff's Exhibit 1       74
7  Plaintiff's Exhibit 2       75
8  Plaintiff's Exhibit 3       77
9  Plaintiff's Exhibit 4       79
10 Plaintiff's Exhibit 5       79
11 Plaintiff's Exhibit 6       80
12 Plaintiff's Exhibit 7       82
13 Plaintiff's Exhibit 8       83
14 Plaintiff's Exhibit 9       86
15 Plaintiff's Exhibit 10      intentionally omitted
16 Plaintiff's Exhibit 11      88
17 Plaintiff's Exhibit 12      89
18
19
20
21
22
23
24
```

**Page 4**

```
1       (Whereupon the deposition commenced at
2  2:57 P.M.)
3          THOMAS J. CHAMBERLAIN,
4  the deponent herein, called as a witness, after
5  having been first duly sworn, was examined and
6  testified as follows:
7             EXAMINATION
8  BY MS. ROTHMANN:
9    Q.  Mr. Chamberlain, would you state your
10 name for the court reporter, please?
11   A.  I go by Tom, but it's Thomas J.
12 Chamberlain.
13   Q.  Let the record reflect this is the
14 discovery deposition of Thomas J. Chamberlain
15 taken pursuant to notice and continued to today's
16 date by agreement of the parties.  This deposition
17 will be taken in accordance with the Rules of
18 Federal Procedure and the Local Rules for the
19 Central District of Illinois.
20       Mr. Chamberlain, have you ever given a
21 deposition before?
22   A.  No, I have not.
23   Q.  Oh, welcome.
24       MR. CROWDER:  Welcome to my world.
```

**Page 5**

```
1    A.  I don't know if that's a good thing or a
2  bad thing, oh, welcome.
3    Q.  I'm going to lay out some ground rules
4  for you.  Counsel may have gone over them.  If she
5  did, I apologize.  But I just want to make sure
6  that we're all on the same table here.  I'm going
7  to be asking you questions.  You're going to be
8  answering my questions hopefully.  And while it's
9  not that formal, we have to make sure we don't
10 speak over each other.  You'll have to let me
11 finish my question.  I'll have to try to remember
12 to let you finish your answer before I throw
13 another one at you.  The court reporter can't down
14 two people talking at once.  Okay?
15   A.  Okay.
16   Q.  That's number one.  Number two is if you
17 don't understand something I say, if you don't
18 understand a question, let me know, I'll rephrase
19 it, I'll ask it a different way.
20       If you answer something, we will assume
21 that you have understood the question and you've
22 answered it.  Okay?
23   A.  Okay.
24   Q.  Is that fair?  Let's see, second, you
```

Page 6

1 want to -- or third, if you want to take a break
2 at any time, let me know, we'll take a break.
3       And last, and this is kind of difficult,
4 is the court reporter can't take down nods of the
5 head and gestures.
6    A. Okay.
7    Q. So you have to remember when you mean
8 yes to say yes instead of uh-huh. And when you
9 mean no to say no instead of huh-uh because uh-huh
10 and huh-uh come out the same way on the
11 transcript. Okay?
12    A. Okay.
13    Q. Okay. I'm going to be asking -- let me
14 back up. I represent American General Life
15 Insurance Company, a Defendant that has been sued
16 by Mr. Crowder's clients, the Stilwells, in this
17 case. I'm going to be asking you some questions
18 relating to a joint claim that was made for
19 proceeds of an insurance policy between -- a joint
20 claim that was made by First Mid Bank --
21    MS. BEYERS: First Mid Illinois Bank &
22 Trust.
23    Q. -- First Mid Illinois Bank & Trust and
24 Tuscola Furniture Group, LLC.

Page 7

1    A. Okay.
2    Q. Before I do that, I want to get a little
3 bit of background information. Where do you
4 reside?
5    A. I reside in Danville, Illinois.
6    Q. What's your address?
7    A. 34 Maywood Drive, in Danville, Illinois.
8 61832 is the ZIP code.
9    Q. Okay. You are represented by Ms. Beyers
10 today, correct?
11    A. Yes.
12    Q. Okay. And if I need to get ahold of
13 you, I can get ahold of you through Ms. Beyers?
14    A. Yes.
15    Q. What's your highest level of education?
16    A. Master's.
17    Q. Where did you get your master's?
18    A. Eastern Illinois University.
19    Q. What was your master's in?
20    A. It was an MBA.
21    Q. Okay. Where did you go to undergrad?
22    A. University of Illinois.
23    Q. Okay. What -- are you currently
24 employed?

Page 8

1    A. Yes, I am.
2    Q. Where are you employed?
3    A. Iroquois Federal Savings & Loan
4 Association.
5    Q. How long have you been employed at
6 Iroquois?
7    A. Since July of 2004.
8    Q. What's your position at Iroquois?
9    A. Vice President.
10    Q. Okay. Prior to working at Iroquois,
11 where did you work?
12    A. First Mid Illinois Bank & Trust.
13    Q. What years of employment at First Mid?
14    A. January of 1986 'til July of 2004.
15    Q. Why did you leave First Mid?
16    A. Better offer. Just job change.
17    Q. Okay. Nothing to do with the facts at
18 issue in this case?
19    A. No.
20    Q. Okay. At Iroquois, do you have any
21 business transactions or dealings with any of the
22 parties to this suit?
23    A. I am unaware of any. So -- I don't know
24 any. The only potential, but I don't think they

Page 9

1 have an account, the parties of Tuscola Furniture
2 Group in a separate LLC have an assisted living
3 facility in Watseka, which is a town we have an
4 office in. They could have a deposit
5 relationship, but I'm unaware of it.
6    Q. But you personally don't have any
7 business relationship with any of the parties in
8 this suit?
9    A. No. I am still a 21 share stockholder
10 of First Mid Illinois Bank & Trust, which is worth
11 about $1,000. So I guess I should disclose that I
12 do have that interest.
13    Q. That's the smoking gun.
14    A. Uh-huh. Yeah, so I guess that's it.
15 But I don't --
16    Q. We're done.
17       All right. Let's focus on -- I want to
18 get you to your softball or volleyball game.
19 Let's focus on your employment at First Mid. What
20 was your title at First Mid?
21    A. My title was Community President, which
22 was equivalent to a Vice President.
23    Q. Okay. What -- I'm assuming then from
24 1986 to when you left in 2004, you weren't Vice

**Page 10**

1 President --
2    A. No.
3    Q. -- the entire time? You kind of worked
4 your way up the chain of command?
5    A. That's correct.
6    Q. How long were you Vice President?
7    A. That's my phone. Sorry.
8    Q. Do you want to take a break?
9    A. No.
10       I'm trying to remember the dates. I
11 started in the Trust & Farm Management Department
12 in '86 until I believe it was '93, when I moved to
13 Tuscola as Vice President, which was a
14 loan officer position. I stayed in Tuscola until
15 -- my years -- I think it was the fall of 2002. I
16 eventually became Community President in Tuscola.
17 And then in about 2002, I was asked to move and
18 start running an operation for First Mid here in
19 Champaign. They had an office in Urbana and were
20 opening up a new office in Champaign, and they
21 asked me to come up and run this operation for
22 them.
23    Q. During your employment with First Mid,
24 did you have an occasion to do business with a

**Page 11**

1 company named Janko? Janko Financial --
2    A. Yes.
3    Q. -- Services, is that what it is, LLC?
4    A. Janko Financial Group. I think it was
5 JFG.
6    Q. Okay. Can you give me an idea of what
7 your business dealings were with Janko? I'm going
8 to call them Janko.
9    A. Yes. When I became Community President
10 of First Mid in Tuscola, I believe that was in the
11 year 2000, they -- Janko Group were dealing more
12 directly with my boss at that time, Doug McCumber.
13    Q. Okay.
14    A. Doug was subsequently let go by First
15 Mid, and I basically had to take over that
16 account, try to save the business. Now, I don't
17 remember if we had any loans on the books at that
18 time, but we were working with I think two loans.
19 The first two loans was a separate LLC, I think,
20 called Central Illinois Hotel Group. I can't
21 remember the exact names. And then the Tuscola
22 Furniture Group. I don't remember which loan
23 closed first. I don't remember when they closed,
24 whether it was before Doug left and I was promoted

**Page 12**

1 or after.
2    Q. And the Tuscola Furniture Group, it's
3 your understanding that they're a -- well, strike
4 that. What's Tuscola Furniture Group's
5 relationship with Janko? Do you know?
6    A. It was an LLC of, I assume, similar
7 parties.
8    Q. Okay. All right. The Central Hotel
9 Group, do you know who the members of that --
10    A. Again --
11    Q. -- entity were?
12    A. -- typically Janko Financial Group would
13 have an interest in it. But in a lot of their
14 entities, they would sell out parts to other
15 parties. But they were usually the managed -- I
16 think it was called managing members of the LLC.
17 So they were the ones that you dealt with when you
18 were dealing with some of these other LLCs.
19    Q. Okay. And Tuscola Furniture Group was
20 one of their LLCs?
21    A. Yes.
22    Q. One that they were a member of?
23    A. Yes.
24    Q. Who were the principals of Janko?

**Page 13**

1    A. The principals that I dealt with were
2 Richard or Dick Janko, Mike -- I think it was Mike
3 Janko, which was his son, and Larry Bianchi.
4    Q. Were the members of Janko the same
5 members of Tuscola Furniture Group, to your
6 understanding? Do you know? Do you have any
7 knowledge?
8    A. I think so. I think there was
9 relationship, but I don't -- as I recall, those
10 three individuals owned a percentage of Janko
11 Financial Group, and then Janko Financial Group
12 would own a percentage of Tuscola Furniture Group
13 or Central Illinois Hotel Group.
14    Q. Okay. And your relationship with the
15 members of Janko was a business relationship --
16    A. Yes.
17    Q. -- is that right? And you came to know
18 them and be acquainted with them through your
19 position at First Mid and especially after your
20 boss had left?
21    A. That's correct.
22    Q. Okay. So the bank had a pre-existing
23 relationship with Janko and their members?
24    A. That's correct.

**Page 14**

1  Q.  Okay.  Now you talked about two loans
2  with -- one to this hotel group; the other one to
3  Tuscola Furniture Group.  I'm going to call them
4  TFG is what everybody calls them, or what I'm
5  going to call them.
6      Do you have -- strike that.  The hotel
7  loan, do you have any knowledge that that has
8  anything to do with the claims at issue in this
9  case?
10  A.  I have no knowledge that there are.
11 They were separate entities.
12  Q.  These are?
13  A.  Yeah.  And when I dealt with both
14 entities, there was never a similarity between the
15 two.  They were always two separate entities.
16  Q.  Got it, okay.  Then I want to focus on
17 the TFG loan.
18  A.  Okay.
19  Q.  Is that all right?
20  A.  That's fine.
21  Q.  Well, let me back up.  First I want to
22 focus on do you have any relationship with the
23 Stilwells?
24  A.  No.

**Page 15**

1  Q.  Okay.  No direct dealings with the
2  Stilwells or any of their companies?
3  A.  No.
4  Q.  The lending agreement that you just
5  referenced with TFG --
6     MS. ROTHMANN:  Let me mark that.
7     (Whereupon Deposition Exhibit No. 1 was
8  marked for identification by the court reporter.)
9  BY MS. ROTHMANN:
10  Q.  I'm showing you what's been marked
11 Exhibit No. 1 for your deposition.  It consists of
12 a number of -- it's basically a group exhibit, a
13 number of documents together Bates stamped 000137,
14 and next one is 138, 139, 140, 141, 142, and 143.
15      The -- is this documentation of one of
16 the -- or the TFG loan that you were just
17 discussing?
18  A.  Yes.
19  Q.  Okay.  And so the bank entered into a
20 lending agreement with TFG on or about -- what's
21 the date there -- November 17th --
22  A.  Yes.
23  Q.  -- is that right, 2000?
24  A.  2000, uh-huh.

**Page 16**

1  Q.  What was the purpose of this loan, to
2  your understanding?
3  A.  This purpose was to fund furniture
4  purchases that Tuscola Furniture Group was making
5  and then providing to, I don't remember the
6  entity's name, but basically Amishland, they were
7  selling furniture.  And the Tuscola Furniture
8  Group had entered into a consignment agreement
9  with Jim Stilwell or his entity, I don't remember
10 the entity there, to sell the furniture.
11      And so we were providing financing to
12 Tuscola Furniture Group, and then they would take
13 that furniture and allow somebody else to sell it.
14 And then when the property sold, they would pay
15 Tuscola Furniture Group, who would turn around and
16 pay us.
17  Q.  Do you have any understanding as to why
18 the Stilwells or their company, their Amishland
19 Company, didn't come directly to the bank for
20 financing?
21  A.  No.  It was a strange agreement going
22 in.  My belief at the time was they couldn't get
23 financing themselves elsewhere and so they had
24 developed a relationship with Janko Financial

**Page 17**

1  Group at the time and then Janko Financial Group
2  said okay, well, we can use our backing to go get
3  a loan, you take care of selling it.  But it did
4  throw a third person in there.  But our dealings
5  with Tuscola Furniture Group, actually Janko
6  Financial, we felt good enough of their business
7  to say okay, we'll make a loan to you.
8  Q.  Got it.  That's what I thought.  I was
9  just clarifying.
10      Looking at -- okay.  So the first
11 document is a -- and it's document 137, is a
12 lending agreement or note between the bank and
13 TFG --
14  A.  That's correct.
15  Q.  -- basically for the purpose of funding
16 the purchase of furniture inventory; is that
17 right?
18  A.  That's correct.
19  Q.  And then the second document, 138 and
20 139, appear to me to be extensions of that lending
21 agreement?
22  A.  Yeah.  Instead of doing a new note, we
23 just extended the existing note with these
24 agreements.  It was our standard documentation.

Page 18

1 Says basically we're keeping things the same.
2  Q. You get an extra year?
3  A. You've got an extra year. And if any
4 terms are changing, here's what would be changing.
5  Q. Okay. And the fourth document, 140, is
6 that a security agreement between the bank and
7 TFG?
8  A. That's correct.
9  Q. Okay. And it basically lays out
10 security for furniture kept at these various
11 addresses, right?
12  A. That's correct.
13  Q. And is it your understanding that these
14 addresses were addresses that the Stilwell -- the
15 Stilwells operated out of? Or did you have any
16 knowledge?
17  A. Yeah. And my understanding, the main
18 address I think it was this 1304 Tuscola Boulevard
19 was where all the furniture ultimately going
20 to be located. But there were other locations
21 that they would bring in. I don't know if they
22 were originally selling there, but I think for
23 storage purposes. So it was other locations we
24 had been told the furniture may be at.

Page 19

1  Q. Right. And then the next document, 141,
2 appears to me to be an identical -- looks like an
3 identical security agreement, but this one is
4 between Tuscola Furniture Group and James Stilwell
5 on behalf of Amishland Country Village?
6  A. That's correct.
7  Q. So does that refresh your recollection
8 as to what Mr. Stilwell's company was called?
9  A. Yeah.
10  Q. Amishland Country Village, or ACV? I
11 might refer to them as ACV.
12  A. Yeah, that's fine.
13  Q. All right. And then this last agreement
14 is -- what is this? Is this a line of credit?
15  A. This is a line of credit agreement,
16 basically. We use these notes. And this was a
17 separate agreement we used when I was at First Mid
18 that just says, you know, everybody understands
19 there is a line of credit agreement tied in with
20 the note.
1    MS. BEYERS: And just for the record,
22 it's number 142 on the bottom there.
23    MS. ROTHMANN: Thanks.
24    MS. BEYERS: Sorry.

Page 20

1    MS. ROTHMANN: That's okay.
2 BY MS. ROTHMANN:
3  Q. All right. And the last document is
4 00143. This, you can't read most -- a lot of it.
5 But it looks like it says on the top guarantee.
6  A. Yes. This was Dick Janko's -- or
7 Richard Janko's guarantee of the note.
8  Q. Okay. All right. And those documents
9 related to a consignment agreement that TFG and
10 the Stilwells and their company had entered into
11 to try to finance and sell this furniture; is that
12 your understanding?
13  A. That's correct, yeah. That was my
14 understanding, I guess is the way to answer.
15    MS. ROTHMANN: Will you mark that?
16    (Whereupon Deposition Exhibit No. 2 was
17 marked for identification by the court reporter.)
18 BY MS. ROTHMANN:
19  Q. Mr. Chamberlain, showing you what's been
20 marked Exhibit 2, do you recognize Exhibit 2 to be
21 the consignment agreement that you referenced
22 previously?
23  A. That is correct.
24  Q. Okay. And that's a consignment

Page 21

1 agreement between TFG and the Stilwell company,
2 ACV, which is what they're referred to in this
3 document?
4  A. That's correct.
5  Q. Okay. I take it you've seen this
6 document before?
7  A. Yes.
8  Q. All right. What -- did you review it at
9 the time that the lending agreements were being
10 entered into, do you know? Do you recall?
11  A. I reviewed it. I don't remember who
12 prepared it. This was not a bank-prepared
13 document. I don't remember if it was Tuscola
14 Furniture Group's attorney that prepared it,
15 whether it was Stilwell's or ACV's attorney that
16 prepared it. I just don't remember who prepared
17 it.
18    When we closed this loan, there was a
19 packet of documents that came that said this goes
20 with that. I also can't remember who, whether we
21 hired an attorney to help make sure I had the
22 right documents to close the loan. This was not a
23 typical loan.
24  Q. All right. And it was not a typical

## Page 22

1 loan because you had a third party or another
2 party, this one being TFG, that was kind of acting
3 as a middleman to finance somebody else's --
4    A. That's correct.
5    Q. -- sale or business, right?
6    A. Yeah. Yeah.
7    Q. Okay. If you did retain outside
8 counsel, do you know who it would have been at
9 that time?
10    A. If we had, I would have assumed it would
11 have been Emerson Moore in Tuscola, because he had
12 an office -- well, at that time, it was probably
13 down the street. No, it was across the street.
14 We moved in Tuscola. And in 2000, we were across
15 the street from him. So ...
16    Q. Okay. And if you did not retain outside
17 counsel independently, would you have worked with
18 Tuscola Furniture Group's counsel --
19    A. Yes.
20    Q. -- in closing --
21    A. Yeah.
22    Q. -- this deal?
23    A. Yeah.
24    Q. Okay. All right.

## Page 23

1    A. And there were some documents. Again, I
2 don't remember if this was one. They had an
3 attorney that sent and said this is part of your
4 transaction to us. These documents you showed
5 were basically the ones we were interested in.
6    Q. And what you're just referring to is
7 Exhibit 1?
8    A. Yeah. Exhibit 1, yes.
9    Q. Okay. But Exhibit 2, this consignment
10 agreement, was this something that was in your
11 file, as well?
12    A. Yes.
13    Q. All right. And looking at the
14 consignment agreement, now, the bank is not a
15 signatory; the bank didn't sign off on this
16 document, correct?
17    A. That's correct.
18    Q. But it's referenced throughout the
19 document?
20    A. (Nods head)
21    Q. It's --
22    A. Yes.
23    Q. -- defined in the definition section,
24 and it's referenced throughout the document. And

## Page 24

1 you had occasion to review this document in
2 conjunction with the closing of the loan, correct?
3    A. Yes.
4    Q. Okay. All right. Looking at the
5 consignment agreement, do you agree with me that
6 the document requires ACV to take certain actions
7 on behalf of the bank?
8    A. Yes.
9    Q. And I'll help you out. Yes? The
10 answer's yes?
11    A. Yes.
12    Q. I'll help you out. If you turn to page
13 4, for example, Section 3.8 talks about casualty
14 insurance. Do you see that section?
15    A. Yes, that's correct.
16    Q. And about halfway down -- well, it says
17 -- basically speaks to how ACV is going to insure
18 the furniture and they're going to add the --
19 they're going to have TFG and the bank as an
20 additional party insured. Do you see that?
21    A. Yes, I see that.
22    Q. And then if you flip the page, there's a
23 Section 3.9 that refers to life insurance.
24    A. Yes.

## Page 25

1    Q. Do you see that? And basically that --
2 I'm going to paraphrase that provision, but it
3 says that ACV will maintain life insurance, pay
4 the premiums on the life insurance in an amount of
5 at least $1.25 million or greater, with TFG and
6 the bank to be named as a beneficiary. Correct?
7    A. Correct.
8    Q. All right. And there's other things, if
9 you go through. If you look down at 3.11, you've
10 got the bank mentioned in there again. ACV will
11 maintain inventory and accounting system
12 acceptable to TFG and the bank.
13    A. That's correct.
14    Q. Okay. So if you turn to page 8 of the
15 consignment agreement, Section 6.3 references a
16 personal guarantee to TFG by James and Margaret
17 Stilwell. Do you see that?
18    A. Okay, uh-huh.
19    Q. Do you have any knowledge of whether
20 this condition was met?
21    A. Do not have knowledge of that, no.
22    Q. Would you assume this condition was met?
23    MR. CROWDER: I'd object. Improper
24 question. Calls for speculation.

Page 26

1    MS. BEYERS: And show my same objection.
2 But you can answer subject to those objections.
3    THE WITNESS: What was the question?
4 BY MS. ROTHMANN:
5    Q.  The answer [sic] was -- well, you know
6 what, I'll strike that.  I'll ask another
7 question.
8    A.  Okay.
9    Q.  You've never seen a personal guarantee
10 in connection with this loan transaction, correct?
11   A.  No.
12   Q.  Okay.  And you have no knowledge that a
13 personal guarantee was ever executed?
14   A.  No knowledge, correct.
15   Q.  Dropping down to 6.4, speaks to a life
16 insurance on James Stilwell in the amount of at
17 least $1.25 million, with TFG and the bank as
18 beneficiaries.  Sets that provision out again
19 underneath the contingencies and conditions.  Do
20 you see that?
21   A.  Yes.
22   Q.  Do you have any knowledge of whether
23 that condition was met?
24   A.  No.  The only knowledge -- well, let me

Page 27

1 see.  Only knowledge I have is I know we did --
2 the bank received an assignment of what I believe
3 was $1 million of life insurance --
4    Q.  Okay.
5    A.  -- in order to meet provisions in this
6 consignment agreement.
7    Q.  All right.  So your understanding is the
8 bank received a $1 million assignment, and that
9 was basically in lieu of 6.4, the provision 6.4?
10   A.  The in lieu of is the question.  I knew
11 at the time I needed a $1 million life insurance
12 policy.
13   Q.  Okay.
14   A.  And so that's what I got, because that
15 was the amount of our loan at that time, was a
16 $1 million.
17   Q.  Did you have any discussions with the
18 Stilwells or TFG, the parties' principals to TFG,
19 concerning this provision 6.4, that the Stilwells
20 were going to get a $1.25 million life insurance
1 policy with the bank and TFG as beneficiaries?
22   A.  The only discussion I had with the
23 Stilwells is that we needed the life insurance
24 assignment.

Page 28

1    Q.  Okay.
2    A.  And so I had discussions with Jim and
3 then I believe, later, Margaret, because she was,
4 I think, the owner of the policy.  She had to
5 actually sign.  And so it was always like oh,
6 yeah, we'll get you the policy.  And in fact, the
7 paperwork was prepared by their insurance agent,
8 and he prepared it.  We just said we need the
9 assignment.  And so it was just general
10 conversations and no one questioned that there was
11 any issue to that and said okay, we'll get that to
12 you.  And --
13   Q.  Okay.  Did you --
14   MR. CROWDER: Let me interpose just an
15 objection to the answer in that if it invades the
16 Dead Man's Act restrictions, I just want to make
17 sure we don't waive that at this point.  So any
18 question -- just show Dead Man's Act objection to
19 that answer.
20   MS. ROTHMANN: Got it.
21 BY MS. ROTHMANN:
22   Q.  You referenced discussions --
23   MS. ROTHMANN: And you can have a
24 standing objection, obviously.

Page 29

1    MR. CROWDER: Sure.
2 BY MS. ROTHMANN:
3    Q.  You referenced discussions to -- or
4 discussions with the Stilwells.  About how many
5 discussions did you have with either --
6    A.  Very few, to tell you the truth.  It was
7 just -- my discussions were mainly with Tuscola
8 Furniture Group.  And this was an item of the
9 transaction to get the life insurance assignment.
10 So I don't believe there were very many
11 discussions.  It was a matter of either calling
12 Jim or he stopped in the bank.  I don't recall, it
13 was so long ago, just saying we need this.  Oh,
14 yeah, I'll get it to you.  And it could have been
15 with his attorney at that time Rick Broch.  I
16 don't -- the conversations went back saying this
17 is an item we need.  As I recall, it was just
18 simple discussion with Jim.  He said, you know,
19 Mr. Lyons -- I think that was the name --
20   MS. BEYERS: Uh-huh.
21   A.  -- the insurance agent was taking care
22 of it.  He would get it all prepared.
23   Q.  Did you have any discussions with
24 Mr. Lyons that you recall?

Page 30

1    A.  Not that I recall, other than I think
2  maybe a telephone conversation saying I've got it.
3  You know, this is something we need.  And he said
4  oh, yes, I'm aware of it.  We'll get that, get
5  that taken care of -- or get that sent to you, or
6  something along those lines.
7    Q.  If I understand your testimony with
8  respect to the entire transaction, your main
9  communication was with TFG --
10    A.  That's correct.
11    Q.  -- correct?  With respect to this
12  specific condition of the life insurance, that's
13  when you had conversations with the Stilwells --
14    A.  Correct.
15    Q.  -- is that right?
16    A.  Correct.
17    Q.  Okay.  And you don't have any specific
18  recollection of a discussion with him; it's
19  general, and I think we need this, or we need
20  this, yeah, I'm going to get it, talk to my
21  insurance agent, that sort of thing, correct?
22    A.  That's correct.
23    Q.  All right.  Not one conversation sticks
24  out in your mind?

Page 31

1    A.  That's correct.
2    Q.  You don't have any idea how many
3  conversations you would have had with him?
4    A.  That's correct.  No, I don't.
5    Q.  All right.  With respect to
6  conversations with TFG -- and when I say TFG, I
7  mean any of their principals -- and Janko, any of
8  their principals, did you have any discussions
9  with them concerning the life insurance provision?
10    A.  I don't recall any specific
11  conversations.  The conversations that I had with
12  them all related to the loan documentation.  That
13  was one item that we knew we needed.  And so the
14  only conversations is yes, we have to have it.
15  But nothing specific other than, you know, the
16  assignment was needed.
17    Q.  Okay.  You don't -- you didn't pull out
18  this agreement and say well, they need to do 1.25
19  and it needs to be done this way; you just knew
20  for purposes of your criteria, the bank's
21  criteria, the underwriting criteria that you
22  needed a million dollars?
23    A.  That's correct.
24    Q.  Okay.  And that's what you went after,

Page 32

1  that's what you wanted?
2    A.  That's correct.
3    Q.  That's what you asked for, that's what
4  you got?
5    A.  Yes.
6    Q.  Okay.  You don't have any knowledge of
7  whether TFG waived this condition, the condition
8  that's in the --
9    A.  I have no knowledge.
10    Q.  -- in the consignment?
11    A.  No.
12    Q.  Okay, all right.
13        (Whereupon Deposition Exhibit No. 3 was
14  marked for identification by the court reporter.)
15  BY MS. ROTHMANN:
16    Q.  Showing you what's been marked Exhibit
17  No. 3, do you recognize this document?
18    A.  Yes.  This was the assignment document
19  that I believe Mr. Lyons prepared to receive the
20  life insurance assignment on the life of
21  Mr. Stilwell.
22    Q.  And this satisfied you and the bank as
23  to that condition?
24    A.  Yes, yes.

Page 33

1    Q.  Okay.  This assignment was never
2  released prior to Mr. Stilwell's death; is that
3  correct?
4        MS. ROTHMANN:  Show an objection to that
5  as calling for a legal conclusion.  But you can
6  answer.
7    A.  That's correct.
8    Q.  You can answer.
9    A.  It wasn't released.
10    Q.  Okay.  Do you have any knowledge of
11  whether TFG received a similar assignment?
12    A.  No.
13    Q.  Did you ever have any discussions with
14  TFG concerning a similar assignment?
15    A.  No.
16    Q.  Back up.  The consignment agreement
17  references a previous consignment agreement dated
18  April 16, 1999.  Do you see that (indicating)?
19    A.  Yes.
20    Q.  Do you know whether the bank was
21  involved as a lender in that transaction?
22    A.  I don't believe we were, no.
23    Q.  All right.
24        (Whereupon Deposition Exhibit No. 4 was

Page 34

1 marked for identification by the court reporter.)
2 BY MS. ROTHMANN:
3    Q.  Showing you what's been marked Exhibit
4 4, do you recognize that document?
5    A.  Appears to be a document we received
6 just verifying that we had an assignment.
7    Q.  Okay.  You don't have any reason to
8 believe that you didn't receive this document?
9    A.  Yeah, I don't have any reason to believe
10 that we did not receive it.
11    Q.  Okay.  Do you have any independent
12 recollection of it being part of your file?
13    A.  Don't remember.  Too long ago.  Sorry.
14    Q.  That's all right.  Prior to this
15 assignment, had you taken other assignments on
16 other loans, that sort of thing, as kind of a
17 general thing?
18    A.  Myself, I think this was the first
19 assignment I ever took.
20    Q.  Okay.  All right.
21        MS. BEYERS:  Of a life insurance policy,
22 right?
23        THE WITNESS:  Of a life insurance
24 policy.  Yeah, sorry.

Page 35

1        MS. ROTHMANN:  All right.
2 BY MS. ROTHMANN:
3    Q.  At some point after receiving the
4 million dollar assignment from Ms. Stilwell --
5 Mrs. Stilwell, did you become aware of whether ACV
6 was having financial problems at any point?
7    A.  Yes.  And I don't recall how, but it was
8 kind of -- I hate to say general knowledge, but
9 there was, for lack of better term, general
10 knowledge that there were some problems out at
11 Amishland.
12        The first evidence that I had of
13 financial problem was we would do our inventory
14 checks and they were always in what I'd call
15 trust.  And then all of a sudden, the inventory
16 wasn't in trust anymore.
17    Q.  Explain that to me.
18    A.  We would do -- we were given what
19 furniture was supposed to be there.  We would make
20 advances to purchase furniture and it was to be
21 there until it was sold.
22    Q.  You trusted them?
23    A.  We trusted them.
24    Q.  Okay.

Page 36

1    A.  But we would have -- and I believe it
2 was monthly inventory checks.  And because our
3 loan said -- again, I'm going off memory -- we
4 would advance up to 80 percent of the purchase
5 price -- not what they were selling it for,
6 purchase price of the value of the furniture -- so
7 we would get our monthly inventory checks.  And
8 let's just say there was a million dollars of
9 insurance, our loan could only be $800,000.  And
10 we had no problem.  And then all of a sudden there
11 was a point when those numbers didn't match, at
12 which point I notified Tuscola Furniture Group and
13 said there's now not enough collateral covering
14 our loan, at which time they made payment to us
15 and had indicated that Mr. Stilwell or ACV wasn't
16 paying them, but they were going to live up to
17 their promise to us to make sure we were in trust
18 with Tuscola Furniture Group.
19        So there were conversations.  I don't
20 remember when they took place, but it was after a
21 point when in the community -- a small town, you
22 hear things -- I'd already heard there was, but
23 that was the first evidence I had that okay,
24 something didn't seem right here.  Somebody was

Page 37

1 selling product and not paying down as they were
2 supposed to.  But I can remember contacting the
3 first time and saying hey, we've got a problem
4 here.
5        As I recall, they always had a bigger
6 cushion than what we required.  And so if I recall
7 correctly, they were already aware that this was
8 happening with Mr. Stilwell or ACV.
9    Q.  Okay.  Other than what you've just
10 described, do you recall any other conversations
11 with anybody at TFG concerning the financial
12 problems that they were having or the financial
13 problems ACV was having during --
14    A.  I mean, other than they were aware of --
15 yeah, I don't remember anything in specific.  But
16 it was all part of the same general conversation
17 that they weren't surprised when I called and said
18 you've got to send me a check, and they said yes,
19 we'll take care of you.  Unfortunately, we're not
20 getting taken care of, but we'll take care of you.
21 We are aware that there are some problems out at
22 Amishland.  You get so many different names.  We
23 typically referred to it as Amishland.
24    Q.  Amishland?  I'll refer to it as

Page 38

1 Amishland. It's a lot easier than ACV.

2    A.  Well, but there were several entities

3 within Amishland, so that's probably not the best

4 name to use. But generically just as we say

5 Stilwells or Jankos or whatever.

6    Q.  You referred to it as Amishland.

7        MS. BEYERS:  And just for the record, I

8 think Mr. Chamberlain's trying to answer your

9 question and he's kind of going into some hearsay

10 statements and things like that. So, you know,

11 just because it is a federal dep and an evidence

12 dep for all purposes, I just want to make sure I

13 make an objection to any hearsay statements. Just

14 a continuing objection, because I think he is

15 responding to your next question before you get to

16 it. So I haven't been able to object, but ... I

17 don't want to slow you down.

18        MS. ROTHMANN:  That's all right. We're

19 almost done. I am.

20 BY MS. ROTHMANN:

21    Q.  Did you have any knowledge of a lawsuit

22 that was filed against the Stilwells and their

23 company ACV?

24    A.  I don't recall that I do, no.

Page 39

1    Q.  All right. Mr. Stilwell passed away on

2 or about May 2nd, 2003. You agree with that?

3    A.  Yes.

4    Q.  All right. Do you recall how it was

5 that you were notified that Mr. Stilwell had

6 passed?

7    A.  I believe I just heard it in the

8 community that he had passed away. But I don't

9 remember anybody calling me and say he passed

10 away. It was just he was a community leader, so

11 when he passes away, the word gets around.

12    Q.  Everybody knew?

13    A.  Yeah.

14    Q.  All right. Do you recall taking any

15 steps to submit a claim under -- pursuant to your

16 assignment after you heard that he passed away?

17    A.  One of the things that I did after he

18 passed away was to contact the insurance agent,

19 Mr. Lyons, just to make sure our assignment was

20 still in force.

21    Q.  All right.

22    A.  I did -- and he said it was. I did that

23 because probably if we had a weakness at First

24 Mid, it was with insurance. And you know, it's

Page 40

1 just -- that's something you're going to do is say

2 oh, I better make sure I still have my assignment

3 there.

4        We didn't have a large loan balance, but

5 I knew the assignment was there. So I called him.

6 He said yes, it was in force.

7    Q.  It was a telephone call that you placed

8 to him?

9    A.  Yes.

10    Q.  You asked him about the assignment. Do

11 you recall anything else about your conversation

12 with him at that point?

13    A.  No.

14    Q.  Okay. I'm showing you -- this was a

15 long time ago, so -- I'm not going to mark this.

16 I don't have any copies.

17        MS. BEYERS:  41?

18        MS. ROTHMANN:  41. Exhibit 41 -- or

19 document Bates stamp 41. 41 and 42.

20        MR. CROWDER:  Okay.

21 BY MS. ROTHMANN:

22    Q.  Showing you documents Bates stamped 41

23 and 42, it appears to be a letter to you dated

24 May 6, 2003 from William Lyons enclosing a

Page 41

1 claimant's statement on --

2    A.  Okay.

3    Q.  -- the policy.

4    A.  Okay.

5    Q.  Was that a result of the telephone call

6 you made, do you know?

7    A.  When did he pass away?

8    Q.  He passed away on the 2nd of May, I

9 believe.

10        MS. BEYERS:  I think it says right

11 there.

12    A.  I assume it is. Yeah, I assume that,

13 you know, Mr. Lyons knew that we had an assignment

14 of life insurance and he forwarded this on to us.

15    Q.  Okay. Do you recall what you did after

16 you received this May 6, 2003 letter?

17    A.  Either before or after, I had a meeting

18 with our company president John Hedges.

19        MS. BEYERS:  And again I just object. I

20 mean, clearly, he can testify to what he said to

21 Mr. Hedges. But again, show my objection to any

22 hearsay statements about what Mr. Hedges' response

23 was.

24        MS. ROTHMANN:  Uh-huh.

## Page 42

