(Pages 1 to 4)

## DIANA L. FIELDS - July 6, 2006

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARGARET J. STILWELL,          *
        Plaintiff,             *
                               *
VS.                            *  NO. 05-CV-02160
                               *
AMERICAN GENERAL LIFE          *
INSURANCE CO.,                 *
        Defendant.             *

*************************************************

ORAL DEPOSITION OF

DIANA L. FIELDS

JULY 6, 2006

*************************************************

ORAL DEPOSITION OF DIANA L. FIELDS, produced as a witness at
the instance of the Plaintiff, and duly sworn, was taken in
the above-styled and numbered cause on the 6th day of July,
2006, from 8:52 a.m. to 11:15 a.m., before LaRita J.
Cormier, Certified Shorthand Reporter in and for the State
of Texas, reported by stenographic means, at the law offices
of WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, 5847 San
Felipe, Suite 2300, Houston, Texas 77057, pursuant to the
Federal Rules of Civil Procedure and the provisions stated
on the record or attached hereto.

---

**Page 2**

## A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jason M. Crowder
    HELLER, HOLMES & ASSOCIATES, P.C.
    1101 Broadway
    Mattoon, Illinois 61938
    Phone:  217.235.2700
    Fax:    217.235.0743

FOR THE DEFENDANT:
    Mr. Daniel J. McMahon
    WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
    120 North LaSalle Street
    Chicago, Illinois 60602
    Phone:  312.704.0550
    Fax:    312.704.1522

---

**Page 3**

## I N D E X

                                        PAGE
APPEARANCES...................................  02
EXAMINATION
    By Mr. Crowder..........................  04
CHANGES.......................................  90
SIGNATURE.....................................  91
REPORTER'S CERTIFICATE.......................  92

---

**Page 4**

                DIANA L. FIELDS,
having been first duly sworn, testified as follows:
                EXAMINATION
BY MR. CROWDER:
    Q.  Could you go ahead and state your name for the
record?
    A.  **Diana Fields.**
    Q.  Okay.  And where do you work?
    A.  **American General, AIG.**
    Q.  Where are you currently located for work purposes?
    A.  **Allen Parkway.**
    Q.  And where is that, what town?
    A.  **Oh, Houston.  I'm sorry.**
    Q.  Okay.  How long have you been at this office?
    A.  **Thirty years.**
    Q.  Can you go through your background for me, your
educational background?
    A.  **I graduated high school and have two years of
junior college.**
    Q.  Okay.  And where did you go to junior college?
    A.  **San Jac, San Jacinto Junior College.**
    Q.  Where is that located?
    A.  **In Houston.**
    Q.  What year did you complete junior college?
    A.  **I don't remember.**

---

EXHIBIT
G 1

### DIANA L. FIELDS - July 6, 2006

5

1   Q.  All right.  Do you know approximately when that
2   was?
3       A.  No, sir.
4       Q.  Okay.  Do you recall -- what year did you graduate
5   from high school?
6       A.  '76.
7       Q.  And did you go directly to junior college?
8       A.  Yes, sir.
9       Q.  Okay.  And did you complete two years
10  consecutively?
11      A.  No, sir.
12      Q.  How many years do you recall going to junior
13  college, or what period of time?
14      A.  I don't remember.
15      Q.  Okay.  When did you -- you said you've been at
16  this office for 30 years.  Is that how long you've been with
17  American General?
18      A.  Yes, sir.
19      Q.  Do you recall your start date, then?
20      A.  June 1st.
21      Q.  Of what year?
22      A.  1976.
23      Q.  Can you tell me your progression through the
24  company, what different positions you've held and when you
25  held them?

6

1       A.  Yes, sir.  I was a -- started in the mailroom of
2   the claims department, up through what I'm currently doing
3   now.
4       Q.  Okay.  What's your current position?
5       A.  Senior claims analyst.
6       Q.  How many positions did you hold between being in
7   the mailroom to senior claims analyst?
8       A.  Three.
9       Q.  Okay.  Tell me about those and when you had them,
10  when you held those positions.
11      A.  I can't tell you the years.  Over 30 years.  The
12  mailroom, and then I was the death claim clerk, and then I
13  became an examiner.
14      Q.  Approximately when did you become an examiner,
15  claims examiner?
16      A.  Don't remember.
17      Q.  Do you recall what your job responsibilities were
18  as a claims examiner?
19      A.  Yes, sir.
20      Q.  Okay.  Can you go through those for me.
21      A.  To review and pay claims that were payable.
22      Q.  Okay.  What, if any, training did you receive in
23  that regard?
24      A.  On the job.
25      Q.  Were these all life insurance policies?

7

1       A.  Yes, sir.
2       Q.  It appeared that Old Line somehow became merged
3   with American General.  Do you recall when that took place?
4       A.  Approximately 2003.
5       Q.  Okay.  Have you ever had your deposition taken
6   before?
7       A.  Yes, sir.
8       Q.  How many times?
9       A.  Four or five.
10      Q.  And what were they related to?  Claims being made
11  against American General?
12      A.  Yes, sir.
13      Q.  Okay.  And were they with respect to the way
14  American General handled the claims?
15      A.  They were in regards to the decision that was made
16  on the claim.
17      Q.  Were those depositions all down here in Houston?
18      A.  With the exception of one.
19      Q.  Okay.  Where was it?
20      A.  Little Rock, Arkansas.
21      Q.  Do you know why you did it up in Little Rock?
22      A.  No, sir.
23      Q.  Somebody told you to go and you went?
24      A.  (The witness nods head.)
25      Q.  Have you ever testified in court?

8

1       A.  Yes, sir.
2       Q.  Okay.  How many times?
3       A.  Twice.
4       Q.  And where were those located?
5       A.  One was in Conroe, Texas.  The other one was in a
6   small town outside of Nashville, Tennessee.  I don't
7   remember the name of the town.
8       Q.  Do you remember the names of the policies?
9       A.  No, sir.
10      Q.  When did you become or when did you start your or
11  when did you become the senior claims analyst?
12      A.  Approximately three years ago.  They renamed the
13  position.
14      Q.  Okay.  And what was the position before then?
15      A.  Claim investigator.
16      Q.  And do you recall when you started that position?
17      A.  No, sir.
18      Q.  Have you essentially held every position in the
19  claims department you can hold?
20      A.  No, sir.
21      Q.  Okay.  But you're familiar with the claims process
22  inside and out, would you agree?
23      A.  The life claims process, yes, sir.
24      Q.  Okay.  Can you tell me the difference between
25  being a claims examiner and a claims investigator?  What are

DIANA L. FIELDS - July 6, 2006

---

9

1  the differences there?
2      A.  The claims investigator handled the contestable
3  claims, the foreign deaths, homicides.
4      Q.  And then a claim investigator handles what kind?
5      A.  Oh, that's what the claims investigator handles.
6  I'm so sorry.
7      Q.  You may have said claims investigator, but I
8  thought you said claims examiner, so let's clear that up.
9  What's the difference, again, between being a claims
10  examiner and a claims investigator?
11      A.  Claims examiner just handles the regular, ordinary
12  death claims.  The claims investigator handles the
13  contestable death claims, the homicides, and foreign deaths.
14      Q.  Then when they changed the name of the position to
15  senior claims analyst, did that change your responsibilities
16  in any way from a claims investigator to a senior claims
17  analyst?
18      A.  No, sir.
19      Q.  Okay.  Prior to today's deposition did you review
20  any documents to familiarize yourself with this particular
21  life insurance policy?
22      A.  Yes, sir, briefly.
23      Q.  Okay.  You understand that it's the life insurance
24  policy for James E. Stilwell; correct?
25      A.  I know it's Mr. Stilwell.  I don't know what his

---

10

1  first name is.
2      Q.  Okay.  And it was a policy that was $4 million in
3  the aggregate; correct?
4      A.  Yes, sir.
5      Q.  Okay.  And there were a number of claims made
6  against that policy; correct?
7      A.  From what I recall, yes, sir.
8      Q.  Okay.  Do you recall what documents you reviewed
9  in preparation for your deposition?
10      A.  I briefly went through the whole file.  The ones I
11  actually looked at were the letters that I wrote.
12      Q.  Do you recall how many letters you were talking
13  about?
14      A.  Two.
15      Q.  Do you recall who those were addressed to?
16      A.  I believe, you.
17      Q.  Now, when you looked through the entire -- you
18  said briefly looked through the entire file, was it a hard
19  copy file or was it basically on a computer screen, pulling
20  it up?
21      A.  It was a hard copy.
22      Q.  Okay.  When you get involved, do you get a hard
23  copy or do you -- and this is during your normal activities
24  as a senior analyst, are you looking at hard copies or are
25  you looking at a computer screen when you get involved?

---

11

1      A.  Hard copy, usually.
2      Q.  Okay.  Do you have the capability from your desk
3  to print anything from a claims file off the computer?
4      A.  Yes, sir.
5      Q.  Did you look back --
6          MR. McMAHON:  I want to clarify something
7  here.  Forgive me for interjecting, because I just don't
8  want to leave a misapprehension here.  When you're referring
9  to a hard copy it is off of an imaged file; right?
10          THE WITNESS:  Yes, sir.
11          MR. McMAHON:  I want to make sure I
12  understand it.
13      Q.  (BY MR. CROWDER)  Why don't we go through that a
14  little bit.  When a document comes in to American General,
15  can you tell me what happens to that document?
16      A.  It's scanned in and then assigned to the
17  appropriate examiner.
18      Q.  Can you explain how it -- how when it's scanned in
19  it gets to the appropriate file like the Stilwell insurance
20  policy file?
21          MR. McMAHON:  I'll object to lack of
22  foundation.
23          You can go ahead and answer.
24      A.  I don't know how it does.
25      Q.  (BY MR. CROWDER)  What department scans it in?

---

12

1      A.  The scan center.
2      Q.  Is that located where?  The scan center is located
3  here in Houston?
4      A.  Oh, yes, sir.  I'm sorry.
5      Q.  I understand that American General has a few
6  satellite or other locations; correct?
7      A.  Yes, sir.
8      Q.  Seems like there was perhaps a location in Dallas
9  as well?
10      A.  Yes, sir.
11      Q.  Let me just hand you document number -- AIG
12  document No. 288.  The only thing I'm really curious about
13  is the numbers here at the top, top right corner.  Are those
14  the -- is that the information that gets placed on a
15  document once it's scanned in?
16          MR. McMAHON:  Objection.  Lack of
17  foundation.
18          You can answer it if you know.
19      A.  I don't know when it's put on there.
20      Q.  (BY MR. CROWDER)  But by the time you see it it's
21  on there?
22      A.  Yes, sir.
23      Q.  Okay.  Can you explain the top line of those two
24  lines that are placed on there?
25      A.  The first part of it is the date.  The other I

---

## DIANA L. FIELDS - July 6, 2006

13

1  don't know what it is.
2      Q.  "The first part of it," when you say that, you're
3  talking about the top line of the two lines that are placed
4  on there by AIG?
5      A.  The first part of the top line.
6      Q.  Okay. Let me have that document back real quick.
7  So when you talk about the first part, you're talking about
8  9-12-03; is that correct?
9      A.  Yes, sir.
10     Q.  Okay. And that would indicate the date that it
11 was scanned in; correct?
12         MR. McMAHON: Objection. Lack of
13 foundation.
14     A.  Yes, sir.
15     Q.  (BY MR. CROWDER) And what you're saying is you
16 don't know what the 1121 number references?
17     A.  No, sir.
18     Q.  Is that correct?
19     A.  Yes, sir.
20     Q.  Okay. And then what about the second line, do you
21 know what that references?
22     A.  No, sir.
23     Q.  I take it, then, that those have no -- in terms of
24 your evaluation of a file, these lines don't have a lot of
25 importance to you?

14

1      A.  No, sir.
2      Q.  Is that correct?
3      A.  Yes, sir.
4      Q.  Do you have any idea what happens to the original
5  document once it's scanned in?
6      A.  Yes, sir.
7      Q.  What happens?
8      A.  It's shredded.
9      Q.  So anything that would have an original signature
10 on it would be shredded once it was scanned in?
11     A.  Yes, sir.
12     Q.  Based on your review of the Stilwell file in
13 preparation for the deposition, do you recall when you first
14 had involvement in that file?
15     A.  I don't remember the date.
16     Q.  Do you recall if it was during the processing of
17 the claims that were being made after Mr. Stilwell's death?
18     A.  No, sir.
19     Q.  It was after -- it was after the claims had been
20 paid, then, to your recollection?
21     A.  Yes, sir.
22     Q.  There was a point in time after claims had been
23 paid when I had submitted a subpoena to get the claims file.
24 Were you involved in any way once that subpoena was sent to
25 American General?

15

1      A.  No, sir.
2      Q.  Would your involvement, then, with this particular
3  claim file have been shortly before you drafted one of the
4  two letters that you drafted -- the first of the two letters that
5  you drafted in this case?
6          MR. McMAHON: Object to the form.
7          You can go ahead and answer.
8      A.  Yes, sir.
9      Q.  (BY MR. CROWDER) Do you recall receiving any
10 letters from me in this case?
11     A.  No, sir.
12     Q.  If I would have drafted you a letter, would that
13 have been made part of the claims file, to your knowledge?
14     A.  To my knowledge, yes, sir.
15     Q.  Do you recall why you got involved in the case,
16 then?
17     A.  No, sir.
18     Q.  Was it prompted by a call from me, or do you have
19 any recollection of why you took a role in this case?
20     A.  I do not recall.
21     Q.  Do you know what documents you reviewed and what
22 you analyzed and who you talked to in preparing your
23 letters?
24     A.  No, sir.
25     Q.  Okay. Do you recall talking to anybody?

16

1      A.  I don't recall.
2      Q.  Let me hand you a document from the claims file
3  that I received, documents -- it's one document, pages 288
4  through 290, and ask you to take a look at that briefly.
5      A.  Okay.
6      Q.  Have you reviewed that document before?
7      A.  No, sir.
8      Q.  You've never seen that letter before?
9      A.  No, sir.
10     Q.  And you've never had any -- in terms of your
11 review of the file, you've never had occasion to read that
12 record or read that document?
13     A.  Not that I recall, no, sir.
14     Q.  Hand you AIG document 291 and 292, ask you if you
15 have ever read that document.
16         MR. McMAHON: If you recall.
17     A.  No, sir, not that I recall.
18     Q.  (BY MR. CROWDER) Hand you AIG document No. 330.
19 Have you ever seen that document before?
20     A.  No, sir.
21     Q.  And do you know whose handwriting is on that
22 document?
23     A.  No, sir.
24     Q.  It's not your handwriting; is that correct?
25     A.  No, sir.

DIANA L. FIELDS - July 6, 2006

**17**

1   Q. That is correct?

2   **A. I mean, that is correct.**

3   Q. Do you understand that this case, this claim file

4 involved collateral assignments that were issued by the

5 owner of the policy?

6   **A. Yes, sir.**

7   Q. Okay. I take it you've dealt with collateral

8 assignments in other files before?

9   **A. Yes, sir.**

10   Q. Okay. Would a collateral assignment that is made

11 against a policy have to be made via a document, an American

12 General document?

13      MR. McMAHON: Object to the lack of

14 foundation. Calls for speculation.

15   **A. I wouldn't know. That's not my area.**

16   Q. (BY MR. CROWDER) Okay. Whose area is that?

17   **A. Policy owner service.**

18   Q. Say that again?

19   **A. Policy owner service.**

20      MR. McMAHON: Policy owner service.

21   **A. Sorry, my southern kicks in.**

22   Q. (BY MR. CROWDER) During your years at American

23 General, have you ever seen a collateral assignment against

24 a policy that was not on an American General collateral

25 assignment form?

**18**

1   **A. Yes, sir.**

2   Q. Okay. On what occasion?

3   **A. Can't give you a particular time or date.**

4   Q. Do you know how many times?

5   **A. No, sir.**

6   Q. I mean, do you know approximately how many times?

7   **A. No, sir.**

8   Q. Over ten?

9   **A. Yes, sir.**

10   Q. And what were the documents, what were they? Were

11 they privately drafted documents, or what did they look

12 like, the collateral assignment?

13   **A. They were documents drafted by the assignee.**

14   Q. Hand you what's been marked AIG document No. 16

15 and ask you if you recognize that form.

16   **A. Yes, sir.**

17   Q. Okay. Is that the assignment form, American

18 General assignment form being used back in 2000 and 2001?

19      MR. McMAHON: Objection. Lack of

20 foundation.

21   **A. Would not know.**

22   Q. (BY MR. CROWDER) Is that an AIG assignment form?

23   **A. Yes, sir.**

24   Q. Is it continuing to be used?

25   **A. I would not know.**

**19**

1   Q. Document No. 16, again, can you tell me when that

2 document was scanned into the system, if you know?

3      MR. McMAHON: Objection. Lack of

4 foundation. Calls for speculation.

5   **A. According to the date at the top, 12-28-2000, I'm**

6 **sorry, 11-28-2000.**

7   Q. (BY MR. CROWDER) Okay. And this is one of those

8 documents you said that as far as you know, once it's

9 scanned in, the original is then shredded; correct?

10      MR. McMAHON: Objection. Lack of

11 foundation.

12   **A. Yes, sir.**

13   Q. (BY MR. CROWDER) Okay. How do you know that that

14 is the process?

15   **A. Because that's what we've been told in trying to**

16 **pull a document back out of the box if we want the original.**

17   Q. Okay. So if you make a request for the original,

18 you've been instructed by AIG that the original is no longer

19 in existence?

20   **A. Yes, sir.**

21   Q. Okay. Under what circumstances have you wanted

22 original documents in the past?

23   **A. If the beneficiary wants the death certificate**

24 **back, we try to pull it to get it back to them, or original**

25 **documents that they've had a hard time recreating for their**

**20**

1 **own personal files.**

2   Q. Going to hand you what's been marked as AIG

3 documents 1 and 2 and ask you if you are familiar with the

4 form itself, not necessarily the handwriting on the form but

5 the form itself. Are you familiar with that form?

6   **A. No, sir.**

7   Q. Okay. You've never seen an assignment that looks

8 like this before?

9      MR. McMAHON: Do you recall?

10   **A. No, sir.**

11   Q. (BY MR. CROWDER) Okay. Are the assignments that

12 you tend to have traditionally worked with like the

13 assignment that's drafted on AIG No. 16, document 16?

14   **A. No, sir.**

15   Q. Okay. What do they typically look like? Can you

16 describe them?

17   **A. They're usually a longer form, similar to that one**

18 **but not -- I can't tell you that the wording is exactly the**

19 **same, but it's more of a wordier document than No. 16.**

20      MR. McMAHON: You're referencing document

21 AIG 1 and 2?

22      THE WITNESS: Yes, sir. Sorry.

23   Q. (BY MR. CROWDER) Would it have at the top

24 something that identified it as an American General

25 document, to your recollection?

6 (Pages 21 to 24)

DIANA L. FIELDS - July 6, 2006

21

1    A. Not that I recall. I don't remember what they
2  look like.
3    Q. Okay. Just so I'm clear, though, you have worked
4  with assignments that look like AIG document 16 before;
5  correct?
6    A. Yes, sir.
7    Q. Now, I want to make sure I understand. If
8  somebody, if somebody wanted to place an assignment against
9  their life insurance policy, a collateral assignment against
10  their life insurance policy, do you know what the process
11  would be for getting that documentation done?
12        MR. McMAHON: Objection. Lack of
13  foundation.
14    A. No, sir.
15    Q. (BY MR. CROWDER) You do not know the process?
16    A. No, sir, do not.
17    Q. Okay. If somebody wanted to -- let me back up.
18  Who would tell you that process at American General?
19    A. Policy owner service.
20    Q. Okay. If somebody said that they had an existing
21  collateral assignment but wanted to have it released, would
22  you know the process for doing that?
23        MR. McMAHON: Same objection.
24    A. No, sir.
25    Q. (BY MR. CROWDER) And who would tell you the

22

1  process for doing that?
2    A. Policy owner service.
3    Q. Do they have written policies that explain this,
4  or do you know?
5        MR. McMAHON: Same objection.
6    A. I do not know.
7    Q. (BY MR. CROWDER) Okay. In your job
8  responsibilities at American General, are there any written
9  policies that you follow?
10    A. No, sir.
11    Q. Okay. If somebody wanted to transfer a collateral
12  assignment, would you be able to explain that process?
13        MR. McMAHON: Same objection.
14    A. No, sir.
15    Q. (BY MR. CROWDER) And who would be familiar with
16  that process?
17    A. Policy owner service.
18    Q. When you do work on a particular file such as the
19  Stilwell file, do you make a computer entry as well
20  indicating that you've done something in the file?
21    A. I don't understand the question. I'm sorry.
22    Q. Well, there are certain documents that I've been
23  provided that show certain computer entries that were made
24  with notes. I'm asking whether or not you've done -- do you
25  do that as part of your practice when you're dealing with a

23

1  file.
2    A. Yes, sir.
3    Q. Okay. What's that called?
4    A. It's the comments section of our AWD system.
5    Q. What's the AWD system?
6    A. Automatic work distribution.
7    Q. How does that system work? What's the purpose?
8        MR. McMAHON: Objection. Lack of
9  foundation.
10    A. That's where our mail is scanned into.
11    Q. (BY MR. CROWDER) When you say mail, you're
12  talking about mail specifically directed to you or just
13  general documents?
14    A. Any and all documents.
15    Q. So these are part of the -- so document No. 16
16  would be part of the AWD system?
17        MR. McMAHON: Objection. Lack of
18  foundation.
19    A. Yes, sir.
20    Q. (BY MR. CROWDER) And the system itself has a --
21  provides you the ability to make specific notes or to make
22  an entry into a specific file; correct?
23        MR. McMAHON: Same objection.
24    A. Yes, sir.
25    Q. (BY MR. CROWDER) And how do you access that

24

1  system? Do you have to use a password or --
2    A. Yes, sir.
3    Q. And then once you're into the system, how do you
4  get into specific files? Do you have to know the file
5  number, name?
6    A. Either.
7    Q. Okay. If you want to make an entry, are there a
8  number of options that you have to go through in order to
9  make an entry?
10    A. No, sir.
11    Q. Okay. What do you do once you get in the system
12  and you want to make an entry on a specific claim file?
13    A. You go to that policy number and then click to
14  "Comments" and it will give you a box to enter.
15    Q. Okay. And then you just type in your comments?
16    A. Uh-huh.
17    Q. Is that correct?
18    A. Yes, sir.
19    Q. Hand you what's labeled AIG documents 5 and 6 and
20  ask you if those are examples of the comments you can enter
21  into the AWD system.
22    A. Yes, sir.
23    Q. It looks like each time you make an entry it shows
24  a begin date; is that correct?
25        MR. McMAHON: Objection. Lack of

DIANA L. FIELDS - July 6, 2006

25

1  foundation.
2      A.  I don't know what all these entries are.
3      Q.  (BY MR. CROWDER)  Well, do you see the begin date
4  at the top?
5      A.  Yes, sir.
6      Q.  Okay.  And does it put a date there for when you
7  get into the system?
8          MR. McMAHON:  Same objection.
9      A.  It's automatically there.
10     Q.  (BY MR. CROWDER)  When you print it out, when it
11  gets printed out, or is it in front of you as well when
12  you're on the screen?
13     A.  It's in front of me.
14     Q.  And is the time as well in front of you when
15  you're on the screen?
16     A.  Yes, sir.
17     Q.  So when you want to access back to something that
18  you have previously put in there or something that somebody
19  else has put in there, you can scroll back to it and see
20  what other people's notes are and what your previous notes
21  were; is that accurate?
22     A.  Yes, sir.
23     Q.  And you can also see who made the notes and those
24  type of things; correct?
25     A.  Yes, sir.

