E-FILED
Monday, 02 April, 2007  04:42:05 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MARGARET J. STILWELL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AMERICAN GENERAL LIFE )<br>INSURANCE COMPANY, )<br>)<br>Defendants )<br>_____)<br>AMERICAN GENERAL LIFE )<br>INSURANCE COMPANY, )<br>)<br>Third-Party Plaintiffs )<br>)<br>v. )<br>)<br>FIRST MID-ILLINOIS BANK & TRUST, )<br>TUSCOLA FURNITURE GROUP, LLC, )<br>And JANKO FINANCIAL GROUP, LLC, )<br>)<br>Third Party Defendants )  | 05 CV 02160 |

## FIRST MID-ILLINOIS BANK & TRUST'S MOTION FOR SUMMARY JUDGMENT ON THIRD PARTY COMPLAINT AND FIRST MID'S CROSS CLAIM AGAINST TFG AND JFG

NOW COMES the Third Party Defendant, First Mid-Illinois Bank & Trust, by its

attorneys, Heavner, Scott, Beyers & Mihlar, and pursuant to Federal Rule of Civil Procedure 56

and Central District Local Rule 7.1(D), respectfully submits this Motion for Summary Judgment

on Defendant/Third Party Plaintiff's, American General Life Insurance Company's, Third Party

Complaint and First Mid-Illinois Bank & Trust Company's Cross-Claim against Third Party

Defendants, Tuscola Furniture Goup, LLC and Janko Financial Group, LLC.  In support of its

motion, First Mid-Illinois Bank & Trust states as follows:

1

## INTRODUCTION

First Mid-Illinois Bank and Trust (hereinafter "First Mid") is a Third Party Defendant in this cause based on a claim for benefits it made under a life insurance policy in the amount of $4,000,000.00 (hereinafter "the Policy.") The Policy was owned by Margaret Stilwell and insured the life of James Stilwell.  In the underlying action, Margaret Stilwell and her daughters, Haley Stilwell, Heidi Stilwell, Jamie Stilwell and Megan Stilwell, have filed a complaint against American General Life Insurance Company (hereinafter "American General") alleging that it improperly paid the claims made by First Mid, Janko Financial Group (hereinafter "JFG"), and Tuscola Furniture Group (hereinafter "TFG"), under the Policy.  Specifically, Stilwells claim that American General's payment of the claims was improper because: JFG did not validly assign the proceeds of the policy to TFG, but rather released same through a document acknowledged by American General on December 1, 2000; Due to said purported release, at the time it made its claim for payment, TFG had only one assignment in the amount of $250,000.00, rather than assignments totaling $2,000,000.00; TFG and JFG did not receive a joint assignment, and thus said entities did not have the right to pool assignments or to file a joint claim for insurance benefits.

After the filing of the Complaint, American General filed a six count third party complaint against First Mid, TFG and JFG  which alleges claims for Constructive Trust or Equitable Lien (Fraud), Constructive Trust or Equitable Lien Based (Mistake), Restitution/Unjust Enrichment (Fraud), Restitution/Unjust Enrichment (Mistake), Contribution, and Implied Indemnity, respectively.  The core allegation of each count of the Third Party Complaint is that the Third Party Defendants allegedly made various misrepresentations in their submission of a "joint claim" submitted to American General for payment under the Policy.

2

Specifically, American General claims that the Third Party Defendants misrepresented that JFG validly assigned its assignments of the benefits of the Policy amounting to $2,000,000.00 to TFG, and that the outstanding assignments of the Policy in favor of First Mid, TFG and JFG totaled at least $3,000,000.00. First Mid suggests that the issues in this case can be even more narrowly defined as whether a document signed by JFG, which was acknowledged by American General on December 1, 2000, validly assigned the assignments then held by JFG to TFG.

First Mid moves for summary judgment in its favor with respect to the issues set forth in the Third Party Complaint, as well as the issues presented in its Cross Claim against JFG and TFG. First, TFG and JFG did validly assign its assignments to TFG. Additionally, the Third Party Defendants did not submit a joint claim, but rather jointly applied for payment under the policy. The Consignment Agreement contemplated a joint assignment to the Bank and TFG, and thus it necessarily follows that a joint application for payment was entirely proper. Further, none of the Third Party Defendants made any misrepresentation concerning the origin of their right to jointly apply for payment, and thus American General's claims, which rest on the alleged impropriety of a joint claim, must fail.

Additionally, the undisputed facts in the record reveal that all information submitted by each of the Third Party Defendants in support of their application for payment was true and correct. American General paid the respective claims of the Third Party Defendants after a full and accurate presentation of all facts, and absent any fraud or mistake on the part of any Third Party Defendant.

Even if the Court disagrees with these propositions, there is no question that this Court should rule in favor of First Mid on all counts of the Third Party Complaint. There is no outstanding issue of material fact that at the time First Mid sent its claim to American General

3

for payment, it had an assignment under the subject policy for $1,000,000.00, and at the time the claim was paid, First Mid was owed, $81,660.37, which was the amount it received from the insurance proceeds.

First Mid's assignment is not in question – rather the assignments at issue in this cause are the assignments in favor of JFG, which were subsequently assigned to TFG. Additionally, any and all information submitted to American General to clarify the validity of the assignments in favor of TFG and JFG was submitted by Lawrence Bianchi on behalf of TFG and JFG, and was not authored or signed off on by First Mid. American General can point to no wrongdoing on the part of First Mid, and thus, First Mid should be excused as a Third Party Defendant in this cause. If this Court determines that First Mid must remain a Third Party Defendant with respect to any count of the Third Party Complaint, these same facts support that First Mid is entitled to contribution against TFG and JFG for any judgment which might be entered against it in this cause.

Thus, First Mid requests that this Court grant judgment in its favor and against American General on the Third Party Complaint. In the alternative, First Mid requests that this Court enter judgment in its favor and against TFG and JFG on First Mid's Cross-Claim.

## UNDISPUTED MATERIAL FACTS

1. In 1998, James and Margaret Stilwell purchased life insurance policies on the life of James Stilwell. The policies were issued by Old Line Life Insurance Company, a subsidiary of American General, and were owned by Margaret Stilwell. (Third Party Complaint, par. 5, Exhbit 1, Lyons Dep. pg. 10, lines 16-24, pg. 11, lines 1-2.)

2.  Policy Number 2384389  was for $1,000,000.00, and Policy Number  2604663 was for $4,000,000.00.  (Exhbit 1, Lyons dep., pg. 12, lines 7-24, pg. 13, lines 1-9.  Also See Exhibit 2 which is a copy of the $4,000,000.00 policy)

3.  Stilwell purchased the $1,000,000.00 Policy as protection for his family, while the $4,000,000.00 Policy was purchased to assign to creditors as security for his business debt.  (Exhibit 1, Lyons dep., pg. 12, lines 22-24, pg. 13, lines 1-9.  Also see, Exhibits 3, 4 and 5, which were previously marked as Lyons deposition exhibits 1 and 2)

4.  At some point JFG and the Stilwells started to do business together.  JFG, James Stilwell and a Company called BLT-3 formed Amishland Development LLC. (Exhibit 6, Bianchi dep., pg. 9, lines 7-21)

5.  The purpose of Amishland Development LLC was to own a retail center in Tuscola, IL. (Exhibit 6, Bianchi dep.pg. 9, lines 22-24, pg. 10, line 1)

6.  The Stilwells also formed a business called Amishland Country Village (hereinafter referred to as "ACV"), and James Stilwell was the President of said entity.  The purpose of that business was to sell Amish made furniture in various locations.  (Third Party Complaint, par. 6, April 16, 1999, Consigment Agreement, attached hereto as Exhibit 7.)

