E-FILED
Monday, 02 April, 2007 04:44:02 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MARGARET J. STILWELL, HALEY
STILWELL, HEIDI STILWELL,
JAMIE STILWELL, MEGAN
STILWELL,                          No. 05-CV-02160

        Plaintiffs,

    vs.

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

        Defendant.

AMERICAN GENERAL LIFE
INSURANCE COMPANY,
  Third-Party Plaintiff,

    VS.

FIRST MID-ILLINOIS BANK &
TRUST, TUSCOLA FURNITURE
GROUP, LLC, and JANKO
FINANCIAL GROUP, LLC,
  Third-Party Defendants.

_ORIGINAL_

DEPOSITION

      The deposition of WILLIAM JOHN LYONS,
taken on behalf of the Third-Party Defendant
First Mid-Illinois at the office of Area Wide
Reporting, 301 W. White, Champaign, Illinois on
February 26, 2007, before Barbara A. Glover, CRR,
RPR, and Certified Shorthand Reporter of the
State of Illinois.

EXHIBIT
1

**Multi-Page™**                                                                    **WILLIAM JOHN LYONS**

Page 2

1  APPEARANCES:

2

3  Heller, Holmes & Associates
   Jason M. Crowder
4  1101 Broadway
   Mattoon, Illinois  61938
5  (217) 235-2700
   Appearing for Plaintiffs
6

7

8  Heavner, Scott, Beyers & Mihlar
   Julie Beyers
9  111 E. Main Street, Suite 200
   Decatur, Illinois  62523
10 (217) 422-1719
   Appearing for Third-Party Defendant First
11 Mid-Illinois

12

13 Howard & Howard
   Michael S. Seneca
14 211 Fulton Street, Suite 600
   Peoria, Illinois  61602-1350
15 (309) 672-1483
   Appearing for Tuscola Furniture and Janko
16 Financial

17

18 Wilson, Elser, Moskowitz, Edelman &
   Dicker LLP
19 Rebecca M. Rothmann
   120 N. LaSalle Street, Suite 2600
20 Chicago, Illinois  60602
   (312) 704-0550
21 Appearing for Defendant American General

22

23

24

---

Page 3

1           I N D E X

2
   EXAMINATION CONDUCTED BY:          PAGE
3
      By: Ms. Beyers              4
4     By: Mr. Seneca             72
      By: Ms. Rothmann           73
5     By: Mr. Crowder            84
      By: Ms. Beyers             89
6     By: Ms. Rothmann           90
      By: Mr. Seneca             93
7     By: Ms. Beyers             94
      By: Mr. Crowder            97
8     Q.

9

10          E X H I B I T S

11 EXHIBIT                     PAGE

12 Exhibit No. 1               13
   Exhibit No. 2               17
13 Exhibit No. 3               19
   Exhibit No. 4               20
14 Exhibit No. 5               24
   Exhibit No. 6               28
15 Exhibit No. 7               29
   Exhibit No. 8               31
16 Exhibit No. 9               32
   Exhibit No. 10              33
17 Exhibit No. 11              40
   Exhibit No. 12              44
18 Exhibit No. 13              46
   Exhibit No. 14              51
19 Exhibit No. 15              55
   Exhibit No. 16              58
20 Exhibit No. 17              62
   Exhibit No. 18              81
21 Exhibit No. 19              84
   Exhibit No. 20              88
   Exhibit No. 21              90
   Exhibit No. 22              97
23

24

---

Page 4

1            WILLIAM JOHN LYONS

2  the deponent herein, called as a witness, after

3  having been first duly sworn, was examined and

4  testified as follows:

5

6        EXAMINATION CONDUCTED

7        BY: MS. BEYERS

8

9     Q. Can you please state your name for the

10 record?

11    A. I am William John Lyons.

12    Q. Mr. Lyons, I'm going to have the

13 record reflect that you are here today pursuant

14 to a notice of deposition and a subpoena --

15    A. Okay.

16    Q. -- that you were served with to secure

17 your presence here today at the deposition and

18 that this deposition is going to be for discovery

19 purposes, and it's done pursuant to the Federal

20 Rules of Civil Procedure.

21        Mr. Lyons, have you ever given your

22 deposition before?

23    A. No, ma'am, I don't believe so.

24    Q. Okay.  I'm going to give you a few

---

Page 5

1  quick rules here.

2     A. Okay.

3     Q. The court reporter is typing down your

4  responses, so she can't -- you have to say your

5  answer out loud.

6     A. Okay.

7     Q. She can't take down nods of the head.

8     A. Okay.  Okay.

9     Q. Of shakes of the head.  The other

10 thing that we have to remember is that one person

11 needs to talk at a time, so I'll ask the

12 question, and then you can provide the response.

13 It's hard to do, but we have to not talk over

14 each other so that she's real clear about what my

15 question is and what your response is.  Okay?

16    A. Okay.

17    Q. I introduced myself to you when you

18 first came in.  My name is Julie Beyers, and I

19 represent First Mid-Illinois Bank & Trust in the

20 case regarding Margaret Stilwell versus American

21 General Life Insurance company, and, Mr. Lyons,

22 have you brought with you today your entire file

23 concerning Margaret Stilwell and any life

24 insurance policies that she and her husband may

Page 10

1   A. Generally what my duties would be
2 would be to get a death certificate.
3   Q. Okay.
4   A. And then -- well, the first thing I
5 inform the company of the death.
6   Q. Okay.
7   A. And they would send me a form to be
8 signed by -- to would be signed by and gather a
9 death certificate and a claimant statement, and I
10 would fill that -- I would have that signed by
11 the claimant and the death certificate and send
12 that back to the home office.
13   Q. Okay. And then the claim would be
14 evaluated and determined there. Is that correct?
15   A. Yes, ma'am.
16   Q. All right. Now, the policies -- the
17 four million dollar policy and the one million
18 dollar policy that are at issue or that we've
19 been talking about in this case it looks like
20 they were issued in approximately 1998. Is that
21 your recollection?
22   A. I really can't -- I would have to look
23 at my stuff, but I gather that you have seen
24 that, so I would agree that it was in 1998.

Page 11

1   Q. Okay. That would seem right to you?
2   A. Yes.
3   Q. Okay. Did you have a relationship
4 with the Stilwells prior to them coming in to
5 apply for the four million dollar policy and the
6 one million dollar policy?
7   A. Yes, ma'am.
8   Q. Okay. And can you tell me about that?
9   A. Yes, ma'am. I have known Margaret and
10 Jim -- I had known Margaret and Jim for a long
11 time, and actually in about '92 sold a life
12 insurance policy to Margaret, Margaret Stilwell.
13   Q. Okay.
14   A. And always tried to do business with
15 people in Atwood, and when Jim took over the meat
16 market, I was one of his best customers, and I
17 enjoyed -- I mean he had a very -- Jim Stilwell
18 was an excellent business person and very, very
19 good meat market, was excellent, and so we kind
20 of formed a friendship.
21   Jim was very -- very much into city
22 business and was very good for the town of
23 Atwood, excellent, and I like Atwood, and I spent
24 a lot of time there, so, you know, it was a -- it

Page 12

1 was a -- he actually let me form a salary
2 allotment and sell some health insurance -- or,
3 excuse me, some life insurance and disability
4 insurance to his employees through payroll
5 deduction.
6   Q. Ah. I see.
7   A. And that's how we formed -- on these
8 two particular cases what happened was --
9   Q. On those two policies, you mean?
10   A. These two policies.
11   Q. And just so that the record is clear,
12 we're talking about the four million dollar
13 policy with the number of 2604663?
14   A. Right.
15   Q. And then a one million dollar policy
16 with the number 2384389. Is that correct?
17   A. Yes. He came to me about those
18 policies.
19   Q. Okay.
20   A. Jim came to me about those policies.
21   Q. Okay.
22   A. And he said I need this insurance.
23 We're moving out of Atwood, and we're expanding,
24 and we need these policies, and the four million

Page 13

1 he told me was for debt that he was going to
2 acquire, and he wanted to protect his family from
3 the debt.
4   Q. Okay.
5   A. And the one million dollar policy he
6 was very explicit about that that would be to
7 take care of Maggie, which is Mrs. Stilwell, I'm
8 sorry, a lot of people call her Maggie and her
9 four daughters, their four children.
10   Q. Okay. All right. I'd like to have
11 you to look at at this time what I'm going to
12 mark as Exhibit No. 1.
13     (At this point the court reporter
14     marked Lyons Exhibit No. 1 for purposes
15     of identification.)
16 BY MS. BEYERS:
17   Q. Can you just state for the record what
18 this document is?
19     MR. CROWDER: Just one page?
20 BY MS. BEYERS:
21   Q. Yeah, it's just that first page there.
22   A. This was a financial personal
23 insurance -- large amount supplement that was --
24 was -- you had to fill this out -- I had to fill

Page 70

1 sort of claims or the way the claims were made.
2 Is that a fair statement?
3     A. I will tell you I did tell Jason and
4 I've told you that Margaret was very upset with
5 Larry Bianchi.
6     Q. And what did you tell Jason about
7 that?
8     A. That's all I said. She was very
9 upset.
10     Q. Basically what you've told me today?
11     A. Yes, it was the same.
12     Q. And that was --
13     A. You know, let me -- let me -- I'll
14 have to be honest. You don't call me the day a
15 guy dies and ask me. You know, you wait until
16 after the funeral, you know, and I didn't think
17 that was very good -- I'm not -- I guess I'm a
18 central Illinois boy.
19      You don't call a person up the day he
20 dies and want to know if the life insurance is
21 still in force. I'm sorry, but that's just my
22 opinion. I probably shouldn't have told you
23 that, but that's the way it is.
24     Q. That's okay. And you said that you

Page 71

1 knew that Margaret was very upset. Again, you've
2 told me all of your conversations with Margaret
3 concerning that particular issue. Is that
4 correct?
5     A. Yes. Yes, ma'am. And my memory is
6 not real good.
7     Q. Well, that's --
8     A. I'm sorry.
9     Q. And when Mr. Bianchi called you, did
10 you have any idea how much the Stilwells or ACV
11 or any related entities owed Janko Financial or
12 TFG or anything like that?
13     A. No. No. Lloyd called me too, but it
14 was like three days after the funeral.
15     Q. And Lloyd is the one that you sent the
16 fax to?
17     A. Yes.
18     Q. That we've already talked about.
19 Correct?
20     A. Yes.
1     Q. And he called you shortly after
22 Mr. Stilwell's death?
23     A. Yeah, it was three days after we
24 buried him.

Page 72

1     MS. BEYERS: Mark, do you want to ask
2 a few questions? I think I'm almost done.
3     EXAMINATION CONDUCTED
4     BY: MR. SENECA
5     Q. I'm Mike Seneca. I have a couple of
6 questions.
7      We've discussed and looked at various
8 documents today provided to you by Larry Bianchi
9 on behalf of Janko Financial Group and Tuscola
10 Furniture Group and then several other documents
11 that you have in your file.
12      Do you have any reason to dispute any
13 of the statements made by Larry to you in any of
14 those letters?
15     A. No, Mike.
16     Q. Do you have any reason to dispute any
17 of the amounts represented in those documents?
18     A. Mike, I wouldn't know anything about
19 the amounts. I'm sorry.
20     Q. Did you do anything to investigate
21 Margaret's complaints about the way claims were
22 made?
23     A. No, ma'am -- no, sir. I'm sorry. I'm
24 sorry.

Page 73

1     Q. That's all right. That's all right.
2 That's all the questions I have.
3     A. I felt and I still feel that is my
4 company's job, not mine.
5     Q. So documents provided to you, you
6 didn't look at, independently review yourself?
7     A. No, sir.
8     Q. You just passed them on to your
9 company?
10     A. Yes, sir.
11     MR. SENECA: Okay. That's all the
12 questions I have.
13     MS. ROTHMANN: I've got a couple.
14     EXAMINATION CONDUCTED
15     BY: MS. ROTHMANN
16     Q. Mr. Lyons, Becky Rothmann. Nice to
17 meet you. I just had one or two, and it was just
18 on points of clarification.
19      You had testified in response to some
20 of Julie's questions that -- I don't want to put
21 words in your mouth -- sometime after
22 Mr. Stilwell passed away Margaret called you into
23 or down to the store for a meeting?
24     A. Yes, ma'am.

PO Box 401
Milwaukee  WI  53201 0401
888 653 5463

# THE OLD LINE LIFE Insurance Company of America

## POLICY DELIVERY RECEIPT

Contract/Certificate Number: _____ 2604663 _____

Owner: _____ MARGARET STILWELL _____

**My life or annuity contract/certificate has been delivered to me.**

Date: _____

Owner Signature: _____

**IMPORTANT NOTICE:**   The laws of your state may require the completed Policy Delivery Receipt be returned to the Insurance Company.

EXHIBIT
tabbies
2

# AMERICAN GENERAL LIFE INSURANCE COMPANY

MARGARET STILWELL
218 N IOWA STREET
ATWOOD IL   61913

Company: OLD LINE LIFE INSURANCE COMPANY
Policy Number: 2604663
Insured or Annuitant: MARGARET STILWELL

## MERGER CERTIFICATE

This certificate has been issued as a result of a merger on March 31, 2003 of:

> **THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA,** a Wisconsin insurance corporation (Old Line Life);

> Into

> **AMERICAN GENERAL LIFE INSURANCE COMPANY,** a Texas insurance corporation (American General Life), the surviving company.

This is to certify that American General Life hereby assumes all liability for the insurance policy, certificate or annuity contract identified above issued by Old Line Life (or any predecessor company) the same as if it had been issued originally by American General Life. Benefits under the policy, certificate or annuity contract identified above will not change as a result of this merger.

This certificate is effective March 31, 2003.

Signed at the Home Office of American General Life Insurance Company,

_Elizabeth M. Snell_
Secretary

**IMPORTANT**

President

This certificate becomes a part of your policy, certificate or annuity contract, and should be attached thereto. All inquiries should be directed to American General Life Insurance Company, 2727-A Allen Parkway, Houston, Texas 77019 (Mailing Address: P.O.Box 4373, Houston, TX 77210-4373).

**FOR INFORMATION OR TO MAKE A COMPLAINT, CALL US AT 1-800-937-2351.**

AGLC 8204-IL

**AMERICAN**
**GENERAL**
**FINANCIAL GROUP**

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA
*Member American General Financial Group*
P.O. Box 401
Milwaukee, Wisconsin 53201-0401
888/653-5463

### CHECKBOOK REMINDER
(Please substitute for any previous slip referring to this policy)

| (Name of Insured)<br>JAMES E STILWELL | (Policy)<br>2604663 |
|---|---|

Please remember to deduct $ __1,780.63__ on the __27__ of each billing period. Your premium will be automatically paid by the Pre-Authorized Check Plan premium.

Notice:    If you change your checking account to another bank, please complete the form below and mail immediately to the address shown.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**AUTHORIZATION TO HONOR PRE-AUTHORIZED PAYMENTS DRAWN AND PAYABLE TO:**

The OLD LINE LIFE Insurance Company of America                    ATTACH VOIDED CHECK TO COMPLETED FORM

As a convenience to me, I hereby request and authorize you, or your Agent Bank, to initiate debit entries on my checking account maintained at the bank named below hereof for the periodic payment to the company named above, hereinafter called COMPANY, of premiums due and/or loan repayment on the policy(ies) shown below, and, if a mutual fund program is indicated below, to the broker/dealer or its nominee or to the funds shown below for mutual fund subscription payments, and if a savings and loan savings account is indicated below, to the savings and loan association shown below for deposit to the indicated savings account and if other amounts are designated, to the designated payee.

It is agreed that:

1. Debit entries shall be drawn on or about the dates on which payments are due.
2. The COMPANY shall incur no liability by reason of the dishonor of any such debit entries.
3. Any requirement for giving notice of premium due on the insurance policies shall be waived as long as this plan is in effect.
4. This authorization shall not become effective unless and until the insurance policies are approved and shall relate only to insurance premiums, policy loan repayment, mutual fund subscription payments or deposits to savings accounts falling due on or after the issue date of said insurance policies.
5. This plan shall continue in effect unless and until terminated by COMPANY or me by thirty (30) days written notice to the other party. COMPANY may terminate the plan immediately if any debit entries are not paid upon presentation.
6. Amounts drawn shall be distributed by Agent Bank to COMPANY, or the funds or savings and loan associations named hereon within fifteen (15) days after presentation of debit entries to bank depositor named hereon.
7. This service shall apply to policies and fund accounts listed hereon.

**This authorization is applicable (please check premium payment desired) to the following:**

| POLICY NUMBERS | NAME OF INSURED | MONTHLY | QUARTERLY | SEMI-ANNUAL | ANNUAL |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

expressly recognizing that the premiums on the above policy(ies) are due in accordance with the provision therein and that the COMPANY hereby in no way waives or modifies the premium due date or any other terms of the policy(ies).

request that debit entries be drawn under this authority on the _____ day of each month a premium is due. If no date is indicated, debit entries will be drawn on the due date, or earliest due date of the policy(ies).

