**E-FILED**
Monday, 02 April, 2007  04:45:44 PM
Clerk, U.S. District Court, ILCD

# CONSIGNMENT AGREEMENT

This Consignment Agreement made this _16_ day of _April_ , 1999 by and between **JANKO FINANCIAL GROUP L.L.C.**, an Illinois Limited Liability Company, hereafter "JANKO" and **AMISHLAND COUNTRY VILLAGE, INC.**, an Illinois Corporation, hereafter "ACV".

WHEREAS, ACV is in the business of retail sale of Amish made furniture and desires to establish a retail outlet in Tuscola, Illinois but lacks financial resources for acquiring an adequate inventory of Amish furniture, and

WHEREAS, JANKO has the financial resources and is willing to purchase an inventory of Amish crafted furniture and consign same with ACV upon the terms and conditions herein.

1.  **DEFINITIONS**

    1.1  "ACV" means **AMISHLAND COUNTRY VILLAGE, INC.**, an Illinois Corporation the consignee under this Consignment Agreement.

    1.2  "AMISH FURNITURE" herein means originally made and crafted Amish furniture, fully finished, and AMISH style furniture made by others but does not include crafts, lamps, pictures and accessories other than wood products, whether Amish made or not.

    1.3  "AVERAGE WHOLESALE COST" means the inventory value of the AMISH FURNITURE as determined by QUICK BOOKS software program on a straight line average

    1.4  "BANK" means **FIRST MID-ILLINOIS BANK and TRUST OF TUSCOLA, ILLINOIS.**

    1.5  "INVENTORY CAP" means the maximum total aggregate amount of the average wholesale cost of Amish Furniture consigned by JANKO to ACV.

    1.6  "JANKO" means **JANKO FINANCIAL GROUP, L.L.C.**, an Illinois Limited Liability Company herein the consignor under this Agreement.

    1.7  "JANKO'S INVESTMENT" means all amounts paid by JANKO for AMISH FURNITURE less credits for payments received from sales of AMISH FURNITURE

1



0308

1.8    "STILWELL" means JAMES and/or MARGARET STILWELL, the sole Shareholders of ACV.

## 2.    AGREEMENTS OF JANKO

2.1    JANKO agrees to purchase the existing inventory of Amish furniture now owned by ACV at current wholesale replacement cost and to purchase new Amish furniture selected by ACV, all at wholesale value or cost from time to time during the existence of this Agreement provided that the total amount of purchases shall never exceed $2,000,000.00 except as otherwise allowed herein.

2.2    JANKO will be the owner of such Amish furniture free and clear of all liens and encumbrances except a Security Agreement with BANK in an amount not to exceed 80% of the wholesale value.

2.3    JANKO will consign the Amish furniture with ACV and with no other party or entity unless with the consent of ACV or pursuant to termination of this Agreement by reason of the default of ACV.

2.4    JANKO will pay ACV, or at the direction of ACV, the seller of the Amish furniture all items delivered to an ACV store or warehouse within seven (7) days of demand and JANKO'S receipt of proper documentation, i.e. Purchase Order Receipts with corresponding copy of vendor invoices and no more frequently than once every two (2) weeks.

2.5    Wholesale value will be determined and supported by receipts or invoices from suppliers, copies to be provided by STILWELL.

2.6    JANKO may increase or waive the inventory cap of $2,000,000.00 limit on the purchase of Amish furniture upon the written request of ACV submitted not earlier than one (1) year from the date of this Agreement and conditioned upon evidence that ACV is current and not in default on any of its financial obligations including all current and long term lenders and tax obligations to State and Federal governmental bodies.

## 3.    AGREEMENTS OF ACV:

3.1    ACV will sell to JANKO its existing inventory of Amish furniture at current wholesale replacement cost and purchase on behalf of JANKO additional Amish furniture at wholesale cost from time to time during the term of this Agreement which total wholesale value should never exceed $2,000,000.00 unless increased pursuant to paragraph 2.6 above.

0309

3.2    ACV's purchase at wholesale of Amish furniture on behalf of JANKO shall be under the supervision and direction of STILWELL who shall exercise reasonable care and diligence in selecting marketable Amish furniture at fair and reasonable cost.

3.3    ACV will keep, preserve, repair and maintain all Amish furniture in good condition at it's store in Tuscola, IL and sell and market same in the ordinary course of its business at retail pricing in such amounts as determined by ACV. At all times ownership of the Amish furniture shall be in the name of JANKO and ACV will execute, obtain or provide such Bill of Sales, Inventory lists, or other documents as deemed necessary by JANKO to evidence its ownership.

3.4    <u>Principal Payments</u>: ACV will pay or remit to BANK in an account designated by JANKO by the 10th day of the month, an amount equal to the average wholesale cost of the items sold during the previous month. Such reductions in the inventory level of Amish furniture may be replaced up to the inventory cap.

3.5    <u>Consignment Payments</u>: For its consignment services, ACV may retain all amounts in excess of average wholesale cost obtained from the sale at retail of the Amish furniture after deducting and paying Bank in an account designated by JANKO by the 10th day of the month an amount equal to the previous month's total of:

a)    10% of retail sale price, exclusive of sales tax;

b)    interest (at the rate charged by BANK to JANKO) on the amount of JANKO'S INVESTMENT; and

c)    all other costs, points, fees, charges by BANK to JANKO.

3.6    <u>Other Furniture</u>: ACV may purchase or maintain for resale any other furniture complimentary to, but not currently produced by Amish manufactures in an amount not to exceed 3% of the average wholesale replacement cost of total inventory.

3.7    <u>Product Liability Insurance</u>: ACV will obtain Product Liability Insurance in the minimum amount of One Million Dollars at its cost, naming JANKO as an additional insured with fee tail coverage, with an Insurance Company rated by AM Best of a rating of "A" or better.

3

3.8     <u>Casualty Insurance:</u> ACV will insure the Amish furniture against fire, loss, theft, vandalism, damage and other casualty with an insurance company rated by AM Best of a rating A or better at its full insurable value naming JANKO and BANK as additional party insured. Said policies will maintain a clause requiring notice to JANKO and BANK ten (10) days prior to any alteration in terms or cancellation. ACV will furnish evidence of such insurance being in force to JANKO and BANK. Any insurance proceeds paid to JANKO and BANK in excess of the balance of the obligations owed by ACV to JANKO and JANKO'S cost for the Amish Furniture shall be the property of ACV and shall be paid over to ACV after the obligations due under this Agreement and Amish furniture costs have been paid in their entirety.

3.9     <u>Life Insurance:</u> ACV will maintain life insurance and pay the premiums thereon on JIM STILWELL in an amount of at least $2,000,000.00 or an amount equal to the Inventory Cap, if higher, with JANKO and BANK named as beneficiary with an insurance company rated A or better by AM Best. The life insurance proceeds shall be used first to pay BANK for the amount JANKO owes BANK in order to release its lien on the Amish furniture, then to JANKO for all Amish furniture owned by JANKO at average wholesale cost, less a credit for the amount paid BANK, and any other amounts owed to JANKO under this Agreement and any excess life insurance proceeds shall be paid to the Estate of JIM STILWELL or ACV. Upon payment JANKO will convey title to as much of the Amish furniture free and clear of all liens, as was paid for by the insurance proceeds, to ACV.

3.10    If ACV shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required above, or fail to pay any premium in whole or in part relating to any such policies, then JANKO may, but need not, obtain and cause to be maintained any or all of such policies and pay any part or all of the premiums due thereunder without thereby waiving the said default or any other default by ACV. Any sums so disbursed by JANKO shall be additional indebtedness owed by ACV to JANKO and shall incur interest at the default rate of 12%.

3.11    ACV shall implement and maintain an inventory and accounting system acceptable to JANKO and BANK for the purpose and tracking the purchase and sale and payment of funds pursuant to this Agreement, which shall include, but not be limited to the following:

     a)     Physical inventory will be taken by ACV once/month and ACV will do such spot inventories as directed by JANKO. JANKO may also conduct its own spot, random or complete inventories.

0311

b)     ACV will maintain on a daily basis, a running book inventory.

c)     Whenever inventory records over a quarterly period indicate "inventory shrinkage" has occurred, ACV will pay JANKO within five (5) days the amount of SHRINKAGE at average wholesale cost, plus 10% of the sale price of the missing inventory and inventory records will be adjusted in accordance therewith.

d)     ACV will establish and implement a physical coding system of inventory items acceptable to JANKO, and every item will be backed by a Bill of Sale, purchase order or paid receipt in connection with its acquisition and a sales receipt in connection with its disposition.

3.12   ACV shall pay and be responsible for all expenses for the storage, transportation, handling, sales and distribution of said Amish furniture, as well as all costs incurred by JANKO in connection with BANK financing of JANKO'S purchase of Amish furniture, including, but not limited to interest, points, fees and other BANK charges incurred to maintain inventory financing by BANK.

3.13   ACV will keep account books and records giving complete information covering all transactions in connection with the purchase, sale, returns and distribution of Amish furniture and payment of the amounts due hereunder, and such books and records shall be open during normal business hours to the inspection of any duly authorized representative of JANKO or BANK.

3.14   Inspections: JANKO, BANK or their agents shall have the right, at any time and from time to time hereunder, to inspect and examine the Amish furniture and to copy any records relating thereto, provided that such inspection, examination or copying does not unreasonably interfere with ACV's Business.

3.15   ACV will use its best efforts to sell and merchandise Amish furniture promptly and in a profitable manner.

3.16   ACV shall not have any store wide sale of Amish furniture for less than average wholesale cost plus 10% without the consent of JANKO except in the case of Amish furniture deemed unmarketable, obsolete or damaged in the opinion of ACV.

0312

4.    **TERM**

4.1     This Agreement shall remain in effect for ten (10) years from the date of the first monies of JANKO used to purchase new or existing inventories of Amish furniture which date shall be inserted at the end of this Agreement.

