IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

MARGARET J. STILWELL,            )
HALEY STILWELL, HEIDI            )
STILWELL, JAMIE STILWELL,        )
MEGAN STILWELL,                  )
    Plaintiffs,                  )
       -vs-                      )
AMERICAN GENERAL LIFE            )
INSURANCE COMPANY,               )
    Defendant.                   )
-----------------------------)  No. 05-CV-02160
AMERICAN GENERAL LIFE            )
INSURANCE COMPANY,               )
    Third-Party Plaintiff        )
       -vs-                      )
FIRST MID ILLINOIS BANK &amp;        )
TRUST, TUSCOLA FURNITURE         )
GROUP, LLC, JANKO                )
FINANCIAL GROUP, LLC,            )
    Third-Party Defendants.)
-----------------------------

CSR License No. 084-003038

DEPOSITION

    The deposition of LAWRENCE BIANCHI, a citizen of the State of Illinois, a witness of lawful age; produced, sworn and examined upon his corporeal oath, on the 9th day of February, 2007, at the offices of Area Wide Reporting Service, 301 West White Street, Champaign, Illinois, before June Haeme, CSR, RMR, CRR, Notary Public in and for the County of Ford and State of Illinois, as a witness in a certain suit and matter now pending and undetermined in the United States District Court for the Central District of Illinois.



Page 2

1  Appearances:
2    Michael S. Seneca
     Attorney at Law
3    Howard & Howard
     One Technology Plaza, Suite 600
4    211 Fulton Street
     Peoria, IL 61602-1350
5    Appearing for Tuscola Furniture Group
       and Janko Financial Group
6
     Rebecca M. Rothman
7    Attorney at Law
     Wilson, Elser, Moskowitz, Edelman &
8      Dicker, LLP
     120 North LaSalle Street, Suite 2600
9    Chicago, IL 60602
     Appearing for American General Life
10
     Jason M. Crowder
11   Attorney at Law
     Heller, Holmes & Associates, P.C.
12   1101 Broadway Avenue
     Mattoon, IL 61938
13   Appearing for Plaintiffs
14   Julie Beyers
     Attorney at Law
15   Heavner, Scott, Beyers & Mihlar
     111 E. Main Street, Suite 200
16   Decatur, IL 62523
     Appearing for First Mid Illinois

Page 3

1           I N D E X
                                    Page
2  EXAMINATION BY MS. ROTHMAN............  3
   EXAMINATION BY MR. CROWDER............ 74
3  EXAMINATION BY MS. BEYERS.............112
   REEXAMINATION BY MS. ROTHMAN..........121
4  EXAMINATION BY MR. SENECA.............123
   REEXAMINATION BY MR. CROWDER..........126
5  REEXAMINATION BY MR. SENECA...........128
   REEXAMINATION BY MR. CROWDER..........129

          E X H I B I T S
                                    Page
   Bianchi Exhibit No. 1................. 18
11 Bianchi Exhibit No. 2................. 48
   Bianchi Exhibit No. 3................. 48
12 Bianchi Exhibit No. 4................. 55
   Bianchi Exhibit No. 5................. 56
13 Bianchi Exhibit No. 6................. 58
   Bianchi Exhibit No. 7................. 59
14 Bianchi Exhibit No. 8................. 64
   Bianchi Exhibit No. 9................. 67
15 Bianchi Exhibit No. 10................ 67
   Bianchi Exhibit No. 11................ 88
16 Bianchi Exhibit No. 12................ 90
   Bianchi Exhibit No. 13................125

Page 4

1       (Commencing at 12:52 p.m.)
2           LAWRENCE BIANCHI,
3  the deponent herein, called as a witness, after
4  having been first duly sworn, was examined and
5  testified as follows:
6       EXAMINATION BY
7       MS. ROTHMAN:
8    Q. Mr. Bianchi, is that --
9    A. That's fine, that's fine.
10   Q. Or what is it?  Is it Bianchi?
11   A. It should be.  I say Bianchi, but Bianchi
12 is the correct pronunciation, how's that?
13   Q. I'm going to call you Mr. Bianchi.
14   A. Great.
15   Q. Would you state your full name for the
16 court reporter please?
17   A. Lawrence William Bianchi.
18   Q. Let the record reflect this is the
19 discovery deposition of Lawrence William Bianchi
20 taken pursuant to notice and continued to today's
21 date by agreement of the parties.
22       MS. ROTHMAN:  Mr. Bianchi is here as an
23 individual fact witness.  He is also here as the
24 corporate representative for Janko and TFG --

Page 5

1       MR. SENECA:  That's correct.
2       MS. ROTHMAN:  -- correct?
3       MR. SENECA:  That's correct.
4    Q. Okay.  Mr. Bianchi, I'm going to get some
5  background information from you just briefly.
6  What's your highest level of education?
7    A. I have a master's degree in criminal
8  justice.
9    Q. Where did you get that?
10   A. It's now the University of Illinois
11 Springfield.  It was Sangamon State University when
12 I went there.
13   Q. Okay.  What -- I understand that you're
14 involved in several companies, several real estate
15 development companies from my review --
16   A. Was.
17   Q. -- of these materials.  Are you -- well,
18 let me ask you what companies you're involved in as
19 an owner?
20   A. Boy, it's changed so much recently, I'm
21 going to have -- I am no longer a member of Janko
22 Financial Group.
23   Q. Okay.
24   A. I have my own LLC.  LW Bianchi and

Page 10

1 Tuscola, Illinois.
2   Q. At some point, Janko became the managing
3 member of Amishland Development; is that right?
4   A. We always were the managing member of the
5 LLC.
6   Q. Okay.
7   A. It was constituted with us as a member.
8   Q. Okay. How -- can you tell me how Janko
9 became involved with Amishland Development or how
10 this development came about?
11      MR. CROWDER: Rebecca, in the event that
12 answers are going to invade the Dead Man's Act,
13 should we go ahead and do the Dead Man's Act?
14      MS. ROTHMAN: You can have a standing
15 objection, we can fight about it later, how's that?
16      MR. CROWDER: Yeah, because I think a lot
17 of his answers might have -- you know, might involve
18 conversations with Jim Stilwell, and I will be
19 making a Dead Man's Act objection, so --
20      MS. ROTHMAN: I have no problem with a
21 standing objection.
22      MR. CROWDER: Is everybody all right with
23 that?
24      MR. SENECA: I'm fine with a standing

Page 11

1 objection. It makes more sense in terms of speed.
2      MS. BEYERS: That's fine, yeah.
3   A. Dick Janko and I were in Tuscola having to
4 do with the development of a Holiday Inn Express
5 hotel that we -- our company was involved in the
6 development of, and we met Jim Stilwell one day at
7 the Chamber of Commerce office. And that was our
8 first encounter with Jim. I don't have a
9 recollection of a date. And from there we became
10 involved with him in various of his entities and
11 various relationships.
12   Q. Okay. Can you list the entities, explain
13 them -- or list them first?
14   A. I can't give you the order that we did
15 them, but there was the -- what did Jim call it?
16 Amishland Country Smokehouse was the name of the
17 business owned by Jim and Margaret Stilwell that
18 leased a restaurant building from Tuscola Restaurant
19 Group, LLC, which the principal owner was Janko
20 Financial Group. Amishland Country Village was the
21 tenant to the building owned by Amishland
22 Development, LLC. And originally Janko Financial
23 Group entered into a consignment agreement with
24 Amishland Country Village that had to do with the

Page 12

1 retailing of Amish furniture.
2   Q. Okay. Anything else?
3   A. Not that I recall.
4   Q. Okay. Then can you describe your business
5 relationship with the Stilwells? I mean you seem to
6 be quite friendly with Mrs. Stilwell.
7   A. We were always on what I thought were very
8 good terms with both Jim and Margaret.
9   Q. Okay. Was there any personal relationship
10 between any of the members of Janko and the
11 Stilwells that predated these business dealings?
12   A. No.
13   Q. Okay. Do you have any contact or business
14 dealings with Mrs. Stilwell or the Stilwell
15 children --
16   A. No.
17   Q. -- now? Okay. Do you know if Janko does
18 or any of the members of Janko?
19   A. Not to my knowledge.
20   Q. All right. You referenced a consignment
21 agreement. If you'd look at what was previously
22 marked for Mrs. Stilwell's deposition as Exhibit No.
23 2, is that -- is that the consignment agreement you
24 were speaking of?

