IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
STATE OF ILLINOIS

MARGARET J. STILWELL,          )
HALEY STILWELL, HEIDI          )
STILWELL, JAMIE STILWELL,      )
MEGAN STILWELL,                )
    Plaintiffs,                )
        -vs-                   )
AMERICAN GENERAL LIFE          )
INSURANCE COMPANY,             )
    Defendant.                 )
-----------------------------) No. 05-CV-02160
AMERICAN GENERAL LIFE          )
INSURANCE COMPANY,             )
    Third-Party Plaintiff      )
        -vs-                   )
FIRST MID ILLINOIS BANK &      )
TRUST, TUSCOLA FURNITURE       )
GROUP, LLC, JANKO              )
FINANCIAL GROUP, LLC,          )
    Third-Party Defendants.)
-----------------------------

CSR License No. 084-003038

DEPOSITION

    The deposition of MARGARET STILWELL, a
citizen of the State of Illinois, a witness of
lawful age; produced, sworn and examined upon her
corporeal oath, on the 9th day of February, 2007, at
the offices of Area Wide Reporting Service, 301 West
White Street, Champaign, Illinois, before June
Haeme, CSR, RMR, CRR, Notary Public in and for the
County of Ford and State of Illinois, as a witness
in a certain suit and matter now pending and
undetermined in the United States District Court for
the Central District of Illinois.



**AREA WIDE REPORTING (800)747-6789**

Page 2

Appearances:

Michael S. Seneca
Attorney at Law
Howard & Howard
One Technology Plaza, Suite 600
211 Fulton Street
Peoria, IL 61602-1350
Appearing for Tuscola Furniture Group
and Janko Financial Group

Rebecca M. Rothman
Attorney at Law
Wilson, Elser, Moskowitz, Edelman &
Dicker, LLP
120 North LaSalle Street, Suite 2600
Chicago, IL 60602
Appearing for American General Life

Jason M. Crowder
Attorney at Law
Heller, Holmes & Associates, P.C.
1101 Broadway Avenue
Mattoon, IL 61938
Appearing for Plaintiffs

Julie Beyers
Attorney at Law
Heavner, Scott, Beyers & Mihlar
111 E. Main Street, Suite 200
Decatur, IL 62523
Appearing for First Mid Illinois

Also Present: Larry Bianchi

Page 3

INDEX

| | Page |
|---|---|
| EXAMINATION BY MS. ROTHMAN | 4 |
| EXAMINATION BY MR. SENECA | 65 |
| EXAMINATION BY MS. BEYERS | 67 |

EXHIBITS

| | Page |
|---|---|
| Stilwell Exhibit No. 1 | 16 |
| Stilwell Exhibit No. 2 | 20 |
| Stilwell Exhibit No. 3 | 23 |
| Stilwell Exhibit No. 4 | 25 |
| Stilwell Exhibit No. 5 | 27 |
| Stilwell Exhibit No. 6 | 28 |
| Stilwell Exhibit No. 7 | 29 |
| Stilwell Exhibit No. 8 | 32 |
| Stilwell Exhibit No. 9 | 46 |
| Stilwell Exhibit No. 10 | 47 |
| Stilwell Exhibit No. 11 | 48 |
| Stilwell Exhibit No. 12 | 52 |
| Stilwell Exhibit No. 13 | 57 |
| Stilwell Exhibit No. 14 | 58 |
| Stilwell Exhibit No. 15 | 58 |
| Stilwell Exhibit No. 16 | 59 |
| Stilwell Exhibit No. 17 | 60 |
| Stilwell Exhibit No. 18 | 45 |
| Stilwell Exhibit No. 19 | 45 |
| Stilwell Exhibit No. 20 | 66 |