```
1       MR. CROWDER: We're okay with that,
2  showing a continuing objection to hearsay
3  statements to the deposition?  You're okay with
4  that?
5       MS. ROTHMANN: I'm fine with that.
6       MR. CROWDER: Okay.  I am, too.  I just
7  want to make sure that's clear.
8       MS. BEYERS: I am, too.  If we're all
9  going to trust each other, I'm totally fine with
10 that.
11      MS. ROTHMANN: Let the record reflect
12 that there's a standing objection to any
13 statements made that would fall under the Dead
14 Man's Act.
15      MS. BEYERS: Or to hearsay.
16      MS. ROTHMANN: Or to hearsay.
17      MS. BEYERS: And off the record.
18      (Whereupon discussion was held off the
19 record.)
20  A.  At some point around this time, and I
21 don't remember why, I think it was just it
22 happened that John Hedges and I were in I believe
23 it was my office together, we talked about the
24 fact that there would be a claim.  We knew
```

## Page 43

```
1  Mr. Stilwell had passed away.  We knew we had a
2  life insurance claim to file.  I had never filed
3  it.  As I just mentioned to you, this is, to my
4  knowledge, the first assignment I ever took.  And
5  I told him I'd never filed a claim.
6       We discussed at that point, because we
7  -- I had knowledge of financial problems of ACV,
8  that instead of us filing something we really
9  didn't know what we were doing, that we would seek
10 counsel to do it.  He recommended Rick Heavner,
11 and we called Mr. Heavner.
12      MS. BEYERS: And again, any
13 conversations with your -- with Mr. Heavner are
14 privileged.  So I would direct you not to answer
15 about your conversations with Mr. Heavner.
16      THE WITNESS: Okay.
17  A.  Other than -- but basically, I mean,
18 there weren't much conversations other than the
19 fact saying we know we've got this claim to file,
20 can we turn it over to Rick?  And he said yes, he
i  would handle it.  So it was turned over to him.
22      The other thing that was going on at
23 that time, I was trying to open up a brand new
24 office here in Champaign.  This really related to
```

## Page 44

```
1  my old business in Tuscola.  So I didn't have time
2  to mess with it, was really -- it was something I
3  was unfamiliar with, and really didn't have time
4  to deal with it.  So we chose to turn it over to
5  Mr. Heavner.
6   Q.  So to summarize your testimony, you had
7  a meeting with your boss, Mr. Heavner [sic] --
8       MS. BEYERS: Mr. Hedges.
9   Q.  -- I'm sorry, Mr. Hedges after you
10 learned that Mr. Stilwell had passed to discuss
11 the next step in submitting a claim.  Mr. Hedges
12 and you decided to turn it over to counsel.  You
13 had enough on your plate with trying to open
14 another branch of the bank as this was kind of
15 something behind you.  And so you turned it over
16 to counsel?
17  A.  That's correct.
18  Q.  Okay.  Did you have any discussions --
19 discussions with anybody else?  Not with your
20 counsel; but with anybody else, anybody from TFG?
21  A.  You know, I would have discussions with
22 individuals at TFG; mainly, Larry Bianchi or
23 possibly Dick or Mike Janko.  But I also had other
24 dealings, I think we subsequently financed another
```

## Page 45