26

1      Q.  Do you know anything about — let me take a look
2  at that one real quick.  Do you know anything about when it
3  says user name, batch station, and user?  Do you know what
4  that means?  I'll show you specifically the one I'm talking
5  about.
6          MR. McMAHON:  Objection.  Lack of
7  foundation.
8      A.  I don't know what batch station and user batch is.
9      Q.  (BY MR. CROWDER)  Okay.  That seems to be in the
10  line where it normally — or in the two lines before it
11  shows the name of the person who used the system.  Do you
12  notice that?
13     A.  Yes, sir.
14     Q.  Okay.  But you don't know why it doesn't show a
15  name and why it just says "batch station"?
16     A.  No, I don't know.
17     Q.  Okay.  And then the one below that doesn't have a
18  user name, if you can see that entry below that, doesn't
19  have a user name, does it?
20         MR. McMAHON:  What page are you on?
21     A.  I'm sorry.  Five rolls to six.
22     Q.  (BY MR. CROWDER)  Okay.  And then it says "user
23  name" and then "user name not found"?
24     A.  Yes, sir.
25     Q.  Do you know why that is?

27

1      A.  No, sir.
2      Q.  Anytime that you log onto the system and make a
3  comment, it automatically is going to put your name on
4  there; would that be accurate?
5          MR. McMAHON:  Objection.  Lack of
6  foundation.
7      A.  It will put my name on there if I'm logging in,
8  yes, sir.
9      Q.  (BY MR. CROWDER)  Right.  Show you what's marked
10  as AIG document 20, ask you if you've seen a document — not
11  this specific document but a document that gets produced
12  like this.
13     A.  No, sir.
14     Q.  Is that something that you're familiar with, a
15  letter that goes out indicating your release of assignment
16  verification?
17     A.  No, sir.
18     Q.  Okay.  You're not part of that process at AIG
19  where a release comes in and then a letter gets drafted to
20  somebody indicating that the release has been recorded?
21     A.  Correct.
22     Q.  You're not part of that process; is that correct?
23     A.  Correct.
24     Q.  Now, in terms of your claims examination or claims
25  investigation, do you often go back to documents like that

28

1  to see if a document's — if an assignment has been released
2  in other type of documents?
3      A.  Yes, sir.
4      Q.  Okay.  Hand you document AIG 21 and just direct
5  you to the wording "poor original."  Do you know anything
6  about why that's on that document?
7      A.  No, sir.
8      Q.  Okay.  I also want to direct you to the fact that
9  there seems to be two stampings, scan stamps on this
10  particular document.  Do you have any idea why that would
11  occur?
12         MR. McMAHON:  Objection.  Calls for
13  speculation.
14     A.  It was scanned twice.
15     Q.  (BY MR. CROWDER)  Can you tell me the
16  circumstances when a document gets scanned twice?
17         MR. McMAHON:  Same objection.
18     A.  It's scanned in originally; and when we send
19  information down to be back-scanned to be added to, like if
20  I've written a letter or the documents that I want added to
21  the file that I've created, documents that aren't pulled out
22  that have already been scanned will be scanned again, and
23  that's how they'll get two numbers.
24     Q.  (BY MR. CROWDER)  Okay.
25     A.  That I'm aware of.

## DIANA L. FIELDS - July 6, 2006

29

1  Q. Right. And have you seen a document with two
2  numbers on it before?
3  **A. Yes, sir.**
4  Q. And what you're indicating is essentially when
5  you're working on a particular file and you have a hard copy
6  of a document such as this assignment, you write a letter
7  that's going to have this as part of the letter; when that
8  letter gets scanned in, this assignment is going to get
9  scanned in again? Would that be accurate?
10     MR. McMAHON: Objection. Calls for
11  speculation and lack of foundation.
12     Go ahead and answer if you can.
13  **A. Not in the circumstances I was just describing.**
14  **It wouldn't necessarily be part of my letter that's going**
15  **out. It may have been something that was used to review the**
16  **file for any reason. Instead of throwing it away because it**
17  **was already scanned in the system, it just got still**
18  **attached to whatever I'm back-scanning and was just scanned**
19  **in again.**
20  Q. (BY MR. CROWDER) So you used the term
21  "back-scanning." Tell me what that -- is that what you just
22  described? Is that what back scanning is?
23  **A. Yes, sir.**
24  Q. Okay. And is there a particular policy for
25  back-scanning documents, or do you just have a custom and

30

1  practice of any document you're working on you're going to
2  end up having them back-scanned?
3     MR. McMAHON: Object to the form.
4     You can answer if you can.
5  **A. Repeat that. I'm sorry.**
6  Q. (BY MR. CROWDER) Sure. I'm just asking whether
7  there's a policy at American General for back scanning
8  documents that you've worked on.
9  **A. I know it's a practice --**
10  Q. Okay.
11  **A. -- for the claims department.**
12  Q. All right. So it's a practice that's utilized by
13  not only you but everybody else in the claims department?
14     MR. McMAHON: Objection. Calls for
15  speculation.
16  Q. (BY MR. CROWDER) To your knowledge?
17     MR. McMAHON: Objection. Lack of
18  foundation.
19  **A. To my knowledge, yes, sir.**
20  Q. (BY MR. CROWDER) Okay. Now, is that part of any
21  written policy, to your knowledge, to back-scan those
22  documents?
23     MR. McMAHON: Same objection.
24  **A. No, sir.**
25  Q. (BY MR. CROWDER) Okay. With respect to what

31

1  documents get attached to a release of assignment
2  verification like the one I showed you, AIG No. 20, who
3  would tell you at American General what documents are
4  provided to this letter that goes out?
5     MR. McMAHON: Objection. Lack of
6  foundation.
7  **A. Policy owner service.**
8  Q. (BY MR. CROWDER) Do you know anybody at policy
9  owner service? Do you know the head of policy owner
10  service?
11  **A. Drawing a blank. I don't know his name. Chris**
12  **Ayres.**
13  Q. Can you spell his last name?
14  **A. A-y-r-e-s.**
15  Q. And is he at the Houston location?
16  **A. Yes, sir.**
17  Q. Okay. As part of your job, do you have to inquire
18  from policy owner services on different issues?
19  **A. Yes, sir.**
20  Q. Okay. What kind of issues would typically come up
21  where you would discuss them with policy owner services?
22  **A. If I had a beneficiary change that wasn't done and**
23  **I wanted to know why and the file wasn't documented, I would**
24  **check with them to find out why.**
25  Q. If there was an assignment that was released and

32

1  you wanted to know if that was properly recorded, is that
2  something you would talk to policy owner service about?
3     MR. McMAHON: Objection. Calls for
4  speculation.
5  **A. If the file wasn't clear, sure.**
6  Q. (BY MR. CROWDER) In your review of the Stilwell
7  matter, did you talk to policy owner service?
8  **A. No, sir.**
9  Q. Okay. There was no reason for you -- from your
10  recollection, there was no reason for you to contact policy
11  owner service regarding the Stilwell file?
12     MR. McMAHON: If you recall.
13  **A. Correct.**
14  Q. (BY MR. CROWDER) Okay. Hand you Document number
15  AIG 21 and ask you if any point in your examination of this
16  file or your review of this file you've reviewed that
17  document.
18     MR. McMAHON: If you recall.
19  **A. Yes, sir.**
20  Q. (BY MR. CROWDER) Okay. And when would you have
21  reviewed that?
22  **A. While looking through the file prior to the**
23  **deposition.**
24  Q. Okay. What about in preparation for drafting your
25  letters that you wrote, if you recall?

DIANA L. FIELDS - July 6, 2006

33

1    A.  I don't recall.
2    Q.  Okay.  What about document No. 23, AIG 23?
3        MR. McMAHON:  Is there a question pending?
4    Q.  (BY MR. CROWDER)  Have you reviewed that document,
5  to your recollection?  Have you seen it before?
6    A.  Yes, sir.
7    Q.  And was that reviewed in preparation for your
8  deposition?
9    A.  Yes, sir.
10    Q.  And do you recall whether you've reviewed it in
11  preparation for drafting your letters?
12    A.  I don't recall.
13    Q.  What about AIG 32, have you seen that?  Did you
14  read that in preparation for your deposition?
15    A.  Yes, sir.
16    Q.  And had you seen that document in preparation for
17  drafting your letters?
18    A.  Don't recall.
19    Q.  AIG document 117, have you seen that document
20  before today?
21    A.  No, sir.
22    Q.  Same question with respect to documents 222
23  through 226, have you ever reviewed any of those documents?
24        MR. McMAHON:  If you recall.
25    A.  No, sir.

34

1        MR. McMAHON:  Jason, can I just get clarity
2  on a line of questioning, because it dawns on me that the
3  witness has testified that she paged through the file.  And
4  the way I've taken your questions are does she have an
5  independent recollection of reviewing certain documents
6  you've pointed out from the file at the time she drafted the
7  letters.  That's what you're meaning by asking the question
8  does she have a recollection?
9        MR. CROWDER:  Well, I mean, the questions
10  are as they stand; but I was trying to get a feel for if she
11  reviewed the documents and essentially whether those
12  documents were -- I'm trying to figure out which ones were
13  important to her in terms of her review of the file.  So I'm
14  going to go through the letters now; and if that changes any
15  of her answers, we can go back to the documents.  But I'm
16  going to hand her her letters that she drafted and see if
17  that changes anything.
18        MR. McMAHON:  Okay.  I guess my question is
19  to the extent that these are documents that are in the claim
20  file, she's provided whatever testimony she's had as to
21  whether or not she reviewed the claim file.  To the extent
22  you're asking her separate and apart from the documents does
23  she have an independent recollection on particular
24  documents, obviously, I think that -- that's an area of
25  inquiry.  If what you're asking her is whether or not these

35

1  are documents that were in the claim file, they are what
2  they are.
3        MR. CROWDER:  Right.  No.  I'm more
4  concerned with what documents she felt were important.
5        MR. McMAHON:  That she has an independent
6  recollection of.
7        MR. CROWDER:  Right.
8        MR. McMAHON:  Okay.  That's the way I
9  understood the questions.  Is that the way you understood
10  the questions?
11        THE WITNESS:  Yes.
12    Q.  (BY MR. CROWDER)  Are there any other documents?
13  And again, I took you through some documents that I have
14  specifically pulled out.  Were there any other documents
15  that were important for you to review or that you recall
16  reviewing that essentially you had to review to prepare your
17  letters?
18    A.  I don't recall.
19    Q.  So there's not one specific document you're saying
20  that you can point to to say this was very important to my
21  examination and preparation of the letter, of the letters I
22  drafted to you?
23    A.  No, sir.
24    Q.  Okay.  I want to make sure of one other thing.  In
25  a letter that was directed to Mr. Sawicki of American

36

1  General, there were a number of documents referenced by a
2  Lawrence Bianchi, and you indicated earlier that you had not
3  examined this letter.  Is that still your recollection?
4    A.  Yes, sir.
5    Q.  Okay.  I just want to make sure whether you have
6  ever examined any of the documents that are made reference
7  in this letter, for example, a -- and you can take a look at
8  this as I point them out, but this made reference to an
9  April 16, 1999, consignment agreement between Janko
10  Financial Group and Amishland Country Village, Inc.  Have
11  you ever seen that document, to your recollection?
12    A.  Not to my recollection.
13    Q.  And do you know if that document is part of the
14  AIG file?
15    A.  Not that I saw.
16    Q.  And you were able to look at the entire file; is
17  that accurate?
18    A.  Yes, sir.
19    Q.  Okay.  There is made reference to an April 19,
20  1999, assignment in the amount of 500,000 from Margaret
21  Stilwell.  I've seen that document in the file.  Do you
22  recall ever having had to review that document?
23    A.  I don't recall.
24    Q.  Okay.  There's made reference in this letter to a
25  September 25, 2000, second assignment from Margaret Stilwell

## DIANA L. FIELDS - July 6, 2006

37

1  to Janko Financial Group for 1.5 million. Do you recall
2  seeing that assignment?
3      **A. Yes, sir.**
4      Q. There's made reference to, in this letter of
5  November 16, 2000, Assignment and Assumption Agreement
6  between Janko Financial Group and Tuscola Furniture Group.
7  Do you recall ever seeing that document?
8      **A. No, sir.**
9      Q. Okay. And is that document part of the AIG claims
10  file?
11         MR. McMAHON: If you know.
12      **A. I don't know.**
13      Q. (BY MR. CROWDER) There's made reference to a
14  November 17, 2000, consignment agreement between Tuscola
15  Furniture and Amishland Country Village. Have you ever
16  reviewed that document?
17      **A. Not that I recall.**
18      Q. And is that document part of the claims file?
19      **A. I do not know.**
20      Q. There's made reference to the November 21, 2000,
21  assignment to TFG for 250,000; and you indicated, I think,
22  that you remember reviewing that assignment; correct?
23      **A. Yes, sir.**
24      Q. And then there's also made reference to a January
25  11, 2001, assignment, collateral assignment from this policy

38

1  to First Mid-Illinois Bank & Trust for 1 million, and I
2  believe you recall reviewing that assignment; correct?
3      **A. Yes, sir.**
4      Q. And then there was made reference to the
5  November 20, 2000, release of assignment assigned by Janko
6  Financial Group, and you recall reviewing that release of
7  assignment; correct?
8      **A. Yes, sir.**
9         MR. CROWDER: Can we make copies of these
10  letters?
11         (Discussion off the record.)
12         (Short recess.)
13      Q. (BY MR. CROWDER) Okay. I've got my copies and,
14  Ms. Fields, you can grab your copy of your letter of January
15  26, 2004. Do you have that in front of you?
16      **A. Yes, sir.**
17      Q. And can you read the page numbers on the bottom,
18  the AIG numbers?
19         MR. McMAHON: They're tough to come out on
20  the copies, unfortunately. It looks like it's AIG 379 to
21  380 is the January 26th, 2004, letter; and Bates stamp AIG
22  384 is the March 5, 2004, letter.
23         MR. CROWDER: Okay.
24         (Discussion off the record.)
25      Q. (BY MR. CROWDER) Have you had an opportunity to

39

1  review this, then, this document, in preparation for your
2  deposition today?
3      **A. Yes, sir.**
4      Q. Okay. And I'm making reference to the letter of
5  January 26, 2004; is that correct? Is that the one you
6  reviewed?
7      **A. Yes, sir.**
8      Q. That letter that you wrote in the first sentence
9  essentially says "your letter of January 7, 2004, has been
10  referred to me for research and response." Have you had an
11  opportunity to read my letter of January 7, 2004?
12      **A. No, sir.**
13      Q. Based on what you said in that earlier -- in the
14  first sentence there of this letter, did you review it in
15  advance of writing this letter of --
16      **A. I don't recall.**
17      Q. Okay. Based on what's said in this letter,
18  though, is there any doubt in your mind that you did receive
19  a letter from me dated January 7, 2004?
20      **A. Based on what it says here, yes, sir.**
21      Q. Okay. And what you're saying is you just don't
22  recall the contents of that letter?
23      **A. Correct.**
24      Q. Now, that letter should be in the claims file, as
25  I understand it?

40

1      **A. Should be.**
2      Q. Okay. And did you see it as you were in
3  preparation for your deposition today when you were
4  reviewing the file?
5      **A. No, sir.**
6      Q. Okay. Can you explain to me why this would have
7  come to you, based on the fact that you're a senior claims
8  analyst?
9      **A. No.**
10         MR. McMAHON: Object to the form of the
11  question. Lack of foundation.
12      **A. Not that I recall, no, sir.**
13      Q. (BY MR. CROWDER) Okay. Is this the type of
14  inquiry that your job responsibility would require you to
15  respond to?
16         MR. McMAHON: Object to the form.
17      You can answer it.
18      **A. Sometimes.**
19      Q. (BY MR. CROWDER) Okay. What I'm trying to get a
20  feel for, is this a pretty unique situation where you're
21  having to respond to something that you typically wouldn't
22  have to, this is typically somebody else's job but you ended
23  up with it for some reason or another?
24      **A. No, it's not unique.**
25      Q. Okay. Is there any particular reason they

DIANA L. FIELDS - July 6, 2006

41

1  wouldn't have had somebody who handled the actual claim
2  process when the checks were being drafted, that type of
3  thing, respond to this particular letter?
4        MR. McMAHON: Would you read the question
5  back?
6        (The reporter read the requested material.)
7        MR. McMAHON: Object to the form. Lack of
8  foundation.
9        A. On this particular case she was no longer with the
10 company.
11 Q. (BY MR. CROWDER) Okay. Who is that person?
12 A. Margaret Singh.
13 Q. Is that spelled S-i-n-g-h?
14 A. Yes, sir.
15 Q. Do you know where she is now?
16 A. No, sir.
17 Q. Okay. To your knowledge, is that the reason you
18 ended up having to review it?
19        MR. McMAHON: Objection. Asked and
20 answered. Also calls for speculation.
21 A. I don't recall why it was given to me.
22 Q. (BY MR. CROWDER) Well, let me ask it this way.
23 Would Margaret Singh have traditionally been the person who
24 would respond to a letter like this --
25        MR. McMAHON: Same objection.

42

1  Q. (BY MR. CROWDER) -- in light of the fact she had
2  handled the claims process?
3        MR. McMAHON: Same objection.
4  A. I wouldn't know because she worked for Old Line,
5  and I don't know what their procedures were.
6  Q. (BY MR. CROWDER) Do you recall where Margaret
7  Singh was located when she was working on this?
8  A. Dallas.
9  Q. There was a Ray Sawicki, S-a-w-i-c-k-i; do you
10 recall his name?
11 A. Yes, sir.
12 Q. Okay. Do you know him?
13 A. Yes, sir.
14 Q. Is he within your department?
15 A. Yes, sir.
16 Q. And is he in Houston?
17 A. Yes, sir.
18 Q. Still located in Houston?
19 A. Yes, sir.
20 Q. You start out this letter of January 26, 2004,
21 after you indicated that you're making reference to my
22 January 7, 2004, letter, you say "As part of our routine
23 handling of a claim with an assignment, we requested a
24 letter from each of the assignees indicating their loan's
25 outstanding balance." Do you see that?

43

1  A. Yes, sir.
2  Q. And did I read that into the record accurately?
3  A. Yes, sir.
4  Q. When you made reference to assignment, did you
5  mean collateral assignment?
6        MR. McMAHON: You're asking her if she
7  remembers what she was thinking at the time in 2004 or what
8  she interprets today or what?
9  Q. (BY MR. CROWDER) How you interpret this letter,
10 what you meant by "assignment."
11        MR. McMAHON: I'll have to object. It calls
12 for speculation.
13 A. I don't remember what I was -- what I was thinking
14 back then.
15 Q. (BY MR. CROWDER) How many different assignments
16 would you have -- how many different types of assignments
17 would you be dealing with besides collateral assignment?
18        MR. McMAHON: Object to the form of the
19 question. Lack of foundation. Calls for speculation.
20        You can answer it if you can.
21 A. There's different types of collateral assignments,
22 I guess is what I'm going at, the funeral home versus a bank
23 or a corporation.
24 Q. (BY MR. CROWDER) So is there any doubt in your
25 mind that you were making reference to a collateral

44

1  assignment, it's just a question of what type of collateral
2  assignment?
3        MR. McMAHON: Objection. Calls for
4  speculation.
5  Q. (BY MR. CROWDER) You can answer.
6  A. Yes, sir, referring to a collateral assignment.
7  Q. Okay. Then your next sentence is "Listed below is
8  each assignee and their outstanding balances," and then you
9  go through and list each of the assignees. When you said
10 outstanding balances, were you making reference to the
11 amount of the assignment?
12        MR. McMAHON: Again, object to the form of
13 the question. Are you asking her if she remembers what she
14 was thinking in 2004?
15        MR. CROWDER: I'm asking her the question
16 today, what she meant by outstanding balances, based on her
17 review of this letter.
18        MR. McMAHON: Calls for speculation.
19        You can answer it if you can.
20 A. As far as reviewing this letter for my deposition,
21 all I did was read over the letter. Where I got the
22 information from, I don't remember.
23 Q. (BY MR. CROWDER) Well, you would have had to have
24 gotten it from the claims file, I would assume?
25 A. Yes, sir.