7.  On April 16, 1999, Amishland Country Village entered into a Consignment Agreement with JFG, pursuant to which JFG financed the inventory of Amish crafted furniture.  In exchange, ACV made principal and consignment payments to JFG.  (See April 16, 1999 Consignment Agreement attached hereto as Exhibit 7)

8.  Pursuant to the April 16, 1999 original Consignment Agreement with JFG, ACV agreed to maintain life insurance and pay the premiums in an amount of at least $2,000,000.00 with First Mid and JFG as the named beneficiaries.  Further, James and Margaret Stilwell

executed a personal Guaranty on the borrowed funds. (see Exhibits 7 and also see Exhibit 8 attached hereto which is the Guaranty; see also Exhibit 6, Bianchi dep. pg. 14 lines 19-24 and pg. 15, lines 1-24)

9. During the term of the original Consignment Agreement and pursuant to same, Margaret Stilwell executed the following assignments of the $4,000,000.00 life insurance policy in favor of JFG: An assignment dated April 19, 1999 in the amount of $500,000.00, and an assignment in the amount of $1,500,000.00 dated September 25, 2000. (Third Party Complaint, paras. 9 and 11; also see Assignments attached hereto as Exhibits 9 and 10, respectively)

10. On November 16, 2000, JFG and a newly formed TFG entered into an Assignment and Assumption Agreement whereby JFG assigned and TFG assumed all rights and obligations under the original Consignment Agreement, including JFG's rights in the assignments of the Policy's proceeds. (See Assignment and Assumption Agreement attached hereto as Exhibit 11. See also Exhibit 6, Bianchi dep., pg. 14, lines 19-24, and pg. 15, lines 1-24.)

11. Thereafter, TFG and Amishland Country Village entered into a second Consignment Agreement dated November 17, 2000. (See November 17, 2000, Consignment Agreement attached hereto as Exhibit 12.)

12. Pursuant to this new agreement, TFG financed the inventory of Amish crafted furniture. In exchange, ACV made principal and consignment payments to TFG. Further, James and Margaret Stilwell executed a personal Guaranty with respect to the borrowed funds. (See November 17, 2000, Consignment Agreement attached hereto as Exhibit 12 and Guaranty attached hereto as Exhibit 13.)

13.  Pursuant to paragraph 3.9 of the Consignment Agreement, Amishland Country Village was to obtain an assignment of a life insurance policy in the amount of $1,250,000.00 which named TFG and First Mid as beneficiaries. (See November 17, 2000 Consignment Agreement attached hereto as Exhibit 12.)

14.  The Stilwells did not bring the assignment called for by the Consignment Agreement to the closing of the agreement. (Exhibit 6, Bianchi dep., pg. 27, lines 2-5)

15.  Because the Stilwells did not bring the assignment called for by the Consignment Agreement to the closing, Larry Bianchi asked James Stilwell to provide a form so he could notify the insurance company that pursuant to the Assignment and Assumption Agreement executed on November 16, 2000, the assignments of the life insurance policy in favor of JFG had transferred to TFG. (Exhibit 6, Bianchi dep., pg. 28, lines 1-10, page 29, lines 9-13.)

16.  In response to his request on or about November 21, 2000, William Lyons provided a form to Larry Bianchi with a cover letter which stated that attached was the form for the release, "from Janko Financial Group." (Exhibit 6, Bianchi dep., pg. 30, lines 6-9, 16-22, and cover letter attached hereto as Exhibit 14.)

17.  Sections 1 and 3 of the form were already filled in.  Bianchi signed the form and then wrote in the words "in favor of Tuscola Furniture Group."  (Exhibit 6, Bianchi dep., pg. 31, lines 16-24, pg. 32, lines 5-15. Attached hereto as Exhibit 15 is the completed form)

18.  Additionally, on November 17, 2000, in order to finance the purchase of the furniture to be provided to and sold by ACV pursuant to the Consignment Agreement, TFG took out a loan with First Mid with a credit limit of $1,000,000.00. (Exhibit 16, Chamberlain dep., pg. 15, lines 19-24, pg. 16, lines 1-16, pg. 19, lines 1-20, pg. 20, lines 1-14. Also see Loan Documents attached hereto as Group Exhibit 17.)

19. Pursuant to its loan agreement with First Mid, TFG agreed to pay interest on the unpaid principal and any attorney's fees incurred by First Mid in collecting on the Note. (See Group Exhibit 17 attached hereto)

20. On November 21, 2000, Margaret Stilwell signed an assignment of the benefits of the Policy in the amount of $250,000.00 in favor of TFG. (Third Party Complaint, par. 15, Exhibit 6, Bianchi dep., pg. 32, lines 22-24, pg. 33, lines 3-22. See assignment and verification attached hereto as Exhibit 18)

21. Subsequently, and on January 11, 2001, First Mid received an assignment of the benefits of the Policy in the amount of $1,000,000.00. (Third Party Complaint, par. 17, Exhibit 6, Bianchi dep., pg. 33, lines 22-24, pg. 34, lines 1-10. See assignment and verification attached hereto as Exhibit 19)

22. James Stilwell passed away on May 2, 2003. (Third Party Complaint, par. 19, Exhibit 20, Margaret Stilwell dep., pg. 37, lines 21-24, pg. 38, lines 1-3)

23. First Mid retained outside counsel to submit a claim for payment under the Policy. (Exhibit 16, Chamberlain dep., pg. 42, lines 20-24)

24. Larry Bianchi, on behalf of TFG and JFG, drafted a letter to accompany the claim forms he was submitting on behalf of those entities to American General. (Exhibit 6, Bianchi dep., pg. 50, lines 13-22. )

25. Thomas Chamberlain of First Mid received a similar letter from his counsel to sign and send in with First Mid's claim form. (Exhibit 16, Chamberlain dep., page 46, lines 16-24, pg. 47, lines 1-2.)

26. The information contained in First Mid's letter and claim form is true and accurate. (Exhibit 21, Also see Exhibit 16, Chamberlain dep., pg. 48, lines 14-18, pg. 49, lines 1-5.)

27. Bianchi, on behalf of TFG and JFG attached his letter with the corresponding claim form for JFG and TFG for submission to American General. (See Exhibit 22, and also see Exhibit 6, Bianchi dep., pg 53, lines 17-24 )

28. The information contained in TFG and JFG's letter and claim form is true and accurate. (Exhibit 6, Bianchi dep., pg. 54, lines 2-4)

29. Lawrence Bianchi signed the letter prepared and submitted on behalf of First Mid and Thomas Chamberlain signed the letter submitted by JFG & TFG, as the Consignment Agreement provided for the submission to be joint, (Exhibit 16, Chamberlain dep., pg. 47, lines 6-24, pg. 48, lines 1-13; Exhibit 6, Bianchi dep., pg. 50, lines 19-24, pg. 51, lines 1-7. Also see paragraph 3.9 of the Consignment Agreement attached hereto as Exhibit 12.)