_____
NAME OF BANK

_____
ADDRESS                                          CITY              STATE              ZIP CODE

_____
ACCOUNT NO.                 DATE              SIGNATURE OF DEPOSITOR AS IT APPEARS ON BANK RECORDS

## Finding a Low Cost Policy

After you have decided what kind of life insurance fits your needs, look for a good buy. Your chances of finding a good buy are better if you use two types of index numbers that have been developed to aid in shopping for life insurance. One is called the "Surrender Cost Index" and the other is the "Net Payment Cost Index". It will be worth your time to try to understand how these indexes are used, but in any event, use them only for comparing the relative costs of similar policies. *LOOK FOR POLICIES WITH LOW COST INDEX NUMBERS.*

## What is Cost?

"Cost" is the difference between what you pay and what you get back. If you pay a premium for life insurance and get nothing back, your cost for the death protection is the premium. If you pay a premium and get something back later on, such as a cash value, your cost is smaller than the premium.

The cost of some policies can also be reduced by dividends; these are called "participating" policies. Companies may tell you what their current dividends are, but the size of future dividends is unknown today and cannot be guaranteed. Dividends actually paid are set each year by the company.

Some policies do not pay dividends. These are called "guaranteed cost" or "non-participating" policies. Every feature of a guaranteed cost policy is fixed so that you know in advance what your future cost will be.

The premiums and cash values of a participating policy are guaranteed, but the dividends are not. Premiums for participating policies are typically higher than for guaranteed cost policies, but the cost to you may be higher or lower, depending on the dividends actually paid.

## WHAT ARE COST INDEXES?

In order to compare the cost of policies, you need to look at:

1. Premiums
2. Cash values
3. Dividends

Cost indexes use one or more of these factors to give you a convenient way to compare relative costs of similar policies. When you compare costs, an adjustment must be made to take into account that money is paid and received at different times. It is not enough to just add up the premiums you will pay and to subtract the cash values and dividends you expect to get back. These indexes take care of the arithmetic for you. Instead of having to add, subtract, multiply and divide many numbers yourself, you just compare the index numbers which you can get from the life insurance agents and companies:

1. *Life Insurance Surrender Cost Index* - This index is useful if you consider the level of the cash values to be of primary importance to you. It helps you compare costs if at some future point in time, such as 10 or 20 years, you were to surrender the policy and take its cash value.

2. *Life Insurance Net Payment Cost Index* - This index is useful if your main concern is the benefits that are to be paid at your death and if the level of cash values is of secondary importance to you. It helps you compare costs at some future point in time, such as 10 or 20 years, if you continue paying premiums on your policy and do not take its cash value.

\*\*\*

There is another number called the Equivalent Level Annual Dividend. It shows the part dividends play in determining the cost index of a participating policy. Adding a policy's Equivalent Level Annual Dividend to its cost index allows you to compare total costs of similar policies before deducting dividends. However, if you make any cost comparisons of a participating policy with a non-participating policy, remember that the total cost of the participating policy will be reduced by dividends, but the cost of the non-participating policy will not change.

## HOW DO I USE COST INDEXES?

The most important thing to remember when using cost indexes is that a policy with a smaller index number is generally a better buy than a comparable policy with a larger index number. The following rules are also important:

1. Cost comparisons should only be made between similar plans of life insurance. Similar plans are those which provide essentially the same basic benefits and require premium payments for approximately the same period of time. The closer policies are to being identical, the more reliable the cost comparison will be.

2. Compare index numbers only for the kind of policy for your age and for the amount you intend to buy. Since no one company offers the lowest cost for *all* types of insurance at *all* ages and for *all* amounts of insurance, it is important that you get the indexes for the actual policy, age and amount which you intend to buy. Just because a "shoppers guide" tells you that one company's policy is a good buy for a particular age and amount, you should not assume that all of the company's policies are equally good buys.

3. Small differences in index numbers could be offset by other policy features, or differences in the quality of service you may expect from the company or its agent. Therefore, when you find small differences in cost indexes, your choice should be based on something other than cost.

4. In any event, you will need other information on which to base your purchase decision. Be sure you can afford the premiums, and that you understand its cash values, dividends and death benefits. You should also make a judgement on how well the life insurance company or agent will provide service in the future to you as a policyholder.

5. These life insurance cost indexes apply to new policies and should not be used to determine whether you should drop a policy you have already owned for awhile in favor of a new one. If such a replacement is suggested, you should ask for information from the company which issued the old policy before you take action.

## Important Things to Remember—A Summary

The first decision you must make when buying a life insurance policy is choosing a policy whose benefits and premiums most closely meet your needs and ability to pay. Next, find a policy which is also a relatively good buy. If you compare Surrender Cost Indexes and Net Payment Cost Indexes of similar competing policies, your chances of finding a relatively good buy will be better than if you do not shop. *REMEMBER, LOOK FOR POLICIES WITH LOWER COST INDEX NUMBERS.* A good life insurance agent can help you choose the amount of life insurance and kind of policy you want and will give you cost indexes so that you can make cost comparisons of similar policies.

Don't buy life insurance unless you intend to stick with it. A policy which is a good buy when held for 20 years can be very costly if you quit during the early years of the policy. If you surrender such a policy during the first few years, you may get little or nothing back and much of your premium may have been used for company expenses.

Read your new policy carefully, and ask the agent or company for an explanation of anything you do not understand. Whatever you decide now, it is important to review your life insurance program every few years to keep up with any changes in your income and responsibilities.

STATEMENT OF POLICY COST AND BENEFIT INFORMATION

LTG SERIES 10 YR
RTG10

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA
P.O. BOX 401
MILWAUKEE,WI 53201-0401

POLICY NO    2604663                                                    DEBBIE

INSURED    JAMES E STILWELL                           AGE   44          NO CITY

| POLICY YEAR | ANNUAL PREMIUM (CURRENT RATES) | GUARANTEED CASH SURRENDER VALUE | GUARANTEED DEATH PAYMENT BEGIN. OF YR. |
|---|---|---|---|
| 1 | 20350.00 | | 4000000 |
| 2 | 20350.00 | | 4000000 |
| 3 | 20350.00 | | 4000000 |
| 4 | 20350.00 | | 4000000 |
| 5 | 20350.00 | | 4000000 |
| 6 | 20350.00 | | 4000000 |
| 7 | 20350.00 | | 4000000 |
| 8 | 20350.00 | | 4000000 |
| 9 | 20350.00 | | 4000000 |
| 10 | 20350.00 | | 4000000 |
| 11 | 127510.00 | | 4000000 |
| 12 | 142990.00 | | 4000000 |
| 13 | 161950.00 | | 4000000 |
| 14 | 183430.00 | | 4000000 |
| 15 | 207440.00 | | 4000000 |
| 16 | 235030.00 | | 4000000 |
| 17 | 266470.00 | | 4000000 |
| 18 | 302470.00 | | 4000000 |
| 19 | 344550.00 | | 4000000 |
| 20 | 385870.00 | | 4000000 |
| AT AGE 62 | 342550.00 | | 4000000 |
| AT AGE 65 | 479710.00 | | 4000000 |

LIFE INSUR. NET PAYMENT COST INDEX
10TH YR.**    20TH YR.**
5.09          24.48

LIFE INSUR. SURRENDER COST INDEX
10TH YR.**    20TH YR.**
5.09          24.48

THE COLUMNS OF THIS REPRESENTATION DO NOT REFLECT THE FACT THAT, BECAUSE OF INTEREST, A DOLLAR IN
THE FUTURE HAS LESS VALUE THAN A DOLLAR TODAY.

**AN EXPLANATION OF THE INTENDED USE OF THE LIFE INSURANCE COST INDEXES IS PROVIDED IN THE LIFE
INSURANCE BUYERS GUIDE.

IMPORTANT NOTE - DURING THE THIRTY DAY PERIOD FROM THE DATE OF DELIVERY OF THIS POLICY, IT MAY BE
SURRENDERED TO THE COMPANY FOR CANCELLATION AND A FULL REFUND OF ANY MONEY PAID.

IL

11/12/2003

STATEMENT OF POLICY COST AND BENEFIT INFORMATION

LTG SERIES 10 YR
RTG10

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA
P.O. BOX 401
MILWAUKEE, WI 53201-0401

POLICY NO   2604663

INSURED   JAMES E STILWELL

AGE   44

DEBBIE
NO CITY

| POLICY YEAR | ANNUAL PREMIUM (MAXIMUM RATES) | GUARANTEED CASH SURRENDER VALUE | GUARANTEED DEATH PAYMENT BEGIN. OF YR. |
|---|---|---|---|
| 1 | 20350.00 | | 4000000 |
| 2 | 20350.00 | | 4000000 |
| 3 | 20350.00 | | 4000000 |
| 4 | 20350.00 | | 4000000 |
| 5 | 20350.00 | | 4000000 |
| 6 | 20350.00 | | 4000000 |
| 7 | 20350.00 | | 4000000 |
| 8 | 20350.00 | | 4000000 |
| 9 | 20350.00 | | 4000000 |
| 10 | 20350.00 | | 4000000 |
| 11 | 165910.00 | | 4000000 |
| 12 | 185950.00 | | 4000000 |
| 13 | 210550.00 | | 4000000 |
| 14 | 238810.00 | | 4000000 |
| 15 | 269710.00 | | 4000000 |
| 16 | 305470.00 | | 4000000 |
| 17 | 346390.00 | | 4000000 |
| 18 | 393190.00 | | 4000000 |
| 19 | 445270.00 | | 4000000 |
| 20 | 501790.00 | | 4000000 |
| AT AGE 62 | 445270.00 | | 4000000 |
| AT AGE 65 | 623710.00 | | 4000000 |

| LIFE INSUR. NET PAYMENT COST INDEX | | LIFE INSUR. SURRENDER COST INDEX | |
|---|---|---|---|
| 10TH YR.** | 20TH YR.** | 10TH YR.** | 20TH YR.** |
| 5.09 | 30.88 | 5.09 | 30.88 |

**AN EXPLANATION OF THE INTENDED USE OF THE LIFE INSURANCE COST INDEXES IS PROVIDED IN THE LIFE INSURANCE BUYERS GUIDE.

THE COLUMNS OF THIS REPRESENTATION DO NOT REFLECT THE FACT THAT, BECAUSE OF INTEREST, A DOLLAR IN THE FUTURE HAS LESS VALUE THAN A DOLLAR TODAY.

IMPORTANT NOTE - DURING THE THIRTY DAY PERIOD FROM THE DATE OF DELIVERY OF THIS POLICY, IT MAY BE SURRENDERED TO THE COMPANY FOR CANCELLATION AND A FULL REFUND OF ANY MONEY PAID.

IL

11/12/2003

AGENCY: 834
AGENT : X DEBBIE
MAILTO: NONE
POLICY: 2604663

NO AGENT ADDRESS FOUND

DEBBIE

||..||..||..||..||..||..||..||

# THE OLD LINE LIFE Insurance Company of America

1200 North Mayfair Road, Suite 300 • PO Box 401 • Milwaukee WI  53201-0401 • 800-487-5433

THE OLD LINE LIFE INSURANCE COMPANY OF AMERICA, A STOCK COMPANY (REFERRED TO IN THIS POLICY AS WE/US/OUR) WILL PAY THE BENEFITS OF THIS POLICY SUBJECT TO ITS PROVISIONS. THIS PAGE AND THE PAGES THAT FOLLOW ARE PART OF THIS POLICY.

SIGNED AT OUR HOME OFFICE AT 1200 NORTH MAYFAIR ROAD, SUITE 300, P.O. BOX 401, MILWAUKEE, WISCONSIN  53201 0401.

_General Counsel_                               _President_

RIGHT TO RETURN POLICY

THE OWNER MAY RETURN THIS POLICY TO US AT THE ABOVE ADDRESS OR TO THE AGENT FROM WHOM IT WAS PURCHASED WITHIN 30 DAYS AFTER RECEIPT.  THIS POLICY WILL THEN BE CANCELLED AS OF ITS DATE OF ISSUE AND ANY PREMIUM PAID WILL BE REFUNDED.

NW                                                                     **B-7133**
                                                           B1101000-1033-0501

**NOTICE PAGE**

## ILLINOIS
## LIFE AND HEALTH INSURANCE GUARANTY
## ASSOCIATION LAW

Note: The terms "policy" and "Policyholder" as used in this Notice shall be read to mean "certificate" and "Certificateholder", respectively, as applicable to persons insured under a group insurance plan.

Residents of Illinois who purchase health insurance, life insurance, and annuities should know that the insurance companies licensed in Illinois to write these types of insurance are members of the Illinois Life and Health Insurance Guaranty Association. The purpose of this Guaranty Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its policy obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the covered claims of policyholders that live in Illinois (and their payees, beneficiaries, and assignees) and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however, as noted on the other side of this page.

### DISCLAIMER

The Illinois Life and Health Insurance Guaranty Association provides coverage of claims under some types of policies if the insurer becomes impaired or insolvent. COVERAGE MAY NOT BE AVAILABLE FOR YOUR POLICY. Even if coverage is provided, there are substantial limitations and exclusions. Coverage is generally conditioned on continued residence in Illinois. Other conditions may also preclude coverage.

You should not rely on availability of coverage under the Life and Health Insurance Guaranty Association Law when selecting an insurer. Your insurer and agent are prohibited by law from using the existence of the Association or its coverage to sell you an insurance policy.

The Illinois Life and Health Insurance Guaranty Association or the Illinois Department of Insurance will respond to any questions you may have which are not answered by this document. Policyholders with additional questions may contact:

Illinois Life and Health Insurance Guaranty Association
8420 West Bryn Mawr Avenue
Chicago, Illinois 60631
(312) 714-8050

Illinois Department of Insurance
320 West Washington Street
4th Floor
Springfield, Illinois 62767
(217) 782-4515

### SUMMARY OF GENERAL PURPOSES AND
### CURRENT LIMITATIONS OF COVERAGE

The Illinois law that provides for this safety-net coverage is called the Illinois Life and Health Insurance Guaranty Association Law ("Law") [215 ILCS 5/531.01, et seq.]. The other side of this page contains a brief summary of the Law's coverages, exclusions and limits. This summary does not cover all provisions, nor does it in any way change anyone's rights or obligations under the Law or the rights or obligations of the Guaranty Association. If you have obtained this document from an agent in connection with the purchase of a policy, you should be aware that its delivery to you does not guarantee that your policy is covered by the Guaranty Association.

(continued on next page)

# COVERAGE

The Illinois Life and Health Insurance Guaranty Association provides coverage to policyholders that reside in Illinois for insurance issued by members of the Guaranty Association, including:

1. life insurance, health insurance, and annuity contracts;
2. life, health or annuity certificates under direct group policies or contracts;
3. unallocated annuity contracts; and
4. contracts to furnish health care services and subscription certificates for medical or health care services issued by certain licensed entities. The beneficiaries, payees, or assignees of such persons are also protected, even if they live in another state.

## EXCLUSIONS FROM COVERAGE

1. The Guaranty Association does not provide coverage for:
   a. any policy or portion of a policy for which the individual has assumed the risk;
   b. any policy of reinsurance (unless an assumption certificate was issued);
   c. interest rate guarantees which exceed certain statutory limitations;
   d. certain unallocated annuity contracts issued to an employee benefit plan protected under the Pension Benefit Guaranty Corporation and any portion of a contract which is not issued to or in connection with a specific employee, union or association of natural persons benefit plan or a government lottery;
   e. any portion of a variable life insurance or variable annuity contract not guaranteed by an insurer; or
   f. any stop loss insurance.

2. In addition, persons are not protected by the Guaranty Association if;
   a. the Illinois Director of Insurance determines that, in the case of an insurer which is not domiciled in Illinois, the insurer's home state provides substantially similar protection to Illinois residents which will be provided in a timely manner; or
   b. their policy was issued by an organization which is not a member insurer of the Association.

## LIMITS ON AMOUNT OF COVERAGE

1. The Law also limits the amount the Illinois Life and Health Insurance Guaranty Association is obligated to pay. The Guaranty Associations's liability is limited to the lesser of either:
   a. the contractual obligations for which insurer is liable or for which the insurer would have been liable if it were not an impaired or insolvent insurer, or
   b. with respect to any one life, regardless of the number of policies, contracts, or certificates:
      i. in the case of life insurance, $300,000 in death benefits but not more than $100,000 in net cash surrender or withdrawal values;
      ii. in the case of health insurance, $300,000 in health insurance benefits, including net cash surrender or withdrawal values; and
      iii. with respect to annuities, $100,000 in the present value of annuity benefits, including net cash surrender or withdrawal values, and $100,000 in the present value of annuity benefits for individuals participating in certain government retirement plans covered by an unallocated annuity contract. The limit for coverage of unallocated annuity contracts other than those issued to certain governmental retirement plans is $5,000,000 in benefits per contract holder, regardless of the number of contracts.