4.2     After completion of the first five (5) years of this Agreement, ACV shall have the right to terminate this Agreement upon thirty (30) days advance written notice to JANKO and payment to JANKO for the Amish furniture at current wholesale replacement cost or average wholesale cost, whichever is higher and all accrued and delinquent obligations owed by ACV to JANKO. In addition, ACV will pay JANKO a "residual payment" equal to two times 2% of the average annual gross retail sales of Amish furniture by ACV during the first five years of this Agreement.  1/8 of said amount shall be paid for the next eight quarters thereafter or until the end of the original ten year term, which ever occurs first.

4.3     JANKO shall have the right to terminate this Agreement after the first twelve months of ACV's operations at its new building at  South Progress Street, Tuscola, IL unless ACV does not open for business at its new building within twelve months of the date of this agreement in which case, JANKO shall have the right to terminate this Agreement any month after the first twelve months from the date of this Agreement.  Written notice of termination shall be given to ACV 120 days in advance of the date of termination. In the event of termination by JANKO, JANKO will be  paid the same amounts as in the event of termination by ACV except JANKO shall not be entitled to the residual payment.

5.    **WARRANTIES AND COVENANTS OF ACV:**

5.1     ACV expressly warrants, covenants and agrees, so long as any indebtedness as hereinbefore described remains unpaid to JANKO, as follows:

5.2     ACV is (or at time of conveyance will be) the sole owner of the Amish furniture in its existing inventory free from any lien, security interest or encumbrance in favor of any person or entity, has the right to convey its existing inventory of Amish furniture to JANKO and will defend the collateral against the claims and demands of all persons.

5.3     Except for sales in the ordinary course of business, ACV shall not sell, assign, transfer, encumber or hypothecate in any manner the Amish furniture.

0313

5.4     ACV is a Corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. ACV has the power and authority to carry on its business, to enter into this Consignment Agreement and to carry out the provisions hereof.

5.5     ACV is not in violation of, and the execution, delivery and performance of and compliance with this Consignment Agreement, will not result in ACV being in violation of, or in conflict with, or constitute a default under any term or provisions of any mortgage, indenture, contract, agreement, instrument, judgement, decree, order, statute, rule or regulation applicable thereto.

5.6     There are no actions, suits or proceedings pending or to the knowledge of ACV threatened against or affecting ACV at law or in equity or before or by any federal, state, municipal or other governmental department, commissions, board, bureau, agency or instrumentality, domestic or foreign, which involve the possibility of any judgement or liability not fully covered by insurance and which may result in any material adverse change in ACV's business or the operations, properties or assets or in the condition (financial or otherwise) of ACV.

## 6.     CONTINGENCIES AND CONDITIONS:

6.1     JANKO'S obligations under this Agreement are contingent upon:

6.2     JANKO obtaining a line of credit in the minimum of 2.0 million dollars from BANK for the purchase of Amish furniture on terms acceptable to JANKO and ACV.

6.3     Personal guarantee to JANKO by JAMES and MARGARET STILWELL of all funds owed by ACV to JANKO and for the obligations of ACV under this Agreement whether to JANKO or BANK.

6.4     Life Insurance on JAMES STILWELL in the amount of at least Two Million Dollars or an amount equal to the Inventory Cap, if higher, with JANKO and BANK as beneficiaries to the extent of the amounts owed to them, with an Insurance Company rated "A" or better by AM Best.

6.5     Casualty insurance coverage equal to average wholesale cost on all furniture inventory with JANKO and BANK named as an additional insured party with an Insurance Company rated "A" or better by AM Best.

7

0314

6.6    Product Liability Insurance in an amount of at least One Million Dollars with JANKO named as an additional insured party, with an Insurance Company rated "A" or better by AM Best.

6.7    ACV having received all necessary government approvals for site plans and building permits, financing approval, a signed contract for construction of all real estate and infrastructure improvements and a signed Contract for construction of a building at _South Progress St._, Tuscola, IL to be used for retail sale of the Amish furniture. Except JANKO will participate in an amount not to exceed $300,000 in average wholesale the cost of inventory for ACV operating at storefront(s) in the Tuscola Outlet Mall until ACV's building is completed and ready for occupancy, subject to the provisions of paragraph 4.3.

6.8    An inventory and accounting system acceptable to JANKO and BANK for the purpose of tracking the Amish furniture business and payments due under this Agreement.

6.9    A Letter of Intent between JANKO and JAMES STILWELL for JAMES STILWELL to lease a restaurant from JANKO on land currently owned by the TUSCOLA HOTEL GROUP, L.L.C. adjacent to the Holiday Inn Express in Tuscola, IL.

6.10   ACV's obligations under this Agreement are contingent upon 6.2, 6.5, 6.7, 6.8 and 6.9 above.

7.    **PERFORMANCE:**

7.1    If ACV (1) defaults by failing to pay when due any single installment or payment required to be made to JANKO or BANK under the terms of this Consignment Agreement and such default is not cured within ten (10) days of written notice to ACV; or (2) defaults in the performance of any other covenant or agreement hereof and such default is not cured by ACV within thirty (30) days after written notice to ACV (unless the default involves a dangerous condition which shall be cured forthwith); JANKO may treat such a default as a breach of this Agreement and JANKO shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity:  (i) maintain an action for any unpaid amounts; (ii) declare the entire balance due and maintain an action for such amount; (iii) forfeit the ACV's interest this Agreement, retain all sums paid; and with or without notice and without process of law, take possession of said

8

furniture, or any part thereof that remains unsold or in the custody of ACV, and for that purpose may enter any of the premises of ACV to search for or obtain said furniture, and consignee hereby waives any trespass or any rights of action for damages that it might or could have against consignor or its agents by reason of consignor, or its agents, procuring or attempt to procure possession of Amish furniture after forfeiture as aforesaid; or (iv) upon ACV's failure to surrender possession of the Amish furniture to JANKO, maintain an action for possession of the Amish furniture under the Illinois Replevin Act.

7.2    If default is based upon the failure to pay sales taxes, insurance, liens or other charges relating to the Amish furniture as provided in this Agreement, JANKO may elect to make such payments, which amounts shall become immediately due and payable by ACV to JANKO, and if not paid within ten (10) days of demand shall then be payable together with 12% interest per annum.

8.    **DEFAULT, FEES:**

8.1    ACV shall pay all reasonable attorney's fees and costs incurred by JANKO in enforcing the terms and provisions of this Consignment Agreement, or in defending any proceeding to which JANKO is made a party defendant as a result of the acts or omissions of ACV.

8.2    All rights and remedies given to JANKO, shall be distinct, separate, and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement; (2) No waiver of any breach or default of either party hereunder shall be implied from any omission by the other party to take any action on account of any similar or different breach or default. The payment or acceptance of money after it falls due after knowledge of any breach of this agreement by JANKO, or after the termination of ACV's right of possession of the Amish Furniture hereunder, or after the service of any notice, or after commencement of any suit, or after final judgment for replevin shall not reinstate, continue, or extend this Agreement nor affect any such notice, demand or suit or any right hereunder not herein expressly waived.

0316

9.    **DELINQUENT MONTHLY PAYMENTS:**

    9.1    ACV acknowledges that late payments by ACV to JANKO of the amounts or other charges due hereunder will cause JANKO to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed upon BANK by the terms of any note, and/or security agreement covering the Amish Furniture. Accordingly, if any installment or any sum due from ACV shall not be received by JANKO or JANKO's designee within ten (10) days after said amount is due, then ACV shall pay to JANKO a late charge equal to the greater of (i) five percent (5%) per month of such overdue amount, plus any attorney's fees incurred by JANKO by reason of ACV's failure to pay and/or other charges due hereunder; or (ii) One Hundred Dollars ($100.00). The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that JANKO will incur by reason of the late payment by ACV. Acceptance of such late charges by JANKO shall in no event constitute a waiver of ACV's default with respect to such overdue amount, nor prevent JANKO from exercising any of the other rights or remedies granted hereunder.

10.    **SEVERABILITY:**

    10.1    Any provisions of this Consignment Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and such other provisions shall remain in full force and effect.

11.    **WAIVER:**

    11.1    The waiver by JANKO of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition of any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of payment hereunder by JANKO shall not be deemed to be a waiver of any preceding breach by ACV of any term, covenant or condition of this Agreement, other than the failure of ACV to pay the particular delinquency so accepted, regardless of the JANKO's knowledge of such preceding breach at the time of acceptance of such delinquent payment.

0317

12. <u>NOTICES</u>:

12.1 All notices and demands which may, or are required to be given by either party to the other hereunder, shall be in writing. All notices and demands by the JANKO to the ACV shall be sent by United States Certified or Registered mail, postage prepaid, addressed to ACV at the business address, or to such other places as the ACV may from time to time designate in writing to the JANKO or may be personally served upon ACV. All notices and demands by ACV to JANKO shall be sent by United States Certified or Registered Mail, postage prepaid, addressed to JANKO, 2220 Marquette Road, Peru, IL or to such other person or place or persons or places as the JANKO may from time to time designate in writing to the ACV. All notices shall be effective as of the date of receipt or certification. Delivery may also be made by an established national overnight delivery service (such as Federal Express).

13. <u>MARGINAL HEADINGS</u>:

13.1 The marginal headings and titles to the Paragraphs of this Agreement are not a part of the Agreement and shall have no effect upon the construction or interpretation of any part hereof.

14. <u>TIME</u>:

14.1 Time is of the essence in this Consignment Agreement and each and all of its provisions.

15. <u>SUCCESSORS AND ASSIGNS; BINDING EFFECT</u>:

15.1 The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

15.2 ACV may not assign its interest, rights or obligations herein without the consent of JANKO.

16. <u>SUBORDINATION</u>:

16.1 Upon the request of JANKO, ACV herewith subordinates or will subordinate its rights hereunder to any lien of any Security Agreement by JANKO to any bank, or other lending institution now or hereafter placed against the Amish furniture. ACV shall execute upon request a document indicating said subordination. The provisions of this paragraph shall be self-operative and no further instrument of subordination shall be required .

11

17. **SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS:**

17.1    JANKO and ACV each hereby agree that their respective representations, warranties, covenants and agreements set forth herein shall survive the closing and shall thereafter be fully effective and enforceable.