Page 13

1   A. Well, there were two consignment
2 agreements. This is the first of those two.
3   Q. Okay. And why was it that the Stilwells
4 -- well, strike that. Was it your understanding
5 that the Stilwells were in need of assistance to
6 finance the furniture? Is that what this agreement
7 is about?
8   A. Jim had approached us for assistance in
9 financing in his furniture operation.
10   Q. Okay. And was it your understanding that
11 he approached you because he did not have the
12 capital or the financial ability to get direct
13 financing from the bank?
14   A. No, Jim had financing from the bank.
15   Q. Okay.
16   A. Jim came to us with two objectives. One,
17 to get a higher credit amount. Number two, to get a
18 better borrowing rate.
19   Q. Okay. And my understanding of this
20 agreement is then by agreement Janko would then
21 purchase the existing inventory that was owned by
22 ACV, Jim Stilwell's company, and then purchase
23 furniture for ACV to sell in a retail business? Is
24 that a fair statement?

### Page 14

1  A. Not in its entirety. We were not involved
2  with the ordering of furniture.
3  Q. Okay.
4  A. We never talked to vendors directly at the
5  time of purchase. That was all done by Jim. And we
6  simply were sent invoices that we made payment on.
7  And then as I understand, we became the owners of
8  the furniture at that point and were consigning that
9  furniture to Jim, but we were not involved in the
10 procurement.
11 Q. Okay. Thanks. Turning your attention --
12 you see the Bates stamp on the bottom? -- to
13 document Bates stamp 311.
14 A. I'm sorry, I don't know what you're
15 referring to. Oh, down here.
16 Q. The numbers on the bottom. See them right
17 there on the bottom?
18 A. Uh-huh.
19 Q. Section 3.9, you see that provision?
20 A. Yes.
21 Q. And my reading of that provision is that
22 under the agreement ACV had the obligation to
23 maintain life insurance on James Stilwell in the
24 amount of $2 million with Janko and the bank as a

### Page 15

1  named beneficiary. Is that your understanding of
2  that provision?
3  A. That's what it says.
4  Q. Okay. What purpose did that provision
5  serve?
6  A. That provision was included as additional
7  security to us under the agreement.
8  Q. Okay. If you turn to page 314 in the
9  agreement, Section 3. -- or 6.3 references a
10 personal guarantee that was a condition to the
11 agreement. Do you see that?
12 A. Now, which section?
13 Q. I'm at section -- down under Section 6,
14 page 314.
15 A. Okay, I'm sorry, I was at 3.14 on the
16 agreement.
17 Q. Sorry.
18 A. 6.3, yes, it shows that there would be a
19 personal guarantee.
20 Q. Okay. So it was your understanding that a
21 condition of the agreement was that Jim and Margaret
22 Stilwell would personally guarantee the debt that
23 was owed by ACV to Janko.
24 A. Yes.

### Page 16

1  Q. All right. And they fulfilled that
2  condition; is that right?
3  A. They signed a guaranty.
4  Q. Okay. And is that guaranty that they
5  signed the document that's 321 and 322 to this
6  exhibit?
7  A. Yes, it is.
8  Q. All right. The provision to procure life
9  insurance is also listed as a condition to the
10 agreement. Do you see that under 6.4?
11 A. 6.4.
12 Q. I'm at -- I'm on page 314.
13 A. Yes.
14 Q. Right under the provision --
15 A. Yes.
16 Q. -- we just discussed.
17 A. Yes, it is.
18 Q. Do you see that?
19 A. Yes.
20 Q. Okay. Did the Stilwells fulfill this
21 condition of the contract?
22 A. Not -- let me read it please.
23 Q. Sure.
24 A. Not originally.

### Page 17

1  Q. Okay. Was there any sort of understanding
2  or agreement between you and the Stilwells or ACV as
3  to how -- as to how they were going to go about
4  fulfilling this condition?
5  A. When we originally signed the agreement
6  and did the original transaction, at some point
7  thereafter, and I don't recall the date, we were
8  provided with a $500,000 beneficial interest in a
9  life policy. At that time, we instructed Jim that
10 that was not sufficient, that's not what the
11 agreement called for. We kept up that contact with
12 him and did not receive the additional beneficial
13 interest until I believe September of 2000.
14 Q. Okay. And that beneficial interest was
15 basically an assignment of rights under an existing
16 insurance policy.
17     MR. CROWDER: I'll object to form.
18 Q. Is that right?
19     MR. CROWDER: Let me object to the form of
20 the question, but you can answer.
21 A. Say again please.
22 Q. Sure. The -- well, let me ask you this.
23 Did the Stilwells to your knowledge go out and
24 obtain insurance with Janko and the bank named as an

Page 18

1 additional beneficiary?
2   A. **No. My understanding is that we were**
3 **assigned a beneficial interest in an existing**
4 **policy.**
5   Q. Okay.
6       MS. ROTHMAN: Would you mark --
7       MS. BEYERS: Are we still on the 1999
8 consignment agreement?
9       MS. ROTHMAN: Yeah.
10      (Bianchi Exhibit No. 1 was marked by the
11 court reporter.)
12 BY MS. ROTHMAN:
13  Q. Mr. Bianchi, showing you what's been
14 marked Exhibit 1 for your deposition, do you have
15 any independent recollection of receiving this
16 document?
17  A. **Not offhand, no.**
18  Q. Okay. Taking -- have you seen this
19 document before?
20  A. **Offhand I don't recall, but I have no**
21 **reason to believe that I didn't at some point.**
22  Q. Okay. Mr. Lyons, who did you -- do you
23 know who he is?
24  A. **Yes.**

Page 19

1   Q. Okay. Who do you understand Mr. Lyons to
2 be?
3   A. **I believe him to be an insurance agent who**
4 **sold Jim various coverages.**
5   Q. Okay. And did you have dealings and
6 communications with Mr. Lyons as the agent for Mr.
7 Stilwell?
8   A. **Yes.**
9   Q. All right. You don't have any prior
10 dealings with Mr. Lyons or any other dealings?
11  A. **No, no.**
12  Q. Okay. This correspondence seems to
13 reference a copy of a $500,000 assignment on a $4
14 million policy and says I will get you another
15 assignment sheet for an additional 1.5 and have
16 Margaret sign it. Do you see that?
17  A. **Yes, I do.**
18  Q. Okay. So turn to Exhibit 3 that was
19 previously marked for Stilwell's deposition. This
20 is a copy of the $500,000 assignment that Janko
21 received that was executed by Margaret Stilwell?
22  A. **That's correct.**
23  Q. Okay. And Exhibit 4, if you look at
24 Exhibit 4, is this the additional $1.5 million

Page 20

1 assignment that Mr. Lyons references as the
2 forthcoming assignment?
3   A. **It appears to be, yes.**
4   Q. Okay. And Exhibit 4, the $1.5 million
5 assignment, is dated September 25th, 2000?
6   A. **That's correct.**
7   Q. Do you see that? And it was -- it's your
8 recollection that it took a while to get this second
9 assignment; is that right?
10  A. **Over a year. Almost a year and a half.**
11  Q. Okay. Do you know what the holdup was?
12  A. **No, I don't.**
13  Q. Okay. In any event, you never or Janko,
14 and when I say you, I mean you as Janko in this --
15  A. **Uh-huh, yes.**
16  Q. -- instance, you never waived the
17 condition that a $2 million protection or life
18 insurance protection be obtained?
19  A. **No, we did not.**
20      MR. CROWDER: Show an objection as it
21 calls for a legal conclusion.
22  Q. And you followed up with Mr. Stilwell
23 and/or somebody on his behalf to obtain the
24 additional assignment?

Page 21

1   A. **Yes, I did.**
2   Q. Okay. But approximately how many times
3 did you attempt to follow-up?
4   A. **I have no recollection of a number, but I**
5 **would say numerous.**
6   Q. Okay. Did he give you any explanation, he
7 meaning Mr. Stilwell, as to what was taking so long
8 and what the holdup was?
9   A. **No.**
10  Q. Showing you what was previously marked
11 Stilwell Exhibit 5 is a packet of documents that all
12 relate to the closing of a consignment transaction
13 on November 17th, 2000. Do you see that?
14  A. **Yes.**
15  Q. Are you familiar with these documents?
16  A. **Yes.**
17  Q. All right. Again, I think your counsel
18 told me I don't have to go through all of these
19 documents to have you review them for me and verify
20 that they contain true and correct copies of all the
21 documents that are listed.
22      MS. ROTHMAN: Is that right?
23      MR. SENECA: We will stipulate to the
24 authenticity of them, yes.