Page 4

1       (Commencing at 10:55 a.m.)
2           MARGARET STIWELL,
3  the deponent herein, called as a witness, after
4  having been first duly sworn, was examined and
5  testified as follows:
6       EXAMINATION BY
7       MS. ROTHMAN:
8    Q. Mrs. Stilwell, can you state your full
9  name for the court reporter please?
10   A. **Margaret Jo Stilwell.**
11   Q. Let the record reflect this is the
12 discovery deposition of Margaret Jo Stilwell taken
13 pursuant to notice and continued to today's date by
14 agreement of the parties. This deposition will be
15 taken in accordance with the federal rules of civil
16 procedure and all local applicable rules.
17      Mrs. Stilwell, my name is Becky Rothman.
18 I'm going to introduce myself again. I represent
19 American General Life Insurance Company, the
20 defendant in the claim that you have filed.
21      Have you ever given a deposition before?
22   A. **No.**
23   Q. Okay. Have you ever testified before?
24   A. **Not that I remember.**

Page 5

1    Q. Okay. Never testified in court before?
2    A. **Not that I remember.**
3    Q. Okay. Is there anything that would --
4  strike that. Are you taking anything that would
5  affect your memory today?
6    A. **No.**
7    Q. Okay. Do you have any known conditions
8  that affect your memory?
9    A. **No.**
10   Q. Okay. You just don't remember if you've
11 testified. Is that a fair statement?
12   A. **Well, you know, like -- seems like a long
13 time ago maybe there was a car accident and I might
14 have had to say something, but I don't remember for
15 sure.**
16   Q. Okay, fair enough. I'm going to run down
17 some rules for deposition. Your counsel may have
18 gone over them with you already, but I'm going to do
19 it again so that we're all on the same page, okay?
20      All of your responses have to be audible
21 so that the court reporter can take it down. I'm
22 going to be asking questions, you're going to be
23 answering my questions, and she's going to be
24 recording what we say here today.

Page 18

1 and he was a teacher and coach there, so I knew him
2 then.
3   Q. Okay. When was that?
4   A. Probably somewhere between 19 -- after '74
5 and '80, somewhere in there.
6   Q. Okay. So you -- you have a -- well,
7 strike that. Had Mr. Lyons been your insurance
8 agent for a while?
9   A. We took out a policy with him for our --
10 to protect each other when we got married. After we
11 got married I guess.
12   Q. Right. And did you have any dealings
13 directly with Mr. Lyons after you got married after
14 you took out that insurance policy?
15   A. He's the only agent we used.
16   Q. Okay. And was he --
17   A. As far as I know.
18   Q. -- the agent that you used in general for
19 your business for liability insurance and that sort
20 of thing?
21   A. As far as I -- I think so.
22   Q. Okay. Get your car insurance --
23   A. Oh, no.
24   Q. No? Another agent for your car insurance?

Page 19

1   A. Yes. We used Diamond Brothers for our car
2 insurance and our house insurance. I'm not sure if
3 we originally had some with him because Jim usually
4 took care of that.
5   Q. Okay.
6   A. I know later on Diamond Brothers in Arcola
7 was the one that we used for car and house
8 insurance.
9   Q. All right. If I told you that there's
10 documentation that I've reviewed that exists to
11 suggest that the purpose of the $4 million policy
12 that was issued was issued to assist in funding
13 business expenses relating to ACV, would you have
14 any reason to disagree with that statement?
15   A. I -- all I would know as far as that is
16 what -- the specific designation that John Lyons
17 explained to me in certain sections.
18   Q. Can you explain what you mean by that?
19   A. There was so much -- so much issued to
20 each -- to separate entities.
21   Q. And this is a conversation that you had
22 after your husband passed away; is that right?
23   A. Right.
24   Q. Okay. I'll come back to that. Let me

Page 20

1 show you --
2       (Stilwell Exhibits No. 2 through 7 were
3 marked by the court reporter.)
4 BY MS. ROTHMAN:
5   Q. Margaret, you've got a stack of exhibits
6 in front of you that we just marked and we have now
7 gone through. The first document, Exhibit 2 for
8 your deposition, is a document titled Consignment
9 Agreement dated April 16th, 1999. Do you recognize
10 that document?
11   A. No.
12   Q. Okay. Do you have any idea what this
13 document is about?
14   A. No. I mean it says consignment.
15   Q. Okay. Do you have any understanding or
16 any knowledge of the financing agreement between ACV
17 and Janko to fund furniture inventory for ACV?
18   A. I know there was some agreement, but Jim
19 took care of it and worked it out with them. I was
20 -- wasn't involved in the decision.
21   Q. Okay. Turning to Exhibit 2 which is Bates
22 stamped -- you see the Bates stamps at the bottom?
23 It's 308. See the first page?
24   A. Yes.