```
1  LLC they had for a hotel in Tuscola.  So we were
2  doing ongoing discussions on other things.
3       They at some point -- and I don't
4  remember when -- had indicated they were filing a
5  claim.
6       MS. BEYERS: And again here, objection
7  to any hearsay statements that Mr. Chamberlain's
8  about to disclose.  But subject to that, go ahead.
9   A.  That they were -- had a claim to file,
10 too.  And they were turning it over to an attorney
11 also.  At some point, we found out their attorney
12 was Tim Howard.  Our attorney was Rick Heavner.
13 And I don't remember whether it was the attorneys
14 that said oh, we know each other, or -- somehow I
15 remember Rick and Tim, I don't remember if Tim
16 called me, I don't know if Rick called, but I had
17 both names and the other one said oh, I know them,
18 I'll call them.  And that's kind of how the two of
19 them hooked up.  Again, and that was about it for
20 that period of time.
21  Q.  Okay.  And at some point you
22 submitted -- the bank submitted the claim for
23 proceeds on the policy; is that right?
24  A.  That's correct.
```

**Page 46**

1    Q.    All right.
2         (Whereupon Deposition Exhibit No. 5 was
3    marked for identification by the court reporter.)
4    BY MS. ROTHMANN:
5    Q.    Mr. Chamberlain, I'm showing you what
6    has been marked Exhibit No. 5 for your deposition,
7    a document Bates stamped 000019 through 25.  If
8    you'd take a look at that.
9    A.    Okay.
10   Q.    Okay.  Do you recognize this as your
11   letter of May 12th, 2003 to William Lyons?
12   A.    That's correct.
13   Q.    Okay.  And is your signature on the
14   second page?
15   A.    Yes.
16   Q.    Document 20?  And did you draft this
17   letter?
18   A.    I don't recall that I did.  And the
19   reason I believe that is the letterhead I used out
20   of my office would normally have our address at
21   the bottom.  If I recall correctly, Rick Heavner's
22   office prepared this.  And again we asked them to
23   prepare the claim for us, to handle it.  And if I
24   remember correctly, this was sent to me and said

**Page 47**

1    all right, this is part of filing the claim.  You
2    need to sign it on behalf of the bank.
3    Q.    Okay.  Did you read it before you signed
4    it?
5    A.    Yes.
6    Q.    All right.  What was your understanding
7    of the content of the letter?
8    A.    That we were filing a claim for -- in
9    relation to the assignment of life insurance.
10   Q.    Okay.  Now, Larry Bianchi signed it
11   also?
12   A.    Yes.
13   Q.    What's your understanding of why he's
14   signing it, too?
15   A.    At some point, we were -- I was notified
16   that the two attorneys had chosen to file a joint
17   claim.
18         MS. BEYERS:  And again, I'm going to
19   object to any conversations he had with counsel
20   regarding ...
1    A.    Yeah.  I don't recall why they chose to
22   file a joint claim other than the fact it all went
23   back to that original assignment of -- or
24   consignment agreement I think was the right title

**Page 48**

1    of that agreement.
2    Q.    Uh-huh.
3    A.    That was it.  You know, they said we're
4    filing a joint claim, it has to do with this
5    consignment agreement.  That's where it all
6    started from, why we had the life insurance in the
7    first place.  So I had no reason to believe
8    anything else and said okay.
9         And so this is -- I did know that they
10   were filing a joint claim just because that's what
11   I was told was going to happen.  The document
12   showed up.  I executed it based upon advice of
13   counsel, and it was --
14   Q.    Okay.  The statements that are made in
15   the letter, to your knowledge, are true and
16   accurate statements?
17   A.    Okay.  (Reviewing)  Yeah, based on my
18   knowledge, they were true and accurate.
19   Q.    Because you wouldn't have have signed
20   your name if it wasn't true and accurate, right?
21   A.    That's true.  But I would sign it based
22   upon advice of counsel.  I've never filed a claim
23   before, so I asked counsel, you tell me what to
24   sign.  And that's what I signed.

**Page 49**

1    Q.    If something in it was wrong and untrue
2    and your counsel told you to sign it, would you
3    sign it?
4    A.    If I thought it was untrue, I wouldn't
5    have signed it, no.
6    Q.    I didn't think so.  Thanks.  But to your
7    knowledge, everything in this letter is true and
8    accurate?
9    A.    Yes.
10   Q.    And that's why you signed it?
11   A.    That's correct.
12   Q.    That, and the fact that counsel told you
13   this was the way to do it?
14   A.    That's right.
15   Q.    All right.  Back to the person who
16   drafted it.  You don't know who drafted this?
17   A.    No, I don't.
18   Q.    You don't know if it came from somebody
19   in your bank or whether this is a template that
20   counsel offered?
21   A.    I don't know for sure.
22   Q.    Okay.
23   A.    I don't believe anybody in our bank
24   would have prepared it.  I really believe it was

Page 50

1 prepared by counsel.

2 Q. All right. In any event, it came from

3 your bank, and you signed off on it?

4 A. Yes.

5 Q. Okay.

6 (Whereupon Deposition Exhibit No. 6 was

7 marked for identification by the court reporter.)

8 BY MS. ROTHMANN:

9 Q. Showing you what's been marked Exhibit

10 No. 6 to your deposition, this is a May 12, 2003

11 letter executed by Larry -- Lawrence Bianchi of

12 Tuscola Furniture Group. Do you recognize your

13 signature on this letter, as well?

14 A. I do, yes.

15 Q. Okay. And if you'd compare this letter

16 with the one that you executed, they appear to be

17 pretty much identical?

18 A. Yes.

19 Q. Do you recall that to be the case?

20 A. Yes.

21 Q. Or do you see that to be the case?

22 A. I see that to be the case.

23 Q. All right. And so you had no problem

24 signing off on this one, too, because it basically

Page 51

1 had the same content?

2 A. It had the same content, and I was

3 relying on the fact that I was told we were going

4 to file a joint claim.

5 Q. The one difference that I notice is

6 other than the signature box is if you turn to the

7 second page, there's a cc: Timothy Howard, you've

8 told me, was counsel for TFG.

9 A. TFG.

10 Q. Richard Heavner was your counsel, bank's

11 counsel?

12 A. Correct.

13 Q. Richard Broch, was it your understanding

14 he was Plaintiff's counsel, the Stilwells'

15 counsel?

16 A. He was Stilwell's counsel.

17 Q. Okay.

18 MR. CROWDER: I'll object, lack of

19 foundation.

20 BY MS. ROTHMANN:

21 Q. Had you had prior dealings with

22 Mr. Broch?

23 A. Yes. When the whole process started, it

24 seemed as if he was involved somehow in the

Page 52

1 documents that Jim had signed, like the

2 consignment agreement.

3 Q. Okay. So the whole process, you mean

4 the lending agreement and the consignment

5 agreement?

6 A. Yeah. And my understanding was he was

7 counsel for Mr. Stilwell at that time.

8 Q. Okay. Did you have any direct dealings

9 with him?

10 A. I talked with him, and I don't remember

11 exactly what about. I believe it was just that

12 we -- you know, I'm trying to do my paperwork, has

13 Mr. Stilwell signed these? Yes, we're talking

14 with the Janko Financial Group or Tuscola

15 Furniture Group's attorneys and -- so that's why I

16 didn't find it abnormal to see his name on there.

17 I guess I assumed at that time we're just

18 notifying, hey, just with all the everything we've

19 done, just to let you know that we are filing the

20 claim.

21 Q. Okay. And this gives notice to all the

22 parties to the consignment agreement, basically?

23 A. Yes.

24 Q. With the exception of the bank is not

Page 53

1 really a party, but an indirect party, correct?

2 A. Yes, that's correct.

3 Q. Okay. All right. Showing you a

4 document that is -- I didn't mark it, but it's

5 Bates stamped 35, do you recognize that document?

6 It appears to be a May 31st [sic], 2003

7 correspondence?

8 A. May 13th.

9 Q. I'm sorry, May 13th correspondence to

10 Lawrence Bianchi from you?

11 A. Yes.

12 Q. Do you see that? Enclosing -- I can't

13 read upside down -- enclosing the original letter

14 which would have been Exhibit 5 -- is that 5 --

15 Exhibit 5; is that right?

16 A. Yes.

17 Q. Okay. And so you executed Exhibit 5,

18 sent it on, executed Exhibit 5 with the paperwork

19 attached?

20 A. Correct.

21 Q. Sent it on to Mr. Bianchi for signature?

22 A. Correct.

23 Q. At some point, you got his letter,

24 Exhibit 6, back. You signed his letter. And then

Page 50 - Page 53

Page 54

1 it says once you send this original letter back, I
2 will hand deliver the forms to Mr. Lyons. Do you
3 see that?
4    A. Yes, uh-huh.
5    Q. Do you have any recollection of actually
6 hand delivering the forms to Mr. Lyons?
7    A. I believe that I did, but I can't
8 exactly remember. But I think I wanted to -- I
9 still lived in Tuscola, so I didn't live that far
10 from Mr. Lyons' office. And just to get things
11 filed, a lot of times I will hand deliver stuff
12 just to make sure it gets there. There's no use
13 -- my other typical way of sending documents would
14 be overnight. Well, to go seven miles from where
15 I lived didn't make a whole lot of sense to spend
16 25 bucks. So I just said I'd hand deliver them.
17    Q. And do you recall when you
18 hand-delivered it, did you discuss with Mr. Lyons
19 the content of your packet?
20    A. No.
21    Q. Your submission?
22    A. I mean, I think I discussed the fact
23 that here's the claim we're filing. But that was
24 -- I don't recall any conversation.

Page 55

1    Q. Okay.
2    A. In fact, I don't even recall if I handed
3 it to him personally or handed it to his
4 secretary. I just remember delivering the claim
5 to his office.
6    Q. Okay. And just to clarify it, do you
7 have any understanding why it was decided that you
8 were going to submit a joint claim?
9    A. No.
10    MS. BEYERS: Well, and again -- well, he
11 said no, so I don't need to object. Okay, go
12 right on ahead.
13    THE WITNESS: Sorry.
14    A. But no, I do not remember why they chose
15 to do it.
16    Q. Okay. After hand delivering this
17 information to Lyons, did you ever have any other
18 conversations with Mr. Lyons?
19    A. No, I don't recall that I did.
20    Q. Okay. No conversations regarding the
21 status of payment or processing of the claim?
22    A. I don't recall any conversation. I do
23 remember at the time it seemed to take a while for
24 the claim to be settled.

Page 56

1    (Whereupon Deposition Exhibit No. 7 was
2 marked for identification by the court reporter.)
3 BY MS. ROTHMANN:
4    Q. Showing you what's been marked Exhibit 7
5 to your deposition, this appears to be a
6 June 11th, 2003 correspondence to a Ray Sawicki,
7 Director of Claims of American General Life from
8 Lawrence Bianchi, with a cc: to you.
9    A. Okay.
10    Q. Do you see that?
11    A. Uh-huh.
12    Q. Do you recognize this document?
13    A. I don't recall it, but I have no reason
14 to believe I didn't receive it either.
15    Q. Did you have any part in drafting this
16 letter?
17    A. No.
18    Q. Okay.
19    A. No.
20    Q. Do you have any recollection of
21 discussing the letter with Mr. Bianchi or anyone
22 else at TFG?
23    A. The only thing that I recall is, as I
24 mentioned earlier, it seems to be taking a while

Page 57

1 to settle the claim. I think in discussions with
2 Mr. Bianchi on other issues that came up in the
3 conversation, and I recall him saying the
4 insurance company is asking us questions and I'm
5 preparing stuff and sending on to them. That was
6 the extent of the conversation.
7    Again, I didn't feel at that point there
8 was any concerns, didn't seem out of the ordinary
9 for somebody to make sure everything was in order.
10 So ...
11    Q. So your understanding was the insurance
12 company was requesting additional information
13 after the submission of your claim, and this was
14 to respond to their request or questions that they
15 had?
16    A. Yeah. My recollection, they were
17 requesting information from Tuscola Furniture
18 Group by Janko Financial Group. But they never
19 contacted me for anything.
20    Q. Okay. You never spoke to anybody at
21 American General directly?
22    A. Not that I can remember.
23    Q. Okay. And you don't have any specific
24 recollection of speaking about -- well, strike

## Page 58

1 that. Did you have any discussions with anybody
2 at TFG regarding the questions that American
3 General had or what it was that they were
4 questioning?
5    A. I don't recall any.
6    Q. Okay. Do you recall getting a copy of
7 this letter?
8    A. I don't recall that I did. But I have
9 no reason to believe I didn't.
10    Q. Okay. Do you -- I'm sorry, go ahead.
11    A. You asked me earlier about any
12 conversations with American General, and I really
13 don't recall. It seemed at some point I did talk
14 with an account rep at American General, and I
15 have no -- I can't remember why I did. And I
16 don't know -- it seemed like it was a lady. And I
17 don't know whether I was just calling to check to
18 say when is the claim going to be paid. But I
19 don't want to be lying and say I never talked to
20 anybody because now I kind of remember I might
21 have talked to somebody, but I don't remember what
22 for.
23    Q. I appreciate that.
24    A. Okay.

## Page 59

1    Q. Looking at Exhibit 7, if you haven't had
2 the opportunity -- well, strike that. Have you
3 seen this document before? Well, strike that.
4 Did you look at this document in preparation for
5 your deposition today?
6    A. No, I did not.
7    Q. Okay. So why don't you take a second
8 and look through it.
9    A. Okay (reviewing).
10    Q. And let me give you the question I'm
11 going to ask you while you're looking through it
12 so you're prepared.
13    A. Okay.
14    Q. Do you have any knowledge, after reading
15 this letter, of any statements that are made in
16 this letter that are not true and accurate?
17    A. Okay.
18    Q. All right?
19    A. (Reviewing) Okay, now your question
20 again?
1 [sic]    Q. After reviewing this letter, do you have
22 any knowledge that any of the statements made in
23 this letter that you just reviewed are not true --
24 well, strike that, because that doesn't sound

## Page 60

1 right.
2    Q. Do you have any knowledge of whether the
3 statements made in this letter are not true and
4 accurate?
5    A. The only thing that I can state is that
6 those relating to me, I do not see any -- I do not
7 take issue with anything that was stated here.
8    Q. Uh-huh.
9    A. I don't have knowledge as to these
10 previous agreements and the timeline. All I know
11 is all right, I did sign this letter. I did sign
12 this letter. You know, I remember the consignment
13 agreement --
14    Q. Uh-huh.
15    A. -- in November of 2000, I believe it
16 was.
17    Q. Uh-huh.
18    A. Or was that -- yeah, November 2000. But
19 a lot of the rest of this letter, I can't answer
20 to. Again, in reading through it, I believe I did
21 see this come through and just understood it was
22 Larry's chronological description of what happened
23 from here to here to here.
24    Q. Got it. Let me see if I understand what

## Page 61

1 you just said. Anything in this letter that
2 relates to you, you don't take issue with?
3    A. No, I don't take issue with.
4    Q. And it's true and accurate, correct?
5    A. Yeah, it appears to be.
6    Q. Anything that doesn't relate to you, you
7 have no knowledge of?
8    A. That's correct.
9    Q. All right. Turning back to Exhibit 5,
10 which is your letter, your May 12th letter.
11 Attached to it, submitted with this letter was the
12 executed claim form, if you turn to document Bates
13 stamped 21.
14    A. Uh-huh.
15    Q. Do you see that? And that's your
16 signature at the bottom, correct?
17    A. That's correct.
18    Q. And this was what was submitted to
19 American General in connection with the claim for
20 proceeds, correct?
21    A. Correct.
22    Q. Okay. And then attached to that is this
23 Exhibit A. Did you create this document,
24 Exhibit A?

## Page 62

1  A.  No, I did not.

2  Q.  Okay.  Did -- you had no part in

3  creating this document?

4  A.  That's correct.

5  Q.  Do you know who did create this

6  document?

7  A.  No.  I assume it came from Tuscola

8  Furniture Group.

9  Q.  Do you have any knowledge of the

10  information that's on this document?  And would

11  you be able to say that the information on this

12  sheet is true and accurate?

13  A.  I could not make any statement to that

14  effect.

15  Q.  Okay.  And you assumed it was true and

16  accurate based on what Tuscola Furniture Group

17  told you and what they provided you with?

18  A.  That's correct.

19  Q.  Okay.  Or what your counsel told you and

20  provided you with?

21  A.  That's correct.

22  Q.  At some point, the bank received a

23  check; is that right?

24  A.  That's correct.

## Page 63

1  Q.  From American General?

2  A.  Correct.

3  Q.  All right.

4  MS. ROTHMANN:  Do you guys mind if I

5  mark these as a group?

6  MS. BEYERS:  No.

7  MR. CROWDER:  No.

8  (Whereupon Deposition Exhibit No. 8 was

9  marked for identification by the court reporter.)

10  BY MS. ROTHMANN:

11  Q.  Showing you what's been marked Exhibit 8

12  for your deposition, this is a June 26

13  correspondence from American General to your

14  attention at First Mid, enclosing a check for

15  $512,974.50.  Do you see that?

16  A.  Yes.

17  Q.  Saying representing payment of benefits

18  payable to Tuscola Furniture Group and First Mid

19  Illinois Bank & Trust.

20  A.  Correct.

21  Q.  Do you see that?  So at some point

22  American General paid out proceeds pursuant to the

23  claim that you made, correct?

24  A.  Correct.

## Page 64

1  Q.  All right.  And attached to it is a

2  document Bates stamped 3, 4 and 7.  And Bates

3  stamp 3 is a copy of the check you received --

4  A.  Uh-huh.

5  Q.  -- is that right?

6  MR. CROWDER:  Is that a yes or no for

7  us?

8  THE WITNESS:  Yes.  Sorry.

9  MS. ROTHMANN:  Good save.

10  BY MS. ROTHMANN:

11  Q.  And in turning to the last page Bates

12  stamped 7, this is a memo dated July 3rd, 2003

13  from you to Mike, Dick and Larry of Janko

14  Financial Group.  Do you see that?

15  A.  Yes.

16  Q.  Saying Matt delivered the check just

17  fine, we paid off the loan balance of $81,660.30

18  and deposited the balance, blah-blah-blah, into

19  your checking account.  Do you see that?

20  A.  Yes, I do.

21  Q.  Do you recall any -- well, strike that.

22  Why did you apply the proceeds like this, or like

23  you stated?

24  A.  The check came made payable to both of

## Page 65

1  us.

2  Q.  Uh-huh.

3  A.  We were only entitled to the balance of

4  our loan, our legal fees, interest.  Insurance

5  companies make joint payable checks all the time.

6  What I did was, instead of endorsing it on behalf

7  of the bank's name, I sent it to Tuscola Furniture

8  Group first for their endorsement.  We had a

9  checking account under the name of Tuscola

10  Furniture Group at the bank.  I'm assuming that I

11  had a conversation when the check arrived that I

12  called either Larry, Dick or Mike and said, by the

13  way, the check's here, I am not going to sign my

14  name on it until your name is on it, which is good

15  business sense on behalf of the bank.  I want to

16  control the proceeds.  So we sent the check to

17  Tuscola Furniture Group.  I don't remember if it

18  was overnight mail, how I sent it, but I sent it

19  up, said you sign the check first.  When it comes

20  back, I will sign the check.  We will take the

21  money that we are owed, I'll let you know how much

22  that is, and then deposit the balance into your

23  account, because they had an account there.

24  Actually, I think we decided instead --

Page 66

1 it would be cleaner just for a paper trail to
2 deposit all of it into Tuscola Furniture Group's
3 account, and they had said debit out the account
4 what you're going to need.
5      I think the Matt -- because I was
6 working again in the Champaign office, I think
7 Matt is Dick Janko's grandson.
8    Q. Okay.
9    A. He was going to school I believe at the
10 U of I. At the time when I made arrangements to
11 get the check signed, they said send it up, by the
12 way, Matt's going to be home. I don't know. I
13 don't think Matt is Mike's son. Dick has others.
14    Q. That's okay.
15    A. But they said we'll send the check back
16 with Matt. That's a half million dollars. So
17 this was my acknowledgment, okay, here's the
18 facts. By the way, you got the check back. This
19 is what we've done. And then a copy of the
20 transaction showing that we did as I said I was
21 going to do.
22    Q. Got it. Thank you. Now, in submitting
23 the claims to American General, you knew American
24 General would be relying on the information and

Page 67

1 the statements contained in the claim form,
2      MS. BEYERS: Well, I'm just going to
3 object in that this question partially calls for a
4 legal conclusion and it's leading, as well.
5      MS. ROTHMANN: You can answer.
6      THE WITNESS: Okay, the question again?
7      MS. ROTHMANN: I'll rephrase it. How's
8 that?
9 BY MS. ROTHMANN:
10    Q. Did you know that American General would
11 be relying on the information and statements that
12 were contained in your claim form?
13      MS. BEYERS: Objection, just it calls in
14 part for a legal conclusion.
15      MS. ROTHMANN: You can answer.
16    A. Seems reasonable.
17    Q. So is the answer yes?
18    A. Yes.
19    Q. All right. And your intent in writing
20 the letter was to get American General to pay the
21 claim; is that right?
22      MS. BEYERS: Again object to leading and
23 -- leading.
24      MS. ROTHMANN: I'll rephrase.

Page 68

1 BY MS. ROTHMANN:
2    Q. Was your intent in writing the letter
3 and submitting the claim form to get American
4 General to pay the claim?
5    A. Yes.
6    Q. Okay. To your knowledge, there was
7 nothing untrue or misleading that was contained in
8 your claim submissions to American General,
9 correct?
10    A. To my knowledge, that is correct.
11      MS. ROTHMANN: All right. That's all I
12 have.
13      EXAMINATION
14 BY MR. CROWDER:
15    Q. I've got some questions for you, Tom.
16 Take a look at Exhibit No. 5 again, if you would.
17      MS. ROTHMANN: Jason, I hate to do this
18 to you, but can I take a break before you get
19 rolling?
20      (A break was taken from 4:11 to
21 4:14 P.M., and the deposition continued as
22 follows:)
23 BY MR. CROWDER:
24    Q. Exhibit No. 5, to your deposition,

Page 69

1 you've got it in front of you, I just want to make
2 sure that I understand what your position was when
3 you signed the letter.
4      One of the things you said was,
5 obviously, you relied on the people who prepared
6 it to get this information accurate, correct?
7    A. Correct.
8    Q. Okay. There wasn't anything that you
9 knew in the letter that was inaccurate; would that
10 be a safe statement?
11    A. That was correct, yeah.
12    Q. Okay. But in terms of verifying the
13 accuracy of it, you didn't take any measures to do
14 that; would that be a safe statement?
15    A. Yes, that would be a safe statement.
16    Q. For example, it talks about Exhibit A --
17 in paragraph 2, it talks about Exhibit A, and it
18 says that the amount owed by Amishland Country
19 Village, Inc. is $512,974.50, correct?
20    A. Correct.
21    Q. Okay. And you signed the letter
22 attesting to that being the case, correct?
23      MS. BEYERS: Well, I'm just going to
24 object to the leading form of the question. I've

Page 70

1 given a lot of leeway to everybody here. I just
2 ask that we ask him not leading questions.
3        MR. CROWDER: You can answer the
4 question.
5    A. I signed this letter based upon advice
6 of counsel.
7    Q. Okay. At the time that you signed it,
8 you didn't know what Amishland Country Village
9 owed Tuscola Furniture Group; is that -- would
10 that be the case?
11       MS. BEYERS: Well, same objection to the
12 leading form of the question.
13       MR. CROWDER: You can answer.
14    A. If you're asking if this 512,974.50, if
15 you knew exactly that's what it was, no. I signed
16 a letter based upon what I told -- I was told to
17 sign the letter. This was prepared, and execute
18 the document. In order to file the claim, execute
19 the documents and send them in. So I was signing
20 the letter.
21    Q. Okay. And you weren't asked to verify
22 the amount of money that was owed Tuscola
23 Furniture Group?
24    A. I was not asked to verify that.

Page 71

1    Q. Okay. Do you know -- or you knew at the
2 time you signed this letter that what the bank was
3 owed was $81,000 and some change, correct?
4        MS. BEYERS: Same objection to leading,
5 but you can answer.
6    A. Yeah. I knew the general amount.
7 Again, you know, because every day you've got
8 interest and others, so that amount changes daily.
9 But I knew in general it was somewhere the 81,000,
10 whatever that amount ended up being.
11    Q. Okay. Did you know how that fit into
12 what -- the number, $512,974.50?
13    A. I assumed it was part of it.
14    Q. Okay. You assumed that basically the
15 $81,000 and change that the bank was owed
16 basically fit into this $512,000 number?
17    A. Correct.
18    Q. Okay. Was that set out anywhere in
19 Exhibit A, to your recollection, or based on your
20 review of Exhibit A?
21    A. To my recollection, I -- well, I don't
22 recall.
23    Q. Okay. But looking at Exhibit A --
24    A. It doesn't appear to be in there.

Page 72

1    Q. Okay. Then going to paragraph 4 of
2 Exhibit 5, there's mention of an assignment dated
3 April 19, 1999 for $500,000 to Janko Financial
4 Group. Did you see that?
5    A. Uh-huh, yes.
6    Q. Or excuse me, I misspoke. There's --
7 there is mention of an April 19, 1999 assignment
8 in the amount of $500,000, correct? Do you see
9 that?
10    A. Correct.
11    Q. Did you have any knowledge of whether
12 that assignment existed or did not exist as of the
13 date you signed the letter?
14    A. No.
15    Q. Okay. There's mention of a
16 September 25, 2000 assignment in the amount of
17 $1.5 million. Did you have any knowledge as to
18 whether that assignment existed at the time that
19 you signed this letter?
20    A. No, I didn't.
21    Q. Okay. Those two assignments that I just
22 mentioned, the one for half million and the one
23 for 1.5 million, did you know that the bank did
24 not have assignments for those amounts?

Page 73

1        MS. BEYERS: Well, you're asking him if
2 the April 19th, 1999 assignment and the
3 September 25th, 2000 assignment that are
4 referenced here were not the bank's assignments?
5 I'm sorry, I object to the form of the question.
6 I didn't understand it. If you understand it,
7 Tom, I guess is the ...
8    A. I had no knowledge that either of those
9 assignments, the bank had an interest in.
10    Q. Okay. And did you know -- did you know
11 of only one assignment that the bank had an
12 interest in?
13    A. Yes.
14    Q. Okay. And that was the $1 million
15 assignment that's mentioned on here dated
16 January 11 of 2001?
17    A. I assume that date is correct. I'd have
18 to go back to the original assignment. The dollar
19 amount's right.
20    Q. You got it?
21    A. Yes, January 11th, 2001. Yes. That
22 would have been the assignment that we had
23 received.
24    Q. Okay. Did you have any knowledge of a

Page 74

1 $250,000 assignment that Tuscola Furniture Group
2 was given?
3   A. No.
4   Q. Okay. Let me run you through some
5 exhibits real quick. These are a little bit
6 duplication of what has already been gone through,
7 but I've marked them Plaintiff's Exhibit No. 1 and
8 so forth. So I'm going to go through them one at
9 a time.
10      I'm going to hand you what's been marked
11 Plaintiff's Exhibit No. 1. And just identify that
12 for the record, if you would.
13   A. **That was the fax that I sent to Mike,**
14 **Dick and Larry saying that we had received -- we**
15 **received the check and it had been deposited and**
16 **we took the funds that we were owed.**
17   Q. Okay. Do you know, there's a portion of
18 that where you talk about what your -- what the
19 bank is owed and you talk about interest. But
20 then you also talk about attorney fees. Do you
21 know what the attorney fees were related to?
22   A. **My recollection was the attorneys fees**
23 **were in relation to collecting the life insurance**
24 **assignment.**

Page 75

1   Q. Okay.
2   A. **So I assume they were paid to Rick**
3 **Heavner's office. But I don't remember**
4 **specifically. I think that was it.**
5   Q. Okay. So the $480 attorney fees was
6 associated -- from your recollection was
7 associated with the cost of preparing the claim
8 forms for the life insurance claim?
9   A. **Yeah, the -- what I would normally call**
10 **the cost of collecting the debt. But it was to**
11 **prepare the documentation for me to sign and send**
12 **on to get the life insurance to go ahead and pay**
13 **off the loan.**
14   Q. Okay. Let me take that back from you
15 and put it there. Then I'll hand you Plaintiff's
16 Exhibit No. 2 and ask if you remember this
17 document?
18   A. **Again, this looks like a copy of the**
19 **assignment verification that I had received.**
20      MS. BEYERS: Well, I guess I just
21 object. Is there a -- you asked him if he
22 recognized the document, and obviously he's saying
23 yes. And I guess I'd just object in that that's
24 the only question before him.

Page 76

1      MS. ROTHMANN: The question's answered.
2      MS. BEYERS: Yeah, the question's
3 answered.
4      MR. CROWDER: So you want to stop him
5 from saying anything further?
6 BY MR. CROWDER:
7   Q. Let me ask you this: With respect to
8 Plaintiff's Exhibit No. 2, there's some writing on
9 that document. Do you see that?
10   A. Yes.
11   Q. Do you recognize that writing or the
12 penmanship or that writing?
13   A. Yes.
14   Q. And whose is that?
15   A. It appears to be mine.
16   Q. Okay. And so explain -- well, let me
17 take it back from you real quick. Can you explain
18 why, if you remember, why you wrote on the
19 assignment verification?
20   A. **The top name is Rick Heavner's. I'm**
21 **assuming that was -- I mean, it's his address. So**
22 **as I have previously testified, we hired him to**
23 **file a claim for us. So I'm almost guessing that**
24 **was a sticky note. I can't tell by the copy.**

Page 77

1 **That there's a sticky note, that I sent this to**
2 **Rick Heavner's office to review so that he could**
3 **prepare the claim.**
4      **The bottom, I'm also guessing is a**
5 **sticky note. Appears to be the name of someone**
6 **and a phone number. And it says Old Line Life**
7 **Insurance. So at some point I either received a**
8 **call and this contact information for this**
9 **individual. I don't remember why.**
10   Q. Okay. Any contacts you had with Rick
11 Heavner, would they have all been after Jim
12 Stilwell's death, to your recollection?
13   A. Yes.
14   Q. Okay. I hand you Plaintiff's
15 Exhibit No. 3. We'll make this a two-page
16 exhibit, which is Bates stamped 100 and 101. Just
17 ask first for you to review that document and let
18 me know if you recall it.
19   A. (Reviewing) I recall this document,
20 yes.
21   Q. Okay. Explain, if you would, what that
22 document -- who that document's from and what he
23 was asking of you?
24   A. The document appears to be what I

Page 74 - Page 77

**Page 78**

1 received from John Lyons for the assignment where
2 he prepared the assignment and said this is what
3 Margaret needs to sign, have her sign it, send it
4 back to the company. Looks like he must have
5 included an envelope. So that's the document we
6 executed to receive the original assignment.
7    Q. Okay. So -- and do you recall the
8 events of calling John Lyons, getting him to send
9 you the assignment, and then later on having it
10 executed?
11    A. Not specifically. But I just remember
12 needing the assignment, talking to John about
13 getting the assignment, he prepared it, sent it to
14 us, we got it signed and sent in.
15    Q. Okay. And what about the actual process
16 of getting it signed by Margaret, would you have
17 met with Margaret, had her sign it? Do you
18 remember anything about that?
19    A. I -- what I recall, not with 100 percent
20 certainty, I believe she came in my office, signed
21 it in my office --
22    Q. Okay.
23    A. -- and sent it in.
24    Q. And that would have been at the First

**Page 79**

1 Mid --
2    A. First Mid Illinois Bank & Trust, yes.
3    Q. And then in Tuscola, Illinois?
4    A. Yes.
5    Q. Okay. Just so we get in order, this is
6 Plaintiff's Exhibit No. 4, and we've discussed
7 that document today already; is that correct?
8    A. Yes.
9    Q. And that's the May 12 letter that you
10 signed on the advice of counsel, correct?
11    A. Correct.
12    Q. Okay. And it's your belief that was
13 prepared by Mr. Heavner?
14    A. That is my belief.
15    Q. Okay. Plaintiff's Exhibit No. 5 is
16 Bates stamped 37 through 40, and again you've seen
17 this before today. That's the letter that's on
18 the Tuscola Furniture Group letterhead?
19    A. Yes, that's their letter.
20    Q. Okay. And you signed that letter, as
1 well, correct?
22    A. Yes, I did.
23        MS. BEYERS: And are we just -- I mean,
24 Exhibit 4 didn't have all the attachments to it.

**Page 80**

1 You just were asking him to look at the letter
2 portion of it; is that right, Jason?
3        MR. CROWDER: Right, I didn't --
4        MS. BEYERS: Yeah.
5 BY MR. CROWDER:
6    Q. This is one you hadn't seen before
7 today. Plaintiff's Exhibit No. 6 is pages 41 and
8 42 of the First Mid records they sent us. Do you
9 recall --
10        MR. CROWDER: And if you need to see
11 that before --
12        MS. BEYERS: She already asked him about
13 it.
14        MS. ROTHMANN: These are all --
15        MS. BEYERS: Uh-huh.
16 BY MR. CROWDER:
17    Q. Do you recall getting that document?
18        MS. BEYERS: I'd just object. Asked and
19 answered as he already testified concerning this
20 document.
21        MR. CROWDER: That's all right.
22    A. I don't recall receiving it, but I
23 assume I did, yeah.
24    Q. It was sent to you. It indicates it was

**Page 81**

1 sent to you --
2    A. Yes.
3    Q. -- by John Lyons, correct?
4    A. I have no reason to believe that I did
5 not receive it, yeah.
6    Q. And did he also -- do you recall the
7 claim form that he sent along with that?
8    A. I don't -- I don't recall it. Again, it
9 appears it was sent, though. I have no reason to
10 believe I didn't receive both.
11    Q. Okay. And it was -- was it after you
12 had contacted John Lyons that you had the
13 conversation with John Hedges?
14    A. I don't remember the exact timeframe,
15 because we're only talking two or three dates
16 almost four years ago. I don't remember the exact
17 when John was in my office and we chose. I
18 thought John and I chose to have Mr. Heavner's
19 office do the claim after my initial call to him,
20 which was either the day of, day after, which was
21 right after I found out Mr. Stilwell had passed
22 away, and then met with John Hedges and said let's
23 turn this over to counsel, have them figure out
24 what we need to do. And then I'm assuming I

Page 82

1 received that letter later. But I can't say with
2 certainty this is the exact timeframe.
3    Q.  Okay.  And just to clear that statement,
4 when you were saying that John was in your office,
5 that was John Hedges you're talking about?
6    A.  Hedges, yes.
7    Q.  Okay.  These were -- Plaintiff's
8 Exhibit No. 7, pages 43 through 45, these were
9 documents that were part of the First Mid file.
10 Just want to see if you have any recollection of
11 receiving those documents, as well?
12    A.  (Reviewing)
13        MS. BEYERS: I might have another copy.
14    A.  I mean, again, just with the previous
15 letter, I don't specifically remember these. But
16 they were addressed to me and I have no reason to
17 believe they weren't sent, that I didn't get a
18 copy.
19    Q.  Okay.  The letter, the second page is
20 basically a letter from John Lyons to Tuscola
21 Furniture Group; is that accurate?
22    A.  That's accurate.
23    Q.  Okay.  And as I understand then, what
24 would have happened then, Larry Bianchi would have

Page 83

1 just kept you in the loop by sending you what he
2 was sent by John Lyons?
3    A.  Yeah.
4    Q.  Now, this again, Plaintiff's
5 Exhibit No. 8 -- I'm sorry, I'll --
6        MS. ROTHMANN:  That's okay.
7    Q.  -- is another letter that was in the
8 First Mid file.  And I just want you to take a
9 look at it, see if you have any recollection of
10 reviewing it.  Plaintiff's Exhibit 8, page 46 of
11 the First Mid records.
12    A.  (Reviewing)  Okay.  It appears to be a
13 letter that again we were copied in on.
14    Q.  Okay.  And do you recall receiving that
15 record at this point?
16    A.  I can't -- again, I assume we received
17 it.  I was copied in on it.  If it was in the loan
18 file, I'm sure I did.  But again, there's nothing
19 in the letter that really has much concern on me
20 other than hey, we're filing -- you know, we're
21 going to file a claim.
22    Q.  Okay.  In the letter, and then it talks
23 about the $1 million of coverage was collaterally
24 assigned to Tuscola Furniture Group and its bank

Page 84

1 First Mid Illinois Bank & Trust by an assignment
2 dated January 11, 2001.  Do you see that portion
3 of the letter?
4    A.  I do.
5    Q.  Okay.  Now, again, this is just based on
6 your understanding.  You're not a lawyer.  But do
7 you have an understanding of whether that
8 statement is accurate?
9        MS. BEYERS: Well, again, I'd object in
10 that you're asking him for a legal conclusion.
11        MR. CROWDER: I'm asking him actually
12 for his understanding.
13    A.  Again, I don't remember the letter
14 particularly.  What I remember about the situation
15 is we had -- the bank had a $1 million life
16 insurance assignment.
17    Q.  So as you read that portion, that
18 sentence that I just pointed out, does that read
19 consistent with your understanding?
20    A.  Again, it reads consistent with our
21 consignment agreement and everything we had that
22 there was to be a $1 million life insurance
23 policy.  In looking at these documents, our name
24 is on the assignment.

Page 85

1    Q.  Okay.  So you would agree that the
2 collateral assignment itself only has First Mid's
3 name on it, correct?
4        MS. BEYERS: Objection to leading.
5    Q.  Correct?
6    A.  Yes.
7    Q.  Okay.  So the statement that $1 million
8 of coverage was collaterally assigned to Tuscola
9 Furniture Group and its bank First Mid Illinois
10 Bank & Trust by an assignment dated January 11,
11 2001 is inaccurate, correct?
12        MS. BEYERS: Well, again, objection to
13 leading.  He's asked and answered this question
14 already based on his understanding.
15        MR. CROWDER: You can answer.
16        MS. BEYERS: And you're also asking him
17 for a legal conclusion, as well.
18        MS. ROTHMANN: You can answer the
19 question.
20        MS. BEYERS: You can answer the
21 question.
22        MS. ROTHMANN: If you can answer the
23 question.
24        MS. BEYERS: Yeah, if you can answer the

Page 86

1  question.
2      MS. ROTHMANN: It's up to you. You
3  don't have to answer the question.
4      A.  All I know is, yeah, I can look at the
5  assignment you're showing me today and it shows
6  our name.  It does not show their name.
7      Q.  That will do.  I show you Plaintiff's
8  Exhibit No. 9.  Again a two-page document, pages
9  97 and 98.  Just have you review that real quick.
10     MS. ROTHMANN: You, Justin, don't want
11  him to get to his volleyball game?  Is that what's
12  going on?
13     MR. CROWDER:  What time is the
14  volleyball game?  I've been going 15 minutes.
15     A.  Okay.
16     Q.  Are you familiar with that document?
17     A.  This appears to be a document we
18  received.  And again, I'm assuming this is a
19  sticky note that at some point -- it looks like
20  it's dated September 5th of 2002.  We -- I made a
21  call to American General just to verify that the
22  policy was still in force.
23     Q.  Okay.  Do you recall why you did that at
24  that point in time?

Page 87

1      A.  No, other than just normal follow-up.  I
2  don't specifically remember a reason.  But it's
3  not abnormal to follow-up just to make sure things
4  are still in force.
5      Q.  And --
6      A.  No different than my call to Mr. Lyons
7  when he passed away.  I want to make sure that
8  it's still in force.
9      Q.  Okay.  I'm just wondering if there was
10  any specific event that resulted in you hey, I'm
11  going to double check?
12     A.  I don't recall anything, no.
13     Q.  And that's your handwriting and your
14  initials?
15     A.  That is correct.
16     Q.  Okay.
17     MS. BEYERS: And we're talking about the
18  handwritten note in the corner, down in the right?
19     THE WITNESS:  Yes.
20     MS. BEYERS: Is that the right-hand
   corner?
22     THE WITNESS:  Lower right-hand corner.
23     MS. BEYERS: I think it is.
24  BY MR. CROWDER:

Page 88

1      Q.  This is out of order.  Plaintiff's
2  Exhibit No. 11, documents 128 through 130, can you
3  identify what those documents pertain to?
4      A.  This appears to be a statement printed
5  off of First Mid's system showing the principal
6  balance of the loan and then a history of activity
7  on the loan.
8      Q.  Okay.  And is that something that would
9  be a part of the First Mid file?  Or is that
10  something that would have been generated at the
11  request of somebody, to your knowledge?
12     A.  It would be something, part of their
13  file.  I don't know.  You know, we pulled it that
14  day, that point in time for some reason.  I don't
15  recall why.
16     Q.  Do you remember, can you tell what day
17  this was pulled?
18     A.  It appears this was pulled, if the
19  system date was correct, on May 7th of 2003.
20     Q.  Okay.  So that would have been shortly
21  after Mr. Stilwell's death?
22     A.  Yes.
23     Q.  Okay.
24     A.  Yeah, I think his death was early in

Page 89

1  May.
2      Q.  And so would this -- would the
3  information about the loan balance of $81,000 and
4  change have been communicated to Mr. Heavner, to
5  your knowledge?
6      MS. BEYERS: Well, again, I'm not going
7  to let him answer that.  That's attorney-client
8  privilege.  You can't answer that.  I mean, I'm
9  instructing him not to answer because that's
10  attorney-client privilege.
11     MR. CROWDER:  Okay.  That's fine.
12  BY MR. CROWDER:
13     Q.  One more document, Plaintiff's
14  Exhibit No. 12.  This is a document from American
15  General to you dated June 10 of 2003.
16     A.  Okay.
17     MS. BEYERS: It's hard when you're just
18  looking at the -- haven't looked at the documents
19  in a while.  Okay.
20     A.  Okay.
21     Q.  And do you have a recollection of
22  receiving that document?
23     A.  Again, I assume that I did.  I don't --
24  I can't remember.  Again, if it's in the file, I'm

## Page 90

1 sure I did. But ...

2    Q. Would you -- anything you got from

3 American General, did you pass it on to your

4 attorneys?

5    A. Yes.

6    Q. Okay. And do you have any recollection

7 of whether you would have passed that on to your

8 attorney?

9    **A. I would assume that I had passed that on**

10 **to our attorneys.**

11    Q. Okay. I'm going to -- just for the

12 record, I'm not going to use Plaintiff's

13 Exhibit No. 10, so that when that exhibit's not in

14 there we don't think it's misplaced. So we will

15 just go from 11 and 12.

16      Then you had mentioned --

17    MR. CROWDER: What's the problem?

18    MS. ROTHMANN: No, I'm just -- we've got

19 all these different exhibits that are all kind of

20 the same thing. That one was the one that I

21 marked.

22    MR. CROWDER: I think I marked them

23 both.

24    MS. ROTHMANN: So we've got a set of

## Page 91

1 Chamberlain's exhibits and a set of Plaintiff's

2 exhibits.

3    MS. BEYERS: Yeah, that's two sets.

4 BY MR. CROWDER:

5    Q. The inventory that you talked about, you

6 would -- kind of explained -- you explained the

7 inventory, that you would go over and double

8 check, make sure that the inventory that was

9 supposed to be there was there; is that correct?

10    **A. I wouldn't. We had hired another**

11 **company to do it.**

12    Q. And do you recall how often they did

13 that?

14    **A. I believe it was monthly.**

15    Q. All right. Did you receive then any

16 type of record from that company as to what the

17 inventory was?

18    **A. Yeah. If I recall correctly, we would**

19 **receive a fax that said here's what the inventory**

20 **level is.**

21    Q. Do you know what you would do with those

22 faxes?

23    **A. No, I don't. I don't recall what we did**

24 **with those faxes. I would assume we would keep**

## Page 92

1 them for a while and then pitch them.

2    Q. At some point in time -- I don't think

3 you put a date on it -- there was becoming a

4 problem with the inventory not matching, correct?

5    **A. Correct.**

6    Q. Do you recall at what point in time

7 after this loan closed that that occurred?

8    **A. No. No, I don't. I don't recall.**

9    Q. All right. And then, of course, when

10 you got the fax from your company, you would have

11 taken some action on it?

12    **A. Yes. We would receive the fax and just**

13 **double check it versus the loan balance and make**

14 **sure we were, as I said, in trust.**

15    Q. Okay. Do you recall the inventory --

16 the company that did the inventory?

17    **A. I think their name was Cherub.**

18    Q. Out of --

19    **A. I think out of Atwood. But I think it**

20 **was C-H-E-R-U-B. It was an odd name.**

21    Q. Okay. But in terms of seeing those

22 documents, those inventory sheets from Cherub, you

23 don't recall having seen those recently?

24    **A. No.**

## Page 93

1    Q. Okay. Did those come directly to you?

2    **A. They were faxed to First Mid and then**

3 **would usually come to my attention.**

4    Q. All right. And then would you

5 physically put those in the loan file or have

6 somebody else do that?

7    **A. I don't recall.**

8    Q. Did you have a practice of then faxing

9 that on to Tuscola Furniture Group?

10    **A. I believe we had a -- that's -- yeah, we**

11 **would fax on saying here's the reduction that we**

12 **need. It was either a fax or a phone call.**

13    Q. But on a -- as a practice, when you got

14 the inventory numbers, would you pass those on to

15 Tuscola Furniture Group? Or only when the

16 problems started showing up?

17    **A. You know, I don't recall. I'm not sure**

18 **they didn't fax those to both parties.**

19    Q. All right.

20    **A. You know, the parties would come in.**

21 **Because what I -- if I recall correctly, there was**

22 **never really a surprise when I called and said we**

23 **need a check. And that's why we did business with**

24 **Tuscola Furniture Group or Janko Financial Group,**

Page 94

1  why we did this whole process in the beginning,
2  they would write us a check. That's who we were
3  loaning to. So even though there was a problem, I
4  never had a problem with them. They always did as
5  they had agreed to do.
6      Q. All right. And at the time -- and
7  essentially the money was owed by Tuscola
8  Furniture Group?
9      A. Yes.
10     Q. I want to make sure with respect to the
11 claim for life insurance monies, did you ever have
12 any conversations with Larry Bianchi regarding the
13 joint claim for life insurance monies?
14     A. I had conversations with Larry Bianchi.
15        MS. BEYERS: And I just object to him
16 making -- because he's going to go ahead and
17 answer a question you haven't asked. So I just
18 object to him talking about any statements on the
19 basis of hearsay.
20        MR. CROWDER: Yeah, I gotcha.
21     A. We had conversations. But if you're
22 asking on the joint claim, I -- it goes back to I
23 don't know when I found out we were doing a joint
24 claim. I assume it was from our attorney. But

Page 95

1  there may have been conversations with Larry,
2  just, you know, this claim's being filed. I mean,
3  the two letters had to be put together to deliver
4  to John Lyons, so obviously I had a conversation
5  with him saying we've got to get these two --
6  we've got to get the signatures together so we can
7  submit this claim.
8      Q. Right. I guess was there ever any
9  conversations that came up between Larry and you
10 or Tim Howard and you, somebody from Tuscola
11 Furniture Group and you that hey, Tuscola
12 Furniture Group could be in a bad position with
13 respect to this claim and we might not get paid
14 out?
15     A. No, no. I had no -- during the whole
16 process, had no reason to believe there was an
17 issue with the filing of the claim.
18     Q. Okay. Larry Bianchi mention to you,
19 I think you said, that he was being contacted by
20 American General for further documentation; is
ι  that right?
22     A. That came from the letter that I had
23 received.
24     Q. That's how you figured that out?

Page 96

1      A. I mean, that's the only thing I -- you
2  know, that's in the file. Larry may have
3  mentioned that in a conversation. I can't
4  remember.
5      Q. Okay.
6      A. I just don't have a recollection.
7      Q. Okay. What documents did you -- what
8  documents would you have reviewed in preparation
9  for your deposition then, if any?
10     A. The only thing that I saw were some
11 documents. Basically these documents.
12     Q. Okay.
13        MS. BEYERS: Off the record.
14        (Whereupon discussion was held off the
15 record.)
16 BY MR. CROWDER:
17     Q. Can you expound on that?
18     A. Can I answer as to the extent of when I
19 got to look at those?
20     Q. I'll ask you. I'll ask you. When did
21 you have an opportunity to review what would have
22 been documents 1 through 202, if --
23        MS. BEYERS: 203.
24     Q. 203.

Page 97

1      A. And I don't know if it was inclusive.
2  It was for an hour yesterday when she and I met.
3  I had not seen those documents since basically the
4  file was put away after the claim was paid. And I
5  subsequently left employment, so it's been --
6      Q. Some time?
7      A. -- years since I've seen them, except
8  for yesterday.
9      Q. One thing I wanted to be clear on, your
10 transfer from Tuscola to Champaign, when was that
11 date again?
12     A. That was in the fall of I believe it was
13 2002.
14     Q. Okay. And so any of the work that you
15 would have done on the claim would have been from
16 the Champaign office?
17     A. From the Champaign office.
18        MR. CROWDER: All right. That's all I
19 have for you.
20        FURTHER EXAMINATION
21 BY MS. ROTHMANN:
22     Q. I've got one or two follow-up. Counsel
23 put a document in front of you.
24        MS. ROTHMANN: Can I look at these?

Page 98

1    MR. CROWDER: Sure.
2 BY MS. ROTHMANN:
3    Q.  Put a document in front of you.  I think
4 it was Exhibit 8, and it was a letter to a
5 Mr. Brock, Broch?
6    MR. CROWDER: Broch, I think.
7    A.  Broch, I believe is how it's pronounced.
8    Q.  Maybe I can do this.  Bear with me.
9    MR. CROWDER: Do you want me to pull it
10 out for you?
11    MS. ROTHMANN: Then I'd be giving up.
12 I'm almost there.  Here it is.
13    Q.  Document to Mr. Broch.  Was that a
14 document that you were cc:'ed on?
15    A.  It was a document First Mid was cc:'ed?
16    Q.  Would that have come to your attention?
17    A.  I don't -- it would have come to First
18 Mid's attention.  But I can't tell you if it came
19 to my office in Champaign.
20    Q.  Okay.
21    A.  And I sent it back for a file.  I can't
22 tell you if it was a letter that was sent to the
23 Tuscola office and was put in the loan file there.
24 I'm assuming it would have come to my attention.

Page 99

1    Q.  Okay.  It's a letter to a Mr. Broch?
2    A.  Broch.
3    Q.  Broch.  It was your understanding that
4 Mr. Broch was representing Plaintiff Margaret
5 Stilwell; is that right?
6    A.  Yes.
7    Q.  Okay.  And --
8    A.  I should say that was my assumption.
9    Q.  Okay.  And that was your assumption
10 because you had prior dealings with Mr. Broch in
11 that capacity with respect to the consignment
12 agreement; is that right?
13    A.  As far as I knew, Mr. Broch was always
14 Mr. Stilwell's attorney.
15    Q.  Okay.  And in this letter, the content
16 of this letter -- and I'm just going to
17 paraphrase -- is just to say -- it says, you know,
18 we express our condolences for the untimely death
19 of Mr. Stilwell.  Pursuant to the consignment
20 agreement, we will seek satisfaction of our claim
21 against your client Amishland Country Village,
22 Inc. from the proceeds of the life insurance
23 policy on the life of Mr. Stilwell.  $1 million of
24 coverage was collaterally assigned to Tuscola

Page 100

1 Furniture Group -- I'm jumping down, I'm sorry --
2 Tuscola Furniture Group, LLC and its bank First
3 Mid Illinois Bank & Trust by an assignment dated
4 January 11, 2001, right?
5    A.  (Nods head)
6    MR. CROWDER: Did you get an answer to
7 that?
8 BY MS. ROTHMANN:
9    Q.  Is that what says?
10    A.  That is what it says.
11    MS. BEYERS: I just object.
12    MS. ROTHMANN: I felt compelled to do
13 that.
14    MS. BEYERS: The document speaks for
15 itself.  That's my objection.
16 BY MS. ROTHMANN:
17    Q.  The document speaks for itself, correct?
18    A.  Yes.
19    Q.  You wouldn't be surprised that Mr. Broch
20 would receive a letter like this, would you?
21    A.  No, I wouldn't be surprised.
22    Q.  And you wouldn't be surprised that
23 Mr. Howard, who is representing Tuscola Furniture
24 Group, was advising Mr. Broch what their intention

Page 101

1 was with respect to the life insurance; is that
2 right?
3    A.  I would not be surprised to that, no.
4    MS. ROTHMANN: Okay.  That's all I've
5 got.
6    EXAMINATION
7 BY MS. BEYERS:
8    Q.  I just have a few follow-up questions.
9 And I don't have any documents, you'll all be
10 happy to know.
11    MS. ROTHMANN: What, you don't have a
12 First Mid set of documents?
13    MS. BEYERS: I think these actually did
14 originate with me.
15    MS. ROTHMANN: Yeah, they did.
16 BY MS. BEYERS:
17    Q.  I'd like to show you, Mr. Chamberlain,
18 what's been marked as -- I believe it's
19 Plaintiff's [sic] Exhibit No. 7.  And you've
20 previously identified that as a letter that
21 Mr. Bianchi authored that was directed to Ray
22 Sawicki at American General; is that correct?
23    A.  That's correct.
24    MR. CROWDER: Before you go on, identify

Page 102

1 that as Chamberlain No. 7 versus Plaintiff's
2 No. 7.
3      MS. BEYERS: Oh, sorry, Chamberlain
4 No. 7.
5      MR. CROWDER: Sorry about that. Just so
6 it's clear.
7      MS. BEYERS: That's okay. No problem.
8 BY MS. ROTHMANN:
9    Q. Mr. Chamberlain, you did not author this
10 document, correct?
11   A. No, I didn't.
12   Q. You didn't have anything to do with
13 drafting the document; is that correct?
14   A. That's correct.
15   Q. This was apparently authored by
16 Mr. Bianchi, and you just received a copy of it at
17 the same time that he would have sent it off to
18 Mr. Sawicki; is that correct?
19   A. That's correct.
20   Q. And you may have had a conversation with
21 Mr. Bianchi wherein he indicated to you that the
22 insurance company was requesting additional
23 information from him, and he was providing that
24 information to the insurance company; is that

Page 103

1 correct?
2    A. That's correct.
3    Q. But he wouldn't have shared with you any
4 specifics; just that he was taking care of
5 whatever other information was needed; is that
6 correct?
7    A. That's correct.
8    Q. And to your knowledge, you didn't ever
9 get any sort of letter or correspondence from Ray
10 Sawicki or from anybody else at American General
11 requesting any additional information from First
12 Mid in order to complete their determination
13 concerning the claim; is that correct?
14   A. I don't recall any, no.
15   Q. Okay. And when you submitted the joint
16 claim, you also believe that American General
17 would review it, ask questions if they needed to
18 ask questions, and then make their own
19 determination as to whether or not the claim
20 should be paid; is that correct?
1    A. That's correct.
22     MR. CROWDER: I'll object to the form.
23 BY MS. BEYERS:
24   Q. And you said that you don't have any

Page 104

1 reason to believe that you did not get this
2 June 11th, 2003 correspondence; is that correct?
3    A. That's correct.
4    Q. And you don't have any reason to believe
5 as you sit here today that anything that
6 Mr. Bianchi stated in this letter is incorrect; is
7 that correct?
8    A. Again, the only thing I can make
9 statements on is where I'm involved. If I'm not
10 involved in it, you know, I have no reason to
11 believe it's incorrect. But at the same -- to be
12 honest, I have no reason to believe it is correct.
13 That's the statements he made.
14   Q. Sure. And you would have no reason to
15 doubt Mr. Bianchi's statements as to anything that
16 pertained to TFG; is that correct?
17   A. That's correct.
18   Q. Okay. Turning to Chamberlain Exhibit
19 No. 5, which is the May 12th, 2003 letter that
20 bears your signature, Mr. Crowder was asking you
21 about the figure of $512,974.50. And I just want
22 to ask you when that was filled in, did you have
23 the attachment that was -- that's Bates stamped
24 number 22?

Page 105

1    A. I believe I did.
2    Q. Okay. And that would have verified the
3 figure of --
4    A. That's where that number would have come
5 from.
6    Q. Okay. From this document that's number
7 22, correct?
8    A. Yes.
9    Q. And as far as the information contained
10 in the last paragraph on the first page of that
11 letter, it was your understanding that all of that
12 information had been verified?
13   A. Yes.
14   Q. Okay.
15     MR. CROWDER: Show the same -- show an
16 objection to the form of the question.
17     MS. BEYERS: Okay. I don't have any
18 other questions.
19     MS. ROTHMANN: I'm done.
20     FURTHER EXAMINATION
21 BY MR. CROWDER:
22   Q. Who was it verified by?
23   A. Who was what verified by?
24   Q. You just answered a question saying that

Page 102 - Page 105

## Page 106

1 it was your understanding that all that
2 information with respect to the assignments had
3 been verified.
4    A.  My assumption is that, again, I was
5 signing a letter as prepared by counsel.  So I'm
6 assuming they had no problem with it.
7    Q.  Okay.  But who --
8    A.  I had no reason to question why counsel
9 would ask me to sign this.
10    Q.  My -- what you just answered a question
11 to was you said that it had been verified.
12       MS. BEYERS:  Well, I said --
13    Q.  You assumed it had been verified; is
14 that accurate?
15       MS. BEYERS:  I object, I think the
16 question I asked him was you assumed it had been
17 verified.
18       MR. CROWDER:  Okay.
19 BY MR. CROWDER:
20    Q.  And you said yes; is that correct?
21    A.  Yes, I did say yes.
22    Q.  And who did you assume it had been
23 verified by?
24    A.  I guess the proper answer was I don't

## Page 107

1 know that it was verified by anybody.  I assumed
2 it was a correct statement.  But I can't -- I
3 cannot say that I -- you know, I assumed
4 somebody verified everything in the letter.  I
5 assumed what I was signing was a correct
6 statement; otherwise counsel wouldn't have given
7 it me to sign.
8       MR. CROWDER:  Okay.  That's all I have.
9       MS. BEYERS:  I don't have any further
10 questions.
11       MS. ROTHMANN:  I'm done.
12       THE COURT REPORTER:  Signature?
13       MS. BEYERS:  We'll reserve signature.
14       (Whereupon the deposition concluded at
15 4:56 P.M.)
16
17
18
19
20
21
22
23
24

## Page 108

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE CENTRAL DISTRICT OF ILLINOIS
                              URBANA DIVISION

 3 MARGARET J. STILWELL, et al.
              Plaintiffs,
 4
 5           -vs-              No. 05 CV 02160

 6 AMERICAN GENERAL LIFE INSURANCE
   COMPANY,
              Defendant.
 7 ------------------------------
   AMERICAN GENERAL LIFE INSURANCE
 8 COMPANY,
              Third Party Plaintiff,
 9
             -vs-
10
   FIRST MID ILLINOIS BANK & TRUST,
11 et al.    Third Party Defendants.

12       This is to certify that I have read the
         transcript of my deposition taken in the
13 above-entitled cause, and that the foregoing
   transcript taken on February 8, 2007, accurately
14 states the questions asked and the answers given
   by me, with the exception of the corrections
15 noted, if any, on the attached errata sheet(s).

16

17

18              THOMAS J. CHAMBERLAIN

   Subscribed and Sworn before
19 me this       day of
                     , 2007.
20

21
   Notary Public
22
              Return to:
23            Area Wide Reporting Service
              301 West White Street
24            Champaign, Illinois  61820
```