RIVERSIDE REPORTING, INC.
713.626.2629

DIANA L. FIELDS - July 6, 2006

45

1    Q.  All right.  So you had reviewed the claims file
2  and then drafted this letter; correct?
3    A.  Yes, sir.
4    Q.  Okay.  And so you put on there Tuscola National
5  Bank, and then you put the original amount assigned was 2
6  million; correct?
7    A.  That's what my letter says, yes, sir.
8    Q.  Okay.  So that would have required you to have
9  reviewed the assignment to Tuscola National Bank and find
10  out what the amount was; correct?
11    A.  Yes, sir.
12    Q.  Okay.  Did you do that with each of the
13  assignments that you listed here?
14    A.  Not that I recall.  I don't recall doing that, no,
15  sir.
16    Q.  How would you have drafted a letter with each of
17  the specific numbers, then, if you didn't review and find
18  out what these assignments were for?
19        MR. McMAHON:  Objection.  Asked and
20  answered.  It also mischaracterizes her testimony.  She
21  already testified that it would have been based upon the
22  documents she reviewed in the claim file.  She's just saying
23  she doesn't have any recollection of it right now.
24    Q.  (BY MR. CROWDER)  You can answer my question.
25    A.  I forgot what your question was.  I'm so sorry.

46

1    Q.  Okay.  Let me ask it again.  Do you see where you
2  write down Tuscola National Bank and then you say the
3  original amount assigned was 2 million?  Correct?
4    A.  Yes, sir.
5    Q.  Okay.  In order to write this letter and put down
6  the 2 million and the original amount assigned was 2 million
7  you would have had to have reviewed something that told you
8  that Tuscola National Bank had an assignment to them for $2
9  million; correct?
10    A.  Yes, sir.
11    Q.  Okay.  Same with Citizens First National Bank of
12  Princeton; is that accurate?
13    A.  Yes, sir.
14    Q.  You would have had to have reviewed an assignment
15  to Citizens First National Bank of Princeton that would have
16  indicated on there there was an assignment for 1.5 million;
17  correct?
18    A.  Yes.
19    Q.  And the same for Tuscola Furniture Group, LLC;
20  correct?
21    A.  Yes, sir.
22    Q.  You would have had to have reviewed that
23  assignment and determined that they had an assignment for
24  250,000; correct?
25    A.  That's the only way I would have known it, yes,

47

1  sir.
2    Q.  Okay.  And the same for First Mid-Illinois Bank &
3  Trust; correct?
4    A.  Yes, sir.
5    Q.  You would have reviewed the assignment that they
6  had on file and determined that it was an assignment for $1
7  million; correct?
8    A.  Yes, sir.
9    Q.  Okay.  Then you would also, based on this letter,
10  have reviewed documents indicating how much each of these
11  banks or each of these entities were claimed to have been
12  owed; correct?
13    A.  Yes, sir.
14    Q.  Okay.  For example, you indicate on June 16th,
15  2003, you received a letter stating that the payoff amount
16  exceeded this amount.  Do you see where you write that?
17    A.  Yes, sir.
18    Q.  Okay.  That's an indication that you received a
19  letter from Tuscola National Bank indicating that they were
20  owed more than 2 million; correct?
21    A.  Yes, sir.
22    Q.  Okay.  The same is true for a letter from Citizens
23  First National Bank of Princeton; correct?  You saw a letter
24  in there dated June 16, 2003, indicating that they were owed
25  more than 1.5 million; correct?

48

1    A.  Yes, sir.
2    Q.  Okay.  And this is a typical process that a claims
3  examiner is going to go through; is that accurate?
4        MR. McMAHON:  Objection.  Lack of
5  foundation.
6    A.  I'm sorry.  One more time.
7    Q.  (BY MR. CROWDER)  I said what you're examining,
8  what you're reviewing here and putting in this letter is a
9  typical process that a claims examiner goes through when a
10  claim is made on a policy; correct?
11        MR. McMAHON:  Same objection.
12        You can answer it if you can.
13    A.  I can't say what every claims examiner would do.
14  I only know what I would do.
15    Q.  (BY MR. CROWDER)  Well, let me ask it this way,
16  then.  If Tuscola National Bank made a claim against life
17  insurance proceeds, you would need to, number one, make sure
18  that they had an assignment that entitled them to a claim;
19  correct?
20        MR. McMAHON:  Objection.  Calls for
21  conclusion or speculation.
22        Answer it if you can.
23    A.  Yes, sir.
24    Q.  (BY MR. CROWDER)  Okay.  You would also need
25  information from Tuscola National Bank that they were

DIANA L. FIELDS - July 6, 2006

49

1  actually owed money from Jim Stilwell; correct?
2      MR. McMAHON: Same objection.
3  A. Yes, sir.
4      Q. (BY MR. CROWDER) Because if they're not owed any
5  money and this is a collateral assignment, then there's no
6  reason for them to be entitled to $2 million; correct?
7      MR. McMAHON: Same objection.
8  A. Correct.
9      Q. (BY MR. CROWDER) Okay. So you want to, as part
10 of your responsibility as a claims examiner, you want to
11 make sure they're actually owed money and that they have a
12 valid collateral assignment; correct?
13     MR. McMAHON: Object to the form. It's a
14 compound question. Calls for conclusion and lack of
15 foundation.
16     You can answer it if you can.
17 A. Could you repeat it? I'm sorry.
18     Q. (BY MR. CROWDER) Two of the things you're going
19 to want to do if somebody is making a claim is make sure
20 they have a valid right to the claim, right to the money by
21 way of an assignment, and that they're actually owed money;
22 correct?
23     MR. McMAHON: Same objection.
24 A. Correct.
25     Q. (BY MR. CROWDER) Okay. Can you tell me what you

50

1  do to confirm these two things, if you're in position of a
2  claims examiner?
3      MR. McMAHON: Are you talking in the
4  abstract or are you talking in the specific instance or
5  what?
6      MR. CROWDER: No. I'm talking about -- she
7  indicated earlier that she can't say what somebody else
8  would do. I'm just asking her what she would do to confirm
9  this.
10 A. I would request a letter in writing from the
11 assignees.
12     Q. (BY MR. CROWDER) As to the amount owed?
13 A. Yes, sir.
14     Q. Okay. And would you also then -- would you
15 request the assignment from them, or would you simply review
16 the claims -- review the file to make sure that there was an
17 assignment on record?
18     MR. McMAHON: Object to the form.
19 A. I would not ask them for a copy of the assignment,
20 no, sir.
21     Q. (BY MR. CROWDER) Right. And that's because
22 essentially if the assignment is not on record with you,
23 then they don't have a right to make a claim; correct?
24     MR. McMAHON: Objection. Calls for a
25 conclusion, calls for a legal conclusion, calls for

51

1  speculation, lack of foundation, and assumes facts not in
2  evidence.
3  A. If I got someone claiming money as an assignee and
4  I didn't have copies of the assignment, I would ask for
5  copies of the assignment and then refer it to legal.
6      Q. (BY MR. CROWDER) Okay. On the Tuscola Furniture
7  Group, LLC, you put the original amount assigned was
8  250,000. Do you see that part?
9  A. Yes, sir.
10     Q. Had Tuscola Furniture Group made a claim in excess
11 of 250,000, would they have been entitled to anything more
12 than the 250,000-dollar assignment, based on your
13 examination and review of the file?
14     MR. McMAHON: Objection. Calls for
15 speculation, calls for conclusion.
16     You can answer if you can.
17 A. In my opinion, no, sir.
18     Q. (BY MR. CROWDER) Explain that.
19 A. If the assignment is $250,000 and they are
20 requesting more or the payoff is more, they would not get
21 more. However, if they came back for whatever reason, to
22 back up their claim, again, I would send it to legal.
23     Q. Okay. On the First Mid-Illinois Bank & Trust, you
24 put the original amount assigned was 1 million. If First
25 Mid-Illinois Bank & Trust is only owed $81,000, how much do

52

1  they get of that 1-million-dollar assignment?
2      MR. McMAHON: Same objection. That calls
3  for a legal conclusion.
4      You can answer it if you can.
5  A. Their assignment is only 81,000?
6      Q. (BY MR. CROWDER) No. Their assignment is a
7  million and they're owed 81,000.
8  A. Then their letter should indicate that, that
9  that's what they're owed is 81,000.
10     Q. My question to you is --
11     MR. McMAHON: He's giving you a hypothetical
12 situation.
13     Q. (BY MR. CROWDER) I'm giving you a hypothetical.
14 If First Mid-Illinois Bank is owed $81,000 and they have an
15 assignment for 1 million, how much, based on your review and
16 examination and understanding of the process, would they be
17 entitled to?
18     MR. McMAHON: Objection. Calls for
19 speculation and it's an incomplete hypothetical, but go
20 ahead and answer it if you can.
21 A. 81,000.
22     Q. (BY MR. CROWDER) From your review of the Stilwell
23 claim file, did Tuscola Furniture Group and First
24 Mid-Illinois Bank & Trust make a joint claim for moneys?
25     MR. McMAHON: Are you asking if she has an

RIVERSIDE REPORTING, INC.
713.626.2629

## DIANA L. FIELDS - July 6, 2006

53

1   independent recollection of that?
2           MR. CROWDER: Yeah. I'm asking from her
3   review of the claims file.
4       A. I don't recall seeing anything in the file, no,
5   sir.
6       Q. (BY MR. CROWDER) Okay. In your letter you say on
7   May 12th we received a letter from First Mid-Illinois Bank &
8   Trust indicating the amount due Tuscola Furniture and First
9   Mid-Illinois Bank & Trust was $512,974.50 jointly. Do you
10  see that?
11      A. Yes, sir.
12      Q. Okay. Then you say this letter was signed by a
13  representative of both entities. Do you see that?
14      A. Yes, sir.
15      Q. Okay. Do you interpret that as making a joint
16  claim for moneys?
17      A. That's what the letter says, yes, sir.
18      Q. Okay. Did you also interpret that they were both
19  owed 512,974.50 total? Do you see that?
20          MR. McMAHON: If you recall.
21      A. Yeah. I don't recall reviewing those documents
22  for this letter.
23      Q. (BY MR. CROWDER) What documents?
24      A. The letter from the two assignees stating what
25  their amount is.

54

1       Q. Okay. You indicate on May 12th, 2003, we received
2   a letter from First Mid-Illinois Bank & Trust. Now to me
3   that means that you reviewed that letter of May 12th, 2003.
4   Is that accurate?
5       A. That's what the letter says.
6       Q. Okay. What you're saying is you don't recall
7   reviewing it?
8       A. Correct.
9           MR. McMAHON: As you sit here today.
10          THE WITNESS: Correct.
11      Q. (BY MR. CROWDER) You don't have an independent
12  recollection of reviewing that document?
13      A. Correct.
14      Q. But your letter tells you, and don't let me put
15  words in your mouth, the letter clearly indicates that you
16  did in fact review it, though?
17      A. That's what the letter says, yes, sir.
18      Q. Okay. Do you understand that letter to be making
19  reference to AIG documents 295 and 296?
20      A. Yes, sir.
21      Q. With respect to documents 295 and 296, do you have
22  an independent recollection of reviewing that document?
23      A. No, sir.
24      Q. From your review, from your examination of the
25  file, did AIG recognize document No. 21 as a release of

55

1   assignment for the Janko Financial Group assignments?
2           MR. McMAHON: Are you asking if she has an
3   independent recollection?
4           MR. CROWDER: Right.
5       A. No, sir.
6       Q. (BY MR. CROWDER) You don't have an independent
7   recollection?
8       A. No, sir.
9       Q. What I'm saying is that in your review of the
10  file, did you consider or did AIG consider this particular
11  document to be a release of assignment for Janko Financial
12  Group's prior assignments?
13          MR. McMAHON: If you recall.
14      A. I don't recall.
15      Q. (BY MR. CROWDER) In order to say that Tuscola
16  Furniture Group, LLC, had an assignment in the original
17  amount of 250,000, did you have to make a decision as to
18  whether or not Janko Financial Group's assignments were
19  released?
20          MR. McMAHON: Objection. Calls for a
21  conclusion.
22      A. Again, I don't recall what I looked at when I did
23  my letter.
24      Q. (BY MR. CROWDER) Do you see on the bottom where
25  it says written in there "in favor of Tuscola Furniture"?

56

1           MR. McMAHON: We're back to document Bates
2   number AIG 21.
3       Q. (BY MR. CROWDER) Do you see that document?
4       A. Yes, sir.
5       Q. And you see that, where it's written in there?
6       A. Yes, sir.
7       Q. Okay. And you're familiar with that, you've seen
8   that before, correct, that writing in the bottom?
9       A. During my review and prep for the deposition, yes,
10  sir.
11      Q. Okay. Had you seen it before that?
12      A. Not that I recall.
13      Q. You're saying that when you drafted these letters
14  of January 26, 2004, you don't recall seeing that?
15          MR. McMAHON: Objection. Lack of
16  foundation.
17      A. Not that I recall.
18      Q. (BY MR. CROWDER) Okay. Take a look at your
19  March 5, 2004, letter which is AIG document 384. You
20  indicated that -- you see down there the sentence where it
21  says "as evidenced by the June 10, 2003, letter"? You see
22  that?
23      A. Yes, sir.
24      Q. It says, "As evidenced by the June 10, 2003,
25  letter authored by a representative of AGL's individual

DIANA L. FIELDS - July 6, 2006

57

1    claims department and sent to Larry Bianchi of Janko
2    Financial Group, LLC, it was AGL's position that the
3    assignment to JFG dated April 2000 and October of 2000 had
4    been released by the release of assignment received by AGL
5    in December 2000." Did I read that accurately?
6        A.  Yes, sir.
7        Q.  The release of assignment, when you say the
8    release of assignment received by AGL in December of 2000,
9    do you recognize that as the document, AIG document No. 21,
10    that you were making reference to there?
11            MR. McMAHON:  Objection. Calls for
12    conclusion. You can answer it if you can.
13        A.  I don't know.
14        Q.  (BY MR. CROWDER)  What don't you know?
15        A.  If that's the document that was referred to in
16    this letter.
17        Q.  Why would you not know?
18        A.  Because I didn't write this letter.
19        Q.  Who wrote this letter?
20        A.  I do not recall. Someone in our legal department,
21    I believe.
22        Q.  Well, why does it have your name on it?
23        A.  Because they generated the letter and asked me to
24    sign it.
25        Q.  Is that standard policy for you to put a name on a

58

1    letter you didn't draft?
2            MR. McMAHON:  Objection. Lack of
3    foundation.
4        A.  Yes, sir.
5        Q.  (BY MR. CROWDER)  You've --
6        A.  I've done it before.
7        Q.  How often do you do that?
8        A.  Not very often.
9        Q.  Under what circumstances would you do that?
10        A.  If it's a claims case and I'm asked by our legal
11    department to draft a letter or to sign a letter that
12    they've drafted regarding one of our cases, that's when I'd
13    do it.
14        Q.  So you don't know -- you didn't draft this letter
15    at all?
16        A.  No, sir.
17        Q.  And the analysis that was discussed in here is not
18    your analysis?
19        A.  Right.
20            MR. McMAHON:  Object to the lack of
21    foundation. Calls for conclusion.
22        Q.  (BY MR. CROWDER)  What was your answer to that
23    question?
24        A.  Correct. I didn't -- I didn't do any of the
25    analysis.

59

1        Q.  Okay.  Well, let's go back to your letter of
2    January 26, 2004.
3        A.  Yes, sir.
4        Q.  Did you draft this letter?
5        A.  Yes, sir.
6        Q.  Was the legal department involved at this point in
7    time?
8        A.  I don't recall.
9        Q.  How did the legal department get involved and end
10    up drafting the March 5, 2004, letter?
11        A.  I don't recall.
12        Q.  Would you have gotten them involved?
13            MR. McMAHON:  Objection. Calls for
14    speculation. Asked and answered.
15        A.  I don't recall.
16        Q.  (BY MR. CROWDER)  Well, let's go through how legal
17    department would get involved in a case, then.  Give me the
18    scenarios in which the legal department would get involved.
19        A.  You want all of them?
20        Q.  I want to know essentially whether the claims
21    department has to contact the legal department or is there
22    some way other than that that the legal department somehow
23    jumps in and drafts a letter.
24            MR. McMAHON:  You want her to give examples
25    of situations with the legal department like when they're

60

1    served with a subpoena from counsel?
2        Q.  (BY MR. CROWDER)  How would the legal department
3    get involved in drafting a letter like this?
4        A.  A file was referred to legal from us through a
5    subpoena, through correspondence coming directly into their
6    office. That's some of the ways.
7        Q.  If correspondence was going directly into the
8    office and they were responding to it, why would they put
9    your name on it?
10            MR. McMAHON:  Objection. Calls for
11    speculation. Also, you're getting into attorney-client
12    communication and I direct her not to answer the question.
13    You're asking her about why legal would take a course of
14    action. The only way she could possibly answer that would
15    be to disclose attorney-client communication, so I'm going
16    to direct her not to answer the question.
17        Q.  (BY MR. CROWDER)  Diana, let me just ask you this.
18    Is there any other possibilities other than you pass
19    something on to the legal department that they would get
20    involved in drafting a letter with your name on it?
21            MR. McMAHON:  Calls for speculation.
22        A.  One more time. I'm so sorry.
23        Q.  (BY MR. CROWDER)  That's okay.
24            MR. CROWDER:  Could you read that question
25    back.

DIANA L. FIELDS - July 6, 2006

61

1    (The reporter read the requested material.)
2    A. If the letter was sent directly to the law
3    department on a claims case.
4    Q. (BY MR. CROWDER) And I guess what I'm trying to
5    say is why would they put your name on it, if it's directly
6    to the law department?
7        MR. McMAHON: I'll direct her not to answer.
8    That's getting into privileged communications. You're
9    asking her to delve into the mind of a lawyer. The only
10   possible way she can answer that question is if the attorney
11   communicates to her what the thought process was. That
12   necessarily gets into attorney-client communications.
13       MR. CROWDER: And I question whether there's
14   attorney-client privilege conversation that took place
15   between Diana Fields and the legal department in drafting
16   this letter.
17       MR. McMAHON: Well, I guess that's an issue
18   that someone else will have to resolve because by necessity
19   it is a communication between a lawyer for the company and a
20   representative of the company, and that's attorney-client
21   communication, and that's going to be subject to privilege.
22   You can disagree with it. That's fine. But we're not going
23   to get that resolved today because I'm directing her not to
24   answer the question.
25       MR. CROWDER: That's fine. I just question

62

1    whether or not you're in an attorney-client situation when
2    there's nothing to suggest that this letter is drafted by an
3    attorney. It doesn't even say it's drafted by the legal
4    department and you're trying to suggest that there's some
5    type of privilege.
6        MR. McMAHON: That's not the question you
7    asked. The question you asked is why would the legal
8    department take certain action. The only way she can answer
9    that is to divulge attorney-client communication because
10   you're asking her -- first of all, you're asking her to
11   delve into the mind of someone else and articulate a reason
12   why someone else would do something. A, that's
13   inappropriate. But separately, the only way she could
14   possibly answer the question is if that someone else
15   communicated to her what the thought process was. And the
16   predicate to the question is why would the legal department
17   do something, and the legal department is the attorneys for
18   the company. She's a representative of the company, and the
19   only way she would know that is it was communicated to her
20   by a lawyer, so it necessarily is an attorney-client
21   communication, and she can't answer that question.
22   Q. (BY MR. CROWDER) Do you recall specifically being
23   asked to sign off on this letter?
24   A. No, sir.
25   Q. You do not?