30. As Tom Chamberlain lived in Tuscola and approximately seven miles from Lyons' office, he delivered the letters and forms of First Mid and JFG and TFG to William Lyons'office. (Exhibit 16, Chamberlain dep., pg. 53, lines 17-24, pg. 1-16.)

31. Bianchi submitted another letter dated May 28, 2003, to American General to add an additional assignment in favor of TFG which he forgot to mention in his May 12, 2003, correspondence. (Exhibit 6, Bianchi dep., pg. 54, lines 16-23, a copy of the May 28, 2003, correspondence attached hereto as Exhibit 23.)

32. After the submission of the letters, JFG received correspondence from American General stating that its assignments had been released and seeking verification of same. (Exhibit 6, Bianchi dep., pg. 53, lines 12-18. See Exhibit 24 attached hereto.)

33. Thereafter, Lawrence Bianchi on behalf of TFG and JFG sent correspondence to American General dated June 11, 2003, which set forth the chronology of JFG and TFG's relationship with Stilwells and Amishland Country Village, including the origin and history of

9

the assignments. (See Exhibit 25, and Exhibit 6, Bianchi dep., pg. 59, lines 7-15, pg. 60, lines 20-24, pg. 61, lines 1-11, pg. 62, lines 22-24, pg. 63, lines 1-21.)

34. This letter was not authored by First Mid, and First Mid did not sign the letter. (See Exhibit 6, Bianchi dep., pg. 119, lines 6-24, pg. 120, lines 1-4)

35. After the submission of said letter, and after a review by American General's legal department, American General paid the claims of First Mid and TFG. (Exhibit 6, Bianchi dep., pg. 99. Also see Exhibit 26 attached hereto.)

36. Upon receiving the claim submissions by the Third Party Defendants, Margaret Singh of American General communicated with in-house counsel for the purpose of soliciting legal advice and assistance in evaluating the claims. (See Affidavit of Diana Fields, attached hereto as Exhibit 26.)

37. An entry by Margaret Singh regarding the claim states "Amt owed to Tuscola Furniture LLC & First Mid-Illionis $512,974.50 (sp) Bkm & Trust (documents received and reviewed by Melinda Boyd, Attorney): OK to pay $512,974.50 to Tuscola Furniture Group LLC & First Mid-Illionis (sp) Bk & Trust . . . per Melinda, sent ck to Tuscola Furniture LLC & First Mid-Illinois Bank and Trust by overnight mail (our expense.) Claim set up for approval." (See AIG 440 attached hereto as Exhibit 27)

38. American General made the determination to pay the claims, and in doing so, relied upon its own evaluation of the legal effect of the documents submitted by each of the Third Party Defendants. (See Exhibits 26 and 27.)

39. The check in payment of the claims was made payable to First Mid and TFG. (Exhibit 16, Chamberlain dep., pg. 64, line 24, pg. 65, line 1)

40.  First Mid received $81,660.37 of the funds, which is the amount it was owed on said date, and which was less than the amount of its assignment.  (Exhibit 16, Chamberlain dep., pg. 64, lines 11-24, pg. 65, lines 1-4, Exhibit 6, Bianchi dep., pg. 117, lines 4-6.  See Exhibits 28 and 29 attached hereto.)

41. TFG received the remaining funds. (Exhibit 6, Bianchi dep., pg 117, lines 1-5)

42.  Prior to the receipt of the funds and on February 13, 2003, Amishland Development filed suit against ACV and Stilwell as guarantors for past due rent. (Exhibit 6, Bianchi dep., pg. 41, lines 11-14)

43.  Amishland Development through its attorneys notifed ACV and Stilwell through her attorney that it would dismiss its action because it was receiving insurance proceeds. (Exhibit 6, Bianchi dep., pg. 46, lines 14-18 and pgs. 70-73)

**ARGUMENT:**

### A.  At the time the Third Party Defendants Filed Their Respective Claims, TFG held $2,250,000.00 in Collateral Assignments.

#### 1.  JFG Validly Assigned its Collateral Assignments to TFG by Way of the November 16, 2000, Assignment and Assumption Agreement.

There is no dispute that at the time of James Stilwell's death, there was a $1,000,000.00 policy and a $4,000,000.00 policy in force with American General.  The $4,000,000.00 policy had been taken out by James Stilwell to secure loans with various creditors in an effort to protect his family from outstanding business debt. The Policy, at page 5, provides that the owner may change the beneficiary or ownership of the Policy upon written notice to the company.  (See Exhibit 2, page 5)

During Mr. Stilwell's lifetime, Margaret Stilwell, the owner of the policy, executed various collateral assignments of the proceeds to be paid at the death of James Stilwell to JFG.

Specifically, Mrs. Stilwell executed an assignment in the amount of $500,000.00, dated April 19, 1999, and an assignment in the amount of $1,500,000.00, dated September 25, 2000.  (See Exhibits 9 and 10)

JFG and Amishland Country Village (hereinafter "ACV") were parties to a Consignment Agreement, dated April 16, 1999 (hereinafter referred to as the "original Consignment Agreement.")  The assignments executed by Margaret Stilwell in favor of JFG were required by the original Consignment Agreement.  Pursuant to the Consignment Agreement, Janko financed ACV's purchase of Amish furniture, JFG became the owner of the furniture, and it was then consigned to ACV to sell.  Pursuant to paragraph 3.4 of the Agreement, ACV was to pay to the Bank, by the 10th of every month, an amount equal to the average wholesale cost of the items sold the previous month.  Additionally, by the 10th of every month, ACV was to pay to TFG 10% of the previous month's total of the retail sale price, as well as other amounts specifically set forth in the agreement.  Under paragraph 3.9 of that agreement, and in order to provide security, ACV had the obligation to maintain life insurance on the life of James Stilwell in the amount of $2,000,000.00, with Janko and the Bank as beneficiaries. (Bianchi, Exhibit 6, page 15)   The purpose of the provision regarding the assignments was to provide additional security to Janko and the Bank. (See Exhibit 7)

On November 16, 2000, Janko Financial Group assigned all of its rights, in the April 16, 1999, Consignment Agreement to a newly created entity, Tuscola Furniture Group LLC ("TFG").  Paragraph 2 of the Assignment and Assumption Agreement specifically assigned from JFG to TFG, "[a]ny and all Contracts and other documents including insurance policies, relating to and incurred in connection with the acquisition and consignment of AMISH FURNITURE

pursuant to the Consignment Agreement referred to in paragraph 1." This document, standing alone, was sufficient to assign JFG's assignments to TFG. (Exhibit 11)

The day after the Assignment and Assumption Agreement was signed, ACV and TFG entered into a new Consignment Agreement. This Consignment Agreement, dated November 17, 2000, provided at paragraph 3.9 that ACV would maintain life insurance on the life of James Stilwell in the amount of at least $1,250,000.00, with TFG and the Bank as named beneficiaries. (Exhibit 12) The Stilwells did not bring the assignment required by paragraph 3.9 to the closing of the Consignment Agreement. Larry Bianchi indicated that TFG did not waive that condition, and asked the Stilwells to obtain the required assignment. Specifically, at his deposition, Bianchi testified that he told the Stilwells at the closing that despite their failure to produce the required assignment, TFG believed it was covered under the Assignment and Assumption Agreement signed the day before. However, he asked Mr. Stilwell to obtain a form so TFG could notify the insurance company of that assignment. Bianchi dep., pg. 27-28.