2. However, in no event is the Guaranty Association liable for more than $300,000 with respect to any one individual.

## NOTICE PAGE (Continued)

If any complaints arise regarding the insurance provided by this policy, you may contact us as follows:

American General Insurance Service Center
Correspondence Unit
P.O. Box 35844
Dallas, Texas 75235-0844

Toll Free Telephone Number: 1-800-487-5433
Within Dallas Area Code 214: 654-6300

If you are unable to obtain the information you need from us, you may write to the Department of Insurance at the following address:

Illinois Department of Insurance
Consumer Division
Springfield, Illinois 62767

## TABLE OF CONTENTS

| PAGE | TITLE OF PROVISION |
|------|--------------------|
| 7 | ASSIGNMENT |
| 7 | BENEFICIARY |
| 7 | CHANGE OF OWNER OR BENEFICIARY |
| 7 | CLAIMS OF CREDITORS |
| 7 | CONTRACT |
| 7 | CORRESPONDENCE |
| 5 | DEFINITIONS |
| 6 | EXCHANGE OPTIONS |
| 5 | GRACE PERIOD |
| 3 | INCONTESTABILITY |
| 7 | MISSTATEMENT OF AGE OR SEX |
| 5 | NONPARTICIPATING |
| 7 | OWNER |
| 3 | PAYMENT OF PROCEEDS |
| 7 | POLICY SETTLEMENT |
| 2 | POLICY SPECIFICATIONS |
| 5 | PREMIUM PAYMENT |
| 5 | REINSTATEMENT |
| 5 | RENEWAL OPTION |
| 5 | RIGHT TO CHANGE PREMIUM |
| COVER | RIGHT TO RETURN POLICY |
| 2 | SCHEDULE OF BENEFITS AND PREMIUMS |
| 3 | SUICIDE |
| LAST | TABLE OF PREMIUMS |

SEE SUPPLEMENTAL BENEFIT PAGES FOR RIDERS, IF ANY

RENEWABLE LEVEL TERM LIFE POLICY -- INDETERMINATE PREMIUM
INSURANCE PAYABLE IN EVENT OF DEATH PRIOR TO EXPIRY DATE
PREMIUMS PAYABLE DURING TERM                    NO DIVIDENDS

80-RCT 97D                    2604663                    PAGE   1

POLICY SPECIFICATIONS

| | | | |
|---|---|---|---|
| INSURED | JAMES E STILWELL | 2604663 | POLICY NUMBER |
| FACE AMOUNT | $4,000,000 | 10/27/1998 | DATE OF ISSUE |
| PREMIUM CLASS | NON-TOBACCO RATED CLASS H | 44 | AGE AT ISSUE |

SCHEDULE OF BENEFITS AND PREMIUMS

| BENEFITS | BENEFIT AMOUNTS | ANNUAL PREMIUMS | YEARS PAYABLE |
|---|---|---|---|
| LIFE INSURANCE | $4,000,000 | $6,830.00 | 10 YEARS* |
| INITIAL EXPIRY DATE  10/27/2008 | | | |

SUBSEQUENT EXPIRY DATES WILL OCCUR AT THE END OF EACH ONE YEAR RENEWABLE TERM PERIOD.  THE FINAL EXPIRY DATE IS 10/27/2049.

| | | | |
|---|---|---|---|
| PERMANENT EXTRA | | 13,520.00 | 10 YEARS |

TOTAL FIRST YEAR ANNUAL PREMIUM          $20,350.00

PREMIUMS OTHER THAN ANNUAL ARE A PERCENTAGE OF THE ANNUAL PREMIUM. PREMIUMS ARE PAYABLE AT 01 MONTH INTERVALS FROM 10/27/1998.   THE FIRST INTERVAL PREMIUM IS $1,780.63.

* RENEWAL PREMIUMS ARE SHOWN ON THE LAST PAGE.  ON THE  TENTH POLICY ANNIVERSARY AND ANY LATER POLICY ANNIVERSARY WE HAVE A LIMITED RIGHT TO CHANGE THE PREMIUM.  SEE THE RIGHT TO CHANGE PREMIUM PROVISION.

THIS POLICY MAY BE EXCHANGED FOR A NEW POLICY.  SEE THE EXCHANGE OPTIONS PROVISION.   OPTION 1 IS AVAILABLE UNTIL THE EIGHTH POLICY ANNIVERSARY, PROVIDED THE INSURED IS AGE 65 OR LESS ON THE DATE OF EXCHANGE.   THE DATE OF EXCHANGE UNDER OPTION 2 IS THE TENTH POLICY ANNIVERSARY, PROVIDED THE INSURED IS AGE 70 OR LESS.

80-PCT 79-2

## PAYMENT OF PROCEEDS

THE FACE AMOUNT WILL BE PAID TO THE BENEFICIARY IMMEDIATELY UPON RECEIPT
OF DUE PROOF OF THE DEATH OF THE INSURED IF DEATH OCCURS PRIOR TO THE
EXPIRY DATE.   IF DEATH OCCURS IN THE GRACE PERIOD OF AN UNPAID PREMIUM
AN AMOUNT EQUAL TO THE PREMIUM FOR ONE MONTH WILL BE DEDUCTED FROM THE
PROCEEDS.

## SUICIDE EXCLUSION

IN THE EVENT OF THE SUICIDE OF THE INSURED, WHILE SANE OR INSANE,
WITHIN 2 YEARS FROM THE DATE OF ISSUE, OUR LIABILITY WILL BE LIMITED
TO THE PREMIUMS PAID.

## INCONTESTABILITY

WE WILL NOT CONTEST THIS POLICY AFTER IT HAS BEEN IN FORCE DURING THE
LIFETIME OF THE INSURED FOR TWO YEARS FROM THE DATE OF ISSUE.  WE WILL
NOT CONTEST ANY REINSTATEMENT AFTER THE REINSTATEMENT HAS BEEN IN FORCE
DURING THE LIFETIME OF THE INSURED FOR TWO YEARS.  IF WE DO CONTEST A
REINSTATEMENT, WE WILL CONTEST ONLY STATEMENTS MADE IN THE REINSTATEMENT
APPLICATION.

(THIS PAGE IS INTENTIONALLY LEFT BLANK.)

## DEFINITIONS

**Age or attained age** means the insured's age nearest birthday at the beginning of a policy year.

**Policy months, years and anniversaries.** The first policy year begins on the date of issue. Policy months, years and anniversaries will be measured from that date.

## PREMIUM PAYMENT

The first premium is due on or before delivery of this policy. Later premiums are due and payable at the intervals and for the period shown on page 2, while the insured is alive. With our consent, premiums may be paid at other intervals.

Premiums after the first are payable at our home office or to an authorized agent in exchange for a receipt signed by one of our officers.

Any premium, after the first, not paid on or before its due date will be in default. Such due date will be the date of default.

## GRACE PERIOD

A 31 day grace period, without interest charge, is allowed for the payment of each premium after the first. This policy will stay in force during this period. If the premium is not paid by the end of this period, insurance will cease.

## REINSTATEMENT

This policy may be reinstated within five years of the date of default subject to receipt of evidence of insurability satisfactory to us.

Reinstatement will also be subject to (1) payment of the premium for the grace period with interest at the rate of 6% per year compounded annually plus the premium due for the current policy month, if this policy has a renewable term period of one year, or (2) payment of all overdue premiums with interest at the rate of 6% per year compounded annually, if this policy has a renewable term period other than one year.

## NONPARTICIPATING

This policy does not pay dividends.

## RENEWAL OPTION

This policy may be renewed without evidence of insurability on each expiry date for a further term period. Renewal premiums are shown on the last page.

The first premium for a new term will be due at the end of the previous term. This policy will renew if this premium is paid within the grace period. Premiums for the new term will be due and payable at the intervals show on page 2.

No term period will extend beyond the final expiry date shown on page 2.

## RIGHT TO CHANGE PREMIUM

We reserve the right to change the premium for this policy on the policy anniversary specified on page 2 and on any later policy anniversary, subject to the following terms:

1. The premium will not exceed the applicable maximum premium shown on the last page.

2. Any change in premium will be made on a uniform basis for all insureds with the same benefits and provisions who have the same age at issue, date of issue, sex and premium class. No change in premium will occur due to any change in the insured's health or occupation.

3. Any change in premium will take effect only after 30 days' prior notice to the owner of this policy.

4. Any change in premium will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the premium.

This provision does not apply to any rider attached to this policy.

**Option 1**

This policy may be exchanged for a new level premium life or endowme nt policy with a level face amount. If no premium is in default and the insured does not qualify for di sability benefits under this policy, written application may be made at any time this option is available, as specified o n page 2.

The new policy will be issued as of the date of exchange based on the in sured's age on that date and the premium rate then in use.

The new policy must comply with our then current rules for amount, age a nd premium class. The face amount may not exceed the amount of insurance under this policy on the date of exch ange. The premium class will be the same as this policy.

The suicide and contestable periods of the new policy will be reduced by the elapsed portion of these periods under this policy.

The new policy will be issued with a disability rider and/or accidental death rider if these riders are in force under this policy at the date of exchange and are available at the insured's age on such date. Any rider not in force may be included in the new policy only with our consent.

**Option 2**

This option is available only on the date of exchange specified on p age 2. We agree to exchange this policy for a new renewable level term policy on the life of the insured. Ev idence of insurability satisfactory to us will be required of the insured. Such evidence will be paid for by us and will b e based on our then current underwriting rules.

This exchange will be subject to the following terms:

1. A properly completed application must be submitted to us withi n 60 days prior to the date of exchange, along with payment of the first premium for the new policy.

2. This policy must be in full force and all premiums due prior t o the date of exchange must be paid. Insurance under this policy will cease when this policy is exchanged.

3. The age at issue for the new policy will be the age of the ins ured on the date of exchange.

4. The new policy will be on the same plan of insurance as this p olicy. Alternatively, the owner may elect any other plan with a shorter renewable term period then being issued on this policy form. The date of issue of the new policy will be the date of exchange. The face amount of the new pol icy may not exceed the face amount of this policy and must meet or exceed the minimum then in effect for the plan elected.

5. Any benefits or riders in force under this policy on the date of exchange will be included in the new policy and will be subject to our then current rules and rates.

6. The new policy will not have a suicide provision.

7. The contestable period of the new policy will start on the dat e of exchange, with respect to the evidence of insurability used to qualify the insured for the new policy. Ho wever, we may contest only the difference between the face amount of the new policy and the face amount that the premi um for the new policy, excluding the premium for any riders, would have purchased on the date of exchange had thi s policy remained in force.

8. The premium rates for the new policy will be our then current rates applicable to a new purchase of the plan elected.

## OWNER

The owner is as shown in the application unless changed. The owner has all rights under this policy while the insured is alive. These rights are subject to the consent of any living irrevocable beneficiary.

## BENEFICIARY

The beneficiary or beneficiaries are as shown in the application unless changed. If no beneficiary survives the insured, the owner or the estate of the owner will be the beneficiary. However, if a trust is the owner and no beneficiary survives the insured, the estate of the insured will be the beneficiary.

## CHANGE OF OWNER OR BENEFICIARY

While this policy is in force the owner may change the beneficiary or ownership by written notice to us. When we record the change, it will take effect as of the date the owner signed the notice, subject to any payment we make or other action we take before recording.

## CORRESPONDENCE

Any request, notice or proof shall be filed with our home office.

## ASSIGNMENT

No assignment of this policy will be binding on us until filed with us in writing and recorded by us. No assignment will affect any payment we made before we recorded the assignment. We will not be responsible for the validity of an assignment.

All rights of the owner and any revocable beneficiary are subject to the rights of any assignee on record with us.

## POLICY SETTLEMENT

In any settlement we may require the return of this policy.

## THE CONTRACT

This policy, including any riders and endorsements, the original application and any supplemental applications and declarations, is the entire contract.

All statements in an application are representations and not warranties. No statement will be used to void this policy or to contest a claim unless it appears in an application or declaration which is attached to and made part of this policy.

This policy may not be changed, nor may any of our rights or requirements be waived, except in writing by one of our authorized officers.

## MISSTATEMENT OF AGE OR SEX

If the insured's age or sex has been misstated, any death benefit payable by us will be what the premiums paid would have bought at the insured's correct age and sex.

## CLAIMS OF CREDITORS

All payments under this policy are exempt from the claims of creditors to the extent permitted by law. Payments may not be assigned or withdrawn without our consent before becoming payable.

80-RCT 79-7.3

**ENDORSEMENT**

The Payment Options of the policy to which this endorsement is attached will be as follows:

## PAYMENT OPTIONS

The term "annuitant/insured" as used in the following paragraph means the person named in the Policy Specifications as annuitant or insured, as the case may be.

Proceeds of less than $5,000 will be paid in one lump sum. Proceeds of $5,000 or more may be paid under an option. When proceeds are placed under an option the payee will receive a settlement contract. The date of the contract will be the date the proceeds become payable. The owner may choose the option only while the annuitant/insured is living. After the death of the annuitant/insured, the beneficiary may choose the option if proceeds are payable in one sum. Payment options for death proceeds must be chosen within six months after the annuitant's/insured's death. Payment options for other proceeds must be chosen within two months of the date they are payable. All elections must be filed with us in writing. Payments may be requested at 1, 3, 6 or 12 month intervals. Each payment must be at least $50. Each payee must be a living person receiving payments in his own right.

The interest rate for options 1, 2 and 3 will be declared by us each year. This rate will never be less than 3% per year. For options 1 and 3 any interest in excess of 3% will be used to increase payment amounts; for option 2 any excess interest will be used to lengthen the payment period.

For options 4, 5, 6 and 7 the payments will be based on rates declared by us from time to time. These rates will be 3 1/2% less than the published rates in effect for immediate annuities on the date of the settlement contract. Payments under these rates will never be less than the amount according to the tables of minimum monthly income in this endorsement. The rates in the tables are derived from a projection of the 1983 Table "a", and an annual interest rate of 3.00%.

**Option 1. Interest.** We will hold the proceeds on deposit. Interest will be paid while the payee is living. Sums of $500 or more may be withdrawn up to four times a year.

**Option 2. Specified Income.** We will pay a stated income amount until the proceeds, with interest on the unpaid balance, are used up. The income each year may not be less than 10% of the proceeds.

**Option 3. Income for Specified Period.** We will pay an income for a stated period, up to 30 years.

**Option 4. Life Income with Guaranteed Period.** We will pay an income for a guaranteed period and for the rest of the payee's life. The guaranteed period may be 10, 15 or 20 years.

**Option 5. Life Income without Guaranteed Period.** We will pay an income for the payee's lifetime. Payments will end at the death of the payee. However, if the payee dies within one year of the date of the settlement contract, payments will be continued to a contingent payee until 10 years from the date of the settlement contract.

**Option 6. Life Income with Installment Refund.** We will pay an income for a guaranteed period and for the rest of the payee's life. The guaranteed period is the period required for the sum of income payments to equal the proceeds applied.

**Option 7. Joint Life Income with 2/3 to Survivor.** We will pay an income while both payees are living. When one payee dies we will pay 2/3 of the income for the rest of the survivor's life. However, if one payee dies within one year from the date of the settlement contract, income will be paid to the survivor thereafter as if the survivor had chosen option 5 on the date of the settlement contract.

**Additional Option to Buy Single Premium Immediate Life Annuity at Reduced Rate.** If proceeds of at least $5,000 are applied under option 4, 5, 6 or 7, additional money may be used to buy a single premium immediate life annuity. The cost of this annuity will be 3 1/2% less than the then published rate. The monthly income from this annuity together with the monthly income from option 4, 5, 6 or 7 may not exceed 3 times the monthly income which could be bought solely by applying the policy proceeds. Written request must be made within 31 days from the date proceeds are payable.

**(Continued on page 2)**

PO3-NQ 79-1D

**Payment Provisions.** The first payment under options 2, 3, 4, 5, 6 or 7 will be due as of the date of the settlement contract. The first payment under option 1 will be due at the end of the first interest period. If any payments remain under an option at the death of the payee, or at the death of the surviving payee in regard to option 7, the amount stated below will be paid in one sum to the payee's executors or administrators, unless otherwise directed in the election of the option:

**Option 1.** Any amount left on deposit with accrued interest.

**Option 2.** The unpaid balance of proceeds with accrued interest.

**Option 3.** The commuted value, based on interest at 3% per year, of any future income payments for the stated guaranteed period.

**Options 4, 5, 6 or 7.** The commuted value of any future income payments for the stated guaranteed period, based on interest as follows:

1. if payments are made according to the tables of minimum monthly income in this endorsement, 3% per year; or

2. if payments are based on the published rates in effect for immediate annuities, the interest rate shown in the settlement contract.

**Evidence of Age and Survival.** We may require due proof of age and continued survival of a payee under options 4, 5, 6 or 7.