18. **AGENTS:**

18.1    JANKO's agent for all matters under this agreement is DICK JANKO, until ACV is notified of a different agent pursuant to paragraph 12.1.

18.2    ACV's agent for all matters under this Agreement is JAMES STILWELL, until JANKO is notified of a different agent pursuant to paragraph 12.1.

19. **ENTIRE AGREEMENT:**

19.1    This Consignment Agreement contains the entire agreement of the parties hereto with respect to the matters covered hereby, and no other agreement, statement or promise made by any party hereto, or to any employee, officer or agent of any party hereto, which is not contained herein, shall be binding or valid.

This Agreement is made the day and year first above written the effective is below.

ACV:                                                         JANKO:

AMISHLAND COUNTRY                        JANKO FINANCIAL GROUP, L.L.C.,
VILLAGE, INC.,                                       An Illinois Limited Liability Company,
an Illinois Corporation

BY:_____       BY:_____
Printed:_____
Its:_____        RICHARD JANKO, Authorized Member
                                                          2220 Marquette Road
                                                          Peru, IL 61354

0319

20. **EFFECTIVE DATE:**

20.1   The parties agree, pursuant to paragraph 4.1, that the beginning date (effective date) of this Agreement is _April 16_, 1999.

ACV:

JANKO:

**AMISHLAND COUNTRY VILLAGE, INC.,**
an Illinois Corporation

BY: _Jim Stilwell_
Printed: _Jim Stilwell_
Its: _President_

**JANKO FINANCIAL GROUP, L.L.C.,**
An Illinois Limited Liability Company,

BY: _____
RICHARD JANKO, Authorized Member
2220 Marquette Road
Peru, IL 61354

JANKO\AMISHLND.AGR3 ML

13

## GUARANTY

WHEREAS, JANKO FINANCIAL GROUP, L.L.C., an Illinois Limited Liability Company, hereinafter referred to as "JANKO" and AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation, hereinafter referred to as "ACV" are about to execute a document entitled "CONSIGNMENT AGREEMENT" dated _April 16_, 1999, wherein JANKO will consign Amish furniture to ACV; and

WHEREAS, JAMES STILWELL and MARGARET STILWELL, hereinafter referred to as "Guarantor", have a financial interest in ACV; and

WHEREAS, JANKO would not execute the Consignment Agreement if Guarantor did not execute and deliver to JANKO this Guarantee.

NOW, THEREFORE, for and in consideration of the execution of the foregoing Consignment Agreement by JANKO and as a material inducement to JANKO to execute said Consignment Agreement, Guarantor hereby unconditionally and irrevocably guarantees the prompt payment by ACV of all sums payable by ACV under said Consignment Agreement and the faithful and prompt performance by ACV of each and every one of the terms, conditions and covenants of said Consignment Agreement to be kept and performed by ACV.

It is specifically agreed and understood that the terms of the foregoing Consignment Agreement may be altered, affected, modified or changed by agreement between JANKO and ACV, or by a course of conduct, and said Consignment Agreement may be assigned by JANKO, or any assignee of JANKO, without consent or notice to Guarantor and that this Guaranty shall thereupon and thereafter guarantee the performance of said Consignment Agreement as so changed, modified, altered or assigned.

This Guaranty shall not be released, modified or affected by failure or delay on the part of JANKO to enforce any of the rights or remedies of JANKO under said Consignment Agreement, whether pursuant to the terms thereof or at law or in equity.

Ten (10) days' notice of default shall be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee under which JANKO may proceed forthwith and immediately against ACV or against Guarantor following any breach or default by ACV or for the enforcement of any rights which JANKO may have as against ACV pursuant to or under the terms of the within Consignment Agreement at law or in equity.

1



EXHIBIT
8

JANKO shall have the right to proceed against the Guarantor hereunder following any breach or default by ACV without first proceeding against ACV and without previous notice to or demand upon ACV.

Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) demand of payment, presentation and protest; (c) all right to assert or plead any statute of limitations as to or relating to this Guaranty and the Consignment Agreement; (d) any right to require JANKO to proceed against the ACV or any other Guarantor or any other person or entity liable to JANKO; (e) any right to require JANKO to proceed under any other remedy JANKO may have before proceeding against Guarantor; and (f) any right of subrogation.

Guarantor does hereby subrogate all existing or future indebtedness of ACV to Guarantor to the obligations owed to JANKO under this Consignment Agreement and this Guaranty.

In the event any action be brought by said JANKO against Guarantor hereunder to enforce the obligation of Guarantor hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the Court.

IN WITNESS WHEREOF, the undersigned have set their hands and seals this _16_ day of _April_, 1999, at _Tuscola_ Illinois.

GUARANTOR:

_James Stilwell_
JAMES STILWELL

ADDRESS: _718 N Iowa_
_Atwood_

_Margaret Stilwell_
MARGARET STILWELL

JANKO\GUARANTY.STL

2

0322

MFS JANKIS FINANCIAL GROUP LLC.

A. For Value Received the undersigned hereby assign, transfer and set over to _____

Address 2220 MARQUETTA Rd
PERU-IL 61354

its successors and assigns, (herein called the "Assignee") Policy No. 260 4663 _____ issued by the

(herein called the "Insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being herein

called the "Policy"), upon the life of JAMES E, Stilwell _____ and all claims, options, privileges, rights, title and interest

of Atwood, IL 61913 _____ therein and thereunder (except as provided in Paragraph C hereof), subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against the Policy. The undersigned by this instrument jointly and severally agree and the Assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth.

B. It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:
  1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;
  2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;
  3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;
  4. The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided that unless and until the Assignee shall notify the Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this assignment; and
  5. The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom.

C. It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof;
  1. The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;
  2. The right to designate and change the beneficiary;
  3. The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer, but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the Assignee hereunder.

D. This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "liabilities").

E. The Assignee covenants and agrees with the undersigned as follows:
  1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed;
  2. That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed , by first-class mail, to the undersigned at the addresses last supplied in writing to the Assignee specifically referring to this assignment, notice of intention to exercise such right; and
  3. That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement.

F. The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the liabilities or the existence of any default therein, or the giving of any notice under Paragraph E (2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received shall be a full discharge and release therefor to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned herein, shall be drawn to the exclusive order of the Assignee if, when, and in such amounts as may be, requested by the Assignee.

G. The Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall draw interest at a rate fixed by the Assignee from time to time not exceeding 8% per annum.

H. The exercise of any right, option, privilege or power given herein to the Assignee shall be at the option of the Assignee, but (except as restricted by Paragraph E (2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

I. The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as the Assignee shall determine the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security.

J. In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail.

K. Each of the undersigned declares that no proceedings in bankruptcy are pending against him and that his property is not subject to any assignment for the benefit of creditors.

x _____ (X) _Margaret Stilwell_ _4/19/99_
      Witness                Policyowner (if company owned, name of company & title of officer signing)       Date

                                          Soc. Sec./Tax ID # 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

x _Lawrence W Bianchi_ (X) _____ _4/19/99_
      Witness                Joint Insured/Owner, Assignee, Irrevocable Beneficiary or Spouse       Date
                             in Community Property State

Received and filed at the Home Office of The Old Line Life Insurance Company of America, 707 North Eleventh Street, P.O. Box 401, Milwaukee, Wisconsin 53201-0401.

Date: _____ By: _____

EXHIBIT 9

## INDIVIDUAL ACKNOWLEDGMENT

State of _____Illinois_____

County of _____Douglas_____  } ss:

On the _____19th_____ day of _____April_____ 19 99 , before me personally came

_____Margaret Stilwell_____ , to me known to be the individual ____ described in and who executed th

assignment on the reverse side hereof and acknowledged to me that_____she_____ executed the same.

_____
Notary Public

My commission expires _____6-22-00_____

> OFFICIAL SEAL
> RICHARD A HARRER
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES:06/22/00

## CORPORATE ACKNOWLEDGMENT

State of _____

County of _____  } ss:

On the _____ day of _____ 19 _____ , before me personally came

_____ , who being by me duly sworn, did depose and say that he resides in

_____ that he is the _____ of_____

the corporation described in and which executed the assignment on the reverse side hereof; that he knows the seal of said corporation; that the seal affixed to said assignment is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

_____
Notary Public

My commission expires _____

Duplicate received and filed at the home office of the Insurer in _Dallas, TX_ , this _____ day of _____ 19 _____

MAY 14 1999

_____
By _____
Authorized Officer

NOTE: When executed by a corporation, the corporate seal should be affixed and there should be attached to the assignment a certified copy of the resolution of the Board of Directors authorizing the signing officer to execute and deliver the assignment in the name and on behalf of the corporation.

SEP 08 2000 15:06 FR AG-DALLAS SERV CTR    2146546022 TO 912175783560    P.02/03



**ADMINISTRATIVE OFFICE**
PO Box 35844
Dallas TX 75235 8683
800 487 5433/214 654 6300/FAX 214 654 6001

# THE OLD LINE LIFE Insurance Company of America

## An American General Company

## ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

$1,500,000

**A.** For Value Received the undersigned hereby assign, transfer and set over to _____
PLEASE PRINT FULL NAME AND ADDRESS OF ASSIGNEE **JANKO Financial Group LLC  3230 MARQUETTA RD Peru FL 61354**

its successors and assigns, (herein called the "Assignee") Policy No. **2604663** , issued by the Company (herein called "Insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy") upon the life of **James E. Stilwell**
Dr **Atwood FL 61913** and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof) subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against the Policy. The undersigned by this instrument jointly and severally agree and the Assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth.

**B.** It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:
  1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity:
  2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;
  3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;
  4. The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee shall notify the Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this assignment; and
  5. The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom.

**C.** It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof:
  1. The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;
  2. The right to designate and change the beneficiary;
  3. The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer; but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the Assignee hereunder.

**D.** This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

**E.** The Assignee covenants and agrees with the undersigned as follows:
  1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed;
  2. That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed, by first-class mail, to the undersigned at the address last supplied in writing to the Assignee specifically referring to this assignment, notice of intention to exercise such right; and
  3. That the Assignee will forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement.