Page 22

1  MS. ROTHMAN: Okay.
2  Q. At some point Janko assigned the interest
3  in it -- the consignment agreement we just discussed
4  to a newly created company, TFG; is that right?
5  A. Yes.
6  Q. All right. Turn to page -- of document
7  Exhibit 5, Group Exhibit 5, turn to page 707. Do
8  you recognize that document?
9  A. Yes, I do.
10  Q. Okay. Is this the assignment and
11  assumption agreement between Janko and TFG?
12  A. Yes, it is.
13  Q. All right. And what is your understanding
14  of the purpose of this document?
15  **A. Purpose of this document was to assign the**
16  **rights that Janko Financial Group currently had in**
17  **its transactions with Amishland Country Village**
18  **concerning the furniture consignment agreement, that**
19  **all those rights be transferred to Tuscola Furniture**
20  **Group.**
21  Q. So not only were the obligations under the
22  consignment agreement transferred, but also the
23  rights -- the rights under the consignment
24  agreement, correct?

Page 23

1  **A. That's correct.**
2  Q. And that would have included the right to
3  any assignment of life insurance that was given to
4  Janko by the Stilwells in connection with the
5  original consignment agreement?
6  **A. That is --**
7  MR. CROWDER: Show an objection as to
8  calling for a legal conclusions for Mr. Bianchi.
9  Subject to that --
10  **A. Section 2 states any and all contracts and**
11  **other documents including insurance policies.**
12  Q. Okay. And your understanding of that
13  section is that it would -- it was meant to include
14  any right to any of the assignment of life insurance
15  proceeds that had been given to Janko in connection
16  with the original assignment, correct?
17  **A. Yes.**
18  MR. CROWDER: Same objection.
19  Q. Now, flipping to the consignment agreement
20  at issue, the November 17th consignment agreement
21  that's on page 655.
22  **A. Yes.**
23  Q. Setting aside -- I've looked at this
24  consignment agreement. I've looked at the prior

Page 24

1  consignment agreement. Setting aside the
2  consigners' names, what, if any, material
3  differences are there between the original
4  consignment agreement and this consignment
5  agreement?
6  **A. I'm not sure that I'm aware of all the**
7  **differences, but the differences that I am aware of,**
8  **on page 656, Section 2.1 calls for a change in the**
9  **amount of available credit.**
10  Q. What was the reason for that decrease in
11  the cap?
12  **A. Simply because the previous amount had not**
13  **been utilized and was not contemplated.**
14  Q. All right. If you flip to --
15  **A. Now, I didn't go over the other -- do you**
16  **want to?**
17  Q. Sure, I'm sorry.
18  **A. Okay.**
19  Q. That's the only one I saw, but --
20  **A. Okay. Specifically also the change in the**
21  **requirement for beneficial interest in the insurance**
22  **policy, in the life policy.**
23  Q. And are you on page 659?
24  **A. No, I'm on page --**

Page 25

1  Q. I'm sorry, Bates stamp 659, Section 3.9.
2  **A. 659, yes.**
3  Q. Okay.
4  **A. Under life policy, the change in the**
5  **amount and that had to be a beneficial interest**
6  **showing TFG and bank named as beneficiary. So the**
7  **change of the amount was -- affected the life**
8  **insurance as well as the amount of credit.**
9  Q. Understood.
10  **A. Another difference was on 0657, Section**
11  **3.3, the specific locations at which furniture could**
12  **be held, that was a difference. On page 0658,**
13  **Section 3.6 was an addition, was an "Exclusive: ACV**
14  **will not accept for consignment, sell or lease**
15  **furniture of any kind except in accordance with this**
16  **consignment agreement," so on and so forth. That**
17  **was an addition.**
18  **And seems to me there would have been one**
19  **other that I'm aware of. I would have to go through**
20  **this.**
21  MR. SENECA: For clarification, you're
22  asking as he sits here today what differences he's
23  aware of.
24  Q. Correct. So you don't have to go through

## Page 26

1 the document.
2    A. Okay.
3    Q. You've covered it for my purposes. You
4 covered it a couple of times ago.
5    A. Okay.
6    Q. The Section 6.3, and this is obviously not
7 a difference because it's the same, but Bates stamp
8 662, again Section 6.3, requires a personal
9 guarantee by James and Margaret Stilwell of the debt
10 that's owed by ACV to TFG; is that right?
11   A. That's correct. And I think the other
12 change that I was looking for that I'd like to
13 mention was the requirement of the UCC filing.
14   Q. Okay. And what provision are you
15 referencing?
16   A. Well, it's referenced in 3.6, but I know
17 it's in the -- on another section.
18   Q. Okay. And what was the change there with
19 the UCC filing?
20   A. I don't know that it was required in the
21 past.
22   Q. Okay. Understand. With respect to the
23 condition of obtaining life insurance, do you know
24 what the Stilwells did to fulfill that obligation

## Page 27

1 under this consignment agreement?
2    A. At closing, the Stilwells did not present
3 an assignment of beneficial interest in the amount
4 of $1,250,000, beneficial interest to JFG -- or
5 excuse me, to Tuscola Furniture Group and the bank.
6    Q. Okay. That was at closing?
7    A. Right.
8    Q. But did you go ahead and close anyway?
9    A. Yes, we did.
10   Q. Okay. And at closing, did you -- was
11 there any discussion as to whether that provision
12 was going to be waived?
13   A. There was never any discussion or intent
14 to waive that provision.
15   Q. Okay. At some point, did -- after the
16 closing, did you obtain an assignment of life
17 insurance in the amount noted in the consignment, in
18 the amount required under the consignment?
19   A. At closing, we instructed Jim and Margaret
20 Stilwell that we had to be covered under this
21 agreement. We stated that we felt that we were
22 covered under the agreement because of the
23 assignment and assumption agreement that was dated
24 the day before this agreement that assigned the life

## Page 28

1 insurance's previous assignments. And we requested,
2 pending receipt of the proper beneficial interest in
3 the amount of $1,250,000 for Tuscola Furniture Group
4 and First Mid Illinois Bank, that we wanted to
5 substantiate to the insurance company the assignment
6 of the rights to the beneficial interest that
7 already existed, and therefore I requested -- we
8 requested from Jim Stilwell that he provide us with
9 a form so that we could notify the insurance
10 company.
11   Q. All right. And this was all discussed at
12 the closing?
13   A. Yes.
14   Q. And Margaret Stilwell was present at the
15 closing?
16   A. Yes, she was.
17   Q. And so would your discussions with Jim
18 also have been directed to Margaret?
19   A. They were directed to them both.
20   Q. All right. So at the closing you advised
21 them that you felt that the fact that they didn't
22 show up with the proper documentation of the
23 assignment of beneficial interest in life insurance
24 was not a deal breaker because you were protected

## Page 29

1 under the assignment and assumption agreement
2 between TFG and Janko that had been executed the day
3 before?
4    A. That's correct.
5    Q. Okay. Did they say anything to you
6 concerning whether they thought that was fine too or
7 whether they were disputing that?
8       MR. CROWDER: Object to the form.
9    A. They didn't dispute it. I was told by Jim
10 that he would get me the form so that we could
11 notify the insurance company of the new name,
12 Tuscola Furniture Group versus Janko Financial
13 Group, on the existing assignments.
14   Q. Okay. So in the discussions at closing,
15 Mr. Stilwell indicated to you that he would get you
16 something from the insurance company or get you
17 something from -- get you something that you could
18 give to the insurance company to protect your
19 interest under the consignment.
20      MR. CROWDER: Same objection. Object to
21 the form.
22   A. To notify them of the assignment and
23 assumption. A form to notify them of the assignment
24 and assumption.