Page 21

1   Q. If you turn to 319 -- you're jumping ahead
2 of me there. I'll ask you about that one in a
3 second.
4       Turn to page 319. Do you recognize your
5 husband's signature on that document? On page 319.
6   A. It's not very clear, but it looks like it.
7   Q. Okay. You've got no reason to believe
8 that's not his signature?
9   A. No, I don't.
10   Q. Okay. And the same thing on 320?
11   A. Correct.
12   Q. Okay. Attached to this document is a
13 document called -- that's guaranty.
14   A. Yes.
15   Q. Bates stamp 321 and 322. Do you see that?
16   A. Yes.
17   Q. If you turn to 322, do you recognize your
18 signature on that document?
19   A. Yes, I do.
20   Q. Okay. Do you have any independent
21 recollection of signing this document?
22   A. My recollection is of signing documents
23 that Jim informed me I needed to sign. I don't
24 remember dates or -- and I really didn't take time

## Page 22

1  to read them, so --
2   Q. Okay. There was nothing that precluded
3  you from reading this document that you signed; is
4  that right?
5   A. Probably not, except shortage of time.
6   Q. Okay. Shortage of time meaning --
7   A. We were always busy.
8   Q. Okay. Busy at your job, in other words?
9   A. Correct.
10  Q. Okay.
11  A. And because when he told me to sign
12 something, I did.
13  Q. All right. Do you have any understanding
14 of what -- what this document is, this guaranty?
15     MR. CROWDER: And she's speaking
16 specifically of --
17  Q. Of the document you signed, 321 and 322.
18  A. I mean if I read it, I'm -- could probably
19 understand it, but at the time I signed it because
20 Jim said I needed to.
21  Q. Okay. Do you recall -- strike that. From
22 time to time in the business of ACV, would Jim come
23 to you and tell you you needed to sign documents and
24 you would sign them; is that right?

## Page 23

1   A. Yes.
2   Q. And he ran the business aspect of that?
3   A. Yes.
4   Q. You just basically did what you were told;
5  is that right?
6   A. Yes. Well, I did my job. My part was
7  basically to do other things other than business
8  agreements.
9   Q. Okay. You left that to him.
10  A. I mean there were certain businesses like
11 grants and sales and travel shows and other things
12 other than this.
13  Q. I understand. With respect to the
14 financing of the business, that was Jim's area --
15  A. Correct.
16  Q. -- correct? Okay. Looking at the next
17 exhibit in front of you, Exhibit No. 3, do you
18 recognize your signature on that document?
19  A. Yes, I do.
20  Q. Okay. Do you recall from time to time
21 being asked to sign documents which assigned your
22 rights under the life insurance policies that were
23 issued on the life of your husband to various
24 creditors of ACV?

## Page 24

1     MR. CROWDER: Do you understand the
2  question?
3   A. Say that again.
4   Q. Sure.
5     MS. ROTHMAN: Would you read back the
6  question?
7     (Requested portion of the deposition was
8  read by the court reporter.)
9   A. I was aware that we had designations for
10 certain monies from the life insurances that I had
11 signed. I don't remember when they were, but I was
12 aware they did -- Jim came through and he'd tell me
13 and I signed them.
14  Q. Your husband would present you with a
15 document, say would you sign this, and you would
16 sign it?
17  A. Or he would say -- he would either present
18 me with a document that said it needed to be signed
19 or tell me I needed to go somewhere and sign
20 something.
21  Q. Okay. And where would you go and sign it?
22 Did you go to Mr. Lyons's office?
23  A. That's very -- that's a possibility.
24  Q. You just -- you have no independent