## Page 109

```
 1 STATE OF ILLINOIS    )
                        ) SS
 2 COUNTY OF McLEAN     )

 3
      I, SHELLEY MARVIN, CRR, RPR, and CSR in and
 4 for the State of Illinois, do hereby certify that
   THOMAS J. CHAMBERLAIN, the deponent herein, was by
 5 me first duly sworn to tell the truth, the whole
   truth and nothing but the truth, in the
 6 aforementioned cause of action.

 7      That the foregoing deposition was taken on
   behalf of the Defendant, on the 8th day of
 8 February, 2007.

 9      That said deposition was taken down in
   stenograph notes, afterwards reduced to
10 typewriting by me, and is a true and accurate
   transcription of the testimony; and that it was
11 agreed by and between the witness and attorneys
   that said signature on said deposition would not
12 be waived.

13      I do hereby certify that I am a disinterested
   person in this cause of action; that I am not a
14 relative of any party or any attorney of record in
   this cause, or an attorney for any party herein,
15 or otherwise interested in the event of this
   action, and am not in the employ of the attorneys
16 for either party.

17      IN WITNESS WHEREOF, I have hereunto set my
   hand this 13th day of February, 2007.
18

19

20

21

22        SHELLEY MARVIN, RPR, CRR, CSR

23

24
```

**-$-**

**$1** [10] 27:3,8,11,16 73:14 83:23 84:15,22 85:7 99:23
**$1,000** [1] 9:11
**$1.25** [3] 25:5 26:17 27:20
**$1.5** [1] 72:17
**$250,000** [1] 74:1
**$480** [1] 75:5
**$500,000** [2] 72:3,8
**$512,000** [1] 71:16
**$512,974.50** [4] 63:15 69:19 71:12 104:21
**$800,000** [1] 36:9
**$81,000** [3] 71:3,15 89:3
**$81,660.30** [1] 64:17

**-'-**

**'86** [1] 10:12
**'93** [1] 10:12
**'ed** [2] 98:14,15
**'til** [1] 8:14

**---**

**-vs** [4] 1:5,10 108:4,9

**-0-**

**000019** [1] 46:7
**000137** [1] 15:13
**00143** [1] 20:4
**02160** [1] 1:5 108:4
**05** [2] 1:5 108:4

**-1-**

**1** [9] 2:22 3:6 15:7,11 23:7,8 74:7,11 96:22
**1.25** [1] 31:18
**1.5** [1] 72:23
**10** [3] 3:15 89:15 90:13
**100** [2] 77:16 78:19
**101** [2] 2:18 77:16
**105** [1] 2:19
**11** [7] 3:16 73:16 84:2 85:10 88:2 90:15 100:4
**1101** [1] 2:2
**111** [1] 2:5
**11th** [3] 56:6 73:21 104:2
**12** [5] 3:17 50:10 79:9 89:14 90:15
**120** [1] 2:9
**128** [1] 88:2
  **2th** [3] 46:11 61:10 104:19
**130** [1] 88:2
**1304** [1] 18:18

**137** [1] 17:11
**138** [2] 15:14 17:19
**139** [1] 15:14 17:20
**13th** [3] 53:8,9 109:17
**140** [2] 15:14 18:5
**141** [1] 15:14 19:1
**142** [2] 15:14 19:22
**143** [1] 15:14
**15** [2] 2:22 86:14
**16** [1] 33:18
**17th** [1] 15:21
**19** [2] 72:3,7
**1986** [2] 8:14 9:24
**1999** [4] 33:18 72:3,7 73:2
**19th** [1] 73:2

**-2-**

**2** [9] 2:23 3:7 20:16,20 20:20 23:9 69:17 75:16 76:8
**20** [2] 2:23 46:16
**200** [1] 2:5
**2000** [8] 11:11 15:23 15:24 22:14 60:15,18 72:16 73:3
**2001** [5] 73:16,21 84:2 85:11 100:4
**2002** [4] 10:15,17 86:20 97:13
**2003** [12] 39:2 40:24 41:16 46:11 50:10 53:6 56:6 64:12 88:19 89:15 104:2,19
**2004** [3] 8:7,14 9:24
**2007** [5] 1:19 108:13 108:19 109:8,17
**202** [1] 96:22
**203** [2] 96:23,24
**21** [2] 9:9 61:13
**22** [1] 104:24 105:7
**25** [3] 46:7 54:16 72:16
**25th** [1] 73:3
**26** [1] 63:12
**2:57** [1] 4:2
**2nd** [2] 39:2 41:8

**-3-**

**3** [7] 2:24 3:8 32:13,17 64:2,3 77:15
**3.11** [1] 25:9
**3.8** [1] 24:13
**3.9** [1] 24:23
**301** [2] 1:18 108:23
**31st** [1] 53:6
**32** [1] 2:24
**34** [2] 3:1 7:7
**35** [1] 53:5
**37** [1] 79:16
**3:00** [1] 1:18

**3rd** [1] 64:12

**-4-**

**4** [10] 2:15 3:1,9 24:13 33:24 34:4 64:2 72:1 79:6,24
**40** [1] 79:16
**41** [7] 40:17,18,18,19 40:19,22 80:7
**42** [3] 40:19,23 80:8
**43** [1] 82:8
**45** [1] 82:8
**46** [2] 3:2 83:10
**4:11** [1] 68:20
**4:14** [1] 68:20
**4:56** [1] 107:15

**-5-**

**5** [15] 3:2,10 46:2,6 53:14,14,15,17,18 61:9 68:16,24 72:2 79:15 104:19
**50** [1] 3:3
**512,974.50** [1] 70:14
**56** [1] 3:4
**5th** [1] 86:20

**-6-**

**6** [8] 3:3,11 40:24 41:16 50:6,10 53:24 80:7
**6.3** [1] 25:15
**6.4** [4] 26:15 27:9,9,19
**60602-2412** [1] 2:9
**61820** [1] 108:24
**61832** [1] 7:8
**61938** [1] 2:3
**62523** [1] 2:6
**63** [1] 3:5
**68** [1] 2:16

**-7-**

**7** [12] 3:4,12 56:1,4 59:1 64:2,12 82:8 101:19 102:1,2,4
**74** [1] 3:6
**75** [1] 3:7
**77** [1] 3:8
**79** [2] 3:9,10
**7th** [1] 88:19

**-8-**

**8** [9] 3:5,13 25:14 63:8 63:11 83:5,10 98:4 108:13
**80** [2] 3:11 36:4
**81,000** [1] 71:9
**82** [1] 3:12
**83** [1] 3:13
**84-003926** [1] 1:20
**86** [1] 3:14

**88** [1] 3:16
**89** [1] 3:17
**8th** [2] 1:18 109:7

**-9-**

**9** [3] 3:14 86:8
**97** [2] 2:17 86:9
**98** [1] 86:9

**-A-**

**able** [2] 38:16 62:11
**abnormal** [2] 52:16 87:3
**above-entitled** [1] 108:13
**acceptable** [1] 25:12
**accordance** [1] 4:17
**account** [9] 9:1 11:16 58:14 64:19 65:9,23 65:23 66:3,3
**accounting** [1] 25:11
**accuracy** [1] 69:13
**accurate** [15] 48:16,18 48:20 49:8 59:16 60:4 61:4 62:12,16 69:6 82:21,22 84:8 106:14 109:10
**accurately** [1] 108:13
**acknowledgment** [1] 66:17
**acquainted** [1] 13:18
**Act** [3] 28:16,18 42:14
**acting** [1] 22:2
**action** [4] 92:11 109:6 109:13,15
**actions** [1] 24:6
**activity** [1] 88:6
**actual** [1] 78:15
**ACV** [14] 19:10,11 21:2 24:6,17 25:3,10 35:5 36:15 37:8,13 38:1,23 43:7
**ACV's** [1] 21:15
**add** [1] 24:18
**additional** [4] 24:20 57:12 102:22 103:11
**address** [4] 7:6 18:18 46:20 76:21
**addressed** [1] 82:16
**addresses** [3] 18:11 18:14,14
**advance** [1] 36:4
**advances** [1] 35:20
**advice** [4] 48:12,22 70:5 79:10
**advising** [1] 100:24
**aforementioned** [1] 109:6
**afterwards** [1] 109:9
**again** [42] 12:10 23:1 25:10 26:18 36:3 41:19 41:21 43:12 45:6,19