63

1    A. No, sir.
2    Q. So you're saying that somebody drafts a letter,
3    asks you to put your name on it, and you don't recall that
4    happening?
5        MR. McMAHON: If the question is does she
6    have an independent recollection?
7        MR. CROWDER: That's what I'm asking.
8    A. No, sir.
9    Q. (BY MR. CROWDER) You don't recall that happening?
10   A. No, sir.
11   Q. Then how do you know you didn't draft the letter?
12   A. By the language of the letter. It's not my style
13   of letter.
14   Q. So you think it's simply the language, the way
15   it's written, that tells you that this was drafted by
16   somebody else?
17   A. Yes, sir.
18   Q. And there's absolutely no way for you to know who
19   drafted it?
20   A. It would be our attorneys.
21       MR. McMAHON: I'm not sure I understand the
22   question. Go ahead. She answered it.
23   Q. (BY MR. CROWDER) How do you know it would be your
24   attorneys, then?
25   A. Because this is the style of letter from the law

64

1    department.
2    Q. You've seen enough letters from the law department
3    to know that this is the style of letter they draft? Is
4    that what you're trying to tell me?
5    A. Yes, sir.
6    Q. Whose style?
7    A. Our attorneys.
8    Q. Okay. Well, who's in the legal department?
9    A. Who's in the legal department?
10   Q. Yeah. Who's drafting letters in the legal
11   department?
12   A. This could have been anybody from Catherine
13   Easterby to Melina Boyd Dressler to Christine Layton.
14   Q. What was the second name?
15   A. Melinda Boyd Dressler.
16       MR. McMAHON: That's all one person.
17   Q. (BY MR. CROWDER) Then there's a third person you
18   said?
19   A. Christine Franze or Christine Layton.
20   Q. Anybody else?
21   A. At this time, no. Just those three.
22   Q. What about back in March of 2004?
23   A. That's the three back in 2004 that we dealt with
24   in the law department.
25   Q. So if the law department drafted this letter, to

RIVERSIDE REPORTING, INC.
713.626.2629

DIANA L. FIELDS - July 6, 2006

---

**65**

1  your knowledge, it would have been one of those three
2  people?
3      **A. To the best of my knowledge, yes, sir.**
4      Q.  Okay.  Let's take a quick break.
5              (Short recess.)
6      Q.  (BY MR. CROWDER)  Hand you AIG document 378 and
7  ask you to take a look at that.
8      **A. Yes, sir.**
9      Q.  Can you explain what that document is?
10     **A. It's part of our AWD system history file.**
11     Q.  And what history is being documented there?
12     **A. That I touched the file.**
13     Q.  Do you know what you did on that day?
14     **A. No, sir, not by this form.**
15     Q.  What form would tell you what you did, or what
16 exists that would tell you what you did on that day?
17     **A. Nothing, that I'm aware of.**
18     Q.  What's the date on there?
19     **A. January 26th, '04, is the end date.  It doesn't**
20 **have a begin date.**
21     Q.  Your first letter was dated January 26, 2004.
22 Does that tell you anything about what that document is made
23 reference to?
24         MR. McMAHON:  Objection.  Calls for
25 speculation.

---

**66**

1          You can answer if you can.
2      **A. It would mean that on January 26th I opened the**
3  **file to look at it.**
4      Q.  (BY MR. CROWDER)  Take a look at documents 381
5  through 383 and ask if you can identify first what those
6  papers are.
7      **A. Again, it's the AWD history.**
8      Q.  And does it show some entries that you were the
9  user on the AWD history?
10     **A. Yes, sir.**
11     Q.  Okay.  What dates did you access the file?
12     **A. March the 5th.**
13     Q.  What time?
14     **A. 1539, 1534, 1529.  1529.**
15         MR. McMAHON:  That's just documents 382 and
16 383?  Is that what you limited your question to?  This 381,
17 there's a different date.
18         THE WITNESS:  This is not me.
19         MR. McMAHON:  Okay.
20         MR. CROWDER:  No.  I was making reference
21 simply to her entries.
22     Q.  (BY MR. CROWDER)  Does it tell you what you
23 accessed the files for on those days?  Was it that day or
24 two days?
25     **A. One day.**

---

**67**

1      Q.  Does it tell you what you accessed the file for on
2  that day?
3      **A. No, sir.**
4      Q.  Do you have any recollection of why you accessed
5  the file?
6      **A. I do not recall, no, sir.**
7      Q.  Okay.  Would it have been in relation to the
8  letters you had drafted?
9      **A. Could have, yes, sir.**
10     Q.  Okay.  Any other reasons you would have accessed
11 the file?
12     **A. I don't recall any other reason.**
13     Q.  Will this document tell you if you printed
14 anything off the file, off the claims file?
15     **A. No, sir.**
16     Q.  Do you recall having any conversations with any of
17 the claims department personnel who handled the processing
18 of the life insurance policy, James Stilwell life insurance
19 policy?
20     **A. I don't recall, no, sir.**
21     Q.  Okay.  Did you talk to Ray Sawicki about his
22 involvement?
23     **A. Not that I recall.**
24     Q.  How about Melinda Singh or --
25         MR. McMAHON:  Margaret Singh?

---

**68**

1      Q.  (BY MR. CROWDER)  Margaret Singh.
2      **A. No, sir.**
3      Q.  You did not talk to her?
4      **A. No, sir.**
5      Q.  Do you recall having any conversations with me?
6      **A. Not that I recall, no, sir.**
7      Q.  If you had conversations with me, would you have
8  logged those into the system?
9      **A. Not necessarily.**
10     Q.  Can you tell me what your custom and practice is
11 with respect to logging things into the AWD system?
12     **A. Currently, in my position that I'm in now, I log**
13 **incoming calls and anything that I'm reviewing in a file.**
14     Q.  What about back in January and March of '04?  Can
15 you tell me what you were doing?
16     **A. Most of my notes, if there were phone calls that I**
17 **wanted to document, I would document on a piece of paper and**
18 **put in the file.**
19     Q.  But you didn't open the system up and document the
20 phone calls?
21     **A. Not often, no, sir.**
22     Q.  Okay.  And did you, to your recollection, see any
23 handwritten notes in the file from you?
24     **A. Not that I recall, no, sir.**
25     Q.  Okay.  Did you always have handwritten notes,

---

**DIANA L. FIELDS - July 6, 2006**

| | 69 |
|---|---|
| 1 | then, from phone conversations, or did you have phone |
| 2 | conversations where you didn't document anything? |
| 3 | **A.  I didn't always document phone conversations.** |
| 4 | Q.  Are phone conversations in any way recorded by |
| 5 | AIG, to your knowledge? |
| 6 | **A.  Not to my knowledge, no, sir.** |
| 7 | Q.  When this letter went out on March 5 of 2004, did |
| 8 | you review it to make sure you thought it was accurate? |
| 9 | **A.  Not that I recall, no, sir.** |
| 10 | Q.  Okay.  Now, that entry, that last entry that I |
| 11 | showed you, which was on pages 382 and 383, indicated that |
| 12 | you were in the system on March 5 of 2004; correct? |
| 13 | **A.  Yes, sir.** |
| 14 | Q.  And this letter went out on March 5 of 2004; |
| 15 | correct? |
| 16 | **A.  Yes, sir.** |
| 17 | Q.  Was there anybody else in the AWD system on |
| 18 | March 5 of 2004, to your recollection? |
| 19 | MR. McMAHON:  Objection. Lack of |
| 20 | foundation. Calls for a conclusion. |
| 21 | **A.  No, sir. It appears to just be me.** |
| 22 | Q.  (BY MR. CROWDER)  Now, does the legal department |
| 23 | have access to the AWD system? |
| 24 | MR. McMAHON:  Objection. Lack of |
| 25 | foundation. |

| | 71 |
|---|---|
| 1 | **A.  Yes, sir.** |
| 2 | Q.  Okay.  So you filled that document 385 out because |
| 3 | you wanted something scanned into the file? |
| 4 | **A.  Yes, sir.** |
| 5 | Q.  Okay.  And what you're saying is you just can't |
| 6 | tell what that document was? |
| 7 | **A.  Correct.** |
| 8 | Q.  But you would be able to review it based on the |
| 9 | fact that when it was scanned in, it was scanned in 3-8-04 |
| 10 | at 1:16 p.m.; correct? |
| 11 | **A.  I'm sorry.  Your question again?** |
| 12 | Q.  Wouldn't you know what document was scanned in |
| 13 | based on the time and date of the scanning? |
| 14 | MR. McMAHON:  Objection. Calls for a |
| 15 | conclusion, lack of foundation. |
| 16 | **A.  Not necessarily. Some other stuff could have** |
| 17 | **gotten mixed in.** |
| 18 | Q.  (BY MR. CROWDER)  So if there was something else |
| 19 | scanned in on 3-8-04 at 1:16 p.m., you wouldn't know if that |
| 20 | was what your intent was?  Was that what you're indicating? |
| 21 | MR. McMAHON:  Same objection. Also you're |
| 22 | asking about her intent.  You haven't established that she |
| 23 | authored that document. |
| 24 | MR. CROWDER:  Yeah, I did. |
| 25 | MR. McMAHON:  I don't think so. |

| | 70 |
|---|---|
| 1 | **A.  I do not know.** |
| 2 | Q.  (BY MR. CROWDER)  Hand you document 385 and ask if |
| 3 | you know what that document is. |
| 4 | **A.  It's an AWD transmittal form.** |
| 5 | Q.  Okay.  What's that?  What's the purpose of it? |
| 6 | **A.  To -- we put it on top of the files that we're** |
| 7 | **sending downstairs to be back-scanned so they'll know who** |
| 8 | **the piece of mail that's attached belongs to.** |
| 9 | Q.  What's this indicate?  Do documents 385 and 386 go |
| 10 | together? |
| 11 | MR. McMAHON:  Objection. Calls for a |
| 12 | conclusion and for speculation. |
| 13 | You can answer if you can. |
| 14 | **A.  I would not have any way of knowing.** |
| 15 | Q.  (BY MR. CROWDER)  Are you indicating that document |
| 16 | 385 suggests there's another document that's going to be |
| 17 | scanned in? |
| 18 | MR. McMAHON:  Objection. Calls for a |
| 19 | conclusion, calls for speculation. |
| 20 | **A.  385 doesn't say what was being scanned, so I have** |
| 21 | **no way of knowing what was attached to this.** |
| 22 | Q.  (BY MR. CROWDER)  But there was something scanned, |
| 23 | based on what you're reading in 385? |
| 24 | **A.  Yes, sir.** |
| 25 | Q.  Okay.  And is that a document that you filled out? |

| | 72 |
|---|---|
| 1 | MR. CROWDER:  She just said she authored the |
| 2 | document. |
| 3 | Q.  (BY MR. CROWDER)  Is that correct? |
| 4 | **A.  Yes.** |
| 5 | MR. McMAHON:  I stand corrected. |
| 6 | Q.  (BY MR. CROWDER)  And what you're indicating, just |
| 7 | so we're clear, is that there was something that was |
| 8 | supposed to be scanned in as a result of you authoring this |
| 9 | document; correct? |
| 10 | **A.  Correct.** |
| 11 | Q.  Okay.  And if this document was scanned on 3-8-04 |
| 12 | at 1:16 p.m., then you would think that whatever you |
| 13 | intended to be scanned in would follow that; correct? |
| 14 | MR. McMAHON:  Objection. Calls for |
| 15 | conclusion and for speculation. |
| 16 | **A.  If we're assuming, yes.** |
| 17 | Q.  (BY MR. CROWDER)  Okay.  In other words, they |
| 18 | wouldn't scan this in 3-8-04 and then scan what you intended |
| 19 | to be documented on 3-9-04; correct? |
| 20 | MR. McMAHON:  Same objection.  You're asking |
| 21 | what she thinks someone else would be doing in an area that |
| 22 | she doesn't work in. |
| 23 | Q.  (BY MR. CROWDER)  I think that, typically |
| 24 | speaking, these systems are set up so that you know when |
| 25 | certain things happen.  Is that accurate? |

DIANA L. FIELDS - July 6, 2006

73

1    A. Correct.
2        MR. McMAHON: Objection. Lack of
3 foundation.
4    Q. (BY MR. CROWDER) Okay. You want to be able to
5 rely on the system so that you know when certain documents
6 were entered into the system; correct?
7        MR. McMAHON: Same objection.
8    Q. (BY MR. CROWDER) Is that accurate?
9    A. Yes, sir.
10    Q. Okay. So if this document was scanned in on
11 3-8-04 at 1:16 p.m., your intent was that the document that
12 you wanted scanned in would be done at that same time;
13 correct?
14        MR. McMAHON: Same objection.
15    A. Yes, sir.
16    Q. (BY MR. CROWDER) Okay.
17        (Brief interruption.)
18    Q. (BY MR. CROWDER) What's -- what was Ray Sawicki's
19 title back in January and March of 2004?
20    A. Director.
21    Q. Director of?
22    A. Claims.
23    Q. Okay. Would he be your boss?
24    A. Yes, sir.
25    Q. Okay. And was he -- does he still have that

74

1 title?
2    A. Yes, sir.
3    Q. Okay. And back in, I think, May of 2003 when
4 Mr. Stilwell passed away, would that have also been his
5 title, director of claims?
6        MR. McMAHON: If you know.
7    A. I don't know.
8    Q. (BY MR. CROWDER) I want to make sure I ask you,
9 did you have any conversations with Lawrence Bianchi, to
10 your recollection?
11    A. Not that I recall.
12    Q. Okay. What about a Tom Chamberlain?
13    A. Not that I recall.
14    Q. What about Tim Howard?
15    A. Not that I recall.
16    Q. A Rick Heavenar, H-e-a-v-e-n-a-r?
17    A. Not that I recall, no, sir.
18    Q. There was a couple names from -- do you know a
19 Roshawn Byrd, B-y-r-d?
20    A. Yes, sir.
21    Q. Okay. What does she do?
22    A. She's no longer with the company.
23    Q. She's no longer with the company?
24    A. Right.
25    Q. What was her position when she was with the

75

1 company?
2    A. I do not know.
3    Q. Was she at the Houston office?
4    A. For a short period of time.
5    Q. Can you give me -- can you tell me what you would
6 do in a situation where you were handling the claim itself
7 from the onset -- let me back up and make sure I set this up
8 accurately.
9        Will you only get involved after the insured has
10 passed away and people are starting to make claims? Would
11 that be your first involvement in a case, in a policy?
12    A. Yes, sir.
13    Q. Okay. So all the assignments and those type of
14 things that take place, if they're going to take place, take
15 place without your involvement; is that accurate?
16    A. Correct.
17    Q. Okay. When -- what, if anything, would you do if
18 you got a message or you got a phone call from somebody
19 involved that they were concerned about claims that were
20 being made and the accuracy of those claims being made? As
21 a claims examiner, what would you do?
22        MR. McMAHON: Objection. Calls for
23 speculation, incomplete hypothetical.
24        You can answer if you can. Lack of foundation
25 too. You can answer if you can.

76

1    A. It would all depend on what the phone call or the
2 concerns were. Normally, I would ask them to document them
3 in writing and give me a letter of their concerns.
4    Q. (BY MR. CROWDER) Along that same inquiry from
5 somebody, what would result in you passing that on to the
6 legal department to make sure that -- or passing that on to
7 somebody else to make sure that in fact their concerns were
8 handled appropriately?
9        MR. McMAHON: Hold on. Can you read the
10 question back, please?
11        (The reporter read the requested material.)
12        MR. McMAHON: Wait a second. I'm not sure I
13 understand the question. I'm concerned to the extent you're
14 asking her when she would involve the legal department? Is
15 that your question?
16    Q. (BY MR. CROWDER) Well, do you understand my
17 question, Diana?
18    A. Yes, sir, I believe I do.
19    Q. Okay.
20    A. And it again would depend on what the letter or
21 the circumstances were about this -- the phone call or their
22 letter that I asked them to send in. It may go to legal.
23 It may go to my director. I might document the file until I
24 was ready with all the other backup documentation to present
25 it to my director.

RIVERSIDE REPORTING, INC.
713.626.2629

## DIANA L. FIELDS - July 6, 2006

77

1    Q.  Okay.  The two sources that you would send that to
2    would be the legal department or your director, though?
3    That's where it would get passed on to if in fact you were
4    going to pass it on?
5    A.  Yes, sir.
6    Q.  Now, does the director get involved in every claim
7    file?
8    A.  No, sir.
9    Q.  Okay.  So, I mean, you can have a typical claim
10   file that the director would never have any involvement in;
11   would that be accurate?
12   A.  Correct.
13   Q.  Okay.  And when the checks get ready to be drafted
14   out, if you're handling the claim file, are you the one
15   that's basically ordering the checks to go to who they need
16   to go to?
17          MR. McMAHON:  Her personally?
18          MR. CROWDER:  Right.
19   Q.  (BY MR. CROWDER)  Are you the one getting those
20   drafted and telling people what the numbers are and those
21   type of things?
22   A.  Yes, sir.
23   Q.  Okay.
24          MR. McMAHON:  I want to be clear.  On a
25   claim that she has that somehow has been assigned to her?

78

1          MR. CROWDER:  Right, a claim that she has.
2    Q.  (BY MR. CROWDER)  The claims that you've had, have
3    you had people call up and say I think somebody's making a
4    false claim?
5    A.  Yes, sir.
6    Q.  And that's when -- tell me what you do in response
7    to that.  I don't want to put words in your mouth.
8    A.  Again, I would ask them to put it in writing,
9    whatever their concern is, and would gather up all the
10   documentation and direct it to either my director or legal.
11   Q.  Okay.  Again, asking what you would do.  When an
12   entity has a collateral assignment, one that you've verified
13   and the system shows it's on record, when it goes to
14   verifying the debt or the amount of money that that entity
15   is owed, do you do anything to make sure that the insured is
16   the actual one owing that money?
17          MR. McMAHON:  Objection to the extent it
18   calls for speculation, incomplete hypothetical.
19          Go ahead and answer it if you can.
20   A.  I do not know, sir.
21   Q.  (BY MR. CROWDER)  You do not understand the
22   question or what?
23   A.  I do not ask the entity if the insured is the
24   debtor.
25   Q.  Okay.  Now why is that?

79

1    A.  Because it doesn't make any difference on a life
2    insurance policy if the insured is the debtor or not,
3    because the owner is the one that makes the assignment.
4    Q.  So, make sure I understand you correctly, then.  A
5    collateral assignment -- this is just -- I'm going to try to
6    understand what you're telling me.  If a collateral
7    assignment is issued to Tuscola Furniture Group by the owner
8    of the policy on the life of James Stilwell, does it matter
9    to you if James Stilwell owes the money to the assignee?
10          MR. McMAHON:  Objection.  Calls for
11   speculation.  Assumes facts not in evidence.
12          Go ahead and answer if you can.
13   A.  Does not matter to me, no, sir.
14   Q.  (BY MR. CROWDER)  Okay.  Does it matter to you if
15   the owner of a policy owes the money to the assignee?
16          MR. McMAHON:  Same objection.
17   A.  No, sir.
18   Q.  (BY MR. CROWDER)  Okay.  And why not?
19   A.  Again, the owner has the right to assign that
20   proceeds or has the right to assign that policy as
21   collateral.  To my knowledge, it doesn't matter who the
22   debtor is.
23   Q.  How do you verify what they're assigning the
24   collateral for, though?
25          MR. McMAHON:  Same objection.

80

1    Q.  (BY MR. CROWDER)  Do you understand what I'm
2    saying?
3    A.  No, sir.
4    Q.  Okay.  If the owner makes a collateral assignment,
5    how do you know if they're making a collateral assignment
6    for one particular debt or another?
7          MR. McMAHON:  Same objection.
8    A.  I do not know.
9    Q.  (BY MR. CROWDER)  And it doesn't matter?
10          MR. McMAHON:  Same objection.
11   A.  I don't understand what you mean it doesn't
12   matter.
13   Q.  (BY MR. CROWDER)  Well, if Margaret Stilwell is
14   the owner of this policy and she makes a collateral
15   assignment to Tuscola Furniture Group for 250,000, so long
16   as Tuscola Furniture Group is owed some money by somebody,
17   they're allowed to make a claim?
18          MR. McMAHON:  Objection.  Calls for
19   speculation.  Assumes facts not in evidence.
20          You can answer if you can.
21   Q.  (BY MR. CROWDER)  Or does Tuscola Furniture Group
22   have to be owed some money from the owner or the insured?
23          MR. McMAHON:  Same objection.
24   Q.  (BY MR. CROWDER)  That's what I'm trying to get a
25   clarification on.

DIANA L. FIELDS - July 6, 2006

81

1      MR. McMAHON: Same objection.
2      **A. I wouldn't know the answer to that.**
3      Q. (BY MR. CROWDER) Okay. But you understand what
4  I'm asking?
5      **A. Yes, sir.**
6      Q. Okay. Let me ask it differently. If Margaret
7  Stilwell makes a collateral assignment to Tuscola Furniture
8  Group for this 250,000 but Tuscola Furniture Group is owed
9  money by a separate corporation, would you want to know
10 that?
11     MR. McMAHON: Objection. Calls for
12 speculation. Incomplete hypothetical.
13     You can answer it if you can.
14     **A. I didn't understand the question.**
15     Q. (BY MR. CROWDER) Okay. Let me ask it again a
16 different way, try to make it more understandable. And
17 maybe the easiest way is when a collateral -- when the
18 assignee of a collateral assignment makes a claim against a
19 life insurance policy, are they, to your knowledge and
20 understanding, are they saying when they make a claim that
21 so-and-so owes me this much money? And if so, who's the
22 so-and-so?
23     MR. McMAHON: Object to the form of the
24 question. Calls for speculation. It's a hypothetical.
25     Do you understand the question?