Subsequently, and pursuant to Bianchi's request for a form to notify American General of the assignment to TFG, William Lyons, on behalf of American General, forwarded the document attached hereto as Exhibit 15. When Bianchi received Exhibit 15, sections one and three had already been completed. Bianchi signed the document and in order to insure that the intent to transfer the assignments from JFG to TFG was clear, Bianchi wrote next to his signature, "In favor of Tuscola Furniture Group, LLC." There is no question that the Assignment and Assumption Agreement, as well as the form signed by Bianchi, were sufficient to assign JFG's assignments to TFG. This proposition is supported by the cases and analysis below.

13

In 1888, the Illinois Supreme Court held that an assignee pursuant to an assignment of a life insurance policy is entitled to receive the benefits accruing at the insured's death, to the extent of the debt owed.  **Martin v. Stubbings, 126 Ill. 387, 18 N.E.2d 265 (Ill. 1888).**  This is still the law in this state.

It has also been consistently and widely held that any objection concerning the failure of an assignee to give proper notice of an assignment can be raised solely by the insurer, as the notice provisions of a policy are for its benefit.  **Equitable Life Insurance Company of Iowa v. Mary L. Mitchell, 248 Ill. App. 401 (2nd Dist., 1927).**  It must also be noted that fundamental contract principles dictate that an assignment need not take any particular form and is valid if it contains language sufficient to show the intent to assign certain rights and interests currently held by one party to another.  **Stoller v. Exchange National Bank of Chicago, 199 Ill. App. 3d 674, 557 N.E.2d 438 (1st Dist., 1990).**

Finally, insurance contracts, including beneficiary changes, assignments, and loans with the policy as collateral, are governed by the same legal principles that govern contracts.  **In the Matter of the Estate of Hyman Cohen, a/k/a Hy Cohen v. Weinberg, 23 Ill. App. 2d 411 at 417, 163 N.E.2d 533 (1st Dist., 1959).**  The insurance policy is the contract between the insured and the insurance company, and it may contain provisions which dictate the, "intent, meaning, or consequences of other documents."  Thus, all documents must be examined to determine the parties' rights.  **In the Matter of the Estate of Hyman Cohan, a/k/a Hy Cohen, 23 Ill. App. 2d at 417.**  "The facts, together with reasonable inferences should control." **Id. at 424**.

Clearly the November 16, 2000, Assignment and Assumption Agreement in and of itself properly and validly assigned the assignments previously made in favor of JFG to TFG.  The

undisputed language of that document and the testimony of Larry Bianchi leaves no question concerning the parties' intent in executing that document. Pursuant to the holding of **Equitable Life,** Margaret Stilwell cannot allege that this assignment is invalid or defective because it was not sent directly to American General. Only American General could raise such an objection and it has not done so in this, or any other action.

Even if American General did object or complain, Larry Bianchi did attempt to and did, in fact, notify American General of the Assignment through the document attached hereto as Exhibit 15. Although the word "release" does appear in places on the document, there is no question when the document is reviewed as a whole in conjunction with all facts and surrounding circumstances, that the document was meant to be and is an assignment of the collateral assignments in favor of JFG to TFG, rather than a full release of same.

The case of **In Re Estate of Nicholas J. Constantine, Deceased, v. Estate of Nicholas J. Constantine, 305 Ill. App. 3d 256, 711 N.E.2d 119, 238 Ill. Dec. 529 (1st Dist., 1999)** is directly on point with respect to this issue. In said case, the Court considered the question: "When is a document entitled "Release" not a release?" **In Re Estate of Nicholas J. Constantine, Deceased, 305 Ill. App. 3d at 257.** The Court answered the question finding that a document is not a release when the people who sign the document intend it to be something else. **Id.** In reaching this holding, the Court specifically noted that when interpreting a contract, the Court must look at the circumstances surrounding the execution of the document in order to determine the intent of the parties. **Id. at 260,** *citing* **Batteast v. Wyeth Laboratories, Inc., 137 Ill. 2d 175 at 183, 560 N.E.2d 315 148 Ill. Dec. 13 (Ill. 1990).** Based on the language of the documents, as well as all facts surrounding the signing of the document, there is no question that Exhibit 15 is not a release of Janko's assignments.

Based on the language of the November 16, 2000, Assignment and Assumption

Agreement, as well as the cases cited herein, there is no question that said agreement, in and of

itself, was sufficient to assign all of JFG's interest in the collateral assignments to TFG.

> **2. Even if the Court Determines that the November 16, 2000, Assignment and Assumption Agreement did not transfer JFG's Collateral Assignments to TFG, the November 2000 document signed by Bianchi was Sufficient to Legally Transfer JFG's rights in those assignments to TFG.**

As noted above, the November 2000 release in favor of TFG is not a release,

but rather is an assignment of JFG's interests in the collateral assignments to TFG. Pursuant to

the cases cited above, when the intent of the party executing the document is considered, along

with all facts surrounding the execution of same, there is no question that the document executed

by Bianchi on or about November 21, 2000, is not a release, but further effectuated the transfer

of JFG's assignments to TFG. Specifically, on November 17, 2000, after the Assignment and

Assumption Agreement was executed, TFG entered into a new Consignment Agreement with

ACV; however, the Stilwells, on behalf of ACV, failed to bring the assignment required by

paragraph 3.9 of the agreement to the closing. Thus, needing to and intending to remain in a

secure position, TFG sought to notify American General on an official form, of the November

16, 2000 Assignment and Assumption Agreement. In response to Bianchi's request for a form,

William Lyons, on behalf of American General, sent Lawrence Bianchi of TFG a letter with a

form to effectuate the assignment. The cover letter sent by Lyons with the form indicates that it

is being sent to Bianchi for the release "from Janko." Although the box designated "release" is

checked on the form, Bianchi, in an effort to make the intent of JFG clear, wrote in next to his

signature, "in favor of TFG." The fact that Bianchi would not have released the assignments on

the date he signed the document in question is evident not only from his testimony, but from the

fact that as of that date, the Stilwells had not delivered the assignments required by paragraph 3.9

16

of the Consignment Agreement to either JFG, TFG or the Bank. The intent of JFG in signing the document, based on the language of the document, and the circumstances present at the time the document was signed, leave no question that this document is not a release and did not constitute a release of JFG's assignments. (See Statement of Undisputed Facts paragraphs 10-17) Rather, the document is and was properly construed by American General as an assignment of JFG's collateral assignments to TFG. Thus, even if the Court determines that the November 16, 2000, document was not sufficient to transfer JFG's interests in the assignments to TFG, there is no question that the document signed by Bianchi on or about November 21, 2000, validly assigned JFG's rights under the assignments to TFG, and put American General on notice of the assignment.