**Special Agreements.** Policy proceeds may be paid in any other manner agreed to by us.

THE OLD LINE LIFE Insurance Company
of America

*Chairman of the Board*

## TABLE OF MINIMUM MONTHLY INCOME FOR FEMALE PAYEES
## UNDER PAYMENT OPTIONS FOR EACH $1,000 OF PROCEEDS

### OPTION 3 — INCOME FOR SPECIFIED PERIOD

| Year | Income |
|---|---|
| 1 | $ 84.47 |
| 2 | 42.86 |
| 3 | 28.99 |
| 4 | 22.06 |
| 5 | 17.91 |
| 6 | 15.14 |
| 7 | 13.16 |
| 8 | 11.68 |
| 9 | 10.53 |
| 10 | 9.61 |
| 11 | 8.86 |
| 12 | 8.24 |
| 13 | 7.71 |
| 14 | 7.26 |
| 15 | 6.87 |
| 16 | 6.53 |
| 17 | 6.23 |
| 18 | 5.96 |
| 19 | 5.73 |
| 20 | 5.51 |
| 21 | 5.32 |
| 22 | 5.15 |
| 23 | 4.99 |
| 24 | 4.84 |
| 25 | 4.71 |
| 26 | 4.59 |
| 27 | 4.48 |
| 28 | 4.37 |
| 29 | 4.27 |
| 30 | 4.18 |

| AGE AT FIRST PAYMENT | OPTION 4 — LIFE INCOME WITH GUARANTEED PERIOD — 10 Years | OPTION 4 — 15 Years | OPTION 4 — 20 Years | OPTION 5 — LIFE INCOME WITHOUT GUARANTEED PERIOD | OPTION 6 — LIFE INCOME WITH INSTALLMENT REFUND |
|---|---|---|---|---|---|
| 5 and under | $ 2.72 | $ 2.72 | $ 2.72 | $ 2.72 | $ 2.79 |
| 6 | 2.73 | 2.73 | 2.73 | 2.73 | 2.79 |
| 7 | 2.74 | 2.74 | 2.74 | 2.74 | 2.79 |
| 8 | 2.75 | 2.75 | 2.75 | 2.75 | 2.79 |
| 9 | 2.76 | 2.76 | 2.76 | 2.76 | 2.79 |
| 10 | 2.77 | 2.77 | 2.77 | 2.77 | 2.79 |
| 11 | 2.78 | 2.78 | 2.78 | 2.78 | 2.79 |
| 12 | 2.79 | 2.79 | 2.79 | 2.79 | 2.79 |
| 13 | 2.80 | 2.80 | 2.80 | 2.80 | 2.80 |
| 14 | 2.81 | 2.81 | 2.81 | 2.81 | 2.81 |
| 15 | 2.82 | 2.82 | 2.81 | 2.82 | 2.82 |
| 16 | 2.83 | 2.83 | 2.83 | 2.83 | 2.83 |
| 17 | 2.85 | 2.85 | 2.84 | 2.85 | 2.84 |
| 18 | 2.86 | 2.86 | 2.86 | 2.86 | 2.86 |
| 19 | 2.87 | 2.87 | 2.87 | 2.87 | 2.87 |
| 20 | 2.89 | 2.89 | 2.89 | 2.89 | 2.88 |
| 21 | 2.90 | 2.90 | 2.90 | 2.90 | 2.90 |
| 22 | 2.92 | 2.92 | 2.92 | 2.92 | 2.91 |
| 23 | 2.93 | 2.93 | 2.93 | 2.93 | 2.93 |
| 24 | 2.95 | 2.95 | 2.95 | 2.95 | 2.95 |
| 25 | 2.97 | 2.97 | 2.96 | 2.97 | 2.96 |
| 26 | 2.98 | 2.98 | 2.98 | 2.98 | 2.98 |
| 27 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| 28 | 3.02 | 3.02 | 3.02 | 3.02 | 3.02 |
| 29 | 3.04 | 3.04 | 3.04 | 3.04 | 3.04 |
| 30 | 3.06 | 3.06 | 3.06 | 3.06 | 3.06 |
| 31 | 3.09 | 3.08 | 3.08 | 3.09 | 3.08 |
| 32 | 3.11 | 3.11 | 3.11 | 3.11 | 3.10 |
| 33 | 3.13 | 3.13 | 3.13 | 3.13 | 3.13 |
| 34 | 3.16 | 3.16 | 3.15 | 3.16 | 3.15 |
| 35 | 3.18 | 3.18 | 3.18 | 3.18 | 3.18 |
| 36 | 3.21 | 3.21 | 3.21 | 3.21 | 3.20 |
| 37 | 3.24 | 3.24 | 3.24 | 3.24 | 3.23 |
| 38 | 3.27 | 3.27 | 3.27 | 3.27 | 3.26 |
| 39 | 3.30 | 3.30 | 3.30 | 3.30 | 3.29 |
| 40 | 3.34 | 3.33 | 3.33 | 3.34 | 3.32 |
| 41 | 3.37 | 3.37 | 3.36 | 3.37 | 3.35 |
| 42 | 3.41 | 3.40 | 3.40 | 3.41 | 3.39 |
| 43 | 3.44 | 3.44 | 3.43 | 3.45 | 3.42 |
| 44 | 3.49 | 3.48 | 3.47 | 3.49 | 3.46 |
| 45 | 3.53 | 3.52 | 3.51 | 3.53 | 3.50 |
| 46 | 3.57 | 3.57 | 3.55 | 3.58 | 3.54 |
| 47 | 3.62 | 3.61 | 3.60 | 3.62 | 3.58 |
| 48 | 3.67 | 3.66 | 3.64 | 3.67 | 3.63 |
| 49 | 3.72 | 3.71 | 3.69 | 3.73 | 3.68 |
| 50 | 3.78 | 3.76 | 3.74 | 3.78 | 3.73 |
| 51 | 3.83 | 3.82 | 3.79 | 3.84 | 3.78 |
| 52 | 3.90 | 3.88 | 3.85 | 3.90 | 3.83 |
| 53 | 3.96 | 3.94 | 3.90 | 3.97 | 3.89 |
| 54 | 4.03 | 4.00 | 3.96 | 4.04 | 3.95 |
| 55 | 4.10 | 4.07 | 4.02 | 4.12 | 4.02 |
| 56 | 4.17 | 4.14 | 4.09 | 4.19 | 4.08 |
| 57 | 4.25 | 4.22 | 4.15 | 4.28 | 4.15 |
| 58 | 4.34 | 4.29 | 4.22 | 4.36 | 4.23 |
| 59 | 4.42 | 4.37 | 4.29 | 4.46 | 4.30 |
| 60 | 4.52 | 4.46 | 4.36 | 4.56 | 4.39 |
| 61 | 4.62 | 4.55 | 4.44 | 4.66 | 4.47 |
| 62 | 4.72 | 4.64 | 4.51 | 4.78 | 4.56 |
| 63 | 4.84 | 4.74 | 4.59 | 4.90 | 4.66 |
| 64 | 4.95 | 4.84 | 4.66 | 5.03 | 4.76 |
| 65 | 5.08 | 4.95 | 4.74 | 5.17 | 4.87 |
| 66 | 5.21 | 5.06 | 4.81 | 5.31 | 4.98 |
| 67 | 5.35 | 5.17 | 4.89 | 5.47 | 5.10 |
| 68 | 5.50 | 5.28 | 4.96 | 5.65 | 5.23 |
| 69 | 5.66 | 5.40 | 5.03 | 5.83 | 5.36 |
| 70 | 5.82 | 5.52 | 5.09 | 6.03 | 5.51 |
| 71 | 6.00 | 5.64 | 5.15 | 6.25 | 5.66 |
| 72 | 6.18 | 5.75 | 5.21 | 6.49 | 5.82 |
| 73 | 6.37 | 5.87 | 5.26 | 6.74 | 5.99 |
| 74 | 6.56 | 5.98 | 5.30 | 7.02 | 6.17 |
| 75 | 6.76 | 6.09 | 5.34 | 7.33 | 6.37 |
| 76 | 6.97 | 6.19 | 5.38 | 7.65 | 6.57 |
| 77 | 7.17 | 6.29 | 5.41 | 8.01 | 6.78 |
| 78 | 7.39 | 6.38 | 5.43 | 8.40 | 7.02 |
| 79 | 7.59 | 6.46 | 5.46 | 8.82 | 7.26 |
| 80 | 7.79 | 6.53 | 5.47 | 9.28 | 7.52 |
| 81 and over | 7.99 | 6.59 | 5.49 | 9.78 | 7.79 |

MINIMUM INCOME AMOUNTS PAYABLE OTHER THAN MONTHLY WILL BE FURNISHED ON REQUEST.

**TABLE OF MINIMUM MONTHLY INCOME FOR MALE PAYEES**
**UNDER PAYMENT OPTIONS FOR EACH $1,000 OF PROCEEDS**

| OPTION 3 INCOME FOR SPECIFIED PERIOD | | AGE AT FIRST PAYMENT | OPTION 4 LIFE INCOME WITH GUARANTEED PERIOD | | | OPTION 5 LIFE INCOME WITHOUT GUARANTEED PERIOD | OPTION 6 LIFE INCOME WITH INSTALLMENT REFUND |
|---|---|---|---|---|---|---|---|
| Year | Income | | 10 Years | 15 Years | 20 Years | | |
| 1 | $ 84.47 | 5 and under | $ 2.78 | $ 2.78 | $ 2.78 | $ 2.78 | $ 2.79 |
| 2 | 42.86 | 6 | 2.79 | 2.79 | 2.79 | 2.79 | 2.79 |
| 3 | 28.99 | 7 | 2.80 | 2.80 | 2.80 | 2.80 | 2.80 |
| 4 | 22.06 | 8 | 2.81 | 2.81 | 2.81 | 2.81 | 2.81 |
| 5 | 17.91 | 9 | 2.82 | 2.82 | 2.82 | 2.82 | 2.82 |
| 6 | 15.14 | 10 | 2.84 | 2.84 | 2.83 | 2.84 | 2.83 |
| 7 | 13.16 | 11 | 2.85 | 2.85 | 2.85 | 2.85 | 2.84 |
| 8 | 11.68 | 12 | 2.86 | 2.86 | 2.86 | 2.86 | 2.86 |
| 9 | 10.53 | 13 | 2.87 | 2.87 | 2.87 | 2.88 | 2.87 |
| 10 | 9.61 | 14 | 2.89 | 2.89 | 2.89 | 2.89 | 2.88 |
| 11 | 8.86 | 15 | 2.90 | 2.90 | 2.90 | 2.90 | 2.90 |
| 12 | 8.24 | 16 | 2.92 | 2.92 | 2.91 | 2.92 | 2.91 |
| 13 | 7.71 | 17 | 2.93 | 2.93 | 2.93 | 2.93 | 2.93 |
| 14 | 7.26 | 18 | 2.95 | 2.95 | 2.95 | 2.95 | 2.94 |
| 15 | 6.87 | 19 | 2.97 | 2.96 | 2.96 | 2.97 | 2.96 |
| 16 | 6.53 | 20 | 2.98 | 2.98 | 2.98 | 2.98 | 2.97 |
| 17 | 6.23 | 21 | 3.00 | 3.00 | 3.00 | 3.00 | 2.99 |
| 18 | 5.96 | 22 | 3.02 | 3.02 | 3.02 | 3.02 | 3.01 |
| 19 | 5.73 | 23 | 3.04 | 3.04 | 3.03 | 3.04 | 3.03 |
| 20 | 5.51 | 24 | 3.06 | 3.06 | 3.06 | 3.06 | 3.05 |
| 21 | 5.32 | 25 | 3.08 | 3.08 | 3.08 | 3.08 | 3.07 |
| 22 | 5.15 | 26 | 3.10 | 3.10 | 3.10 | 3.10 | 3.09 |
| 23 | 4.99 | 27 | 3.13 | 3.12 | 3.12 | 3.13 | 3.11 |
| 24 | 4.84 | 28 | 3.15 | 3.15 | 3.14 | 3.15 | 3.14 |
| 25 | 4.71 | 29 | 3.18 | 3.17 | 3.17 | 3.18 | 3.16 |
| 26 | 4.59 | 30 | 3.20 | 3.20 | 3.19 | 3.20 | 3.19 |
| 27 | 4.48 | 31 | 3.23 | 3.23 | 3.22 | 3.23 | 3.21 |
| 28 | 4.37 | 32 | 3.26 | 3.26 | 3.25 | 3.26 | 3.24 |
| 29 | 4.27 | 33 | 3.29 | 3.29 | 3.28 | 3.29 | 3.27 |
| 30 | 4.18 | 34 | 3.32 | 3.32 | 3.31 | 3.32 | 3.30 |
| | | 35 | 3.35 | 3.35 | 3.34 | 3.36 | 3.33 |
| | | 36 | 3.39 | 3.38 | 3.37 | 3.39 | 3.36 |
| | | 37 | 3.43 | 3.42 | 3.41 | 3.43 | 3.39 |
| | | 38 | 3.46 | 3.46 | 3.44 | 3.47 | 3.43 |
| | | 39 | 3.50 | 3.50 | 3.48 | 3.51 | 3.47 |
| | | 40 | 3.55 | 3.54 | 3.52 | 3.55 | 3.50 |
| | | 41 | 3.59 | 3.58 | 3.56 | 3.60 | 3.54 |
| | | 42 | 3.64 | 3.62 | 3.60 | 3.64 | 3.58 |
| | | 43 | 3.68 | 3.67 | 3.65 | 3.69 | 3.63 |
| | | 44 | 3.74 | 3.72 | 3.69 | 3.75 | 3.67 |
| | | 45 | 3.79 | 3.77 | 3.74 | 3.80 | 3.72 |
| | | 46 | 3.84 | 3.82 | 3.79 | 3.86 | 3.77 |
| | | 47 | 3.90 | 3.88 | 3.84 | 3.92 | 3.82 |
| | | 48 | 3.97 | 3.94 | 3.89 | 3.99 | 3.88 |
| | | 49 | 4.03 | 4.00 | 3.95 | 4.05 | 3.93 |
| | | 50 | 4.10 | 4.06 | 4.00 | 4.12 | 3.99 |
| | | 51 | 4.17 | 4.13 | 4.06 | 4.20 | 4.06 |
| | | 52 | 4.24 | 4.20 | 4.12 | 4.28 | 4.12 |
| | | 53 | 4.32 | 4.27 | 4.19 | 4.36 | 4.19 |
| | | 54 | 4.41 | 4.35 | 4.25 | 4.45 | 4.26 |
| | | 55 | 4.49 | 4.42 | 4.32 | 4.55 | 4.33 |
| | | 56 | 4.59 | 4.51 | 4.38 | 4.64 | 4.41 |
| | | 57 | 4.68 | 4.59 | 4.45 | 4.75 | 4.50 |
| | | 58 | 4.79 | 4.68 | 4.52 | 4.86 | 4.58 |
| | | 59 | 4.89 | 4.77 | 4.59 | 4.98 | 4.68 |
| | | 60 | 5.01 | 4.87 | 4.66 | 5.11 | 4.77 |
| | | 61 | 5.13 | 4.97 | 4.73 | 5.25 | 4.87 |
| | | 62 | 5.25 | 5.07 | 4.80 | 5.39 | 4.98 |
| | | 63 | 5.39 | 5.17 | 4.86 | 5.55 | 5.09 |
| | | 64 | 5.53 | 5.27 | 4.93 | 5.72 | 5.21 |
| | | 65 | 5.67 | 5.38 | 4.99 | 5.90 | 5.34 |
| | | 66 | 5.83 | 5.49 | 5.05 | 6.09 | 5.47 |
| | | 67 | 5.98 | 5.60 | 5.11 | 6.30 | 5.61 |
| | | 68 | 6.15 | 5.70 | 5.17 | 6.52 | 5.76 |
| | | 69 | 6.32 | 5.81 | 5.21 | 6.76 | 5.91 |
| | | 70 | 6.50 | 5.91 | 5.26 | 7.02 | 6.08 |
| | | 71 | 6.68 | 6.01 | 5.30 | 7.29 | 6.25 |
| | | 72 | 6.86 | 6.11 | 5.34 | 7.59 | 6.43 |
| | | 73 | 7.05 | 6.20 | 5.37 | 7.91 | 6.62 |
| | | 74 | 7.24 | 6.29 | 5.40 | 8.24 | 6.82 |
| | | 75 | 7.42 | 6.37 | 5.42 | 8.61 | 7.04 |
| | | 76 | 7.61 | 6.44 | 5.44 | 9.01 | 7.26 |
| | | 77 | 7.79 | 6.51 | 5.46 | 9.43 | 7.49 |
| | | 78 | 7.97 | 6.57 | 5.48 | 9.89 | 7.74 |
| | | 79 | 8.14 | 6.62 | 5.49 | 10.38 | 7.99 |
| | | 80 | 8.30 | 6.67 | 5.50 | 10.91 | 8.27 |
| | | 81 and over | 8.45 | 6.71 | 5.51 | 11.47 | 8.55 |