**F.** The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the Liabilities or the existence of any default therein, or the giving of any notice under Paragraph E (2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received shall be a full discharge and release therefor to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned therein, shall be drawn to the exclusive order of the Assignee if, then, and in such amounts as may be requested by the Assignee.

**G.** The Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum.

**H.** The exercise of any right, option, privilege or power given herein to the Assignee shall be at the option of the Assignee, but (except as restricted by Paragraph E (2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as the Assignee shall determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting to or regard to other security.

**I.** In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail.

**K.** Each of the undersigned declares that no proceedings in bankruptcy are pending against him and that his property is not subject to any assignment for the benefit of creditors.



POOR ORIGINAL

**EXHIBIT**
Myron #6

**EXHIBIT**
10
tabbies



SEP 08 2000 15:07 FR AG-DALLAS SERV CTR    2146546022 TO 912175783560

Signed this _____ 25 day of September _____ 2000 YEAR

In the presence of:

William John Lyons

INSURED OR OWNER (IF OTHER THAN INSURED)

_____        _____
                                          OTHER REQUIRED SIGNATURE

_____        _____
                                          OTHER REQUIRED SIGNATURE

**POOR ORIGINAL**

CORPORATE ACKNOWLEDGEMENT

STATE OF ___ Illinois _____
                                          } ss:
COUNTY OF ___ Douglas _____

On the 25th of September 2000 before me personally came Margaret Stilwell
                              YEAR
who being by me duly sworn, did depose and say that she resides in Atwood, IL that he is
the Vice President of Arcola Meat Service Inc. the corporation described in and which executed the foregoing instrument; that he
knows the seal of said corporation; that the seal affixed to said assignment is such corporate seal; that it was so affixed by order of the
Board of Directors of said corporation, and that he signed his name thereto by like order.

```
OFFICIAL SEAL
GERALD V. ALEXANDER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/03/02
```

_____
        NOTARY PUBLIC

My commission expires _____ 4-3-02

---

**HOME OFFICE USE ONLY**

This is to certify that the original of this collateral Assignment has been recorded with the Company.

Dated in Dallas, TX this _____ day of _____        OCT 02 2000
                                                                          YEAR

By _____
              AUTHORIZED OFFICER

## ASSIGNMENT AND ASSUMPTION AGREEMENT
## (AMISH FURNITURE)

This Assignment and Assumption Agreement made as of this _16_ day of _NOV_____, 2000 by and between JANKO FINANCIAL GROUP, LLC, an Illinois Limited Liability Company, Assignor, and TUSCOLA FURNITURE GROUP, LLC, an Illinois Limited Liability Company, Assignee.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt whereof is acknowledged, Assignor hereby assigns and Assignee hereby agrees to assume and to fully and faithfully perform the obligations of Assignor under the following:

1.  Consignment Agreement dated 4/16/99 by and between AMISHLAND COUNTRY VILLAGE, INC.,   and JANKO FINANCIAL GROUP, L.L.C.

2.  Any and all Contracts and other documents including insurance policies,  relating to and incurred in connection with the acquisition and consignment of AMISH FURNITURE pursuant to the Consignment Agreement referred to in paragraph 1.

3.  All inventory of AMISH FURNITURE owned by Assignor and subject to the Consignment Agreement.

IN WITNESS WHEREOF, the Assignor and Assignee have caused this Assignment and Assumption Agreement to be fully executed  and delivered this _16_ day of _NOV_____, 2000.

ASSIGNEE:
TUSCOLA FURNITURE  GROUP, LLC
by  its Manager,
JANKO FINANCIAL GROUP,L.L.C.

BY: _____
RICHARD JANKO, Authorized Member

ASSIGNOR:
JANKO FINANCIAL  GROUP, LLC

BY: _____
RICHARD JANKO, Authorized Member

EXHIBIT

11

JANKO\TUSCOLA-AMISHLAND.ASNM

000153

*11/02/00*

# CONSIGNMENT AGREEMENT

This Consignment Agreement made this _17th_ day of _November_ 2000 by and between TUSCOLA FURNITURE GROUP, LLC., an Illinois Limited Liability Company, hereafter "TFG" and AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation, hereafter "ACV".

WHEREAS, ACV is in the business of retail sale of Amish made furniture and desires to establish a retail outlet in Tuscola, Illinois but lacks financial resources for acquiring an adequate inventory of Amish furniture, and

WHEREAS, TFG has the financial resources and is willing to purchase an inventory of Amish crafted furniture and consign same with ACV upon the terms and conditions herein, and

WHEREAS, JANKO FINANCIAL GROUP, L.L.C., an Illinois Limited Liability Company, hereafter "JANKO" and ACV are parties to a "Consignment Agreement" dated April 16, 1999, and

WHEREAS, JANKO having the right, without the consent of ACV, to assign its interest in the Cosignment Agreement, has assigned its interest in the Cosignment Agreement dated 4/16/99 to TFG, and

WHEREAS, TFG (as assignee of JANKO) and ACV, desiring to    modify the Cosignment Agreement dated April 16, 1999, by terminating same and entering into this agreement do hereby agree as follows:

## 0.O    THE AGREEMENT:

0.1     The Consignment Agreement dated April 16, 1999 by and between JANKO and ACV is hereby terminated and replaced by this Consignment Agreement, effective as of the date of this agreement.

0.2     ACV shall cooperate with JANKO and TFG in regards to changing the name of the consignor on all documents relating to transactions relating to this agreement.

1

EXHIBIT

tabbies

12

0655

1. <u>DEFINITIONS</u>

    1.1    "ACV" means AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation the consignee under this Consignment Agreement.

    1.2    "AMISH FURNITURE" herein means (i) originally made and crafted Amish furniture, fully finished, (ii) AMISH style furniture made by others and (iii) any "other furniture" purchased and owned by TFG in an amount not to exceed 3% of the average wholesale replacement cost of total inventory, but does not include crafts, lamps, pictures and accessories other than wood products, whether Amish made or not.

    1.3    "AVERAGE WHOLESALE COST" means the inventory value of the AMISH FURNITURE as determined by QUICK BOOKS software program on a straight line average

    1.4    "BANK" means FIRST MID-ILLINOIS BANK and TRUST OF TUSCOLA, ILLINOIS.

    1.5    "INVENTORY CAP" means the maximum total aggregate amount of the average wholesale cost of Amish Furniture consigned by TFG to ACV.

    1.6    "JANKO" means JANKO FINANCIAL GROUP, L.L.C., an Illinois Limited Liability Company, the manager of TFG.

    1.7    "TFG'S INVESTMENT" means all amounts paid by TFG for AMISH FURNITURE less credits for payments received from sales of AMISH FURNITURE

    1.8    "STILWELL" means JAMES and/or MARGARET STILWELL, the sole Shareholders of ACV.

    1.9    "TFG" means TUSCOLA FURNITURE GROUP, LLC., an Illinois Limited Liability Company, the consigner under this Agreement.

2. <u>AGREEMENTS OF TFG</u>

    2.1    TFG agrees to purchase the existing inventory of Amish furniture now owned by ACV at current wholesale replacement cost and to purchase new Amish furniture selected by ACV, all at wholesale value or cost from time to time during the existence of this Agreement provided that the total amount of purchases shall never exceed $1,250,000.00 except as otherwise allowed herein.

    2.2    TFG will be the owner of such Amish furniture free and clear of all liens and encumbrances except a Security Agreement with BANK in an amount not to exceed 80% of the wholesale value.

0656

2.3      TFG will consign the Amish furniture with ACV and with no other party or entity unless with the consent of ACV or pursuant to termination of this Agreement by reason of the default of ACV.

2.4      TFG will pay ACV, or at the direction of ACV, the seller of the Amish furniture all items delivered to an ACV store or warehouse within seven (7) days of demand and TFG'S receipt of proper documentation, i.e. Purchase Order Receipts with corresponding copy of vendor invoices and no more frequently than once every two (2) weeks.

2.5      Wholesale value will be determined and supported by receipts or invoices from suppliers, copies to be provided by STILWELL.

2.6      TFG may increase or waive the inventory cap of $1,250,000.00 limit on the purchase of Amish furniture upon the written request of ACV submitted not earlier than one (1) year from the date of this Agreement and conditioned upon evidence that ACV is current and not in default on any of its financial obligations including all current and long term lenders and tax obligations to State and Federal governmental bodies.

3.      <u>AGREEMENTS OF ACV:</u>

3.1      ACV will sell to TFG its existing inventory of Amish furniture at current wholesale replacement cost and purchase on behalf of TFG additional Amish furniture at wholesale cost from time to time during the term of this Agreement which total wholesale value should never exceed $1,250,000.00 unless increased pursuant to paragraph 2.6 above.

3.2      ACV's purchase at wholesale of Amish furniture on behalf of TFG shall be under the supervision and direction of STILWELL who shall exercise reasonable care and diligence in selecting marketable Amish furniture at fair and reasonable cost.

3.3      ACV will keep, preserve, repair and maintain all Amish furniture in good condition at only the following locations:

(1) <u>1304 Tuscola Blvd., Tuscola, IL. 61953</u>
(2) <u>East Route 36, Atwood, IL 61913</u>
(3) <u>123 N. Main St., Atwood, IL 61913</u>
(4) <u>601 & 603 S. Main, Tuscola, IL 61953</u> ( 1 bldg. occupying 2 lots)

3

and sell and market same in the ordinary course of its business at retail pricing in such amounts as determined by ACV. At all times ownership of the Amish furniture shall be in the name of TFG and ACV will execute, obtain or provide such Bill of Sales, Inventory lists, or other documents as deemed necessary by TFG to evidence its ownership.

3.4     <u>Principal Payments</u>: ACV will pay or remit to BANK in an account designated by TFG by the 10th day of the month, an amount equal to the average wholesale cost of the items sold during the previous month. Such reductions in the inventory level of Amish furniture may be replaced up to the inventory cap.