Page 30

1  Q. All right. So Mr. Stilwell advised you
2  that he would get you a form to notify the insurance
3  company of the assignment and assumption agreement?
4  A. Yes.
5  Q. Okay. And did he ever do that?
6  A. I received from Mr. Stilwell's insurance
7  agent, John Lyons, a form that had been completed
8  and was ready for my signature in order to show the
9  assignment of the beneficial interest.
10  Q. Showing you what was previously marked
11  Stilwell's Deposition Exhibit 20, is that the
12  document that you're referring to?
13  A. That's correct.
14  Q. Okay. Do you recall when you received
15  this document from Mr. Lyons?
16  A. I believe I received it on the 21st of
17  November, though I don't have any document that
18  states that, but noticing that apparently Mr. Lyons
19  received it, it was received to Mr. Lyons's fax
20  number on the 20th, and Mr. Lyons then forwarded
21  that to me with a note stating that he was providing
22  me the form.
23  Q. Okay. Did you have any discussions with
24  Mr. Lyons concerning this document?

Page 31

1  A. No, other than he was sending the --
2  Q. Other than he would send it to you?
3  A. Correct.
4  Q. So you did initially have a discussion
5  with him and asked him to send you something?
6  A. No.
7  Q. Oh, okay.
8  A. I talked to Mr. Stilwell.
9  Q. Okay.
10  A. Mr. Stilwell contacted Mr. Lyons and
11  provided the form, and I had asked Mr. Stilwell to
12  provide us with a form that we could show an
13  assignment of our $2 million beneficial interest
14  from Janko Financial Group to Tuscola Furniture
15  Group.
16  Q. Okay. All right. And this is what you
17  got, Exhibit 20?
18  A. I got this form and it was Sections 1 and
19  3 were filled out.
20  Q. All right. And so what you did to
21  effectuate that intent was sign it and fill out the
22  words released in favor of Tuscola Furniture Group,
23  LLC?
24  A. Correct.

Page 32

1  MR. CROWDER: Object to the form of the
2  question.
3  Q. All right. Why don't you tell me what you
4  did after you received this document?
5  A. When I received this document, after
6  having read it, I knew that to make the document
7  effective I had to sign it, and the reason that I
8  put in favor of Tuscola Furniture Group is because I
9  wanted to make sure that everyone understood that
10  this was a transfer of the assignment from Janko
11  Financial Group in favor of Tuscola Furniture Group.
12  I was concerned about the statement that I saw
13  release of assignment, but I made an assumption that
14  that meant the release from Janko Financial Group to
15  Tuscola Furniture Group.
16  Q. Okay. And you didn't have any discussions
17  with Mr. Lyons about -- about that?
18  A. No.
19  Q. Okay. Did you have any discussions with
20  anybody at American General about that at this time?
21  A. No.
22  Q. Okay. Showing you what was marked for
23  Mrs. Stilwell's deposition as No. 6, this is an
24  assignment to Tuscola Furniture Group in the amount

Page 33

1  of $250,000. Can you tell me what this was, how
2  this came about?
3  A. This is what we received from Jim Stilwell
4  after closing and after I had signed this other
5  document. And having received this from Jim, I
6  notified him of two discrepancies between this
7  document and what was required in the consignment
8  agreement. Number one, the amount was wrong, it was
9  250,000 instead of 1,250,000. And number two, this
10  was an assignment to Tuscola Furniture Group only
11  whereas our agreement stated that it was to be
12  Tuscola Furniture Group, LLC, and the bank.
13  Q. And was this a conversation you had with
14  him face-to-face or over the phone --
15  A. I don't recollect that.
16  Q. -- do you recall? Okay. Do you recall
17  what he said to you in return?
18  A. Jim stated that he would get for me the
19  proper assignment.
20  Q. Okay. And did he ever do that?
21  A. No.
22  Q. Showing you what is marked Stilwell No. 7,
23  it says an assignment from Margaret Stilwell to
24  First Mid Illinois Bank and Trust for $1 million.

Page 34

1 Do you see this?
2    A. Yes.
3    Q. But do you know how this document came
4 about?
5    A. Well, this is -- is a further response
6 that we received from Jim Stilwell concerning our
7 request for $1,250,000 of assignment of beneficial
8 interest in a life policy showing beneficial
9 interest to Tuscola Furniture Group and First Mid
10 Illinois Bank.
11    Q. Okay.
12       MR. CROWDER: Move to strike the answer.
13 Lacks foundation.
14       MS. ROTHMAN: Can you read back my --
15    Q. Well, I'll ask you something else. When
16 did you -- have you ever received -- strike that.
17 Do you recall receiving a copy of this document?
18    A. Yes, I do.
19    Q. Okay. When did you first receive a copy
20 of this document?
21    A. Sometime in January of 2001.
22    Q. And when did -- who did you receive a copy
23 of it from?
24    A. To my best recollection, from Jim

Page 35

1 Stilwell.
2    Q. Okay. Did you have any discussions with
3 Jim Stilwell about this document?
4    A. Yes, I did.
5    Q. Okay. And what were those discussions?
6    A. I informed Jim that this document did not
7 satisfy the requirements of our consignment
8 agreement and that he still needed to get to us an
9 assignment of beneficial interest in the amount of
10 $1,250,000 and that the assignment should be to
11 Tuscola Furniture Group and First Mid Illinois Bank,
12 and further, that we would not release any of the
13 prior assignments that we held, those being the $2
14 million that we got originally at various times and
15 the $250,000 that came after that, now the $1
16 million. We told him that it needed to be correct
17 according to the documents.
18    Q. Okay. And what did he say to you?
19    A. Jim stated that he would get that release
20 -- that assignment for me.
21    Q. Did he ever -- and he never did that; is
22 that right?
23    A. That's correct.
24    Q. Okay. After you had the discussion that

Page 36

1 you just described with Mr. Stilwell concerning the
2 assignment he had given to the bank in the amount of
3 $1 million, did you have further follow-up
4 discussions with him concerning meeting this
5 requirement?
6    A. At various times I would ask him what the
7 status was of fulfilling that requirement and he
8 would respond that he was working on it.
9    Q. Okay. Did he give you any explanation as
10 to why he did it the way he did? Why he had one for
11 $250,000 to TFG and why there was one for $1 million
12 to the bank?
13    A. The only thing I recollect him ever
14 stating is that he must have misunderstood the
15 proper form.
16    Q. Okay. And so when you didn't get the
17 additional or the corrected forms, you kept after
18 him to provide you with the proper forms, correct?
19    A. Correct.
20       MR. CROWDER: Object to the form.
21    Q. But it was your position that you had
22 sufficient protection -- or strike that. Was it
23 your position that you had sufficient protection?
24    A. It was my position, our position rather,

Page 37

1 that we were overprotected from the standpoint of
2 amounts, and specifically the bank was protected in
3 that our borrowing authority with them on this
4 consignment agreement was $1 million. And
5 therefore, if there was an assignment that existed
6 for $1 million, even though the consignment
7 agreement called for them as well as us to be listed
8 for 1,250,000, that we know that that assignment
9 that we had received would, in fact, cover the
10 bank's position. So we felt that the bank was fully
11 protected and that we were more than fully
12 protected.
13    Q. Okay. Let me turn you back to Exhibit 20,
14 the document you executed -- well, let me ask you.
15 This was -- let me just clarify. This was a
16 document that you executed in an effort to confirm
17 the assignment between Janko and TFG with American
18 General?
19       MR. CROWDER: Object to the form.
20    A. It was my understanding that we needed to
21 notify the insurance company that the -- there was a
22 transfer of the beneficial interest or at least our
23 rights to the beneficial interest from JFG to
24 Tuscola Furniture Group, and since we had a new

### Page 38

1 consignment agreement under a new name and we did --
2 were not provided with the proper assignment at
3 closing, that we wanted all parties effected to be
4 notified.
5    Q. Okay. So you executed this document to
6 notify American General of the assignment between
7 Janko and Tuscola Furniture Group.
8    A. Correct.
9    Q. Okay.
10    A. Or to -- actually to effectuate with them
11 that assignment.
12    Q. Them being American General?
13    A. Yes, American General.
14    Q. All right. To notify them of that
15 agreement, that business --
16    A. Well, I stop short of that because I don't
17 know that we ever notified them that there was a
18 separate agreement document.
19    Q. Uh-huh.
20    A. But in support of the document that we had
21 signed, we felt that we needed to let the insurance
22 company know that Janko Financial Group no longer
23 possessed this beneficial interest and now Tuscola
24 Furniture Group did.