## Page 25

1  recollection as you sit here today?
2   A. Not of individual things. It's been too
3  long.
4   Q. Okay. Looking at document Exhibit 3 in
5  front of you, do you recognize your signature on
6  that document?
7   A. Yes.
8   Q. Okay. Exhibit 4, do you have any
9  independent recollection of executing this document?
10 And if you turn the page --
11  A. It was the same story. It was something
12 that that is my signature and it would have been
13 something that Jim told me I needed to sign.
14  Q. Okay. And that was basically all you
15 knew.
16  A. Correct.
17  Q. Okay. The next document is a group
18 exhibit labeled Amishland Country Village
19 Consignment Documents, and is it a fair statement to
20 say that you were not directly involved in this
21 business transaction?
22  A. Correct.
23  Q. Okay. And you don't have much of any
24 knowledge of the -- this consignment agreement?

Page 26

1 A. I knew we had a consignment agreement. I
2 didn't know information that would be all of this,
3 all of the -- all of the documents that are in this
4 exhibit.
5 Q. Okay. What was your understanding of the
6 consignment agreement?
7 A. That we had one and that's all.
8 Q. Okay. And did you have an understanding
9 of what a consignment agreement was?
10 A. Well, I know what consignment means.
11 Q. Okay. And what -- what does it mean?
12 A. That somebody furnishes merchandise or
13 product and then they're reimbursed with
14 compensation for furnishing it financially.
15 Q. Okay. So was it your understanding that
16 the company named Tuscola Furniture Group was going
17 to be assisting you in furnishing you with furniture
18 inventory and then you would go ahead and sell that
19 through ACV?
20 A. That's what I said. That's the basic
21 knowledge I had and no details.
22 Q. Okay. Turning to the second page, which
23 is a document titled Consignment Agreement dated
24 November 17th, 2000, and it is Bates stamped 655

Page 27

1 through 666, do you recognize your husband's
2 signature on page 666?
3     MR. CROWDER: That's the same as Exhibit
4 2, isn't it?
5     MS. ROTHMAN: Exhibit 2 was the first
6 consignment agreement.
7 A. Yes, I recognize my husband's signature.
8 Q. Okay. The next page is another guaranty
9 document, 667 and 668. Do you see that?
10 A. Yes.
11 Q. And do you recognize your signature on
12 page 668?
13 A. Yes.
14 Q. And do you recognize your husband's
15 signature on that document?
16 A. Yes.
17 Q. Okay. Did you -- do you have any
18 independent recollection of executing this guaranty?
19 A. No.
20 Q. Okay. Do you have any understanding of
21 what this document means?
22     MR. CROWDER: The guaranty?
23     MS. ROTHMAN: Yeah.
24 A. Not really. I mean not the particulars.

Page 28

1 Q. Do you have an understanding that it means
2 that you're personally guarantying the debt of the
3 company, ACV?
4     MR. CROWDER: At this time or when she
5 signed it?
6 Q. At any time.
7 A. I know that a guaranty means that you are
8 guarantying the payment of something, but I don't
9 remember -- like I said before, I don't remember
10 particular dates or had not read the documents. I
11 just did what Jim told me to do.
12 Q. Okay. And there was nothing that
13 precluded you from reading this document?
14 A. No.
15 Q. Okay. Turning to Exhibit 6. You can put
16 that one away. Do you recognize this document?
17 A. I don't remember it, but I recognize my
18 signature.
19 Q. Okay. Can I ask you what you did today to
20 prepare for your deposition?
21 A. What I did today?
22 Q. Uh-huh. Or what you did -- strike that,
23 what you did to prepare for your deposition. Did
24 you look at any documents?