**46:22 47:18 55:10 57:7 59:20 60:20 66:6 67:6 67:22 68:16 71:7 75:18 79:16 81:8 82:14 83:4 83:13,16,18 84:5,9,13 84:20 85:12 86:8,18 89:6,23,24 97:11 104:8 106:4
**against** [2] 38:22 99:21
**age** [1] 1:17
**agent** [4] 28:7 29:21 30:21 39:18
**ago** [4] 29:13 34:13 40:15 81:16
**agree** [3] 24:5 39:2 85:1
**agreed** [2] 94:5 109:11
**agreement** [35] 4:16 15:4,20 16:8,21 17:12 17:21 18:6 19:3,13,15 19:17,19 20:9,21 21:1 23:10,14 24:5 25:15 27:6 31:18 33:16,17 47:24 48:1,5 52:2,4,5 52:22 60:13 84:21 99:12,20
**agreements** [3] 17:24 21:9 60:10
**ahead** [5] 45:8 55:12 58:10 75:12 94:16
**ahold** [2] 7:12,13
**al** [2] 108:3,11
**allow** [1] 16:13
**almost** [4] 38:19 76:23 81:16 98:12
**along** [3] 30:6 81:7
**always** [6] 14:15 28:5 35:14 37:5 94:4 99:13
**American** [28] 1:6,8 2:11 6:14 56:7 57:21 58:2,12,14 61:19 63:1 63:13,22 66:23,23 67:10,20 68:3,8 86:21 89:14 90:3 95:20 101:22 103:10,16 108:5 108:7
**Amishland** [14] 16:6 16:18 19:5,10 35:11 37:22,23,24 38:1,3,6 69:18 70:8 99:21
**amount** [10] 25:4 26:16 27:15 69:18 70:22 71:6 71:8,10 72:8,16
**amount's** [1] 73:19
**amounts** [1] 72:24
**answer** [31] 5:12,20 20:14 26:2,5 28:15,19 33:6,8 38:8 43:14 60:19 67:5,15,17 70:3 70:13 71:5 85:15,18 85:20,22,24 86:3 89:7 89:8,9 94:17 96:18 100:6 106:24
**answer's** [1] 24:10
**answered** [7] 5:22 76:1 76:3 80:19 85:13 105:24 106:10

answering [1] 5:8
answers [1] 108:14
apologize [1] 5:5
  ppear [3] 17:20 50:16
  71:24
APPEARANCES [1]
  2:1
Appearing [3] 2:4,7
  2:10
apply [1] 64:22
appreciate [1] 58:23
April [4] 33:18 72:3,7
  73:2
Area [2] 1:17 108:23
arrangements [1]
  66:10
arrived [1] 65:11
assigned [3] 83:24 85:8
  99:24
assignment [52] 27:2
  27:8,24 28:9 29:9
  31:16 32:18,20 33:1
  33:11,14 34:6,15,19
  35:4 39:16,19 40:2,5
  40:10 41:13 43:4 47:9
  47:23 72:2,7,12,16,18
  73:2,3,11,15,18,22
  74:1,24 75:19 76:19
  78:1,2,6,9,12,13 84:1
  84:16,24 85:2,10 86:5
  100:3
assignments [6] 34:15
  72:21,24 73:4,9 106:2
  assisted [1] 9:2
associated [2] 75:6,7
ASSOCIATES [1]
  2:2
Association [1] 8:4
assume [15] 5:20 12:6
  25:22 41:12,12 62:7
  73:17 75:2 80:23 83:16
  89:23 90:9 91:24 94:24
  106:22
assumed [10] 22:10
  52:17 62:15 71:13,14
  106:13,16 107:1,3,5
assuming [7] 9:23
  65:10 76:21 81:24
  86:18 98:24 106:6
assumption [3] 99:8
  99:9 106:4
attached [5] 53:19
  61:11,22 64:1 108:15
attachment [1] 104:23
attachments [1] 79:24
attention [5] 63:14
  93:3 98:16,18,24
attesting [1] 69:22
attorney [16] 21:14,15
  21:21 23:3 29:15 45:10
  45:11,12 74:20,21 75:5
  90:8 94:24 99:14
  109:14,14
attorney-client [2]
  89:7,10

attorneys [8] 45:13
  47:16 52:15 74:22 90:4
  90:10 109:11,15
Atwood [1] 92:19
author [1] 102:9
authored [2] 101:21
  102:15
Avenue [1] 2:2
aware [5] 30:4 35:5
  37:7,14,21
away [12] 39:1,8,10,11
  39:16,18 41:7,8 43:1
  81:22 87:7 97:4

-B-

background [1] 7:3
backing [1] 17:2
bad [2] 5:2 95:12
balance [6] 40:4 64:17
  64:18 65:3,22 88:6
  89:3 92:13
bank [52] 1:11 2:7 6:20
  6:21,23 8:12 9:10
  13:22 15:19 16:19
  17:12 18:6 23:14,15
  24:7,19 25:6,10,12
  26:17 27:2,8,21 29:12
  32:22 33:20 44:14
  45:22 47:2 49:19,23
  50:3 52:24 62:22 63:19
  65:10,15 71:2,15 72:23
  73:9,11 74:19 79:2
  83:24 84:1,15 85:9,10
  100:2,3 108:10
bank's [4] 31:20 51:10
  65:7 73:4
bank-prepared [1]
  21:12
based [9] 48:12,17,21
  62:16 70:5,16 71:19
  84:5 85:14
basis [1] 94:19
Bates [12] 15:13 40:19
  40:22 46:7,53:5 61:12
  64:2,2,11 77:16 79:16
  104:23
Bear [1] 98:8
bears [1] 104:20
became [2] 10:16 11:9
become [1] 35:5
becoming [1] 92:3
beginning [1] 94:1
behalf [9] 2:4,7,10 19:5
  24:7 47:2 65:6,15
  109:7
behind [1] 44:15
belief [3] 16:22 79:12
  79:14
beneficiaries [2]
  26:18 27:21
beneficiary [1] 25:6
benefits [1] 63:17
best [1] 38:3
better [3] 8:16 35:9
  40:2

between [8] 6:19 14:14
  17:12 18:6 19:4 21:1
  95:9 109:11
Beyers [67] 2:5,6,18
  6:21 7:9,13 19:21,24
  26:1 29:20 34:21 38:7
  40:17 41:10,19 42:8
  42:15,17 43:12 44:8
  45:6 47:18 55:10 63:6
  67:2,13,22 69:23 70:11
  71:4 73:1 75:20 76:2
  79:23 80:4,12,15,18
  82:13 84:9 85:4,12,16
  85:20,24 87:17,20,23
  89:6,17 91:3 94:15
  96:13,23 100:11,14
  101:7,13,16 102:3,7
  103:23 105:17 106:12
  106:15 107:9,13
Bianchi [17] 3:13 44:22
  47:10 50:11 53:10,21
  56:8,21 57:2 82:24
  94:12,14 95:18 101:21
  102:16,21 104:6
Bianchi's [1] 104:15
bigger [1] 37:5
bit [2] 7:3 74:5
blah-blah-blah [1]
  64:18
books [1] 11:17
boss [3] 11:12 13:20
  44:7
bottom [4] 19:22 46:21
  61:16 77:4
Boulevard [1] 18:18
box [1] 51:6
branch [1] 44:14
brand [1] 43:23
break [5] 6:1,2 10:8
  68:18,20
bring [1] 18:21
Broadway [1] 2:2
Broch [15] 29:15 51:13
  51:22 98:5,6,7,13 99:1
  99:2,3,4,10,13 100:19
  100:24
Brock [1] 98:5
bucks [1] 54:16
business [11] 8:21 9:7
  10:24 11:7,16 13:15
  17:6 22:5 44:1 65:15
  93:23

-C-

C-H-E-R-U-B [1]
  92:20
calls [4] 14:4 25:24
  67:3,13
cannot [1] 107:3
capacity [1] 99:11
care [7] 17:3 29:21 30:5
  37:19,20,20 103:4
case [8] 6:17 8:18 14:9
  50:19,21,22 69:22
  70:10

casualty [1] 24:13
cc [4] 51:7 56:8 98:14
  98:15
Central [7] 1:1,21 4:19
  11:20 12:8 13:13 108:1
certain [2] 1:20 24:6
certainty [1] 78:20
  82:2
certify [3] 108:12 109:4
  109:13
chain [1] 10:4
Chamberlain [15]
  1:16 4:3,9,12,14,20
  20:19 46:5 101:17
  102:1,3,9 104:18
  108:17 109:4
Chamberlain's [3]
  38:8 45:7 91:1
Champaign [10] 1:18
  10:19,20 43:24 66:6
  97:10,16,17 98:19
  108:24
change [4] 8:16 71:3
  71:15 89:4
changes [1] 71:8
changing [2] 18:4,4
check [20] 37:18 58:17
  62:23 63:14 64:3,16
  64:24 65:11,16,19,20
  66:11,15,18 74:15
  87:11 91:8 92:13 93:23
  94:2
check's [1] 65:13
checking [2] 64:19
  65:9
checks [4] 35:14 36:2
  36:7 65:5
Cherub [2] 92:17,22
Chicago [1] 2:9
chose [5] 44:4 47:21
  55:14 81:17,18
chosen [1] 47:16
chronological [1]
  60:22
citizen [1] 1:16
claim [59] 6:18,20
  39:15 42:24 43:2,5,19
  44:11 45:5,9,22 46:23
  47:1,8,17,22 48:4,10
  48:22 51:4 52:20 54:23
  55:4,8,21,24 57:1,13
  58:18 61:12,19 63:23
  67:1,12,21 68:3,4,8
  70:18 75:7,8 76:23
  77:3 81:7,19 83:21
  94:11,13,22,24 95:7
  95:13,17 97:4,15 99:20
  103:13,16,19
claim's [1] 95:2
claimant's [1] 41:1
claims [3] 14:8 56:7
  66:23
clarify [1] 55:6
clarifying [1] 17:9
cleaner [1] 66:1

clear [4] 42:7 82:3 97:9
  102:6
clearly [1] 41:20
client [1] 99:21
clients [1] 6:16
close [1] 21:22
closed [4] 11:23,23
  21:18 92:7
closing [2] 22:20 24:2
code [1] 7:8
collateral [2] 36:13
  85:2
collaterally [3] 83:23
  85:8 99:24
collecting [2] 74:23
  75:10
command [1] 10:4
commenced [1] 4:1
communicated [1]
  89:4
communication [1]
  30:9
community [6] 9:21
  10:16 11:9 36:21 39:8
  39:10
companies [2] 15:2
  65:5
company [23] 1:7,9
  2:11 6:15 11:1 16:18
  16:19 19:8 20:10 21:1
  38:23 41:18 57:4,12
  78:4 91:11,16 92:10
  92:16 102:22,24 108:6
  108:8
compare [1] 50:15
compelled [1] 100:12
complete [1] 103:12
concern [1] 83:19
concerning [6] 27:19
  31:9 33:14 37:11 80:19
  103:13
concerns [1] 57:8
concluded [1] 107:14
conclusion [5] 33:5
  67:4,14 84:10 85:17
condition [7] 25:20,22
  26:23 30:12 32:7,7,23
  33:16,17 47:24 48:5
  52:2,4,4,22 60:12 84:21
  99:11,19
conditions [1] 26:19
condolences [1] 99:18
conjunction [1] 24:2
connection [2] 26:10
  61:19
consignment [21] 16:8
  20:9,21,24 23:9,14
  24:5 25:15 27:6 32:10
  33:16,17 47:24 48:5
  52:2,4,22 60:12 84:21
  99:11,19
consistent [2] 84:19
  84:20
consists [1] 15:11
contact [2] 39:18 77:8
contacted [3] 57:19
  81:12 95:19

**contacting** [1] 37:2
**contacts** [1] 77:10
**contained** [4] 67:1,12
68:7 105:9
**content** [5] 47:7 51:1
51:2 54:19 99:15
**CONTENTS** [1] 2:14
**contingencies** [1]
26:19
**continued** [2] 4:15
68:21
**continuing** [2] 38:14
42:2
**control** [1] 65:16
**conversation** [13] 30:2
30:23 37:16 40:11
54:24 55:22 57:3,6
65:11 81:13 95:4 96:3
102:20
**conversations** [22]
28:10 29:16 30:13 31:3
31:6,11,11,14 36:19
37:10 43:13,15,18
47:19 55:18,20 58:12
94:12,14,21 95:1,9
**copied** [2] 83:13,17
**copies** [1] 40:16
**copy** [8] 58:6 64:3
66:19 75:18 76:24
82:13,18 102:16
**corner** [3] 87:18,21,22
**corporeal** [1] 1:17
**correct** [108] 7:10 10:5
13:21,24 17:14,18 18:8
18:12 19:6 20:13,23
21:4 22:4 23:16,17
24:2,15 25:6,7,13
26:10,14 30:10,11,14
30:16,21,22 31:1,4,23
32:2 33:3,7 44:17
45:24 46:12 49:11
51:12 53:1,2,20,22
61:4,8,16,17,20,21
62:4,18,21,24 63:2,20
63:23,24 68:9,16 69:6
69:7,11,19,20,22 71:3
71:17 72:8,10 73:17
79:7,10,11,21 81:3
85:3,5,11 87:15 88:19
91:9 92:4,5 100:17
101:22,23 102:10,13
102:14,18,19 103:1,2
103:6,7,13,20,21 104:2
104:3,7,12,16,17 105:7
106:20 107:2,5
**corrections** [1] 108:14
**correctly** [5] 37:7
46:21,24 91:18 93:21
**correspondence** [6]
53:7,9 56:6 63:13
103:9 104:2
**cost** [2] 75:7,10
**counsel** [31] 5:4 22:8
22:17,18 43:10 44:12
44:16,20 47:19 48:13
48:22,23 49:2,12,20
50:1 51:8,10,11,14,15
51:16 52:7 62:19 70:6

**Country** [5] 19:5,10
69:18 70:8 99:21
**COUNTY** [1] 109:2
**course** [1] 92:9
**court** [15] 1:1,21 4:10
5:13 6:4 15:8 20:17
32:14 34:1 46:3 50:7
56:2 63:9 107:12 108:1
**coverage** [3] 83:23
85:8 99:24
**covering** [1] 36:13
**create** [2] 61:23 62:5
**creating** [1] 62:3
**credit** [3] 19:14,15,19
**criteria** [3] 31:20,21
31:21
**Crowder** [49] 2:3,16
2:19 4:24 25:23 28:14
29:1 40:20 42:1,6
51:18 63:7 64:6 68:14
68:23 70:3,13 76:4,6
80:3,5,10,16,21 84:11
85:15 86:13 87:24
89:11,12 90:17,22 91:4
94:20 96:16 97:18 98:1
98:6,9 100:6 101:24
102:5 103:22 104:20
105:15,21 106:18,19
107:8
**Crowder's** [1] 6:16
**CRR** [3] 1:19 109:3,22
**CSR** [4] 1:19,19 109:3
109:22
**cushion** [1] 37:6
**CV** [2] 1:5 108:4

**-D-**

**daily** [1] 71:8
**Danville** [2] 7:5,7
**date** [7] 4:16 15:21
72:13 73:17 88:19 92:3
97:11
**dated** [10] 33:17 40:23
64:12 72:2 73:15 84:2
85:10 86:20 89:15
100:3
**dates** [2] 10:10 81:15
**Dead** [3] 28:16,18
42:13
**deal** [2] 22:22 44:4
**dealing** [2] 11:11 12:18
**dealings** [8] 8:21 11:7
15:1 17:4 44:24 51:21
52:8 99:10
**dealt** [3] 12:17 13:1
14:13
**death** [5] 33:2 77:12
88:21,24 99:18
**debit** [1] 66:3
**debt** [1] 75:10
**Decatur** [1] 2:6
**decided** [1] 44:12 55:7

65:24
**Defendant** [5] 1:7 2:7
6:15 108:6 109:7
**Defendant/Third** [1]
2:10
**Defendants** [2] 1:13
108:11
**defined** [1] 23:23
**definition** [1] 23:23
**deliver** [4] 54:2,11,16
95:3
**delivered** [1] 64:16
**delivering** [3] 54:6
55:4,16
**dep** [2] 38:11,12
**Department** [1] 10:11
**deponent** [2] 4:4 109:4
**deposit** [3] 9:4 65:22
66:2
**deposited** [2] 64:18
74:15
**deposition** [37] 1:15
1:16 2:22,23,24 3:1,2
3:3,4,5 4:1,14,16,21
15:7,11 20:16 32:13
33:24 42:3 46:2,6 50:6
50:10 56:1,5 59:5 63:8
63:12 68:21,24 96:9
107:14 108:12 109:7,9
109:11
**described** [1] 37:10
**description** [1] 60:22
**determination** [1]
103:12,19
**developed** [1] 16:24
**Dick** [8] 13:2 20:6
44:23 64:13 65:12 66:7
66:13 74:14
**DICKER** [1] 2:8
**difference** [1] 51:5
**different** [4] 5:19
37:22 87:6 90:19
**difficult** [1] 6:3
**direct** [3] 15:1 43:14
52:8
**directed** [1] 101:21
**directly** [4] 11:12
16:19 57:21 93:1
**Director** [1] 56:7
**disclose** [2] 9:11 45:8
**discovery** [1] 4:14
**discuss** [2] 44:10 54:18
**discussed** [3] 43:6
54:22 79:6
**discussing** [2] 15:17
56:21
**discussion** [5] 27:22
29:18 30:18 42:18
96:14
**discussions** [17] 27:11
28:2,22 29:3,4,5,7,11
29:23 31:8 33:13 44:18
44:19,21 45:2 57:1
58:1

**disinterested** [1]
109:13
**District** [7] 1:1,1,21
1:21 4:19 108:1,1
**DIVISION** [2] 1:2
108:2
**document** [62] 17:11
17:11,19 18:5 19:1
20:3 21:3,6,13 23:16
23:19,24 24:1,6 32:17
32:18 34:4,5,8 40:19
46:7,16 48:11 53:4,5
56:12 59:3,4 61:12,23
62:3,6,10 64:2 70:18
75:17,22 76:9 77:17
77:19,22,24 78:5 79:7
80:17,20 86:8,16,17
89:13,14,15 100:14,17
102:10,13 105:6
**document's** [1] 77:22
**documentation** [5]
15:14 77:24 31:12
75:11 95:20
**documents** [25] 15:13
20:8 21:19,22 23:1,4
40:22 52:1 54:13 70:19
82:9,11 84:23 88:2,3
89:18 92:22 96:7,8,11
96:11,22 97:3 101:9
101:12
**doesn't** [3] 59:24 61:6
71:24
**dollar** [2] 35:4 73:18
**dollars** [3] 31:22 36:8
66:16
**done** [8] 9:16 31:19
38:19 52:19 66:19
97:15 105:19 107:11
**double** [3] 87:11 91:7
92:13
**doubt** [1] 104:15
**Doug** [3] 11:12,14,24
**down** [12] 5:13 6:4
22:13 24:16 25:9 26:15
37:1 38:17 53:13 87:18
100:1 109:9
**draft** [1] 46:16
**drafted** [2] 49:16,16
**drafting** [2] 56:15
102:13
**Drive** [1] 7:7
**Dropping** [1] 26:15
**duly** [2] 4:5 109:5
**duplication** [1] 74:6
**during** [3] 10:23 37:13
95:15

**-E-**

**early** [1] 88:24
**easier** [1] 38:1
**East** [1] 2:5
**Eastern** [1] 7:18
**EDELMAN** [1] 2:8
**education** [1] 7:15

**effect** [1] 62:14
**either** [10] 29:5,11
41:17 56:14 65:12 73:8
77:7 81:20 93:12
109:16
**ELSER** [1] 2:8
**elsewhere** [1] 16:23
**Emerson** [1] 22:11
**employ** [1] 109:15
**employed** [3] 7:24 8:2
8:5
**employment** [4] 8:13
9:19 10:23 97:5
**enclosing** [4] 40:24
53:12,13 63:14
**ended** [1] 71:10
**endorsement** [1] 65:8
**endorsing** [1] 5:12
**entered** [4] 15:19 16:8
20:10 21:10
**entire** [1] 10:3 30:8
**entities** [5] 12:14 14:11
14:14,15 38:2
**entitled** [1] 65:3
**entity** [3] 12:11 16:9
16:10
**entity's** [1] 16:6
**envelope** [1] 78:5
**equivalent** [1] 9:22
**errata** [1] 108:15
**especially** [1] 13:19
**essentially** [1] 94:7
**et** [2] 108:3,11
**event** [3] 50:2 87:10
109:15
**events** [1] 78:8
**eventually** [1] 10:16
**everybody** [4] 14:4
19:18 39:12 70:1
**evidence** [3] 35:12
36:23 38:11
**exact** [3] 11:21 81:14
81:16 82:2
**exactly** [3] 52:11 54:8
70:15
**Examination** [10]
2:15,16,17,18,19 4:7
68:13 97:20 101:6
105:20
**examined** [2] 1:17 4:5
**example** [2] 24:13
69:16
**except** [1] 97:7
**exception** [2] 52:24
108:14
**excuse** [1] 72:6
**execute** [1] 70:17,18
**executed** [9] 26:13
48:12 50:11,16 53:17
53:18 61:12 78:6,10
**exhibit** [79] 2:22,23,24
3:1,2,3,4,5,6,7,8,9,10
3:11,12,13,14,15,16

3:17 15:7,11,12 20:16
20:20,20 23:7,8,9
32:13,16 33:24 34:3
40:18 46:2,6 50:6,9
53:14,15,17,18,24 56:1
56:4 59:1 61:9,23,24
63:8,11 68:16,24 69:16
69:17 71:19,20,23 72:2
74:7,11 75:16 76:8
77:15,16 79:6,15,24
80:7 82:8 83:5,10 86:8
88:2 89:14 90:13 98:4
101:19 104:18
**exhibit's** [1] 90:13
**exhibits** [5] 2:21 74:5
90:19 91:1,2
**exist** [1] 72:12
**existed** [2] 72:12,18
**existing** [1] 17:23
**explain** [4] 35:17 76:16
76:17 77:21
**explained** [2] 91:6,6
**expound** [1] 96:17
**express** [1] 99:18
**extended** [1] 17:23
**extensions** [1] 17:20
**extent** [2] 57:6 96:18
**extra** [2] 18:2,3

### -F-

**facility** [1] 9:3
**fact** [8] 28:6 42:24
43:19 47:22 49:12 51:3
54:22 55:2
**facts** [2] 8:17 66:18
**fair** [1] 5:24
**fall** [3] 10:15 42:13
97:12
**familiar** [1] 86:16
**far** [3] 54:9 99:13 105:9
**Farm** [1] 10:11
**fax** [7] 74:13 91:19
92:10,12 93:11,12,18
**faxed** [1] 93:2
**faxes** [2] 91:22,24
**faxing** [1] 93:8
**February** [4] 1:19
108:13 109:8,17
**federal** [2] 4:18 8:3
38:11
**fees** [5] 65:4 74:20,21
74:22 75:5
**felt** [2] 17:6 100:12
**few** [3] 29:6 101:8
**figure** [3] 81:23 104:21
105:3
**figured** [1] 95:24
**file** [22] 23:11 34:12
43:2,19 45:9 47:16,22
51:4 70:18 76:23 82:9
83:8,18,21 88:9,13
89:24 93:5 96:2 97:4
98:21,23
**filed** [6] 38:22 43:2,5

48:22 54:11 95:2
**filing** [10] 43:8 45:4
47:1,8 48:4,10 52:19
54:23 83:20 95:17
**filled** [1] 104:22
**finance** [2] 20:11 22:3
**financed** [1] 44:24
**financial** [19] 1:12
11:1,4 12:12 13:11,11
16:24 17:1,6 35:6,13
37:11,12 43:7 52:14
57:18 64:14 72:3 93:24
**financing** [3] 16:11,20
16:23
**fine** [6] 14:20 19:12
42:5,9 64:17 89:11
**finish** [2] 5:11,12
**first** [54] 1:11 2:7 4:5
6:20,21,23 8:12,13,15
9:10,19,20 10:18,23
11:10,14,19,23 13:19
14:21 17:10 19:17
34:18 35:12 36:23 37:3
39:23 43:4 48:7 63:14
63:18 65:8,19 77:17
78:24 79:2 80:8 82:9
83:8,11 84:1 85:2,9
88:5,9 93:2 98:15,17
100:2 101:12 103:11
105:10 108:10 109:5
**fit** [2] 71:11,16
**flip** [1] 24:22
**focus** [4] 9:17,19 14:16
14:22
**follow-up** [4] 87:1,3
97:22 101:8
**follows** [2] 4:6 68:22
**force** [5] 39:20 40:6
86:22 87:4,8
**foregoing** [2] 108:13
109:7
**form** [10] 61:12 67:1
67:12 68:3 69:24 70:12
73:5 81:7 103:22
105:16
**formal** [1] 5:9
**forms** [3] 54:2,6 75:8
**forth** [1] 74:8
**forwarded** [1] 41:14
**found** [3] 45:11 81:21
94:23
**foundation** [1] 51:19
**four** [1] 81:16
**fourth** [1] 18:5
**front** [3] 69:1 97:23
98:3
**fund** [1] 16:3
**funding** [1] 17:15
**funds** [1] 74:16
**furniture** [60] 1:12
6:24 9:1 11:22 12:2,4
12:19 13:5,12 14:3
16:3,4,7,7,10,12,13,15
17:5,16 18:10,19,24
19:4 20:11 21:14 22:18

24:18 29:8 35:19,20
36:6,12,18 50:12 52:15
57:17 62:8,16 63:18
65:7,10,17 66:2 70:9
70:23 74:1 79:18 82:21
83:24 85:9 93:9,15,24
94:8 95:11,12 100:1,2
100:23

### -G-

**game** [3] 9:18 86:11,14
**general** [36] 1:6,8 2:11
6:14 28:9 30:19 34:17
35:8,9 37:16 56:7
57:21 58:3,12,14 61:19
63:1,13,22 66:23,24
67:10,20 68:4,8 71:6,9
86:21 89:15 90:3 95:20
101:22 103:10,16 108:5
108:7
**generated** [1] 88:10
**generically** [1] 38:4
**gestures** [1] 6:5
**given** [6] 4:20 35:18
70:1 74:2 107:6 108:14
**giving** [1] 98:11
**goes** [2] 21:19 94:22
**gone** [2] 5:4 74:6
**good** [4] 5:1 17:6 64:9
65:14
**gotcha** [1] 94:20
**grandson** [1] 66:7
**greater** [1] 25:5
**ground** [1] 5:3
**group** [61] 1:12,12 6:24
9:2 11:4,11,20,22 12:2
12:9,12,19 13:5,11,11
13:12,13 14:2,3 15:12
16:4,8,12,15 17:1,1,5
19:4 29:8 36:12,18
50:12 52:14 57:18,18
62:8,16 63:5,18 64:14
65:8,10,17 70:9,23
72:4 74:1 79:18 82:21
83:24 85:9 93:9,15,24
93:24 94:8 95:11,12
100:1,2,24
**Group's** [5] 12:4 21:14
22:18 52:15 66:2
**guarantee** [5] 20:5,7
25:16 26:9,13
**guess** [9] 9:11,14 20:14
52:17 73:7 75:20,23
95:8 106:24
**guessing** [2] 76:23 77:4
**gun** [1] 9:13
**guys** [1] 63:4