82

1      THE WITNESS: Yes.
2      **A. I don't see the behind the scenes as far as who**
3  **owes to whom, but when I ask for a letter from the assignee**
4  **as far as what their indebtedness is for this assignment for**
5  **this policy, I would expect to get back what the debt is.**
6  **As far as to who owes it, I don't know that.**
7      Q. (BY MR. CROWDER) And that's not -- in terms of
8  the way you handle claims, that's not something that you
9  research into to verify that this debt is a legitimate debt?
10     MR. McMAHON: Same objection.
11     Q. (BY MR. CROWDER) Is that accurate?
12     **A. Right.**
13     Q. Okay. You rely on the verification of the
14 assignee that they're owed money under this collateral
15 assignment?
16     **A. Yes, sir.**
17     Q. Okay. And you might not know in this particular
18 case -- let me ask it differently. Have you dealt with
19 claims where there's collateral assignment that exceed --
20 out there that exceed the actual amount of the life
21 insurance policy?
22     **A. Yes, sir.**
23     Q. Okay. If in fact there are collateral, two
24 collateral assignments, say, on a 4-million-dollar policy,
25 one of them for 3 million and one for 2 million, and

83

1  both of them are owed the amount to the assignment, how do
2  you determine who gets the money?
3      MR. McMAHON: Objection. Calls for
4  speculation, calls for a conclusion.
5      You can answer it.
6      **A. The person that had the first assignment would**
7  **have first claim on the money.**
8      Q. (BY MR. CROWDER) Okay. To your knowledge, in the
9  Stilwell claim, did that become an issue?
10     MR. McMAHON: If you know.
11     **A. Oh, I don't know.**
12     Q. (BY MR. CROWDER) I think I know the answer to
13 this question, but I want to make sure it's on the record.
14 In the situation where there are collateral assignments to a
15 bank, the bank will send you a letter saying here's the
16 balance, here's the interest on the date of death; correct?
17     **A. No, sir.**
18     Q. What do they do?
19     **A. They will send me what the balance is and they'll**
20 **usually send me a per diem, that's what I ask for, a per**
21 **diem amount of interest.**
22     Q. And through what date, though?
23     **A. I don't give them an end date. It's when I get a**
24 **per diem so that I can figure out when I pay it how much the**
25 **interest will be.**

84

1      Q. Okay. From your standpoint and review of a file,
2  is it the amount of money that's owed on the date of death
3  that's critical?
4      MR. McMAHON: Object to the form of the
5  question. Lack of foundation.
6      If you understand it, go ahead and answer it.
7      **A. I don't understand it. Sorry.**
8      Q. (BY MR. CROWDER) Okay. Well, if Jim Stilwell
9  owes a million dollars to Tuscola National Bank, is it --
10 and of course that money continues to -- what he owes has
11 interest involved, is it what he owes on his date of death,
12 May 2nd, '03, that allows him to make a claim, or does his
13 date of death not have anything to do with it?
14     MR. McMAHON: I'm going to object to the
15 lack of foundation and assumes facts not in evidence, mainly
16 to the form of the question.
17     Q. (BY MR. CROWDER) Do you understand the question?
18     **A. Uh-huh, yes, sir. Date of death doesn't have**
19 **anything to do with it.**
20     Q. Okay. From your review and what you do, you're
21 not concerned with date of death?
22     **A. Correct.**
23     Q. Okay. Is there any inquiry into the person who
24 made the assignment, the owner of the policy, as to whether
25 or not they owe this money that's being claimed?

DIANA L. FIELDS - July 6, 2006

85

1    MR. McMAHON: Objection. Calls for
2  speculation, lack of foundation.
3        Answer if you can.
4    A. I missed the question. I'm sorry.
5    Q. (BY MR. CROWDER) All right. We've established
6  that in a policy like this the owner is the one that's
7  making the assignment; correct?
8    A. Correct.
9    Q. The owner is the person that is allowed to make an
10 assignment of life insurance policy; accurate?
11   A. Correct.
12   Q. Okay. Is there any verification with the owner,
13 after the insured has passed away, as to people who are
14 making the claims?
15       MR. McMAHON: You're asking her what her
16 personal procedure would be if she was faced with that
17 circumstance?
18       MR. CROWDER: Right.
19       MR. McMAHON: Objection. Calls for
20 speculation.
21       You can answer it if you can.
22   A. No, sir, I don't run it by the beneficiary.
23   Q. (BY MR. CROWDER) Can it be as simple -- when a
24 person is making a claim on a collateral assignment, can it
25 be as simple as I'm owed X amount of dollars and then verify

86

1  it and sign the name?
2        MR. McMAHON: Objection. Calls for
3  speculation, assumes facts not in evidence.
4        If you can answer the question.
5    A. It has to be on their letterhead and signed by an
6  officer of the company; but yes, it can be as simple as
7  that.
8    Q. (BY MR. CROWDER) And in terms of how they got to
9  that number or the calculations that lead to that number,
10 that's not important to you?
11       MR. McMAHON: Same objection.
12   A. No, sir.
13   Q. (BY MR. CROWDER) On AIG document No. 21, did you
14 make any determination as to whether or not this assignment
15 or this release of assignment gave any rights to Tuscola
16 Furniture Group?
17       MR. McMAHON: If you recall.
18   A. I don't recall.
19   Q. (BY MR. CROWDER) You don't remember one way or
20 the other?
21   A. No, sir.
22   Q. Okay. If you were the claims examiner on this
23 file, I'm asking you hypothetically, if you were claims
24 examiner on this file and you were dealing with this release
25 of assignment and had somebody saying -- had a claimant

87

1  saying to you that Janko Financial Group released or
2  transferred their prior assignments to Tuscola Furniture
3  Group based on this document, what would you do?
4        MR. McMAHON: Objection. Calls for
5  speculation, incomplete hypothetical, and assumes facts not
6  in evidence.
7        You can answer it if you can.
8    A. If someone came in and made a claim on behalf of
9  them for this assignment, I would have directed it to my
10 director.
11   Q. (BY MR. CROWDER) Do you know if that's what
12 happened in this case?
13   A. I do not know.
14   Q. You would not have made any -- drawn any
15 conclusions or you would not have made any decisions as to
16 whether or not Tuscola Furniture Group was entitled to the
17 prior Janko Financial Group assignments?
18       MR. McMAHON: Well, I think she's already
19 testified she didn't get involved until the money was
20 already paid.
21       MR. CROWDER: I'm just asking from a
22 hypothetical situation.
23   Q. (BY MR. CROWDER) You would not have made --
24       MR. McMAHON: In a separate claim
25 hypothetical, if this document came in to her, you're asking

88

1  her what she would do?
2        MR. CROWDER: Right.
3        MR. McMAHON: Same objections.
4        Go ahead and answer.
5    A. No, I wouldn't have.
6    Q. (BY MR. CROWDER) Okay. You would not have made
7  any decisions about this document doesn't give Tuscola
8  Furniture Group any rights or this document does give
9  Tuscola Furniture Group any rights?
10   A. I wouldn't have made a decision at all on it.
11   Q. You would have simply passed the documentation on
12 to your director?
13   A. Correct.
14   Q. Okay.
15       MR. CROWDER: That's all I have for you.
16       MR. McMAHON: We'll reserve signature. I
17 have a question. Jason, are you going to be testifying in
18 this case and offering an affidavit yourself, or do you plan
19 to take the position that any communications that were not
20 reduced to writing that you had are somehow relevant to the
21 case?
22       MR. CROWDER: I am not going to be
23 testifying, obviously. We're basing this on, obviously,
24 documentation; so I don't see that that's something that I
25 plan on doing.

# DIANA L. FIELDS - July 6, 2006

89

1  MR. McMAHON: Okay. If you were, we'd want
2  to take your deposition, but I don't want to take a lawyer's
3  deposition lightly, particularly a lawyer representing a
4  client in a case, and I have no intention of doing that
5  unless you're planning to be a witness. Otherwise, I'd have
6  to change that position, obviously. So we can confirm this
7  one way or the other off the record, but I just was curious
8  at this point as to whether you had a position on that.
9  Right now you have no intention of being a witness in this
10 case?
11     MR. CROWDER: No. I mean, as I understood
12 and I asked her today, she has no recollection of any
13 conversations with me.
14     MR. McMAHON: Do you have recollections of
15 conversations with her?
16     MR. CROWDER: I do have recollections, but I
17 don't know that they are --
18     MR. McMAHON: Relevant.
19     MR. CROWDER: -- yeah, relevant to and
20 contradictory to anything that's said in the letters. And I
21 just don't know that they're going to be important to the
22 outcome of this case anyway.
23     MR. McMAHON: We can talk about that.
24     (Deposition concluded at 11:15 a.m.)
25

90

1          CHANGES AND SIGNATURE
2      WITNESS NAME: DIANA L. FIELDS
3      DATE OF DEPOSITION: 07-06-06
4
5  PAGE   LINE      CHANGE          REASON_____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

91

1  I, DIANA L. FIELDS, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5
6          _____
7              DIANA L. FIELDS
8  THE STATE OF TEXAS:
9  COUNTY OF HARRIS:
10
11     Before me, _____, on this day
12 personally appeared DIANA L. FIELDS, known to me (or proved
13 to me under oath or through _____) (description
14 of identity or other document) to be the person whose name
15 is subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18
19     Given under my hand and seal of office this
20 _____ day of _____, 2006.
21
22
23          _____
24          NOTARY PUBLIC IN AND FOR
25          THE STATE OF _____

92

1  STATE OF TEXAS   )
2                   )
3  COUNTY OF HARRIS )
4          DEPOSITION OFFICER'S CERTIFICATE
   ORAL DEPOSITION OF DIANA L. FIELDS
5  Taken on July 06, 2006
6  I, LaRita J. Cormier, Certified Shorthand Reporter in and
   for the State of Texas, hereby certify that this deposition
7  transcript is a true record of the testimony given by the
   witness named herein, after said witness was duly sworn or
8  affirmed by me.
9  I further certify that I am neither attorney nor counsel
   for, related to, nor employed by any of the parties to the
10 action in which this testimony was taken. Further, I am not
   a relative nor employee of any attorney of record in this
11 cause, nor do I have a financial interest in this action.
12 Further certification requirements pursuant to the Rules
   will be certified to after they have occurred, if
13 applicable.
14 Subscribed and sworn to on this the 12th day of July, 2006.
15
16          _____
17          LaRita J. Cormier, Texas CSR 3412
            Expiration Date: 12-31-07
18          Firm Registration No. 62
            4545 Post Oak Place, Suite 350
            Houston, Texas  77027
19          PHONE:  713.626.2629
            FAX:    713.626.1966
20
21
22
23
24
25

## RIVERSIDE REPORTING, INC.
### 713.626.2629

07478.00134

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARGARET J. STILWELL, HALEY STILWELL,    )
HEIDI STILWELL, JAMIE STILWELL, MEGAN    )
STILWELL,                                )
                                         )    No. 05 CV 02160
                   Plaintiff,            )
                                         )    Honorable Chief Judge
        v.                               )    Michael P. McCuskey
                                         )
AMERICAN GENERAL LIFE INSURANCE          )    Magistrate Judge
COMPANY,                                 )    David G. Bernthal
                                         )
                   Defendants.           )
_____  )
AMERICAN GENERAL LIFE INSURANCE          )
COMPANY,                                 )
                                         )
                   Third-Party Plaintiff, )
                                         )
        v.                               )
                                         )
FIRST MID ILLINOIS BANK & TRUST,         )
TUSCOLA FURNITURE GROUP, LLC,            )
and JANKO FINANCIAL GROUP, LLC,          )
                                         )
                   Third-Party Defendants. )

## AFFIDAVIT OF DIANA FIELDS

I, Diana Fields, under penalty of perjury, depose and state as follows:

1.       I am employed as a Senior Claims Analyst with American General Life Insurance

Company ("American General"), the defendant/third-party plaintiff in the above-captioned

lawsuit, and have personal knowledge of the statements contained in this affidavit and, if sworn

to testify could competently testify thereto.

2.       Margaret Singh held a position as claims examiner while employed with

American General.  She no longer works at American General.

384169.1
338597.1



3.    I have been employed with American General for over 30 years and have previously held the position of claims examiner with American General.

4.    A claim examiner has the authority and responsibility to review and pay claims that are payable.

5.    In connection with this determination, a claim examiner may call on American General's in-house counsel for the purpose of soliciting legal advice and assistance in determining whether funds should be paid in light of the claim documentation submitted and the policy terms.

6.    Upon review of the file in this case, Margaret Singh communicated with American General's in-house counsel for the purpose of soliciting legal advice and assistance upon receiving the claim submissions from the Third-Party Defendants.

7.    I became a Senior Claims Analyst on or about 2003 when my position as Claim Investigator was renamed to Senior Claims Analyst.

8.    As a Senior Claims Analyst, and previously as a Claim Investigator, I am responsible for the handling of contestable claims, foreign death claims, fraudulent claims and claims pertaining to homicides.

9.    As a Senior Claims Analyst I have the authority and responsibility to analyze the claim documentation submitted and determine if the proceeds are payable in light of that documentation under a policy.

384169.1

10.    In connection with my determination, I may call on American General's in-house counsel for the purpose of soliciting legal advice and assistance in determining whether funds should be paid in light of the claim documentation submitted and the policy terms.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 5th day of March, 2007.

Diana Fields
_____
Diana Fields

07478.00134

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MARGARET J. STILWELL, HALEY STILWELL,  )
HEIDI STILWELL, JAMIE STILWELL, MEGAN  )
STILWELL,                              )
                                       )      No. 05 CV 02160
            Plaintiff,                 )
                                       )      Honorable Chief Judge
      v.                               )      Michael P. McCuskey
                                       )
AMERICAN GENERAL LIFE INSURANCE        )      Magistrate Judge
COMPANY,                               )      David G. Bernthal
                                       )
            Defendants.                )
                                       )
AMERICAN GENERAL LIFE INSURANCE        )
COMPANY,                               )
                                       )
            Third-Party Plaintiff,     )
                                       )
      v.                               )
                                       )
FIRST MID ILLINOIS BANK & TRUST,       )
TUSCOLA FURNITURE GROUP, LLC,          )
and JANKO FINANCIAL GROUP, LLC,        )
                                       )
            Third-Party Defendants.    )

## AFFIDAVIT OF DIANA FIELDS

I, Diana Fields, under penalty of perjury, depose and state as follows:

1.      I am employed as a Senior Claims Analyst with American General Life Insurance

Company ("American General"), the defendant/third-party plaintiff in the above-captioned

lawsuit, and have personal knowledge of the statements contained in this affidavit and, if sworn

to testify could competently testify thereto.

2.      I have been employed with American General for over 30 years and have

previously held the position of claims examiner with American General. A claim examiner has

the authority and responsibility to review the documentation that is submitted with a claim and



EXHIBIT

G3

determine whether the claim is payable based upon that documentation. I became a Senior Claims Analyst on or about 2003. As a Senior Claims Analyst, I am responsible for the handling of contestable claims, foreign death claims, fraudulent claims and claims involving homicides. In this position I have the authority and responsibility to determine if the proceeds are payable in light of the claims documentation that is submitted under a policy.

3.    American General's Policy No. 2604663 ("the Policy") required Plaintiff to execute and submit a claimants' statement. This purpose of requiring a claimant to giving notice of a claim and to submit claimant's statement and other reasonably requested information in connection with a claim is to allow American General to make the necessary investigation to determine if and when payment is proper under the Policy and also to protect the Company from paying contested claims.

4.    In reviewing claims that are made and determining whether those claims are payable, the claims examiner and claims analyst relies on the truth of the representations that are made in the documents and claim submissions that are received with the claim.

5.    With respect to the Stilwell Policy No 2604663, there is no evidence in the claim file that American General ever received an executed claimant's statement from Margaret Stilwell under the $4 Million Policy. There is also no evidence in the claim file that Margaret Stilwell ever notified American General that she objected to payment of the joint claim submitted by First Mid Illinois Bank and Trust ("the Bank") and Tuscola Furniture Group LLC ("TFG") prior to payment of that claim.

6.    When adverse claims are received by American General, its standard practice in processing adverse claims under a policy is to refer the matter to American General's in-house

- 2 -

384169.1

counsel for the purpose of determining whether proceeds can be paid pursuant to a settlement agreement between the adverse parties, or to seek protection as an innocent stakeholder from the risk of possible double liability under the Policy by filing an action for interpleader relief.

7.    Based on my review of the claim file, American General paid what was believed to be an uncontested claim after a detailed and thorough investigation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 2nd day of April, 2007.

_Diana Fields_
Diana Fields

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| MARGARET J. STILWELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05 CV 02160 |
| | ) | |
| AMERICAN GENERAL LIFE | ) | |
| INSURANCE COMPANY | ) | Honorable Chief Judge |
| | ) | Michael P. McCuskey |
| Defendant/ Third Party Plaintiff | ) | |
| | ) | Magistrate Judge |
| | ) | David G. Bernthal |
| v. | ) | |
| | ) | |
| FIRST MID ILLINOIS BANK & TRUST | ) | |
| And TUSCOLA FURNITURE GROUP, LLC | ) | |
| And JANK FINANCIAL GROUP, LLC | ) | |
| | ) | |
| Third Party Defendants | ) | |

## AFFIDAVIT OF RICHARD L. BROCH

I, Richard L. Broch, having been duly sworn, deposes and states as follows:

1.    I am an attorney licensed to practice in Illinois since 1982. I am over the age of eighteen and have personal knowledge of the facts, matters and events described in this affidavit and am fully competent to testify thereto.

2.    I was retained by James Stilwell and Margaret Stilwell to act as corporate counsel for their company, Amishland Country Village, Inc. ("ACV").

3.    In that capacity, I represented ACV and the Stilwells in a lawsuit that was filed by Amishland Development, LLC. A true and correct copy of the complaint filed by Amishland Development, LLC against the Stilwells and ACV is attached at Exhibit A ("the forcible Entry and Detainer Action").

EXHIBIT
H

4.    A true and correct copy of the Answer that was filed by Amishland Country Village, James Stilwell, and Margaret Stilwell in response to the Forcible Entry and Detainer Action is attached at Exhibit B.

5.    On or about May 6, 2003, I received a letter from Timothy J. Howard, counsel for the plaintiff members of Amishland Development, including the landlord, Tuscola Furniture Group LLC, which indicated that plaintiffs would seek satisfaction of their claim of approximately $481,000 against ACV pursuant to a Consignment Agreement from the insurance proceeds on the life of Mr. Stilwell. Mr. Howard also indicated in this letter that if his clients were paid from the insurance proceeds, there would be no need to proceed to trial with the Lawful Entry and Detainer Action. A true and correct copy of the Howard's May 6, 2003 correspondence to me is attached as Exhibit C.

6.    After receiving Mr. Howard's May 6, 2003 letter, I discussed the matters raised in the letter, including the known status of insurance amounts and claims to those amounts with Mrs. Stilwell and her insurance agent, John Lyons.

7.    On or about May 19, 2003, after speaking with Mrs. Stilwell and Mr. Lyons, I drafted a fax to Mr. Howard in an attempt to determine if the life insurance proceeds from Mr. Stilwell's death would cover the liens against the Stilwell's business, ACV. A true and correct copy of my May 6, 2003 fax correspondence is attached at Exhibit D.

8.    Thereafter, Plaintiffs satisfied their claim against ACV and the Stilwells through insurance proceeds and, as a result, voluntarily dismissed the Forcible Entry and Detainer Action. A true and correct copy of the motion for voluntary dismissal is attached at Exhibit E.

2

I AFFIRM, UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING

STATEMENTS ARE TRUE AND CORRECT.

_____
Richard L. Broch

381756.1

COPY

## IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## DOUGLAS COUNTY, ILLINOIS

AMISHLAND DEVELOPMENT, LLC,
an Illinois Limited Liability Company,

      Plaintiff,

v.

AMISHLAND COUNTRY VILLAGE,
INC.,
JAMES STILWELL, and
MARGARET STILWELL,

      Defendants.

Case No. 03 LM-10

**FILED**

**FEB 1 3 2003**

*Julie Mills*
CLERK OF THE CIRCUIT COURT
DOUGLAS COUNTY, ILLINOIS

oward & Howard
law for business

One North Main
Suite 430
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304.5151
248.645.1483

The Michigan Building
Suite 200
100 Portage Street
Kalamazoo, MI 49007.4802
269.382.1483

The Phoenix Building
Suite 500
12 North Washington Square
Lansing, MI 48933.1817
517.485.1483

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483

### COMPLAINT – FORCIBLE ENTRY AND DETAINER

NOW COMES Plaintiff, AMISHLAND DEVELOPMENT, LLC, by Howard & Howard

Attorneys, P.C., and for its Complaint for Forcible Entry and Detainer, states as follows:

    1.    Plaintiff, Amishland Development, LLC, is an Illinois limited liability company

and the Landlord of certain property occupied by the Defendants and commonly known as 1304

South Tuscola Boulevard, Tuscola, Illinois 61953 (the "Premises").

    2.    Defendant, Amishland Country Village, Inc. is the tenant of the Premises pursuant

to a written Lease Agreement dated May 25, 2001 ("Lease"). A copy of the Lease is attached

hereto as Exhibit A.

    3.    The Defendants, James Stilwell and Margaret Stilwell are the Guarantors of the

Lease and may be in possession of the Premises.

    4.    The transaction complained of herein occurred in the County of Douglas, State of

Illinois.

    5.    The Defendants have failed to comply with the terms of the Lease by failing to

pay in a timely manner, the rent and real estate taxes as required by the Lease.



0047

*6.* Since January 1, 2002, the Defendants are in default of the payment of rent in the sum of $384,190.33.

*A. 7.* Pursuant to Section 24 of the Lease, the Plaintiff served the Defendants with a Landlord's Ten Day Notice on January 30, 2003. A copy of the Landlord's Ten Day Notice is attached hereto as Exhibit B.

*8.* Unless the Defendants cured the payment defaults, the Notice also terminated the Lease and notified the Defendants to quit and deliver up possession of the Property pursuant to 735 ILCS 5/9-210 (West 2001).

*9.* At the time of the hearing on this Complaint, more than ten days will have elapsed since the service of the Notice of Default upon the Defendants, and the Plaintiff is entitled to possession of the Premises by virtue of the Defendants' default and their refusal to quit and deliver up possession thereof.

*10.* Defendants owe Plaintiff for rent, after allowing all just credits and set-offs, the sum of $384,190.33.

*11.* Plaintiff is also entitled to recover its reasonable attorneys' fees and costs incurred in enforcing the terms of the Lease pursuant to Section 20.1 of the Lease.