### 3. As TFG held $2,250,000.00 in Collateral Assignments, Each Count of the Third Party Plaintiff's Complaint Fails.

As the assignment of JFG's collateral assignments to TFG was proper as effectuated by the November 16, 2000 Assignment and Assumption Agreement, and was further confirmed by the November 21, 2000 assignment in favor of TFG, there is no question that at the time Third Party Defendant submitted their respective claims for payment, TFG had $2,250,000.00 of valid assignments under the Policy. Because JFG's collateral assignments were properly assigned to TFG, and as same were not released by the document signed by Bianchi on or about November 21, 2000, there is no question that all counts of American General's Third Party Complaint must fail.

At the core of each count of American General's six count Third Party Complaint is the allegation that the Third Party Defendants misrepresented the total amount of TFG's assignments held at the time the various Third Party Defendants' claims were submitted. (Third Party Complaint, Count I through IV, paragraphs 37 and 39, Count V, paragraphs 37, 39 and 43, and

Count VI, paragraphs 37, 39, and 48.)  Once it is determined that TFG held $2,250,000 in assignments when its claim was submitted, the side issue of whether the parties had the right to file a joint claim or to make a joint application for payment becomes irrelevant. Once it is determined that the assignments in question were validly assigned to TFG rather than released, there is no question in this cause that TFG and First Mid were both paid what they were owed, which amounts were less than the amounts of their valid assignments.  Summary Judgment is appropriate where a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." **Celotex Corp. v Catrett, 477 U.S. 317, 323 (1986).**  As the core premise of each count of the Third Party Plaintiff's Complaint fails, First Mid is entitled to judgment as a matter of law in its favor and against American General on each count of the Third Party Complaint.

> **B. In the Alternative, even if this Court finds that summary judgment is not proper on the bases alleged above, there is no question that Judgment must be entered in favor of First Mid and against American General on each count of the Third Party Complaint.**

Counts I through IV of the Third Party Complaint are alleged against First Mid based on one or a combination of the allegations that First Mid made fraudulent statements or misrepresentations concerning the validity of JFG's assignments to TFG, that American General relied on those statements, and that First Mid received more than it was owed.  As set forth hereinbelow, the record in this cause leaves no question that all of these allegations as to First Mid fail, and First Mid is entitled to judgment in its favor on these counts of the Third Party Complaint.

Counts V and VI, for contribution and implied indemnity respectively, are again based on the allegation that First Mid somehow engaged in improper conduct concerning the statements made in its claim form and supporting information.  As set forth hereinbelow, the

record in this cause leaves no question that all of these allegations as to First Mid fail, and that

First Mid is entitled to judgment in its favor as to these counts of the Third Party Complaint.

### 1. First Mid Made No Misrepresentations Concerning its Basis for Jointly Applying for Payment.

In its Third Party Complaint, American General claims that the Third Party Defendants

improperly filed a joint claim. The record rebuts this fact. The May 12, 2003, letters submitted

by First Mid and TFG clearly state that, "Tuscola Furniture Group, LLC ("TFG") and First Mid-

Illinois Bank & Trust ("Bank") are jointly making application on the Collateral Assignments

they received . . . ."

The record reveals that the parties filled out their own claim forms that were attached to

the back of their respective letters. (Exhibits 21 and 22 ) Specifically, First Mid filled out and

signed its own claim form based on its own assignment. The letter submitted on behalf of TFG

and JFG attached TFG's own claim form signed solely by Larry Bianchi. Based on the

foregoing, it is undisputed that First Mid did not, in fact, submit a joint claim as alleged by

American General.

Further, there is no question that even if the Court deems that First Mid did submit a joint

claim, it was absolutely entitled to do so pursuant to paragraph 3.9 of the Consignment

Agreement between TFG and the Stilwells. Paragraph 3.9 of the November 17, 2000

Consignment Agreement, provides, in pertinent part, as follows:

> **Life Insurance.** ACV will maintain life insurance and pay the premiums thereon
> on JAMES STILWELL in an amount of at least $1,250,000.00 or an amount
> equal to the Inventory Cap . . .The life insurance proceeds shall be used first to
> pay BANK for the amount TFG owes Bank in order to release its lien on the
> Amish furniture, then to TFG for all Amish furniture owned by TFG at average
> wholesale cost, less a credit for the amount paid BANK, and any other amounts
> owed to TFG under Agreement and any excess life insurance proceeds shall be
> paid to the Estate of JAMES STILWELL or ACV. ...(See Exhibit 12)

The plain language of this provision makes it clear that James Stilwell, as President of ACV, agreed that any claim submitted to American General by First Mid and TFG for payment under any assignments of the proceeds of the life insurance policy would necessarily be submitted and considered jointly. The relationship of ACV, TFG and First Mid necessarily mandated a joint application for payment.

Further, First Mid in no way misrepresented the basis upon which it jointly applied for payment. Each of the Third Party Defendants completed its own claim form and attached the various assignments upon which their claims were based. American General had every opportunity to review the various assignments, in their true and correct form, in order to determine the propriety of paying the claims as submitted. First Mid should not remain a Third Party Defendant in this cause as a result of any issue concerning a joint claim or a joint application for payment, as American General can show no misrepresentations, of any kind, in this regard.

### 2. First Mid had an Assignment for $1,000,000.00, and it Received $81,660.07, the Amount it was owed under its Loan Agreement with TFG.

At her deposition, Margaret Stilwell admitted that her signature appears on the assignment in the amount of $1,000,000.00 to First Mid. (Stilwell dep. pg. 29, lines 23-24). Stilwell further admits that she would have signed this document because her husband asked her to do so. (Stilwell dep. pg. 30, lines 1-9). No one has disputed, and no one can dispute the validity of First Mid's assignment.

As noted above, TFG had a Consignment Agreement with ACV whereby TFG purchased Amish furniture which it then consigned to ACV. In order to purchase the furniture, TFG obtained a loan from First-Mid Illinois Bank and Trust. The loan made by First Mid to TFG, which was signed by Richard Janko on or about November 17, 2000, was a line of credit in

the amount of $1,000,000.00. (Group Exhibit 17). The loan documents provide that interest accrues on the principal balance, from time to time, until paid in full. The loan documents further provide that TFG would pay any attorney's fees incurred by First Mid in collecting on the Note. (See Group Exhibit 17)

On the date of Jim Stilwell's death, the principal balance owed by TFG to First Mid on the loan which TFG used to purchase Amish furniture pursuant to its Consignment Agreement with ACV was $81,020.00. (Exhibit 16, Chamberlain dep., pg. 88, lines 1-22, and Exhibits 28 and 29) Tom Chamberlain, the officer at First Mid who handled the receipt of the insurance proceeds, testified that on the date the funds were received, the total balance due on the loan was $81,660.07. (Exhibit 16, Chamberlain dep., pg. 64, lines 11-24, pg. 65, lines 1-4) This amount was broken down as $81,020 in principal, $480.00 in legal fees, plus $160.07 in accrued interest. (See Exhibits 28 and 29. Also see Exhibit 16, Chamberlain dep., pg. 74, lines 13-24, pg. 74, lines 1-13.) That is the amount that First Mid received from the check issued by American General to First Mid and TFG. The remaining funds from the check were retained by TFG. (Exhibit 16, Chamberlain dep., pgs. 64 and 65) None of the parties dispute the fact that First Mid received what it was owed. (Exhibit 6, Bianchi dep., pg. 116, lines 22-24, pg. 117, lines 1-6. *Also See* Exhibit 20, Stilwell dep., pg. 67, lines 21-24, pg. 68, lines 1-24, pg. 69, lines 1-22, Stilwell has no reason to dispute the amounts set forth as being owed to TFG and the Bank in the May 12, 2003, letter to American General).