**MINIMUM INCOME AMOUNTS PAYABLE OTHER THAN MONTHLY WILL BE FURNISHED ON REQUEST.**

## TABLE OF MINIMUM MONTHLY INCOME UNDER PAYMENT OPTIONS FOR EACH $1,000 OF PROCEEDS

### OPTION 7 - JOINT LIFE INCOME WITH TWO THIRDS TO SURVIVOR

| Female | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
|--------|------|------|------|------|------|------|------|------|------|
| **Male** | | | | | | | | | |
| 40 | $3.35 | $3.45 | $3.55 | $3.67 | $3.80 | $3.94 | $4.10 | $4.28 | $4.47 |
| 41 | 3.37 | 3.47 | 3.58 | 3.70 | 3.83 | 3.97 | 4.14 | 4.32 | 4.51 |
| 42 | 3.39 | 3.49 | 3.60 | 3.72 | 3.86 | 4.01 | 4.18 | 4.37 | 4.56 |
| 43 | 3.41 | 3.51 | 3.62 | 3.75 | 3.89 | 4.05 | 4.22 | 4.41 | 4.61 |
| 44 | 3.42 | 3.53 | 3.65 | 3.78 | 3.92 | 4.08 | 4.26 | 4.46 | 4.67 |
| 45 | 3.44 | 3.55 | 3.67 | 3.81 | 3.96 | 4.12 | 4.31 | 4.51 | 4.72 |
| 46 | 3.46 | 3.57 | 3.70 | 3.84 | 3.99 | 4.16 | 4.35 | 4.56 | 4.78 |
| 47 | 3.48 | 3.59 | 3.72 | 3.87 | 4.03 | 4.20 | 4.40 | 4.61 | 4.84 |
| 48 | 3.50 | 3.62 | 3.75 | 3.90 | 4.07 | 4.25 | 4.45 | 4.67 | 4.90 |
| 49 | 3.52 | 3.64 | 3.78 | 3.93 | 4.10 | 4.29 | 4.50 | 4.73 | 4.97 |
| 50 | 3.54 | 3.66 | 3.80 | 3.96 | 4.14 | 4.34 | 4.55 | 4.79 | 5.04 |
| 51 | 3.56 | 3.69 | 3.83 | 4.00 | 4.18 | 4.38 | 4.61 | 4.85 | 5.11 |
| 52 | 3.58 | 3.71 | 3.86 | 4.03 | 4.22 | 4.43 | 4.66 | 4.92 | 5.19 |
| 53 | 3.60 | 3.73 | 3.89 | 4.07 | 4.26 | 4.48 | 4.72 | 4.99 | 5.27 |
| 54 | 3.62 | 3.76 | 3.92 | 4.10 | 4.31 | 4.53 | 4.78 | 5.06 | 5.35 |
| 55 | 3.65 | 3.78 | 3.95 | 4.14 | 4.35 | 4.59 | 4.85 | 5.13 | 5.43 |
| 56 | 3.67 | 3.81 | 3.98 | 4.17 | 4.39 | 4.64 | 4.91 | 5.21 | 5.52 |
| 57 | 3.69 | 3.84 | 4.01 | 4.21 | 4.44 | 4.69 | 4.98 | 5.29 | 5.62 |
| 58 | 3.72 | 3.86 | 4.04 | 4.24 | 4.48 | 4.75 | 5.05 | 5.37 | 5.72 |
| 59 | 3.74 | 3.89 | 4.07 | 4.28 | 4.53 | 4.81 | 5.12 | 5.46 | 5.82 |
| 60 | 3.76 | 3.92 | 4.10 | 4.32 | 4.58 | 4.87 | 5.19 | 5.55 | 5.93 |
| 61 | 3.79 | 3.95 | 4.13 | 4.36 | 4.62 | 4.93 | 5.27 | 5.64 | 6.04 |
| 62 | 3.82 | 3.97 | 4.17 | 4.40 | 4.67 | 4.99 | 5.34 | 5.74 | 6.16 |
| 63 | 3.84 | 4.00 | 4.20 | 4.44 | 4.72 | 5.05 | 5.42 | 5.84 | 6.28 |
| 64 | 3.87 | 4.03 | 4.24 | 4.48 | 4.77 | 5.11 | 5.51 | 5.94 | 6.41 |
| 65 | 3.90 | 4.06 | 4.27 | 4.52 | 4.82 | 5.18 | 5.59 | 6.05 | 6.54 |
| 66 | 3.92 | 4.10 | 4.31 | 4.57 | 4.88 | 5.25 | 5.68 | 6.16 | 6.68 |
| 67 | 3.95 | 4.13 | 4.34 | 4.61 | 4.93 | 5.31 | 5.76 | 6.28 | 6.83 |
| 68 | 3.98 | 4.16 | 4.38 | 4.65 | 4.98 | 5.38 | 5.85 | 6.39 | 6.98 |
| 69 | 4.01 | 4.19 | 4.42 | 4.70 | 5.04 | 5.45 | 5.94 | 6.51 | 7.13 |
| 70 | 4.04 | 4.23 | 4.45 | 4.74 | 5.09 | 5.52 | 6.03 | 6.63 | 7.29 |
| 71 | 4.07 | 4.26 | 4.49 | 4.78 | 5.14 | 5.59 | 6.12 | 6.76 | 7.45 |
| 72 | 4.10 | 4.29 | 4.53 | 4.83 | 5.20 | 5.66 | 6.22 | 6.88 | 7.62 |
| 73 | 4.13 | 4.33 | 4.57 | 4.87 | 5.25 | 5.73 | 6.31 | 7.01 | 7.80 |
| 74 | 4.16 | 4.36 | 4.61 | 4.92 | 5.31 | 5.80 | 6.40 | 7.14 | 7.97 |
| 75 | 4.19 | 4.39 | 4.65 | 4.96 | 5.36 | 5.87 | 6.50 | 7.27 | 8.15 |
| 76 | 4.22 | 4.43 | 4.68 | 5.01 | 5.42 | 5.94 | 6.59 | 7.40 | 8.33 |
| 77 | 4.25 | 4.46 | 4.72 | 5.05 | 5.47 | 6.00 | 6.68 | 7.53 | 8.52 |
| 78 | 4.28 | 4.49 | 4.76 | 5.10 | 5.52 | 6.07 | 6.77 | 7.66 | 8.71 |
| 79 | 4.31 | 4.53 | 4.80 | 5.14 | 5.58 | 6.14 | 6.87 | 7.79 | 8.89 |
| 80 | 4.34 | 4.56 | 4.83 | 5.18 | 5.63 | 6.21 | 6.96 | 7.92 | 9.08 |

MINIMUM INCOME AMOUNTS FOR AGES NOT SHOWN AND MINIMUM INCOME AMOUNTS
PAYABLE OTHER THAN MONTHLY WILL BE FURNISHED ON REQUEST.

Application for insurance to:

**PART A**

THE OLD LINE LIFE Insurance Company of America

2604663

*(referred to in this application as we/us/our)*

**COMPLETE FOR ALL POLICIES (Please Print)** — Questions 1a through g apply to Proposed Insured

**1. a. NAME** (first / middle / last): James E Stilwell  ☒ Male  ☐ Female

**b.** ☐ Single ☒ Married ☐ Divorced ☐ Widowed ☐ Separated

**c. DATE OF BIRTH** (month / day / year): 10 07 54  **d. AGE** 43  **e. BIRTHPLACE** (state): IL (country): USA

**f. SOCIAL SECURITY OR TAX NO.** 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

**g. HOME TELEPHONE NO.** 217 578-3152

**2. SEND ALL MAIL TO OWNER AT ADDRESS IN** ☐ 3a ☐ 3b ☐ 9

**3. a. RESIDENCE ADDRESS OF PROPOSED INSURED**
No. & Street 218 N. Iowa 5
City Atwood   State IL   Zip 61913
How long at this address? 5 yrs.   Previous Addresses (5 Yrs.)

QUESTIONS 3b & c APPLY TO PROPOSED INSURED IF AGE 15 OR OVER. TO OWNER OR PAYOR IF PROPOSED INSURED UNDER AGE 15.

**b. BUSINESS ADDRESS** with present employer _____ yrs.
Employer Self Employed Entrepreneur
No. & Street 102 N Main
City Atwood   State IL   Zip 61913
Nature of Business Antiques, Furniture, Entertainment

**c. OCCUPATION** (AII, if more than one) Food Service, Restaurant
Owner
Duties (Describe)

| 4. HAS ANY PERSON PROPOSED FOR INSURANCE: | Yes | No |
|---|---|---|
| a. smoked cigarettes during the past 12 months? | ☐ | ☒ |
| b. smoked pipes or cigars during the past 12 months? | ☐ | ☒ |
| c. used any other tobacco products during the past 12 months? | ☐ | ☒ |

| 5. HAS ANY PERSON PROPOSED FOR INSURANCE: | | |
|---|---|---|
| a. engaged, or intend to engage, in hang gliding, racing, scuba diving, sky diving? | ☐ | ☒ |
| b. had driver's license restricted, revoked or suspended? If yes, give driver's ID#. | ☐ | ☒ |
| c. other life insurance applications pending? | ☐ | ☒ |
| d. ever had life or health insurance declined, modified or rated? | ☐ | ☒ |
| e. any intention of traveling or residing outside the U.S.? | ☐ | ☒ |
| f. any intention of replacing or changing any life insurance or annuity policy in force in this or any other company? | ☐ | ☒ |

*If any of 5a through 5f are answered Yes, give names & full details in REMARKS.*

**g.** taken within five years or intend to take flights other than as fare-paying passenger on scheduled airlines? ☐ ☒
*If Yes, complete Aviation Questionnaire.*

**6. a. PLAN** LT6 10   ☒ Non Par ☐ Par   **b. AMOUNT** 5,000,000

**c. PREMIUMS PAYABLE** ☐ Annual ☒ Semi-annual ☐ Quarterly
☐ Pre-Auth. Chk. ☐ GAP ☐ List Bill ☐

**d. For Universal Life only:**
☐ Option 1 ☐ Option 2
Planned Premium $ ..........
Additional Initial Premium $ ..........

**e. AUTOMATIC PREMIUM LOAN**, if available ☐ Yes ☐ No

**f. ADDITIONAL COVERAGES** (Check if desired)
☐ WP or WMD ..........
☐ ADB $ .......... ........... Units
☐ Spouse Rider .......... Units ☐ Child Rider .......... Units
☐ Term Rider Plan .......... $ .......... (Amt. or M.I.)
☐ Term Rider on Other Insured — use separate application

**g. IF PARTICIPATING, USE OF DIVIDENDS**
| | Purchase 1 Yr. Term, balance to: |
|---|---|
| ☐ (1) Cash | ☐ (5) Deposit at Interest |
| ☐ (2) Reduce Premium | ☐ (6) Reduce Premiums |
| ☐ (3) Paid Up Additions | ☐ (7) Purchase Paid Up Additions |
| ☐ (4) Deposit at Interest | ☐ (8) Use All to Purchase 1 Yr. Term |

**7. LIFE INSURANCE IN FORCE ON PROPOSED INSURED**

| Name of Company | Issue Year | Amount | ADB | Personal/Business |
|---|---|---|---|---|
| Bankers Life | 84 | 800,000 | | Business |

**8. BENEFICIARY** for benefits payable upon death of the proposed insured

Primary: (Full Name) Margaret Stilwell (Age) 47 (Relationship) Wife 60%
Jamie Stilwell (10%) Heidi Stilwell (10%) Mega —
Contingent: Stilwell (10%) Haley Stilwell (10%)
Stilwell + Trustee

Except as otherwise directed: (a) The proceeds are to be divided equally among all persons who are named as Primary Beneficiary and who survive the insured, but if none survive, equally among all persons who are named as Contingent Beneficiary and who survive the insured. (b) The right to change the beneficiary is reserved.

**9. NAME OF OWNER** if other than proposed insured  Relationship
Margaret Stilwell   Wife
Address 218 N Iowa
Atwood, IL 61913
Social Security or Tax No. 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

**10. SPECIAL POLICY DATE, IF DESIRED**

**11. AMOUNT PAID WITH THIS APPLICATION:** $ 0

**12. REMARKS**

**AMENDMENTS AND CORRECTIONS** (for Home Office use only)
Plan LT9 10

**THIS IS A REISSUED POLICY AND REPLACES ANY POLICY BEARING THIS NUMBER PRIOR TO** 10-30-98

This application consists of Part A and one or more Parts B. This application is not a contract of insurance. A contract of insurance shall take effect only if a policy is issued on this application and the first premium is paid in full (a) during the lifetime of all proposed insureds and (b) while there is no change in the insurability and health of all such persons from that stated in this application. However, if cash is paid when this application is signed, the terms of the Conditional Receipt shall apply. It is represented that all statements and answers in this application are true, full and complete, and bind all parties in interest under any policy applied for. Only an authorized officer of our Company can make, void, waive or change any of the conditions or provisions of any application, policy or receipt or accept any risks or pass on insurability. Notice to or knowledge by an agent or medical examiner is not notice to or knowledge by us. Acceptance of any policy issued on this application shall mean acceptance of any change, correction, addition or amendment noted by us in the "Amendments and Corrections" Section. However, any such change shall require the written consent of the person or persons who sign this application. The Proposed Insured shall be the policy owner unless another owner is named above.

**DECLARATION**

I have carefully read the receipt. I understand and agree to its terms including the conditions under which a limited amount of insurance may take effect before policy delivery. I have received the MIB, Inc. and Fair Credit Reporting Act Notices.

Signed at City Atwood   State IL

Signature of Proposed Insured: James E Stilwell
Date 3/2/98
Witness William Hardin (LICENSED RESIDENT AGENT WHERE REQUIRED BY STATUTE OR REGULATION)

Signature of Spouse (Spouse Rider Only)
Signature of Owner (if 9 answered) Margaret Stilwell

SIGNATURE & TITLE OF OFFICER SIGNING FOR CORP. OR TRUSTEE

Form 4485-Q (Rev. 88)

FF-04001000-1048-1996
Supply Ordering Number 0420100-1019-1996

continuation of application for life insurance to:

# THE OLD LINE LIFE Insurance Company of America    2384139

(referred to in this application as we/us/our)

## PART B

| 1. PROPOSED INSURED (Person Named on 1a Part A) | A. Height ...6 ft. 1 in. | B. Weight 320 lbs. | C. Change in weight in past 12 months. *(Give reason)* lbs.   Loss ..............   Gain .............. |
|---|---|---|---|

2. FULL NAME(S) OF ADDITIONAL INDIVIDUAL(S) PROPOSED FOR INSURANCE (PLEASE PRINT)

| first   middle   last | DATE OF BIRTH month day year | Age | Sex | Place of Birth | Height ft. in. | Weight lbs. | Total Insurance in Force |
|---|---|---|---|---|---|---|---|
| a. SPOUSE OR PAYOR (If proposed for insurance) | | | | | | | |
| b. CHILDREN (If proposed for insurance and residing with Proposed Insured) | | | | | | | |

3. Name and address of your personal physician (if none, so state) DR. MANOHAN - MAIN Street - Atwood IL 6/9/1

QUESTIONS 4-8 PERTAIN TO ALL PERSONS NAMED ABOVE AND ARE TO BE ANSWERED TO THE BEST OF THE APPLICANT'S KNOWLEDGE AND BELIEF

GIVE FULL DETAILS IF ANSWER TO QUESTION 4 IS NO OR 5, 6, 7, 8 IS YES

| | Yes | No | Name of Person | Details, Dates, Doctors' Names & Addresses |
|---|---|---|---|---|
| 4. Are all persons proposed for insurance in good health? | ☒ | ☐ | | |
| 5. Has any person proposed for insurance any physical defect? | ☐ | ☒ | | |
| 6. HAS ANY PERSON PROPOSED FOR INSURANCE: | | | | |
| a. received treatment or joined an organization for alcoholism or drug dependency or abuse; been advised to discontinue the use of alcohol or drugs? | ☐ | ☒ | | |
| b. used cocaine, barbiturates, amphetamines or any other drug which might cause a dependency, other than as prescribed by a licensed physician? | ☐ | ☒ | | |
| c. ever been diagnosed by or received medical treatment from a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☒ | | |
| d. ever applied for or received disability benefits from any source? | ☐ | ☒ | | |
| 7. HAS ANY PERSON PROPOSED FOR INSURANCE EVER HAD: | | | | |
| a. convulsions, epilepsy, paralysis, neuritis, sciatica, nervous breakdown, headache, dizziness, fainting spells, speech defect, nervous or mental disorder? | ☐ | ☒ | | |
| b. high blood pressure, chest pain, palpitation, heart attack, stroke, heart murmur, hemorrhage, rheumatic fever, disorder of heart or blood vessels? | ☐ | ☒ | | |
| c. persistent hoarseness or cough, shortness of breath, asthma, emphysema, tuberculosis, bronchitis, disorder of respiratory system? | ☐ | ☒ | | |
| d. recurrent indigestion, ulcer, colitis, diverticulitis, hernia, intestinal bleeding, appendicitis, disorder of stomach, liver, digestive or abdominal organs? | ☐ | ☒ | | |
| e. sugar, albumin, blood or pus in urine, kidney stone, diabetes, or disorder of kidneys, bladder, prostate, or genito-urinary organs? | ☐ | ☒ | | |
| f. arthritis, gout, disorder of muscles, bones, joints or spine? | ☐ | ☒ | | |
| g. impairment of vision or hearing or disorder of eyes, ears, nose or throat? | ☐ | ☒ | | |
| h. tumor, cyst, cancer, hemorrhoids, venereal disease, anemia, disorder of blood, skin, thyroid or other glands? | ☐ | ☒ | | |
| i. treatment or observation in any hospital or institution? (past 5 years) | ☐ | ☒ | | |
| j. X-ray or electrocardiograms? (past 5 years) | ☐ | ☒ | | |
| k. treatment or consultations with any physicians or practitioners, other than as stated above? (past 5 years) | ☐ | ☒ | | |
| 8. Is any person proposed for insurance now pregnant? (if so, how many months?) | ☐ | ☒ | | |

**COMPLETE IF PROPOSED INSURED UNDER AGE 15**

9. List life insurance in force on family (if none, so state)..........

| Age | Amount | Age | Amount |
|---|---|---|---|
| Father ............. | | Mother ............. | |
| Brothers ............. | | Sisters ............. | |

Owner (if other than parent) $..........

Signature of Proposed Insured .................

Witness ............. *(LICENSED RESIDENT AGENT WHERE REQUIRED BY STATUTE OR REGULATION)*

Form 4485-Q (Rev. 88)

**COMPLETE IF PROPOSED INSURED AGE 15 OR OVER & NOT SELF-SUPPORTING**

10. Parent's/Spouse's full name ...............

11. Parent's/Spouse's occupation ...............

12. How much insurance does Parent/Spouse carry? ...............

13. Does Proposed Insured have an independent source of income? (state source) ...............

Signature of Spouse (If required) ...............