3.5     <u>Consignment Payments</u>: For its consignment services, ACV may retain all amounts in excess of average wholesale cost obtained from the sale at retail of the Amish furniture after deducting and paying Bank in an account designated by TFG by the 10th day of the month an amount equal to the previous month's total of:

       a)      10% of retail sale price, exclusive of sales tax;

       b)      interest (at the rate charged by BANK to TFG) on the amount of TFG'S INVESTMENT; and

       c)      all other costs, points, fees, charges by BANK to TFG.

3.6     <u>Exclusive</u>: ACV will not accept for consignment, sell or lease furniture of any kind except in accordance with this Consignment Agreement, and ACV will not pledge the Amish Furniture or proceeds therefrom as collateral except as required by paragraph 3.17 of this Agreement.

3.7     <u>Product Liability Insurance</u>: ACV will obtain Product Liability Insurance in the minimum amount of One Million Dollars at its cost, naming TFG as an additional insured with fee tail coverage, with an Insurance Company rated by AM Best of a rating of "A" or better.

3.8     <u>Casualty Insurance</u>: ACV will insure the Amish furniture against fire, loss, theft, vandalism, damage and other casualty with an insurance company rated by AM Best of a rating A or better at its full insurable value naming TFG and BANK as additional party insured. Said policies will maintain a clause requiring notice to TFG and BANK ten (10 ) days prior to any alteration in terms or cancellation. ACV will furnish evidence of such insurance being in force to TFG and BANK. Any insurance proceeds paid to TFG and BANK in excess of the balance of the obligations owed by ACV to TFG and TFG'S cost for the Amish Furniture shall be the property of ACV and shall be paid over to ACV after the obligations due under this Agreement and Amish furniture costs have been paid in their entirety.

4

3.9    Life Insurance:  ACV will maintain life insurance and pay the premiums thereon on JAMES STILWELL in an amount of at least $1,250,000.00 or an amount equal to the Inventory Cap, if higher,  with TFG and BANK named as beneficiary with an insurance company rated A or better by AM Best. The life insurance proceeds shall be used first to  pay BANK for the amount TFG owes BANK in order to release its lien on the Amish furniture, then to TFG for all Amish furniture owned by TFG at average wholesale cost, less a credit for the amount paid BANK, and any other amounts owed to TFG under this Agreement and any excess life insurance proceeds shall be paid to the Estate of JAMES STILWELL or ACV. Upon payment, TFG will convey title to as much of the Amish furniture free and clear of all liens, as was paid for by the insurance proceeds, to ACV.

3.10    If ACV shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required above, or fail to pay any premium in whole or in part relating to any such policies, then TFG may, but need not, obtain and cause to be maintained any or all of such policies and pay any part or all of the premiums due thereunder without thereby waiving the said default or any other default by ACV. Any sums so disbursed by TFG shall be additional indebtedness owed by ACV to TFG and shall incur interest at the default rate of 12%.

3.11    ACV shall implement and maintain an inventory and accounting system acceptable to TFG and BANK for the purpose of  tracking the purchase and sale and payment of funds pursuant to this Agreement, which shall include, but not be limited to the following:

a)    Physical inventory will be taken by ACV once/month and ACV will do such spot inventories as directed by TFG. TFG may also conduct its own spot, random or complete inventories.

b)    ACV will maintain on a daily basis, a running book inventory.

c)    Whenever inventory records over a quarterly period indicate "inventory shrinkage" has occurred, ACV will pay TFG within  five (5) days the amount of SHRINKAGE at average wholesale cost, plus 10% of the sale price of the missing inventory and inventory records will be adjusted in accordance therewith.

d)    ACV will establish and implement a physical coding system of inventory items acceptable to TFG, and every item will be backed by a Bill of Sale, purchase order or paid receipt in connection with its acquisition and a sales receipt in connection with its disposition.

0659

3.12    ACV shall pay and be responsible for all expenses for the storage, transportation, handling, sales and distribution of said Amish furniture, as well as all costs incurred by TFG in connection with BANK financing of TFG'S purchase of Amish furniture, including, but not limited to interest, points, fees and other BANK charges incurred to maintain inventory financing by BANK.

3.13    ACV will keep account books and records giving complete information covering all transactions in connection with the purchase, sale, returns and distribution of Amish furniture and payment of the amounts due hereunder, and such books and records shall be open during normal business hours to the inspection of any duly authorized representative of TFG or BANK.

3.14    Inspections: TFG, BANK or their agents shall have the right, at any time and from time to time hereunder, to inspect and examine the Amish furniture and to copy any records relating thereto, provided that such inspection, examination or copying does not unreasonably interfere with ACV's Business.

3.15    ACV will use its best efforts to sell and merchandise Amish furniture promptly and in a profitable manner.

3.16    ACV shall not have any store wide sale of Amish furniture for less than average wholesale cost plus 10% without the consent of TFG except in the case of Amish furniture deemed unmarketable, obsolete or damaged in the opinion of ACV.

3.17    Security Agreement: ACV will execute any and all security agreements and UCC financing statements required by Article 9 of the Uniform Commercial Code, Section 9-114 in order for TFG to perfect a security interest in the Amish Furniture with priority over the creditors of ACV.

4.    TERM

4.1    This Agreement shall remain in effect for ten (10) years from the date of April 16, 1999.

4.2    Not until after April 15, 2004, shall ACV have the right to terminate this Agreement and then only upon thirty (30) days advance written notice to TFG and payment within said 30 days to TFG for the Amish furniture at current wholesale replacement cost or average wholesale cost, whichever is higher and all accrued and delinquent obligations owed by ACV to TFG. In addition, ACV will pay TFG a "residual payment" equal to two times 2% of the average annual gross retail sales of Amish furniture by ACV during the previous five

6

years.    1/8 of said amount shall be paid for the next eight quarters thereafter or until April 15, 2009, which ever occurs first.

4.3    TFG shall have the right to terminate this Agreement any month after January 1, 2001. Written notice of termination shall be given to ACV 120 days in advance of the date of termination. In the event of termination by TFG, TFG will be paid within said 120 days the same amounts as in the event of termination by ACV except TFG shall not be entitled to the residual payment.

5.    <u>WARRANTIES AND COVENANTS OF ACV:</u>

5.1    ACV expressly warrants, covenants and agrees, so long as any indebtedness as hereinbefore described remains unpaid to TFG, as follows:

5.2    ACV is (or at time of conveyance will be) the sole owner of the Amish furniture in its existing inventory free from any lien, security interest or encumbrance in favor of any person or entity, has the right to convey its existing inventory of Amish furniture to TFG and will defend the collateral against the claims and demands of all persons.

5.3    Except for sales in the ordinary course of business, ACV shall not sell, assign, transfer, encumber or hypothecate in any manner the Amish furniture.

5.4    ACV is a Corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. ACV has the power and authority to carry on its business, to enter into this Consignment Agreement and to carry out the provisions hereof.

5.5    ACV is not in violation of, and the execution, delivery and performance of and compliance with this Consignment Agreement, will not result in ACV being in violation of, or in conflict with, or constitute a default under any term or provisions of any mortgage, indenture, contract, agreement, instrument, judgement, decree, order, statute, rule or regulation applicable thereto.

5.6    There are no actions, suits or proceedings pending or to the knowledge of ACV threatened against or affecting ACV at law or in equity or before or by any federal, state, municipal or other governmental department, commissions, board, bureau, agency or instrumentality, domestic or foreign, which involve the possibility of any judgement or liability not fully covered by insurance and which may result in any material adverse change in ACV's business or the operations, properties or assets or in the condition (financial or otherwise) of ACV.

0661

6.    CONTINGENCIES AND CONDITIONS:

6.1    TFG'S obligations under this Agreement are contingent upon:

6.2    TFG obtaining a line of credit in the minimum of 1.0 million dollars from BANK for the purchase of Amish furniture on terms acceptable to TFG and ACV.

6.3    Personal guarantee to TFG by JAMES and MARGARET STILWELL of all funds owed by ACV to TFG and for the obligations of ACV under this Agreement whether to TFG or BANK. In addition, STILWELL, will co-sign and will cause ATWOOD MEAT SERVICE, INC. to co-sign the Security Agreements and UCC Financing Statements referred to in paragraph 3.17.

6.4    Life Insurance on JAMES STILWELL in the amount of at least 1.25 Million Dollars or an amount equal to the Inventory Cap, if higher, with TFG and BANK as beneficiaries to the extent of the amounts owed to them, with an Insurance Company rated "A" or better by AM Best.

6.5    Casualty insurance coverage equal to average wholesale cost on all furniture inventory with TFG and BANK named as an additional insured party with an Insurance Company rated "A" or better by AM Best.

6.6    Product Liability Insurance in an amount of at least One Million Dollars with TFG named as an additional insured party, with an Insurance Company rated "A" or better by AM Best.

6.7    An inventory and accounting system acceptable to TFG and BANK for the purpose of tracking the Amish furniture business and payments due under this Agreement.

PERFORMANCE:

7.1    If ACV (1) defaults by failing to pay when due any single installment or payment required to be made to TFG or BANK under the terms of this Consignment Agreement and such default is not cured within ten (10) days of written notice to ACV; or (2) defaults in the performance of any other covenant or agreement hereof and such default is not cured by ACV within thirty (30) days after written notice to ACV (unless the default involves a dangerous condition which shall be cured forthwith); TFG may treat such a default as a breach of this Agreement and TFG shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity: (i) maintain an action for any unpaid amounts; (ii) declare the entire

8

balance due and maintain an action for such amount; (iii) forfeit the ACV's interest this Agreement, retain all sums paid; and with or without notice and without process of law, take possession of said furniture, or any part thereof that remains unsold or in the custody of ACV, and for that purpose may enter any of the premises of ACV to search for or obtain said furniture, and consignee hereby waives any trespass or any rights of action for damages that it might or could have against consignor or its agents by reason of consignor, or its agents, procuring or attempt to procure possession of Amish furniture after forfeiture as aforesaid; or (iv) upon ACV's failure to surrender possession of the Amish furniture to TFG, maintain an action for possession of the Amish furniture under the Illinois Replevin Act.