### Page 39

1    Q. The name had changed in other words.
2    A. Right.
3      MR. CROWDER: Object to the form.
4    Q. Okay. At some point, Amishland Country
5 Village and the Stilwells started having financial
6 difficulties; is that right?
7    A. That's my understanding, yes.
8    Q. When did you first become aware that they
9 were starting to have financial problems?
10    A. I don't know a date. I know a
11 circumstance and that being that they started to
12 become delinquent on their rental and they -- we
13 started to see shortages in furniture inventory.
14      MR. CROWDER: Object to the answer without
15 foundation.
16    Q. Were you the point person so to speak?
17 You were involved in the Stilwell -- the business
18 dealings between Janko or TFG and Amishland Country
19 Village; is that right?
20    A. In the furniture business, I was involved,
21 but I would not necessarily call myself the point
22 person. I don't know that such a person existed
23 because we had -- we hired a firm to do inventory.
24    Q. Okay.

### Page 40

1    A. And our office in Downers Grove handled
2 the transactions for that business, and I wasn't
3 aware of those individual transactions, didn't have
4 anything to do with them, so I was the contact
5 person with Jim Stilwell.
6    Q. Okay. You just described that you became
7 aware that they were having financial problems
8 because they were unable to pay their rent; is that
9 right?
10    A. Well, I don't know which came first, the
11 rent or the furniture.
12    Q. Okay. All right. At some point, do you
13 recall that Janko sued ACV and the Stilwells
14 individually? Filed an action?
15    A. I don't know that Janko did. I know that
16 Amishland Development did.
17    Q. I'm sorry, okay. And Janko was a member
18 of the Amishland --
19    A. Was the managing member.
20    Q. Managing member?
21    A. Yes.
22    Q. Okay. Looking at Exhibit 8 that is in
23 front of you that was marked at Mrs. Stilwell's
24 deposition, this is a group of documents that was

### Page 41

1 produced in discovery to me, and directing your
2 attention to Bates stamps 47 through 51 -- I'm
3 sorry, 47 through looks like 74 is the complaint and
4 at least two of the exhibits to the complaint.
5      Does this refresh your recollection on the
6 fact that a lawsuit was filed?
7      MR. CROWDER: I'll object to the form.
8    A. I am aware that a lawsuit was filed and
9 this -- in reviewing this document, it appears to me
10 that this is the document that I'm familiar with.
11    Q. Okay. And so on or about -- on February
12 13th, 2003, Amishland Development filed suit against
13 ACV and the Stilwells for delinquency in their rent.
14    A. That's correct.
15    Q. Okay. And you verified the allegations in
16 this complaint, correct? Is that your signature on
17 page 50?
18    A. Yes, it is.
19    Q. And 51?
20    A. Yes, it is.
21    Q. Okay. Now, the suit was brought against
22 the Stilwells personally, and I see that in the
23 caption. Do you know why that was? Was it -- did
24 they have a guarantee, did they personally guarantee

Page 46

1  Q. Does that refresh your recollection as to
2 why the replevin action was voluntarily dismissed?
3  A. Yes, it does.
4  Q. Okay. And so is it your understanding
5 that you voluntarily dismissed that action because
6 you were being paid -- you anticipated payment of
7 insurance proceeds?
8  A. Correct.
9  Q. Okay. And you understood Mr. Broch to be
10 -- to be the Stilwell's counsel, correct?
11  A. In this action, yes.
12  Q. In this action. Mr. Stilwell passed away
13 on or about May 2nd, 2003. Do you recall how you
14 heard that he had passed?
15  A. I think my partner, Dick Janko, notified
16 me and he had received a call and I don't know if it
17 was from Margaret or someone down in Amishland.
18  Q. Okay. What -- did you take any steps to
19 recover under the insurance policy after you learned
20 that he had passed?
21  A. On which of our business dealings?
22  Q. On -- well, on any of your business
23 dealings --
24  A. Yes.

Page 47

1  Q. -- how's that? Which business dealing are
2 we talking about?
3  A. We're talking about both the consignment
4 agreement and the rental agreement between Amishland
5 Development and Amishland Country Village.
6  Q. Okay. And what steps did you take?
7  A. I think I contacted John Lyons first and
8 John said that he would provide us forms for filing
9 a claim.
10  Q. Okay. That was a telephone conversation
11 you had?
12  A. I believe so, yes.
13  Q. All right. And was the -- what you said
14 to him and what he said to you basically what you
15 just told us, that you know you asked him to provide
16 you claims, he said he would, that was the end of it
17 or --
18  A. Yes.
19  Q. Okay. What happened next?
20  A. I think we proceeded to gather
21 documentation as to the amount of our claim and
22 proceeded at some point to file the claim.
23  Q. Okay.
24     (Bianchi Exhibits No. 2 through 8 were

Page 48

1 marked by the court reporter.)
2     MS. ROTHMAN: 3 was the cover sheet. I'm
3 skipping 2 because 2 is actually the second page of
4 3. If you guys want to look at it, it's document
5 43, 44 and 45.
6     MR. CROWDER: From our production
7 probably.
8     MS. ROTHMAN: Either production.
9     MR. SENECA: No, actually that was --
10    MS. BEYERS: Is that yours?
11    MR. SENECA: -- the response to subpoena I
12 think to Jason previously, but anyway, we produced
13 that document at some point.
14    MR. CROWDER: It's got a number on it.
15    MS. ROTHMAN: You'll probably find it in
16 about three different spots.
17 BY MS. ROTHMAN:
18  Q. Mr. Bianchi, showing you what was marked
19 Exhibit 3 for your deposition, and we're skipping
20 Exhibit 2 because it's contained in Exhibit 3, is
21 this -- you had described a conversation with John
22 Lyons whereby you advised him that you needed a
23 claim form and he had -- he sent you a claim form;
24 is that right?

Page 49

1  A. It -- I'm stating that I received a claim
2 form from John Lyons.
3  Q. Oh, I'm sorry. This is a fax transmittal
4 to Tim Howard.
5  A. Correct.
6  Q. And Tim Howard was your attorney; is that
7 right?
8  A. Yes.
9  Q. Okay. So you received a claim form from
10 John Lyons and you -- and that's document 44, the
11 second document of Exhibit 3, correct?
12  A. That's not the form. That's the -- the
13 letter that accompanied the form.
14  Q. Okay. And then the next document is the
15 form, correct?
16  A. That's correct.
17  Q. Okay. And then you -- when you received
18 that document, did you discuss it with anybody?
19  A. I don't recall offhand other than faxing
20 it to Tim and probably also with my partners.
21  Q. Okay. What did you do after receiving
22 this document and faxing it to Tim and your
23 partners?
24  A. We gathered information and, based on Tim

## Page 50

1  Howard's review of the statement, went ahead and
2  filed the claim.
3      Q. Okay. Looking at Exhibit -- let me see
4  what exhibit -- 13.
5      MS. ROTHMAN: Is it over here? I'm
6  looking for Stilwell 13.
7      MR. CROWDER: Yeah.
8      MR. SENECA: Yeah, 13 and 14 are right
9  there.
10     MS. BEYERS: I mean this is a --
11     MS. ROTHMAN: I got it.
12 BY MS. ROTHMAN:
13     Q. Okay. Showing you what's been marked
14 previously Stilwell Exhibit 13, do you recognize
15 this document?
16     A. Yes, I do.
17     Q. Okay. Did you draft this document?
18     A. Yes, I did.
19     Q. Okay. Is this a document that you
20 submitted in connection -- submitted to American
21 General in connection with your claim under the
22 policy?
23     A. Yes, it is.
24     Q. Okay. And if you flip -- you've got First

## Page 51

1  Mid. Thomas Chamberlain signed the document as
2  well?
3      A. Yes.
4      Q. Can you tell me how it came about that you
5  were making a joint claim with the bank?
6      A. It was our understanding that our
7  consignment agreement required that.
8      Q. Okay. Flipping to Exhibit A -- I think
9  it's Exhibit A, it's Exhibit A that's referenced in
10 the letter -- which is a document, a spreadsheet
11 type document titled Tuscola Furniture Group, LLC.
12     A. Correct.
13     Q. Did you create this document?
14     A. No, I did not.
15     Q. Okay. Do you know who did create this
16 document?
17     A. The staff of Janko Financial Group.
18     Q. Okay. Anybody verify the numbers on this
19 document?
20     A. I'm not sure I understand the question.
21 What do you mean by verify?
22     Q. Let me strike that. Do you have any
23 reason to believe that the figures that are
24 reflected here as due and owing are not accurate?