Page 29

1 A. No.
2 Q. Did you --
3 A. I didn't have access -- I don't -- I
4 didn't have these at home.
5 Q. Okay. Did you look at them at any time to
6 prepare for your deposition?
7 A. Well, back when I signed it.
8 Q. Okay. After you signed it?
9 A. No.
10 Q. Have you seen the document since you
11 signed it?
12 A. No.
13 Q. Okay. All right. But that is your
14 signature --
15 A. Yes, it is.
16 Q. -- on this document? All right. Do you
17 have any understanding or any knowledge as to why
18 you signed this document?
19 A. It looks like an assignment for life
20 insurance since it's from American General. No, you
21 know, I really -- I don't know. I don't see any
22 figures or anything, so I really don't know.
23 Q. Okay. Turning to Exhibit 7 -- can you put
24 Exhibit 6 away? Exhibit 7, you recognize your

Page 30

1 signature on that document?
2 A. Yes, I do.
3 Q. Okay. Do you have any independent
4 recollection of signing this document?
5 A. No.
6 Q. Okay. And would this be another one of
7 the documents that your husband would tell you you
8 had to sign --
9 A. Correct.
10 Q. -- and you signed? Okay. My
11 understanding from reviewing the documents that have
12 been produced in discovery is that at some point
13 Amishland Development -- well, strike that.
14   At some point, ACV started to have some
15 financial difficulties. Is that a true statement?
16 A. In reflection, it is. My husband did
17 dealings with business connections and business
18 people and did not really keep me advised of that.
19 Q. Okay. So at -- do you recall at some
20 point that you learned that there were some
21 financial difficulties?
22 A. Yes.
23 Q. Okay. When was that that you learned
24 that, you first learned that?

Page 31

1 A. I don't remember the exact date, but it
2 was after we had been in operation for quite
3 sometime.
4 Q. Okay. When did you start operating?
5 A. I think it was September. I mean I -- I
6 can't be quoted on this, but I think it was
7 September of 1999. I don't want to be --
8 Q. Okay.
9 A. -- pinpointed on it.
10 Q. Fair enough.
11   THE WITNESS: Was it?
12   MR. CROWDER: Margaret, you got to do the
13 best of your recollection and just tell Rebecca --
14 A. I think it was September 1999.
15 Q. That's fine. And I fully understand that
16 you -- your recollection is a little cloudy, and,
17 you know, this is just to the best of your
18 recollection.
19 A. Correct.
20 Q. Okay. That's fine. Do you recall being
21 sued by anybody in relation to your business?
22 A. I don't recall at this time.
23 Q. Pardon me?
24 A. I really can't recall at this time.

Page 32

1 Q. Okay.
2   (Stilwell Exhibit No. 8 was marked by the
3 court reporter.)
4   (Recess.)
5 BY MS. ROTHMAN:
6 Q. Looking at Exhibit 8 for your deposition,
7 does this actually -- this is a group exhibit
8 document Bates stamped 32 through 36 and then 47
9 through 74, I believe. Look at -- turning your
10 attention to document 47, Bates stamp 47, this is a
11 complaint for forcible entry and detainer filed by
12 Amishland Development against Amishland Country
13 Village, James Stilwell and Margaret Stilwell.
14   Does this refresh your recollection as to
15 whether at some point you were -- you and your
16 husband and company were sued over financial
17 difficulties?
18 A. I don't recall. I remember that we owed
19 money and they were -- had conversations, but I
20 don't recall this.
21 Q. Okay. You don't have any independent
22 recollection of being served with a lawsuit or being
23 personally named in a lawsuit?
24 A. No.

Page 33

1 Q. Okay. Flip to 34. 34 through 36 is an
2 answer that was filed on your behalf by a Richard
3 Broch. Do you have a recollection that Mr. Richard
4 Broch represented you?
5 A. Yes, he was our attorney for the business.
6 Q. Okay. And if you flipped to page 36, do
7 you see your signature on that page?
8 A. Yes.
9 Q. Okay. And did you have an opportunity to
10 review the complaint and your answer to the
11 complaint --
12 A. No.
13 Q. -- before you signed it?
14 A. No.
15 Q. You didn't have the opportunity to do
16 that?
17 A. Oh. I just didn't --
18 Q. Okay.
19 A. -- because of being busy.
20 Q. All right. Mr. Broch was your attorney
21 for the business, is that what you said?
22 A. He handled business affairs.
23 Q. Okay. So he -- how long had he been your
24 counsel?