### -H-

**HALEY** [1] 1:3
**half** [2] 66:16 72:22
**halfway** [1] 24:16
**hand** [9] 54:2,6,11,16
55:16 74:10 75:15
77:14 109:17

**hand-delivered** [1]
54:18
**handed** [2] 55:2,3
**handle** [2] 43:21 46:23
**handwriting** [1] 87:13
**handwritten** [1] 87:18
**happening** [1] 37:8
**happy** [1] 101:10
**hard** [1] 89:17
**hate** [2] 35:8 68:17
**head** [3] 6:5 23:20
100:5
**hear** [1] 36:22
**heard** [3] 36:22 39:7
39:16
**hearsay** [8] 38:9,13
41:22 42:2,15,16 45:7
94:19
**Heavner** [12] 2:5 43:10
43:11,13,15 44:5,7
45:12 51:10 77:11
79:13 89:4
**Heavner's** [5] 46:21
75:3 76:20 77:2 81:18
**Hedges** [10] 41:18,21
42:22 44:8,9,11 81:13
81:22 82:5,6
**Hedges'** [1] 41:22
**HEIDI** [1] 1:3
**held** [2] 42:18 96:14
**HELLER** [1] 2:2
**help** [3] 21:21 24:9,12
**hereby** [2] 109:4,13
**herein** [3] 4:4 109:4,14
**hereunto** [1] 109:17
**hey** [5] 37:3 52:18
83:20 87:10 95:11
**highest** [1] 7:15
**hired** [3] 21:21 76:22
91:10
**history** [1] 88:6
**HOLMES** [1] 2:2
**home** [1] 66:12
**honest** [1] 104:12
**hooked** [1] 45:19
**hopefully** [1] 5:8
**hotel** [6] 11:20 12:8
13:13 14:2,6 45:1
**hour** [1] 97:2
**Howard** [4] 45:12 51:7
95:10 100:23
**huh-uh** [2] 6:9,10

### -I-

**idea** [2] 11:6 31:2
**identical** [3] 19:2,3
50:17
**identification** [8] 15:8
20:17 32:14 34:1 46:3
50:7 56:2 63:9
**identified** [1] 101:20
**identify** [3] 74:11 88:3

101:24
**Illinois** [32] 1:1,11,16
1:18,19,21 2:3,6,7,9
4:19 6:21,23 7:5,7,18
7:22 8:12 9:10 11:20
13:13 63:19 79:2,3
84:1 85:9 100:3 108:1
108:10,24 109:1,4
**Improper** [1] 25:23
**inaccurate** [2] 69:9
85:11
**Inc** [2] 69:19 99:22
**included** [1] 78:5
**inclusive** [1] 97:1
**incorrect** [2] 104:6,11
**independent** [1] 34:11
**independently** [1]
22:17
**indicated** [3] 36:15
45:4 102:21
**indicates** [1] 80:24
**indicating** [1] 33:18
**indirect** [1] 53:1
**individual** [1] 77:9
**individuals** [2] 13:10
44:22
**information** [18] 7:3
55:17 57:12,17 62:10
62:11 66:24 67:11 69:6
77:8 89:3 102:23,24
103:5,11 105:9,12
106:2
**initial** [1] 81:19
**initials** [1] 87:14
**instead** [6] 6:8,9 17:22
43:8 65:6,24
**instructing** [1] 89:9
**insurance** [47] 1:6,8
2:11 6:15,19 24:14,23
25:3,4 26:16 27:3,11
27:20,23 28:7 29:9,21
30:12,21 31:9 32:20
34:21,23 36:9 39:18
39:24 41:14 43:2 47:9
48:6 57:4,11 65:4
74:23 75:8,12 77:7
84:16,22 94:11,13
99:22 101:1 102:22,24
108:5,7
**insure** [1] 24:17
**insured** [1] 24:20
**intent** [2] 67:19 68:2
**intention** [1] 100:24
**intentionally** [1] 3:15
**interest** [7] 9:12 12:13
65:4 71:8 73:9,12
74:19
**interested** [2] 23:5
109:15
**interpose** [1] 28:14
**invades** [1] 28:15
**inventory** [16] 17:16
25:11 35:13,15 36:2,7
91:5,7,8,17,19 92:4,15
92:16,22 93:14

involved [4] 33:21
51:24 104:9,10
Iroquois [5] 8:3,6,8
8:10,20
ssue [7] 8:18 14:8
28:11 60:7 61:2,3
95:17
issues [1] 57:2
item [2] 29:8,17 31:13
itself [3] 85:2 100:15
100:17

-J-

J [8] 1:3,16 4:3,11,14
108:3,17 109:4
James [3] 19:4 25:16
26:16
JAMIE [1] 1:3
Janko [27] 1:12 11:1,1
11:4,7,8,11 12:5,12,24
13:2,3,4,10,11,15,23
16:24 17:1,5 31:7
44:23 52:14 57:18
64:13 72:3 93:24
Janko's [3] 20:6,7 66:7
Jankos [1] 38:5
January [6] 4:14 73:16
73:21 84:2 85:10 100:4
Jason [3] 2:3 68:17
80:2
JFG [1] 11:5
im [6] 16:9 28:2 29:12
29:18 52:1 77:11
job [1] 8:16
John [6] 41:18 42:22
78:1,8,12 81:3,12,13
81:17,18,22 82:4,5,20
83:2 95:4
joint [13] 6:18,19 47:16
47:22 48:4,10 51:4
55:8 65:5 94:13,22,23
103:15
Julie [1] 2:6
July [3] 8:7,14 64:12
jumping [1] 100:1
June [4] 56:6.63:12
89:15 104:2
Justin [1] 86:10

-K-

keep [1] 91:24
keeping [1] 18:1
kept [2] 18:10 83:1
kind [4] 6:3 10:3 22:2
34:16 35:8 38:9 44:14
45:18 58:20 90:19 91:6
knew [15] 27:10 31:13
31:19 39:12 40:5 41:13
42:24 43:1 66:23 69:9
70:15 71:1,6,9 99:13
knowledge [13] 13:7
14:7,10 18:16 25:19
25:21 26:12,14,22,24
27:1 32:6,9 33:10 35:8

35:10 38:21 43:4,7
48:15,18 49:7 59:14
59:22 60:2,9 61:7 62:9
68:6,10 72:1,11,17.73:8
73:24 88:11 89:5 103:8

-L-

lack [1] 35:9 51:18
lady [1] 58:16
large [1] 40:4
Larry [14] 13:3 44:22
47:10 50:11 64:13
65:12 74:14 82:24
94:12,14 95:1,9,18
96:2
Larry's [1] 60:22
LaSalle [1] 2:9
last [5] 6:3 19:13 20:3
64:11 105:10
lawful [1] 1:17
Lawrence [3] 50:11
53:10 56:8
lawsuit [1] 38:21
lawyer [1] 84:6
lay [1] 5:3
lays [1] 18:9
leader [1] 39:10
leading [9] 67:4,22,23
69:24 70:2,12 71:4
85:4,13
learned [1] 44:10
least [2] 25:5 26:17
leave [1] 8:15
leeway [1] 70:1
left [4] 9:24 11:24 13:20
97:5
legal [4] 33:5 65:4 67:4
67:14 84:10 85:17
lender [1] 33:21
lending [6] 15:4,20
17:12,20 21:9 52:4
letter [70] 40:23 41:16
46:11,17 47:7 48:15
49:7 50:11,13,15 53:13
53:23,24 54:1 56:16
56:21 58:7 59:15,16
59:21,23 60:3,11,12
60:19 61:1,10,10,11
67:20 68:2 69:3,9,21
70:5,16,17,20 71:2
72:13,19 79:9,17,19
79:20 80:1 82:1,15,19
82:20 83:7,13,19,22
84:3,13 95:22 98:4,22
99:1,15,16 100:20
101:20 103:9 104:6,19
105:11 106:5 107:4
letterhead [4] 46:19
79:18
letters [1] 95:3
level [2] 7:15 91:20
License [1] 1:20
lieu [2] 27:9,10
life [37] 1:6,8 2:11 6:14
24:23 25:3,4 26:15

27:3,11,20,23 29:9
30:12 31:9 32:20,20
34:21,23 41:14 43:2
47:9 48:6 56:7 74:23
75:8,12 77:6 84:15,22
94:11,13 99:22,23
101:1 108:5,7
line [4] 19:14,15,19
77:6
lines [1] 30:6
live [2] 36:16 54:9
lived [2] 54:9,15
living [1] 9:2
LLC [10] 1:12,12 6:24
9:2 11:3,19 12:6,16
45:1 100:2
LLCs [2] 12:18,20
LLP [1] 2:8
loan [32] 8:3 10:14
11:22 14:7,17 15:16
16:1 17:3,7 21:18,22
21:23 22:1 24:2 26:10
27:15 31:12 36:3,9,14
40:4 64:17 65:4 75:13
83:17 88:6,7 89:3 92:7
92:13 93:5 98:23
loaning [1] 94:3
loans [5] 11:17,18,19
14:1 34:16
Local [1] 4:18
located [1] 18:20
locations [1] 18:20,23
look [10] 25:9 46:8 59:4
59:8 68:16 80:1 83:9
86:4 96:19 97:24
looked [1] 89:18
looking [8] 17:10 23:13
24:4 59:1,11 71:23
84:23 89:18
looks [5] 19:2 20:5
75:18 78:4 86:19
loop [1] 83:1
Lower [1] 87:22
lying [1] 58:19
Lyons [20] 29:19,24
32:19 39:19 40:24
41:13 46:11 54:2,6,18
55:17,18 78:1,8 81:3
81:12 82:20 83:2 87:6
95:4
Lyons' [1] 54:10

-M-

M [2] 2:3,10
mail [1] 65:18
main [3] 2:5 18:17 30:8
maintain [1] 25:3,11
Man's [3] 28:16,18
42:14
managed [1] 12:15
Management [1]
10:11
managing [1] 12:16
Margaret [1] 1:3

25:16 28:3 78:3,16,17
99:4 108:3
mark [5] 15:6 20:15
40:15 53:4 63:5
marked [21] 15:8,10
20:17,20 32:14,16 34:1
34:3 46:3,6 50:7,9 56:2
56:4 63:9,11 74:7,10
90:21,22 101:18
Marvin [1] 1:19 109:3
109:22
master's [3] 7:16,17
7:19
match [1] 36:11
matching [1] 92:4
Matt [5] 64:16 66:5,7
66:13,16
Matt's [1] 66:12
matter [2] 1:20 29:11
Mattoon [1] 2:3
may [19] 5:4 18:24 39:2
40:24 41:8,16 46:11
50:10 53:6,8,9 61:10
79:9 88:19 89:1 95:1
96:2 102:20 104:19
Maywood [1] 7:7
MBA [1] 7:20
McCumber [1] 11:12
McLEAN [1] 109:2
mean [14] 6:7,9 31:7
37:14 41:20 43:17 52:3
54:22 76:21 79:23
82:14 89:8 95:2 96:1
measures [1] 69:13
meet [1] 27:5
meeting [2] 41:17 44:7
MEGAN [1] 1:4
member [1] 12:22
members [12] 12:9,16
13:4,5,15,23
memo [1] 64:12
memory [1] 36:3
mention [4] 72:2,7,15
95:18
mentioned [7] 25:10
43:3 56:24 72:22 73:15
90:16 96:3
mess [1] 44:2
met [6] 25:20,22 26:23
78:17 81:22 97:2
Mid [35] 1:11 2:7 6:20
6:21,23 8:12,13,15
9:10,19,20 10:18,23
11:10,15 13:19 19:17
39:24 63:14,18 79:1,2
80:8 82:9 83:8,11 84:1
85:9 88:9 93:2 98:15
100:3 101:12 103:12
108:10
Mid's [3] 85:2 88:5
98:18
middleman [1] 22:3
might [4] 19:11 58:20
82:13 95:13
MIHLAR [1] 2:5

Mike [6] 13:2,2 44:23
64:13 65:12 74:13
Mike's [1] 66:13
miles [1] 54:14
million [20] 25:5 26:17
27:3,8,11,16,20 31:22
35:4 36:8 66:16 72:17
72:22,23 73:14 83:23
84:15,22 85:7 99:23
mind [2] 30:24 63:4
mine [1] 76:15
minutes [1] 86:14
misleading [1] 68:7
misplaced [1] 90:14
misspoke [1] 72:6
money [5] 65:21 70:22
94:7
monies [2] 94:11,13
monthly [3] 36:2,7
91:14
Moore [1] 22:11
MOSKOWITZ [1]
2:8
most [1] 20:4
move [1] 10:17
moved [2] 10:12 22:14
Mrs [1] 35:5
Ms [131] 2:15,17 4:8
6:21 7:9,13 15:6,9
19:21,23,24 20:1,2,15
20:18 26:1,4 28:20,21
28:23 29:2,20 32:15
33:4 34:2,21 35:1,2,4
38:7,18,20 40:17,18
40:21 41:10,19,24 42:5
42:8,11,15,16,17 43:12
44:8 45:6 46:4 47:18
50:8 51:20 55:10 56:3
63:4,6,10 64:9,10 67:2
67:5,7,9,13,15,22,24
68:1,11,17 69:23 70:11
71:4 73:1 75:20 76:1,2
79:23 80:4,12,14,15
80:18 82:13 83:6 84:9
85:4,12,16,18,20,22
85:24 86:2,10 87:17
87:20,23 89:6,17 90:18
90:24 91:3 94:15 96:13
96:23 97:21,24 98:2
98:11 100:8,11,12,14
100:16 101:4,7,11,13
101:15,16 102:3,7,8
103:23 105:17,19
106:12,15 107:9,11,13
must [1] 78:4

-N-

name [4] 4:10 16:6
29:19 38:4 48:20 52:16
65:7,9,14,14 76:20
77:5 84:23 85:3 86:6,6
92:17,20
named [2] 11:1 25:6
names [3] 11:21 37:22
45:17
need [15] 7:12 28:8

29:13,17 30:3,19,19
31:18 47:2 55:11 66:4
80:10 81:24 93:12,23

**needed** [7] 27:11,23
31:13,16,22 103:5,17

**needing** [1] 78:12

**needs** [2] 31:19 78:3

**never** [11] 14:14 26:9
33:1 43:2,5 48:22
57:18,20 58:19 93:22
94:4

**new** [3] 10:20 17:22
43:23

**next** [4] 15:14 19:1
38:15 44:11

**nods** [3] 6:4 23:20
100:5

**normal** [1] 87:1

**normally** [2] 46:20
75:9

**North** [1] 2:9

**Notary** [1] 108:21

**note** [10] 17:12,22,23
19:20 20:7 76:24 77:1
77:5 86:19 87:18

**noted** [1] 108:15

**notes** [2] 19:16 109:9

**nothing** [5] 8:17 31:15
68:7 83:18 109:5

**notice** [3] 4:15 51:5
52:21

**notified** [3] 36:12 39:5
47:15

**notifying** [1] 52:18

**November** [3] 15:21
60:15,18

**now** [1] 1:20 11:16
14:1 23:14 36:13 47:10
58:20 59:19 66:22 83:4
84:5

**number** [11] 5:16,16
15:12,13 19:22 71:12
71:16 77:6 104:24
105:4,6

**numbers** [2] 36:11
93:14

---

**-O-**

**oath** [1] 1:17

**object** [19] 25:23 38:16
41:19 47:19 51:18
55:11 67:3,22 69:24
73:5 75:21,23 80:18
84:9 94:15,18 100:11
103:22 106:15

**objection** [18] 26:1
28:15,18,24 33:4 38:13
38:14 41:21 42:2,12
45:6 67:13 70:11 71:4
85:4,12 100:15 105:16

**bjections** [1] 26:2

**obviously** [4] 28:24
69:5 75:22 95:4

**occasion** [2] 10:24 24:1

**occurred** [1] 92:7

---

**odd** [1] 92:20

**off** [12] 23:15 36:3
42:17,18 50:3,24 64:17
75:13 88:5 96:13,14
102:17

**offer** [1] 8:16

**offered** [1] 49:20

**office** [22] 9:4 10:19,20
22:12 42:23 43:24
46:20,22 54:10 55:5
66:6 75:3 77:2 78:20
78:21 81:17,19 82:4
97:16,17 98:19,23

**officer** [1] 10:14

**offices** [1] 1:17

**often** [1] 91:12

**old** [2] 44:1 77:6

**omitted** [1] 3:15

**once** [2] 5:14 54:1

**one** [30] 5:13,16 12:20
12:22 14:2,2 15:14,15
19:3 22:2,3 28:10
30:23 31:13 39:17
45:17 50:16,24 51:5
69:4 72:22,22 73:11
74:8 80:6 89:13 90:20
90:20 97:9,22

**ones** [2] 12:17 23:5

**ongoing** [1] 45:2

**open** [2] 43:23 44:13

**opening** [1] 10:20

**operated** [1] 18:15

**operation** [2] 10:18
10:21

**opportunity** [2] 59:2
96:21

**order** [7] 27:5 57:9
70:18 79:5 88:1 103:12

**ordinary** [1] 57:8

**original** [5] 47:23
53:13 54:1 73:18 78:6

**originally** [1] 18:22

**originate** [1] 101:14

**otherwise** [2] 107:6
109:15

**outside** [2] 22:7,16

**overnight** [2] 54:14
65:18

**owed** [9] 65:21 69:18
70:9,22 71:3,15 74:16
74:19 94:7

**own** [2] 13:12 103:18

**owned** [1] 13:10

**owner** [1] 28:4

---

**-P-**

**P.C** [1] 2:2

**P.M** [4] 1:18 4:2 68:21
107:15

**packet** [2] 21:19 54:19

**page** [10] 2:14 24:12
24:22 25:14 46:14 51:7
64:11 82:19 83:10
105:10

---

**pages** [3] 80:7 82:8
86:8

**paid** [7] 58:18 63:22
64:17 75:2 95:13 97:4
103:20

**paper** [1] 66:1

**paperwork** [1] 28:7
52:12 53:18

**paragraph** [3] 69:17
72:1 105:10

**paraphrase** [2] 25:2
99:17

**part** [11] 23:3 34:12
37:16 47:1 56:15 62:2
67:14 71:13 82:9 88:9
88:12

**partially** [1] 67:3

**particularly** [1] 84:14

**parties** [9] 4:16 8:22
9:1,7 12:7,15 52:22
93:18,20

**parties'** [1] 27:18

**parts** [1] 12:14

**party** [13] 1:9,13 2:10
22:1,2 24:20 53:1,1
108:8,11 109:14,14,16

**pass** [3] 41:7 90:3 93:14

**passed** [13] 39:1,6,8,9
39:16,18 41:8 43:1
44:10 81:21 87:7 90:7
90:9

**passes** [1] 39:11

**pay** [6] 16:14,16 25:3
67:20 68:4 75:12

**payable** [2] 63:18
64:24 65:5

**paying** [2] 36:16 37:1

**payment** [3] 36:14
55:21 63:17

**pending** [1] 1:20

**penmanship** [1] 76:12

**people** [2] 5:14 69:5

**percent** [2] 36:4 78:19

**percentage** [2] 13:10
13:12

**period** [1] 45:20

**person** [3] 17:4 49:15
109:13

**personal** [2] 25:16
26:9,13

**personally** [2] 9:6 55:3

**pertain** [1] 88:3

**pertained** [1] 104:16

**phone** [3] 10:7 77:6
93:12

**physically** [1] 93:5

**pitch** [1] 92:1

**place** [3] 36:20 48:7

**placed** [1] 40:7

**Plaintiff** [4] 1:9 2:11
99:4 108:8

**Plaintiff's** [31] 3:6,7,8
3:9,10,11,12,13,14,15
3:16,17 51:14 74:7,11

---

75:15 76:8 77:14 79:6
79:15 80:7 82:7 83:4
83:10 86:7 88:1 89:13
90:12 91:1 101:19
102:1

**Plaintiffs** [3] 1:4 2:4
108:3

**plate** [1] 44:13

**point** [25] 28:17 35:3,6
36:11,12,21 40:12
42:20 43:6 45:3,11,21
47:15 53:23 57:7 58:13
62:22 63:21 77:7 83:15
86:19,24 88:14 92:2,6

**pointed** [1] 84:18

**policy** [12] 6:19 27:12
27:21 28:4,6 34:21,24
41:3 45:23 84:23 86:22
99:23

**portion** [4] 74:17 80:2
84:2,17

**position** [5] 8:8 10:14
13:19 69:2 95:12

**possibly** [1] 44:23

**potential** [1] 8:24

**practice** [2] 93:8,13

**pre-existing** [1] 13:22

**premiums** [1] 25:4

**preparation** [2] 59:4
96:8

**prepare** [3] 46:23
75:11 77:3

**prepared** [18] 21:12
21:14,16,16 28:7,8
29:22 32:19 46:22
49:24 50:1 59:12 69:5
70:17 78:2,13 79:13
106:5

**preparing** [2] 57:5
75:7

**president** [9] 8:9 9:21
9:22 10:1,6,13,16 11:9
41:18

**pretty** [1] 50:17

**previous** [3] 33:17
60:10 82:14

**previously** [3] 20:22
76:22 101:20

**price** [1] 36:5,6

**principal** [1] 88:5

**principals** [5] 12:24
13:1 27:18 31:7,8

**printed** [1] 88:4

**privilege** [2] 89:8,10

**privileged** [1] 43:14

**problem** [10] 35:13
36:10 37:3 50:23 90:17
92:4 94:3,4 102:7
106:6

**problems** [7] 35:6,10
37:12,13,21 43:7 93:16

**Procedure** [1] 4:18

**proceeds** [7] 6:19
45:23 61:20 63:22
64:22 65:16 99:22

---

**process** [5] 51:23 52:3
78:15 94:1 95:16

**processing** [1] 55:21

**produced** [1] 1:17

**product** [1] 37:1

**promise** [1] 36:17

**promoted** [1] 11:24

**pronounced** [1] 98:7

**proper** [1] 106:24

**property** [1] 16:14

**provided** [2] 62:17,20

**providing** [3] 16:5,11
102:23

**provision** [5] 25:2
26:18 27:9,19 31:9

**provisions** [1] 27:5

**Public** [1] 108:21

**pull** [2] 31:17 98:9

**pulled** [3] 88:13,17,18

**purchase** [4] 17:16
35:20 36:4,6

**purchases** [1] 16:4

**purpose** [3] 16:1,3
17:15

**purposes** [3] 18:23
31:20 38:12

**pursuant** [4] 4:15
39:15 63:22 99:19

**put** [8] 75:15 92:3 93:5
95:3 97:4,23 98:3,23

---

**-Q-**

**question's** [2] 76:1,2

**questioned** [1] 28:10

**questioning** [1] 58:4

**questions** [14] 5:7,8
6:17 57:4,14 58:2
68:15 70:2 101:8
103:17,18 105:18
107:10 108:14

**quick** [3] 74:5 76:17
86:9

---

**-R-**

**Ray** [3] 56:6 101:21
103:9

**read** [6] 20:4 47:3
53:13 84:17,18 108:12

**reading** [2] 59:14
60:20

**reads** [1] 84:20

**real** [3] 74:5 76:17 86:9

**really** [9] 43:8,24 44:2
44:3 49:24 53:1 58:12
83:19 93:22

**reason** [18] 34:7,9
46:19 48:7 56:13 58:9
81:4,9 82:16 87:2
88:14 95:16 104:1,4
104:10,12,14 106:8

**reasonable** [1] 67:16

**Rebecca** [1] 2:10

**receive** [11] 32:19 34:8 34:10 56:14 78:6 81:5 81:10 91:15,19 92:12 100:20

**eceived** [18] 27:2,8 33:11 34:5 41:16 62:22 64:3 73:23 74:14,15 75:19 77:7 78:1 82:1 83:16 86:18 95:23 102:16

**receiving** [5] 35:3 80:22 82:11 83:14 89:22

**recently** [1] 92:23

**recognize** [8] 20:20 32:17 34:4 46:10 50:12 53:5 56:12 76:11

**recognized** [1] 75:22

**recollection** [17] 19:7 30:18 34:12 54:5 56:20 57:16,24 71:19,21 74:22 75:6 77:12 82:10 83:9 89:21 90:6 96:6

**recommended** [1] 43:10

**record** [13] 4:13 19:21 38:7 42:11,17,19 74:12 83:15 90:12 91:16 96:13,15 109:14

**records** [2] 80:8 83:11

**reduced** [1] 109:9

**reduction** [1] 93:11

**refer** [2] 19:11 37:24

**eferenced** [7] 15:5 20:21 23:18,24 28:22 29:3 73:4

**references** [2] 25:15 33:17

**referred** [3] 21:2 37:23 38:6

**referring** [1] 23:6

**refers** [1] 24:23

**reflect** [2] 4:13 42:11

**refresh** [1] 19:7

**regarding** [4] 47:20 55:20 58:2 94:12

**relate** [1] 61:6

**related** [2] 20:9 31:12 43:24 74:21

**relates** [1] 61:2

**relating** [2] 6:18 60:6

**relation** [2] 47:9 74:23

**relationship** [9] 9:5,7 12:5 13:9,14,15,23 14:22 16:24

**relative** [1] 109:14

**released** [2] 33:2,9

**relied** [1] 91:9

**relying** [3] 51:3 66:24 67:11

**emember** [51] 5:11 6:7 10:10 11:17,21,22 11:23 16:5,9 21:11,13 21:16,20 23:2 34:13 36:20 37:2,15 39:9

**respect** [9] 30:8,11 31:5 76:7 94:10 95:13 99:11 101:1 106:2

**respond** [1] 57:14

**responding** [1] 38:15

**response** [1] 41:22

**rest** [1] 60:19

**restrictions** [1] 28:16

**result** [1] 41:5

**resulted** [1] 87:10

**retain** [2] 22:7,16

**Return** [1] 108:22

**review** [8] 21:8 24:11 71:20 77:2,17 86:9 96:21 103:17

**reviewed** [3] 21:11 59:23 96:8

**reviewing** [3] 48:17 59:9,19,21 77:19 82:12 83:10,12

**Richard** [2] 13:2 20:7 51:10,13

**Rick** [11] 29:15 43:10 43:20 45:12,15,16 46:21 75:2 76:20 77:2 77:10

**right** [78] 9:17 12:8 13:17 14:19 15:2,3 17:17 18:11 19:1,13 20:3,8 21:8,22,24 22:5 22:24 23:13 24:4 25:8 27:7 30:15,21 31:5 32:12 33:23 34:14,20 34:22 35:1 36:24 38:18 39:1,4,14,21 41:10 45:23 46:1 47:1,6,24 48:20 49:14,15 50:2 50:23 53:3,15 55:12

**42:21** 45:4,13,15,15 46:24 52:10 54:8 55:4 55:14,23 57:22 58:15 58:20,21 60:12 67:15 75:3,16 76:18 77:9 78:11,18 81:14,16 82:15 84:13,14 87:2 88:16 89:24 96:4