WHEREFORE, Plaintiff prays for Judgment in its favor and against Defendants as follows:

A.    Plaintiff have and recover possession of the Premises from the Defendants;

B.    Defendants be ordered to immediately vacate the Premises and return all keys to the Premises to the Plaintiff, and in default thereof, an order of possession be issued to the Douglas County Sheriff to remove the Defendants from the Premises; and

C.    Plaintiff recover from the Defendants all amounts incurred and owing for past due rent, reasonable attorneys' fees and costs of suit.

2

Howard & Howard
law for business

One North Main
Suite 430
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304.5151
248.645.1483

The Michigan Building
Suite 200
100 Portage Street
Kalamazoo, MI 49007.4802
269.382.1483

The Phoenix Building
Suite 500
222 North Washington Square
Lansing, MI 48933.1817
517.485.1483

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483

AMISHLAND DEVELOPMENT, LLC

By: _____
　　　　Timothy J. Howard,
　　　　One of its Attorneys

oward ☒ Howard
law for business

One North Main
Suite 430
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
oomfield Hills, MI 48304.5151
248.645.1483

The Michigan Building
Suite 200
100 Portage Street
Kalamazoo, MI 49007.4802
269.382.1483

The Phoenix Building
Suite 500
2 North Washington Square
Lansing, MI 48933.1817
517.485.1483

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483

Timothy J. Howard
Jeffrey G. Sorenson
Howard & Howard Attorneys, P.C.
One Technology Plaza
211 Fulton Street, Suite 600
Peoria, IL 61602
(309) 672-1483
(309) 672-1568 (fax)

3

## VERIFICATION

STATE OF ILLINOIS      )
                              ) SS

COUNTY OF DOUGLAS   )

      Lawrence W. Bianchi, being first duly sworn, states that he is an authorized representative of Plaintiff, Amishland Development, LLC, that he has read the foregoing Complaint, and that the allegations therein contained are true in substance and in fact to the best of his knowledge, information and belief.

<em>Lawrence W. Bianchi</em>

Lawrence W. Bianchi

<em>Authorized Representative</em>

Subscribed and sworn to before me
this  6  day of February, 2003.

_Kari J Bouxsein_
Notary Public

> "OFFICIAL SEAL"
> KARI J BOUXSEIN
> Notary Public, State of Illinois
> My Commission Expires 12-07-04

4

## AFFIDAVIT REGARDING DAMAGES SOUGHT
### (Pursuant to Supreme Court Rule 222(b))

Lawrence W. Bianchi, being first duly sworn, upon his oath, deposes and says:

1.     That he is an authorized representative of Plaintiff, Amishland Development, LLC, and is duly authorized to make this Affidavit on its behalf and to proceed in this matter.

2.     That he has read the Complaint to be filed in this cause and knows its contents, and that all the matters and things stated in it are true and correct.

3.     That the total amount of money damages sought by Plaintiff, Amishland Development, LLC, against the Defendants, Amishland Country Village, Inc., James Stilwell and Margaret Stilwell, exceeds $50,000.00.

4.     That if sworn as a witness in the trial of this case, I can competently testify to the above.

_Lawrence W. Bianchi_
Lawrence W. Bianchi
_Authorized Representative_

Subscribed and sworn to before me
this __6__ day of February, 2003.

_Kari J Bouxsein_
Notary Public

> "OFFICIAL SEAL"
> KARI J BOUXSEIN
> Notary Public, State of Illinois
> My Commission Expires 12-07-04

betty\g:\j-l\janko financial\amishland dev\pldgs\cmplt forcible entry

5

0051



## IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## DOUGLAS COUNTY, ILLINOIS

AMISHLAND DEVELOPMENT, LLC,           )
An Illinois Limited Liability Company )
                                      )
                          Plaintiff,  )
vs.                                   )      No. 03-LM-10
                                      )
AMISHLAND COUNTRY VILLAGE, INC.       )
JAMES STILWELL, and                   )
MARGARET STILWELL,    Defendants.     )

**FILED**

**MAR 19 2003**

*Julie Mills*
CLERK OF THE CIRCUIT COURT
DOUGLAS COUNTY, ILLINOIS

### ANSWER
### TO COMPLAINT-FORCIBLE ENTRY AND DETAINER

Now come the Defendants, AMISHLAND COUNTRY VILLAGE, INC., and JAMES STILWELL and MARGARET STILWELL, by their attorney, Richard L. Broch, and for their answer to the Complaint for Forcible Entry and Detainer filed in this cause state as follows:

1. Defendants admit the allegations as contained in paragraph 1. of the Complaint.

2. Defendants admit the allegations as contained in paragraph 2. of the Complaint.

3. Defendants admit the allegations of paragraph 3. of the Complaint.

4. Defendants admit the allegations of paragraph 4 of the Complaint.

5. Defendants deny the allegations of paragraph 5. of the Complaint, and demand proof thereof.

6. Defendants deny the allegations of paragraph 6. of the Complaint, and demand proof thereof.

7. Defendants admit the allegations of paragraph 7. of the Complaint.

8. Defendants deny  the allegations of paragraph 8. of the Complaint, and demand proof thereof.

9. Defendants deny the allegations of paragraph 9. of the Complaint, an

**EXHIBIT**
**B**
tabbies'

RECEI
MAR 20

0034

proof thereof.

10. Defendants deny the allegations of paragraph 10. of the Complaint, and demand proof thereof.

11. Defendants deny the allegations of paragraph 11. of the Complaint, and demand proof thereof.

WHEREFORE, the Defendants pray for Judgment in their favor and against the Plaintiff as follows :

A. Plaintiff not be allowed possession of the premises from the Defendants;

B. Defendants not be adjudged in default of the Lease as requested by Plaintiff, and no order of possession be issued to remove Defendants from the premises.

C. The Court not allow Plaintiff to recover from Defendants any amounts for alleged past due rent, attorney's fees and costs of suit.

D. The Court allow Defendants to recover their reasonable attorney's fees incurred in defense of this action.

E. For such further relief as the Court would deem equitable and proper.

> AMISHLAND COUNTRY VILLAGE INC.,
> JAMES STILWELL and MARGARET
> STILWELL, Defendants
>
> BY: _Richard L Broch_
> Richard L. Broch, Their Attorney

Richard L. Broch
Attorney at Law
1304 S. Tuscola Blvd.
P.O. Box 253
Tuscola, IL 61953
(217) 253-2366

## VERIFICATIONS

STATE OF ILLINOIS     )
                       ) SS

COUNTY OF DOUGLAS  )

     James Stilwell, being first duly sworn, states that he is an authorized representative of Defendant, Amishland Country Village, Inc., that he has read the foregoing Answer to Complaint- Forcible Entry and Detainer, and that he knows that the anwers to the allegations of said Complaint are true in substance and in fact to the best of his knowledge, information and belief.

                                                James Stilwell,
                                                Authorized Representative

Subscribed and sworn to before me this _19th_ day of March, 2003.

_____
Notary Public

> "OFFICIAL SEAL"
> RICHARD L. BROCH
> Notary Public, State of Illinois
> My Commission Expires  05/29/06

STATE OF ILLINOIS     )
                       ) SS

COUNTY OF DOUGLAS )

     James Stilwell and Margaret Stilwell, first being duly sworn, state that they are named Defendants in this cause, that they have read the foregoing Answer to Complaint- Forcible Entry and Detainer, and that the answers to the allegations of sais Complaint therein contained are true in substance and in fact to the best of their knowledge, information and belief.

                                                James Stilwell

                                              Margaret Stilwell

Subscribed and sworn to before me this _19th_ day of March, 2003.

_____
Notary Public

> "OFFICIAL SEAL"
> RICHARD L. BROCH
> Notary Public, State of Illinois
> My Commission Expires  05/29/06

# Howard & Howard

### law for business

## FACSIMILE TRANSMITTAL SHEET

This communication is confidential and intended only for the addressee. Any distribution or duplication of this communication is prohibited. If this facsimile was not intended for you, please telephone us immediately so that we can arrange for its return at our expense.

TO: *Richard Broch*

FROM: Timothy J. Howard

COMPANY:

DATE: *5-6-03*

FAX NUMBER: *217/253-2296*

TOTAL NO. OF PAGES INCLUDING COVER: *2*

PHONE NUMBER:

SENDER'S TELEPHONE NUMBER: (309) 672-1483

CLIENT NUMBER: *17379-3*

SENDER'S FAX NUMBER: (309) 672-1568

RE:

☐ URGENT     ☐ FOR REVIEW     ☐ PLEASE COMMENT     ☐ PLEASE REPLY

NOTES/COMMENTS:

*CC: Tuscola Furniture*
*First Mid-Illinois Bank (Tom C.)*
*217/359-9889*

**EXHIBIT**

*C*

000047

HOWARD & HOWARD ATTORNEYS, P.C.
ONE TECHNOLOGY PLAZA, SUITE 600
211 FULTON STREET
PEORIA, ILLINOIS 61602-1350

Bloomfield Hills   Kalamazoo   Lansing   Peoria

# Howard & Howard

### law for business

direct dial: 309.999.6307

Timothy J. Howard
May 6, 2003

email: TIIoward@howardandhoward.com

Richard L. Broch, Esq.
P.O. Box 253
1304 S. Tuscola Blvd.
Tuscola, IL 61953

*VIA FACSIMILE – 217/253-2296*

RE:     **Tuscola Furniture Group, LLC v. Amishland Country Village, Inc., et al.**
        **Douglas Co. Case No. 03-L-5**
        <u>Our File No. 17379-3</u>

Dear Mr. Broch:

This is to express our condolences on the untimely death of Mr. Stilwell.

Pursuant to the Consignment Agreement, we will seek satisfaction of our claim against your client, Amishland Country Village, Inc., from the proceeds of the life insurance policy on the life of Mr. Stilwell. Pursuant to paragraph 3.9 of the Agreement, Mr. Stilwell maintained a life insurance policy on his life with Old Line Life Insurance Company (Policy No. 2604663). One million dollars of coverage was collaterally assigned to Tuscola Furniture Group, LLC ("TRG") and its bank, First Mid-Illinois Bank & Trust by an Assignment dated January 11, 2001. The proceeds of this policy are sufficient to satisfy the TRG claim of approximately $481,000, with the excess proceeds payable to Mrs. Stilwell. Our client is preparing a payoff statement.

Finally, we do not see the need to proceed with the replevin action that has been scheduled for trial this Friday, because our client and the bank will be paid from the insurance proceeds.

Please call me to discuss this matter at your convenience.

Very truly yours,

HOWARD & HOWARD ATTORNEYS, P.C.

Timothy J. Howard

cc:     Tuscola Furniture Group, LLC (Via facsimile)
        First Mid-Illinois Bank & Trust (Via facsimile-217/359-9889)

betty\g:\j-l\janko financial\tuscola furniture grp\cor\rb5-6-03

BROCH & NOLAN                    PAGE  01

**RICHARD L. BROCH**
1304 S. Tuscola Blvd.
Tuscola, IL  61953
Phone:  217/ 253-2366
Fax:  217/ 253-2296

## FAX TRANSMITTAL COVER SHEET

TO:  Tim Howard
FROM:  Rick Broch

DATE:  05/19/03

FAX RECEIVER NUMBER:  309-672-1568
NUMBER OF PAGES SENT, INCLUDING COVER SHEET: 2
SPECIAL INSTRUCTIONS:  Re: Assignments of Life Insurance Policies

Dear Tim,

As Margaret Stilwell had forgotten about the specifics of the life insurance assignments, I have indicated I would go over those with her to explain exactly where the proceeds would go, for what purposes and in what amounts. In that regard, I want to clear up a couple of questions I have since speaking with her insurance agent, John Lyons of Atwood.

Mr. Lyons indicated to me originally that their were three assignments as to the 4 million dollar policy :  2 million to T.N.B., 1.5 million to Citizens Bank in Princeton, 1 million to F.M.I.B. and $250,000 to Janko Furniture Group.  An earlier assignment in the amount of $500,000 to Janko Financial Group had been released.

When I spoke with you on the telephone, you confirmed these amounts, and stated the assignments in fact overlapped, and were all connected to furniture debt in the amount of $481,000 plus additional expenses.

Mr. Lyons last week indicated to me that he had been receiving the claims of the assignees, and that Citizens Bank was in fact claiming the 1.5 million dollar assignment, and further indicated to him they were owed the sum of 2 million dollars. This claim could clearly not involve the furniture as we had discussed.  The Janko Furniture Group Claim has now increased to over $500,000.

The purpose for this fax is to inquire as to whether or not you have, and would be able to forward to me, the assignment documentation for Janko Furniture Group, Citizens Bank and FMIB, so that I can go over with Margaret the exact nature of the assignments. We need to determine the amount still owed to FMIB by JFG as of May 2,



EXHIBIT

D

tabbies

0011

2003; why Princton is now claiming the 1.5 million; and the specifics as to the JFG claimed amount of $500,000 plus. Margaret is interested in taking care of any valid assignment as soon as the insurance money arrives, however needs to have these questions cleared up for her peace of mind. Please call me if you have any questions.

Thank you.    Rick Broch

## *********CONFIDENTIALITY NOTE *********

THE DOCUMENT ACCOMPANYING THIS TELECOPY TRANSMISSION CONTAINS INFORMATION FROM THE OFFICE OF BROCH & NOLAN, ATTORNEYS AT LAW, WHICH MAY BE CONFIDENTIAL AND/OR LEGALLY PRIVILEGED. THE INFORMATION IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ON THIS TRANSMISSION SHEET. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS TELECOPIED INFORMATION IS STRICTLY PROHIBITED, AND THAT THE DOCUMENTS SHOULD BE RETURNED TO THIS FIRM IMMEDIATELY. IN THIS REGARD, IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY SO THAT WE CAN ARRANGE FOR THE RETURN OF THE ORIGINAL DOCUMENTS TO US AT NO COST TO YOU.

Ble    field Hills    Kalamazoo    Lansing    Peoi

# Howard & Howard
## law for business

direct dial: 309.999.6307                    Timothy J. Howard                    email: THoward@howardandhoward.com

June 27, 2003

**The Honorable Frank W. Lincoln**
Circuit Judge
Douglas County
Douglas County Courthouse
401 S. Center Street
Tuscola, IL 61953

RE:    **Amishland Development, LLC v. Amishland Country Village, Inc., et al.**
**Case No. 03 LM 10**
**Our File No. 17379-1**

Dear Judge Lincoln:

Pursuant to our telephone status conference, enclosed please find our Motion for Voluntary Dismissal and proposed Order of Dismissal. Please enter the Order at your convenience and have your Clerk return file-stamped copies of the Motion and Order in the return envelope provided. This will close this matter.

Thank you.

Very truly yours,

HOWARD & HOWARD ATTORNEYS, P.C.

Timothy J. Howard

Enclosures
cc:    Tuscola Furniture Group, LLC (w/encs)
       Richard L. Broch, Esq. (w/encs)
       Rodney L. Smith, Esq. (w/encs)

betty\g:\j-l\janko financial\amishland dev\cor\judge



EXHIBIT
*E*

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
DOUGLAS COUNTY, ILLINOIS

AMISHLAND DEVELOPMENT, LLC,
an Illinois Limited Liability Company,

     Plaintiff,

v.

AMISHLAND COUNTRY VILLAGE,
INC.,
JAMES STILWELL, and
MARGARET STILWELL,

     Defendants.

Case No. 03 LM 10

## MOTION FOR VOLUNTARY DISMISSAL

Plaintiff, AMISHLAND DEVELOPMENT, LLC, by Howard & Howard Attorneys, P.C., moves to dismiss its Complaint.

Dated: June 27, 2003.

AMISHLAND DEVELOPMENT, LLC,

By: _____
          Timothy J. Howard,
          One of its Attorneys

Timothy J. Howard
Michael S. Seneca
Howard & Howard Attorneys, P.C.
One Technology Plaza
211 Fulton Street, Suite 600
Peoria, IL 61602
(309) 672-1483
(309) 672-1568 (fax)

Howard & Howard
law for business

One North Main
Suite 430
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
Bloomfield Hills, MI 48304.5151
248.645.1483

The Michigan Building
Suite 200
100 Portage Street
Kalamazoo, MI 49007.4802
269.382.1483

The Phoenix Building
Suite 500
1 North Washington Square
Lansing, MI 48933.1817
517.485.1483

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483

1

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Motion was served upon the parties of record by enclosing same in envelopes addressed as follows:

Richard L. Broch, Esq.
1304 S. Tuscola Blvd.
P.O. Box 253
Tuscola, IL 61953

Rodney L. Smith, Esq.
Brankey & Smith, P.C.
622 Jackson Avenue
Charleston, IL 61920

by hand delivery and/or by depositing said envelopes in the United States Mail with first-class postage fully prepaid in Peoria, Illinois, on this 27th day of June, 2003.

Timothy J. Howard

betty\g:\j-l\janko financial\amishland dev\pldgs\motion for dismissal

oward & Howard
law for business

One North Main
Suite 430
101 North Main Street
Ann Arbor, MI 48104.1475
734.222.1483

The Pinehurst Office Center
Suite 101
39400 Woodward Avenue
oomfield Hills, MI 48304.5151
248.645.1483

The Michigan Building
Suite 200
100 Portage Street
Kalamazoo, MI 49007.4802
269.382.1483

The Phoenix Building
Suite 500
12 North Washington Square
Lansing, MI 48933.1817
517.485.1483

One Technology Plaza
Suite 600
211 Fulton Street
Peoria, IL 61602.1350
309.672.1483

2

ADV

# U.S. Bankruptcy Court
## Central District of Illinois (Danville)
### Bankruptcy Petition #: 03-93877

*Assigned to:* Judge Gerald D. Fines
Chapter 7
Voluntary
Asset

*Date Filed:* 11/25/2003
*Date Discharged:* 04/27/2004

**Debtor**
**Margaret Jo Stilwell**
2701 Curtis Rd
Champaign, IL 61822
SSN: xxx-xx-1792

represented by **Rodney L Smith**
622 Jackson Ave
Charleston, IL 61920
(217) 345-6222
Email:
cwebster@brankeysmithpc.com

**Trustee**
**Marsha L Combs-Skinner**
2391 E County Rd 800 N
Newman, IL 61942
217-837-9730

represented by **Jason M Crowder**
POB 889
Mattoon, IL 61938
(217) 235-2700
Email: crowderjason@hotmail.com

**Marsha L Combs Skinner**
2391 E County Rd 800 N
Newman, IL 61942
217-837-9730
Email:
MARSHA@ECICWIRELESS.COM

| Filing Date | # | Docket Text |
|---|---|---|
| 11/25/2003 | 1 | Voluntary Petition. Filing Fee Received: $ 209.00 Receipt # 90046007 (court,nbed) Additional attachment(s) added on 2/1/2006 (court, dphi). (Entered: 11/25/2003) |
| 11/25/2003 | 2 | Notice re: Liability Schedules. (court,nbed) Additional attachment(s) added on 2/1/2006 (court, dphi). (Entered: 11/25/2003) |
| 11/25/2003 | 3 | Order Requiring Matrix/Amended Petition:oflmtrl1. Due 12/8/03 (court,nbed) Additional attachment(s) added on 2/1/2006 (court, dphi). (Entered: 11/25/2003) |
| 11/25/2003 | 4 | Incomplete Filings/Missing Documents:stmtfina, schs, summ, decsch, feedscl, stmtint. Due 12/10/03 (court,nbed) Additional attachment(s) added on 2/1/2006 (court, dphi). (Entered: 11/25/2003) |