### 3. The statements made by First Mid to American General were True and Accurate.

The statements made in First Mid's letter which was submitted with its claim form are true and accurate (Exhibit 21 and Chamberlain dep., pg. 48, lines 14-18, pg. 49, lines 1-5). The letter sent by First Mid is almost identical to the letter sent to American General by JFG

and TFG. (Exhibit 22) Lawrence Bianchi, who signed the letter on behalf of TFG and JFG, testified at his deposition that all of the information contained in his letter is true and accurate. (Bianchi dep., pg. 54, Lines 2-4) Thus, there is no question concerning the fact that all information submitted by First Mid to American General was true and correct.

Further, after First Mid sent in its letter and claim form, American General sent out various letters requesting additional information. Specifically, American General sent a letter directed to JFG which stated that its records showed that the assignments to JFG had been released. (Exhibit 6, Bianchi dep., pg. 53, lines 12-18 Exhibit 24) In response, Bianchi called American General and spoke with Ray Salwicki. (Exhibit 6, Bianchi deposition, pgs. 59, 62) After his conversation with Salwicki, Bianchi wrote the June 11, 2003 letter to follow-up on his conversation with American General, and to provide a more complete overview of TFG/JFG's relationship with ACV, and some of the events that had transpired over the term of that relationship (Exhibit 6, Bianchi dep., pg. 59, lines 7-15, pg. 60, lines 20-24, pg. 61, lines 1-11, pg. 62, lines 1-21.) A review of the letter itself shows that it contains a full recitation of facts concerning the various Consignment Agreements, as well as all of the events surrounding JFG's assignment of the collateral assignments to TFG. (See Exhibit 25) There is absolutely no testimony in the record that First Mid was sent a similar letter or that American General contacted First Mid in any way concerning the validity of the assignments from JFG to TFG. By his own admission, Bianchi was the sole author of the June 11, 2003, letter, and First Mid had no part in drafting same, (Bianchi dep., pg. 119, lines 6-24, page 120, lines 1-4.)

> **4. In making its determination to pay the claims, American General did not rely on any statements made by First Mid concerning the assignment from JFG to TFG.**

22

Finally, American General cannot claim that in paying the claims it relied on any alleged misstatements made by First Mid. After the May 12, 2003, letters sent by the Third Party Defendants were received by American General, it sent a letter seeking verification of its purported assignments. Thus, any statements that First Mid might have been deemed to have made in its May 12, 2003, correspondence concerning the total amount of assignments were not relied upon by American General in paying the respective claims of the Third Party Defendants. Rather, American General, in order to make its own assessment and evaluation, asked for supplemental information from JFG which was provided by TFG and JFG.

American General's own notes concerning payment of the claim support this proposition. The document marked AIG 000440, which is a portion of American General's notes regarding the claim, indicates that on June 11, 2003, Larry Bianchi spoke with Ray Salwicki of American General. The notes document that Bianchi indicated he was going to fax a letter, and that once the letter was received, the file would go to in-house counsel. The Note finally reveals that Bianchi was informed that the file was going to be referred to American General's legal department for review. (See Exhibit 27.)

This documentation further reveals that the representations made concerning JFG's transfer of its assignment to TFG all came from JFG and TFG. American General did not rely on any information submitted in the May 12, 2003, letters concerning the validity of TFG's assignments as assigned by JFG to TFG, but rather asked for supplemental information. Once that information was received, the file was referred to American General's legal department for review.

**5. Based on all of the Foregoing, Judgment must be entered in favor of First Mid on the Third Party Complaint.**

23

The facts set forth above leave no question that First Mid had a valid assignment and it was paid only what it was owed from the insurance proceeds, which was less than the amount of its assignment. First Mid did not make any misrepresentations or fraudulent statements in submitting its application, including but not limited to statements concerning its right to jointly apply for payment.

Rather, the record is clear that when questions arose concerning the Third Party Defendant's respective claims, those questions revolved around JFG's assignment of its collateral assignments to TFG. American General did not involve First Mid in its effort to verify that JFG's assignments had been validly assigned to TFG. First Mid did not author and did not collaborate in the June 11, 2003, correspondence prepared and submitted by Bianchi to provide American General with the requested verification. There is no question in this cause that it was TFG's assignments that were at issue, and, at American General's request to JFG, it was TFG that presented all information to American General to verify those assignments.

Finally, by moving past the information contained in the May 12, 2003, correspondence, and requesting additional information in order to evaluate the claims, American General cannot be said to have relied on any statements made in the May 12, 2003 correspondence. The law requires that in order for a representation to be actionable, the complaining party must have had a right to rely on the representation at issue. **Miner v. Fashion Enterps**, **342 Ill. App. 3d 405, 794 N.E.2d 902 (1st Dist., 2003.)** By seeking additional information, American General cannot be said to have relied on any statements made by First Mid in its May 12, 2003 correspondence.

Again, as set forth above, all counts of the Third Party Complaint as to First Mid are premised on one or a combination of the following allegations: First Mid allegedly made fraudulent statements or misrepresentations concerning its right to make a joint claim; First Mid

24

allegedly made fraudulent statements, misrepresentations or mistaken representations concerning the validity of JFG's assignments to TFG; American General relied on the statements made by First Mid; and First Mid received more than it was owed.  As set forth above, the record reveals that none of these statements alleged in American General's Third Party Complaint against First Mid are true.  As the core allegation of each count of American General's Third Party Complaint fails as to First Mid, and pursuant to the Court's holding in **Celotex**, cited above, First Mid is entitled to judgment as a matter of law in its favor on each count of the Third Party Complaint.

### C. In the Alternative to those Arguments Set Forth in Paragraphs A. and B., First Mid is Nevertheless Entitled to Judgment as a Matter of Law Based on the Voluntary Payment Doctrine.

In the alternative to the arguments set forth in paragraphs A and B above, and adopting the argument of JFG and TFG, First Mid is entitled to judgment in its favor on Counts II and IV which allege mistake.  Illinois law prevents recovery where, as here, American General made a mistake of law.  American General made a voluntary payment in this case based on all pertinent evidence presented.

Under the "voluntary payments doctrine, … neither money paid under a claim of right with full knowledge of the underlying facts and absent coercion, fraud or a superior bargaining position by the transferee nor money paid under a mistake of law is recoverable." **Cohn v. Anthem Life & Health Insurance Co., 965 F. Supp. at 1121-22**. "Mistake of law" has been defined as an erroneous conclusion of the legal effect of known facts.  **Id**. *See also* **Hartford v. Doubler, 105 Ill. App. 3d 999, 434 N.E.2d 1189, 1191 (3rd Dist. 1982)**.  ("It is a well established proposition of law that money paid under a mistake of fact can be recovered by the payor.  However, money paid under mistake of law cannot be so recovered.")