Signature of Owner (If required) ...............

PRODUCER'S REPORT

Is policy intended to replace insurance or annuity in any company? ☐ Yes ☒ No  If Yes, give full details and attach any other papers required by state law.
Are you related to any person proposed for insurance? ☐ Yes ☒ No  If Yes, give details
Estimate of Proposed Insured's Income:  Salary $ 150,000    Other Income $ ..........    Net Worth $ 10,000,000

.............  William John Lynn  WCO90
AGENCY OR BRANCH OFFICE    CODE NO.    PRODUCER'S NAME FOR RECORD PURPOSES (IF MORE THAN ONE INDICATE % SPLIT)    CCDE NO.

I hereby certify that I personally solicited and completed this application; that I have no knowledge of anything which might affect the insurability of any person proposed for insurance which is not fully set forth herein.

.............  William John Lynn
SIGNATURE OF PRODUCER

FF-04001000-1048-1196
Supply Ordering Number- 04201000-1019-1196

2604663

# THE OLD LINE LIFE Insurance Company of America

**ANSWERS TO MEDICAL EXAMINER**    Agency # Co090

PART B    forming Part B of Application when used in connection with new Life Insurance

Proposed Insured  *Earl*  / First Name    *James* / Middle Initial    *Stidwell* / Last Name    Birth Date  *10*  / Month  *7* / Day  *54* / Year

| | Yes | No |
|---|---|---|
| 1. a. Name and address of your personal physician (if none, so state) *Dr. Nath Atm Atwood Ill* | | |
| b. Date and reason last consulted? *Resp. infection - 1 yr. ago* | | |
| c. What treatment was given or medication prescribed? *Med - Rx* | | |

| | Yes | No |
|---|---|---|
| 2. Have you smoked cigarettes during the past 12 months? | ☐ | ☑ |
| Do you currently smoke pipes or cigars or use any other tobacco products? | ☐ | ☑ |
| 3. a. Have you received treatment or joined an organization for alcoholism or drug dependency or abuse; been advised to discontinue the use of alcohol or drugs? | ☐ | ☑ |
| b. Have you used cocaine, barbiturates, amphetamines or any other drug which might cause a dependency, other than as prescribed by a licensed physician? | ☐ | ☑ |
| 4. Have you ever had or been told you had or been treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☑ |
| **5. Are you in good health?** | ☑ | ☐ |
| 6. Do you have any physical defect? | ☐ | ☑ |
| 7. Have you ever been treated for or ever had any known indication of: | | |
| a. convulsions, epilepsy, paralysis, neuritis, sciatica, nervous breakdown, headache, dizziness, fainting spells, speech defect, nervous or mental disorder? | ☐ | ☑ |
| b. high blood pressure, chest pain, palpitation, heart attack, stroke, heart murmur, hemorrhage, rheumatic fever, disorder of heart or blood vessels? | ☐ | ☑ |
| c. persistent hoarseness or cough, shortness of breath, asthma, emphysema, tuberculosis, bronchitis, disorder of respiratory system? | ☐ | ☑ |
| d. recurrent indigestion, ulcer, colitis, diverticulitis, hernia, intestinal bleeding, appendicitis, disorder of stomach, liver, digestive or abdominal organs? | ☐ | ☑ |
| e. sugar, albumin, blood or pus in urine, kidney stone, diabetes, or disorder of kidneys, bladder, prostate, or genito-urinary organs? | ☐ | ☑ |
| f. arthritis, gout, disorder of muscles, bones, joints or spine? | ☐ | ☑ |
| g. impairment of vision or hearing or disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| h. tumor, cyst, cancer, hemorrhoids, venereal disease, anemia, disorder of blood, skin, thyroid or other glands? | ☐ | ☑ |
| 8. Are you now under observation or taking treatment? | ☐ | ☑ |
| 9. Have you had any change in weight in the past year? | ☐ | ☑ |
| 10. Other than above, have you within the past 5 years: | | |
| a. Had any mental or physical disorder not listed above? | ☐ | ☑ |
| b. Had a checkup, consultation, illness, injury, surgery? | ☐ | ☑ |
| c. Been a patient in a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☑ |
| d. Had electrocardiogram, X-ray, or other diagnostic test? | ☐ | ☑ |
| e. Been advised to have any diagnostic test, hospitalization, or surgery which was not completed? | ☐ | ☑ |

| | Yes | No |
|---|---|---|
| 11. Have you ever been deferred, rejected or discharged from military service or discharged because of a physical or mental condition? | ☐ | ☑ |
| 12. Have you ever requested or received a pension, benefits, or payment because of an injury, sickness or disability? | ☐ | ☑ |
| 13. Family History: Tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide? | ☐ | ☑ |

| | Age if Living? | Cause of Death | Age at Death? |
|---|---|---|---|
| Father | 64 | living + well | |
| Mother | 103 | living + well | |
| Brothers and Sisters No. Living . . . . | | 1 Brother - Stidham - Buth | |
| No. Dead . . . . | | 1 Sister 41 - living + well | |

| | Yes | No |
|---|---|---|
| 14. Females only: | | |
| a. Have you ever had any disorder of menstruation, pregnancy or of the female organs or breasts? | ☐ | ☐ |
| b. Are you now pregnant? (If so, how many months?) | ☐ | ☐ |

Give full details in REMARKS if Answer to Question 5 is No, or if answer to Questions 2-4 or 6-14 is Yes. Identify question number and circle applicable items; include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.

**REMARKS**

I hereby declare that, to the best of my knowledge and belief, the information given above is correctly recorded, complete and true, and I agree that the Company, believing it to be true, shall rely and act upon it accordingly.

Date  *3 - 23 - 98*    Signature of Person Examined ...*[signature]*...

Signed at City *Urbana* ......... State *Ill* .........    Witnessed by *[signature]* .....M.D.

Form 80P (Rev. 87)    The attached authorization should be dated and signed by the person examined.

04201000-1032-1194 (Front)

TABLE OF PREMIUMS AT THE CURRENT AND MAXIMUM RATES FOR THE FACE AMOUNT
AND PREMIUM CLASS OF THIS POLICY.

WE MAY CHANGE THE CURRENT PREMIUM IN ACCORDANCE WITH THE RIGHT TO CHANGE
PREMIUM PROVISION.

| POLICY YEAR | CURRENT ANNUAL LIFE INSURANCE PREMIUM | MAXIMUM ANNUAL LIFE INSURANCE PREMIUM |
|---|---|---|
| 1- 10 | 20,350.00 | 20,350.00 |
| 11 | 127,510.00 | 165,910.00 |
| 12 | 142,990.00 | 185,950.00 |
| 13 | 161,950.00 | 210,550.00 |
| 14 | 183,430.00 | 238,510.00 |
| 15 | 207,430.00 | 269,710.00 |
| 16 | 235,030.00 | 305,470.00 |
| 17 | 266,470.00 | 346,390.00 |
| 18 | 302,470.00 | 393,190.00 |
| 19 | 342,550.00 | 445,270.00 |
| 20 | 385,870.00 | 501,790.00 |
| 21 | 432,190.00 | 561,790.00 |
| 22 | 479,710.00 | 623,710.00 |
| 23 | 524,950.00 | 682,510.00 |
| 24 | 569,350.00 | 740,350.00 |
| 25 | 616,510.00 | 801,430.00 |
| 26 | 670,150.00 | 871,270.00 |
| 27 | 735,910.00 | 956,590.00 |
| 28 | 814,270.00 | 1,064,710.00 |
| 29 | 902,950.00 | 1,189,630.00 |
| 30 | 1,001,350.00 | 1,339,630.00 |
| 31 | 1,108,750.00 | 1,526,710.00 |
| 32 | 1,220,950.00 | 1,759,150.00 |
| 33 | 1,339,390.00 | 2,045,710.00 |
| 34 | 1,465,270.00 | 2,397,910.00 |
| 35 | 1,595,230.00 | 2,832,190.00 |
| 36 | 1,726,990.00 | 3,366,070.00 |
| 37 | 1,860,430.00 | 3,827,830.00 |
| 38 | 1,977,430.00 | 3,827,830.00 |
| 39 | 2,080,030.00 | 3,827,830.00 |
| 40 | 2,198,470.00 | 3,827,830.00 |
| 41 | 2,359,870.00 | 3,827,830.00 |
| 42 | 2,591,470.00 | 3,827,830.00 |
| 43 | 2,892,070.00 | 3,827,830.00 |
| 44 | 3,245,110.00 | 3,827,830.00 |
| 45 | 3,646,990.00 | 3,827,830.00 |

80-RCT 79-8                    2604663                    NEXT TO LAST PAGE

TABLE OF PREMIUMS AT THE CURRENT AND MAXIMUM RATES FOR THE FACE AMOUNT
AND PREMIUM CLASS OF THIS POLICY.    (CONTINUED)

| POLICY YEAR | CURRENT ANNUAL LIFE INSURANCE PREMIUM | MAXIMUM ANNUAL LIFE INSURANCE PREMIUM |
|---|---|---|
| 46 | 3,827,830.00 | 3,827,830.00 |
| 47 | 3,827,830.00 | 3,827,830.00 |
| 48 | 3,827,830.00 | 3,827,830.00 |
| 49 | 3,827,830.00 | 3,827,830.00 |
| 50 | 3,827,830.00 | 3,827,830.00 |
| 51 | 3,827,830.00 | 3,827,830.00 |

RENEWABLE LEVEL TERM LIFE POLICY -- INDETERMINATE PREMIUM
INSURANCE PAYABLE IN EVENT OF DEATH PRIOR TO EXPIRY DATE
PREMIUMS PAYABLE DURING TERM                      NO DIVIDENDS

80-RCT 79-8                    2604663                    LAST PAGE

**THE OLD LINE LIFE** Insurance Company of America
An **American General** Company

**FINANCIAL UNDERWRITING**
**PERSONAL INSURANCE – LARGE AMOUNT SUPPLEMENT**
(To be completed by agent)

1. Name of Proposed Insured   James E. Stilwell     Date of birth  10/7/54

2. How long and how well have you known proposed insured?   20 years

3. Purpose of Insurance *(explain how purpose conceived)* To Cover Adamson Present and Future Liability

4. Circumstances of application *(explain fully all details)* For New Business with Construction + Tuscol
   - ☑ solicitation by agent    See Attached Cover Letter
   - ☐ inquiry by applicant
   - ☐ other

5. How was amount of application determined? *(attach copies of relevant calculations, insurance needs discussed, estate analysis, etc.)* See Attached Cover Letter

6. Insurance in force

| | Amount | Annual Premium |
|---|---|---|
| a. personal | $ | $ |
| b. business | $ | $ |
| Insurance applied for in this company | $ 800,000 | $ ~~4100~~ 4,000 |
| Applied for other companies *(explain circumstances)* | $ | $ |
| Total | $ 800,000 | Total Prem. $ 4,000 |

7. Income of proposed insured *(attach financial statement if possible or have insured mail confidential statement direct to Home Office)*

| | |
|---|---|
| a. Annual Salary | $ 50,000 + |
| b. Dividends, etc. | $ |
| c. Other Income *(describe)* | $ |
| Total | $ 50,000 ~~000~~ |
| d. Undistributed profits | $ 300,000 |

8. Present net worth  3,560,000     $

9. Personal Banking references
   Banks   Tuscola National Bank     Addresses   Tuscola, IL.

10. Personal accountant and attorney references *(List any brokers or financial advisers who might assist in financial underwriting,*
    Names   Lloyd Murphy (President Bank)     Addresses   900 S. Progress
    Richard Broch     Tuscola, IL.

DATE   3/16/98     AGENT'S SIGNATURE

EXHIBIT
3

EXHIBIT

 The **Franklin**

John Lyons, LUTCF
*District Manager*
*Registered Representative*
Rural Route 1
P.O. Box 260
Atwood IL 61913
Bus.: 217-578-3142
Fax: 217-578-3560

March 17, 1998

**Oldline Insurance Company**
**Large Case Underwriting**

**Fax #800-245-1580**

**Dear Sirs:**

I am enclosing two financial underwriting questionnaires for my client, James Stilwell, pending App. #2384389. Mr. Stilwell has been my client in the past with Franklin Life. When he started his plans for new business in Tuscola, Il. he contacted me and asked me to get a quote for $5,000,000 of coverage for 10 years. I believe the bank and he decided on the amount of coverage desired. When I took the application, Mr. Stilwell indicated that he desired this much coverage to protect his family while the business was getting started. Mr. Stilwell is a very successful business man in Atwood and is now opening up a $7,000,000 project off interstate 57 in Tuscola, Il. This business will house a 1,100 seat buffet restaurant, oak furniture mall, antique mall, and cheese outlet mall all under one roof. Of the $7,000,000, there will be 3.5 million for inventory and the other portion will be for the building and land. Mr. Stilwell does not want his family to have a forced liquidation in case of his untimely death. Thus, the need for the additional insurance.

Mr. Stilwell is working closely with the President of the Tuscola National Bank. The president is: Lloyd Murphy and the phone number is 217-253-4711. If you have any further questions, please feel free to contact me. Thank you for your consideration.

Sincerely,

*John Lyons*



EXHIBIT

4



EXHIBIT

*Lyons #2*

THE FRANKLIN LIFE INSURANCE COMPANY
# 1 Franklin Square
Springfield IL 62713
800-528-2011
217-528-2011
TDD Service 217-528-3158

*Whole Life Insurance • Term Life Insurance
Fixed Annuities • Income Protection*

THE AMERICAN FRANKLIN LIFE
INSURANCE COMPANY
# 1 Franklin Square
Springfield IL 62713
800-528-2011
217-528-2011
Fax 217-528-8279
TDD Service 217-528-3158

*Flexible Premium Variable Life • Fixed and Variable Annuity*

FRANKLIN FINANCIAL SERVICES CORPORATION
# 1 Franklin Square
Springfield IL 62713
800-528-2011
217-528-2011
Fax 217-753-0183

*A Securities Broker/Dealer, Distributor of Mutual
Funds and Other Securities. Member: NASD and SIPC*

★ *An American General Company*



John Lyons, LUTCF
District Manager
Registered Representative
Rural Route 1
P.O. Box 260
Atwood IL 61913
Bus.: 217-578-3142
Fax: 217-578-3560

Cindy Priegel
Oldline Life
707 North 11 Street
P O Box 401
Milwaukee Wis. 53201-0401

Dear Cindy,

I Am enclosing the Following Items :

    Ⓐ Policy # 2384389
    Ⓑ Form 725 (Rev. 82)
    Ⓒ Check for 1st Semi Annual Premium
    Ⓓ Policy Deliverys Receipt.



EXHIBIT
5

EXHIBIT
Lyons # 4

Cindy. Jim And Mrs Stilwell want Policy # 2384389 to be
For 1,000,000. A Check for 2850.00 is for the 1st Semi Annual
Premium is enclosed. They would like Another policy to be
issued for the Remaining 4,000,000 of coverage. This policy
will be Assigned to the Bank to cover the Loan Expenses

(over)

THE FRANKLIN LIFE INSURANCE COMPANY
# 1 Franklin Square
Springfield IL 62713
800-528-2011
217-528-2011
TDD Service 217-528-3158

Whole Life Insurance • Term Life Insurance
Fixed Annuities • Income Protection

★ An American General Company

THE AMERICAN FRANKLIN LIFE
INSURANCE COMPANY
# 1 Franklin Square
Springfield IL 62713
800-528-2011
217-528-2011
Fax 217-528-8279
TDD Service 217-528-3158

Flexible Premium Variable Life • Fixed and Variable Annuity

*A subsidiary of The Franklin Life Insurance Company

FRANKLIN FINANCIAL SERVICES CORPORATION
# 1 Franklin Square
Springfield IL 62713
217-528-2011
Fax 217-753-0183
TDD Service 217-528-3158

A Securities Broker/Dealer, Distributor of Mutual
Funds and Other Securities. Member: NASD and SIPC

*A subsidiary of The Franklin Life Insurance Company

And New Business Expenses. This policy will be funded by
a separate check from the Amish Cheese Corporation.
This policy will be paid for after it is issued. I have enclosed
Statement of Health and Policy Delivery Receipt. Please
call me it you have questions!

Josh.

ATWOOD MEAT SERVICE, INC.    12-88    24417
JAMES E. STILWELL, PRES.
102 N. MAIN, P.O. BOX 538
ATWOOD, IL  61913                                      70-579/711

PAY
TO THE
ORDER OF  Old Line Ins Co.                DATE  7/3/98    $ 2850 00

two thousand eight hundred & fifty & no/100 ———— DOLLARS

T TUSCOLA
NATIONAL BANK
TUSCOLA, ILLINOIS 61953

FOR _____          Janice Stilwell

⑆024417⑆ ⑈071105798⑈  01 109 6⑇           MP

1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
2                     STATE OF ILLINOIS

3
    MARGARET J. STILWELL,        )
4   HALEY STILWELL, HEIDI        )
    STILWELL, JAMIE STILWELL,    )
5   MEGAN STILWELL,              )
        Plaintiffs,              )
6          -vs-                  )
    AMERICAN GENERAL LIFE        )
7   INSURANCE COMPANY,           )
        Defendant.               )
8   --------------------------)  No. 05-CV-02160
    AMERICAN GENERAL LIFE        )
9   INSURANCE COMPANY,           )
        Third-Party Plaintiff    )
10         -vs-                  )
    FIRST MID ILLINOIS BANK &    )
11  TRUST, TUSCOLA FURNITURE     )
    GROUP, LLC, JANKO            )
12  FINANCIAL GROUP, LLC,        )
        Third-Party Defendants.) 
13  --------------------------

14                          CSR License No. 084-003038

15

16                          DEPOSITION

17          The deposition of LAWRENCE BIANCHI, a
    citizen of the State of Illinois, a witness of
18  lawful age; produced, sworn and examined upon his
    corporeal oath, on the 9th day of February, 2007, at
19  the offices of Area Wide Reporting Service, 301 West
    White Street, Champaign, Illinois, before June
20  Haeme, CSR, RMR, CRR, Notary Public in and for the
    County of Ford and State of Illinois, as a witness
21  in a certain suit and matter now pending and
    undetermined in the United States District Court for
22  the Central District of Illinois.