7.2     If default is based upon the failure to pay sales taxes, insurance, liens or other charges relating to the Amish furniture as provided in this Agreement, TFG may elect to make such payments, which amounts shall become immediately due and payable by ACV to TFG, and if not paid within ten (10) days of demand shall then be payable together with 12% interest per annum.

## 8.    DEFAULT, FEES:

8.1     ACV shall pay all reasonable attorney's fees and costs incurred by TFG in enforcing the terms and provisions of this Consignment Agreement, or in defending any proceeding to which TFG is made a party defendant as a result of the acts or omissions of ACV.

8.2     All rights and remedies given to TFG, shall be distinct, separate, and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement. No waiver of any breach or default of either party hereunder shall be implied from any omission by the other party to take any action on account of any similar or different breach or default. The payment or acceptance of money after it falls due after knowledge of any breach of this agreement by TFG, or after the termination of ACV's right of possession of the Amish Furniture hereunder, or after the service of any notice, or after commencement of any suit, or after final judgment for replevin shall not reinstate, continue, or extend this Agreement nor affect any such notice, demand or suit or any right hereunder not herein expressly waived.

## 9.    DELINQUENT MONTHLY PAYMENTS:

9.1     ACV acknowledges that late payments by ACV to TFG of the amounts or other charges due hereunder will cause TFG to incur costs not contemplated by this Agreement, the exact amount of which will be extremely difficult to ascertain.

9

Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed upon BANK by the terms of any note, and/or security agreement covering the Amish Furniture. Accordingly, if any installment or any sum due from ACV shall not be received by TFG or TFG'S designee within ten (10) days after said amount is due, then ACV shall pay to TFG a late charge equal to the greater of (i) five percent (5%) per month of such overdue amount, plus any attorney's fees incurred by TFG by reason of ACV's failure to pay and/or other charges due hereunder; or (ii) One Hundred Dollars ($100.00). The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that TFG will incur by reason of the late payment by ACV. Acceptance of such late charges by TFG shall in no event constitute a waiver of ACV's default with respect to such overdue amount, nor prevent TFG from exercising any of the other rights or remedies granted hereunder.

10.    SEVERABILITY:

10.1    Any provisions of this Consignment Agreement which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and such other provisions shall remain in full force and effect.

11.    WAIVER:

11.1    The waiver by TFG of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition of any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of payment hereunder by TFG shall not be deemed to be a waiver of any preceding breach by ACV of any term, covenant or condition of this Agreement, other than the failure of ACV to pay the particular delinquency so accepted, regardless of the TFG'S knowledge of such preceding breach at the time of acceptance of such delinquent payment.

12.    NOTICES:

12.1    All notices and demands which may, or are required to be given by either party to the other hereunder, shall be in writing. All notices and demands by the TFG to the ACV shall be sent by United States Certified or Registered mail, postage prepaid, addressed to ACV at the business address, or to such other places as the ACV may from time to time designate in writing to the TFG or may be personally served upon ACV. All notices and demands by ACV to TFG shall be sent by United States Certified or Registered Mail, postage prepaid, addressed to TFG, 2220 Marquette Road, Peru, IL or to such other person or place or persons or places as the TFG may from time to time designate in writing to the ACV. All notices shall be effective as of the date of receipt or certification. Delivery may also be made by an established national overnight delivery service (such as Federal Express).

0664

13. **MARGINAL HEADINGS:**

13.1  The marginal headings and titles to the Paragraphs of this Agreement are not a part of the Agreement and shall have no effect upon the construction or interpretation of any part hereof.

14. **TIME:**

14.1  Time is of the essence in this Consignment Agreement and each and all of its provisions.

15. **SUCCESSORS AND ASSIGNS; BINDING EFFECT:**

15.1  The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

15.2  ACV may not assign its interest, rights or obligations herein without the consent of TFG.

16. **SUBORDINATION:**

16.1  Upon the request of TFG, ACV herewith subordinates or will subordinate its rights hereunder to any lien of any Security Agreement by TFG to any bank, or other lending institution now or hereafter placed against the Amish furniture.  ACV shall execute upon request a document indicating said subordination. The provisions of this paragraph shall be self-operative and no further instrument of subordination shall be required .

17. **SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS:**

17.1  TFG and ACV each hereby agree that their respective representations, warranties, covenants and agreements set forth herein shall survive the closing and shall thereafter be fully effective and enforceable.

18. **AGENTS:**

18.1  TFG'S agent for all matters under this agreement is DICK JANKO, until ACV is notified of a different agent pursuant to paragraph 12.1.

18.2  ACV's agent for all matters under this Agreement is JAMES STILWELL, until TFG is notified of a different agent pursuant to paragraph 12.1.

11

19.   **ENTIRE AGREEMENT:**

19.1   This Consignment Agreement contains the entire agreement of the parties hereto with respect to the matters covered hereby, and no other agreement, statement or promise made by any party hereto, or to any employee, officer or agent of any party hereto, which is not contained herein, shall be binding or valid.

This Agreement is made _____ 17 _____ day, of _____ November _____, 2000.

ACV:                                          TFG:

**AMISHLAND COUNTRY**                          **TUSCOLA FURNITURE GROUP, LLC.,**
**VILLAGE, INC.,**                             **An Illinois Limited Liability Company,**
an Illinois Corporation                        **By its manager:   JANKO FINANCIAL**
                                               **GROUP, L.L.C., An Limited Liability**
                                               **Company,**

BY: _____                      BY: _____
Printed: JAMES STILLWELL                            RICHARD JANKO, Authorized Member
Its:      President                                 2220 Marquette Road
                                                    Peru, IL 61354

JANKO\AMISHLND-TFG.AGR3SA

0666

## GUARANTY

WHEREAS, TUSCOLA FURNITURE GROUP, LLC., an Illinois Limited Liability Company, hereinafter referred to as "TFG" and AMISHLAND COUNTRY VILLAGE, INC., an Illinois Corporation, hereinafter referred to as "ACV" are about to execute a document entitled "CONSIGNMENT AGREEMENT" dated _____ Nov  17 , 2000, wherein TFG will consign Amish furniture to ACV; and

WHEREAS, JAMES STILWELL and MARGARET STILWELL, hereinafter referred to as "Guarantor", have a financial interest in ACV; and

WHEREAS, TFG would not execute the Consignment Agreement if Guarantor did not execute and deliver to TFG this Guarantee.

NOW, THEREFORE, for and in consideration of the execution of the foregoing Consignment Agreement by TFG and as a material inducement to TFG to execute said Consignment Agreement, Guarantor hereby unconditionally and irrevocably guarantees the prompt payment by ACV of all sums payable by ACV under said Consignment Agreement and the faithful and prompt performance by ACV of each and every one of the terms, conditions and covenants of said Consignment Agreement to be kept and performed by ACV.

It is specifically agreed and understood that the terms of the foregoing Consignment Agreement may be altered, affected, modified or changed by agreement between TFG and ACV, or by a course of conduct, and said Consignment Agreement may be assigned by TFG, or any assignee of TFG, without consent or notice to Guarantor and that this Guaranty shall thereupon and thereafter guarantee the performance of said Consignment Agreement as so changed, modified, altered or assigned.

This Guaranty shall not be released, modified or affected by failure or delay on the part of TFG to enforce any of the rights or remedies of TFG under said Consignment Agreement, whether pursuant to the terms thereof or at law or in equity.

Ten (10) days' notice of default shall be given to Guarantor, it being specifically agreed and understood that the guarantee of the undersigned is a continuing guarantee under which TFG may proceed forthwith and immediately against ACV or against Guarantor following any breach or default by ACV or for the enforcement of any rights which TFG may have as against ACV pursuant to or under the terms of the within Consignment Agreement at law or in equity.



EXHIBIT
13

TFG shall have the right to proceed against the Guarantor hereunder following any breach or default by ACV without first proceeding against ACV and without previous notice to or demand upon ACV.

Guarantor hereby waives (a) notice of acceptance of this Guaranty; (b) demand of payment, presentation and protest; (c) all right to assert or plead any statute of limitations as to or relating to this Guaranty and the Consignment Agreement; (d) any right to require TFG to proceed against the ACV or any other Guarantor or any other person or entity liable to TFG; (e) any right to require TFG to proceed under any other remedy TFG may have before proceeding against Guarantor; and (f) any right of subrogation.

Guarantor does hereby subrogate all existing or future indebtedness of ACV to Guarantor to the obligations owed to TFG under this Consignment Agreement and this Guaranty.

In the event any action be brought by said TFG against Guarantor hereunder to enforce the obligation of Guarantor hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the Court.

IN WITNESS WHEREOF, the undersigned have set their hands and seals this _17_ day of _Nov_, 2000, at _Tuscola_, Illinois.