## Page 52

1      MR. CROWDER: Object to the form.
2      A. I -- I believe these to be accurate
3  numbers --
4      Q. Okay.
5      A. -- except for one situation. If you would
6  look under the area that says $101,780.32 unlocated
7  inventory at cost, unknown sales price certainly
8  higher, TFG entitled to a minimum of 10 percent fee,
9  and you'll see a 10 percent figure there, that
10 101.780.32 was the wholesale amount. Under our
11 agreement, we were due 10 percent of retail sales
12 value, so that number may, in effect, be less than
13 what it should have been.
14     Q. Got it. Other than that exception, is --
15 do you have any reason to believe that the figures
16 conveyed on this sheet are not accurate?
17     A. No, I do not.
18     Q. Okay. The second document, Tuscola
19 Furniture Group, LLC, Stilwell Inventory
20 Reconciliation, do you see that?
21     A. Yes, I do.
22     Q. Did you prepare that document?
23     A. No, I did not.
24     Q. Okay. Do you know who did?

## Page 53

1      A. Staff of Janko Financial Group.
2      Q. All right. Do you have any reason to
3  believe that the figures on that document are not
4  accurate?
5      A. No, I do not.
6      MR. CROWDER: Show an objection to
7  foundation.
8      Q. Okay. The last pages are the claim form
9  and you executed that claim form on behalf of TFG,
10 correct?
11     A. That's correct.
12     Q. And your intent in executing that claim
13 form on behalf of TFG was to -- was to submit a
14 claim to American General for American General to
15 pay, correct?
16     A. That's correct.
17     Q. All right. And in connection with the
18 claim that you submitted, you submitted the May
19 12th, 2003, correspondence, correct?
20     A. Correct.
21     Q. All right.
22     A. That was the cover letter.
23     Q. That was the cover letter to your claim
24 form.

### Page 54

1  A. Correct.
2  Q. Are the statements contained in your May
3 12th, 2003, correspondence true and correct?
4  A. Yes.
5  Q. Okay. Looking at --
6  A. With one -- with one -- I think I
7 corrected or made an addition to the information
8 there with my May 28th, 2003, letter.
9  Q. Okay. And that May 28th, 2003, letter
10 is --
11    MS. BEYERS: Stilwell 14.
12  A. Stilwell 14.
13  Q. Stilwell 14, okay. How did you -- how did
14 you come about knowing that you needed to amend the
15 original letter?
16  A. In reviewing my information, I saw that
17 there was one assignment that I had not listed as
18 one that we would release in exchange for the
19 receipt of the proceeds, and I thought that rather
20 than wait for somebody on the other side to point it
21 out, that I wanted to -- you know, it came to my
22 attention, so I wanted to point it out to the
23 insurance company.
24  Q. Okay. Looking at I think it was Stilwell

### Page 55

1 Exhibit 4, Stilwell Exhibit 4 is a copy of a letter
2 dated May 12th, 2003, to William Lyons from Thomas
3 Chamberlain that was also executed by you, correct?
4  A. Yes, it was.
5  Q. Okay. And this is basically an identical
6 letter to your May 12th letter, correct?
7  A. I don't know if it's identical, but I
8 believe it's extremely similar.
9  Q. Okay. Did you discuss with anybody at the
10 bank the drafting of this letter? I mean how did
11 these two letters come -- come to be?
12  A. I don't remember discussing the drafting
13 of the letter. However, I may have shared my letter
14 in draft form with the bank. But I don't have a
15 recollection of discussing it.
16  Q. Okay.
17    MS. BEYERS: And I think -- is that
18 Stilwell Exhibit 4 or is that -- this one here, the
19 one we're on, is that Bianchi 4?
20    MS. ROTHMAN: I'm sorry, Bianchi 4.
21    MS. BEYERS: Okay, I just wanted to make
22 sure.
23    MS. ROTHMAN: Stilwell's 13, Bianchi's 4.
24    MS. BEYERS: 4, yeah. Okay, I'm sorry.

### Page 56

1    MS. ROTHMAN: Two letters.
2 BY MS. ROTHMAN:
3  Q. All right. You signed off on the May
4 12th, 2003, correspondence, correct? I think you
5 said you did.
6  A. Yes.
7  Q. And you don't have any reason to believe
8 that the content of the bank's May 12th letter is
9 not true and accurate, do you?
10  A. Other than the same correction to the last
11 paragraph on the page, it did not include the
12 $250,000 assignment --
13  Q. Okay.
14  A. -- for release.
15  Q. And after you submitted the May 12th
16 letter, on or about May 28th, 2003, you amended your
17 original letter with --
18  A. I amended my letter. I didn't cite the
19 bank's letter or amend it.
20  Q. Right. And that -- that is Exhibit 5
21 that's in front of you? Do you have Exhibit 5?
22  A. Yeah.
23  Q. Bianchi 5?
24  A. Yes, it is.

### Page 57

1  Q. Okay. Top page is a fax transmittal that
2 you sent to John Lyons that basically says "attached
3 is a letter as an amendment to my original letter
4 dated May 12th, 2003. If there's any problem with
5 this letter, please call me immediately. If I do
6 not hear from you, I will overnight the letter to
7 your office."
8  A. Correct.
9  Q. Do you see that? Did you have any
10 discussions with John Lyons at this time or any time
11 before sending this 5/28 fax concerning the need to
12 amend here?
13  A. I don't recall whether or not I would have
14 called John to let him know, but I do know that upon
15 becoming aware of the fact that there was one more
16 assignment, that we needed to document that and
17 specifically to state that we would release that in
18 exchange for payment. So it would cover all
19 assignments currently existing.
20  Q. Did you have -- I might have asked you
21 this and I apologize if I did. Did you have any
22 conversations with John Lyons at any time concerning
23 the number of outstanding assignments held by TFG?
24  A. I don't know if my conversation was with

Page 70

1 be fair to say, Mr. Bianchi, that the insurance
2 payment that you received from American General
3 reduced the amount that was owed to you by the
4 Stilwells and their company?
5     MR. CROWDER: Object to the form.
6  A. I --
7     MR. CROWDER: No foundation.
8  A. I really don't know how to answer that
9 because I don't -- I'm, you know, reading this again
10 after a long time and I really don't understand the
11 details of this transaction. So I could not verify
12 what you just said was true or not.
13  Q. You can't verify for me whether the
14 payment that was made by American General reduced
15 the amount that was owed to you by the Stilwells and
16 their company, ACV?
17     MR. CROWDER: Object to the form.
18  A. The only thing I know about the fact that
19 we had a payment is that we had life insurance as
20 collateral on the loan, on the lease.
21  Q. Okay. But were you owed a debt from the
22 Stilwells and their company?
23     MR. SENECA: Just a point of
24 clarification. When you're talking about this, are

Page 71

1 you talking about the payment of the 512, whether
2 that reduced --
3     MS. ROTHMAN: Correct.
4     MR. SENECA: -- Stilwell's debt to --
5     MS. ROTHMAN: Yes, that what I'm --
6     MR. SENECA: -- various entities?
7     MR. CROWDER: That's a separate --
8     MS. ROTHMAN: That's what I meant.
9  A. The payment of 512,000 --
10  Q. I'm not --
11     MS. BEYERS: She's not talking about --
12  Q. I'm off of that.
13  A. Oh, because there was another insurance
14 payment. I was thinking of the other insurance
15 payment. The $512,000 to my recollection had
16 nothing to do with this action.
17  Q. Okay. Got you. The $512,000 that was --
18 and change that was paid to you by the insurance, by
19 American General, that's at issue here --
20  A. Correct.
21  Q. -- is it fair to say that that payment
22 reduced the overall amount of debt that ACV and the
23 Stilwells owed to --
24  A. No, that's an incorrect statement. It did

Page 72

1 not reduce the overall amount. It only satisfied
2 the amount owed under the consignment agreement.
3 Had no relationship to the rest of the money owed.
4  Q. Okay. It was -- it was -- it was -- but
5 it did reduce the amount that they owed you under
6 the consignment agreement.
7  A. It satisfied the amount they owed us under
8 the consignment agreement.
9  Q. Okay. All right. So it reduced it to
10 zero.
11  A. That, yes.
12  Q. Okay.
13  A. But when you say the amount they owed us,
14 they owed us more money than just what --
15     MR. SENECA: That's what I wanted to
16 clarify.
17     MS. ROTHMAN: I understand that.
18 That's --
19     MR. SENECA: There's a bunch of different
20 entities here who owed money.
21     MS. ROTHMAN: I understand that.
22 BY MS. ROTHMAN:
23  Q. So you mentioned another insurance
24 payment. What -- what can you tell me about that?