Page 58

1  Q. Okay. What about with respect to the $4
2  million one?
3  A. I don't remember -- I'm sure there was a
4  discussion, but I don't recall what it was or how
5  much was discussed.
6  Q. Okay. Looking at Exhibit 14, simply
7  because we've marked it, have you ever seen this
8  document before?
9  A. Not to my recollection.
10 Q. Okay. In Exhibit 15, a letter of May 28,
11 2003, to John or to American General from John Lyons
12 stating that he was returning a check made payable
13 to you because you and your attorney decided you
14 wanted the money to be placed in an interest-bearing
15 checkbook. Do you recall that?
16 A. I remember the decision. I don't remember
17 the specific conversation.
18 Q. Okay. So at some point you received funds
19 under the $1 million policy, correct?
20 A. Correct.
21 Q. Okay. How much was that?
22 A. I don't remember the exact amount.
23 Q. How much was it generally?
24 A. Between 20 and 30 possibly.

Page 59

1  Q. Under the $1 million policy? You sure it
2  wasn't more like 600,000?
3  A. Oh, no, no. Oh, okay.
4  Q. It was approximately 600,000?
5  A. Yes.
6  Q. Okay. All right. Do you have any
7  recollection of any conversations you had with Mr.
8  Lyons at this point concerning the $4 million policy
9  and whether you were entitled to any money under the
10 $4 million policy?
11 A. No, I don't recall a specific
12 conversation. I do remember him telling me that any
13 balance was due to any -- any unused money would go
14 to myself and the girls.
15 Q. Okay. Flip to Exhibit 16. This is a
16 letter dated July 11 from American General to you.
17 Do you recall receiving this document?
18 A. No, I don't recall.
19 Q. Okay. Is that your -- your correct
20 address up there?
21 A. Yes.
22 Q. All right. You don't have any reason to
23 believe you didn't receive this document?
24 A. No.

Page 60

1  Q. All right. And it says enclosed is our
2  check for $25,354.98. Do you see that?
3  A. Uh-huh.
4  Q. All right. And at some point you received
5  a check under the $4 million for approximately
6  $25,000. Is that correct?
7  A. Correct.
8  Q. Okay. Flip to Exhibit 17. This is a memo
9  dated July 10th from American General to John Lyons.
10 Is that your signature on that page?
11 A. Yes.
12 Q. Okay. And this is basically just
13 confirmation of delivery of the check.
14     MR. CROWDER: I think that's a question
15 she wants you to answer.
16 Q. Actually I'll strike that.
17     MR. CROWDER: Okay. You're done with that
18 one?
19     MS. ROTHMAN: I'm done with that one.
20 Q. Do you recall what you did with the
21 proceeds, that $25,000 check you got? Do you recall
22 what it was that you did with that money?
23 A. No.
24 Q. Did you return it to American General?

Page 61

1  A. I don't recall.
2  Q. Okay. At some point you filed for
3  bankruptcy, correct?
4  A. Correct.
5  Q. Personal bankruptcy. Do you recall when
6  that was?
7  A. I don't remember the date.
8  Q. Okay. Did you receive a discharge? Is
9  that bankruptcy over?
10 A. No.
11 Q. Is it still pending?
12 A. Yes.
13 Q. Okay. Do you know if you received a
14 discharge?
15 A. I know I did not receive a discharge for
16 personal bankruptcy.
17 Q. All right. Do you have any agreement with
18 the trustee in bankruptcy, the trustee of your
19 bankruptcy estate, to pursue this case?
20 A. Yes.
21 Q. Okay. And can you tell me what that
22 agreement is?
23 A. I can't tell the particulars. You'd have
24 to talk to the attorney. I don't know.