**rep** [1] 108:8

**rephrase** [3] 5:18 67:7 67:24

**reporter** [12] 4:10 5:13 6:4 15:8 20:17 32:14 34:1 46:3 50:7 56:2 63:9 107:12

**Reporting** [2] 1:18 108:23

**represent** [1] 6:14

**represented** [1] 7:9

**representing** [3] 63:17 99:4 100:23

**request** [2] 57:14 88:11

**requesting** [4] 57:12 57:17 102:22 103:11

**required** [1] 37:6

**requires** [1] 24:6

**reserve** [1] 107:13

**reside** [2] 7:4,5

**59:18** 60:1,11 61:9 62:23 63:3 64:1,5 67:19,21 68:11 73:19 80:2,3,21 81:21 87:18 91:15 92:9 93:4,19 94:6 95:8,21 97:18 99:5,12 100:4 101:2

**right-hand** [2] 87:20 87:22

**rolling** [1] 68:19

**Rothmann** [67] 2:10 2:15,17 4:8 15:6,9 19:23 20:1,2,15,18 26:4 28:20,21,23 29:2 32:15 33:4 34:2 35:1,2 38:18,20 40:18,21 41:24 42:5,11,16 46:4 50:8 51:20 56:3 63:4 63:10 64:9,10 67:5,7,9 67:15,24 68:1,11,17 76:1 80:14 83:6 85:18 85:22 86:2,10 90:18 90:24 97:21,24 98:2 98:11 100:8,12,16 101:4,11,15 102:8 105:19 107:11

**RPR** [3] 1:19 109:3,22

**rules** [3] 4:17,18 5:3

**run** [2] 10:21 74:4

**running** [1] 10:18

—S—

**s** [1] 108:15

**safe** [3] 69:10,14,15

**sale** [1] 22:5

**satisfaction** [1] 99:20

**satisfied** [1] 32:22

**save** [1] 11:16 64:9

**Savings** [1] 8:3

**saw** [1] 96:10

**school** [1] 66:9

**SCOTT** [1] 2:5

**second** [6] 5:24 17:19 46:14 51:7 59:7 82:19

**secretary** [1] 55:4

**section** [3] 23:23 24:13 24:14,23 25:15

**security** [3] 18:6,10 19:3

**see** [30] 5:24 24:14,20 24:21 25:1,17 26:20 27:1 33:18 50:21,22 52:16 53:12 54:3 56:10 60:6,21,24 61:15 63:15 63:21 64:14,19 72:4,8 76:9 80:10 82:10 83:9 84:2

**seeing** [1] 92:21

**seek** [1] 43:9 99:20

**seem** [2] 36:24 57:8

**sell** [4] 12:14 16:10,13 20:11

**selling** [5] 16:7 17:3 18:22 36:5 37:1

**send** [8] 37:18 54:1 66:11,15 70:19 75:11 78:3,8

**sending** [3] 54:13 57:5 83:1

**sense** [2] 54:15 65:15

**sent** [24] 23:3 30:5 46:24 53:18,21 65:7 65:16,18,18 74:13 77:1 78:13,14,23 80:8,24 81:1,7,9 82:17 83:2 98:21,22 102:17

**sentence** [1] 84:18

**separate** [5] 9:2 11:19 14:11,15 19:17

**September** [3] 72:16 73:3 86:20

**Service** [2] 1:18 108:23

**Services** [1] 11:3

**set** [5] 71:18 90:24 91:1 101:12 109:17

**sets** [2] 26:18 91:3

**settle** [1] 57:1

**settled** [1] 55:24

**seven** [1] 54:14

**several** [1] 38:2

**share** [1] 9:9

**shared** [1] 103:3

**sheet** [2] 62:12 108:15

**sheets** [1] 92:22

**Shelley** [1] 1:19 109:3 109:22

**shortly** [1] 88:20

**show** [9] 26:1 28:18 33:4 41:21 86:6,7 101:17 105:15,15

**showed** [2] 23:4 48:12

**showing** [16] 15:10 20:19 32:16 34:3 40:14 40:22 42:2 46:5 50:9 53:3 56:4 63:11 66:20 86:5 88:5 93:16

**shows** [1] 86:5

**sign** [19] 23:15 28:5 47:2 48:21,24 49:2,3 60:11,11 65:13,19,20 70:17 75:11 78:3,3,17 106:9 107:7

**signatory** [1] 23:15

**signature** [9] 46:13 50:13 51:6 53:21 61:16 104:20 107:12,13 109:11

**signatures** [1] 95:6

**signed** [24] 47:3,10 48:19,24 49:5,10 50:3 52:1,13 53:24 66:11 69:3,21 70:5,7,15 71:2 72:13,19 78:14,16,20 79:10,20

**signing** [5] 47:14 50:24 70:19 106:5 107:5

**similar** [3] 12:6 33:11 33:14

**similarity** [1] 14:14

**simple** [1] 29:18

**sit** [1] 104:5

**situation** [1] 84:14

**slow** [1] 38:17

**small** [1] 36:21

**smoking** [1] 9:13

**softball** [1] 9:18

**sold** [2] 16:14 35:21

**someone** [1] 77:5

**somewhere** [1] 71:9

**son** [2] 13:3 66:13

**sorry** [14] 10:7 19:24 34:13,24 44:9 53:9 55:13 58:10 64:8 73:5 83:5 100:1 102:3,5

**sort** [3] 30:21 34:16 103:9

**sound** [1] 59:24

**speak** [1] 5:10

**speaking** [1] 57:24

**speaks** [4] 24:17 26:15 100:14,17

**specific** [7] 30:12,17 31:10,15 37:15 57:23 87:10

**specifically** [4] 75:4 78:11 82:15 87:2

**specifics** [1] 103:4

**speculation** [1] 25:24

**spend** [1] 54:15

**spoke** [1] 57:20

**SS** [1] 109:1

**stamp** [2] 40:19 64:3

**stamped** [10] 15:13 40:22 46:7 53:5 61:13 64:2,12 77:16 79:16 104:23

**standard** [1] 17:24

**standing** [2] 28:24 42:12

**start** [1] 10:18

**started** [4] 10:11 48:6 51:23 93:16

**state** [6] 1:16,19 4:9 60:5 109:1,4

**statement** [11] 41:1 62:13 69:10,14,15 82:3 84:8 85:7 88:4 107:2,6

**statements** [17] 38:10 38:13 41:22 42:3,13 45:7 48:14,16 59:15 59:22 60:3 67:1,11 94:18 104:9,13,15

**states** [4] 1:1,21 108:1 108:14

**status** [1] 55:21

**stayed** [1] 10:14

**stenograph** [1] 109:9

**step** [1] 44:11

**steps** [1] 39:15

**sticks** [1] 30:23

**ticky** [4] 76:24 77:1,5 86:19

**still** [7] 9:9 39:20 40:2 54:9 86:22 87:4,8

**Stilwell** [27] 1:3,3,3,3 1:4 16:9 18:14 19:4 21:1 25:17 26:16 32:21 35:4,5 36:15 37:8 39:1 39:5 43:1 44:10 52:7 52:13 81:21 99:5,19 99:23 108:3

**Stilwell's** [7] 19:8 21:15 33:2 51:16 77:12 88:21 99:14

**Stilwells** [13] 6:16 14:23 15:2 16:18 18:15 20:10 27:18,19,23 29:4 30:13 38:5,22

**Stilwells'** [1] 51:14

**stockholder** [1] 9:9

**stop** [1] 76:4

**stopped** [1] 29:12

**storage** [1] 18:23

**strange** [1] 16:21

**street** [7] 1:18 2:5,9 22:13,13,15 108:23

**strike** [8] 12:3 14:6 26:6 57:24 59:2,3,24 64:21

**uff** [2] 54:11 57:5

**subject** [2] 26:2 45:8

**submission** [2] 54:21 57:13

**submissions** [1] 68:8

**submit** [3] 39:15 55:8 95:7

**submitted** [5] 45:22 45:22 61:11,18 103:15

**submitting** [3] 44:11 66:22 68:3

**Subscribed** [1] 108:18

**subsequently** [3] 11:14 44:24 97:5

**sudden** [2] 35:15 36:10

**sued** [1] 6:15

**suit** [3] 1:20 8:22 9:8

**Suite** [1] 2:5

**summarize** [1] 44:6

**supposed** [3] 35:19 37:2 91:9

**surprise** [1] 93:22

**surprised** [5] 37:17 100:19,21,22 101:3

**sworn** [4] 1:17 4:5 108:18 109:5

**system** [3] 25:11 88:5 38:19

---

**-T-**

**table** [1] 5:6

**taking** [4] 29:21 39:14 56:24 103:4

**talks** [4] 24:13 69:16 69:17 83:22

**telephone** [3] 30:2 40:7 41:5

**template** [1] 49:19

**term** [1] 35:9

**terms** [3] 18:4 69:12 92:21

**testified** [3] 4:6 76:22 80:19

**testify** [1] 41:20

**testimony** [3] 30:7 44:6 109:10

**TFG** [32] 14:4,17 15:5 15:16,20 17:13 18:7 20:9 21:1 22:2 24:19 25:5,12,16 26:17 27:18 27:18,21 30:9 31:6,6 32:7 33:11,14 37:11 44:20,22 51:8,9 56:22 58:2 104:16

**Thank** [1] 66:22

**Thanks** [1] 19:23 49:6

**themselves** [1] 16:23

**third** [7] 1:9,13 6:1 17:4 22:1 108:8,11

**Thomas** [5] 1:16 4:3 4:11,14 108:17 109:4

**thought** [3] 17:8 49:4 81:18

**three** [2] 13:10 81:15

**through** [15] 7:13 13:18 25:9 46:7 59:8 59:11 60:20,21 74:6 74:8 79:16 82:8 88:2 96:22

**throughout** [2] 23:18 23:24

**throw** [2] 5:12 17:4

**tied** [1] 19:19

**Tim** [4] 45:12,15,15 95:10

**timeframe** [2] 81:14 82:2

**timeline** [1] 60:10

**times** [1] 54:11

**Timothy** [1] 51:7

**title** [3] 9:20,21 47:24

**today** [7] 7:10 9:5 79:7,17 80:7 86:5 104:5

**today's** [1] 4:15

**together** [4] 15:13 42:23 95:3,6

**Tom** [3] 4:11 68:15 73:7

**too** [6] 34:13 42:6,8 45:10 47:14 50:24

**took** [4] 34:19 36:20 43:4 74:16

**top** [2] 20:5 76:20

**totally** [1] 42:9

**town** [2] 9:3 36:21

**trail** [1] 66:1

**transaction** [6] 23:4 26:10 29:9 30:8 33:21 66:20

**transactions** [1] 8:21

**transcript** [2] 6:11 108:12,13

**transcription** [1] 109:10

**transfer** [1] 97:10

**true** [7] 48:15,18,20 48:21 49:7 59:16,23 60:3 61:4 62:12,15 109:10

**trust** [18] 1:11 2:7 6:22 6:23 8:12 9:10 10:11 35:15,16 36:17 42:9 63:19 79:2 84:1 85:10 92:14 100:3 108:10

**trusted** [2] 35:22,23

**truth** [4] 29:6 109:5,5 109:5

**try** [5] 5:11 11:16 20:11

**trying** [5] 10:10 38:8 43:23 44:13 52:12

**turn** [6] 16:15 24:12 25:14 43:20 44:4,12 51:6 61:12 81:23

**turned** [2] 43:21 44:15

**turning** [4] 45:10 61:9 64:11 104:18

**Tuscola** [61] 1:12 6:24 9:1 10:13,13,14,16 11:10,21 12:2,4,19 13:5,12 14:3 16:4,7,12 16:15 17:5 18:18 19:4 21:13 22:11,14,18 29:7 36:12,18 44:1 45:1 50:12 52:14 54:9 57:17 62:7,16 63:18 65:7,9 65:17 66:2 70:9,22 74:1 79:3,18 82:20 83:24 85:8 93:9,15,24 94:7 95:10,11 97:10 98:23 99:24 100:2,23

**two** [15] 5:14,16 11:18 11:19 14:1,15,15 45:18 47:16 72:21 81:15 91:3 95:3,5 97:22

**two-page** [2] 77:15 86:8

**type** [1] 91:16

**typewriting** [1] 109:10

**typical** [3] 21:23,24 54:13

**typically** [2] 12:12 37:23

---

**-U-**

**U** [1] 66:10

**ultimately** [1] 18:19

**unaware** [2] 8:23 9:5

**under** [3] 39:15 42:13 65:9

**undergrad** [1] 7:21

**underneath** [1] 26:19

**understand** [8] 5:17 5:18 30:7 60:24 69:2 73:6,6 82:23

**understands** [1] 19:18

**understood** [2] 5:21 60:21

**underwriting** [1] 31:21

**undetermined** [1] 1:20

**unfamiliar** [1] 44:3

**Unfortunately** [1] 37:19

**United** [3] 1:1,21 108:1

**University** [2] 7:18,22

**untimely** [1] 99:18

**untrue** [3] 49:1,4 68:7

**up** [9] 6:14 10:4,20,21 14:21 33:16 36:4,16 43:23 45:19 48:12 57:2 65:19 66:11 71:10 86:2 93:16 95:9 98:11

**upside** [1] 53:13

**Urbana** [3] 1:2 10:19 108:2

**used** [2] 19:17 46:19

**usually** [2] 12:15 93:3

---

**-V-**

**value** [1] 36:6

**various** [1] 18:10

**verification** [2] 75:19 76:19

**verified** [11] 105:2,12 105:22,23 106:3,11,13 106:17,23 107:1,4

**verify** [3] 70:21,24 86:21

**verifying** [2] 34:6 69:12

**versus** [2] 92:13 102:1

**Vice** [5] 8:9 9:22,24 10:6,13

**Village** [5] 19:5,10 69:19 70:8 99:21

**volleyball** [3] 9:18 86:11,14

---

**-W-**

**waive** [1] 28:17

**waived** [2] 32:7 109:12

**Watseka** [1] 9:3

**weakness** [1] 39:23

**welcome** [3] 4:23,24 5:2

**West** [2] 1:18 108:23

**wherein** [1] 102:21

**WHEREOF** [1] 109:17

**White** [2] 1:18 108:23

**whole** [6] 51:23 52:3 54:15 94:1 95:15 109:5

**Wide** [1] 1:17 108:23

**William** [2] 40:24 46:11

**WILSON** [1] 2:8

**within** [1] 38:3

**witness** [13] 1:16,20 4:4 26:3 34:23 43:16 55:13 64:8 67:6 87:19 87:22 109:11,17

**wondering** [1] 87:9

**word** [1] 39:11

**worked** [2] 10:3 22:17

**world** [1] 4:24

**worth** [1] 9:10

**write** [1] 94:2

**writing** [5] 67:19 68:2 76:8,11,12

**wrong** [1] 49:1

**wrote** [1] 76:18

---

**-Y-**

**year** [3] 11:11 18:2,3

**years** [4] 8:13 10:15 81:16 97:7

**yesterday** [2] 97:2,8

---

**-Z-**

**ZIP** [1] 7:8

---

**-[-**

**[sic]** [4] 26:5 44:7 53:6 101:19

| 2220 MARQUETTE ROAD | N.A. | Loan Number 2150095387 |
|---|---|---|
| ARG 3113 6135 | 410 S MAIN, P.O. BOX 18 | Date NOVEMBER 17, 2000 |
| | TUSCOLA, IL 61953 | Maturity Date APRIL 16, 2002 |
| | | Loan Amount $ 1,000,000.00 |
| | | Renewal Of |
| **BORROWER'S NAME AND ADDRESS** | **LENDER'S NAME AND ADDRESS** | : ID#: 36-4391423 |
| "I" includes each borrower above, joint and severally. | "You" means the lender, its successors and assigns. | |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of ONE MILLION AND NO/100
* * * * * * * * * * * * * * * * * * * * * * * * * Dollars $ 1,000,000.00

☐ **Single Advance:** I will receive all of this principal sum on _____. No additional advances are contemplated under this n

☒ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On NOV. 17, 2
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
**Conditions:** The conditions for future advances are UPON REQUEST OF TUSCOLA FURNITURE GROUP, LLC, MANAGER JANKO FINANCIAL GROUP, LLC, AUTHORIZED MEMBERS RICHARD JANKO OR MICHAEL JANKO, BASED ON INVOICES, NOT TO EXCEED 80% OF ACTUAL COST OF INVENTORY

☒ **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subjec
all other conditions and expires on APRIL 16, 2002

☐ **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from NOVEMBER 17, 2000 _____ at the rate of 9.50%
per year until JANUARY 16, 2001.

☒ **Variable Rate:** This rate may then change as stated below.
☒ **Index Rate:** The future rate will be EQUAL TO the following index rate: HIGHEST PRIME RATE AS LISTED IN THE MONEY RATE SECTION OF THE WALL STREET JOURNAL

☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
☒ **Frequency and Timing:** The rate on this note may change as often as QUARTERLY
A change in the interest rate will take effect THE 16TH DAY OF EACH JANUARY, APRIL, JULY & OCTOBER
☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less
_____ %. The rate may not change more than _____ % each _____
**Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
☒ The amount of each scheduled payment will change.     ☒ The amount of the final payment will change.
☐

**ACCRUAL METHOD:** Interest will be calculated on a ACTUAL/365 basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as state_____ ☐ below.
☒ on the same fixed or variable rate basis in effect before maturity (as indicated above).
☐ at a rate equal to

☒ **LATE CHARGE:** If a payment is made more than 10 days after it is due, I agree to pay a late charge of 5.000% OF T
LATE PAYMENT WITH A MAXIMUM OF $25.00

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the p
above: _____

**PAYMENTS:** I agree to pay this note as follows:
☒ **Interest:** I agree to pay accrued interest ON DEMAND, BUT IF NO DEMAND IS MADE THEN ON THE 16TH DAY OF EACH MONTH BEGINNING DECEMBER 16, 2000
☒ **Principal:** I agree to pay the principal ON DEMAND, BUT IF NO DEMAND IS MADE THEN ON APRIL 16, 2002

☐ **Installments:** I agree to pay this note in _____ payments. The first payment will be in the amount of $ _____
and will be due _____ . A payment of $ _____ will be due _____ the e
unpaid balance of principal and interest will be due _____ thereafter. The final payment of

**ADDITIONAL TERMS:**
INVENTORY CHECKS WILL BE CONDUCTED MONTHLY BY A REPRESENTATIVE OF THE BORROWER AND/OR A BA_____ N_
OFFICER AT THE BANK'S SOLE DISCRETION. A REPORT DETAILING THE FINDINGS OF THE INVENTORY
CHECK WILL BE FORWARDED TO THE BANK FOR REVIEW WITHIN THREE BUSINESS DAYS.
LINE OF CREDIT AGREEMENT OF EVEN DATE WITH THIS NOTE. IT IS EXPRESSLY UNDERSTOOD THAT FIRS_
MID-ILLINOIS BANK & TRUST WILL ADVANCE UP TO AN AMOUNT NOT TO EXCEED 80% OF THE ACTUAL COST
OF INVENTORY.
ASSIGNMENT OF UCC-1 AND SECURITY AGREEMENT ORIGINIALLY EXECUTED BY AMISHLAND'S COUNTRY
VILLAGE, INC., DEBTOR AND GRANTED TO TUSCOLA FURNITURE GROUP.
$300,000 PERSONAL GUARANTY FROM RICHARD F JANKO.

☒ **SECURITY:** This note is separately secured by (describe separate document by type and date) SECURITY AGREEMENT & UCC-1 AGREEMENT SIGNED EVEN DATE TO THIS NOTE; ASSIGNEMENT OF SECURITY AGREEMENT & UCC-1 FROM CONSIGNOR; PERSONAL GUARANTY
(This section is for your internal use. Failure to list a separate security document does not mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is BUSINESS: FLOOR PL_ FURNITURE INVENTORY
☒ **CONFESSION OF JUDGMENT:** I agree to the term "Confession of Judgment" paragraph on page 2.
**SIGNATURES:** I AGREE TO THE TERMS OF THIS NOTE (INCLUDE THOSE ON PAGE 2). I have received a copy on today's date.

Signature for Lender

X _Thomas J Chamberlain_
THOMAS J CHAMBERLAIN

TUSCOLA FURNITURE GROUP, LLC BY ITS MANAG_
JANKO FINANCIAL GROUP, LLC

BY: _Richard F Janko_
RICHARD F JANKO, AUTHORIZED MEMBER

UNIVERSAL NOTE
©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN-IL 4/9/96

**EXHIBIT**

000137

(page 1

Chamberlain #1
2-8-07  sm

**DEFINITIONS:** As used on page 1, "X" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Illinois will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits us and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not doing any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**CONFESSION OF JUDGMENT:** In addition to your remedies listed herein, I authorize any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment, without process, against me in favor of you, for any unpaid principal, accrued interest and accrued charges due on this agreement, together with collection costs including reasonable attorney's fees.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except to the extent prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice that any party to this agreement without releasing any other or notice release up any of your rights, with or without notice, it will not party. If you do pay this note, any extension of new credit to any of us affect to pay it. (Of course, you are entitled to only one payment from me. that you may at your option extend this note or the debt in full.) I agree this note, or any portion of the note or debt, from limit represent with limit or notice and for any term without affecting my liability to pay any of the note. I will not assign my obligation under this ability for payment with your prior written approval.

**CREDIT INFORMATION:** I agree and authorize you to obtain credit information about me from time to time (for example, by requesting a credit report) and to report to others your credit experience with me (such as a credit reporting agency). I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH: |
|---|---|---|---|---|---|---|---|
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |

© 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form UN-IL 4/9/96

2220 MARQUETTE ROAD

PERU, IL 361354

TAXPAYER I.D. NUMBER : 36-4391423

**DEBTOR'S NAME, ADDRESS AND SSN OR TIN**
("I" means each Debtor who signs.)

FIRST MID-ILLINOIS BANK & TRUST, N.A.

410 S MAIN, P.O. BOX 18
TUSCOLA, IL 61953

**SECURED PARTY'S NAME AND ADDRESS**
("You" means the Secured Party, its successors and assigns.)

I am entering into this security agreement with you on ___NOVEMBER 17, 2000___ (date).

**SECURED DEBTS.** I agree that this security agreement will secure the payment and performance of the debts, liabilities or obligations described below that (Check one) ☐ I ☒ (name) TUSCOLA FURNITURE GROUP, LLC owe(s) to you now or in the future: ◯

(Check one below):

☐ **Specific Debt(s).** The debt(s), liability or obligations evidenced by (describe): _____ and all extensions, renewals, refinancings, modifications and replacements of the debt, liability or obligation.

☒ **All Debt(s).** Except in those cases listed in the "LIMITATIONS" paragraph on page 2, each and every debt, liability and obligation of every type and description (whether such debt, liability or obligation now exists or is incurred or created in the future and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several).

**Security Interest.** To secure the payment and performance of the above described Secured Debts, liabilities and obligations, I give you a security interest in all of the property described below that I now own and that I may own in the future (including, but not limited to, all parts, accessories, repairs, improvements, and accessions to the property), wherever the property is or may be located, and all proceeds and products from the property.

☒ **Inventory:** All inventory which I hold for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☐ **Equipment:** All equipment including, but not limited to, all machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and recordkeeping equipment, and parts and tools. All equipment described in a list or schedule which I give to you will also be included in the secured property, but such a list is not necessary for a valid security interest in my equipment.

☐ **Farm Products:** All farm products including, but not limited to:
(a) all poultry and livestock and their young, along with their products, produce and replacements;
(b) all crops, annual or perennial, and all products of the crops; and
(c) all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☒ **Accounts, Instruments, Documents, Chattel Paper and Other Rights to Payment:** All rights I have how and that I may have in the future to the payment of money including, but not limited to:
(a) payment for goods and other property sold or leased or for services rendered, whether or not I have earned such payment by performance; and
(b) rights to payment arising out of all present and future debt instruments, chattel paper and loans and obligations receivable.
The above include any rights and interests (including all liens and security interests) which I may have by law or agreement against any account debtor or obligor of mine.

☒ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, and the right to use my name.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, or other benefits (including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance payments, diversion payments, and conservation reserve payments) in which I now have and in the future may have any rights or interest and which arise under or as a result of any preexisting, current or future Federal or state governmental program (including, but not limited to, all programs administered by the Commodity Credit Corporation and the ASCS).

☒ **The secured property includes, but is not limited to, the following:** ALL ORIGINALLY MADE AND CRAFTED AMISH FURNITURE, FULLY FINISHED, AND AMISH STYLE FURNITURE MADE BY OTHERS, PLUS OTHER FURNITURE COMPLIMENTARY TO, BUT NOT CURRENTLY PRODUCED BY AMISH MANUFACTURES, BUT DOES NOT INCLUDE CRAFTS, LAMPS, PICTURES AND ACCESSORIES OTHER THAN WOOD PRODUCTS WHETHER AMISH MADE OR NOT

If this agreement covers timber to be cut, minerals (including oil and gas), fixtures or crops growing or to be grown, the legal description is:

FURNITURE COVERED BY THIS SECURITY AGREEMENT IS TO BE KEPT, PRESERVED, REPAIRED AND MAINTAINED AT THE FOLLOWING LOCATIONS:

1. 1304 TUSCOLA BLVD., TUSCOLA, ILLINOIS 61953
2. EAST ROUTE 36, ATWOOD, ILLINOIS 61913
3. 123 N. MAIN ST., ATWOOD, ILLINOIS 61913
4. 601 & 603 S. MAIN ST., TUSCOLA, ILLINOIS 61953
   (1 BUILDING OCCUPYING 2 LOTS)

I am a(n) ☐ individual ☐ partnership ☐ corporation
☒ LIMITED LIABILITY COMPANY

☐ If checked, file this agreement in the real estate records.

Record Owner (if not me): _____

The property will be used for ☐ personal ☒ business
☐ agricultural ☐ _____ reasons.

FIRST MID-ILLINOIS BANK & TRUST, N.A.
(Secured Party's Name)

By: _Thomas J. Chamberlain_
THOMAS J CHAMBERLAIN

Title: VICE PRESIDENT

**I AGREE TO THE TERMS SET OUT ON BOTH PAGE 1 AND PAGE 2 OF THIS AGREEMENT. I have received a copy of this document on today's date.**

TUSCOLA FURNITURE GROUP, LLC BY ITS MANAGER:
JANKO FINANCIAL GROUP, LLC
(Debtor's Name)

By: _____
RICHARD F. JANKO

Title: AUTHORIZED MEMBER

By: _____

Title: _____

©1986, 1990 BANKERS SYSTEMS, INC., ST. CLOUD, MN (1-800-397-2341) SECURITY AGREEMENT FORM SA 8/5/91

GENERALLY - "You" means the Secured Party identified on page 1 of this agreement. "I," "me" and "my" means each person who signs this security agreement as Debtor and who agrees to give the property described in this agreement as security for the Secured Debts. All terms and duties under this agreement are joint and individual. No modification of this security agreement is effective unless made in writing and signed by you and me. This security agreement remains in effect, even if the note is paid and I owe no other debt to you, until discharged in writing. Time is of the essence in this agreement.