EXHIBIT
I

| 11/27/2003 | | Courts BNC Certificate of Service Re: [3-1] Order Matrix Petition . # of Notices: 4. (admin) (Entered: 11/27/2003) |
|---|---|---|
| 11/27/2003 | | Courts BNC Certificate of Service Re: [4-1] Order missing documents . # of Notices: 3. (admin) (Entered: 11/27/2003) |
| 11/27/2003 | | Courts BNC Certificate of Service Re: [2-1] Liability Schedules Notice . # of Notices: 3. (admin) (Entered: 11/27/2003) |
| 12/08/2003 | 5 | Motion By Debtor Margaret Jo Stilwell To Extend Time To File Missing Documents ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/1/2006 (court, dphi). (Entered: 12/08/2003) |
| 12/09/2003 | 6 | Order Granting [5-1] Motion To Extend Time To File Missing Documents by Margaret Jo Stilwell Matrix Amended Petition Due: 12/22/03 Statement of Financial Affairs, Schedules A-J, Summary of Schedules, Declaration Concerning Schedules, Attorneys Fee Disclosure Statement, Statement of Intention Due: 12/22/03 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 12/09/2003) |
| 12/23/2003 | 7 | All Statements and Schedules. (court,ngre) (Entered: 12/23/2003) |
| 12/23/2003 | | Matrix. (court,ngre) (Entered: 12/23/2003) |
| 12/23/2003 | 8 | First Meeting of Creditors Scheduled For 11:30 2/20/04 At Edgar Co. Courthouse - Paris Last Day To Oppose Discharge: 4/20/04 (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 12/23/2003) |
| 12/25/2003 | | Courts BNC Certificate of Service Re: [8-1] First Meeting . # of Notices: 305. (admin) (Entered: 12/25/2003) |
| 12/29/2003 | 9 | Motion By Creditor Illini Community Development Corporation For Relief From Stay , To Abandon Real Estate ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 12/29/2003) |
| 12/29/2003 | 10 | Notice RE: [9-2] Motion To Abandon Real Estate by Illini Community Development Corporation , Setting Objections Due Date: 1/13/04, [9-1] Motion For Relief From Stay by Illini Community Development Corporation , Setting Objections Due Date: 1/13/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 12/29/2003) |
| 12/29/2003 | | Filing Fee Received for [9-2] Motion To Abandon Real Estate by Illini Community Development Corporation, [9-1] Motion For Relief |

| | | |
|---|---|---|
| | | From Stay by Illini Community Development Corporation . Filing Fee Received: $ 150.00 Receipt # 090046579. (court,ngre) (Entered: 12/29/2003) |
| 12/31/2003 | | Courts BNC Certificate of Service Re: [10-1] Scheduling Objection Notice . # of Notices: 308. (admin) (Entered: 12/31/2003) |
| 12/31/2003 | 13 | Amended Schedule C; No Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/06/2004) |
| 01/02/2004 | 11 | Motion By Creditor 1st State Bank For Relief From Stay ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/05/2004) |
| 01/05/2004 | 12 | Notice RE: [11-1] Motion For Relief From Stay by 1st State Bank , Setting Objections Due Date: 1/20/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/05/2004) |
| 01/05/2004 | | Filing Fee Received for [11-1] Motion For Relief From Stay by 1st State Bank . Filing Fee Received: $ 150.00 Receipt # 090046631. (court,ngre) (Entered: 01/05/2004) |
| 01/07/2004 | | Courts BNC Certificate of Service Re: [12-1] Scheduling Objection Notice . # of Notices: 310. (admin) (Entered: 01/07/2004) |
| 01/08/2004 | 14 | Notice of Appearance And Request For Service Of Notice By Timothy Smith for Creditor Tuscola National Bank. Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/08/2004) |
| 01/08/2004 | 15 | Motion By Creditor Community Banks of Shelby County For Relief From Stay , To Abandon Real Estate ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/08/2004) |
| 01/08/2004 | | Filing Fee Received for [15-2] Motion To Abandon Real Estate by Community Banks of Shelby County, [15-1] Motion For Relief From Stay by Community Banks of Shelby County . Filing Fee Received: $ 150.00 Receipt # 090046700. (court,ngre) (Entered: 01/08/2004) |
| 01/08/2004 | 16 | Notice RE: [15-2] Motion To Abandon Real Estate by Community Banks of Shelby County , Setting Objections Due Date: 1/23/04, [15-1] Motion For Relief From Stay by Community Banks of Shelby County , Setting Objections Due Date: 1/23/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/08/2004) |

| | | |
|---|---|---|
| 01/10/2004 | | Courts BNC Certificate of Service Re: [16-1] Scheduling Objection Notice . # of Notices. 314. (admin) (Entered: 01/12/2004) |
| 01/13/2004 | 17 | Amended Notice RE: [11-1] Motion For Relief From Stay by 1st State Bank , Setting Objections Due Date: 1/28/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/13/2004) |
| 01/15/2004 | | Courts BNC Certificate of Service Re: [17-1] Scheduling Objection Notice . # of Notices. 314. (admin) (Entered: 01/15/2004) |
| 01/16/2004 | 18 | Order Granting [9-2] Motion To Abandon Real Estate by Illini Community Development Corporation Granting [9-1] Motion For Relief From Stay by Illini Community Development Corporation . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/16/2004) |
| 01/22/2004 | 19 | Motion By Creditor Tuscola National Bank For Relief From Stay , To Abandon Real Estate and Personal Property ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/22/2004) |
| 01/22/2004 | | Filing Fee Received for [19-2] Motion To Abandon Real Estate and Personal Property by Tuscola National Bank, [19-1] Motion For Relief From Stay by Tuscola National Bank . Filing Fee Received: $ 150.00 Receipt # 090046912. (court,ngre) (Entered: 01/22/2004) |
| 01/22/2004 | 20 | Notice RE: [19-2] Motion To Abandon Real Estate and Personal Property by Tuscola National Bank , Setting Objections Due Date: 2/6/04, [19-1] Motion For Relief From Stay by Tuscola National Bank , Setting Objections Due Date: 2/6/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/22/2004) |
| 01/24/2004 | | Courts BNC Certificate of Service Re: [20-1] Scheduling Objection Notice . # of Notices. 314. (admin) (Entered: 01/26/2004) |
| 01/26/2004 | 21 | Order Granting [15-2] Motion To Abandon Real Estate by Community Banks of Shelby County Granting [15-1] Motion For Relief From Stay by Community Banks of Shelby County . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/26/2004) |
| 01/30/2004 | 22 | Order Granting [11-1] Motion For Relief From Stay by 1st State Bank . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 01/30/2004) |
| 02/04/2004 | 23 | Order Granting [11-1] Motion For Relief From Stay by 1st State |

| | | |
|---|---|---|
| | | Bank . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/04/2004) |
| 02/11/2004 | 24 | Order Granting [19-2] Motion To Abandon Real Estate and Personal Property by Tuscola National Bank Granting [19-1] Motion For Relief From Stay by Tuscola National Bank . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/11/2004) |
| 02/20/2004 | 25 | Motion By Creditor Tuscola National Bank To Vacate [24-1] Order ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/23/2004) |
| 02/24/2004 | 26 | First Meeting Held as scheduled. (court,ngre) Additional attachment (s) added on 2/2/2006 (court, dphi). (Entered: 02/24/2004) |
| 02/26/2004 | 27 | Hearing Re: [25-1] Motion To Vacate [24-1] Order by Tuscola National Bank Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/26/2004) |
| 02/26/2004 | 28 | Objection to Exemption By Creditor Community Banks of Shelby County . ; Certificate of Service. (court,ngre) Additional attachment (s) added on 2/2/2006 (court, dphi). (Entered: 02/26/2004) |
| 02/26/2004 | 29 | Motion by Creditor Community Banks of Shelby County For Turnover of Funds ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/26/2004) |
| 02/27/2004 | 30 | Hearing Re: [29-1] Motion For Turnover of Funds by Community Banks of Shelby County Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris, [28-1] Exemption Objection by Community Banks of Shelby County Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 02/27/2004) |
| 02/27/2004 | 31 | Brief/Memorandum of Law filed by Creditor Tuscola National Bank ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/01/2004) |
| 02/27/2004 | 32 | Objection to Exemption By Creditor Tuscola National Bank . ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/01/2004) |
| 02/28/2004 | | Courts BNC Certificate of Service Re: [27-1] Hearing . # of Notices: 4. (admin) (Entered: 03/01/2004) |
| 02/29/2004 | | Courts BNC Certificate of Service Re: [30-1] Hearing . # of Notices: |

| | | |
|---|---|---|
| | | 4. (admin) (Entered: 03/01/2004) |
| 03/01/2004 | 33 | Hearing Re: [32-1] Exemption Objection by Tuscola National Bank Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/01/2004) |
| 03/02/2004 | 34 | Objection to Exemption By . Creditor BLT III ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/02/2004) |
| 03/02/2004 | 35 | Hearing Re: [34-1] Exemption Objection by BLT III Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/02/2004) |
| 03/03/2004 | | Courts BNC Certificate of Service Re: [33-1] Hearing . # of Notices: 4. (admin) (Entered: 03/03/2004) |
| 03/04/2004 | | Courts BNC Certificate of Service Re: [35-1] Hearing . # of Notices: 4. (admin) (Entered: 03/04/2004) |
| 03/05/2004 | 36 | Brief/Memorandum of Law filed by Creditor BLT III ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/05/2004) |
| 03/08/2004 | 37 | Motion by Trustee Marsha L Combs Skinner For Turnover of Funds ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/08/2004 | 38 | Objection By Trustee Marsha L Combs Skinner To [29-1] Motion For Turnover of Funds by Community Banks of Shelby County . Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/08/2004 | 39 | Objection to Exemption By Trustee Marsha L Combs Skinner . ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/08/2004 | 40 | Brief/Memorandum of Law filed by Trustee Marsha L Combs Skinner ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/09/2004 | 41 | Hearing Re: [39-1] Exemption Objection by Marsha L Combs Skinner Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris, [38-1] Objection by Marsha L Combs Skinner Scheduled For 9:00 3/16/04 at Edgar Co. Courthouse - Paris, [37-1] Motion For Turnover of Funds by Marsha L Combs Skinner Scheduled For 9:00 3/16/04 at |

| | | Edgar Co. Courthouse - Paris (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
|---|---|---|
| 03/09/2004 | 42 | Courts Certificate of Mailing Re: [41-1] Hearing (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/09/2004 | 43 | Request by Trustee Marsha L Combs Skinner for Claims Date to be set. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/09/2004) |
| 03/10/2004 | 44 | Order Fixing Time for Filing Claims. Last Day to File Claims 6/8/04 ; Proof of Claim (gov) Due: 6/8/04 (court,ngre) Additional attachment (s) added on 2/2/2006 (court, dphi). (Entered: 03/10/2004) |
| 03/12/2004 | | Courts BNC Certificate of Service Re: [44-1] Fix'g Time for Filing Claims Order . # of Notices: 314. (admin) (Entered: 03/12/2004) |
| 03/12/2004 | 45 | Objection By Creditor Community Banks of Shelby County To [38-1] Objection by Marsha L Combs Skinner . Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/15/2004) |
| 03/12/2004 | 46 | Objection By Debtor Margaret Jo Stilwell To [37-1] Motion For Turnover of Funds by Marsha L Combs Skinner . Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/15/2004) |
| 03/15/2004 | 47 | Brief/Memorandum of Law filed by Debtor Margaret Jo Stilwell ; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/15/2004) |
| 03/15/2004 | 48 | Objection By Debtor Margaret Jo Stilwell To [39-1] Exemption Objection by Marsha L Combs Skinner, [34-1] Exemption Objection by BLT III, [32-1] Exemption Objection by Tuscola National Bank, [28-1] Exemption Objection by Community Banks of Shelby County . Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/15/2004) |
| 03/15/2004 | 49 | 2nd Amended Schedule C; Certificate of Service. (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/15/2004) |
| 03/16/2004 | | Hearing Held Re: [25-1] Motion To Vacate [24-1] Order by Tuscola National Bank . Order in 14 days (court,ngre) (Entered: 03/16/2004) |
| 03/16/2004 | 50 | Court Notice Order Re: Order Re: Motion by Tuscola National Bank |

| | | to Vacate Order Due: 3/30/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/16/2004) |
|---|---|---|
| 03/16/2004 | | Hearing Held Re: [37-1] Motion For Turnover of Funds by Marsha L Combs Skinner . Order in 14 days (court,ngre) (Entered: 03/16/2004) |
| 03/16/2004 | 51 | Court Notice Order Re: Order Re: Motion for Turnover by Trustee Due: 3/30/04 . (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/16/2004) |
| 03/16/2004 | 52 | Hearing Re: [39-1] Exemption Objection by Marsha L Combs Skinner Continued For 8:30 4/20/04 at Telephone Conference - Danville, [34-1] Exemption Objection by BLT III Continued For 8:30 4/20/04 at Telephone Conference -Danville, [32-1] Exemption Objection by Tuscola National Bank Continued For 8:30 4/20/04 at Telephone Conference -Danville, [28-1] Exemption Objection by Community Banks of Shelby County Continued] For 8:30 4/20/04 at Telephone Conference -Danville (court,ngre) Additional attachment (s) added on 2/2/2006 (court, dphi). (Entered: 03/16/2004) |
| 03/16/2004 | 53 | Hearing Set RE: Status of Paragraph D of Trustee's Motion for Turnover. 8:30 4/20/04 at Telephone Conference -Danville (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/16/2004) |
| 03/16/2004 | 54 | Final Hearing Re: [29-1] Motion For Turnover of Funds by Community Banks of Shelby County Continued For 9:00 5/26/04 at Room 120 - Danville (court,ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/16/2004) |
| 03/18/2004 | | Courts BNC Certificate of Service Re: [52-1] Hearing . # of Notices: 6. (admin) (Entered: 03/18/2004) |
| 03/18/2004 | | Courts BNC Certificate of Service Re: [53-1] set Hearing . # of Notices. 3. (admin) (Entered: 03/18/2004) |
| 03/18/2004 | | Courts BNC Certificate of Service Re: [50-1] Notice Order Court . # of Notices. 2. (admin) (Entered: 03/18/2004) |
| 03/18/2004 | | Courts BNC Certificate of Service Re: [51-1] Notice Order Court . # of Notices. 2. (admin) (Entered: 03/18/2004) |
| 03/18/2004 | | Courts BNC Certificate of Service Re: [54-1] Hearing . # of Notices: 4. (admin) (Entered: 03/18/2004) |
| 03/26/2004 | 55 | Order Granting [37-1] Motion For Turnover of Funds by Marsha L Combs Skinner as to Bank 1 Checking Account identified as Bank |

| | | One Atwood Meat Service; Amishlands Country Village and 1st Mid IL Bank and Trust Amish and Oak Account only. (court,dtow) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 03/26/2004) |
|---|---|---|
| 04/05/2004 | 56 | Order Granting Motion To Vacate (Related Doc # 25) for Limited Purposes. Signed on 4/5/2004. (court, ngre)Copies Sent: Timothy Smith, Marsha Combs-Skinner, Rodney Smith, UST Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 04/05/2004) |
| 04/07/2004 | 57 | Motion to Sell Filed by Trustee Marsha L Combs Skinner (court, ngre) Additional attachment(s) added on 2/2/2006 (court, dphi). (Entered: 04/08/2004) |
| 04/08/2004 | 58 | Hearing Set (RE: related document(s)57 Motion to Sell filed by Trustee Marsha L Combs Skinner) Hearing to be held on 5/26/2004 at 09:00 AM Room 120-Danville, IL for 57, (court, ngre) (Entered: 04/08/2004) |
| 04/10/2004 | 59 | BNC Certificate of Mailing - Hearing No. of Notices: 316. Service Date 04/10/2004. (Related Doc # 58) (Admin.) (Entered: 04/11/2004) |
| 04/20/2004 | | Hearing Held (RE: related document(s)29 Motion for Turnover filed by Creditor Community Banks of Shelby County) Hearing held deadline set: 5/4/2004. (court, ngre) (Entered: 04/20/2004) |
| 04/20/2004 | 61 | Court Notice Requesting Order (RE: related document(s)29 Motion for Turnover filed by Creditor Community Banks of Shelby County) Order Due 5/4/2004. (court, ngre) (Entered: 04/20/2004) |
| 04/20/2004 | 62 | Hearing Set (RE: related document(s)28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank, 34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner) Hearing to be held on 5/26/2004 at 09:00 AM Room 120-Danville, IL for 39 and for 28 and for 32 and for 34, (court, ngre) (Entered: 04/20/2004) |
| 04/21/2004 | 63 | Correspondence Filed by Creditor Community Banks of Shelby County. (Pogge, Mariann) (Entered: 04/21/2004) |
| 04/22/2004 | 64 | BNC Certificate of Mailing - Hearing No. of Notices: 315. Service Date 04/22/2004. (Related Doc # 62) (Admin.) (Entered: 04/23/2004) |
| 04/22/2004 | 65 | BNC Certificate of Mailing No. of Notices: 4. Service Date 04/22/2004. (Related Doc # 61) (Admin.) (Entered: 04/23/2004) |

| | | |
|---|---|---|
| 04/23/2004 | 66 | Order Granting Motion To Turnover (Related Doc # 29) Signed on 4/23/2004. Entered by the court on 4/26/04 (court, ngre) (Entered: 04/26/2004) |
| 04/27/2004 | 67 | Order Discharging Debtor Signed on 4/27/2004 (RE: related document(s)8 First Meeting of Creditors). (court, ngre) (Entered: 04/27/2004) |
| 04/28/2004 | 68 | BNC Certificate of Mailing - PDF Document No. of Notices: 5. Service Date 04/28/2004. (Related Doc # 66) (Admin.) (Entered: 04/29/2004) |
| 04/29/2004 | 69 | BNC Certificate of Mailing - Order of Discharge No. of Notices: 317. Service Date 04/29/2004. (Related Doc # 67) (Admin.) (Entered: 04/30/2004) |
| 05/26/2004 | | Hearing Held (RE: related document(s)34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner, 28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank, 57 Motion to Sell filed by Trustee Marsha L Combs Skinner) Hearing held deadline set: 6/2/2004 Motion regarding insurance policies and proposed order. (court, ngre) (Entered: 05/26/2004) |
| 05/26/2004 | 71 | Hearing Set (RE: related document(s)28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank, 34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner) Hearing to be held on 7/22/2004 at 08:30 AM Telephone Conference-Danville,IL for 39 and for 28 and for 32 and for 34, (court, ngre) (Entered: 05/26/2004) |
| 05/27/2004 | 72 | Motion for 2004 Examination Filed by Creditor Tuscola National Bank (Attachments: # 1 Exhibit) (Smith, Timothy) (Entered: 05/27/2004) |
| 05/27/2004 | 73 | Hearing Set (RE: related document(s)72 Motion for Examination filed by Creditor Tuscola National Bank) Hearing to be held on 7/20/2004 at 09:00 AM Edgar Cty Courthouse-Paris, IL for 72, (court, ngre) (Entered: 05/27/2004) |
| 05/28/2004 | 74 | BNC Certificate of Mailing - Hearing No. of Notices: 6. Service Date 05/28/2004. (Admin.) (Entered: 05/29/2004) |

| 05/29/2004 | 75 | BNC Certificate of Mailing - Hearing No. of Notices: 7. Service Date 05/29/2004. (Admin.) (Entered: 05/30/2004) |
| 06/01/2004 | 76 | Court Notice re Cancellation of Hearing (RE: related document(s)72 Motion for Examination filed by Creditor Tuscola National Bank) (court, ngre) (Entered: 06/01/2004) |
| 06/01/2004 | 77 | Order Granting Motion for 2004 Examination (Related Doc # 72) Signed on 6/1/2004. (court, ngre) (Entered: 06/02/2004) |
| 06/03/2004 | 78 | BNC Certificate of Mailing No. of Notices: 7. Service Date 06/03/2004. (Admin.) (Entered: 06/04/2004) |
| 06/04/2004 | 79 | Order Granting Motion To Sell (Related Doc # 57) Signed on 6/4/2004. (court, ephi) (Entered: 06/04/2004) |
| 06/04/2004 | 80 | BNC Certificate of Mailing - PDF Document No. of Notices: 6. Service Date 06/04/2004. (Admin.) (Entered: 06/05/2004) |
| 06/06/2004 | 81 | BNC Certificate of Mailing - PDF Document No. of Notices: 4. Service Date 06/06/2004. (Admin.) (Entered: 06/07/2004) |
| 06/08/2004 | 82 | Certificate of Service Filed by Creditor Tuscola National Bank. (Attachments: # 1 Exhibit Application For Life Insurance# 2 Exhibit) (Smith, Timothy) (Entered: 06/08/2004) |
| 06/14/2004 | 83 | Court Notice re Claim Date Expiration Response Due: 6/29/2004. (court, ngre) (Entered: 06/14/2004) |
| 06/16/2004 | 84 | BNC Certificate of Mailing (RE: related document(s)83 Court Notice Claim) No. of Notices: 2. Service Date 06/16/2004. (Admin.) (Entered: 06/17/2004) |
| 06/23/2004 | 85 | Request for Claims Filed by Trustee Marsha L Combs Skinner. (Combs Skinner, Marsha) (Entered: 06/23/2004) |
| 06/25/2004 | 86 | CORRECTIVE ENTRY. ENTERED IN THIS CASE IN ERROR. Court Notice of Transmittal of Claims Claims Set to be Returned by 7/30/2004. (court, ngre) Modified on 6/25/2004 (court, ngre). (Entered: 06/25/2004) |
| 06/25/2004 | 87 | Court Notice of Transmittal of Claims Claims Set to be Returned by 7/30/2004. (court, ngre) (Entered: 06/25/2004) |
| 07/07/2004 | 88 | Complaint by Rodney L Smith ; Margaret Jo Stilwell on behalf of Margaret Jo Stilwell against Internal Revenue Service 04-09058; |

| | | |
|---|---|---|
| | | Nature of Suit(s): 498 (Other Action) , Fee Amount . Filed by Rodney L Smith ; Margaret Jo Stilwell on behalf of Margaret Jo Stilwell . (Smith, Rodney) (Entered: 07/07/2004) |
| 07/13/2004 | 89 | Correspondence Filed by Rochelle A. Funderburg . (court, ngre) (Entered: 07/13/2004) |
| 07/16/2004 | 90 | Court Notice re Claim filed for Creditor (court, ngre) (Entered: 07/16/2004) |
| 07/18/2004 | 91 | BNC Certificate of Mailing (RE: related document(s)90 Claim Filed for Creditor Notice) No. of Notices: 5. Service Date 07/18/2004. (Admin.) (Entered: 07/19/2004) |
| 07/22/2004 | | Hearing Held (RE: related document(s)34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner, 28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank) Stipulation of Facts due Hearing held deadline set: 8/11/2004. (court, ngre) Modified on 7/22/2004 (court, ngre). (Entered: 07/22/2004) |
| 07/27/2004 | 93 | Motion for Approval of or Authority to *Provide Notice of Trustee Sale and an Opportunity to Respond to Such Sale to Cure a Lack of Notice onthe Trustee's Motion to Sell Real Estate and Request for Authority to Close on Sale* Filed by Creditor Tuscola National Bank (Attachments: # 1 Exhibit) (Smith, Timothy) (Entered: 07/27/2004) |
| 07/27/2004 | 94 | Report of Sale Filed by Creditor Tuscola National Bank. (Attachments: # 1 Exhibit Report of Sale) (Smith, Timothy) (Entered: 07/27/2004) |
| 07/28/2004 | 95 | Hearing Set (RE: related document(s)93 Approval or Authority, filed by Creditor Tuscola National Bank, 94 Report of Sale filed by Creditor Tuscola National Bank) Hearing to be held on 8/10/2000 at 09:00 AM Room 120-Danville, IL for 93 and for 94, (court, ngre) (Entered: 07/28/2004) |
| 07/30/2004 | 96 | Hearing Set (RE: related document(s)93 Approval or Authority, filed by Creditor Tuscola National Bank, 94 Report of Sale filed by Creditor Tuscola National Bank) Hearing to be held on 8/10/2004 at 09:00 AM Room 120-Danville, IL for 93 and for 94, (court, ngre) (Entered: 07/30/2004) |
| 07/30/2004 | 97 | BNC Certificate of Mailing - Hearing (RE: related document(s)95 |