In **Hartford**, the defendant rancher's insurance policy excluded coverage for the loss of livestock while in a public sale barn.  When some of the rancher's steers were stolen from the barn, the insured notified the authorities and his insurer.  **434 N.E.2d at 1190**. The claims form submitted by the insured noted that the loss occurred at a public sale barn.  After interviewing the insured, and reviewing the police report and claim form, the insurer paid the claim.  **Id**.  The insurer later filed suit to recover the payment, asserting the adjuster made payment by mistake without knowledge of the public barn exclusion.  **Id at 1191**.

The appellate court affirmed the trial court's grant of summary judgment in favor of the rancher.  In doing so, it noted the insurer is charged with knowledge of its policies and received the request to act under the terms of its policy.  **Id**.  Thus, the court held, the insurer made the payment with full knowledge of the sale barn exclusion and it was a nonrecoverable mistake of law.  It stated "[b]ecause approval and payment of the … claims were made voluntarily and without lack of knowledge or mistake of fact, any policy provisions exempting coverage have been waived."  **Id**. **at 1192**.

In **Hartford v. Doubler** the defendants neither withheld information nor distorted the facts presented to the plaintiff.  Because approval of payment of the defendants' claims was made voluntarily and without lack of knowledge or mistake of facts, the insurer could not recover those amounts.

The **Hartford** court relied on the earlier case of **Western & Southern Life Insurance Co. v. Brueggeman**, **323 Ill. App. 3d 173, 55 N.E.2d 719 (4th Dist. 1944)**.  In **Western**, an insurer inadvertently made payment on a claim of a beneficiary to a life insurance policy for a military death despite a military and naval service exemption clause in the policy.  The insurer made payment with knowledge that the insured was in the military.  The court in **Western** found

that payment had been made voluntarily without any fraud or misrepresentation and that the insurer could not recover the payment.

In **Auto Owners Ins. Co. v. South Side Trust & Savings Bank, 176 Ill. App. 3d 303, 531 N.E.2d 146 (3rd Dist. 1988)**, South Side Bank brought a counterclaim against an insurer to recover payments its employees made on a letter of credit. South Side issued a letter of credit on behalf of an electrical subcontractor to secure a performance bond issued by the insurer. The performance bond did not conform to the letter of credit, but South Side paid a draw made by the issuer of the performance bond. Its employees had assumed that the wording of the bond and the letter of credit were in compliance.

South Side later learned that the performance bond and letter of credit were not in compliance, and it sued the issuer of the performance bond to recover the draw it had paid. South Side argued that its error was one of fact entitling it to recover its payment to the issuer of the performance bond and that it was not aware of noncompliance because the plaintiff failed to supply it with a copy of the bond. The insurer successfully argued that since South Side Bank misinterpreted the legal effect of the letter of credit, it had made a mistake of law. The Appellate Court held that since the defendant paid the money without demanding to see the bond, it also had waived its right to reimbursement.

The record in this cause shows that no facts or documents were concealed from American General's review. American General has failed to bring forth any evidence to the contrary and Mr. Lyons stated he had no reason to doubt the accuracy of the information provided to American General. (See Lyons dep, pg 72). American General's corporate representative, Diana Fields, did not identify any errors in the accuracy of information or documents provided to American General. Larry Bianchi stated that the numbers supporting the amount of the Third

Party Defendant's claim are accurate and may even be understated. (Bianchi Dep., pgs. 52-53).

He and Tom Chamberlain both stated that all of the information contained in their respective

correspondence to American General is true and correct. (Bianchi Dep., pg. 54, Chamberlain

dep. Pg. 48, lines 14-18, pg. 49, lines 1-5). If a mistake was made in this case, which First Mid

expressly denies, it was one of law. As a result, American General cannot recover under its

Third Party Complaint.

     American General reached its own legal conclusion regarding the Third-Party

Defendants' right to payment and whether the document executed by Bianchi on or about

November 21, 2000, was a valid assignment from JFG to TFG, based on all of the information

provided to it. Margaret Singh of American General communicated with in-house counsel for

the purpose of soliciting legal advice and assistance upon receiving the claim submissions from

the Third-Party Defendants. (See Affidavit of Diana Fields, Exhibit 26) The documents

produced by American General corroborate that it conducted an independent legal analysis of the

facts and documents submitted in this case. Margaret Singh stated in a file entry that the

documents submitted by Larry Bianchi were received and reviewed by Melinda Boyd, Attorney

and that American General was approving payment of $512,974.50 to TFG and First Mid per

Melinda. (See Exhibit 27).

     Here, like the nonrecoverable payments in **Hartford v. Doubler**, **Auto Owners** and

**Western & Southern**, American General made a voluntary payment, with full knowledge and

with the benefit of the documents, including the release of assignment by JFG in favor of TFG.

American General required the Bank, TFG and JFG to produce documents and information for

its review. (Third-Party Complaint, Factual Background, ¶ *27*). Pursuant to American General's

request for verification of the continued validity of the assignments originally made to JFG,

Lawrence Bianchi sent an exhaustive verification correspondence on behalf of JFG and TFG explaining in chronological detail the assignments and events which formed the basis of the claims made under the Policy and drawing attention to the release of assignment by JFG in favor of TFG, which Bianchi signed on or about November 21, 2000. (See June 11, 2003 correspondence attached as Exhibit 25, and Exhibits 7-9 to the Third-Party Complaint. See also Third-Party Complaint, Factual Background, ¶¶ 21-32.)

American General's Third-Party Complaint on its face recognizes it received all relevant underlying facts. American General alleges it requested, received, acknowledged receipt of, and subsequently recorded all four assignments. (Third-Party Complaint, Factual Background, ¶¶ 9-18) This includes the assignments from Margaret to JFG and TFG, as well as the November 21, 2000 assignment from JFG in favor of TFG. (Third-Party Complaint, Factual Background, ¶ 13 and Exhibit 4, thereto. See also American General's Answer to Stilwell's Complaint, ¶ 8, Affirmative Defense, ¶ 13 attached as Exhibit 13 to Third-Party Complaint.) As is clear from Paragraphs 11 through 14 of the Third-Party Complaint, American General had the assignment from JFG to TFG which Bianchi signed on or about November 21, 2000, prior to its decision to make payment. Now, only after Plaintiffs claim the assignment from JFG to TFG was a blanket release and not an assignment does American General seek to recover payments it voluntarily made.

**D. In the Alternative to the Arguments Set Forth In Paragraphs A and B, First Mid is entitled to judgment in its favor on the Third Party Complaint as the evidence in the record unequivocally demonstrates a complete lack of fraud.**

Again, First Mid states in the alternative to paragraphs A and B of this Motion for Summary Judgment, and adopting the argument of TFG and JFG, as follows:

29

The only way American General can possibly circumvent Illinois law regarding voluntary payments is to establish a fraudulent misrepresentation was made to it by First Mid. The evidence shows no such misrepresentation was made by First Mid or any of the Third Party Defendants. As a result, American General fails to carry its burden and Third Party Defendants are entitled to judgment as a matter of law. To state a cause of action for fraudulent misrepresentation, a plaintiff must allege that the defendant made a representation of material fact, the defendant knew or believed the representation was untrue, the plaintiff had a right to and did rely on the representation, the representation was made for the purpose of inducing the plaintiff to act or refrain from acting, and the representation led to the plaintiff's injury. **Miner v. Fashion Enterps. Inc.** **342 Ill. App. 3d 405, 794 N.E.2d 902 (1st Dist. 2003)**. A misrepresentation is "material" and therefore actionable if it is such that had the other party been aware of it, he would have acted differently. **Mack v. Plaza Dewitt Ltd. Partnership**, **137 Ill. App. 3d 343, 484 N.E.2d 900 (1st Dist. 1985)**.