23

24



EXHIBIT
6

1                    Appearances:

2                        Michael S. Seneca
                         Attorney at Law
3                        Howard & Howard
                         One Technology Plaza, Suite 600
4                        211 Fulton Street
                         Peoria, IL  61602-1350
5                        Appearing for Tuscola Furniture Group
                           and Janko Financial Group
6
                         Rebecca M. Rothman
7                        Attorney at Law
                         Wilson, Elser, Moskowitz, Edelman &
8                          Dicker, LLP
                         120 North LaSalle Street, Suite 2600
9                        Chicago, IL  60602
                         Appearing for American General Life
10
                         Jason M. Crowder
11                       Attorney at Law
                         Heller, Holmes & Associates, P.C.
12                       1101 Broadway Avenue
                         Mattoon, IL  61938
13                       Appearing for Plaintiffs

14                       Julie Beyers
                         Attorney at Law
15                       Heavner, Scott, Beyers & Mihlar
                         111 E. Main Street, Suite 200
16                       Decatur, IL  62523
                         Appearing for First Mid Illinois

17

18

19

20

21

22

23

24

3

1                        I N D E X
                                                Page
2    EXAMINATION BY MS. ROTHMAN...................   3
     EXAMINATION BY MR. CROWDER...................  74
3    EXAMINATION BY MS. BEYERS.................... 112
     REEXAMINATION BY MS. ROTHMAN................. 121
4    EXAMINATION BY MR. SENECA.................... 123
     REEXAMINATION BY MR. CROWDER................. 126
5    REEXAMINATION BY MR. SENECA.................. 128
     REEXAMINATION BY MR. CROWDER................. 129
6

7

8

9
                        E X H I B I T S
10                                               Page
     Bianchi Exhibit No. 1........................  18
11   Bianchi Exhibit No. 2........................  48
     Bianchi Exhibit No. 3........................  48
12   Bianchi Exhibit No. 4........................  55
     Bianchi Exhibit No. 5........................  56
13   Bianchi Exhibit No. 6........................  58
     Bianchi Exhibit No. 7........................  59
14   Bianchi Exhibit No. 8........................  64
     Bianchi Exhibit No. 9........................  67
15   Bianchi Exhibit No. 10.......................  67
     Bianchi Exhibit No. 11.......................  88
16   Bianchi Exhibit No. 12.......................  90
     Bianchi Exhibit No. 13....................... 125
17

18

19

20

21

22

23

24

1       Q.   Okay.

2       A.   If it is, then they would still be a 60

3  percent owner.

4       Q.   Okay.  Was Janko an original member of --

5  by original, I mean a founding member of Amishland

6  Development, do you know?

7       A.   No.  Clarification.  There was a new,

8  newly formed Amishland Development when Janko became

9  involved.  There was a previous Amishland

10 Development.  And the only distinction that I can

11 remember that a document might show is one had

12 L.L.C., the other one had LLC.  Janko Financial

13 Group was a founding member of the newly constituted

14 Amishland Development.

15      Q.   Okay.  When was that newly constituted

16 approximately?

17      A.   I don't have a recollection of when.

18      Q.   Okay.  The members of Amishland

19 Development, LLC, were James Stilwell, Janko and a

20 company called BLT-3 --

21      A.   Correct.

22      Q.   -- is that right?  Okay.  And what was the

23 purpose of Amishland Development?

24      A.   The purpose was to own a retail center in

1    Tuscola, Illinois.

2         Q.   At some point, Janko became the managing

3    member of Amishland Development; is that right?

4         A.   We always were the managing member of the

5    LLC.

6         Q.   Okay.

7         A.   It was constituted with us as a member.

8         Q.   Okay.  How -- can you tell me how Janko

9    became involved with Amishland Development or how

10   this development came about?

11             MR. CROWDER:  Rebecca, in the event that

12   answers are going to invade the Dead Man's Act,

13   should we go ahead and do the Dead Man's Act?

14             MS. ROTHMAN:  You can have a standing

15   objection, we can fight about it later, how's that?

16             MR. CROWDER:  Yeah, because I think a lot

17   of his answers might have -- you know, might involve

18   conversations with Jim Stilwell, and I will be

19   making a Dead Man's Act objection, so --

20             MS. ROTHMAN:  I have no problem with a

21   standing objection.

22             MR. CROWDER:  Is everybody all right with

23   that?

24             MR. SENECA:  I'm fine with a standing

1        A.    Not in its entirety.  We were not involved

2    with the ordering of furniture.

3        Q.    Okay.

4        A.    We never talked to vendors directly at the

5    time of purchase.  That was all done by Jim.  And we

6    simply were sent invoices that we made payment on.

7    And then as I understand, we became the owners of

8    the furniture at that point and were consigning that

9    furniture to Jim, but we were not involved in the

10   procurement.

11       Q.    Okay.  Thanks.  Turning your attention --

12   you see the Bates stamp on the bottom? -- to

13   document Bates stamp 311.

14       A.    I'm sorry, I don't know what you're

15   referring to.  Oh, down here.

16       Q.    The numbers on the bottom.  See them right

17   there on the bottom?

18       A.    Uh-huh.

19       Q.    Section 3.9, you see that provision?

20       A.    Yes.

21       Q.    And my reading of that provision is that

22   under the agreement ACV had the obligation to

23   maintain life insurance on James Stilwell in the

24   amount of $2 million with Janko and the bank as a

1    named beneficiary.  Is that your understanding of

2    that provision?

3         A.    That's what it says.

4         Q.    Okay.  What purpose did that provision

5    serve?

6         A.    That provision was included as additional

7    security to us under the agreement.

8         Q.    Okay.  If you turn to page 314 in the

9    agreement, Section 3. -- or 6.3 references a

10   personal guarantee that was a condition to the

11   agreement.  Do you see that?

12        A.    Now, which section?

13        Q.    I'm at section -- down under Section 6,

14   page 314.

15        A.    Okay, I'm sorry, I was at 3.14 on the

16   agreement.

17        Q.    Sorry.

18        A.    6.3, yes, it shows that there would be a

19   personal guarantee.

20        Q.    Okay.  So it was your understanding that a

21   condition of the agreement was that Jim and Margaret

22   Stilwell would personally guarantee the debt that

23   was owed by ACV to Janko.

24        A.    Yes.

1    under this consignment agreement?

2          A.   At closing, the Stilwells did not present

3    an assignment of beneficial interest in the amount

4    of $1,250,000, beneficial interest to JFG -- or

5    excuse me, to Tuscola Furniture Group and the bank.

6          Q.   Okay.  That was at closing?

7          A.   Right.

8          Q.   But did you go ahead and close anyway?

9          A.   Yes, we did.

10         Q.   Okay.  And at closing, did you -- was

11   there any discussion as to whether that provision

12   was going to be waived?

13         A.   There was never any discussion or intent

14   to waive that provision.

15         Q.   Okay.  At some point, did -- after the

16   closing, did you obtain an assignment of life

17   insurance in the amount noted in the consignment, in

18   the amount required under the consignment?

19         A.   At closing, we instructed Jim and Margaret

20   Stilwell that we had to be covered under this

21   agreement.  We stated that we felt that we were

22   covered under the agreement because of the

23   assignment and assumption agreement that was dated

24   the day before this agreement that assigned the life

1    insurance's previous assignments.  And we requested,

2    pending receipt of the proper beneficial interest in

3    the amount of $1,250,000 for Tuscola Furniture Group

4    and First Mid Illinois Bank, that we wanted to

5    substantiate to the insurance company the assignment

6    of the rights to the beneficial interest that

7    already existed, and therefore I requested -- we

8    requested from Jim Stilwell that he provide us with

9    a form so that we could notify the insurance

10   company.

11        Q.   All right.  And this was all discussed at

12   the closing?

13        A.   Yes.

14        Q.   And Margaret Stilwell was present at the

15   closing?

16        A.   Yes, she was.

17        Q.   And so would your discussions with Jim

18   also have been directed to Margaret?

19        A.   They were directed to them both.

20        Q.   All right.  So at the closing you advised

21   them that you felt that the fact that they didn't

22   show up with the proper documentation of the

23   assignment of beneficial interest in life insurance

24   was not a deal breaker because you were protected

1    under the assignment and assumption agreement

2    between TFG and Janko that had been executed the day

3    before?

4         A.    That's correct.

5         Q.    Okay.  Did they say anything to you

6    concerning whether they thought that was fine too or

7    whether they were disputing that?

8              MR. CROWDER:  Object to the form.

9         A.    They didn't dispute it.  I was told by Jim

10   that he would get me the form so that we could

11   notify the insurance company of the new name,

12   Tuscola Furniture Group versus Janko Financial

13   Group, on the existing assignments.

14        Q.    Okay.  So in the discussions at closing,

15   Mr. Stilwell indicated to you that he would get you

16   something from the insurance company or get you

17   something from -- get you something that you could

18   give to the insurance company to protect your

19   interest under the consignment.

20             MR. CROWDER:  Same objection.  Object to

21   the form.

22        A.    To notify them of the assignment and

23   assumption.  A form to notify them of the assignment

24   and assumption.

1      Q.    All right.  So Mr. Stilwell advised you

2   that he would get you a form to notify the insurance

3   company of the assignment and assumption agreement?

4      A.    Yes.

5      Q.    Okay.  And did he ever do that?

6      A.    I received from Mr. Stilwell's insurance

7   agent, John Lyons, a form that had been completed

8   and was ready for my signature in order to show the

9   assignment of the beneficial interest.

10     Q.    Showing you what was previously marked

11  Stilwell's Deposition Exhibit 20, is that the

12  document that you're referring to?

13     A.    That's correct.

14     Q.    Okay.  Do you recall when you received

15  this document from Mr. Lyons?

16     A.    I believe I received it on the 21st of

17  November, though I don't have any document that

18  states that, but noticing that apparently Mr. Lyons

19  received it, it was received to Mr. Lyons's fax

20  number on the 20th, and Mr. Lyons then forwarded

21  that to me with a note stating that he was providing

22  me the form.

23     Q.    Okay.  Did you have any discussions with

24  Mr. Lyons concerning this document?

1      A.    No, other than he was sending the --

2      Q.    Other than he would send it to you?

3      A.    Correct.

4      Q.    So you did initially have a discussion

5   with him and asked him to send you something?

6      A.    No.

7      Q.    Oh, okay.

8      A.    I talked to Mr. Stilwell.

9      Q.    Okay.

10     A.    Mr. Stilwell contacted Mr. Lyons and

11   provided the form, and I had asked Mr. Stilwell to

12   provide us with a form that we could show an

13   assignment of our $2 million beneficial interest

14   from Janko Financial Group to Tuscola Furniture

15   Group.

16     Q.    Okay.  All right.  And this is what you

17   got, Exhibit 20?

18     A.    I got this form and it was Sections 1 and

19   3 were filled out.

20     Q.    All right.  And so what you did to

21   effectuate that intent was sign it and fill out the

22   words released in favor of Tuscola Furniture Group,

23   LLC?

24     A.    Correct.

1          MR. CROWDER:  Object to the form of the

2     question.

3          Q.   All right.  Why don't you tell me what you

4     did after you received this document?

5          A.   When I received this document, after

6     having read it, I knew that to make the document

7     effective I had to sign it, and the reason that I

8     put in favor of Tuscola Furniture Group is because I

9     wanted to make sure that everyone understood that

10    this was a transfer of the assignment from Janko

11    Financial Group in favor of Tuscola Furniture Group.

12    I was concerned about the statement that I saw

13    release of assignment, but I made an assumption that

14    that meant the release from Janko Financial Group to

15    Tuscola Furniture Group.

16         Q.   Okay.  And you didn't have any discussions

17    with Mr. Lyons about -- about that?

18         A.   No.

19         Q.   Okay.  Did you have any discussions with

20    anybody at American General about that at this time?

21         A.   No.

22         Q.   Okay.  Showing you what was marked for

23    Mrs. Stilwell's deposition as No. 6, this is an

24    assignment to Tuscola Furniture Group in the amount

1      of $250,000.  Can you tell me what this was, how

2      this came about?

3            A.    This is what we received from Jim Stilwell

4      after closing and after I had signed this other

5      document.  And having received this from Jim, I

6      notified him of two discrepancies between this

7      document and what was required in the consignment

8      agreement.  Number one, the amount was wrong, it was

9      250,000 instead of 1,250,000.  And number two, this

10     was an assignment to Tuscola Furniture Group only

11     whereas our agreement stated that it was to be

12     Tuscola Furniture Group, LLC, and the bank.

13            Q.    And was this a conversation you had with

14     him face-to-face or over the phone --

15            A.    I don't recollect that.

16            Q.    -- do you recall?  Okay.  Do you recall

17     what he said to you in return?

18            A.    Jim stated that he would get for me the

19     proper assignment.

20            Q.    Okay.  And did he ever do that?

21            A.    No.

22            Q.    Showing you what is marked Stilwell No. 7,

23     it says an assignment from Margaret Stilwell to

24     First Mid Illinois Bank and Trust for $1 million.

1     Do you see this?

2         A.    Yes.

3         Q.    But do you know how this document came

4     about?

5         A.    Well, this is -- is a further response

6     that we received from Jim Stilwell concerning our

7     request for $1,250,000 of assignment of beneficial

8     interest in a life policy showing beneficial

9     interest to Tuscola Furniture Group and First Mid

10    Illinois Bank.

11        Q.    Okay.

12              MR. CROWDER:    Move to strike the answer.

13    Lacks foundation.

14              MS. ROTHMAN:    Can you read back my --

15        Q.    Well, I'll ask you something else.    When

16    did you -- have you ever received -- strike that.

17    Do you recall receiving a copy of this document?

18        A.    Yes, I do.

19        Q.    Okay.    When did you first receive a copy

20    of this document?

21        A.    Sometime in January of 2001.

22        Q.    And when did -- who did you receive a copy

23    of it from?

24        A.    To my best recollection, from Jim

1    produced in discovery to me, and directing your

2    attention to Bates stamps 47 through 51 -- I'm

3    sorry, 47 through looks like 74 is the complaint and

4    at least two of the exhibits to the complaint.

5        Does this refresh your recollection on the

6    fact that a lawsuit was filed?

7        MR. CROWDER:  I'll object to the form.

8    A.    I am aware that a lawsuit was filed and

9    this -- in reviewing this document, it appears to me

10   that this is the document that I'm familiar with.

11   Q.    Okay.  And so on or about -- on February

12   13th, 2003, Amishland Development filed suit against

13   ACV and the Stilwells for delinquency in their rent.

14   A.    That's correct.

15   Q.    Okay.  And you verified the allegations in

16   this complaint, correct?  Is that your signature on

17   page 50?

18   A.    Yes, it is.

19   Q.    And 51?

20   A.    Yes, it is.

21   Q.    Okay.  Now, the suit was brought against

22   the Stilwells personally, and I see that in the

23   caption.  Do you know why that was?  Was it -- did

24   they have a guarantee, did they personally guarantee

1       Q.    Does that refresh your recollection as to

2    why the replevin action was voluntarily dismissed?

3       A.    Yes, it does.

4       Q.    Okay.  And so is it your understanding

5    that you voluntarily dismissed that action because

6    you were being paid -- you anticipated payment of

7    insurance proceeds?

8       A.    Correct.

9       Q.    Okay.  And you understood Mr. Broch to be

10   -- to be the Stilwell's counsel, correct?

11      A.    In this action, yes.

12      Q.    In this action.  Mr. Stilwell passed away

13   on or about May 2nd, 2003.  Do you recall how you

14   heard that he had passed?

15      A.    I think my partner, Dick Janko, notified

16   me and he had received a call and I don't know if it

17   was from Margaret or someone down in Amishland.

18      Q.    Okay.  What -- did you take any steps to

19   recover under the insurance policy after you learned

20   that he had passed?

21      A.    On which of our business dealings?

22      Q.    On -- well, on any of your business

23   dealings --

24      A.    Yes.

1    Howard's review of the statement, went ahead and

2    filed the claim.

3        Q.   Okay.  Looking at Exhibit -- let me see

4    what exhibit -- 13.

5            MS. ROTHMAN:  Is it over here?  I'm

6    looking for Stilwell 13.

7            MR. CROWDER:  Yeah.

8            MR. SENECA:  Yeah, 13 and 14 are right

9    there.