GUARANTOR:

_____
JAMES STILWELL

_____
MARGARET STILWELL

ADDRESS: _218 n Iowa_
_Atwood  ILL  61913_

JANKO\GUARANTY.STL-TFG

2

0668



**WILLIAM "JOHN" LYONS, LUTCF**
*District Leader*
*P. O. Box 260*
*Atwood IL 61913*
*Bus.: 217-578-3142*
*Res.: 217-578-3058*
*Fax: 217-578-3560*

Dear Larry,

I have enclosed the Form to Release the Assignment of Policy # 2604663 from Janko Financial Group. Please sign on the very bottom of the form, and mail in the enclosed envelope. Please call if you have questions. Thanks

Joe

EXHIBIT
14



EXHIBIT
Bianchi 13
2-9-07        SH

NOV 20 2000 11:14 FR AG-DALLAS SERV CTR    2146546022 TO 912175783560

## POOR ORIGINAL

**AMERICAN GENERAL FINANCIAL GROUP**

**Assignment**

EXHIBIT 15

- ☐ All American Life Insurance Company (AAL), P.O. Box 35844 Dallas, TX 75235-8883
- ☐ The American Franklin Life Insurance Company (AMFLIC), P.O. Box 19520, Springfield, IL 62794-9520
- ☐ American General Life Insurance Company (AGL), P.O. Box 4373, Houston TX 77210-4373
- ☐ The Franklin Life Insurance Company (FLIC), #1 Franklin Square, Springfield, IL 62713-0001
- ☒ The Old Line Life Insurance Company of America (OLL), P.O. Box 35844, Dallas TX 75235-8883

Members of American General Financial Group. American General Financial Group is the marketing name for American General Corporation and its subsidiaries.

| 1. | CONTRACT IDENTIFICATION | You may use this form for multiple contracts that have the same contract owner and require the same signatures. All contracts must be assigned to the same assignee or all contracts released from assignment with same assignee. |
|---|---|---|

☐ Check Here if New Address

CONTRACT No.: 2604663

OWNER: MARGARET Stilwell    SSN/TIN OR EIN: 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

Address: 218 N. Iowa

Atwood, IL 61913

Phone No.: (217) 578-3132

INSURED/ANNUITANT (if other than Owner): James E. Stilwell

| 2. ☐ ASSIGNMENT | For value received, I/we hereby assign and transfer to the named Assignee/Creditor as their interest may appear, the Contract number named above, issued by the Company, upon the life as named above and all moneys now or hereafter payable thereunder, subject to the conditions of said contract, the regulations of the Company and to any lien, charge, or indebtedness thereon now or hereafter existing in favor of the Company |
|---|---|

Assignee/Creditor Name:

Assignee/Creditor Address:

| 3. ☒ RELEASE OF ASSIGNMENT | The consideration for which the Assignment was made, having been fully paid and satisfied, all right, title, and interest of the assignee in the above named Contract issued or assumed by the Company on the above named life is hereby relinquished. |
|---|---|

Assignee/Creditor Name: Janko Financial Group LL.C.

Assignee/Creditor Address: 2220 Marquetta Rd    Perry, IL 61354

| 4. | SIGN HERE FOR ABOVE REQUEST | This request must be dated and all required signatures must be written in ink, using full legal names.

To assign this contract, this request must be signed by the person or persons who have the rights of ownership under the terms of the contract. For Corporate Owned contracts, this form must be signed by one officer followed by the officer's title. The request must be accompanied by a piece of corporate letterhead or paper with the corporate seal that has been signed by that officer. For contracts owned by a Partnership, the full name of the partnership should be written followed by the signatures of any partner, other than the Insured. For contracts owned and assigned to a Trustee, Trustee signatures are required as instructed by the trust agreement.

Under penalty of perjury, the contract owner(s) certify: (1) that the number(s) shown on this form is my (are our) correct social security (or taxpayer identification) number(s) and (2) that I am (we are) not subject to backup withholding under Section 3406(A)(1)(C) of the Internal Revenue Code. |
|---|---|---|

NOT OVERLAP

The Old Line Life Insurance Received and Recorded on DEC 01 2000 ASSIGNMENT

RELEASE OF ASSIGNMENT

| Signature of Owner | Date | Signature of co-owner (or other party interested in contract) | Date |
|---|---|---|---|

To release the assignment of this contract, this request must be signed by the Assignee.

X Lawrence W. Bianchi / Authorized Member    In favor of Tuscola Furniture Group, LLC

2146546022

11/28/009:54

AIG-000021

1

```
 1          IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                 URBANA DIVISION

 3   MARGARET J. STILWELL, HALEY STILWELL,
     HEIDI STILWELL, JAMIE STILWELL,
 4   MEGAN STILWELL,
                Plaintiffs,
 5
                -vs-                    No. 05 CV 02160
 6
     AMERICAN GENERAL LIFE INSURANCE
 7   COMPANY,
                Defendant.
 8   ----------------------------------
     AMERICAN GENERAL LIFE INSURANCE
 9   COMPANY,
                Third Party Plaintiff,
10
                -vs-
11
     FIRST MID ILLINOIS BANK & TRUST,
12   TUSCOLA FURNITURE GROUP, LLC, and
     JANKO FINANCIAL GROUP, LLC,
13          Third Party Defendants.

14

15                  DEPOSITION

16        The Deposition of THOMAS J. CHAMBERLAIN, a
     citizen of the State of Illinois, a witness of
17   lawful age; produced, sworn, and examined upon his
     corporeal oath, at the offices of Area Wide
18   Reporting Service, 301 West White Street,
     Champaign, Illinois, at 3:00 P.M. on the 8th day
19   of February, 2007, before Shelley Marvin, CRR,
     RPR, and CSR in and for the State of Illinois, CSR
20   License No. 84-003926, as a witness in a certain
     suit and matter now pending and undetermined in
21   the United States District Court for the Central
     District of Illinois.
22

23

24
```

COPY

EXHIBIT

tabbies

16

2

```
 1                    APPEARANCES

 2   HELLER, HOLMES & ASSOCIATES, P.C.
     1101 Broadway Avenue
 3   Mattoon, Illinois  61938
     By: Jason M. Crowder
 4   Appearing on behalf of Plaintiffs

 5   HEAVNER, SCOTT, BEYERS & MIHLAR
     111 East Main Street, Suite 200
 6   Decatur, Illinois  62523
     By: Julie Beyers
 7   Appearing on behalf of Defendant First Mid
     Illinois Bank & Trust
 8
     WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
 9   120 North LaSalle Street
     Chicago, Illinois  60602-2412
10   By: Rebecca M. Rothmann
     Appearing on behalf of Defendant/Third Party
11   Plaintiff American General Life Insurance Company

12

13
```

```
14                    CONTENTS                      Page

15   Examination by Ms. Rothmann                     4

16   Examination by Mr. Crowder                     68

17   Further Examination by Ms. Rothmann            97

18   Examination by Mr. Beyers                     101

19   Further Examination Mr. Crowder               105

20

21                    EXHIBITS

22   Deposition Exhibit 1                           15

23   Deposition Exhibit 2                           20

24   Deposition Exhibit 3                           32
```

3

1    Deposition Exhibit 4                                34

2    Deposition Exhibit 5                                46

3    Deposition Exhibit 6                                50

4    Deposition Exhibit 7                                56

5    Deposition Exhibit 8                                63

6    Plaintiff's Exhibit 1                               74

7    Plaintiff's Exhibit 2                               75

8    Plaintiff's Exhibit 3                               77

9    Plaintiff's Exhibit 4                               79

10    Plaintiff's Exhibit 5                              79

11    Plaintiff's Exhibit 6                              80

12    Plaintiff's Exhibit 7                              82

13    Plaintiff's Exhibit 8                              83

14    Plaintiff's Exhibit 9                              86

15    Plaintiff's Exhibit 10        intentionally omitted

16    Plaintiff's Exhibit 11                             88

17    Plaintiff's Exhibit 12                             89

18

19

20

21

22

23

24

1       Q.      Okay.  No direct dealings with the

2    Stilwells or any of their companies?

3       A.      No.

4       Q.      The lending agreement that you just

5    referenced with TFG --

6               MS. ROTHMANN:  Let me mark that.

7               (Whereupon Deposition Exhibit No. 1 was

8    marked for identification by the court reporter.)

9    BY MS. ROTHMANN:

10      Q.      I'm showing you what's been marked

11   Exhibit No. 1 for your deposition.  It consists of

12   a number of -- it's basically a group exhibit, a

13   number of documents together Bates stamped 000137,

14   and next one is 138, 139, 140, 141, 142, and 143.

15              The -- is this documentation of one of

16   the -- or the TFG loan that you were just

17   discussing?

18      A.      Yes.

19      Q.      Okay.  And so the bank entered into a

20   lending agreement with TFG on or about -- what's

21   the date there -- November 17th --

22      A.      Yes.

23      Q.      -- is that right, 2000?

24      A.      2000, uh-huh.

16

1    Q.    What was the purpose of this loan, to

2    your understanding?

3    A.    This purpose was to fund furniture

4    purchases that Tuscola Furniture Group was making

5    and then providing to, I don't remember the

6    entity's name, but basically Amishland, they were

7    selling furniture.  And the Tuscola Furniture

8    Group had entered into a consignment agreement

9    with Jim Stilwell or his entity, I don't remember

10   the entity there, to sell the furniture.

11        And so we were providing financing to

12   Tuscola Furniture Group, and then they would take

13   that furniture and allow somebody else to sell it.

14   And then when the property sold, they would pay

15   Tuscola Furniture Group, who would turn around and

16   pay us.

17   Q.    Do you have any understanding as to why

18   the Stilwells or their company, their Amishland

19   Company, didn't come directly to the bank for

20   financing?

21   A.    No.  It was a strange agreement going

22   in.  My belief at the time was they couldn't get

23   financing themselves elsewhere and so they had

24   developed a relationship with Janko Financial

1      Q.     Right.  And then the next document, 141,

2   appears to me to be an identical -- looks like an

3   identical security agreement, but this one is

4   between Tuscola Furniture Group and James Stilwell

5   on behalf of Amishland Country Village?

6      A.     That's correct.

7      Q.     So does that refresh your recollection

8   as to what Mr. Stilwell's company was called?

9      A.     Yeah.

10      Q.     Amishland Country Village, or ACV?  I

11   might refer to them as ACV.

12      A.     Yeah, that's fine.

13      Q.     All right.  And then this last agreement

14   is -- what is this?  Is this a line of credit?

15      A.     This is a line of credit agreement,

16   basically.  We use these notes.  And this was a

17   separate agreement we used when I was at First Mid

18   that just says, you know, everybody understands

19   there is a line of credit agreement tied in with

20   the note.

21           MS. BEYERS:  And just for the record,

22   it's number 142 on the bottom there.

23           MS. ROTHMANN:  Thanks.

24           MS. BEYERS:  Sorry.

1          MS. ROTHMANN:   That's okay.

2   BY MS. ROTHMANN:

3      Q.    All right.  And the last document is

4   00143.  This, you can't read most -- a lot of it.

5   But it looks like it says on the top guarantee.

6      A.    Yes.  This was Dick Janko's -- or

7   Richard Janko's guarantee of the note.

8      Q.    Okay.  All right.  And those documents

9   related to a consignment agreement that TFG and

10  the Stilwells and their company had entered into

11  to try to finance and sell this furniture; is that

12  your understanding?

13     A.    That's correct, yeah.  That was my

14  understanding, I guess is the way to answer.