Page 73

1  A. That was a $1.5 million insurance payment
2 to Amishland Development by the insurance company
3 under terms of the lease agreement that called for a
4 life policy, assignment of the beneficial interest.
5  Q. Okay. Was that a payment that was made to
6 a lender, do you know?
7  A. Offhand, I don't know exactly how that
8 flowed.
9  Q. Okay. Margaret Stilwell filed for
10 bankruptcy, personally filed for bankruptcy,
11 correct?
12  A. That's my understanding.
13  Q. Your understanding. You -- you were the
14 Janko company's -- Janko and TFG, did they assert a
15 claim against Margaret Stilwell in her bankruptcy?
16  A. I do not believe so.
17  Q. Okay. And do you know why a claim was not
18 asserted against Margaret Stilwell in her
19 bankruptcy?
20  A. Because we had been satisfied -- our
21 claims had been satisfied, number one, through the
22 payment of life insurance proceeds under the
23 consignment agreement and, number two, through this
24 agreement that was reached in our other transaction

## Page 74

1 between Amishland Development and Amishland Country
2 Village. And I think we had previously reached an
3 agreement on the restaurant rental prior to her
4 filing bankruptcy.
5    MS. ROTHMAN: Okay, that's all I have.
6    MR. CROWDER: Julie, do you have any
7 questions?
8    MS. BEYERS: I do have some. Do you want
9 me to go first?
10    MR. CROWDER: I don't care.
11    MS. BEYERS: You go ahead.
12    EXAMINATION BY
13    MR. CROWDER:
14    Q. Larry, with respect to the bankruptcy
15 question, do you know what, if any, payment you
16 would have received from Margaret's bankruptcy had
17 you filed a claim?
18    MR. SENECA: Objection, calls for
19 speculation.
20    A. I have no knowledge of that.
21    Q. You haven't researched in any way whether
22 or not you would have been paid any -- as an
23 unsecured creditor, you would have been paid
24 anything in Margaret's bankruptcy?

## Page 75

1    A. I have not researched that.
2    Q. With respect to the consignment
3 agreements, there were two of them; is that
4 accurate?
5    A. That's correct.
6    Q. Okay. The first one Amishland Country
7 Village entered into with Janko Financial Group; is
8 that correct?
9    A. That's correct.
10    Q. Okay. When that deal was negotiated, was
11 it Tim Howard that was representing Janko Financial
12 Group in that transaction?
13    A. No, it was not.
14    Q. Who handled that?
15    A. Lawrence Baxter of Ottawa, Illinois.
16    Q. Okay. Do you recall -- do you recall
17 attending the closing for that consignment
18 agreement, if there was one?
19    A. Not for the first consignment agreement.
20 I don't recall.
21    Q. Okay. At the time of the consignment
22 agreement being signed, this is the one with Janko
23 Financial Group, you were not provided any type of
24 life insurance benefits from Jim Stilwell's life

## Page 76

1 insurance; is that accurate?
2    A. I don't have the date of when we received
3 the first assignment received from Jim of 500,000,
4 but there was a provision that it would be provided.
5 Whether or not it was provided at closing, I -- I
6 think it was very close to closing if it wasn't at
7 closing, but I don't have the date in front of me.
8    Q. Okay. You ultimately got an assignment of
9 $500,000; is that correct?
10    A. First assignment received was in the
11 amount of 500,000.
12    Q. And that was an assignment signed by
13 Margaret to Janko Financial Group, correct?
14    A. I assume it was signed by Margaret. I
15 don't have the document in front of me.
16    Q. Okay.
17    MR. SENECA: Want to pull it out?
18    MR. CROWDER: Sure, if you want. I just
19 want to -- the document speaks for itself, but --
20    Q. And then later on I think you mentioned --
21 go ahead and take a look at that.
22    A. Yes, Margaret signed it.
23    Q. And what was that exhibit number?
24    A. Stilwell 3.

## Page 77

1    Q. Okay. And then later on you received a
2 $1.5 million assignment to Janko Financial Group,
3 correct?
4    A. That's correct.
5    Q. And that was again signed by Margaret.
6    A. Is this the continuation of that document?
7    Q. Supposed to be.
8    A. There's a signature by Margaret Stilwell,
9 yes.
10    MR. SENECA: On page 2 of --
11    A. Stilwell 4.
12    Q. Stilwell 4, okay. Then -- and the purpose
13 of those two assignments that you received for the
14 benefit of Janko Financial Group was basically to
15 collateralize Janko Financial Group with respect to
16 the consignment agreement transaction, correct?
17    A. Well, not only that -- the answer to that
18 question is yes, but at the time that I was finally
19 provided, we were under negotiations for revising
20 the assignment -- the consignment agreement, and we
21 stipulated that we would not revise the consignment
22 agreement or assignment of the consignment agreement
23 unless the Stilwells lived up to the original
24 insurance requirement.

**Page 86**

1 agreement of November 17. Is that accurate?
2   A. I'm not sure how to answer because I don't
3 know what Janko Financial Group's majority ownership
4 in Tuscola Furniture Group, if that means that they
5 owed Tuscola Furniture Group and Janko Financial
6 Group or if they just owed Tuscola Furniture Group.
7 So I don't believe I can answer that.
8   Q. Okay. So you consider that to be kind of
9 a legal -- legal thing that you're not -- that you
10 don't know?
11   A. It's a legal question that I don't know
12 the answer to.
13   Q. Okay. But from your understanding, Janko
14 Financial Group was no longer involved in any
15 transactions with Amishland Country Village as of
16 November 17, 2000?
17   A. No, they were still involved, but my
18 understanding is that the new consignment agreement
19 was between Amishland Country Village and Tuscola
20 Furniture Group.
21   Q. Okay.
22   A. But there were other interactions between
23 the two groups outside of the furniture business.
24   Q. Right. What were those between Janko

**Page 87**

1 Financial Group and Amishland Country Village?
2   A. Janko Financial Group was the managing
3 member of the Amishland Development. Janko
4 Financial Group was the majority owner of Tuscola
5 Restaurant Group. Well, that transaction didn't
6 have anything to do with Amishland Country Village,
7 but Amishland Development did.
8   Q. But I think what I'm trying to make sure
9 is clear on the record, that as of November 17 -- is
10 it 2000?
11     MS. ROTHMAN: Yes.
12   Q. -- 2000, there were no agreements, signed
13 written agreements between Janko Financial Group and
14 Amishland Country Village to your knowledge?
15   A. Other than the assignment of beneficial
16 interest, no.
17   Q. Okay. When you say the assignment of
18 beneficial interest, you're referencing back to the
19 5 million and the $1.5 million assignment.
20   A. The 500,000 and the 1.5.
21   Q. Yeah, the 500 and the 1.5. Did you -- do
22 you recall having any conversations with Tom
23 Chamberlain with respect to the -- what you're
24 referring to as assignment of beneficial interest to

**Page 88**

1 First Mid?
2   A. I don't have any specific recollection of
3 discussing it with Tom, no.
4   Q. Okay. You were made aware that Tom had
5 received an assignment of 1 million from --
6   A. That's correct.
7   Q. -- the life insurance policy, correct?
8   A. That's correct.
9   Q. Okay. And you, in fact, received an
10 assignment of 250,000 from the -- from -- signed by
11 Margaret Stilwell on the life insurance policy,
12 correct?
13   A. To Tuscola Furniture Group, yes.
14   Q. Okay. And that -- and that's the -- those
15 documents were being filtered through you, correct?
16 You were the person that was getting --
17   A. I don't know if I'm the one that received
18 them, but I certainly saw them.
19   Q. Okay.
20     (Bianchi Exhibits No. 11 and 12 were
21 marked by the court reporter.)
22 BY MR. CROWDER:
23   Q. Larry, do you have in front of you a
24 document that's been marked as your Exhibit No. 11?