APPLICABLE LAW - I agree that this security agreement will be governed by the law of the state in which you are located. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the property is located.

To the extent permitted by law, the terms of this agreement may vary applicable law. If any provision of applicable law may not be varied by agreement, any provision of this agreement that does not comply with that law will not be effective. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement.

OWNERSHIP AND DUTIES TOWARD PROPERTY - I represent that I own all of the property, or to the extent this is a purchase money security interest I will acquire ownership of the property with the proceeds of the loan. I will defend it against any other claim. Your claim to the property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the property ahead of the claims of other creditors. I will not do anything to harm your position.

I will keep books, records and accounts about the property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the property.

I will keep the property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the property and, if I am not, that I have provided you with a list of prior owners of the property.

I will keep the property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the property is to be used in another state, I will give you a list of those states. I will not try to sell the property unless it is inventory or I receive your written permission to do so. If I sell the property I will have the payment made payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent (1) a beneficial interest in the debtor is sold or transferred or (2) there is a change in either the identity or number of members of a partnership or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the property as they become due. You have the right of reasonable access in order to inspect the property. I will immediately inform you of any loss or damage to the property.

LIMITATIONS - This agreement will not secure a debt described in the section entitled "Secured Debts" on page 1:
1) if you fail to make any disclosure of the existence of this security interest required by law for such other debt;
2) if this security interest is in my principal dwelling and you fail to provide (to all persons entitled) any notice of right of rescission required by law for such other debt;
3) to the extent that this security interest is in "household goods" and the other debt to be secured is a "consumer" loan (as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices);
4) if this security interest is in margin stock subject to the requirements of 12 C.F.R. Section 207 or 221 and you do not obtain a statement of purpose if required under these regulations with respect to that debt; or
5) if this security interest is unenforceable by law with respect to that debt.

PURCHASE MONEY SECURITY INTEREST - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any non-purchase money loan also secured by this agreement will not be deemed to apply to the purchase money loan, and (b) payments on the purchase money loan will be deemed to apply first to the non-purchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase money loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancings of such loan.

AUTHORITY OF SECURED PARTY TO MAKE ADVANCES AND PERFORM FOR DEBTOR - I agree to pay you on demand any sums you advanced on my behalf including, but not limited to, expenses incurred in collecting, insuring, conserving, or protecting the property or in any inventories, audits, inspections or other examinations by you in respect to the property. If I fail to pay such sums, you may do so for me, adding the amount paid to the other amounts secured by this agreement. All such sums will be due on demand and will bear interest at the highest rate provided in any agreement, note or other instrument evidencing the Secured Debt(s) and permitted by law at the time of the advance.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. I understand that this authorization includes, but is not limited to, permission to: (1) prepare, file, and sign my name to any necessary reports or accountings; (2) notify any account debtor of your interest in this property and tell the account debtor to make the payments to you or someone else you name, rather than me; (3) place on any chattel paper a note indicating your interest in the property; (4) in my name, demand, collect, receive and give a receipt for, compromise, settle, and handle any suits or other proceedings involving the collateral; (5) take any action you feel is necessary in order to realize on the collateral, including performing any part of a contract or endorsing it in my name; and (6) make an entry on my books and records showing the existence of the security agreement. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

INSURANCE - I agree to buy insurance on the property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

WARRANTIES AND REPRESENTATIONS - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of my agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 198_

DEFAULT - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) I change my name or assume an additional name without first notifying you before making such a change; (9) failure to plant, cultivate and harvest crops in due season; (10) if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

REMEDIES - If I am in default on this agreement, you have the following remedies.
1) You may demand immediate payment of all I owe you under any obligation secured by this agreement.
2) You may set off any obligation I have to you against any right I have to the payment of money from you.
3) You may demand more security or new parties obligated to pay any debt I owe you as a condition of giving up any other remedy.
4) You may make use of any remedy you have under state or federal law.
5) If I default by failing to pay taxes or other charges, you may pay them (but you are not required to do so). If you do, I will repay to you the amount you paid plus interest at the highest contract rate.
6) You may require me to gather the property and make it available to you in a reasonable fashion.
7) You may repossess the property and sell it as provided by law. You may repossess the property so long as the repossession does not involve a breach of the peace or an illegal entry into my property. You may sell the property as provided by law. You may apply what you receive from the sale of the property to: your expenses; your reasonable attorneys' fees and legal expenses (where not prohibited by law); any debt I owe you. If what you receive from the sale of the property does not satisfy the debts, you may take me to court to recover the difference (where permitted by law).

I agree that 10 days written notice sent to my address listed on page 1 by first class mail will be reasonable notice to me under the Uniform Commercial Code.

If any items not otherwise subject to this agreement are contained in the property when you take possession, you may hold these items for me at my risk and will not be liable for taking possession of them.
8) In some cases, you may keep the property to satisfy the debt. You may enter upon and take possession of all or any part of my property, so long as you do not breach the peace or illegally enter onto the property, including lands, plants, buildings, machinery, and equipment as may be necessary to permit you to manufacture, produce, process, store or sell or complete the manufacture, production, processing, storing or sale of any of the property and to use and operate the property for the length of time you feel is necessary to protect your interest, all without payment or compensation to me.

By choosing any one or more of these remedies, you do not waive your right to later use any other remedy. You do not waive a default if you choose not to use any remedy, and, by electing not to use any remedy, you do not waive your right to later consider the event a default and to immediately use any remedies if it continues or occurs again.

FILING - A carbon, photographic or other reproduction of this security agreement or the financing statement covering the property described in this agreement may be used as a financing statement where allowed by law. Where permitted by law, you may file a financing statement which does not contain my signature, covering the property secured by this agreement.

CO-MAKERS - If more than one of us has signed this agreement, we are all obligated equally under the agreement. You may sue any one of us or any of us together if this agreement is violated. You do not have to tell me if any term of the agreement has not been carried out. You may release any co-signer and I will still be obligated under this agreement. You may release any of the security and I will still be obligated under this agreement. Waiver by you of any of your rights will not affect my duties under this agreement. Extending this agreement or new obligations under this agreement, will not affect my duty under the agreement.

1304 TUSCOLA BLVD
TUSCOLA, IL 61953

TAXPAYER I.D. NUMBER : 37-1397921

DEBTOR'S NAME, ADDRESS AND SSN OR TIN
("I" means each Debtor who signs.)

TUSCOLA FURNITURE GROUP, LLC
2220 MARQUETTE ROAD
PERU, IL 61354

SECURED PARTY'S NAME AND ADDRESS
("You" means the Secured Party, its successors and assigns.)

I am entering into this security agreement with you on _____ (date)

**SECURED DEBTS.** I agree that this security agreement will secure the payment and performance of the debts, liabilities or obligations described below that (Check one) ☐ I ☒ (name) AMISHLAND'S COUNTRY VILLAGE, INC. owe(s) to you now or in the future:

(Check one below):

☐ **Specific Debt(s).** The debt(s), liability or obligations evidenced by (describe): _____

extensions, renewals, refinancings, modifications and replacements of the debt, liability or obligation. _____ and all

☒ **All Debt(s).** Except in those cases listed in the "LIMITATIONS" paragraph on page 2, each and every debt, liability and obligation of every type and description (whether such debt, liability or obligation now exists or is incurred or created in the future and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several).

**Security Interest.** To secure the payment and performance of the above described Secured Debts, liabilities and obligations, I give you a security interest in all of the property described below that I now own and that I may own in the future (including, but not limited to, all parts, accessories, repairs, improvements, and accessions to the property), wherever the property is or may be located, and all proceeds and products from the property.

☒ **Inventory:** All inventory which I hold for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☐ **Equipment:** All equipment including, but not limited to, all machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and recordkeeping equipment, and parts and tools. All equipment described in a list or schedule which I give to you will also be included in the secured property, but such a list is not necessary for a valid security interest in my equipment.

☐ **Farm Products:** All farm products including, but not limited to:
(a) all poultry and livestock and their young, along with their products, produce and replacements;
(b) all crops, annual or perennial, and all products of the crops; and
(c) all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☒ **Accounts, Instruments, Documents, Chattel Paper and Other Rights to Payment:** All rights I have now and that I may have in the future to the payment of money including, but not limited to:
(a) payment for goods and other property sold or leased or for services rendered, whether or not I have earned such payment by performance; and
(b) rights to payment arising out of all present and future debt instruments, chattel paper and loans and obligations receivable. The above include any rights and interests (including all liens and security interests) which I may have by law or agreement against any account debtor or obligor of mine.

☒ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, and the right to use my name.

☐ **Government Payments and Programs:** All payments, accounts, general intangibles, or other benefits (including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance payments, diversion payments, and conservation reserve payments) in which I now have and in the future may have any rights or interest and which arise under or as a result of any preexisting, current or future Federal or state governmental program (including, but not limited to, all programs administered by the Commodity Credit Corporation and the ASCS).

☒ **The secured property includes, but is not limited to, the following:** ALL ORIGINALLY MADE AND CRAFTED AMISH FURNITURE, FULLY FINISHED, AND AMISH STYLE FURNITURE MADE BY OTHERS, PLUS OTHER FURNITURE COMPLIMENTARY TO, BUT NOT CURRENTLY PRODUCED BY AMISH MANUFACTURES, BUT DOES NOT INCLUDE CRAFTS, LAMPS, PICTURES AND ACCESSORIES OTHER THAN WOOD PRODUCTS WHETHER AMISH MADE OR NOT

If this agreement covers timber to be cut, minerals (including oil and gas), fixtures or crops growing or to be grown, the legal description is:

FURNITURE COVERED BY THIS SECURITY AGREEMENT IS TO BE KEPT, PRESERVED, REPAIRED AND MAINTAINED AT THE FOLLOWING LOCATIONS:

1. 1304 TUSCOLA BLVD., TUSCOLA, ILLINOIS 61953
2. EAST ROUTE 36, ATWOOD, ILLINOIS 61913
3. 123 N. MAIN ST., ATWOOD, ILLINOIS 61913
4. 601 & 603 S. MAIN ST., TUSCOLA, ILLINOIS 61953
   (1 BUILDING OCCUPYING 2 LOTS)

I am a(n) ☐ individual ☐ partnership ☒ corporation

☐ If checked, file this agreement in the real estate records.
Record Owner (if not me): _____

The property will be used for ☐ personal ☒ business ☐ agricultural reasons.

I AGREE TO THE TERMS SET OUT ON BOTH PAGE 1 AND PAGE 2 OF THIS AGREEMENT. I have received a copy of this document on today's date.

AMISHLAND'S COUNTRY VILLAGE, INC
(Debtor's Name)

By: _James E Stilwell_

Title: PRESIDENT

By: _____

Title: _____

TUSCOLA FURNITURE GROUP, LLC

BY ITS MANAGER: JANKO FINANCIAL GROUP, LLC

By: _Janko_
RICHARD JANKO

Title: AUTHORIZED MEMBER

©1986, 1990 BANKERS SYSTEMS, INC., ST. CLOUD, MN (1-800-397-2341) SECURITY AGREEMENT FORM SA 8/5/91

000141

(page 1 of 2)

this agreement. "I," "me," and "my" means each person who signs this security agreement as debtor and who agrees to give the property described in this agreement as security for the Secured Debts. All terms and duties under this agreement are joint and individual. No modification of this security agreement is effective unless made in writing and signed by you and me. This security agreement remains in effect, even if the note is paid and I owe no other debt to you, until discharged in writing. Time is of the essence in this agreement.

**APPLICABLE LAW** - This agreement will be governed by the law of the state in which you are located. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the property is located.

To the extent permitted by law, the terms of this agreement may vary applicable law. If any provision of applicable law may not be varied by agreement, any provision of this agreement that does not comply with that law will not be effective. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement.

**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the property, or to the extent this is a purchase money security interest I will acquire ownership of the property with the proceeds of the loan. I will defend it against any other claim. Your claim to the property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in this property ahead of the claims of other creditors. I will not do anything to harm your position.

I will keep books, records and accounts about the property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the property.

I will keep the property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the property and, if I am not, that I have provided you with a list of prior owners of the property.

I will keep the property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the property is to be used in another state, I will give you a list of those states. I will not try to sell the property unless it is inventory or I receive your written permission to do so. If I sell the property I will have the payment made payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent (1) a beneficial interest in the debtor is sold or transferred or (2) there is a change in either the identity or number of members of a partnership or (3) there is a change in ownership of more than than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the property as they become due. You have the right of reasonable access in order to inspect the property. I will immediately inform you of any loss or damage to the property.

**LIMITATIONS** - This agreement will not secure a debt described in the section entitled "Secured Debts" on page 1:
1) if you fail to make any disclosure of the existence of this security interest required by law for such other debt;
2) if this security interest is in my principal dwelling and you fail to provide its all persons entitled any notice of right of rescission required by law for such other debt;
3) to the extent that this security interest is in "household goods" and the other debt to be secured is a "consumer" loan (as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices);
4) if this security interest is in margin stock subject to the requirements of 12 C.F.R. Section 207 or 221 and you do not obtain a statement of purpose if required under these regulations with respect to that debt; or
5) if this security interest is unenforceable by law with respect to that debt.

**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any non-purchase money loan also secured by this agreement will not be deemed to apply to the purchase money loan, and (b) payments on the purchase money loan will be deemed to apply first to the non-purchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase money loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancings of such loan.

**AUTHORITY OF SECURED PARTY TO MAKE ADVANCES AND PERFORM FOR DEBTOR** - I agree to pay you on demand any sums you advanced on my behalf including, but not limited to, expenses incurred in collecting, insuring, conserving, or protecting the property or in any inventories, audits, inspections or other examinations by you in respect to the property. If I fail to pay such sums, you may do so for me, adding the amount paid to the other amounts secured by this agreement. All such sums will be due on demand and will bear interest at the highest rate provided in any agreement, note or other instrument evidencing the Secured Debt(s) and permitted by law at the time of the advance.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. I understand that this authorization includes, but is not limited to, permission to: (1) prepare, file, and sign my name to any necessary reports or accountings; (2) notify any account debtor of your interest in this property and tell the account debtor to make the payments to you or someone else you name, rather than me; (3) place on any chattel paper a note indicating your interest in the property; (4) in my name, demand, collect, receive and give a receipt for, compromise, settle, and handle any suits or other proceedings involving the collateral; (5) take any action you feel is necessary in order to realize on the collateral, including performing any part of a contract or endorsing it in my name; and (6) make an entry on my books and records showing the existence of the security agreement. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. In addition to those parties named on this written list, I authorize you to notify at your sole discretion any additional parties regarding your security interest in my farm products. I remain subject to all applicable penalties for selling my farm products in violation of your agreement with you and the Food Security Act. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

**DEFAULT** - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you; (8) I change my name or assume an additional name without first notifying you before making such a change; (9) failure to plant, cultivate and harvest crops in due season; (10) if any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES** - If I am in default on this agreement, you have the following remedies:
1) You may demand immediate payment of all I owe you under any obligation secured by this agreement.
2) You may set off any obligation I have to you against any right I have to the payment of money from you.
3) You may demand more security or new parties obligated to pay any debt I owe you as a condition of giving up any other remedy.
4) You may make use of any remedy you have under state or federal law.
5) If I default by failing to pay taxes or other charges, you may pay them (but you are not required to do so). If you do, I will repay to you the amount you paid plus interest at the highest contract rate.
6) You may require me to gather the property and make it available to you in a reasonable fashion.
7) You may repossess the property and sell it as provided by law. You may repossess the property so long as the repossession does not involve a breach of the peace or an illegal entry onto my property. You may sell the property as provided by law. You may apply what you receive from the sale of the property to your expenses, your reasonable attorneys' fees and legal expenses (where not prohibited by law); any debt I owe you. If what you receive from the sale of the property does not satisfy the debts, you may take me to court to recover the difference (where permitted by law).
   I agree that 10 days written notice sent to my address listed on page 1 by first class mail will be reasonable notice to me under the Uniform Commercial Code.
   If any items not otherwise subject to this agreement are contained in the property when you take possession, you may hold these items for me at my risk and you will not be liable for taking possession of them.
8) In some cases, you may keep the property to satisfy the debt. You may enter upon and take possession of all or any part of my property, so long as you do not breach the peace or illegally enter onto the property, including lands, plants, buildings, machinery, and equipment as may be necessary to permit you to manufacture, produce, process, store or sell or complete the manufacture, production, processing, storing or sale of any of the property and to use and operate the property for the length of time you feel is necessary to protect your interest, all without payment or compensation to me.

By choosing any one or more of these remedies, you do not waive your right to later use any other remedy. You do not waive a default if you choose not to use any remedy, and, by electing not to use any remedy, you do not waive your right to later consider the event a default and to immediately use any remedies if it continues or occurs again.

**FILING** - A carbon, photographic or other reproduction of this security agreement or the financing statement covering the property described in this agreement may be used as a financing statement where allowed by law. Where permitted by law, you may file a financing statement which does not contain my signature, covering the property secured by this agreement.

**CO-MAKERS** - If more than one of us has signed this agreement, we are all obligated equally under the agreement. You may sue any one of us or any of us together if this agreement is violated. You do not have to tell me if any term of the agreement has not been carried out. You may release any co-signer and I will still be obligated under this agreement. You may release any of the security and I will still be obligated under this agreement. Waiver by you of any of your rights will not affect my duties under this agreement. Extending this agreement or new obligations under this agreement, will not affect my duty under the agreement.

| | |
|---|---|
| 2220 MARQUETTE ROAD<br>PERU, IL  61354<br><br>**BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | FIRST MID-ILLINOIS BANK & TRUST,<br>N.A.<br>410 S MAIN, P.O. BOX 18<br>TUSCOLA, IL  61953<br>**LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. |

Line of Credit No. 2150095387
Date  NOVEMBER 17, 2000
Max. Credit Amt.  $1,000,000.00
Loan Ref. No. 2150095387

You have extended to me a line of credit in the
AMOUNT of ONE MILLION AND NO/100                                                      $       1,000,000.00

You will make loans to me from time to time until  3:00        P m. on APRIL 15, 2002                                    . Although the line of cre
expires on that date, I will remain obligated to perform all my duties under this agreement so long as I owe you any money advanced according to t
terms of this agreement, as evidenced by any note or notes I have signed promising to repay these amounts.
This line of credit is an agreement between you and me. It is not intended that any third party receive any benefit from this agreement, v 'her
direct payment, reliance for future payment or in any other manner. This agreement is not a letter of credit.

**1. AMOUNT:** This line of credit is:
☒ OBLIGATORY: You may not refuse to make a loan to me under this line of credit unless one of the following occurs:
  a. I have borrowed the maximum amount available to me;
  b. This line of credit has expired;
  c. I have defaulted on the note (or notes) which show my indebtedness under this line of credit;
  d. I have violated any term of this line of credit or any note or other agreement entered into in connection with this line of credit;
  e. _____

☐ DISCRETIONARY: You may refuse to make a loan to me under this line of credit once the aggregate outstanding advances equal or excee
_____ $ _____
Subject to the obligatory or discretionary limitations above, this line of credit is:
  ☒ OPEN-END (Business or Agricultural only): I may borrow up to the maximum amount of principal more than one time.
  ☐ CLOSED-END: I may borrow up to the maximum only one time.
**2. PROMISSORY NOTE:** I will repay any advances made according to this line of credit agreement as set out in the promissory note, I signed
NOVEMBER 17, 2000 _____, or any note(s) I sign at a later time which represent advances under this agreement. The note(s) set(s) or
the terms relating to maturity, interest rate, repayment and advances. If indicated on the promissory note, the advances will be made as follow:
UPON REQUEST OF TUSCOLA FURNITURE GROUP, LLC, MANAGER JANKO FINANCIAL GROUP, LLC,
AUTHORIZED MEMBERS RICHARD JANKO OR MICHAEL JANKO, BASED ON INVOICES OR RECEIPTS, NOT TO
EXCEED 80% OF THE ACTUAL COST OF INVENTORY

**3. RELATED DOCUMENTS:** I have signed the following documents in connection with this line of credit and note(s) entered into in accordance wit
this line of credit:
  ☒ security agreement dated NOVEMBER 17, 2000 _____         ☐ _____
  ☐ mortgage dated _____         ☐ _____
  ☒ guaranty dated NOVEMBER 17, 2000 _____         ☐ _____
**4. REMEDIES:** If I am in default on the note(s) you may:
  a. take any action as provided in the related documents;
  b. without notice to me, terminate this line of credit.
  By selecting any of these remedies you do not give up your right to later use any other remedy. By deciding not to use any remedy should
default, you do not waive your right to later consider the event a default, if it happens again.
**5. COSTS AND FEES:** If you hire an attorney to enforce this agreement I will pay your reasonable attorney's fees, where permitted by law. I will als
pay your court costs and costs of collection, where permitted by law.
**6. COVENANTS:** For as long as this line of credit is in effect or I owe you money for advances made in accordance with the line of credit, I will do the
following:
  a. maintain books and records of my operations relating to the need for this line of credit;
  b. permit you or any of your representatives to inspect and/or copy these records;
  c. provide to you any documentation requested by you which support the reason for making any advance under this line of credit;
  d. permit you to make any advance payable to the seller (or seller and me) of any items being purchased with that advance;
  e. _____

**7. NOTICES:** All notices or other correspondence with me should be sent to my address stated above. The notice or correspondence shall be effective
when deposited in the mail, first class, or delivered to me in person.
**8. MISCELLANEOUS:** This line of credit may not be changed except by a written agreement signed by you and me. The law of the state in which you
are located will govern this agreement. Any term of this line of credit which is contrary to applicable law will not be effective, unless the law per-
mits you and me to agree to such a variation.

FOR THE LENDER

THOMAS J CHAMBERLAIN

Title VICE PRESIDENT

**SIGNATURES:** I AGREE TO THE TERMS OF THIS LINE OF CREDIT. I
HAVE RECEIVED A COPY ON TODAY'S DATE.

TUSCOLA FURNITURE GROUP, LLC BY ITS MANAGER:
JANKO FINANCIAL GROUP, LLC
BY:
RICHARD F JANKO, AUTHORIZED MEMBER

© 1985 BANKERS SYSTEMS, INC., ST. CLOUD, MN 56301 (1-800-397-2341) FORM LCA 5/2/91

## LOAN EXTENSION AGREEMENT

Note No. __2150095387__                                   TUSCOLA          ILLINOIS
                                                          ‾‾‾‾‾‾‾‾          ‾‾‾‾‾‾‾‾
                                                            CITY             STATE

$ 1,000,000.00 LINE OF CREDIT NOTE          Date __4-3-2002__

| Amount Financed | FINANCE CHARGE | ANNUAL PERCENTAGE RATE | Total of Payments |
|---|---|---|---|
| $ | $ | % | $ |
| This is the amount you are borrowing. | This is the dollar amount this loan will cost you. | This is what your loan will cost as a yearly rate of interest. | This is the total amount you will pay if you make all payments as scheduled. |

IT IS HEREBY AGREED that the above numbered note, or payment, on which there is an unpaid balance

__AN OPEN ONE MILLION AND NO/100 LINE OF CREDIT__    ($ 1,000,000.00 ) DOLLAR

shall be and is hereby extended to become due __ON APRIL 16, 2003, WHEN ALL UNPAID PRINCIPAL__
                                                                    EXPLAIN

__AND INTEREST SHALL BE DUE AND PAYABLE__

and the undersigned, in consideration of the extension of time for payment, does hereby agree to pay a fee

$ __0.00__ and further agrees to pay the said note, or payment, as above specified together with interes

the rate of __4.75% VARIABLE__ per cent per annum, payable __MONTHLY__
                                                            EXPLAIN (MONTHLY - SEMI-ANNUALLY)

from __MARCH 16, 2002__ , ‾‾ until the maturity as herein specified and at the highest rate allow

by law, from maturity until fully paid. All terms and conditions of the original note and any security thereto attached
fully incorporated herein and fully ratified except as specifically modified by this extension agreeme

**By executing this Extension Agreement, the undersigned acknowledge receipt of a completely filled
copy prior to consummation.**

FIRST MID-ILLINOIS BANK & TRUST, N.A.           TUSCOLA FURNITURE GROUP, LLC BY I
          CREDITOR                              MANAGER: JANKO FINANCIAL GROUP, L
                                                                CUSTOMER
By _Thomas J. Chamberl_                         BY: _J. Janko_
    TUSCOLA COMMUNITY PRESIDENT    TITLE         RICHARD F. JANKO, AUTHORIZED MEMB
                        **AN EQUAL OPPORTUNITY LENDER**

000138

## LOAN EXTENSION AGREEMENT

Note No. __2150095387__                                    CHAMPAIGN              IL
                                                          CITY                  STATE

$ __85,409.00__                                     Date __APRIL 10, 2003__

*THE LINE OF CREDIT FEATURE IS NOT EXTENDED.

| Amount Financed | FINANCE CHARGE | ANNUAL PERCENTAGE RATE | Total of Payments |
|---|---|---|---|
| $ This is the amount you are borrowing. | $ This is the dollar amount this loan will cost you. | This is what your loan will cost as a yearly rate of interest. | $ This is the total amount you will pay if you make all payments as scheduled. |

IT IS HEREBY AGREED that the above numbered note, or payment, on which there is an unpaid balance

__EIGHTY-FIVE THOUSAND FOUR HUNDRED NINE & NO/1$0  85,409.00__ ) DOLLAR

shall be and is hereby extended to become due __APRIL 16, 2004, when all unpaid princip__
                                                          EXPLAIN

and interest shall be due and payable.

and the undersigned, in consideration of the extension of time for payment, does hereby agree to pay a fee

$ __0.00__ and further agrees to pay the said note, or payment, as above specified together with interes

the rate of __4.25% Variabl__per cent per annum, payable __Monthly__
                                                          EXPLAIN (MONTHLY - SEMI-ANNUALLY)

from __MARCH 16__ , __2003__ until the maturity as herein specified and at the highest rate allow

by law, from maturity until fully paid. All terms and conditions of the original note and any security thereto attached
fully incorporated herein and fully ratified except as specifically modified by this extension agreeme

**By executing this Extension Agreement, the undersigned acknowledge receipt of a completely filled**
copy prior to consummation.

FIRST MID-ILLINOIS BANK & TRUST, N.A.                     TUSCOLA FURNITURE GROUP, LL(
          CREDITOR                                        ITS MANAGER:JANKO FINANCIAL
                                                          LLC
By _Thomas Chew___                                                    CUSTOMER

COMMUNITY PRESIDENT       **AN EQUAL OPPORTUNITY LENDER**   RICHARD F. JANKO, AUTHORIZED
              TITLE                                        MEMBER

000139