| | | |
|---|---|---|
| | | Hearing (Bk Other) Set, Hearing (Bk Other) Set) No. of Notices: 10. Service Date 07/30/2004. (Admin.) (Entered: 07/31/2004) |
| 08/01/2004 | 98 | BNC Certificate of Mailing - Hearing (RE: related document(s)96 Hearing (Bk Other) Set, Hearing (Bk Other) Set) No. of Notices: 322. Service Date 08/01/2004. (Admin.) (Entered: 08/02/2004) |
| 08/09/2004 | | Request to remove Clara Poore from case Filed by Creditor Clara Poore . (court, ngre) (Entered: 08/09/2004) |
| 08/10/2004 | | Hearing Held (RE: related document(s)94 Report of Sale filed by Creditor Tuscola National Bank, 93 Approval or Authority, filed by Creditor Tuscola National Bank) Hearing held Order Re: (93) and (94) deadline set: 8/24/2004. (court, ngre) (Entered: 08/10/2004) |
| 08/19/2004 | 100 | Objection to Claim 24 Filed by Debtor Margaret Jo Stilwell. (Smith, Rodney) (Entered: 08/19/2004) |
| 08/19/2004 | 101 | Objection to Claim Objection Date Notice (RE: related document(s) 100 Objection to Claim filed by Debtor Margaret Jo Stilwell) Setting Objections Due Date for: 9/8/2004. (court, ngre) (Entered: 08/19/2004) |
| 08/21/2004 | 102 | BNC Certificate of Mailing (RE: related document(s)101 Claim Objection Notice) No. of Notices: 5. Service Date 08/21/2004. (Admin.) (Entered: 08/22/2004) |
| 08/24/2004 | 103 | Motion to Extend/Shorten Time Filed by Trustee Marsha L Combs Skinner (Smith, Timothy) (Entered: 08/24/2004) |
| 08/25/2004 | 104 | Court Notice Requesting Order (RE: related document(s)94 Report of Sale filed by Creditor Tuscola National Bank, 93 Approval or Authority, filed by Creditor Tuscola National Bank) Order Due 9/8/2004. (court, ngre) (Entered: 08/25/2004) |
| 08/26/2004 | 105 | Order Granting Motion to Extend/Shorten Time (Related Doc # 103) Signed on 8/26/2004. (court, ngre) (Entered: 08/26/2004) |
| 08/27/2004 | 106 | BNC Certificate of Mailing (RE: related document(s)104 Order Request Notice) No. of Notices: 2. Service Date 08/27/2004. (Admin.) (Entered: 08/28/2004) |
| 09/01/2004 | 107 | Stipulation By Tuscola National Bank and Filed by Creditor Tuscola National Bank. (Smith, Timothy) (Entered: 09/01/2004) |
| 09/01/2004 | 108 | Motion to Extend/Shorten Time Filed by Creditor Tuscola National Bank (Smith, Timothy) (Entered: 09/01/2004) |

| 09/07/2004 | 109 | Order Granting Motion to Extend/Shorten Time (Related Doc # 108) Signed on 9/7/2004. (court, dtow) (Entered: 09/07/2004) |
| 09/08/2004 | 110 | Response Filed by Respondent Internal Revenue Service (RE: related document(s)100 Objection to Claim). (Steiner, David) Modified on 9/8/2004 (court, ephi). (Entered: 09/08/2004) |
| 09/08/2004 | 111 | Second Motion for Approval of or Authority to *Provide Notice of Proposed Trustee Sale and an Opportunity to Respond to or Object to Such Sale by the Estate and Heirs of James Stilwell, and Supplemental Request for Authority to Close on Sale* Filed by Trustee Marsha L Combs Skinner (Attachments: # 1 Exhibit # 2 Exhibit) (Smith, Timothy) (Entered: 09/08/2004) |
| 09/09/2004 | 112 | BNC Certificate of Mailing (RE: related document(s)109 Order on Motion to Extend/Shorten Time) No. of Notices: 6. Service Date 09/09/2004. (Admin.) (Entered: 09/10/2004) |
| 09/10/2004 | 113 | Notice Scheduling Objections (RE: related document(s)111 Approval or Authority, filed by Trustee Marsha L Combs Skinner) Objections Due: 9/25/2004. (court, ephi) (Entered: 09/10/2004) |
| 09/10/2004 | 114 | Hearing Set (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell) Hearing to be held on 9/21/2004 at 09:00 AM Edgar Cty Courthouse-Paris, IL for 100, (court, ephi) (Entered: 09/10/2004) |
| 09/12/2004 | 115 | BNC Certificate of Mailing - Hearing (RE: related document(s)114 Hearing (Bk Other) Set) No. of Notices: 3. Service Date 09/12/2004. (Admin.) (Entered: 09/13/2004) |
| 09/12/2004 | 116 | BNC Certificate of Mailing (RE: related document(s)113 Notice Scheduling Objection Date) No. of Notices: 10. Service Date 09/12/2004. (Admin.) (Entered: 09/13/2004) |
| 09/21/2004 |  | Hearing Held (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell) (court, ephi) (Entered: 09/21/2004) |
| 09/21/2004 | 118 | Hearing Set (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell)Status Hearing to be held on 1/18/2005 at 09:00 AM Edgar Cty Courthouse-Paris, IL for 100, (court, ephi) (Entered: 09/21/2004) |
| 09/23/2004 | 119 | BNC Certificate of Mailing - Hearing (RE: related document(s)118 Hearing (Bk Other) Set) No. of Notices: 5. Service Date 09/23/2004. (Admin.) (Entered: 09/24/2004) |

2:05-cv-02160-MPM-DGB    # 83-18    Page 63 of 69

| 09/27/2004 | 120 | Court Notice Requesting Order (RE: related document(s)111 Approval or Authority, filed by Trustee Marsha L Combs Skinner) Order Due 10/11/2004. (court, ephi) (Entered: 09/27/2004) |
|---|---|---|
| 09/29/2004 | 121 | BNC Certificate of Mailing (RE: related document(s)120 Order Request Notice) No. of Notices: 3. Service Date 09/29/2004. (Admin.) (Entered: 09/30/2004) |
| 10/05/2004 | 122 | Order Granting Application for Approval of or Authority to (Related Doc # 93), Granting Application for Approval of or Authority to (Related Doc # 111) Signed on 10/5/2004. (court, ephi) (Entered: 10/05/2004) |
| 10/07/2004 | 123 | BNC Certificate of Mailing - PDF Document (RE: related document (s)122 Order on Application for Approval of or Authority to, ) No. of Notices: 4. Service Date 10/07/2004. (Admin.) (Entered: 10/08/2004) |
| 10/19/2004 | 124 | Opinion Signed on 10/19/2004 (RE: related document(s)28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner, 34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III). (court, dphi) (Entered: 10/19/2004) |
| 10/19/2004 | 125 | Courts Certificate of Mailing to Rodney Smith, Mariann Pogge, Timothy Smith, Rochelle Funderburg, Marsha Combs-Skinner, UST (RE: related document(s)124 Opinion, ) (court, dphi) (Entered: 10/19/2004) |
| 10/19/2004 | 126 | Order Re: Signed on 10/19/2004 (RE: related document(s)28 Objection to Debtor's Claim of Exemptions filed by Creditor Community Banks of Shelby County, 32 Objection to Debtor's Claim of Exemptions filed by Creditor Tuscola National Bank, 39 Objection to Debtor's Claim of Exemptions filed by Trustee Marsha L Combs Skinner, 34 Objection to Debtor's Claim of Exemptions filed by Creditor BLT III). (court, dphi) (Entered: 10/19/2004) |
| 10/19/2004 | 127 | Courts Certificate of Mailing to Rodney Smith, Mariann Pogge, Timothy Smith, Rochelle Funderburg, Marsha Combs-Skinner, UST (RE: related document(s)126 Order (Generic), Order (Generic)) (court, dphi) (Entered: 10/19/2004) |
| 10/21/2004 | 128 | Notice of Appeal Fee Amount $255 Filed by Creditor Community Banks of Shelby County (RE: related document(s)124 Opinion,, 126 Order (Generic), Order (Generic)). Appellant Designation due by 10/31/2004. (Pogge, Mariann) (Entered: 10/21/2004) |

| 10/21/2004 | | Receipt of Notice of Appeal(03-93877) [appeal,ntcapl] ( 255.00) Filing Fee. Receipt number 473745. Fee amount 255.00 (U.S. Treasury) (Entered: 10/21/2004) |
|---|---|---|
| 10/21/2004 | 129 | Notice Re: Procedures for Filing Designation of Contents and Ordering Transcripts (RE: related document(s)128 Notice of Appeal filed by Creditor Community Banks of Shelby County) Appellee designation due by 10/31/2004. (court, dphi) (Entered: 10/21/2004) |
| 10/21/2004 | 130 | Courts Certificate of Mailing to Margaret Stilwell, Marsha Combs-Skinner, UST, Timothy Smith, Rochelle Funderburg, and Mariann Pogge (RE: related document(s)129 Appeal Designation of Contents and Ordering Transcripts Procedural Notice) (court, dphi) (Entered: 10/21/2004) |
| 10/22/2004 | 131 | Notice of Appeal Fee Amount $255 Filed by Creditor Tuscola National Bank (RE: related document(s)126 Order (Generic), Order (Generic)). Appellant Designation due by 11/1/2004. (Smith, Timothy) (Entered: 10/22/2004) |
| 10/22/2004 | | Receipt of Notice of Appeal(03-93877) [appeal,ntcapl] ( 255.00) Filing Fee. Receipt number 476183. Fee amount 255.00 (U.S. Treasury) (Entered: 10/22/2004) |
| 10/22/2004 | 132 | Appellant Designation of Contents For Inclusion in Record On Appeal, Statement of Issues on Appeal, Filed by Creditor Tuscola National Bank (RE: related document(s)131 Notice of Appeal, 128 Notice of Appeal). Appellee designation due by 11/1/2004. Transmission of Designation Due by 11/21/2004. (Attachments: # 1 Exhibit # 2 Exhibit)(Smith, Timothy) (Entered: 10/22/2004) |
| 10/25/2004 | 133 | Notice Re: Procedures for Filing Designation of Contents and Ordering Transcripts (RE: related document(s)131 Notice of Appeal filed by Creditor Tuscola National Bank) Appellee designation due by 11/4/2004. (court, dphi) (Entered: 10/25/2004) |
| 10/25/2004 | 134 | Courts Certificate of Mailing to Rodney Smith, Marsha Combs-Skinner, UST, Timothy Smith, Mariann Pogge, and Rochelle Funderburg. (RE: related document(s)133 Appeal Designation of Contents and Ordering Transcripts Procedural Notice, 131 Notice of Appeal filed by Creditor Tuscola National Bank) (court, dphi) Modified on 10/25/2004 (court, dphi). (Entered: 10/25/2004) |
| 10/28/2004 | 135 | Appellant Designation of Contents For Inclusion in Record On Appeal Filed by Creditor Community Banks of Shelby County (RE: related document(s)128 Notice of Appeal). Appellee designation due by 11/7/2004. Transmission of Designation Due by 11/27/2004. (Pogge, Mariann) (Entered: 10/28/2004) |

| 10/28/2004 | 136 | Motion To Stay Pending Appeal (related documents 124 Opinion,, 126 Order (Generic), Order (Generic)) Filed by Creditor Community Banks of Shelby County (Pogge, Mariann) (Entered: 10/28/2004) |
|---|---|---|
| 11/01/2004 | 137 | Hearing Set (RE: related document(s)136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Hearing to be held on 11/9/2004 at 09:00 AM Room 120-Danville, IL for 136, (court, dphi) (Entered: 11/01/2004) |
| 11/01/2004 | 138 | Correspondence Filed by Creditor Tuscola National Bank. (Smith, Timothy) (Entered: 11/01/2004) |
| 11/03/2004 | 139 | BNC Certificate of Mailing - Hearing (RE: related document(s)137 Hearing (Bk Other) Set) No. of Notices: 7. Service Date 11/03/2004. (Admin.) (Entered: 11/04/2004) |
| 11/09/2004 |  | Hearing Held (RE: related document(s)136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) (court, dtow) (Entered: 11/09/2004) |
| 11/09/2004 | 141 | Hearing Set (RE: related document(s)136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Hearing to be held on 12/8/2004 at 09:00 AM Room 120-Danville, IL for 136, (court, dtow) (Entered: 11/09/2004) |
| 11/11/2004 | 142 | BNC Certificate of Mailing - Hearing (RE: related document(s)141 Hearing (Bk Motion) Set) No. of Notices: 6. Service Date 11/11/2004. (Admin.) (Entered: 11/12/2004) |
| 11/17/2004 | 143 | Hearing Set (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell) Status Hearing to be held on 1/18/2005 at 09:00 AM Room 120-Danville, IL for 100, (court, dphi) (Entered: 11/17/2004) |
| 11/18/2004 | 144 | Notice of Docketing Record on Appeal. Civil Action Number: 04-2258 Filed by (RE: related document(s)128 Notice of Appeal, 131 Notice of Appeal). (court, dphi) Modified on 12/14/2004 (court, dphi). (Entered: 11/18/2004) |
| 11/18/2004 | 145 | Transmittal of Record or Addendum of Record on Appeal to U.S. District Court Filed by (RE: related document(s)128 Notice of Appeal, 131 Notice of Appeal). (court, dphi) (Entered: 11/18/2004) |
| 11/18/2004 | 146 | Courts Certificate of Mailing to Timothy Smith, Mariann Pogge, Marsha Combs-Skinner, and UST (RE: related document(s)144 Notice of Docketing Record on Appeal, 145 Transmittal of Record or Addendum of Record on Appeal (USDC)) (court, dphi) Modified on |

| | | 11/18/2004 (court, dphi). (Entered: 11/18/2004) |
|---|---|---|
| 11/19/2004 | 147 | BNC Certificate of Mailing - Hearing (RE: related document(s)143 Hearing (Bk Other) Set) No. of Notices: 5. Service Date 11/19/2004. (Admin.) (Entered: 11/20/2004) |
| 12/08/2004 | | Hearing Held (RE: related document(s)136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Hearing held deadline set: 12/29/2004. (court, dphi) (Entered: 12/08/2004) |
| 12/08/2004 | 149 | DISREGARD THIS ENTRY-ENTERED IN THIS CASE IN ERROR. Court Notice Requesting Order (RE: related document(s) 136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Order Due 12/29/2004. (court, dphi) Modified on 12/8/2004 (court, dphi). (Entered: 12/08/2004) |
| 12/08/2004 | | Corrective Entry Document 149 Entered In This Case In Error. (RE: related document(s)149 Order Request Notice, ) (court, dphi) (Entered: 12/08/2004) |
| 12/08/2004 | 150 | DISREGARD THIS ENTRY-ENTERED IN THIS CASE IN ERROR. Court Notice Requesting Order (RE: related document(s) 136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Order Due 12/29/2004. (court, dphi) Modified on 12/8/2004 (court, dphi). (Entered: 12/08/2004) |
| 12/08/2004 | 151 | Court Notice Requesting Order (RE: related document(s)136 Motion To Stay Pending Appeal filed by Creditor Community Banks of Shelby County) Order Due 12/29/2004. (court, dphi) (Entered: 12/08/2004) |
| 12/08/2004 | | Corrective Entry Document 150 Entered In This Case In Error. (RE: related document(s)150 Order Request Notice, ) (court, dphi) (Entered: 12/08/2004) |
| 12/10/2004 | 152 | BNC Certificate of Mailing (RE: related document(s)149 Order Request Notice, ) No. of Notices: 3. Service Date 12/10/2004. (Admin.) (Entered: 12/11/2004) |
| 12/10/2004 | 153 | BNC Certificate of Mailing (RE: related document(s)150 Order Request Notice, ) No. of Notices: 3. Service Date 12/10/2004. (Admin.) (Entered: 12/11/2004) |
| 12/10/2004 | 154 | BNC Certificate of Mailing (RE: related document(s)151 Order Request Notice) No. of Notices: 3. Service Date 12/10/2004. (Admin.) (Entered: 12/11/2004) |

| | | Marsha L Combs-Skinner (Combs-Skinner, Marsha) (Entered: 04/06/2005) |
|---|---|---|
| 04/06/2005 | 180 | Statement re: No Division Filed by Trustee Marsha L Combs-Skinner (RE: related document(s)179 Application to Employ Jason Crowder as Attorney). (Combs-Skinner, Marsha) (Entered: 04/06/2005) |
| 04/06/2005 | 181 | BNC Certificate of Mailing (RE: related document(s)176 Sale Document Deficiency Notice) No. of Notices: 2. Service Date 04/06/2005. (Admin.) (Entered: 04/07/2005) |
| 04/07/2005 | 182 | Order Granting Application to Employ (Related Doc # 179) Signed on 4/7/2005. (court, dphi) (Entered: 04/07/2005) |
| 04/07/2005 | 183 | Order Vacating Order Signed on 4/7/2005 (RE: related document(s) 182 Order Authorizing Employment of Professional). (court, dphi) (Entered: 04/07/2005) |
| 04/07/2005 | 184 | Hearing Set (RE: related document(s)179 Application to Employ filed by Trustee Marsha L Combs-Skinner) Hearing to be held on 5/17/2005 at 09:00 AM Room 120-Danville, IL for 179, (court, dphi) (Entered: 04/07/2005) |
| 04/07/2005 | 185 | BNC Certificate of Mailing - PDF Document (RE: related document (s)178 Order Confirming Sale) No. of Notices: 7. Service Date 04/07/2005. (Admin.) (Entered: 04/08/2005) |
| 04/09/2005 | 186 | BNC Certificate of Mailing - Hearing (RE: related document(s)184 Hearing (Bk Motion) Set) No. of Notices: 330. Service Date 04/09/2005. (Admin.) (Entered: 04/10/2005) |
| 04/09/2005 | 187 | BNC Certificate of Mailing - PDF Document (RE: related document (s)182 Order Authorizing Employment of Professional) No. of Notices: 5. Service Date 04/09/2005. (Admin.) (Entered: 04/10/2005) |
| 04/09/2005 | 188 | BNC Certificate of Mailing - PDF Document (RE: related document (s)183 Order Vacating Order) No. of Notices: 5. Service Date 04/09/2005. (Admin.) (Entered: 04/10/2005) |
| 05/17/2005 | | Hearing Held (RE: related document(s)179 Application to Employ filed by Trustee Marsha L Combs-Skinner) (court, dphi) (Entered: 05/17/2005) |
| 05/17/2005 | 190 | Order Granting Application to Employ (Related Doc # 179) Signed on 5/17/2005. (court, dphi) (Entered: 05/17/2005) |
| 05/19/2005 | 191 | BNC Certificate of Mailing - PDF Document (RE: related document |

| | | |
|---|---|---|
| | | (s)190 Order Authorizing Employment of Professional) No. of Notices: 10. Service Date 05/19/2005. (Admin.) (Entered: 05/20/2005) |
| 07/19/2005 | | Hearing Held (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell) (court, dphi) (Entered: 07/19/2005) |
| 07/19/2005 | 193 | Order Re: Denying (RE: related document(s)100 Objection to Claim filed by Debtor Margaret Jo Stilwell). (court, dphi) (Entered: 07/19/2005) |
| 07/21/2005 | 194 | US Trustee's Interim Report. (Combs-Skinner, Marsha) (Entered: 07/21/2005) |
| 07/21/2005 | 195 | BNC Certificate of Mailing - PDF Document (RE: related document (s)193 Order (Generic)) No. of Notices: 7. Service Date 07/21/2005. (Admin.) (Entered: 07/22/2005) |
| 07/22/2005 | | Disposition of Adversary 04-9058 Close Adversary: 7/29/2005. (court, dphi) (Entered: 07/22/2005) |
| 08/01/2005 | | Adversary Case 2-04-ap-09058 Closed (court, dphi) (Entered: 08/01/2005) |
| 01/31/2006 | 196 | Trustee's Interim Report. (Combs-Skinner, Marsha) (Entered: 01/31/2006) |
| 04/12/2006 | 197 | Notice of Change of Address for Margaret Jo Stilwell, POB 538, Atwood, IL 61913. New address changed to: Margaret Jo Stilwell, 2701 Curtis Road, Champaign, IL 61822 Filed by Rodney L Smith on behalf of Margaret Jo Stilwell. (Smith, Rodney) (Entered: 04/12/2006) |
| 07/20/2006 | 198 | US Trustee's Interim Report. (Combs-Skinner, Marsha) (Entered: 07/20/2006) |
| 02/02/2007 | 199 | US Trustee's Interim Report for the period ending 12/31/06. (Combs-Skinner, Marsha) (Entered: 02/02/2007) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 03/16/2007 16:44:28 |

| PACER Login: | we0014 | Client Code: | 07478.00134 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 03-93877 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| Billable Pages: | 12 | Cost: | 0.96 |