Here there was not a misrepresentation of material fact. The statement that "JFG released its assignments amounting to $2,000,000 in favor of TFG and thus, transferred those rights under the assignment to TFG pursuant to the agreement dated November 16, 2000, between JFG and TFG and the release of assignment dated November 20, 2000 submitted to American General" is not a misrepresentation at all. Larry Bianchi affirmatively stated that the information and correspondence he provided is true and correct. Mr. Lyons himself stated that he has no reason to doubt the accuracy of the information or documents provided by the Third Party Defendants. (Lyons dep pg. 72) No other evidence gleaned from the record even suggests any inaccuracies in the documents or submissions sent by Third Party Defendants.

Even assuming the record did reveal that some "misrepresentation" was made, it could not have been one of fact. The "misrepresentation" alleged in the Third Party Complaint is the legal effect of the November 21, 2000 assignment from JFG in favor of TFG. American General does not allege that any of the Third-Party Defendants misrepresented the language in the November 21, 2000 assignment. TFG and JFG in its letter of June 11, 2003, simply quoted the language in the assignment. Simply put, the Plaintiff in this cause reached a different conclusion of the legal effect of the language than American General. First Mid expressly denies that the conclusion reach by American General was incorrect. However, regardless of the conclusion reached, American General, made its decision with full knowledge of the facts. Therefore, in the alternative to the bases set forth in paragraphs A and B above, First Mid is entitled to judgment as a matter of law on all counts of the Third Party Complaint.

### E.  In the Alternative to Paragraphs A and B of this Motion, American General's Fraud, Unjust Enrichment, Contribution and Implied Indemnity Claims are Nothing More than Re-labeled Mistake Claims and are Defective for the Same Reasons as its Mistake Claims.

Again, First Mid states in the alternative to paragraphs A and B of this Motion for Summary Judgment, and adopting the argument of TFG and JFG, as follows:

As stated above, the only mistake that could have occurred was one of law made by American General, and the record reveals no evidence of fraud or misrepresentation. The remaining counts contained in the Third Party Complaint should be dismissed in their entirety because Illinois law does not recognize an exception to the voluntary payments doctrine for claims of unjust enrichment, contribution or implied indemnity.

Even if Illinois law allowed such claims, all of American General's third party claims are redundant because they are based on the same "misrepresentations." The Third-Party Complaint alleges that TFG, JFG and Bank represented that JFG had released its assignment of two million

dollars ($2,000,000) in favor of TFG pursuant to the release signed by Bianchi on or about

November 21, 2000. The Third-Party Complaint further alleges TFG, JFG and Bank represented

that the outstanding life insurance assignments totaled three million dollars ($3,000,000). (See

Count II, ¶ 37)  In Counts II and IV, American General alleges TFG, JFG and Bank made these

representations based on the mistaken belief that JFG's release in favor of TFG on November 20,

2000 was a valid transfer rather than a blanket release whereas in Counts I and III, it claims the

very same "misrepresentations" were made with knowledge of their inaccuracy or reckless

disregard for the same. The exact same "misrepresentations" purportedly give rise to American

General's contribution claim in Count V and implied indemnity claim in Count VI.

The problem with these alternative theories of recovery is that they suffer from the same

defects as American General's mistake claim. These are not misrepresentations of fact.

Regardless of how American General chooses to characterize the same conduct, it fails to state a

cause of action because it has not and cannot allege it did not have complete knowledge of the

material facts.

### F. First Mid is entitled to Judgment in its Favor on its Cross-Claim against TFG and JFG.

In the alternative, if this Court finds that First Mid must remain a Third Party Defendant

in this cause with respect to any count of the Third Party Complaint, for the same reasons set

forth in paragraph B above, First Mid seeks summary judgment against TFG and JFG on its

cross-claim. The pleadings in this cause make clear that the assignments out of which this cause

of action arose are those assignments which JFG assigned to TFG, and which JFG verified. As

First Mid's assignment is not in question and as First Mid was paid what it was owed, which was

less than the amount of its assignment, if First Mid remains a Third Party Defendant in this

cause, and if any judgment is rendered in this cause against First Mid, First Mid must be entitled

to judgment against TFG and JFG on its cross-claim

**CONCLUSION:**

For all the reasons set forth above, First Mid-Illinois Bank & Trust seeks judgment in its favor

and against the Third Party Plaintiff, American General on the Third Party Complaint.    In the

alternative, First Mid seeks judgment in its favor and against the Third Party Defendants, JFG and TFG

on its Cross-Claim.

FIRST MID-ILLINOIS BANK & TRUST,


/s/ Julie Beyers_____
Julie Beyers

Julie Beyers
HEAVNER, SCOTT, BEYERS & MIHLAR
111 E. Main Street, Suite 200
Decatur, IL 62523
Phone: (217) 422-1719
Fax:    (217) 422-1754
juliebeyers@hsbattys.com
ARDC#06217185


**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that its Motion for Summary Judgment complies with the type
volume limitation of Local Rule 7.1(B)(4)(b)(1) in that its Argument contains 35,664 characters with no
spaces and 43,059 characters with spaces.


/s/_____    Julie Beyers_____
Julie Beyers

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2007, I electronically filed the foregoing First Mid-Illinois Bank & Trust's Motion for Summary Judgment on Third Party Complaint and First Mid's Cross Claim Against TFG and JFG with the Clerk of the Court using the ECF system and that service was made electronically to the parties as indicated on that system.

Jason Crowder
Heller Holmes & Associates PC
crowderjason@hotmail.com

Timothy J. Howard
Howard & Howard Attorneys PC
toward@howardandhoward.com

Jason M. Kuzniar
Wilson Elser Moskowitz Edelman & Dicker LLP
Jason.Kuzniar@wilsonelser.com

Daniel J. McMahon
Wilson Elser Moskowitz Edelman & Dicker LLP
Daniel.mcmahon@wilsonelser.com

Cinthia G. Motley
Wilson Elser Moskowitz Edelman & Dicker LLP
cinthia.motley@wilsonelser.com

Rebecca M. Rothmann
Wilson Elser Moskowitz Edelman & Dicker LLP
Rebecca.rothmann@wilsonelser.com

Michael S. Seneca
mseneca@howardandhoward.com
lforney@howardandhoward.com

/s/          Julie Beyers
           Julie Beyers

Julie Beyers
HEAVNER, SCOTT, BEYERS & MIHLAR
111 E. Main Street, Suite 200
Decatur, IL 62523
Phone: (217) 422-1719
Fax:    (217) 422-1754
juliebeyers@hsbattys.com
ARDC#06217185