10           MS. BEYERS:  I mean this is a --

11           MS. ROTHMAN:  I got it.

12   BY MS. ROTHMAN:

13       Q.   Okay.  Showing you what's been marked

14   previously Stilwell Exhibit 13, do you recognize

15   this document?

16       A.   Yes, I do.

17       Q.   Okay.  Did you draft this document?

18       A.   Yes, I did.

19       Q.   Okay.  Is this a document that you

20   submitted in connection -- submitted to American

21   General in connection with your claim under the

22   policy?

23       A.   Yes, it is.

24       Q.   Okay.  And if you flip -- you've got First

1    Mid.  Thomas Chamberlain signed the document as

2    well?

3         A.   Yes.

4         Q.   Can you tell me how it came about that you

5    were making a joint claim with the bank?

6         A.   It was our understanding that our

7    consignment agreement required that.

8         Q.   Okay.  Flipping to Exhibit A -- I think

9    it's Exhibit A, it's Exhibit A that's referenced in

10   the letter -- which is a document, a spreadsheet

11   type document titled Tuscola Furniture Group, LLC.

12        A.   Correct.

13        Q.   Did you create this document?

14        A.   No, I did not.

15        Q.   Okay.  Do you know who did create this

16   document?

17        A.   The staff of Janko Financial Group.

18        Q.   Okay.  Anybody verify the numbers on this

19   document?

20        A.   I'm not sure I understand the question.

21   What do you mean by verify?

22        Q.   Let me strike that.  Do you have any

23   reason to believe that the figures that are

24   reflected here as due and owing are not accurate?

1            MR. CROWDER:  Object to the form.

2       A.   I -- I believe these to be accurate

3   numbers --

4       Q.   Okay.

5       A.   -- except for one situation.  If you would

6   look under the area that says $101,780.32 unlocated

7   inventory at cost, unknown sales price certainly

8   higher, TFG entitled to a minimum of 10 percent fee,

9   and you'll see a 10 percent figure there, that

10  101.780.32 was the wholesale amount.  Under our

11  agreement, we were due 10 percent of retail sales

12  value, so that number may, in effect, be less than

13  what it should have been.

14      Q.   Got it.  Other than that exception, is --

15  do you have any reason to believe that the figures

16  conveyed on this sheet are not accurate?

17      A.   No, I do not.

18      Q.   Okay.  The second document, Tuscola

19  Furniture Group, LLC, Stilwell Inventory

20  Reconciliation, do you see that?

21      A.   Yes, I do.

22      Q.   Did you prepare that document?

23      A.   No, I did not.

24      Q.   Okay.  Do you know who did?

53

1         A.    Staff of Janko Financial Group.

2         Q.    All right.  Do you have any reason to

3    believe that the figures on that document are not

4    accurate?

5         A.    No, I do not.

6               MR. CROWDER:  Show an objection to

7    foundation.

8         Q.    Okay.  The last pages are the claim form

9    and you executed that claim form on behalf of TFG,

10   correct?

11        A.    That's correct.

12        Q.    And your intent in executing that claim

13   form on behalf of TFG was to -- was to submit a

14   claim to American General for American General to

15   pay, correct?

16        A.    That's correct.

17        Q.    All right.  And in connection with the

18   claim that you submitted, you submitted the May

19   12th, 2003, correspondence, correct?

20        A.    Correct.

21        Q.    All right.

22        A.    That was the cover letter.

23        Q.    That was the cover letter to your claim

24   form.

1          A.    Correct.

2          Q.    Are the statements contained in your May

3     12th, 2003, correspondence true and correct?

4          A.    Yes.

5          Q.    Okay.  Looking at --

6          A.    With one -- with one -- I think I

7     corrected or made an addition to the information

8     there with my May 28th, 2003, letter.

9          Q.    Okay.  And that May 28th, 2003, letter

10    is --

11              MS. BEYERS:  Stilwell 14.

12         A.    Stilwell 14.

13         Q.    Stilwell 14, okay.  How did you -- how did

14    you come about knowing that you needed to amend the

15    original letter?

16         A.    In reviewing my information, I saw that

17    there was one assignment that I had not listed as

18    one that we would release in exchange for the

19    receipt of the proceeds, and I thought that rather

20    than wait for somebody on the other side to point it

21    out, that I wanted to -- you know, it came to my

22    attention, so I wanted to point it out to the

23    insurance company.

24         Q.    Okay.  Looking at I think it was Stilwell

1    at American General to state that they should have a

2    copy of the form in which we assigned JFG's rights

3    to Tuscola Furniture Group.

4        Q.    Do you remember who you spoke to at

5    American General?

6        A.    I believe it was Ray Sawicki.

7        Q.    Okay.  In looking at Exhibit -- Bianchi

8    Exhibit 7 is a letter dated June 11th, 2003, from

9    you on behalf of Janko Financial Group to Mr.

10   Sawicki?

11       A.    That's correct.

12       Q.    Do you see that?  Was this a letter that

13   you wrote in follow-up to the conversation that you

14   had with him?

15       A.    Yes, it was.

16       Q.    Okay.  Did you have just one conversation

17   with him or did you have multiple conversations with

18   him?

19       A.    I talked to several people at the

20   insurance company.  This is the only conversation I

21   remember having with Mr. Sawicki.

22       Q.    Okay.  Do you remember -- well, strike

23   that.  How many different people did you speak to at

24   the insurance company?

1       A.    Perhaps as many as three.

2       Q.    Okay.  Do you remember the sub --

3    substance of your conversation with each one of

4    these people?

5       A.    No, I don't.

6       Q.    Okay.  Would it have been all around the

7    same time when you were trying to get this claim

8    paid?

9       A.    Oh, that's the only time that I would have

10   talked to someone at the insurance company is after

11   Jim's death.

12      Q.    Okay.  And it would have been in

13   connection with the claim materials you submitted;

14   is that right?

15      A.    It would have been in regard to the claim.

16   I don't know if it was conversation before the claim

17   was submitted or after.

18      Q.    Okay.

19      A.    But around that time.

20      Q.    All right.  Well, is it fair to say that

21   in -- I'm looking at the letters that we previously

22   referenced, June 10th.  That after receiving the

23   claim, American General had some additional

24   questions that they were posing and they had some

1    additional information they needed from you before

2    they processed your claim.

3              MR. CROWDER:  Object to the form.

4         A.    I don't know that they had additional

5    questions.  All I knew is that in the document they

6    stated that they were unaware of the existing --

7    let's see.  Let me review this.

8              All I know is by their letter that they're

9    stating that we had released collateral assignments,

10   and to my knowledge, that was not true.

11        Q.    Okay.

12        A.    And so therefore my contact was to clarify

13   that point.

14        Q.    Okay.  How did you get ahold of Mr.

15   Sawicki?

16        A.    I believe that I probably talked to

17   someone else who gave me his name and number and

18   that -- and as I understand, my recollection, I may

19   have talked to someone in Houston who directed me to

20   Mr. Sawicki in Dallas.

21        Q.    Okay.  And you had a conversation with Mr.

22   Sawicki in which you explained the information

23   that's laid out in your letter.  Is that --

24        A.    That's correct.

1        Q.    -- a fair assumption?  And then your June

2    11th, 2003, correspondence was basically in

3    follow-up to your conversation with Mr. Sawicki?

4        A.    Yes, it was.

5        Q.    Basically laying out the information you

6    had already provided him over the phone with respect

7    to, you know, documentation for -- to support your

8    claim; is that right?

9        A.    I can't state that we covered every one of

10   these points in the phone conversation.

11       Q.    Okay.

12       A.    But I felt the need to give a complete

13   explanation in writing so that, you know, he

14   understood what had happened.

15       Q.    Okay.  And was it your information in

16   submitting this letter that American General be

17   relying on the statements that you made in

18   processing your claim?

19             MR. SENECA:  Objection, calls for

20   speculation.

21       A.    That I couldn't say.

22       Q.    Did you have any understanding as to why

23   you were drafting this letter?

24       A.    I drafted this letter to document what had

1    happened.

2        Q.    Okay.  Did you draft this letter and

3    submit it in connection with the claim that you had

4    made for the proceeds under the policy?

5        A.    I drafted this letter in response to a

6    letter received from the insurance agency.

7        Q.    Okay.  And the letter received from the

8    insurance agency or the insurance company --

9        A.    Company.

10       Q.    -- I think it was is the one that said we

11   don't have any record of your assignment?

12       A.    Correct.

13             MR. CROWDER:  Object to the form.

14       Q.    Okay.  And so you were in drafting this

15   letter advising the insurance company of the fact

16   that you did indeed have these assignments; is that

17   right?

18       A.    I was notifying them of the chronology of

19   the -- of our relationship with Amishland Country

20   Village and some of the actions that had transpired

21   over the term of our relationship with them.

22       Q.    Okay.  Did you submit any documentation,

23   any other documents that went with this letter or

24   your letter?

1   be fair to say, Mr. Bianchi, that the insurance

2   payment that you received from American General

3   reduced the amount that was owed to you by the

4   Stilwells and their company?

5           MR. CROWDER:  Object to the form.

6       A.   I --

7           MR. CROWDER:  No foundation.

8       A.   I really don't know how to answer that

9   because I don't -- I'm, you know, reading this again

10  after a long time and I really don't understand the

11  details of this transaction.  So I could not verify

12  what you just said was true or not.

13      Q.   You can't verify for me whether the

14  payment that was made by American General reduced

15  the amount that was owed to you by the Stilwells and

16  their company, ACV?

17          MR. CROWDER:  Object to the form.

18      A.   The only thing I know about the fact that

19  we had a payment is that we had life insurance as

20  collateral on the loan, on the lease.

21      Q.   Okay.  But were you owed a debt from the

22  Stilwells and their company?

23          MR. SENECA:  Just a point of

24  clarification.  When you're talking about this, are

```
 1      you talking about the payment of the 512, whether

 2      that reduced --

 3                  MS. ROTHMAN:  Correct.

 4                  MR. SENECA:  -- Stilwell's debt to --

 5                  MS. ROTHMAN:  Yes, that what I'm --

 6                  MR. SENECA:  -- various entities?

 7                  MR. CROWDER:  That's a separate --

 8                  MS. ROTHMAN:  That's what I meant.

 9          A.   The payment of 512,000 --

10          Q.   I'm not --

11                  MS. BEYERS:  She's not talking about --

12          Q.   I'm off of that.

13          A.   Oh, because there was another insurance

14      payment.  I was thinking of the other insurance

15      payment.  The $512,000 to my recollection had

16      nothing to do with this action.

17          Q.   Okay.  Got you.  The $512,000 that was --

18      and change that was paid to you by the insurance, by

19      American General, that's at issue here --

20          A.   Correct.

21          Q.   -- is it fair to say that that payment

22      reduced the overall amount of debt that ACV and the

23      Stilwells owed to --

24          A.   No, that's an incorrect statement.  It did
```

1     not reduce the overall amount.  It only satisfied

2     the amount owed under the consignment agreement.

3     Had no relationship to the rest of the money owed.

4          Q.   Okay.  It was -- it was -- it was -- but

5     it did reduce the amount that they owed you under

6     the consignment agreement.

7          A.   It satisfied the amount they owed us under

8     the consignment agreement.

9          Q.   Okay.  All right.  So it reduced it to

10    zero.

11         A.   That, yes.

12         Q.   Okay.

13         A.   But when you say the amount they owed us,

14    they owed us more money than just what --

15              MR. SENECA:  That's what I wanted to

16    clarify.

17              MS. ROTHMAN:  I understand that.

18    That's --

19              MR. SENECA:  There's a bunch of different

20    entities here who owed money.

21              MS. ROTHMAN:  I understand that.

22    BY MS. ROTHMAN:

23         Q.   So you mentioned another insurance

24    payment.  What -- what can you tell me about that?

1          A.    That was a $1.5 million insurance payment

2    to Amishland Development by the insurance company

3    under terms of the lease agreement that called for a

4    life policy, assignment of the beneficial interest.

5          Q.    Okay.  Was that a payment that was made to

6    a lender, do you know?

7          A.    Offhand, I don't know exactly how that

8    flowed.

9          Q.    Okay.  Margaret Stilwell filed for

10   bankruptcy, personally filed for bankruptcy,

11   correct?

12         A.    That's my understanding.

13         Q.    Your understanding.  You -- you were the

14   Janko company's -- Janko and TFG, did they assert a

15   claim against Margaret Stilwell in her bankruptcy?

16         A.    I do not believe so.

17         Q.    Okay.  And do you know why a claim was not

18   asserted against Margaret Stilwell in her

19   bankruptcy?

20         A.    Because we had been satisfied -- our

21   claims had been satisfied, number one, through the

22   payment of life insurance proceeds under the

23   consignment agreement and, number two, through this

24   agreement that was reached in our other transaction

1   hear any -- anything further from them with respect

2   to whether they agreed with your position?

3       A.   Did I hear from them?  The only thing that

4   I can recollect is that they approved the fact that

5   we had beneficial interest in the amount of

6   $2,250,000 to Tuscola Furniture Group and $1 million

7   to First Mid Illinois and that payment was to be

8   made.

9       Q.   Okay.  That's --

10      A.   But that may have come from John Lyons not

11  from -- I didn't talk to Ray Sawicki again.

12      Q.   Okay.  That's what I want to get at.  You

13  mentioned that they approved that Tuscola Furniture

14  Group had $2.25 million worth of assignments.  Are

15  you saying that American General through somebody

16  told you that?

17      A.   I can't say that they told me that.  All I

18  know is that that's what happened.

19      Q.   That's what your position was.

20      A.   No, that's what happened.

21      Q.   Well, tell me why you think that's what

22  happened.

23      A.   Well, they wouldn't have paid the claim

24  otherwise.

1        A.    Correct.

2        Q.    And what was contemplated under the

3    consignment agreement was that there would be these

4    beneficial interests or these assignments of the

5    beneficial interest in life insurance policies to

6    secure that amount that was owed to the bank.

7        A.    I'm going to amend your statement.  We had

8    looked for one assignment.  There were not to be

9    multiple assignments.  The one assignment was to be

10   to Tuscola Furniture Group and First Mid Illinois

11   Bank or actually the consignment agreement says the

12   bank --

13       Q.    Sure.

14       A.    -- which happened to be First Mid Illinois

15   Bank.

16       Q.    First Mid.

17       A.    Had -- had that assignment been properly

18   presented, we wouldn't be here today.

19       Q.    But First Mid did have an assignment for

20   $1 million; is that correct?

21       A.    I've seen the document that states that.

22       Q.    Okay.  And they were paid what they were

23   owed by TFG out of the proceeds from the life

24   insurance policies; is that correct?

1         A.    I don't know exactly what the flow of

2     funds were, but my understanding is that TFG was

3     paid and then the bank was paid by TFG.

4         Q.    Okay.  And they were paid what they were

5     owed, correct, by TFG?

6         A.    As far as I know, yes.

7         Q.    Okay.

8         A.    You know what?  In retrospect, I believe

9     that the check -- I don't know if the check was a

10    two-party check.  Transactionally what I believe

11    happened was that the bank received the check and

12    either deposited it in our account and then made

13    payment or took the money out and made payment and

14    then put the balance in our checking account, but

15    the net result was the same.

16        Q.    Correct.  I mean the bank --

17        A.    The bank was paid.

18        Q.    And you got the remainder --

19        A.    Right.

20        Q.    -- is that correct?

21        A.    That's correct.

22        Q.    Okay.  Now, Mr. Bianchi, you were saying

23    that you received some correspondence after you

24    submitted your May 12th, 2003, letter from American

1        A.    The attention on the letter is to Janko

2    Financial Group and myself.

3        Q.    Okay.   To Janko Financial Group and

4    yourself; is that correct?

5        A.    That's correct.

6        Q.    And on behalf of Janko Financial Group,

7    then you responded to that particular letter; is

8    that correct?

9        A.    That's what prompted me to call American

10   General again and that's how I got in touch with Mr.

11   Sawicki.

12       Q.    And then after you spoke with Mr. Sawicki,

13   then you drafted Bianchi Exhibit No. 7 --

14       A.    That's correct.

15       Q.    -- is that correct?

16       A.    That's correct.

17       Q.    And you are the sole author of this

18   exhibit which is Bianchi Exhibit No. 7 --

19       A.    That's correct.

20       Q.    -- is that correct?

21       A.    Yes.

22       Q.    First Mid Illinois Bank and Trust did not

23   draft that letter with you; is that correct?

24       A.    That's correct.

1          Q.    And you provided them with a copy of that

2     for the first time at the same time that you would

3     have sent it to Mr. Sawicki; is that correct?

4          A.    That's correct.

5          Q.    And let's then go to your May 28th, 2003,

6     letter to Mr. Lyons which I think it's Stilwell

7     Exhibit 14.

8          A.    14, yes.

9          Q.    And just so we're clear, it's not that --

10    you wrote this letter not because the information

11    contained in your May 12th, 2003, letter was

12    incorrect.  It's just that you left out one

13    assignment --

14         A.    Right.

15         Q.    -- is that correct?

16         A.    I wanted to amend that letter to include,

17    and therefore that's why I wrote it as I did, which

18    was to rewrite that paragraph -- actually to make an

19    addition to that paragraph, took out an and, put in

20    a comma, and then put in the additional assignment

21    of beneficial interest that I had inadvertently left

22    out of the May 12th letter.

23         Q.    So it was really sent to make an addition

24    to your prior letter.