15         MS. ROTHMANN:   Will you mark that?

16         (Whereupon Deposition Exhibit No. 2 was

17  marked for identification by the court reporter.)

18  BY MS. ROTHMANN:

19     Q.    Mr. Chamberlain, showing you what's been

20  marked Exhibit 2, do you recognize Exhibit 2 to be

21  the consignment agreement that you referenced

22  previously?

23     A.    That is correct.

24     Q.    Okay.  And that's a consignment

1           MR. CROWDER:  We're okay with that,

2    showing a continuing objection to hearsay

3    statements to the deposition?  You're okay with

4    that?

5           MS. ROTHMANN:  I'm fine with that.

6           MR. CROWDER:  Okay.  I am, too.  I just

7    want to make sure that's clear.

8           MS. BEYERS:  I am, too.  If we're all

9    going to trust each other, I'm totally fine with

10   that.

11          MS. ROTHMANN:  Let the record reflect

12   that there's a standing objection to any

13   statements made that would fall under the Dead

14   Man's Act.

15          MS. BEYERS:  Or to hearsay.

16          MS. ROTHMANN:  Or to hearsay.

17          MS. BEYERS:  And off the record.

18          (Whereupon discussion was held off the

19   record.)

20   A.    At some point around this time, and I

21   don't remember why, I think it was just it

22   happened that John Hedges and I were in I believe

23   it was my office together, we talked about the

24   fact that there would be a claim.  We knew

1       Q.    All right.

2             (Whereupon Deposition Exhibit No. 5 was

3    marked for identification by the court reporter.)

4    BY MS. ROTHMANN:

5       Q.    Mr. Chamberlain, I'm showing you what

6    has been marked Exhibit No. 5 for your deposition,

7    a document Bates stamped 000019 through 25.  If

8    you'd take a look at that.

9       A.    Okay.

10      Q.    Okay.  Do you recognize this as your

11   letter of May 12th, 2003 to William Lyons?

12      A.    That's correct.

13      Q.    Okay.  And is your signature on the

14   second page?

15      A.    Yes.

16      Q.    Document 20?  And did you draft this

17   letter?

18      A.    I don't recall that I did.  And the

19   reason I believe that is the letterhead I used out

20   of my office would normally have our address at

21   the bottom.  If I recall correctly, Rick Heavner's

22   office prepared this.  And again we asked them to

23   prepare the claim for us, to handle it.  And if I

24   remember correctly, this was sent to me and said

1    all right, this is part of filing the claim.  You

2    need to sign it on behalf of the bank.

3         Q.    Okay.  Did you read it before you signed

4    it?

5         A.    Yes.

6         Q.    All right.  What was your understanding

7    of the content of the letter?

8         A.    That we were filing a claim for -- in

9    relation to the assignment of life insurance.

10         Q.    Okay.  Now, Larry Bianchi signed it

11    also?

12         A.    Yes.

13         Q.    What's your understanding of why he's

14    signing it, too?

15         A.    At some point, we were -- I was notified

16    that the two attorneys had chosen to file a joint

17    claim.

18              MS. BEYERS:  And again, I'm going to

19    object to any conversations he had with counsel

20    regarding ...

21         A.    Yeah.  I don't recall why they chose to

22    file a joint claim other than the fact it all went

23    back to that original assignment of -- or

24    consignment agreement I think was the right title

1    of that agreement.

2       Q.    Uh-huh.

3       A.    That was it.  You know, they said we're

4    filing a joint claim, it has to do with this

5    consignment agreement.  That's where it all

6    started from, why we had the life insurance in the

7    first place.  So I had no reason to believe

8    anything else and said okay.

9             And so this is -- I did know that they

10   were filing a joint claim just because that's what

11   I was told was going to happen.  The document

12   showed up.  I executed it based upon advice of

13   counsel, and it was --

14      Q.    Okay.  The statements that are made in

15   the letter, to your knowledge, are true and

16   accurate statements?

17      A.    Okay.  (Reviewing)  Yeah, based on my

18   knowledge, they were true and accurate.

19      Q.    Because you wouldn't have have signed

20   your name if it wasn't true and accurate, right?

21      A.    That's true.  But I would sign it based

22   upon advice of counsel.  I've never filed a claim

23   before, so I asked counsel, you tell me what to

24   sign.  And that's what I signed.

1      Q.    If something in it was wrong and untrue

2    and your counsel told you to sign it, would you

3    sign it?

4      A.    If I thought it was untrue, I wouldn't

5    have signed it, no.

6      Q.    I didn't think so.  Thanks.  But to your

7    knowledge, everything in this letter is true and

8    accurate?

9      A.    Yes.

10     Q.    And that's why you signed it?

11     A.    That's correct.

12     Q.    That, and the fact that counsel told you

13   this was the way to do it?

14     A.    That's right.

15     Q.    All right.  Back to the person who

16   drafted it.  You don't know who drafted this?

17     A.    No, I don't.

18     Q.    You don't know if it came from somebody

19   in your bank or whether this is a template that

20   counsel offered?

21     A.    I don't know for sure.

22     Q.    Okay.

23     A.    I don't believe anybody in our bank

24   would have prepared it.  I really believe it was

1    really a party, but an indirect party, correct?

2        A.    Yes, that's correct.

3        Q.    Okay.  All right.  Showing you a

4    document that is -- I didn't mark it, but it's

5    Bates stamped 35, do you recognize that document?

6    It appears to be a May 31st [sic], 2003

7    correspondence?

8        A.    May 13th.

9        Q.    I'm sorry, May 13th correspondence to

10   Lawrence Bianchi from you?

11       A.    Yes.

12       Q.    Do you see that?  Enclosing -- I can't

13   read upside down -- enclosing the original letter

14   which would have been Exhibit 5 -- is that 5 --

15   Exhibit 5; is that right?

16       A.    Yes.

17       Q.    Okay.  And so you executed Exhibit 5,

18   sent it on, executed Exhibit 5 with the paperwork

19   attached?

20       A.    Correct.

21       Q.    Sent it on to Mr. Bianchi for signature?

22       A.    Correct.

23       Q.    At some point, you got his letter,

24   Exhibit 6, back.  You signed his letter.  And then

1      Q.    All right.  And attached to it is a
2    document Bates stamped 3, 4 and 7.  And Bates
3    stamp 3 is a copy of the check you received --
4      A.    Uh-huh.
5      Q.    -- is that right?
6            MR. CROWDER:  Is that a yes or no for
7    us?
8            THE WITNESS:  Yes.  Sorry.
9            MS. ROTHMANN:  Good save.
10    BY MS. ROTHMANN:
11     Q.    And in turning to the last page Bates
12    stamped 7, this is a memo dated July 3rd, 2003
13    from you to Mike, Dick and Larry of Janko
14    Financial Group.  Do you see that?
15     A.    Yes.
16     Q.    Saying Matt delivered the check just
17    fine, we paid off the loan balance of $81,660.30
18    and deposited the balance, blah-blah-blah, into
19    your checking account.  Do you see that?
20     A.    Yes, I do.
21     Q.    Do you recall any -- well, strike that.
22    Why did you apply the proceeds like this, or like
23    you stated?
24     A.    The check came made payable to both of

1    us.

2        Q.    Uh-huh.

3        A.    We were only entitled to the balance of
4    our loan, our legal fees, interest.  Insurance
5    companies make joint payable checks all the time.
6    What I did was, instead of endorsing it on behalf
7    of the bank's name, I sent it to Tuscola Furniture
8    Group first for their endorsement.  We had a
9    checking account under the name of Tuscola
10   Furniture Group at the bank.  I'm assuming that I
11   had a conversation when the check arrived that I
12   called either Larry, Dick or Mike and said, by the
13   way, the check's here, I am not going to sign my
14   name on it until your name is on it, which is good
15   business sense on behalf of the bank.  I want to
16   control the proceeds.  So we sent the check to
17   Tuscola Furniture Group.  I don't remember if it
18   was overnight mail, how I sent it, but I sent it
19   up, said you sign the check first.  When it comes
20   back, I will sign the check.  We will take the
21   money that we are owed, I'll let you know how much
22   that is, and then deposit the balance into your
23   account, because they had an account there.

24              Actually, I think we decided instead --

1    $250,000 assignment that Tuscola Furniture Group

2    was given?

3        A.    No.

4        Q.    Okay.  Let me run you through some

5    exhibits real quick.  These are a little bit

6    duplication of what has already been gone through,

7    but I've marked them Plaintiff's Exhibit No. 1 and

8    so forth.  So I'm going to go through them one at

9    a time.

10           I'm going to hand you what's been marked

11   Plaintiff's Exhibit No. 1.  And just identify that

12   for the record, if you would.

13       A.    That was the fax that I sent to Mike,

14   Dick and Larry saying that we had received -- we

15   received the check and it had been deposited and

16   we took the funds that we were owed.

17       Q.    Okay.  Do you know, there's a portion of

18   that where you talk about what your -- what the

19   bank is owed and you talk about interest.  But

20   then you also talk about attorney fees.  Do you

21   know what the attorney fees were related to?

22       A.    My recollection was the attorneys fees

23   were in relation to collecting the life insurance

24   assignment.

1      Q.    This is out of order.  Plaintiff's

2  Exhibit No. 11, documents 128 through 130, can you

3  identify what those documents pertain to?

4      A.    This appears to be a statement printed

5  off of First Mid's system showing the principal

6  balance of the loan and then a history of activity

7  on the loan.

8      Q.    Okay.  And is that something that would

9  be a part of the First Mid file?  Or is that

10  something that would have been generated at the

11  request of somebody, to your knowledge?

12     A.    It would be something, part of their

13  file.  I don't know.  You know, we pulled it that

14  day, that point in time for some reason.  I don't

15  recall why.

16     Q.    Do you remember, can you tell what day

17  this was pulled?

18     A.    It appears this was pulled, if the

19  system date was correct, on May 7th of 2003.

20     Q.    Okay.  So that would have been shortly

21  after Mr. Stilwell's death?

22     A.    Yes.

23     Q.    Okay.

24     A.    Yeah, I think his death was early in