**Page 89**

1   A. Yes.
2   Q. Okay. And that's a letter to Tuscola
3 Furniture Group from the Old Line Life Insurance
4 Company?
5   A. That's correct.
6   Q. Okay. Dated December 4, 2000?
7   A. That's correct.
8   Q. Would this have -- would this be a
9 document that you recall receiving?
10   A. I don't recall receiving it, no.
11   Q. With respect to documents that would come
12 in that were addressed to Tuscola Furniture Group,
13 would there have been a custom and practice to try
14 to get those documents to you?
15   A. Yes. Yes.
16   Q. The address that's on there, Tuscola
17 Furniture Group, would that be for -- for this
18 letter to Tuscola Furniture Group, would that be an
19 address where you would typically receive letters?
20   A. Uh-huh, yes.
21   Q. Okay. So while you -- make sure I
22 understand. Did you say you recall receiving this
23 or not?
24   A. I don't see how anybody could say they

Page 110

1  A. No.
2     MR. SENECA: I'll object. The document
3  speaks for itself.
4  A. No, I wouldn't, because in terms of
5  referencing the reason why this document was
6  generated, it was generated because of a consignment
7  agreement that called for a joint collateral
8  assignment. So what I'm stating is I don't know the
9  law well enough to know that if you provided a
10 collateral -- a beneficial interest to one or the
11 other, if that excludes the other.
12 Q. Okay.
13 A. I don't know that it does that. I don't
14 know yes or no.
15 Q. Okay. You also don't know with respect to
16 Exhibit No. 7 how that document or -- how that
17 document got generated? In other words, you were
18 copied on it, but you don't know how it --
19 A. I know how it got generated because I
20 would hound Jim almost on a daily basis to provide
21 us with a further beneficial interest. This form
22 was generated because of my pressure on Jim Stilwell
23 to live up to the consignment agreement.
24 Unfortunately, the form that this takes isn't the

Page 111

1  exact form that's called for in the consignment
2  agreement.
3  Q. Okay. When you -- when you communicated
4  with American General after the -- after Jim
5  Stilwell's death and provided them documentation,
6  did you provide them a copy of the assignment and
7  assumption agreement that you made reference to?
8  A. I don't have knowledge of that.
9  Q. Your letter of June 11, 2003, does not
10 suggest you provided them an assignment/assumption
11 agreement.
12 A. I don't -- don't believe that I would have
13 at that time, but I don't know whether or not I did
14 at some previous time or at some time after that. I
15 am sure they have it now.
16 Q. When you say you're sure you have it
17 now --
18 A. Part of the filings in the case.
19 Q. Okay. But at the time that they -- at the
20 time that they processed the life insurance claim,
21 do you know whether or not you had provided it to
22 them?
23 A. I -- I don't know.
24 Q. And then the same thing with the actual

Page 112

1  consignment agreement between TFG and ACV. Do you
2  know whether or not you had provided that to --
3  A. I don't know.
4  Q. -- American General?
5  A. I don't know.
6  Q. If their records reflect that they don't
7  have it, would you believe that it's because you
8  hadn't given it to them?
9  A. No, I believe it's because they don't have
10 it.
11 Q. Okay. Do you know whether or not you had
12 again provided that to them at any time?
13 A. I don't. I don't know.
14 Q. Okay. So you can't testify one way or the
15 other as to whether or not you gave it to them?
16 A. No.
17 Q. Is that a correct statement?
18 A. That's a correct statement.
19    MR. CROWDER: I think that's all I've got.
20    MS. BEYERS: I've got just a very few
21 questions.
22    EXAMINATION BY
23    MS. BEYERS:
24 Q. Mr. Bianchi, I'd like you to look at your

Page 113

1  May 12, 2000, letter -- 2003 letter, I apologize. I
2  think it's your Exhibit No. 13.
3  A. Correct. Well, Stilwell 13.
4  Q. Stilwell 13. And Mr. Crowder was asking
5  you about that previously. In paragraph two of that
6  letter, you have here that the amount owed by
7  Amishland Country Village and guaranteed by James
8  and Margaret Stilwell is $512,974.50. That amount
9  includes the amount that TFG owes the bank; is that
10 correct?
11 A. Correct.
12 Q. And that's a true and correct statement?
13 A. That's correct.
14 Q. And he referenced exhibit or the amounts
15 -- the exhibit attached to the letter that says
16 Tuscola Furniture Group, LLC, amounts due from
17 Stilwells/ACV as of April 30th of 2003. Do you see
18 that attached to the letter?
19 A. Yes, I do.
20 Q. And he pointed out to you that the amounts
21 due to First Mid aren't specifically set forth on
22 that document.
23 A. Are not specifically set forth?
24 Q. Right. Are they on there? Well, strike

Page 114

that. At the time that this letter was submitted, First Mid was owed approximately $81,000; is that correct?
A. That's my understanding.
Q. And that amount was, in fact, included in this $512,974.50 figure; is that correct?
A. Let me caution you on one thing.
Q. Yeah, of course.
A. The amount of money that was owed to the bank had no bearing on the creation of this document. This document shows what's owed to Tuscola Furniture Group. The idea that we had a line of credit with the bank was a separate and distinct business transaction. So what we owed First Mid Illinois Bank at the time, which was tied to this business, okay, had we been -- you know, the amount of money here would act in satisfaction of the debts owed to Tuscola Furniture Group. Then it would be up to Tuscola Furniture Group to satisfy the debt with the bank.
Q. Okay. All right. But First Mid was owed pursuant to the consignment agreement at this time approximately $81,000?
A. Pursuant to our loan documents not

Page 115

necessary -- they were not a signatory to the consignment.
Q. Okay. But pursuant to your loan documents, they were owed approximately $81,000 at the time that this letter was signed by you?
A. $81,000 on transactions that had involved our financial relationship with Amishland Country Village, yes.
Q. Okay. And that's why it's represented here in paragraph two that that was part of the $512,974.50; is that correct?
A. State that again.
Q. I'm sorry, and that's why here in paragraph two you stated that the amounts TFG owes the bank are included in the 512.974.50?
A. It's there to state that that payment would satisfy all the debts owed to us and therefore we could satisfy the bank.
Q. Okay.
A. And the distinction I want to make is that there was no money owed by Amishland Country Village to the bank. It was owed to us.
Q. And then in turn, you were to pay that to the bank.

Page 116

A. Correct.
Q. And what was contemplated under the consignment agreement was that there would be these beneficial interests or these assignments of the beneficial interest in life insurance policies to secure that amount that was owed to the bank.
A. I'm going to amend your statement. We had looked for one assignment. There were not to be multiple assignments. The one assignment was to be to Tuscola Furniture Group and First Mid Illinois Bank or actually the consignment agreement says the bank --
Q. Sure.
A. -- which happened to be First Mid Illinois Bank.
Q. First Mid.
A. Had -- had that assignment been properly presented, we wouldn't be here today.
Q. But First Mid did have an assignment for $1 million; is that correct?
A. I've seen the document that states that.
Q. Okay. And they were paid what they were owed by TFG out of the proceeds from the life insurance policies; is that correct?

Page 117

A. I don't know exactly what the flow of funds were, but my understanding is that TFG was paid and then the bank was paid by TFG.
Q. Okay. And they were paid what they were owed, correct, by TFG?
A. As far as I know, yes.
Q. Okay.
A. You know what? In retrospect, I believe that the check -- I don't know if the check was a two-party check. Transactionally what I believe happened was that the bank received the check and either deposited it in our account and then made payment or took the money out and made payment and then put the balance in our checking account, but the net result was the same.
Q. Correct. I mean the bank --
A. The bank was paid.
Q. And you got the remainder --
A. Right.
Q. -- is that correct?
A. That's correct.
Q. Okay. Now, Mr. Bianchi, you were saying that you received some correspondence after you submitted your May 12th, 2003, letter from American